# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

GRETCHEN S. STUART, M.D.; JAMES R.
DINGFELDER, M.D.; DAVID A. GRIMES,
M.D.; AMY BRYANT, M.D.; SERINA FLOYD,
M.D.; DECKER & WATSON, INC., d/b/a
PIEDMONT CAROLINA MEDICAL CLINIC;
PLANNED PARENTHOOD OF CENTRAL
NORTH CAROLINA; A WOMAN'S CHOICE
OF RALEIGH, INC.; PLANNED
PARENTHOOD HEALTH SYSTEMS, INC.;
TAKEY CRIST, M.D.; and TAKEY CRIST,
M.D., P.A., d/b/a CRIST CLINIC FOR
WOMEN, on behalf of themselves and their
patients seeking abortions,

                 Plaintiffs,

v.

JANICE E. HUFF, M.D., in her official capacity
as President of the North Carolina Medical
Board; ROY COOPER, in his official capacity as
Attorney General of North Carolina; LANIER M.
CANSLER, in his official capacity as Secretary
of the North Carolina Department of Health and
Human Services; JIM WOODALL, in his official
capacity as District Attorney ("DA") for
Prosecutorial District ("PD") 15B; TRACEY E.
CLINE, in her official capacity as DA for PD 14;
DOUG HENDERSON, in his official capacity as
DA for PD 18; BILLY WEST, in his official
capacity as DA for PD 12; C. COLON
WILLOUGHBY, JR., in his official capacity as
DA for PD 10; BENJAMIN R. DAVID, in his
official capacity as DA for PD 5; JIM O'NEILL,
in his official capacity as DA for PD 21; ERNIE
LEE, in his official capacity as DA for PD 4; and
their employees, agents, and successors,

                 Defendants.

CIVIL ACTION

Case No. _____

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiffs, by and through their undersigned attorneys, bring this complaint against the above-named Defendants, their employees, agents, and successors in office, and in support thereof allege the following:

## I.  INTRODUCTORY STATEMENT

1.  Plaintiffs bring this civil rights action, on behalf of themselves and their patients seeking abortion, under the U.S. Constitution and 42 U.S.C. § 1983 to challenge the constitutionality of North Carolina Session Law 2011-405 (House Bill 854 or "the Act"),[1] which adds a new Article – entitled the "Woman's Right to Know Act" – to Chapter 90 of the North Carolina General Statutes. *See* Act (adding Article 1I, to be codified at N.C. Gen. Stat. §§ 90-21.80 *et seq*.). The Act was ratified by the General Assembly on June 16, 2011, vetoed by Governor Perdue, and then enacted on July 28, 2011, upon legislative override of the veto. *See* Act, Sec. 3. The Act states that it "becomes effective 90 days after it becomes law and applies to claims for relief arising on or after October 1, 2011." Act, Sec. 3. Thus, the Act becomes effective October 26, 2011, and applies to claims arising on or after that date.

2.  Of particular relevance here, the Act adds two new requirements to North Carolina law. The first, found in Section 90-21.82, requires physicians or some of their agents to provide certain state-mandated information about abortion at least 24 hours in advance of the procedure. Plaintiffs challenge this "Informed Consent to Abortion"

---

[1] A copy of the Act is annexed hereto as Exhibit 1.

2

requirement as impermissibly vague, thereby violating their right to due process of law and chilling the provision of abortion services, in violation of their patients' rights.

3. The second requirement, found in Section 90-21.85, requires physicians or certain other limited individuals to perform an ultrasound at least four hours prior to the abortion and to use the woman's body – even against her wishes – to provide certain state-mandated, ideological information using images, sounds, and words. This "Display of Real-Time View Requirement" profoundly intrudes on the practice of medicine, forces providers to deliver ideological speech to patients, forces patients to allow their bodies to be treated as the source for government-mandated speech, treats women as less than fully competent adults, fails to further any legitimate state interests, and chills the exercise of constitutional rights and the provision of abortions.

4. Physicians or clinics who fail to comply with any one of the Act's myriad requirements could place their licenses at risk. In addition, the Act may also impose criminal penalties for failure to perform a medical procedure — and then deliver a visual and auditory message to the patient — that is mandated solely for the purpose of delivering the State's ideological message about the pregnant woman's medical decision-making.

5. The Act threatens irreparable injury to Plaintiffs and their patients and violates their rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution to due process, free speech, privacy, liberty, bodily integrity, and freedom from unreasonable searches and seizures.

3

6.     Plaintiffs seek declaratory and injunctive relief from those constitutional deprivations.

## II.     JURISDICTION AND VENUE

7.     Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331, 1343(a)(3).

8.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this Court.

9.     Venue is appropriate under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district and because Defendants Jim Woodall, Tracey E. Cline, Doug Henderson, and Jim O'Neill reside in this district.

## III.     PLAINTIFFS

10.     Plaintiff Gretchen Stuart, M.D., is a physician licensed to practice medicine in the State of North Carolina and is board-certified in obstetrics and gynecology.  She currently provides reproductive healthcare services, including abortions, in Chapel Hill. Dr. Stuart is appearing as a plaintiff in this action in her individual capacity.

11.     Plaintiff James R. Dingfelder, M.D., is a physician licensed to practice medicine in the State of North Carolina.  He is the owner of Eastowne OB/GYN and Infertility ("Eastowne"), located in Chapel Hill, North Carolina.  Dr. Dingfelder and Eastowne provide a full range of obstetrical and gynecological care, including medical and surgical abortions.

4

12. Plaintiff David A. Grimes, M.D., is a physician licensed to practice medicine in the State of North Carolina and is board-certified in obstetrics and gynecology and preventive medicine. He currently practices gynecology, including abortions, in Chapel Hill. Dr. Grimes is appearing as a plaintiff in this action in his individual capacity.

13. Plaintiff Amy Bryant, M.D., is a physician licensed to practice medicine in the State of North Carolina. She currently provides reproductive healthcare services, including abortions, in Chapel Hill. Dr. Bryant is appearing as a plaintiff in this action in her individual capacity.

14. Plaintiff Serina Floyd, M.D., M.S.P.H., is a physician licensed to practice medicine in the State of North Carolina. She practices at Duke University Medical Center in Durham and provides a range of reproductive health services, including general obstetrical and gynecological services and medical and surgical abortions. Dr. Floyd is appearing as a plaintiff in this action in her individual capacity.

15. Plaintiff Decker & Watson, Inc., provides reproductive health care services through the abortion clinic Piedmont Carolina Medical Clinic ("Piedmont Carolina"), located in Greensboro. Services provided by Piedmont Carolina include contraceptive services and counseling, testing for sexually-transmitted diseases, medical abortions, and surgical abortions.

16. Plaintiff Planned Parenthood of Central North Carolina ("PPCNC") is a not-for-profit corporation headquartered in Chapel Hill, North Carolina. PPCNC operates three health centers, located in Durham, Chapel Hill, and Fayetteville. PPCNC provides

5

a broad range of reproductive health services, including physical exams, pregnancy testing and options education, contraception and contraceptive education, testing for HIV and sexually transmitted infections ("STI") and STI treatment, and screening for cervical and breast cancer. PPCNC also provides abortion services at its health centers in Chapel Hill and Fayetteville.

17.    Plaintiff A Woman's Choice of Raleigh, Inc., is a health care facility in Raleigh, North Carolina, that provides a range of reproductive health care services, including contraceptive services and counseling, testing for sexually-transmitted diseases, medical abortions, and surgical abortions.

18.    Plaintiff Planned Parenthood Health Systems, Inc. ("PPHS") is a not-for-profit corporation headquartered in Raleigh, North Carolina. PPHS operates six health centers in North Carolina (located in Asheville, Charlotte, Greensboro, Raleigh, Wilmington, and Winston-Salem), as well as health centers in South Carolina, Virginia, and West Virginia. PPHS provides a broad range of reproductive health services, including physical exams, pregnancy testing and options education, contraception and contraceptive education, testing for HIV and STI's and STI treatment, and screening for cervical and breast cancer. PPHS also provides abortion services in North Carolina at its health centers in Wilmington and Winston-Salem.

19.    Plaintiff Takey Crist, M.D., is a physician licensed to practice medicine in the State of North Carolina. He is the owner of Crist Clinic for Women ("Crist Clinic"),

6

located in Jacksonville, North Carolina. Dr. Crist provides a range of reproductive health services, including medical and surgical abortions.

20. Plaintiff Takey Crist, M.D., P.A., d/b/a Crist Clinic for Women ("Crist Clinic"), is a general obstetrics/gynecology clinic located in Jacksonville, North Carolina. Crist Clinic provides a range of obstetrical and gynecological reproductive health care services, including general prenatal care, care for high risk pregnancies, routine check-ups, and medical and surgical abortions.

21. Each of the Plaintiffs intends to continue providing abortion services after the effective date of the Act. Absent injunctive relief from this Court, each of the Plaintiffs will be forced to provide those services in compliance with the Act, as described herein, or face the risk of civil suits, administrative penalties, and/or criminal penalties.

22. Each of the individual Plaintiffs sues on his or her own behalf and on behalf of his or her patients. Each of the facility Plaintiffs sues on its own behalf, on behalf of its physicians and staff, and on behalf of its patients seeking abortions.

## IV. DEFENDANTS

23. Defendant Janice E. Huff, M.D., is the President of the North Carolina Medical Board ("the Board"). The Board has the power to place physicians on probation, impose other sanctions, or suspend or revoke their licenses for a variety of acts or conduct, including "[p]roducing or attempting to produce an abortion contrary to law." N.C. Gen. Stat. § 90-14(a)(2). Defendant Huff is sued in her official capacity.

7

24.    Defendant Roy Cooper is the Attorney General of North Carolina.  He is authorized to seek injunctive relief for willful violations of the Act.  *See* Act, Sec. 1 (to be codified at N.C. Gen. Stat. § 90-21.88).  Defendant Cooper is sued in his official capacity.

25.    Defendant Lanier M. Cansler is the Secretary of the North Carolina Department of Health and Human Services ("the Department").  The Department regulates abortion clinics in North Carolina and is authorized to investigate complaints "relative to the care, treatment or complications of any patient."  *See* Tit. 10A N.C. Admin. Code Rule 14E.0101 *et seq.*  Defendant Cansler is sued in his official capacity.

26.    Defendant Jim Woodall is the District Attorney for Prosecutorial District 15B. He is responsible for criminal prosecutions of the Act occurring within Prosecutorial District 15B, including in the town of Chapel Hill.  *See* N.C. Const. art. IV, § 18(1); N.C. Gen. Stat. §§ 7A-60, 7A-61.  Defendant Woodall is sued in his official capacity.

27.    Defendant Tracey E. Cline is the District Attorney for Prosecutorial District 14.  She is responsible for criminal prosecutions of the Act occurring within Prosecutorial District 14, including in the city of Durham.  *See* N.C. Const. art. IV, § 18(1); N.C. Gen. Stat. §§ 7A-60, 7A-61.  Defendant Cline is sued in her official capacity.

28.    Defendant Doug Henderson is the District Attorney for Prosecutorial District 18.  He is responsible for criminal prosecutions of the Act occurring within Prosecutorial District 18, including in the city of Greensboro.  *See* N.C. Const. art. IV, § 18(1); N.C. Gen. Stat. §§ 7A-60, 7A-61.  Defendant Henderson is sued in his official capacity.

8

29.     Defendant Billy West is the District Attorney for Prosecutorial District 12. He is responsible for criminal prosecutions of the Act occurring within Prosecutorial District 12, including in the city of Fayetteville. *See* N.C. Const. art. IV, § 18(1); N.C. Gen. Stat. §§ 7A-60, 7A-61. Defendant West is sued in his official capacity.

30.     Defendant C. Colon Willoughby, Jr. is the District Attorney for Prosecutorial District 10. He is responsible for criminal prosecutions of the Act occurring within Prosecutorial District 10, including in the city of Raleigh. *See* N.C. Const. art. IV, § 18(1); N.C. Gen. Stat. §§ 7A-60, 7A-61. Defendant Willoughby is sued in his official capacity.

31.     Defendant Benjamin R. David is the District Attorney for Prosecutorial District 5. He is responsible for criminal prosecutions of the Act occurring within Prosecutorial District 5, including in the city of Wilmington. *See* N.C. Const. art. IV, § 18(1); N.C. Gen. Stat. §§ 7A-60, 7A-61. Defendant David is sued in his official capacity.

32.     Defendant Jim O'Neill is the District Attorney for Prosecutorial District 21. He is responsible for criminal prosecutions of the Act occurring within Prosecutorial District 21, including in the city of Winston-Salem. *See* N.C. Const. art. IV, § 18(1); N.C. Gen. Stat. §§ 7A-60, 7A-61. Defendant O'Neill is sued in his official capacity.

33.     Defendant Ernie Lee is the District Attorney for Prosecutorial District 4. He is responsible for criminal prosecutions of the Act occurring within Prosecutorial District 4, including in the city of Jacksonville. *See* N.C. Const. art. IV, § 18(1); N.C. Gen. Stat. §§ 7A-60, 7A-61. Defendant Lee is sued in his official capacity.

9

## V.    STATUTORY FRAMEWORK

### Current Statutory and Regulatory Requirements for Performance of Abortions

34.    Currently in North Carolina, a physician must obtain informed consent from each patient – including patients seeking abortions – prior to providing health care treatment. *See* N.C. Gen. Stat. § 90-21.13; *see also* Tit. 10A N.C. Admin. Code Rule 14E.0305(a).

35.    North Carolina has some specific legal requirements applicable only to the provision of abortions.  In particular, to gain and maintain certification from the Department of Health and Human Services as an abortion clinic, a facility must satisfy various requirements related to, *inter alia*, patient care, physical plant, staffing, equipment, and patient records.  *See* Tit. 10A N.C. Admin. Code Rule 14E.0101 *et seq.*

36.    As part of those requirements, certified facilities are required by regulation to provide specified information in addition to that required by N.C. Gen. Stat. § 90-21.13, including the name of the physician and whether or not the physician has hospital admitting privileges. Tit. 10A N.C. Admin. Code Rule 14E.0304(d).  In addition, an ultrasound examination must be performed for each patient scheduled for an abortion procedure in a certified facility and the results must be posted in the patient's medical record. Tit. 10A N.C. Admin. Code Rule 14E.0305(d).

37.    The Act adds numerous new requirements for the provision of abortions in North Carolina, in particular specific content and process requirements for obtaining informed consent, which must take place at least 24 hours before an abortion is

10

performed (Section 90-21.82) and requirements for the performance of an ultrasound for the purpose of providing a State-mandated message, which must take place at least four hours before an abortion is performed (Section 90-21.85). The Act also, *inter alia*, puts abortion providers at risk of lawsuits brought by not only a patient, but also a patient's sexual partner, spouse, parents, siblings, guardian, current licensed health care providers, and former licensed health care providers, as well as by the Attorney General. Section 90-21.88.

### The Act's "Informed Consent to Abortion" Requirement

38.    The Act provides that "consent to an abortion is voluntary and informed only if" the requirements set forth in Section 90-21.82 are satisfied. That section imposes requirements for the provision of specified information at least twenty-four hours before an abortion is performed. Section 90-21.82(1).

39.    Although Subsection (1) of Section 90-21.82 states that the required information can be provided by "a physician or qualified professional," it also states that some information has to be provided by "[t]he physician performing the abortion, qualified technician, or referring physician." At another place, it says that the information may be based on facts supplied by the woman "to the physician." *Id.* And yet another place requires the information to be provided "during a consultation in which the *physician* is able to ask questions of the patient and the patient is able to ask questions of the *physician.*" *Id.* (emphasis added).

11

40.   Specified additional information must also be provided to abortion patients by a physician or a "qualified professional" by telephone or in person 24 hours before the abortion, but this information may be provided by a tape recording "if provision is made to record or otherwise register specifically whether the woman does or does not choose to have the [State] materials given or mailed to her." Section 90-21.82(2).

41.   The referenced State materials are materials that the Act requires the Department of Health and Human Services to publish and make available on a state website, within 90 days of the effective date of the Act. Those materials must provide specified information. Sections 90-21.83, 90-21.84. In addition, the State materials must

> inform the woman of the probable anatomical and physiological characteristics of the unborn child at two-week gestational increments from the time a woman can be known to be pregnant until full term, including pictures or drawings representing the development of the unborn child at two-week gestational increments. The pictures shall contain the dimensions of the unborn child, information about brain and heart functions, the presence of external members and internal organs, and be realistic and appropriate for the stage of pregnancy depicted.

Section 90-21.83(a)(2).

42.   The Act defines the term "qualified professional" to mean "[a]n individual who is a registered nurse, nurse practitioner, or physician assistant licensed in accordance with Article 1 of this Chapter, or a qualified technician acting within the scope of the qualified technician's authority as provided by North Carolina law and under the supervision of a physician." Section 90-21.81(8).

43.   Before the abortion can be performed, the woman must certify in writing that the information required by subsections (1) and (2) of Section 90-21.82 was furnished to

12

her and that she was informed of her opportunity to review the State materials. Section 90-21.82(3). The original of that certification must be maintained in the woman's medical file, she must be given a copy, and "[b]efore the performance of the abortion, the physician who will perform the abortion or the qualified technician" must receive a copy of it. Sections 90-21.82(3), (4).

44.    The Act also requires that the information which must be provided under Section 90-21.82 must be presented in a specified manner "to ensure that the woman is not the victim of a coerced abortion." Section 90-21.90(a). In addition, before an abortion is performed, a physician or qualified professional is required to "read the materials" referenced in Section 90-21.82 to the woman "in a language she understands" if the woman is "unable to read the materials." Section 90-21.90(b).

The Act's "Display of Real-Time View Requirement"

45.    The Act dramatically alters the existing ultrasound requirement for abortions, by adding a new "[d]isplay of real-time view requirement." *See* Section 90-21.85. The Act mandates that either "the physician who is to perform the abortion" or a "qualified technician working in conjunction with the physician" perform "an obstetric real-time view of the unborn child on the pregnant woman" at least four hours before an abortion is performed for that woman and before any anesthesia or medication is administered to her in preparation for performing an abortion. Section 90-21.85(a), (a)(1). In conjunction with performing that "obstetric real-time view of the unborn child," the physician or qualified technician is required to take other specified steps, as detailed below. Section

13

90-21.85(a)(1)-(6). The Act states that these mandated actions must be taken "in order for the woman to make an informed decision" about her abortion. Section 90-21.85(a).

46. The Act defines "display a real-time view of the unborn child" as meaning "[a]n ultrasound or any more scientifically advanced means of viewing the unborn child in real time." Section 90-21.81(4). The Act defines "qualified technician" as "[a] registered diagnostic medical sonographer who is certified in obstetrics and gynecology by the American Registry for Diagnostic Medical Sonography (ARDMS) or a nurse midwife or advanced practice nurse practitioner in obstetrics with certification in obstetrical ultrasonography." Section 90-21.81(9).

47. The physician or qualified technician performing the required display must "[d]isplay the images so that the pregnant woman may view them." Section 90-21.85(a)(3). The image must be of a quality consistent with the current standard medical practice of North Carolina abortion providers. Section 90-21.85(a)(2).

48. The physician or qualified technician must also provide a simultaneous, detailed "explanation of what the display is depicting," which must include "the presence, location, and dimensions" of the embryo or fetus within the uterus. Section 90-21.85(a)(2). In addition, the physician or qualified technician must provide a "medical description of the images, which shall include the dimensions of the embryo or fetus and the presence of external members and internal organs, if present and viewable." Section 90-21.85(a)(4).

14

49. The Act additionally mandates that the physician or qualified technician offer the woman "the opportunity to hear the fetal heart tone." Section 90-21.85(a)(2). The Act further states that the "auscultation of fetal heart tone shall be of a quality consistent with the standard medical practice in the community." *Id.*

50. The Act states that "[n]othing in [Section 90-21.85] shall be construed to prevent a pregnant woman from averting her eyes from the displayed images or from refusing to hear the simultaneous explanation and medical description." Section 90-21.85(b).

51. The Act additionally states that "[i]f the woman has had an obstetric display of a real-time image of the unborn child within 72 hours before the abortion is to be performed, the certification of the physician or qualified technician who performed the procedure in compliance with this subsection shall be included in the patient's records and the requirements under this subsection shall be deemed to have been met." Section 90-21.85(a).

<u>Liability Under the Act</u>

52. The Act provides for two types of civil remedies for some violations of the Act. Section 90-21.88. First, a damages action may be brought "against the person who performed the abortion in knowing or reckless violation of [the Act]" by the woman who had the abortion and/or by "any father of an unborn child that was the subject of an abortion." Section 90-21.88(a). In addition, "[a]ny person upon whom an abortion has

15

been attempted may maintain an action for damages against the person who performed the abortion in willful violation of this Article." *Id.*

53. Second, an action seeking an injunction to "prevent the abortion provider from performing or inducing further abortions" in North Carolina in violation of the Act may be brought against "any person who has willfully violated" the Act, by any of the following persons: "(i) the woman upon whom an abortion was performed or attempted to be performed in violation of this Article, (ii) any person who is the spouse, parent, sibling, or guardian of, or a current or former licensed health care provider of, the woman upon whom an abortion has been performed or attempted to be performed in violation of this Article, or (iii) the Attorney General." Section 90-21.88(b).

54. Physicians who fail to comply with the Act are at risk of disciplinary penalties by the State Medical Board, including possible loss of medical license. *See* N.C. Gen. Stat. § 90-14. Licensed clinics that fail to comply may be the subject of complaints that will be investigated by their licensing agency, the Department of Health and Human Services.

55. By including the phrase "notwithstanding G.S. 14-45.1," in Section 90-21.85, the Act appears to provide that performing an abortion in violation of the Display of Real-Time View Requirement would constitute performance of an abortion in violation of North Carolina General Statutes Section 14-44 and/or Section 14-45, thus giving rise to potential felony criminal liability as well. *See* N.C. Gen. Stat. §§ 14-44, 14-45, 14-45.1; *see also* Act, Sec. 1, § 90-21.85. Section 14-45.1 of the North Carolina General

16

Statutes is the section of the criminal code that defines the circumstances under which abortions are not criminal. N.C. Gen. Stat. § 14.45.1; *see also id.* §§ 14-44, 14-45.

## VI. FACTUAL ALLEGATIONS

### Abortion Background

56. Legal abortion is a very safe medical procedure; it is one of the safest procedures in contemporary medical practice. Major complications from abortion are very rare. Abortion through 20 weeks of pregnancy is significantly safer than pregnancy and childbirth.

57. Abortions may be performed by surgical or medical means. Medication abortion (also called "medical abortion") involves the administration of medication(s) to induce an abortion.

58. Women seek abortions for a variety of psychological, emotional, medical, familial, economic, and personal reasons.

59. The vast majority of abortions in North Carolina are performed in the first trimester of pregnancy.

60. It is not standard medical practice for abortion providers to make fetal heart auscultation audible. Therefore, many abortion providers do not have equipment that will make fetal heart auscultation audible. At very early gestational ages, it may not be possible to make fetal heart auscultation audible to the pregnant woman using any equipment.

17

61.     Studies have shown that abortion poses little risk of negative psychological consequences or *sequelae* for women of all ages, and this risk is lower than that associated with childbirth.

62.     Although abortion is a very safe procedure, its medical risks increase with gestational age.

The Impact of the Display of Real-Time View Requirement on the Practice of Medicine

63.     In providing medical care, healthcare providers have an obligation to comply with standards of medical ethics. Central tenets of the standards of medical ethics provide that the physician may not act upon the patient without her consent; that the physician must respect the patient's autonomy; and that the physician must act in the patient's best interests. Unless requested by the patient, as a matter of medical ethics, it is inappropriate for a physician to interject into the patient's decision-making process the physician's own value-based views or the value-based views of the government or any other third party. By requiring physicians to display images and provide information against a patient's wishes, the Display of Real-Time View Requirement requires physicians to violate each of these ethical obligations.

64.     The Display of Real-Time View Requirement conflicts with prevailing standards of medical practice to the extent that it prohibits anyone other than a physician or a "qualified technician," as defined by the Act, from performing the ultrasound mandated by the Act. Ultrasounds performed prior to abortions are performed to

18

determine the presence of an intrauterine pregnancy and to determine the gestational age of the pregnancy. It is common, acceptable medical practice for a trained, but non-certified, individual to perform such an ultrasound, the results of which are reviewed by the physician. The Act's limited definition of "qualified technician" is not in line with the standard of care for an ultrasound performed prior to an abortion.

65. The ultrasound required by the Act differs from the ultrasound currently performed as part of standard medical practice for the provision of abortion in North Carolina in the following ways, among others: the purpose for which the ultrasound must be performed; the limitations on who can perform the ultrasound; the time at which the ultrasound must be performed; the requirement that the image be placed in the patient's view; the requirements for provision of explanations and descriptions of the images; and the requirements regarding fetal heart tone.

### Other Impacts of the Display of Real-Time View Requirement on Women Seeking Abortions and Abortion Providers

66. The Display of Real-Time View Requirement will compel physicians or qualified technicians to deliver government-mandated speech to their patients. This speech consists of both actual speech (verbal explanations and descriptions) and symbolic speech (displaying ultrasound images, requiring the woman to wait four hours, requiring the woman's certification).

67. The speech and experiences which the Display of Real-Time View Requirement compels physicians or qualified technicians to convey to their patients are

19

inconsistent with general principles of informed consent and medical ethics. Moreover, they are aimed at interjecting the State's ideological viewpoint regarding the decision the pregnant woman should make and how she should prioritize the potential life of the fetus over all other factors in her life (*e.g.*, medical conditions, existing family obligations, socio-economic circumstances). The Display of Real-Time View Requirement conveys to the woman the State-mandated message that she should prioritize the fetus (and the continued life of the fetus) above all other considerations.

68. Similarly, the Display of Real-Time View Requirement will expose abortion patients to delivery, by their physicians or qualified technicians, of unwanted government-mandated speech. This compulsion will take place in a private medical setting and must occur in order for the patients to receive their desired health care.

69. The Display of Real-Time View Requirement will compel women seeking abortions to receive, and physicians or qualified technicians to provide, an experience and information that the women consider unwanted and/or immaterial.

70. The Display of Real-Time View Requirement requires the performance of a medical procedure for the purpose of conveying the State's ideological message to women seeking abortions.

71. The Display of Real-Time View Requirement requires women seeking abortions to allow their bodies to be used for the purpose of generating images and information to facilitate the State's ideological message. Moreover, the Display of Real-

20

Time View Requirement requires physicians or qualified technicians to use their patients' bodies for that purpose.

72.     The Display of Real-Time View Requirement may require some abortion patients to undergo a second, medically unnecessary ultrasound in order to obtain an abortion.

73.     The Display of Real-Time View Requirement is not rationally related to any legitimate government interest.

74.     All women have a reasonable expectation of privacy in their bodies, which the government is obligated to respect. Requiring health care providers to intrude upon that expectation for no valid medical reasons constitutes an unreasonable intrusion upon that expectation of privacy.

<u>The Act's Failure to Provide Adequate Notice of its Requirements</u>

75.     The Act imposes a number of vague requirements or prohibitions that fail to give Plaintiffs notice of how to conform their conduct to the law. These include, but are not limited to, the examples set forth in the next several paragraphs.

76.     The Display of Real-Time View Requirement is vague as to whether failure to comply with its requirements and prohibitions exposes abortion providers to the risk of criminal penalties. The Act is placed within the section of the code regulating the practice of medicine and the only new penalties it explicitly adds are civil. *See* Section 90-21.88. However, Section 90-21.85 states that "notwithstanding G.S. 14-45.1, except in the case of a medical emergency, in order for the woman to make an informed

21

decision" the requirements specified in Section 90-21.85 must be met.  *See* Section 90-21.85.  Section 14-45.1 of the North Carolina General Statutes is the section of the criminal code that defines the circumstances under which abortions are *not* criminal.  By including the reference to N.C. Gen. Stat. Section 14-45.1, the Act seemingly indicates that performing an abortion in violation of Section 90-21.85 would constitute performance of an abortion in violation of the criminal code, which is punishable as a felony.  *See* N.C. Gen. Stat. §§ 14-44, 14-45, 14-45.1; *see also* Act, Sec. 1, § 90-21.85.  However, no other section in the Act references any sections of the criminal code.  It is, therefore, unclear whether any, or which, provisions of the Act give rise to criminal liability.

77.    As discussed in Paragraph 39, *supra*, the Informed Consent to Abortion Requirement contains numerous internal contradictions that make it unclear whether the requirements of subdivision (1) of Section 90-21.82 can all be satisfied by a qualified professional.

78.    The Act uses unclear terms in defining the phrase "qualified technician," thus leaving abortion providers uncertain as to who can perform the actions required by Section 90-21-85(a).   In particular, the meaning of the term "advanced practice nurse practitioner in obstetrics" is unclear.

79.    The Act requires that the physician or qualified technician "offer the pregnant woman the opportunity to hear the fetal heart tone," and, if she accepts that opportunity, make "the auscultation of fetal heart tone . . . of a quality consistent with the standard

22

medical practice in the community." Section 90-21.85(a)(2). Because it is not "standard medical practice" to make the heart tone audible prior to an abortion, it is not clear how Plaintiffs are to comply with this requirement.

80. Section 90-21.85(a) includes the statement: "If the woman has had an obstetric display of a real-time image of the unborn child within 72 hours before the abortion is to be performed, the certification of the physician or qualified technician who performed the procedure in compliance with this subsection shall be included in the patient's records and the requirements under this subsection shall be deemed to have been met." Section 90-21.85(a). The meaning of this statement and how it affects the requirements of Section 90-21.85 is unclear in many respects. It is unclear whether this statement imposes a requirement that the physician or qualified technician complete a certification in all situations, some situations, or no situations. It is unclear whether the referenced certification by the physician or qualified technician would be in place of or in addition to the certification the woman is required to provide under subsection (a)(5). It is unclear whether this statement imposes a limitation on how long before the abortion is performed the mandated ultrasound may be performed. It is unclear whether this statement references ultrasounds performed at any facility, including the facility where the woman obtains her abortion, or if it is intended as some sort of exception for situations in which the woman obtained an ultrasound at a facility that was not going to provide abortion services.

23

81.    At least 24 hours prior to an abortion, each woman must be told that she has the "right to review" certain State-printed materials.  Section 90-21.82(2)(e).  The woman may choose to view those materials on the Internet, have them given to her 24 hours in advance of the abortion, or have them sent certified mail at least 72 hours before the abortion.  *Id.*  The Act does not require her to actually *read* those materials, but the Act also states that if "a woman is unable to read" the materials, "a physician or qualified professional *shall read* the materials to the woman in a language the woman understands before the abortion."  Section 90-21.90(b) (emphasis added).  It is unclear when faced with a woman who cannot read the materials whether the provider has to only offer to read them to her or whether the provider must read them to her against her wishes.

Irreparable Harms

82.    The Act will inflict significant harm on the physician-patient relationship. For example, in situations where the Act requires a physician or qualified technician to subject a patient to an experience or information that the patient does not want, it puts the patient in a position of protecting or defending herself against something a medical provider is doing to her.

24

83.     The Act will harm the integrity of the medical profession and of abortion providers in North Carolina by forcing physicians and qualified technicians to take actions contrary to their ethical duties to act in their patients' best interests, with respect for their patients' autonomy, and with their patients' consent.

84.     The Act also threatens to inflict significant harm on the health and well-being of abortion patients. For example, in situations where the Act requires a physician or qualified technician to subject a patient to an experience or information that the patient has declined to accept, it will unnecessarily stress, upset, and/or anger her as she prepares to undergo a medical procedure. In addition, the Act will cause delays in obtaining an abortion.

85.     The Act will chill abortion providers in their provision of constitutionally-protected procedures by imposing vague standards under a law with disciplinary penalties, including possible loss of medical license, as well as possible criminal penalties.

86.     The Act will impose irreparable harms on patients who seek, and physicians who provide, abortions by depriving them of their constitutional rights to due process, free speech, privacy, liberty, bodily integrity, and freedom from unreasonable searches and seizures.

25

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
#### (Due Process of Laws)

87. The allegations of paragraphs 1 through 86 are incorporated as though fully set forth herein.

88. North Carolina Session Law 2011-405 (House Bill 854) violates the rights of Plaintiffs under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution because it fails to give Plaintiffs fair notice of the requirements of the Act and encourages arbitrary and discriminatory enforcement.

### SECOND CLAIM FOR RELIEF
#### (First Amendment Rights of Physicians)

89. The allegations of paragraphs 1 through 88 are incorporated as though fully set forth herein.

90. North Carolina Session Law 2011-405 (House Bill 854) violates the rights of Plaintiffs under the First Amendment, as applied through the Fourteenth Amendment, to the U.S. Constitution by forcing them to deliver unwanted, government-mandated speech; in particular, the Act compels physicians to convey to their abortion patients in a private medical setting unwanted government speech that falls outside accepted and ethical standards and practices for medical informed consent.

### THIRD CLAIM FOR RELIEF
#### (First and Fourteenth Amendment Rights of Patients)

91. The allegations of paragraphs 1 through 90 are incorporated as though fully set forth herein.

26

92.     North Carolina Session Law 2011-405 (House Bill 854) violates the rights of patients seeking abortions in North Carolina under the First and Fourteenth Amendments to the U.S. Constitution, by forcing them both to submit to a medical procedure for the purpose of subjecting them to unwanted, government-mandated speech that falls outside the accepted standards and practices for medical informed consent, and to submit to that government-mandated speech in a private setting as a condition of accessing a constitutionally protected medical service, in violation of their free speech, privacy, and liberty rights.

## FOURTH CLAIM FOR RELIEF
### (Fourteenth Amendment Right to Substantive Due Process)

93.     The allegations of paragraphs 1 through 92 are incorporated as though fully set forth herein.

94.     North Carolina Session Law 2011-405 (House Bill 854) violates the right of Plaintiffs and their patients to substantive due process, as guaranteed by the Fourteenth Amendment of the U.S. Constitution, by requiring them to comply with the Section 90-21.85, which is not rationally related to any legitimate government interest.

## FIFTH CLAIM FOR RELIEF
### (Fourteenth Amendment Right to Bodily Integrity)

95.     The allegations of paragraphs 1 through 94 are incorporated as though fully set forth herein.

96.     North Carolina Session Law 2011-405 (House Bill 854) violates the right to bodily integrity of women seeking abortions in North Carolina, guaranteed under the Due

27

Process Clause of the Fourteenth Amendment of the U. S. Constitution, by conditioning access to a constitutionally-protected medical service on the woman's submission to a specified type of ultrasound procedure that is not medically necessary or typically performed in connection with an abortion.

## SIXTH CLAIM FOR RELIEF
### (Fourth Amendment Rights of Patients)

97.     The allegations of paragraphs 1 through 96 are incorporated as though fully set forth herein.

98.     North Carolina Session Law 2011-405 (House Bill 854) violates the rights of women seeking abortions in North Carolina under the Fourth Amendment, as applied through the Fourteenth Amendment, to the U. S. Constitution by subjecting them – through the requirements of Section 90-21.85 – to an unreasonable, warrantless search and seizure.

## REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court:

1.     Issue a declaratory judgment that North Carolina Session Law 2011-405 (House Bill 854) is unconstitutional and unenforceable as a whole and/or in part;

2.     Issue permanent injunctive relief, without bond, restraining Defendants, their employees, agents, and successors in office from enforcing Session Law 2011-405 (House Bill 854) as a whole and/or in part;

28

3.    Grant Plaintiffs attorneys' fees, costs and expenses pursuant to 42 U.S.C. § 1988; and/or;

4.    Grant such other and further relief as this Court may deem just, proper, and equitable.

Dated:  September 29, 2011

Respectfully submitted,

*s/ Katherine Lewis Parker*
Katherine Lewis Parker
NC Bar #36263
Legal Director
American Civil Liberties Union
of North Carolina Legal Foundation
P.O. Box 28004
Raleigh, NC 27611
(919) 834-3466
(866) 511-1344 Fax
acluncklp@nc.rr.com

COUNSEL FOR ALL PLAINTIFFS

Bebe J. Anderson*
Senior Counsel
Center for Reproductive Rights
120 Wall Street, 14th Floor
New York, NY 10005
(917) 637-3687
(917) 637-3666 Fax
banderson@reprorights.org

COUNSEL FOR GRETCHEN S.
STUART, M.D., DAVID A. GRIMES,
M.D., AMY BRYANT, M.D., DECKER
& WATSON d/b/a PIEDMONT
CAROLINA MEDICAL CLINIC, & A
WOMAN'S CHOICE OF RALEIGH,
INC.

Andrew D. Beck*
Staff Attorney
American Civil Liberties Union
Foundation
125 Broad Street
New York, NY 10004
(212) 284-7318
(212) 549-2651 Fax
abeck@aclu.org

COUNSEL FOR JAMES R.
DINGFELDER, M.D., SERINA FLOYD,
M.D., TAKEY CRIST, M.D., & TAKEY
CRIST M.D., P.A. d/b/a CRIST CLINIC
FOR WOMEN

Helene T. Krasnoff*
Planned Parenthood Fed. of America
1110 Vermont Avenue NW, Suite 300
Washington, DC 20005
(202) 973-4800
helene.krasnoff@ppfa.org


COUNSEL FOR PLANNED
PARENTHOOD OF CENTRAL NORTH
CAROLINA & PLANNED
PARENTHOOD HEALTH SYSTEMS,
INC.

*Notice of Special Appearance to be Filed

30