# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

GRETCHEN S. STUART, M.D., et al.,    )
    )
       Plaintiffs,    )
    )
v.    )    CIVIL ACTION
    )
JANICE E. HUFF, M.D., et al.,    )    Case No. _____
    )
       Defendants.    )

## PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Katherine Lewis Parker, NC Bar #36263
Legal Director, American Civil Liberties Union
of North Carolina Legal Foundation
P.O. Box 28004
Raleigh, NC 27611
(919) 834-3466
acluncklp@nc.rr.com

COUNSEL FOR ALL PLAINTIFFS

Bebe J. Anderson, Senior Counsel*
Center for Reproductive Rights
120 Wall Street, 14th Floor
New York, NY 10005
(917) 637-3687
banderson@reprorights.org

COUNSEL FOR GRETCHEN S. STUART,
M.D., DAVID A. GRIMES, M.D., AMY
BRYANT, M.D., DECKER & WATSON
d/b/a PIEDMONT CAROLINA MEDICAL
CLINIC, & A WOMAN'S CHOICE OF
RALEIGH, INC.

Andrew D. Beck*
American Civil Liberties Union
125 Broad Street
New York, NY 10004
(212) 284-7318
abeck@aclu.org

COUNSEL FOR JAMES R. DINGFELDER,
M.D., SERINA FLOYD, M.D., TAKEY CRIST,
M.D., & TAKEY CRIST, M.D., P.A., d/b/a
CRIST CLINIC FOR WOMEN

Helene T. Krasnoff*
Planned Parenthood Fed. of America
1110 Vermont Avenue NW, Suite 300
Washington, DC 20005
(202) 973-4800
helene.krasnoff@ppfa.org

COUNSEL FOR PLANNED
PARENTHOOD OF CENTRAL NORTH
CAROLINA & PLANNED PARENTHOOD
HEALTH SYSTEMS, INC.

*Notice of Special Appearance to be Filed

# TABLE OF CONTENTS

TABLE OF AUTHORITIES............................................................................. i

INTRODUCTION............................................................................................ 1

FACTUAL BACKGROUND............................................................................ 2

QUESTIONS PRESENTED.............................................................................. 3

ARGUMENT..................................................................................................... 4

I.     Plaintiffs are Substantially Likely to Prevail on the Merits of Their Claims..... 4

     A.    The Display and Speech Requirement Unconstitutionally Compels
          Unwilling Speakers to Deliver the State's Message........................... 4

          1.    Compelled Speech is Subject to First Amendment Scrutiny.......... 4

          2.    The Act's Display and Speech Requirement Violates the First
               Amendment Rights of Health Care Providers........................... 5

          3.    The Analysis of the Informed Consent Provision in *Casey* Does
               Not Govern Here............................................................ 9

     B.    The Act is Impermissibly Vague................................................. 10

          1.    Who May Provide the Information Required by Section
               90-21.82................................................................... 12

          2.    Providing Written Materials to Those Who Cannot Read Them..... 13

          3.    What is an "Advanced Practice Nurse Practitioner in Obstetrics"?.. 14

          4.    Additional Vague Portions of Section 90-21.85....................... 15

     C.    The Act's Display and Speech Requirement Violates Due Process
          Because It Is Not Rationally Related to a Legitimate Government
          Objective..................................................................... 17

II.    Plaintiffs and Their Patients Will Suffer Irreparable Harm......................... 18

III.   The Balance Of Equities Favors Granting Preliminary Injunctive Relief......... 19

IV.   The Public Interest Favors Granting Preliminary Injunctive Relief................ 20

CONCLUSION................................................................................................ 20

CERTIFICATE OF SERVICE........................................................................ 22

## TABLE OF AUTHORITIES

**FEDERAL COURT CASES**                                                    **Page**

*Colautti v. Franklin*, 439 U.S. 379 (1979) ........................................................11

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998) ......................................17

*Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507 (4th Cir. 2002) ...............19, 20

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ............................................10

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
    515 U.S. 557 (1995) .....................................................................................4, 5

*Kolender v. Lawson*, 461 U.S. 352 (1983) .........................................................11

*Multimedia Pub. Co. of South Carolina, Inc. v. Greenville-Spartanburg*
    *Airport Dist.*, 991 F.2d 154 (4th Cir. 1993) .........................................17, 18

*Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249 (4th Cir. 2003) .................18

*Planned Parenthood of Cent. N.J. v. Farmer*, 220 F.3d 127 (3d Cir. 2000) .....................12

*Planned Parenthood of S.E. Penn. v. Casey*, 505 U.S. 833 (1992) ............................1, 9, 10

*Richmond Med. Ctr. for Women v. Gilmore*, 55 F. Supp. 2d 441 (E.D. Va. 1999),
    *aff'd*, 224 F.3d 337 (4th Cir. 2000) .............................................................11

*Riley v. Nat'l Fed'n of the Blind of North Carolina, Inc.*, 487 U.S. 781 (1988) .............4, 5

*Romer v. Evans*, 517 U.S. 620 (1996) .................................................................18

*Smith v. Goguen*, 415 U.S. 566 (1974) ........................................................10, 17

*Tex. Med. Providers Performing Abortion Servs. v. Lakey*, No. A-11-CA-486-SS,
    2011 WL 3818879 (W.D. Tex. Aug. 30, 2011) ...............................1, 8, 10

*United States v. Alexander*, 48 F.3d 1477 (9th Cir. 1995) .................................17

i

*United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803 (2000) .......................................5

*Williamson v. Lee Optical of Oklahoma*, 348 U.S. 483 (1955) ..........................................17

*Winter v. Natural Res. Def. Council*, 555 U.S. 7 (2008) ......................................................4

*Women's Med. Ctr. of Nw. Houston v. Bell*, 248 F.3d 411 (5th Cir. 2001) .......................12

*WV Ass'n of Club Owners & Fraternal Svs., Inc. v. Musgrave*,
    553 F.3d 292 (4th Cir. 2009)......................................................................................19

## STATE COURT CASES

*Nova Health Systems v. Pruitt*, No. CV 2010-533 (Okla. Dist. Ct. Aug. 3, 2010)..............2

## NORTH CAROLINA SESSION LAW

N.C. Session Law 2011-405 (House Bill 854, to be codified at N.C. Gen. Stat.
    § 90-21.80 to 90-21.92)................................................................................... *passim*

## NORTH CAROLINA STATUTES

N.C. Gen. Stat. § 90-14(a)(2).............................................................................................12

N.C. Gen. Stat. § 90-14-45.1..............................................................................................11

N.C. Gen. Stat. § 90-21.13 ...................................................................................................2

## NORTH CAROLINA REGULATIONS

10A N.C. Admin. Code 14E.0305 .........................................................................................2

21 N.C. Admin. Code 32M.0101 ........................................................................................14

## OTHER AUTHORITIES

Stedman's Medical Dictionary (27th ed. 2000) ..................................................................15

Case 1:11-cv-00804-CCE-LPA   Document 9   Filed 09/29/11   Page 4 of 26

# INTRODUCTION

Plaintiffs move for a temporary restraining order and preliminary injunction enjoining certain provisions of North Carolina Session Law 2011-405 (House Bill 854), to be codified at N.C. Gen. Stat. sections 90-21.80 to 90-21.92 (the "Act"), and to take effect October 26, 2011. *See* Act, sec. 3. Absent injunctive relief to maintain the status quo, the Act will irreparably harm women seeking abortions and abortion providers.

The Supreme Court, in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, ruled that a state may enact a law requiring women to receive some types of information 24 hours before they obtain an abortion. 505 U.S. 833 (1992). Some of the requirements in Section 90-21.82 are similar to those upheld in *Casey*, but the provision differs in ways that makes it unconstitutionally vague. And with Section 90-21.85, the "display and speech requirement," North Carolina has sought to impose on women requirements that are totally unlike any requirement considered by the Supreme Court. In particular, the State forces health care providers to use the body of each abortion patient to create imagery in order to deliver the State's message about the embryo or fetus and the woman's decision-making – all without regard to her circumstances. This profound and unconstitutional intrusion into the practice of medicine is far more extreme than, and qualitatively different from, any abortion law enforced in this country.[1]

---

[1] Only two states have enacted similar requirements and those have been enjoined. *See Tex. Med. Providers Performing Abortion Servs. v. Lakey*, No. A-11-CA-486-SS,2011 WL 3818879, at *23-32 (W.D. Tex. Aug. 30, 2011) (preliminarily enjoining, *inter alia*,

1

# FACTUAL BACKGROUND

Existing North Carolina law requires physicians to obtain informed consent from each abortion patient,[2] and each patient has an ultrasound examination prior to an abortion. *See* 10A N.C. Admin. Code 14E.0305(d) (2011). The purpose of the existing pre-abortion ultrasound is to confirm, locate, and date the patient's pregnancy; typically, at early gestational ages, a vaginal probe is inserted in the woman's vagina and, at later ages, an abdominal probe is placed on her abdomen. Stuart Decl. ¶ 10; Dingfelder Decl. ¶¶ 12-14. Patients can choose to view and/or ask questions about the ultrasound image. *See* Stuart Decl. ¶ 11; Dingfelder Decl. ¶ 15.

The Act dramatically alters the informed consent requirements, by specifying the information that the patient's medical providers must convey or make available to her and requiring her to then wait at least 24 hours before obtaining an abortion. *See* § 90-21.82.[3] But the Act mandates far more than a change to the informed consent process. It

---

requirements for display, explanation, and description of ultrasound images codified at Tex. Health & Safety Code Ann. §§ 171.012(a)(4)(B)-(D)); *Nova Health Systems v. Pruitt*, No. CV 2010-533 (Okla. Dist. Ct. Aug. 3, 2010) (preliminarily enjoining, *inter alia*, requirements for display, explanation, and description of ultrasound images codified at Okla. Stat. tit. 63, § 1-738.3d) (2011) (Order appended as Exhibit 1).

[2] *See* N.C. Gen. Stat. § 90-21.13 (requiring informed consent for all health care procedures); 10A N.C. Admin. Code 14E.0305(a) (requiring inclusion of consent form in each abortion patient's medical record).

[3] *See also* §§ 90-21.87, 90-21.90 (referencing § 90-21.82 as containing informed consent requirements). The state-produced material that the medical provider must make available to the patient 24 hours before she has an abortion concerns, *inter alia*, embryonic and fetal development and abortion risks. §§ 90-21.83, 90-21.84; *see also* §§ 90-21.82(1)e, (2)e.

2

also requires the woman to undergo the "display of real-time view of the unborn child" via "an ultrasound or any more scientifically advanced means." §§ 90-21.81(4), 90-21.85. "[I]n order for the woman to make an informed decision," either the physician "who is to perform the abortion or [a] qualified technician working in conjunction with the physician" must do each of the following at least four hours before "any part of an abortion is performed":

(1) perform "an obstetric real-time view of the unborn child on the pregnant woman" and display "the images so that [she] may view them";

(2) provide "a simultaneous explanation of what the display is depicting," which must include "the presence, location, and dimensions" of the embryo or fetus;

(3) provide a "medical description of the images, which shall include the dimensions of the embryo or fetus and the presence of external members and internal organs, if present and viewable"; and

(4) offer the woman "the opportunity to hear the fetal heart tone."

§ 90-21.85(a). The Act states that "[n]othing in [Section 90-21.85] shall be construed to prevent a pregnant woman from averting her eyes from the displayed images or from refusing to hear the simultaneous explanation and medical description." § 90-21.85(b).

## QUESTIONS PRESENTED

Are Plaintiffs likely to prevail on their claims that the Act violates constitutional rights of due process and speech?[4] Will Plaintiffs and their patients suffer irreparable

---

4 While Plaintiffs brief only several of their claims in this motion, they reserve their right to seek later rulings from this Court on all of the claims in their Complaint.

3

injury without preliminary injunctive relief?  Does the injury outweigh any injury to Defendants?  And, is the preliminary injunctive relief in the public interest?

**ARGUMENT**

A plaintiff seeking temporary or preliminary injunctive relief "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008).  Plaintiffs readily meet this test.

**I.  Plaintiffs Are Substantially Likely to Prevail on the Merits of Their Claims.**

    **A.  The Display and Speech Requirement Unconstitutionally Compels Unwilling Speakers to Deliver the State's Message.**

        1.  <u>Compelled Speech is Subject to First Amendment Scrutiny.</u>

The First Amendment encompasses the right to refuse to engage in government-compelled speech.  *See, e.g., Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995); *Riley v. Nat'l Fed. of the Blind of North Carolina, Inc.*, 487 U.S. 781, 795 (1988).  As the Supreme Court has explained, although "[t]here is certainly some difference between compelled speech and compelled silence," in "the context of protected speech, the difference is without constitutional significance, for the First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what *not* to say."  *Riley*, 487 U.S. at 796-97 (emphasis in original).  The right is the same whether the speech at issue is factual or ideological in

4

nature. *See Hurley*, 515 U.S. at 573 ("Indeed this general rule, that the speaker has the right to tailor the speech, applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid."); *Riley*, 487 U.S. at 797-98 (stating that both "compelled statements of opinion" and "compelled statements of 'fact'" serve to "burden[ ] protected speech").

Strict scrutiny applies to laws that compel either noncommercial speech or mixed speech in which commercial and noncommercial elements are inextricably intertwined. *See, e.g., Riley*, 487 U.S. at 798. A statute cannot survive strict scrutiny unless it is narrowly tailored to further a compelling state interest; if a less restrictive alternative would serve the government's purpose, the state must use that alternative. *See, e.g., United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000). Because the Act compels health care providers to convey government-mandated, noncommercial speech, based on visual and verbal depictions of the embryo or fetus derived from the patient's own body, this Court should review it under strict scrutiny.

2.  <u>The Act's Display and Speech Requirement Violates the First Amendment Rights of Health Care Providers.</u>

The State has decided that each woman seeking an abortion must be subjected to the specifics of her own embryo's or fetus's dimensions and anatomy and then must wait four hours before she can obtain an abortion. Although the Act states that "[n]othing in this section shall be construed to prevent a pregnant woman from averting her eyes from the displayed images or from refusing to hear the simultaneous explanation and medical

5

description," the Act does not relieve the physician or technician of his or her obligations to display the images "so that the pregnant woman may view them" and provide the mandated details about them.  Thus, the Act mandates that the provider, while performing an ultrasound on a patient, display the images and provide the specified verbal explanation and description.

And the patient, while this vaginal or abdominal ultrasound is being performed in or on her body, will have the screen placed in front of her eyes and have the required statements said to her, whether or not she wants that experience or to hear that speech at all, in part, or in whole.  Asking a woman if she wants to receive certain information and then providing it to her upon her request is one thing.  But under the Act, if a woman has decided that viewing and hearing about images of her own embryo or fetus is not useful to her decision-making process, she still must give the physician or technician access to her body to generate the images for the State's purposes.  She cannot say "please do not turn the screen toward me or describe it for me."  Rather, her only recourse is to avert her eyes and somehow "refuse to hear."  And after being subjected to those experiences, she must wait four hours before the abortion, even if she feels no need to ponder the images or speech and even if she has averted her eyes and has nothing to ponder, other than the state's message that she is a flawed decision-maker.  Compelling a health care provider to be the conduit of this speech – unsolicited by the patient and even against the patient's express wishes – violates the First Amendment.

6

Moreover, the display and speech requirement puts health care providers in the position of either violating their ethical obligations or violating the Act. The mandated speech falls outside accepted medical practice for obtaining informed consent and requires providers to violate central tenets of medical ethics: to act upon the patient only with her consent; to respect the patient's autonomy and right to make medical decisions based on her own values; and to act in the patient's best interests. Forcing the patient – in the midst of a medical procedure – to avert her eyes and stop up her ears is antithetical to these tenets. *See* Lyerly Decl. ¶¶ 7-18; Stuart Decl. ¶¶ 17-21, 35-36.[5]

The forced symbolic and actual speech required by Section 90-21.85 clearly goes far beyond information designed to inform a patient's decision – such as the information on medical risks and embryonic development in the state materials that must be available to the patient 24 hours before an abortion. *See* §§ 90-21.82, 90-21.83, 90-21.84. The display and speech requirement delivers the State's message that the woman has a relationship with her own viewed and described "unborn child" that is of a moral dimension that makes it indispensible to her abortion decision. The State has decided for the woman that it is necessary for her to have those images placed in front of and

---

[5] It will harm women to subject them to the "display and speech requirement" when they have not chosen to have those experiences. *See* Lyerly Decl. ¶¶ 16-18; Stuart Decl. ¶¶ 17-18. Forcing the experiences on them when they specifically try to decline will be even more harmful. *See* Lyerly Decl. ¶ 16; Stuart Decl. ¶¶ 19, 25-27; Stotland Decl. ¶ 16; Dingfelder Decl. ¶¶ 22-25. And some patients are especially likely to experience this as very upsetting and cruel, such as patients ending a pregnancy because the fetus was diagnosed with a serious anomaly or pregnant due to rape or incest. Stuart Decl. ¶¶ 19, 26; Stotland Decl. ¶ 17; Dingfelder Decl. ¶¶ 24-25.

7

described to her, and to wait four hours in order to make her decision. Thus the State –
using the health care provider and the woman's own body as its mouthpieces – provides
the woman with a clear message: the ultrasound images and description of the embryo or
fetus are essential for your decision-making. Like the very similar requirements
preliminarily enjoined in Texas, North Carolina's display and speech requirement
"compels physicians to advance an ideological agenda with which they may not agree,
regardless of any medical necessity, and irrespective of whether the pregnant women
wish to listen." *Tex. Med. Providers Performing Abortion Servs. v. Lakey*, No. A-11-CA-
486-SS, 2011 WL 3818879, at *30 (W.D. Tex. Aug. 30, 2011).

Regardless of whether this Court views the display and speech requirement as
interjecting the State's values into the physician-patient relationship to advance an
ideological agenda, it should conclude that the requirement is not purely commercial
speech. As the court explained in the Texas case,

> Defendants do not suggest the speech at issue here is purely commercial, nor could
> they . . . . [I]n the context of abortion, the speech between physician and patient,
> taken as a whole, implicates a variety of medical, ethical, legal, practical, and
> commercial concerns. Because these concerns are all closely related, the Court
> finds any commercial speech involved is "inextricably intertwined" with the non-
> commercial components, such that strict scrutiny is appropriate.

2011 WL 3818879, at *24.

Accordingly, Defendants must meet a heavy burden: establishing that the State's
forced speech requirements further a compelling state interest and are narrowly tailored
to achieve that interest. This Defendants cannot do. Although the State's interest in

8

potential life is "legitimate" and even "substantial," it is not "compelling" prior to viability. *See Casey*, 505 U.S. at 846, 876. And the State certainly cannot establish that the requirements are the least restrictive alternative. Any permissible state interest could be furthered by requiring abortion providers to *offer* each patient the opportunity to view the images and have them explained, while fully respecting any patient's decision to decline entirely or determine how much explanation or description she wants, in conformity with standards of medical ethics. *See* Lyerly Decl. ¶¶ 7-18.

### 3. The Analysis of the Informed Consent Provision in *Casey* Does Not Govern Here.

To the extent that the State will claim that the Act's display and speech requirement is governed by *Casey*, that argument must be rejected because the display and speech requirement is qualitatively and fundamentally different from the Pennsylvania law upheld by the Supreme Court. The Pennsylvania statute, similar to parts of what North Carolina tried to do with Section 90-21.82, required a physician to give the patient information about standard informed consent topics – the medical risks of abortion and childbirth; the nature of and alternatives to abortion; and the probable gestational age of the embryo or fetus – and to make available state information on embryonic and fetal development which she could decide for herself to view or not. *Compare Casey*, 505 U.S. at 902-04 (providing text of statute) *with* § 90-21.82 *and with* § 90-21.85. The Pennsylvania statute *did not* require the woman to undergo a medical procedure in order for her to make an informed decision; *did not* require physicians to

9

obtain information from the patient's body and use that information to convey a state-mandated message; *did not* force physicians to deliver to women unwanted images and verbal explanations and descriptions of their own embryo or fetus; and *did not* require physicians to violate tenets of medical ethics. *See Casey*, 505 U.S. at 902-04.

A plurality of the *Casey* Court ruled that physicians' First Amendment rights were not violated by the requirement that, as part of obtaining informed consent for an abortion, a physician provide "information about the risks of abortion, and childbirth, in a manner mandated by the State." 505 U.S. at 884 (addressing First Amendment claim). The Court considered such a requirement – which is similar to portions of Section 90-21.82, but *not* Section 90-21.85 – to be part of reasonable regulation of medical practice. *Id*. The speech mandated by Section 90-21.85 is not part of the reasonable regulation of medical practice, and nothing in *Casey* suggests that the First Amendment permits a state to compel such speech. *Tex. Med. Providers Performing Abortion Servs.*, 2011 WL 3818879, at *25-28. Indeed, as is explained above, the First Amendment disallows it.

**B. The Act is Impermissibly Vague.**

Due process prohibits laws so vague that persons "of common intelligence must necessarily guess at [their] meaning and differ as to [their] application." *Smith v. Goguen*, 415 U.S. 566, 573 n.8 (1974) (citations omitted). Vague laws offend due process in two respects. They fail to provide the persons targeted by the law with "a reasonable opportunity to know what is prohibited, so that [they] may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). And they fail to provide explicit

10

standards for those who apply them, thus "impermissibly delegat[ing] basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Id.* at 108-09.

Where "a statute imposes criminal penalties, the standard of certainty is higher." *Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983). Failure to satisfy this stringent standard necessitates that the law be held vague on its face "even when [the law] could conceivably have had some valid application." *Id.* Here, the Act is not only vague as to many of its requirements, but it is also vague as to *what* penalties it imposes. The Act is placed within the section of the code regulating the practice of medicine (rather than the criminal code) and the only new penalties it explicitly adds are civil. *See* § 90-21.88. However, it seems that Section 90-21.85 may carry criminal penalties as well, because it states that the ultrasound must be performed "notwithstanding G.S. 14-45.1." General Statutes section 14-45.1 is the section of the criminal code that defines the circumstances under which abortions are not criminal. N.C. Gen. Stat. § 14-45.1. The other provisions of the Act, such as Section 90-21.82, do not contain the same "notwithstanding" language. It is, therefore, unclear which, if any, provisions give rise to criminal liability.

Regardless of whether the Act is a criminal law, this court's review must be more stringent because "the uncertainty induced by the statute threatens to inhibit the exercise of constitutionally protected rights." *Colautti v. Franklin*, 439 U.S. 379, 391 (1979) (citations omitted); *see also Richmond Med. Ctr. for Women v. Gilmore*, 55 F. Supp. 2d 441, 494 (E.D. Va. 1999), *aff'd*, 224 F.3d 337 (4th Cir. 2000) (recognizing in holding

11

abortion statute impermissibly vague that "the required degree of clarity is particularly stringent" because of the constitutional rights implicated). Moreover, the Act imposes "quasi-criminal" penalties in the form of significant civil liability and administrative penalties, including license revocation, *see* N.C. Gen. Stat. § 90-14(a)(2), which will have the same chilling effect on abortion providers.[6] Numerous provisions of the Act fail the stringent review required.

        1.  <u>Who May Provide the Information Required by Section 90-21.82</u>

      Section 90-21.82 includes several internal inconsistencies about who may provide the information required by that section. First, it says that "a physician or *qualified professional*" may orally inform the woman of the required information. § 90-21.82(1) (emphasis added).[7] However, that same subdivision states later that "[t]he information required by this subdivision ... shall be provided during a consultation in which *the physician* is able to ask questions of the patient and the patient is able to ask questions of

---

[6] *See Women's Med. Ctr. of Nw. Houston v. Bell*, 248 F.3d 411, 422 (5th Cir. 2001) (defining as "quasi-criminal" a statute that imposed "significant civil and administrative penalties, including fines and license revocation" and holding that it must "define its terms with sufficient definiteness that ordinary people can understand what conduct is prohibited in a manner that does not encourage arbitrary and discriminatory enforcement" (quotation marks and citation omitted)); *Planned Parenthood of Cent. N.J. v. Farmer*, 220 F.3d 127, 137-38 (3d Cir. 2000) ("It is constitutionally impermissible to force a physician to guess at the meaning of this inherently vague term and risk losing his or her professional license and receiving a heavy fine if he or she guesses wrong.").

[7] A "qualified professional" includes "an individual who is a registered nurse, nurse practitioner, or physician assistant" as well as a "qualified technician." Section 90-21.81(8).

*the physician.*" *Id.* It also states that the "required information may be based on facts supplied by the woman to the *physician* ...." and it requires that the "probable gestational age" be provided, yet defines that term to be dependent on involvement of "the physician." §§ 90-21.81(7), 90-21-82(1)c. These discrepancies about whether the information must be provided by a physician or can be provided by a qualified professional are further complicated by the fact that subsection (e) of that same subdivision requires that certain information (regarding the availability of free ultrasounds) be provided by "the physician performing the abortion, *qualified technician,* or referring physician." § 90-21.82(e). Thus, in the face of these conflicting provisions, it is unclear whether a "qualified professional" can speak with a woman at least 24 hours prior to the abortion and satisfy the requirements of Section 90-21.82 or whether only a physician may do so.

### 2. Providing Written Materials to Those Who Cannot Read Them

At least 24 hours prior to an abortion, each woman must be told that she has the "right to review" certain State-printed materials. § 90-21.82(2)(e); *see also* § 90-21.82(3). The woman may choose to view those materials on the Internet, have them given to her 24 hours in advance of the abortion, or have them sent certified mail at least 72 hours before the abortion. The Act does not require her to actually *read* those materials. However, the Act also states that if "a woman is unable to read" the materials, "a physician or qualified professional *shall read* the materials to the woman in a language the woman understands before the abortion." § 90-21.90(b) (emphasis added).

13

This seems to set up a strange situation where women who can read one of the languages in which the State has prepared the materials have a choice whether to read them, but those who cannot read one of those languages will have the materials forced upon them. Presumably Section 90-21.90 requires only that providers *offer* to read the materials to those women who cannot read them, because any other interpretation would implicate the First Amendment. *See* Section I.A., *supra*. Nonetheless, without further clarification, providers have no way of knowing how to comply.

### 3. What is an "Advanced Practice Nurse Practitioner in Obstetrics"?

The requirements of Section 90-21-85(a) must be performed by "the physician who is to perform the abortion, or a qualified technician working in conjunction with the physician." § 90-21.85(a). The Act defines a "qualified technician" as:

> A registered diagnostic medical sonographer who is certified in obstetrics and gynecology by the American Registry for Diagnostic Medical Sonography (ARDMS) or a nurse midwife or *advanced practice nurse practitioner in obstetrics* with certification in obstetrical ultrasonography.

§ 90-21.81(9) (emphasis added). Plaintiffs are unaware of what an "advanced practice nurse practitioner in obstetrics" is. *See* Stuart Decl. ¶ 44. In North Carolina, there are individuals licensed as "nurse practitioners"; there is no licensing for an "advanced practice nurse practitioner."[8] In addition, Plaintiffs do not know what it means to be a "nurse practitioner *in obstetrics*." *See* Stuart Decl. ¶ 44.

---

[8] *See, e.g.*, 21 N.C. Admin. Code 32M.0101 (defining "nurse practitioner" as "a currently licensed registered nurse approved to perform medical acts consistent with the nurse's

14

Therefore, Plaintiffs are left to guess as to what persons may perform the ultrasounds required by the Act. May nurse practitioners or advanced practice nurses become "qualified technicians" as long as they obtain a "certification in obstetrical ultrasonography"? Is it sufficient that that person has worked in obstetrics before? Obstetrics is defined as the care of pregnant women,[9] so is having experience in an abortion clinic sufficient? Or is some sort of coursework or qualification required, and if so which one? Without the answers to these questions, Plaintiffs are unable to utilize the option given by the Act to have "an advanced practice nurse practitioner in obstetrics" perform the required ultrasound.

### 4. Additional Vague Portions of Section 90-21.85

In addition, the physician or qualified technician must "offer the pregnant woman the opportunity to hear the fetal heart tone," and if she accepts, make "the auscultation of fetal heart tone . . . of a quality consistent with the standard medical practice in the community." § 90-21.85(a)(2). However, it is not "standard medical practice" to make the heart tone audible prior to an abortion. Stuart Decl. ¶ 41. Therefore, abortion providers must guess at the meaning of this requirement.

---

area of nurse practitioner academic educational preparation and national certification under an agreement with a licensed physician for ongoing supervision, consultation, collaboration and evaluation of medical acts performed"). The medical community also uses the term "advance practice nurse." Stuart Decl. ¶ 44.

[9] *See, e.g.,* Stedman's Medical Dictionary (27th ed. 2000) (defining "obstetrics" as "[t]he specialty of medicine concerned with the care of women during pregnancy, parturition, and the puerperium").

15

Section 90-21.85(a) also requires that a woman must have an ultrasound at least four hours prior to the abortion and that *she* certify that the ultrasound complies with the Act. However, that same section states that:

> If the woman has had an obstetric display of a real-time image of the unborn child within 72 hours before the abortion is to be performed, the certification of the physician or qualified technician who performed the procedure in compliance with this subsection shall be included in the patient's records and the requirements under this subsection shall be deemed to have been met.

*Id.* It is completely unclear what this 72-hour provision means. Is it a requirement that the physician also complete a certification? Is it a limitation on how long before the abortion the ultrasound may be performed – *i.e.*, does this mean that only ultrasounds performed sometime between 4 and 72 hours in advance of the abortion satisfy the Act? Is it some sort of exception for women who had ultrasounds at another facility? If it is an exception, could the provider accept the certification of the other physician and not comply with any of this subsection's mandates, including having the woman herself sign the certification it requires? *See* Stuart Decl. ¶¶ 28-29.

* * * * *

Each of these problems in and of itself leaves abortion providers in North Carolina unclear on how to continue to provide this constitutionally-protected service without running afoul of the Act. But combined, Plaintiffs are left with a law that persons "of common intelligence must necessarily guess at its meaning and differ as to its

16

application." *Smith*, 415 U.S. at 572 n.8 (citations omitted). Sections 90-21.82, 90-21.85, and 90-21.90 are, therefore, impermissibly vague.

## C. The Act's Display and Speech Requirement Violates Due Process Because It Is Not Rationally Related to a Legitimate Government Objective.

The Act's display and speech requirement also violates substantive due process, because it is not rationally related to a legitimate government objective. *See Multimedia Pub. Co. of South Carolina, Inc. v. Greenville-Spartanburg Airport Dist.*, 991 F.2d 154, 159 (4th Cir. 1993) (due process requires that all laws at minimum be "rationally related to a legitimate governmental objective"). "[T]he touchstone of due process is protection of the individual against arbitrary action of government." *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) (quotation omitted); *see also United States v. Alexander*, 48 F.3d 1477, 1491 (9th Cir. 1995) ("arbitrary" laws do not satisfy due process); *accord Williamson v. Lee Optical of Oklahoma*, 348 U.S. 483, 488 (1955).

Here, at least as to those women who want to "avert their eyes" and "refuse to hear," no legitimate state interest is furthered by the display and speech requirement. Rather, that requirement compels health care providers and patients to engage in an absurd exercise with only one even remotely plausible – and patently illegitimate – purpose: to shame and humiliate abortion patients. The Act does not give the woman the ability to opt out of the requirement altogether. Thus, even if she does not want to see or hear anything having to do with the ultrasound, the show must go on. The physician must orient the image toward the woman, while she "avert[s] her eyes", and must

17

"[p]rovide a simultaneous explanation of what the display is depicting," while she attempts somehow to "refus[e] to hear" that. And this entire farcical routine must take place at least four hours before the abortion, to afford ample time for a woman who has averted her eyes and covered her ears to contemplate all that she did not see or hear.

Far from being "rational[]," *Multimedia Pub. Co.*, 991 F.2d at 159, the scenario that results from this requirement is grotesque. It turns a medical procedure into an ideological exercise that is at once intrusive and pointless. There is no "legitimate governmental objective," *id.*, that could possibly be served by requiring health care professionals to display images and provide simultaneous explanations to a woman who is attempting not to see or hear anything, and no valid state interest is served by requiring that this hollow routine take place four hours before the procedure. *See* Stuart Decl. ¶¶ 19-26; Dingfelder Decl. ¶ 21. Although rational basis review does not impose rigorous restrictions on legislative enactments, it is not an empty requirement. *See, e.g., Romer v. Evans*, 517 U.S. 620, 632-33 (1996). Because the display and speech requirement bears no relationship to any legitimate state interest, it violates due process and must be enjoined.

## II.    Plaintiffs and Their Patients Will Suffer Irreparable Harm.

Unless enjoined, the Act will cause irreparable harm to Plaintiffs and their patients. First and foremost, as demonstrated above, the Act violates the constitutional rights of Plaintiffs and their patients, which constitutes manifest, irreparable harm. *See, e.g., Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) ("[L]oss of

18

First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") (*quoting Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *WV Ass'n of Club Owners & Fraternal Svs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009) ("[I]n the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits of plaintiff's First Amendment claim."). Even if further showing of irreparable harm were required, it has been more than met by evidence that the Act will harm the integrity of the medical profession, the relationship between women and their health care providers, and the well-being of women seeking abortions, as well as chilling the exercise of constitutional rights. *See* Stuart Decl. ¶¶ 17-27, 30-38; Dingfelder Decl. ¶¶ 17-26; Lyerly Decl. ¶¶ 16-18; Stotland Decl. ¶¶ 15-18.

### III. The Balance of Equities Favors Granting Preliminary Injunctive Relief.

The balance of equities also weighs heavily in favor of an injunction. While Plaintiffs and their patients will suffer grievous harm in the absence of an injunction, Defendants face little, if any, injury, from its issuance. As the Fourth Circuit has recognized, government officials are "in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002). Moreover, the injunction sought will impose no affirmative obligation, administrative burden, or cost upon Defendants. It will serve only to maintain the status quo while the Court assesses the

19

constitutionality of the Act. Abortion providers will continue to obtain informed consent, and women will have an ultrasound performed prior to an abortion.

## IV. The Public Interest Favors Granting Preliminary Injunctive Relief.

Finally, preliminarily enjoining the Act will not disserve the public interest. It is a well-established principle that "upholding constitutional rights surely serves the public interest." *Giovani Carandola*, 303 F.3d at 521. There is a strong public interest, moreover, in protecting the integrity of the medical profession and the sanctity of the physician-patient relationship. The constitutional rights of Plaintiffs and their patients are threatened by enforcement of the Act, and the only way to ensure that those rights are not denied is by issuance of an injunction.

## CONCLUSION

For the foregoing reasons, this Court should enjoin Sections 90-21.82, 90-21.85, 90-21.87, and 90-21.90.

20

Respectfully submitted,

September 29, 2011

*s/ Katherine Lewis Parker*
Katherine Lewis Parker
NC Bar #36263
Legal Director
American Civil Liberties Union
of North Carolina Legal Foundation
P.O. Box 28004
Raleigh, NC 27611
(919) 834-3466
(866) 511-1344 Fax
acluncklp@nc.rr.com

Bebe J. Anderson*
Senior Counsel
Center for Reproductive Rights
120 Wall Street, 14th Floor
New York, NY 10005
(917) 637-3687
(917) 637-3666 Fax
banderson@reprorights.org

COUNSEL FOR ALL PLAINTIFFS

COUNSEL FOR GRETCHEN S.
STUART, M.D., DAVID A. GRIMES,
M.D., AMY BRYANT, M.D., DECKER
& WATSON d/b/a PIEDMONT
CAROLINA MEDICAL CLINIC, & A
WOMAN'S CHOICE OF RALEIGH,
INC.

Andrew D. Beck*
Staff Attorney
American Civil Liberties Union
Foundation
125 Broad Street
New York, NY 10004
(212) 284-7318
(212) 549-2651 Fax
abeck@aclu.org

Helene T. Krasnoff*
Planned Parenthood Fed. of America
1110 Vermont Avenue NW, Suite 300
Washington, DC 20005
(202) 973-4800
helene.krasnoff@ppfa.org

COUNSEL FOR JAMES R.
DINGFELDER, M.D., SERINA FLOYD,
M.D., TAKEY CRIST, M.D., & TAKEY
CRIST, M.D., P.A., d/b/a CRIST CLINIC
FOR WOMEN

COUNSEL FOR PLANNED
PARENTHOOD OF CENTRAL NORTH
CAROLINA & PLANNED
PARENTHOOD HEALTH SYSTEMS,
INC.

*Notice of Special Appearance to be Filed
21

# CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of September, 2011, I electronically filed the foregoing PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing.

/s/ Katherine Lewis Parker
Katherine Lewis Parker
NC Bar No. 36263
Legal Director, American Civil Liberties Union
of North Carolina Legal Foundation
Post Office Box 28004
Raleigh, North Carolina 27611
(919) 834-3466
(866) 511-1344 Fax
acluncklp@nc.rr.com

22