IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| GRETCHEN S. STUART, M.D., et al., | ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | CIVIL ACTION |
| JANICE E. HUFF, M.D., et al., | ) ) | Case No. _____ |
| Defendants. | ) ) ) ) | |

## DECLARATION OF GRETCHEN S. STUART, M.D., M.P.H. & T.M., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION/TEMPORARY RESTRAINING ORDER

GRETCHEN S. STUART, M.D., M.P.H. & T.M., declares and states the following:

1. I am one of the named plaintiffs in this case. I submit this declaration in support of Plaintiffs' motion for a preliminary injunction and/or temporary restraining order.

2. I am a physician licensed to practice medicine in North Carolina and also in Texas and California. I am board-certified in obstetrics and gynecology. In 1994, I graduated from both the School of Medicine and the School of Public Health and Tropical Medicine at Tulane University, with, respectively, an M.D. and an M.P.H. & T.M. I completed my residency in obstetrics and gynecology in 1998, at Parkland Memorial Hospital at the University of Texas Southwestern Medical Center, Dallas.

1

3. I have provided reproductive health care, including performing abortions, for over fifteen years. For eight of those years, I practiced obstetrics, including delivering babies, in private practice and at Parkland Memorial Hospital. I currently provide reproductive healthcare services, including abortions, in Chapel Hill.

4. Currently, I am employed by the University of North Carolina ("UNC") at Chapel Hill, in the Department of Women's Primary Healthcare. I am an Assistant Professor at UNC and also am the Director of: the Ryan Residency Program; the Family Planning Fellowship; and the Special Contraception Clinic. I am appearing as a plaintiff in this action as an individual citizen and am in no way appearing in any official capacity in relation to UNC nor am I suing on behalf of UNC.

My Provision of Abortion Services

5. Women seek abortions for many different reasons, relating to their individual situations at the time of that pregnancy. In the United States, one out of three women who has reached the age of 45 has had at least one abortion. The reasons women choose to have an abortion include difficulties or concerns related to financial, relationship, family, health (her health or fetal health), or other issues in their lives.

6. I provide surgical abortions in a clinical setting and also on both an outpatient and an inpatient basis in a university hospital setting. My practice includes training medical students, residents, and fellows how to provide abortions in those settings.

2

7. I perform both first and second trimester abortions; some of the second trimester abortions are two day procedures. Many of my abortion patients have been referred to the clinic by other physicians or medical facilities. Many of these patients have medical conditions (for example, a cervical or uterine anomaly) that make the performance of an abortion more complicated than is typically the case. Many others are seeking an abortion because the pregnancy puts their health at risk or their fetus has been diagnosed with a serious fetal anomaly.

8. Most of my patients live in North Carolina, but they come to me from throughout the state. Some of them travel several hours each way to the clinic.

9. For my patients having a one day procedure, the typical process consists of the following steps. After determining that the patient has a support system and is comfortable with her decision to have an abortion, I perform an ultrasound. I then counsel the patient, obtain her informed consent for the abortion procedure, and perform the abortion. The amount of time that elapses between performing the ultrasound and performing the abortion typically ranges from about half an hour to two hours, depending mainly on how many patients we are seeing that day. Our goal is to keep the length of the patient's clinic visit to less than four hours total as often as possible, for the convenience of the patient. If the patient is having a two day procedure, the typical process is very similar, except that after obtaining the patient's informed consent, I begin the preparation of the patient's cervix. On a subsequent day, after the patient's cervix is sufficiently dilated, I complete the abortion procedure. The amount of time that elapses

between performing the ultrasound and inserting the dilators is typically about thirty minutes or less.

10. For my abortion patients, I perform an ultrasound to determine the gestational age of the fetus and to confirm the pregnancy and its location. It is my practice to first perform an abdominal ultrasound, which involves putting an ultrasound probe over her abdomen while she lies still on the examining table. If I am not able to confirm that there is an intrauterine pregnancy using the abdominal probe, I will perform a vaginal ultrasound, which involves inserting a probe into the woman's vagina while she lies still on the examining table with her feet in stirrups. Patients differ, but typically when the gestational age is 8 weeks lmp or less, I need to use the vaginal probe.

11. It is my practice to offer my patients the opportunity to view the ultrasound. A relatively small number, probably about 20%, choose to look at the image. I have never had a patient who asked me to describe the image, nor have I ever had a patient who decided not to have an abortion after viewing the image.

HB 854

12. I have read HB 854 and have many concerns about how it will affect women seeking abortions in North Carolina, my provision of abortion services to my patients, and my obligations as a physician.

13. If HB 854 goes into effect, I understand that I will be at risk of disciplinary penalties by the State Medical Board if I do not comply with all of its requirements,

4

which could include suspension or revocation of my license to practice medicine. In addition, I understand that I might be at risk of criminal penalties if I violate at least some of its requirements. Also, I understand that HB 854 gives some persons the right to bring a lawsuit for damages and gives many persons – including parents, siblings, and current and former health care providers – the right to bring a lawsuit for an injunction against someone who has violated its requirements.

14. I have concerns about many aspects of HB 854, some of which I discuss below. In this declaration I discuss in particular concerns I have about Section 90-21.85 of HB 854. That section imposes what I refer to here as the "extra ultrasound requirements," which include requiring that a physician or "qualified technician" perform an ultrasound at least 4 hours before the start of the abortion procedure, put the ultrasound image in the patient's view, provide an explanation and a description of the image to the patient, and obtain from the patient a written certification in which she states both that all of the required actions have been done and whether or not she looked at the ultrasound image that the physician or qualified technician had to put in her view.

15. HB 854 seems to assume that women who are seeking an abortion have not thought about their decision to seek an abortion and do not realize what an abortion is. Those assumptions do not fit my patients. Of course, as for other medical procedures, I make sure that my patients understand the abortion procedure and are comfortable with their decision, as part of the standard informed consent process that I am ethically and legally required to do.

5

16.     Below, I discuss first some of the harms to my patients from HB 854 and then discuss some of the harms to me as a physician and to the medical profession more generally. But as explained in the latter section, the two sets of harms are directly linked: forcing me to impose harms on my patients harms me and the practice of medicine.

Impact and Harms from HB 854 on My Patients

17.     HB 854 is harmful for abortion patients because it threatens the patient's right of autonomy. It assumes that the woman cannot make her own judgment about what information she needs to make her decision whether to have an abortion. Respecting patient autonomy is a key principle of medical ethics and, as a medical professional, I have an obligation to respect it and my patient is disserved if I do not. The woman can ask to see the ultrasound image if she wants that experience and she can ask for information about the image if she wants that information. It is my practice to ask my patient if she wants to see the ultrasound, but that is very different from requiring that I put the screen in her view and describe the images to her.

18.     Under HB 854, the patient is not autonomous in what she sees and what she hears or does not hear. Section 90-21.85 says that I must take the required actions, without allowing me to let my patient determine whether I put the image in her view and provide the required explanation and description and whether she must wait for four hours in order to have made "an informed decision." Failing to respect the patient's autonomy in this way will be harmful to my patients.

6

19. Forcing images and descriptions on a patient who does not want those experiences. The specific emotions they experience will vary; some will feel anger, sadness, violated, upset, and/or disrespected. Some are even likely to be traumatized by the requirements. For example, I have had patients who have become pregnant due to rape or incest and I would not want to put them through the extra ultrasound requirements. One of my patients was a 13 year old rape victim. She had already been through a traumatizing situation; given her circumstances, I think it would have been extremely upsetting for her if I had put an ultrasound screen in her view and described the images to her.

20. Section 90-21.85 says the patient can "avert her eyes" from the ultrasound image and "refuse to hear." That sounds unworkable, undignified and offensive to my patients. While I am performing an ultrasound, my patient should not be forced to direct her gaze either at or away from the ultrasound screen. As mentioned above, the patient needs to lies still on the examining table, whether I am using a vaginal or an abdominal probe. She is captive, under my control, while I have the probe in or on her. I suppose the woman must then close her eyes or turn her head to avoid the image I am required to put in her view, if she does not want to view it.

21. It is even harder for me to visualize how my patients can "refuse to hear" the explanation and description Section 90-21.85 requires me to give. If my patient does not want to hear what I am required to say, must she put her fingers in her ears, put on headphones?

7

22. The extra ultrasound requirements also harm my patients by imposing a four hour delay between the ultrasound and the beginning the abortion procedure. In the clinic, I try to avoid the need for the patient to make more than one trip to the clinic, unless there is a medical need for two visits. I feel this is especially important because many of my patients travel several hours to get to the clinic. The extra ultrasound requirements will require women to be at the clinic longer than they are now. Most of my patients will have to take extra time off from work or arrange for more hours of childcare as a result.

23. For example, recently I had a 21 year old patient who came to me from about two hours away after finding out that she was too far along to get an abortion at a nearer facility. It took her about a week after she first made contact with my practice to get the money she needed for the procedure and arrange for someone to drive her to the clinic. She came with her mother and we kept her first visit under two hours, so she and her mother could get back home and her mother could get to her job. If HB 854 were in effect, she would have had to be at the clinic for an extra four hours, which would have caused her mother to lose a full day of wages.

24. For some of my patients, the delay caused by the extra ultrasound requirements is likely to be greater than 4 hours, causing greater burdens. My patients who travel great distances to get to the clinic are not likely to be able to arrive in time to satisfy the extra ultrasound requirements and have the abortion on the same day. Those women will have to stay overnight in the Chapel Hill area. That will mean additional

8

expense, additional time off work and/or extra childcare. These harms will fall disproportionately on low income women. Also, additional expense may cause some women to delay getting an abortion because they need to gather more funds to cover the extra time off work, or childcare, or an overnight stay. Although abortion is a very safe procedure, with increased gestational age the medical risks increase, so these women face possible increased medical risks as a result of HB 854's requirements.

25. As I understand HB 854, I will need to comply with the extra ultrasound requirements even for patients who come to me with a detailed ultrasound report that they have discussed with another physician. In my practice, I frequently provide abortion services to women who have been referred to me after they already have seen at least one physician and have had an ultrasound performed. Some of my patients have had more than one ultrasound performed before they see me, depending on how far along they were in their pregnancy. Many of these patients have been diagnosed with a serious or even fatal fetal anomaly or with a medical condition that puts the woman's own health at risk if she continues the pregnancy and – after receiving that information about her fetus or about her health – the woman has decided to seek an abortion. In those situations, I receive a full, detailed ultrasound report for the patient. Yet even in those situations, it appears that I will need to comply with the extra ultrasound requirements of HB 854 before I can initiate the abortion. The patient does not need for me to repeat the information that she has already received about her fetus. Complying with the extra ultrasound requirements in these situations cannot possibly serve any valid purpose.

9

26. For example, one of my patients was a woman from Tennessee who was diagnosed late in pregnancy with a serious fetal anomaly after an ultrasound was performed. She decided to seek an abortion, but could not get it locally and arranged to come to us, which she did about a week after she had that ultrasound. She had already received detailed information about her fetus, from the physician who reviewed that earlier ultrasound with her. With that patient, it would not have served any purpose for me to comply with the extra ultrasound requirement. And I think it would have been upsetting to her for me to perform an ultrasound in which I put the screen in her view and described her fetus to her. I am concerned about the impact this requirement will have on the emotional health of patients like this.

27. Similarly, many of the patients I see who are seeking an abortion due to maternal indications are referred to me by another physician and I receive a full, detailed ultrasound report. For these patients also, complying with the extra ultrasound requirements cannot possibly provide the patient with information she does not already have and has considered, and it will be cruel and unethical for me to comply with the extra ultrasound requirements, to ignore my patient's wishes, and to extend the time she must spend in the clinic because of the four hour requirement. For example, one of my patients was under the care of her maternal fetal medical doctor when she was diagnosed with stage 3 colon cancer and needed to initiate chemotherapy as rapidly as possible. She could not continue her pregnancy and be on chemotherapy and decided to have an abortion. She had fully discussed and considered her decision with her doctor and had

10

full counseling from that doctor before she saw me. Her decision was a very difficult one and I believe it would have been very painful for her if, before she could obtain the abortion, I had performed another ultrasound on her and shown and described the fetal images to her.

28. I see that HB 854 has language about the extra ultrasound requirements being met if a physician or qualified technician has performed an ultrasound in compliance with those requirements within 72 hours of when an abortion is performed. I am not sure what that language means, but think that it might apply to situations in which a referring physician – instead of the physician who will perform the abortion – has done an ultrasound. But it appears to require that the other physician put the image in the woman's view, provide the required explanation and description, obtain the required certification from the patient, and take the other steps required by Section 90-21.85(a). To avoid having another ultrasound performed solely to comply with HB 854 and thus to provide the best patient care, which means avoiding medically unnecessary procedures and delay, obstetricians and fetal medicine specialists will have to coordinate their services to perform the ultrasound in way required by HB 854 – even though the woman may not even be contemplating an abortion when that ultrasound is performed – and promptly refer the patient to me.

29. The 72 hour limit appears to be a totally random number, which does not take into account patient circumstances. For example, my patients seeking an abortion due to a fetal anomaly rarely have had their ultrasound within 72 hours of when they see

11

me. Typically they see me about 7 to 14 days after they have had the ultrasound, after they have considered the news about their fetus and made the decision whether or not to continue the pregnancy. Also, many of them live several hours away from my clinic location and, once they have made their decision, need to make arrangements in order to come to my clinic. So, even if obstetricians and fetal medicine specialists start performing ultrasounds in the way required by Section 90-21.85(a), it appears to me that I would still need to perform the extra ultrasound required by HB 854 for most of these patients.

### Impact and Harms from HB 854 on My Practice of Medicine

30. The requirements of HB 854 will impair my ability to practice medicine, intrude into my relationship with my patients, and force me to engage in medically unethical conduct.

31. By forcing me to practice medicine in a way that imposes harms on my patients, as discussed above, HB 854 will harm me (including threatening my medical licensure in the state of North Carolina) and harm the medical profession generally.

32. Under standard, long-established principles of medical ethics, I inform all my abortion patients of the medical risks of the abortion procedure and the available alternatives and their associated risks. I make sure that each patient has the information that she wants in order to make her decision whether to have an abortion.

33.   Section 90-21.85 requires me to assume that every patient, in order to make her decision, needs to have an ultrasound image put in her view, needs to hear a description and an explanation of the image (including the dimensions of the fetus and the presence of internal organs and external members). However, I am required by my medical license to use my judgment and to be guided by my patient's wishes in determining what experiences and information to provide to that individual patient. HB 854 takes away my discretion and use of medical judgment. It tells me what to do and how to behave with each patient. I am trusted to use my judgment in obtaining consent from patients for every other type of medical care I provide, including major surgeries and treatment in life-threatening situations. Yet my license to practice medicine is basically being challenged by my provision of this very safe medical procedure.

34.   As an independently licensed physician, I have legal and professional responsibilities to behave ethically in delivering patient care. I am obligated to provide care in a way that does not harm my patient, respects her decision-making, and respects her autonomy. Complying with HB 854 puts me in the position of practicing medicine which is harmful to my patients, which is unethical and contrary to the requirements of the North Carolina Board of Medicine.

35.   Forcing me to fail to respect my patient's autonomy and her wishes, undermines my practice as a physician; conflicts with my conscience which obliges me to do the best thing for my patients based on medical considerations and medical ethics; and interferes with my relationship with my patients.

36. Interfering with the physician-patient relationship harms me and my patients. Such interference also undermines the medical profession.

37. I believe it is a violation of my obligations as a licensed physician and my free speech rights to force me to say things to a patient which in my conscience I believe are harmful to my patient.

38. The delays imposed by HB 854 will also impair my ability as a healthcare provider to provide professional, ethical medical care to my patients. These delays are not medically justified and, as discussed above, will harm many of my patients. Therefore, imposing those delays on my patients is unethical.

39. In addition to these harms to medical practice, there are other aspects of the extra ultrasound requirements which are contrary to how medicine is practiced.

40. The extra ultrasound requirements limit who can do the required ultrasound to the physician who will perform the abortion or a "qualified technician." I do not believe there is any valid medical reason to limit the performance of the ultrasound and related required steps to those categories of persons. As an experienced abortion provider, especially one who provides abortions later in pregnancy, I am able to provide medical care that few physicians in North Carolina can provide. As an issue of allocation of medical resources, it does not make sense to require me to spend extra time to satisfy the extra ultrasound requirements. Other physicians or other personnel are competent to perform a pre-abortion ultrasound and to take the other steps required by HB 854.

14

41. Section 90-21.85 also states that the patient must be offered "the opportunity to hear the fetal heart tone" and that the "auscultation of fetal heart tone shall be of a quality consistent with standard medical practice in the community." I am not sure what these requirements mean. It is not my practice to make the fetal heart tone audible for my patients seeking an abortion. When I teach medical students, residents, and fellows how to provide abortions, I do not include in my teaching instructions about making the fetal heart tone audible. To my knowledge, it is not standard medical practice to make the fetal heart tone audible for patients seeking abortions. None of my abortion patients have ever asked me if she could hear the fetal heart tone or if I could make it audible. In contrast, in my obstetrics practice it was my practice to make the fetal heart tone audible.

Confusing Aspects to the Act

42. I find it hard to understand what some parts of HB 854 mean, yet I understand that I must comply with it in order to continue to provide abortions and avoid penalties.

43. The meaning of the language about ultrasounds performed within 72 hours is unclear to me for the reasons discussed above. In addition, I am not sure whether the "physician" referred to in that language can be any referring physician. If any physician certifies that he or she has met the requirements of Section 90-21.85 and did so in the last 72 hours, may I perform the abortion without taking the steps required by Section 90-

15

21.85?  Does that physician need to have the patient provide the required certification or do I?

44.     It is unclear to me who can perform the extra ultrasound (and related actions) required by HB 854.  As mentioned above, can it be a referring physician?  If so, under what circumstances?  And it is unclear to me who can qualify as a "qualified technician."  The term "advanced practice nurse practitioner" is odd; I have not heard of there being any "advanced practice nurse practitioners" in North Carolina.  I have heard of "advanced practice nurses" and "nurse practitioners."  The addition of the phrase "in obstetrics" makes the term even more confusing; I have not heard of "advanced practice nurses in obstetrics" or "nurse practitioners in obstetrics," much less "advanced practice nurse practitioners in obstetrics."  There are advanced practice nurses and nurse practitioners who work in obstetrics, but I do not know if experience working in obstetrics is what is meant or if there must be some sort of special coursework or other qualification.

45.     As explained above, enforcement of HB 854 will cause immediate and irreparable harms to women seeking abortions, to providers of abortion services including myself, and to the practice of medicine.

//

//

//

//

I declare under penalty of perjury that the foregoing is true and correct.

Executed this  28  day of September, 2011 at Chapel Hill , N.C. .

_____
GRETCHEN S. STUART, M.D., M.P.H. & T.M.

17