IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

GRETCHEN S. STUART, M.D., et al., )
)
          Plaintiffs, )
)   CIVIL ACTION
v. )
)   Case No. _____
JANICE E. HUFF, M.D., et al., )
)
          Defendants. )
)
)

## DECLARATION OF JAMES R. DINGFELDER, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

JAMES R. DINGFELDER, M.D., declares and states the following:

1. I am a physician licensed to practice medicine in the State of North Carolina and a plaintiff in this action. I am currently the owner of Eastowne OB/GYN and Infertility ("Eastowne"), located in Chapel Hill, North Carolina. I have consulting privileges at Duke University Medical Center, as well as admitting privileges in general obstetrics and gynecology at Durham Regional Hospital. I am also Assistant Consulting Professor of OB-GYN at Duke University School of Medicine. I submit this declaration in support of Plaintiffs' motion for a temporary restraining order and preliminary injunction.

2. I attended Wesleyan University and was graduated from Thiel College, as well as Jefferson Medical College, and I have a residency and fellowship in obstetrics

and gynecology from Case-Western Reserve University following service as a Medical Officer in the United States Air Force. I am a Fellow of the American College of Surgeons, a Fellow of the American College of Obstetrics and Gynecology, and a Founding Member of the Society of Reproductive Surgeons.

3. I have been practicing medicine for more than 46 years. Over the course of my years of practice, I have provided a full range of OB/GYN care. I have delivered thousands of babies over the course of my career.

4. I have also been providing abortion services for approximately four decades. I currently provide surgical and medical abortions at Eastowne.

5. I have also taught medical students and residents and published numerous articles in the area of reproductive health.

6. I have read the "Woman's Right to Know Act." I am very concerned that it forces me to act in a manner that is contrary both to my patients' best interests and to medical ethics. In particular, requiring me, while performing an ultrasound on a patient, to describe the images in detail regardless of whether she wants this is antithetical to good medical practice, will damage my relationship with my patients, and will inflict stress and emotional harm on my patients. In addition, parts of the Act are so vague that I am unsure what will fulfill some of its requirements.

Abortions in North Carolina and in My Practice

7. Legal abortion is a very safe medical procedure; it is one of the safest procedures in contemporary medical practice. Major complications from abortion are

2

very rare. Abortion through the 20th week of pregnancy is significantly safer than pregnancy and childbirth.

8. It is my experience, and the experience of my staff, that women seek abortions for all kinds of reasons related to psychological, emotional, medical, familial, economic and personal issues. Every patient has a different story. We have encountered women who seek to terminate because of spousal abuse and fears of further abuse; because of fears of economic destitution; because of the need to take care of an existing child with special needs; because of learning that the fetus has a significant fetal anomaly, which would make it hard to take care of the child along with other children in the family; and many other reasons.

9. The vast majority of abortions in North Carolina, and in the nation, are performed in the first trimester of pregnancy, which consists of the first twelve weeks postfertilization.

10. As in general medical practice, my practice already provides informed consent for all health care treatments. Obtaining such consent takes place in the context of a confidential medical consultation between my clinical staff, usually a registered nurse, and the patient. During that consultation, my staff explains the abortion procedure, discusses the medical risks, discusses the alternatives, and answers any questions the patient may have.

11. While the vast majority of our patients are firm in their decision, occasionally we see a patient who is not sure. In those rare circumstances, we will not provide an abortion for the patient. Depending on her circumstances, we offer to talk

through her decision with her more extensively, we offer to refer her to a counselor, and/or we suggest that she take more time to think through her decision and come back if and when she decides that she does, indeed, want to end her pregnancy.

The Act

12. As required by North Carolina law, all of my abortion patients already receive an ultrasound before the procedure. These ultrasounds are used to determine the presence and location of an intrauterine pregnancy, the gestational age of the pregnancy, and whether the patient is carrying multiples. These ultrasounds typically take less than 5 minutes to complete.

13. For pregnancies up to approximately 8 gestational weeks, a vaginal ultrasound is sometimes used because it may provide a clearer picture at those very early stages of pregnancy. During a vaginal ultrasound, a patient must put her legs into the stirrups and a vaginal probe is inserted into her vagina.

14. From approximately 8 gestational weeks onward, an abdominal probe is typically used because it is sufficient for determining the location and length of the pregnancy.

15. We ask every woman if she wants to see a print-out of the ultrasound. It is up to the patient.

16. At Eastowne, these ultrasounds are performed by physicians or registered nurses or medical assistants who have been trained in ultrasound and have, over time, extensive hands-on, supervised experience.

4

17. Under the Act, as I understand it, regardless of whether the patient wants to look at the images or hear a description of them, I must explain and describe the pictures to her, including the external members and internal organs if they are present and visible. Of course, I am glad to provide an explanation of the ultrasound images to any patient who wants it. But that is completely different from providing this detailed description to a patient who does not want to hear it. And, contrary to medical ethics and good medical practice, the law does not allow me to tailor the information I provide to fit my patients' circumstances and needs.

18. While I understand that the Act allows a patient to "refuse to hear," this doesn't alleviate my concerns. Under the Act, I still have to provide the explanation and description. The law therefore creates a situation where it appears that I am directly at odds with my patient – where she literally has to place her fingers in her ears and hum while I force a description of her embryo or fetus upon her.

19. This is not only directly contrary to medical ethics, but it also undermines my relationship with my patients. It suggests to my patient that I think this information is critical to her decision, that I think she ought to look at the pictures and hear the description, and that I think it ought to influence her decision. It uses me to suggest that her decision-making is unsound or that her morals are deficient if she doesn't look at the pictures and reconsider.

20. The relationship between physicians and nurses and their patients is not intended to be adversarial. Subjecting patients to this speech against their will creates a barrier between the physician or nurse and the patient (whom they are dedicated to

5

serve). Further, the sacrosanct physician-patient relationship is violated when physicians are forced to introduce information that they believe may induce emotional turmoil.

21. Nor can I understand what possible legitimate reason there could be for me to force my patient to come four hours early, subject herself to an ultrasound for the purpose of generating images that she doesn't have to see and a description of those images that she can try to refuse to hear, and then wait four hours before beginning the procedure. It appears designed to induce shame and guilt in my patients. It is repugnant to think that I have to play an active role in shaming my patients in this manner.

22. Moreover, based on my nearly half century of experience as a doctor treating pregnant women, I believe that requiring patients to be subjected to this treatment will have deleterious effects on some of my patients' emotional well-being.

23. For example, over the course of my practice I have provided care to dozens of women who desperately wanted to be pregnant and have a child, only to discover that there were severe complications with the pregnancy. These women and their husbands or partners are often devastated by the news. I remember a woman with a wanted pregnancy who was devastated to learn that her fetus had anencephaly, a fatal medical condition in which the fetus lacks the cerebral hemispheres of the brain. This patient specifically asked that we take no more time than was necessary for her ultrasound because she did not want to see anything—she already was well aware of the tragic diagnosis and did not want to see anything more. I cannot imagine having to tell this woman that before I can provide her the care she needs, I must perform an ultrasound and

describe the details of her fetus to her. I am extremely concerned about the effect this will have on my patients' well-being and ability to heal.

24. I have also treated patients who are seeking abortions because they have been raped. I strongly believe that it would cause some of these patients significant emotional distress for me to describe their rapist's fetus, yet that is exactly what the Act would compel me to do. I remember one patient in particular who had been raped—she showed up with the police report of the rape in her hand. To force this woman to listen to a detailed description of her rapist's fetus (or to cover her ears while such a description was made) would be cruel and harmful, and contrary to medical ethics.

25. But these tragic circumstances are not the only ones I am concerned about. I worry too, for example, about the message forcing me to show and describe the ultrasound sends to the young woman who is certain that she is not ready to have a baby and wants an abortion, but who has been told by her community that abortion is a sin. Requiring me to describe the pictures to her if she says she doesn't want it sends the message that her decision is wrong or immoral or selfish and that she should reconsider.

26. I am also concerned about the requirement that women come for an ultrasound four hours before "having any part of an abortion performed or induced, and before the administration of any anesthesia or medication in preparation for the abortion on the woman." Many of our patients are limited in the day or days and the time of day when they come to the clinic. Due to her location (many patients come long distances), work schedule, child care responsibilities, ability to get away from an abusive partner, and/or other factors, a patient may only be able to come to the clinic one day of the week

7

or only certain hours of the day. For those patients, scheduling the procedure is already difficult. The required four-hour delay between the ultrasound and the abortion procedure will only make things worse, in terms of lost wages, increased childcare difficulties, unaccounted-for time away from an abusive partner. Given that my patients aren't even required to look at the images or listen to the description, I can't understand why I must burden them in this way.

27. There are a number of terms and provisions of the Act that are unclear to me and I am not sure what must be done in order to ensure that I do not run afoul of the Act. As just one example, it is also not clear what I am supposed to do if I have a patient who cannot read the State's printed materials. The Act says that either I or my staff have to tell all patients that they have the "right to review" the materials, but it does not require them to actually read them. However, the Act also states that if "a woman is unable to read" the materials, "a physician or qualified professional shall read the materials to the woman in a language the woman understands before the abortion." So, if I have a patient who cannot read the materials – either because she cannot read or because she speaks a language that the state materials are not printed in, do I just have to offer to read them to her? Or do I have to read them to her against her wishes, even though if she could read materials, she wouldn't have to read them?

8

I declare under penalty of perjury that the foregoing is true.

Executed this 27th day of September, 2011.

*James R. Dingfelder, M.D.*
James R. Dingfelder, M.D.