IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| GRETCHEN S. STUART, M.D., et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | CIVIL ACTION |
| ) | |
| JANICE E. HUFF, M.D., et al., ) | Case No. 1:11-CV-00804-CCE-LPA |
| ) | |
| Defendants. ) | |

## PLAINTIFFS' REPLY BRIEF

## IN SUPPORT OF MOTION FOR

## TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Defendants repeatedly obfuscate which parts of the Act Plaintiffs are challenging and on what bases. Moreover, Defendants fail to acknowledge the clear contrast between the display and speech (90-21.85) and the informed consent (90-21.82) sections. Section 90-21.82 requires the type of information at issue in *Planned Parenthood of S.E. Penn. v. Casey*, 505 U.S. 833 (1992), but its requirements are contradictory and confusing. Section 90-21.85 is wholly unlike the requirements reviewed in *Casey* and the other informed consent cases Defendants cite. Contrary to Defendants' arguments, the Supreme Court has not given states constitutional *carte blanche* to require women seeking abortions to submit to, and physicians providing abortion to supply to them, any information and any experiences, derived by any means and provided through any mouthpiece. With Section 90-21.85, the State has gone too far.

## ARGUMENT

**I. Plaintiffs Are Likely to Prevail on Their First Amendment Claim.**

**A. The *Casey* Decision Does Not Govern Plaintiffs' Free Speech Claim.**

Defendants claim that the Supreme Court's decision in *Casey* establishes that Section 90-21.85 does not violate the free speech rights of physicians, Defs.' Br. at 2-11, but they misread the Act, the statute at issue in *Casey*, and the bases for the free speech ruling in *Casey*. The informed consent provision upheld in *Casey* required that abortion providers give information about the nature of the procedure, the health risks of the abortion and childbirth, the probable gestational age of the fetus or embryo, and the availability of State-prepared materials containing information regarding fetal

1

development and support for childbirth. 505 U.S. at 881. Section 90-21.82, which Plaintiffs do not challenge on free speech grounds, contains very similar requirements.

Section 90-21.85 is qualitatively different. It requires that: The physician who will perform the abortion or a qualified technician perform an ultrasound to generate images from the woman's body, which must be displayed so that she "may view them." § 90-21.85. That person must give a "simultaneous explanation of what the display is depicting" and "a medical description of the images" which must include State-selected content: "the presence, location, and dimensions of the unborn child within the uterus"; "the presence of external members and internal organs"; and "the number of unborn children depicted." *Id.* The woman must certify that these requirements were met and if she "availed herself of the opportunity to view the image," *id.*, or instead "resisted the powerful urge to see her unborn child on a real time display." Defs.' Br. at 18.

And then the woman still cannot have an abortion: she must have a "cooling off" period of four hours first. *Id.* at 15. If she still "resists the [State's] efforts to get her to change her mind," she then can obtain a legal abortion. *Id.* at 19. If she averted her eyes from the ultrasound images, she can use that period as an "opportunity to contemplate the loss of that unique opportunity." *Id.* at 18. The language of Section 90-21.85 and Defendants' explanations of it show that the display and speech requirement has no relation whatsoever to the Pennsylvania statute's requirements.[1]

---

[1] The General Assembly appears to have recognized the difference between requirements comparable to those in *Casey* – which it put in Section 90-21.82 ("Informed consent to abortion") – and those in Section 90-21.85 ("Display of real-time view requirement").

2

Moreover, the *Casey* Court clearly pegged its First Amendment ruling to the issue before it: "an asserted First Amendment right of a physician not to provide information about the risks of abortion, and childbirth, in a manner mandated by the State." 505 U.S. at 884. Information about the risks of a procedure and of its alternatives is typically required as part of informed consent.[2] The Court viewed providing that information to be part of the reasonable regulation of the practice of medicine and concluded that "[w]e see no constitutional infirmity in the requirement that the physician provide *the information mandated by the State here.*" *Id.* (emphasis added). Nothing in *Casey* supports a conclusion that requiring the use of the patient's body to generate and provide information the State wants the patient to contemplate and which conflicts with medical ethics[3] is part of the reasonable regulation of the practice of medicine.

The requirements in the other cases discussed by Defendants also differ fundamentally from the display and speech requirement. Those cases all involved additions to the general statements that must be told to, or placed into written materials given to, women, and those courts' interpretation of *Casey* must be read in that context. For example, the South Dakota law at issue in *Rounds* required that all women be handed the same piece of paper with certain information on it. *See Planned Parenthood of Minn., N.D. & S.D. v. Rounds,* 530 F.3d 724, 735-36 (8th Cir. 2008) (upholding some mandated information in reviewing preliminary injunction ruling); *id.,* Nos. 09-3231, 09-

---

[2] *See, e.g.,* N.C. Gen. Stat. § 90-21.13 (requiring information providing "a general understanding of the procedures or treatments and of the usual and most frequent risks and hazards inherent in the proposed procedures or treatments . . . .").

[3] *See* Lyerly Decl. ¶¶ 16-18.

3

3233, 09-3362, 2011 WL 3862585 (8th Cir. Sept. 2, 2011) (upholding some and striking down some mandated information under First and Fourteenth Amendments).[4]

Finally, Defendants seek to rely on *Casey*'s analysis of a privacy claim to defeat Plaintiffs' free speech claim. Defs.' Br. at 3-8. Moreover, in doing so, Defendants overstate the Court's privacy ruling. The Court stated – with reference to information about the nature and risks of the abortion procedure, the risks of childbirth, and the probable gestational age of the fetus – that "[i]f the information the State requires *to be made available* to the woman is truthful and not misleading, the requirement *may* be permissible." 505 U.S. at 882 (emphasis added).[5] It did not say that *all* information would be permissible. Moreover, the Court concluded that requiring physicians to inform women *of the availability* of State-prepared materials "relating to the consequences to the fetus" was permissible – a far cry from what the State is requiring physicians to do here to impart its message about her values and decision-making.[6] *Id.* at 883. As a federal district court in Texas recently held, the *Casey* ruling cannot properly be read as "giv[ing] governments *carte blanche* to force physicians to deliver, and force women to consider,

---

[4] *See also Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, No. 1:11-cv-630-TWP, 2011 WL 2532921, at *21-25 (S.D. Ind. June 24, 2011) (enjoining some and allowing other information all women must be told).

[5] The portion of *Gonzales v. Carhart*, 550 U.S. 124 (2007), relied upon by Defendants, *see* Defs.' Br. at 8, is not only *dicta*, it relates to information about the medical procedure.

[6] Indeed, Defendants seem to believe that the message "I have some printed materials prepared by the State about fetal development and childbirth support if you want to read them" is equivalent to "You cannot have an abortion unless while performing a medical procedure on you, I describe to you your fetus, including telling you if it has arms, legs, and a heart, regardless of whether you want to hear it." In fact, these messages are quite different and the fact that *Casey* upheld one in no way sanctions the other.

Case 1:11-cv-00804-CCE-LPA   Document 36   Filed 10/14/11   Page 5 of 13

whatever information the government deems appropriate." *Tex. Med. Providers Performing Abortion Servs. v. Lakey*, No. A-11-CA-486-SS, 2011 WL 3818879, at *26 (W.D. Tex. Aug. 30, 2011).

### B. The Display and Speech Requirement Cannot Meet the Required Standard of Review.

Defendants repeatedly assert that the speech mandated by 90-21.85 is "factual." Even if this Court agrees, it should still apply strict scrutiny. *See* Pls.' Br. at 4-8. However, Defendants' explanations, as well as the Act's language, show that the speech compelled by 90-21.85 is ideological: designed not simply to impart information, but to "promot[e] experiences" – via a "unique opportunity" to form a bond with her "unborn child." Defs.' Br. at 18. The mandated "cooling off" period of "sober reflection" forces the woman to contemplate those State-mandated experiences in order to influence her understanding of "the best interest of herself and her unborn child." *Id.* at 15.[7]

Defendants make the startling statement that Section 90-21.85 advances the State's compelling interest "in protecting a large segment of the State's citizens from very real and serious future psychological and emotional injuries." Defs.' Br. at 12.

---

[7] The fact that the speech is being compelled from a health care provider does not lower the level of scrutiny. *See* Defs.' Br. at 11-12. As explained above, this is not the type of speech that is required as part of the normal regulation of medical practice. Moreover, the cases on which Defendants rely do not support their argument against strict scrutiny. *See Tepeyac v. Montgomery Cnty.*, 779 F. Supp. 2d 456, 465-66 (D. Md. 2011) (discussing in dicta conflicting indicators of degree of scrutiny applicable to "professional speech"); *Wollschlaeger v. Farmer*, 2011 WL 4080053, at *9 (S.D. Fla. Sept. 14, 2011) (applying strict scrutiny to content-based restriction on physician's speech with patient); *see also Tex. Med. Providers Performing Abortion Servs*, 2011 WL 3818879, at *24-28 (applying strict scrutiny to ultrasound requirements very similar to those at issue here).

5

Defendants "support" that assertion by positing that "the effect on [a woman's] psychological and emotional health could [be] significant" if she has an abortion without being offered "the opportunity to see and hear the heart beat" and later "sees an image and/or hears the heart beat of a human fetus." *Id.* at 12, 14. The many problems with these statements include: (1) they are made without any factual support; (2) they mischaracterize the Act, which does not simply require an offer to view the images, but requires that they be put in her view and described; (3) they are contradicted by evidence in the record, including evidence about the actual psychological impacts of abortion, based on extensive, peer-reviewed studies, *see* Stotland Decl., and about the harms that Section 90-21.85 will impose on patients and about actual abortion practices in North Carolina, *see* Stuart Decl. ¶¶ 9, 11, 15, 18-20, 25-27, Dingfelder Decl. ¶¶ 10-11, 15, 17, 21-25, Lyerly Decl. ¶¶ 10, 18; and (4) they assume that women seeking abortions have never seen an ultrasound image of a fetus or heard a fetal heart tone, which is belied by the fact that a majority of the women who obtain abortions already have children.[8]

Even if Defendants had met their burden of showing this interest is furthered by 90-21.85, they cannot show that it is narrowly tailored. For example, a mandatory offer to see and hear descriptions of the ultrasound images is a less restrictive alternative.[9]

---

[8] *See* R. Jones, L. Finer & S. Singh, "Characteristics of U.S. Abortion Patients, 2008" (2010), available at http://www.guttmacher.org/pubs/US-Abortion-Patients.pdf ("61% of women obtaining abortions in 2008 already had children;" "34% who had two or more.").
[9] *Compare, e.g.*, Miss. Code Ann. § 41-41-34 (requiring performance of ultrasound before abortion, mandating offer of opportunity to view image and to hear heart tone if audible, and mandating offer to provide picture of image to woman).

6

Defendants' assertion that Section 90-21.85 furthers the State's "perhaps even more[] compelling interest" in "protecting its female citizens from being pressured or even compelled into undergoing an abortion that the pregnant female does not herself want," Defs.' Br. at 13, is both unsupported and mystifying. Not only is there no evidence that such protection is needed in North Carolina, there is no credible explanation how the display and speech requirement would further such an interest – or even relates in any way to that issue – let alone is narrowly tailored to further it.[10] Defendants' assertion that "arm[ing] herself with real-time visual and auditory information about her pregnancy and the particular fetus living within her," Defs.' Br. at 15, would advance that interest "by the most logical, direct and effective means," *id.* at 14, simply lacks any credibility.

## II. Plaintiffs Are Likely to Prevail on Their Vagueness Claims.

In response to Plaintiffs' evidence that certain provisions of the Act fail to provide fair warning of the conduct prescribed, Defendants argue only that the Act is not vague because there are no criminal penalties and any vagueness is cured by the scienter required for civil liability under Section 90-21.88. As to criminal liability, Defendants make no attempt to explain what the words "notwithstanding G.S. 14-45.1" (referring to the criminal abortion statute) mean in Section 90-21.85. To protect themselves from possible criminal liability, Plaintiffs need more than Defendants' assertion; they need a

---

[10] *Compare, e.g.,* Idaho Code Ann. § 18-615 (criminalizing coercing woman to obtain abortion); Ohio Rev. Code Ann. § 3701.791 (requiring posting of anti-coercion notice). Indeed the Act does have a provision related to coercion, Section 90-21.91, which Plaintiffs have not sought to enjoin.

7

Case 1:11-cv-00804-CCE-LPA Document 36 Filed 10/14/11 Page 8 of 13

court order binding those Defendants with prosecutorial authority and their successors to a reading of Section 90-21.85 that ensures no criminal prosecution.

Regardless, Defendants are wrong that the Act "is not subject to the more exacting standards for clarity applicable to criminal statutes." Defs.' Br. at 16. Laws that regulate constitutional rights – such as the right of reproductive choice – are subject to heightened review, especially when, like the Act, they impose quasi-criminal penalties. *See* Pls.' Br. at 11-12. Defendants completely ignore the threat the Act poses to health care providers' licenses. In particular, N.C. Gen. Stat. § 90-14(a) states that the Medical Board has:

> the power to place on probation with or without conditions, impose limitations and conditions on, ..., fine, deny, annul, suspend, or revoke a license, or other authority to practice medicine in this State, issued by the Board to any person who has been found by the Board to have committed any of the following acts or conduct, or for any of the following reasons: . . . (2) *Producing or attempting to produce an abortion contrary to law.*

(emphasis added). Thus, a provider who fails to comply with any of the Act's provisions could lose his license *regardless of scienter* because that abortion would be contrary to law. But even if the Act required scienter, a "requirement of knowledge as applied to an unknowable element cannot save a provision from constitutional invalidity." *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 933 (9th Cir. 2004).[11]

Defendants admit that the Act contains "imperfections," "imprecisions," and "inconsistencies," Defs.' Br. at 17, but they do not even attempt to explain how a

---

[11] *See also Richmond Med. Ctr. for Women v. Gilmore*, 55 F. Supp. 2d 441, 499 (E.D. Va. 1999) ("All three [scienter requirements] modify otherwise vague terms in the Act, and they do not render the Act's vague language any more certain. Thus, the scienter requirements fail to provide physicians subject to the Act's criminal penalties with any more notice of what is forbidden.").

provider – who could face loss of his or her license – is supposed to act in the face of a law which, in Defendants' own words, "does not consistently describe" how to comply. *Id*. at 16. Thus, the many problems identified by Plaintiffs remain. For example:

- May a registered nurse (who is a "qualified professional") provide all of the information required by Section 90-21.82?
- Under Sections 90-21.82 and 90-21.90, what does a provider have to do with the state's printed materials if a woman cannot read them?
- Can a nurse practitioner with a certification in obstetrical ultrasonography and experience in an abortion clinic fulfill the requirements of Section 90-21.85?
- How does one make the fetal heart tone audible in a "quality consistent with the standard medical practice" when there is no practice of doing that at all?
- What does the 72-hour provision mean? If a woman has an ultrasound that complies with Section 90-21.85 four days before the abortion, is that okay?

Plaintiffs presented evidence that providers are unable to answer these questions and, therefore, do not have fair warning of how to comply with the Act, *see* Dingfelder Decl. ¶27; Stuart Decl. ¶¶28-29, 42-44, and Defendants failed to present any contrary evidence.

### III. Plaintiffs Are Likely to Prevail on Their Substantive Due Process Claim.

Defendants' arguments in response to Plaintiffs' substantive due process claim actually support that claim. First, Defendants contend that the Act might increase the chance that a woman would choose not to have an abortion. But for women who "avert their eyes" and "refuse to hear," the suggestion that the Act's requirements are rationally related to this interest is untenable: Defendants do not, and cannot, explain how a woman could possibly be persuaded by images and speech that she has blocked out.

Second, Defendants appear to suggest that "sham[ing]" and "humiliating" abortion patients might *itself* be a legitimate state interest, because if a patient "resists the efforts

9

to get her to change her mind and elects to go through with the abortion, then she is less likely to ever regret making that choice." Defs.' Br. at 18-19. Of course, no court has held that there is a legitimate state interest in shaming abortion patients, *cf. Daugaard*, 2011 WL 2582731, at *8 (enjoining abortion regulation that "humiliates and degrades [the patient] as a human being"), and a "bare desire to harm" is not a legitimate state interest, *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 447 (1985) (citation omitted). Moreover, Defendants' contention that undermining a patient's "short[-]term comfort" might somehow improve her "long[-]term peace of mind," Defs.' Br. at 19, is nonsensical. Nor does it serve any legitimate purpose for the State to force these requirements on and impose harm of any duration on the women who avert their eyes and refuse to hear.

## IV. Plaintiffs Satisfy the Other Requirements for Preliminary Injunctive Relief.

Defendants cannot seriously claim that irreparable harm will occur if the status quo – which includes obtaining informed consent and performing an ultrasound prior to an abortion – is maintained while this case proceeds. And they ignore the irreparable harm that will occur to women and health care providers without an injunction, including, but not limited to, violation of their constitutional rights. *See* Pls.' Br. at 18-19.

## CONCLUSION

For all of the foregoing reasons and those set forth in Plaintiffs' opening papers, this Court should enjoin Sections 90-21.82, 90-21.85, 90-21.87, and 90-21.90 of the Act.

October 14, 2011                                                                 Respectfully submitted,

10

*s/ Katherine Lewis Parker*
Katherine Lewis Parker
NC Bar #36263
Legal Director
American Civil Liberties Union
of North Carolina Legal Foundation
P.O. Box 28004
Raleigh, NC 27611
(919) 834-3466
(866) 511-1344 Fax
acluncklp@nc.rr.com

COUNSEL FOR ALL PLAINTIFFS

Bebe J. Anderson*
Senior Counsel
Center for Reproductive Rights
120 Wall Street, 14th Floor
New York, NY 10005
(917) 637-3687
(917) 637-3666 Fax
banderson@reprorights.org

COUNSEL FOR GRETCHEN S. STUART, M.D., DAVID A. GRIMES, M.D., AMY BRYANT, M.D., DECKER & WATSON d/b/a PIEDMONT CAROLINA MEDICAL CLINIC, & A WOMAN'S CHOICE OF RALEIGH, INC.

Andrew D. Beck*
Staff Attorney
American Civil Liberties Union
Foundation
125 Broad Street
New York, NY 10004
(212) 284-7318
(212) 549-2651 Fax
abeck@aclu.org

COUNSEL FOR JAMES R. DINGFELDER, M.D., SERINA FLOYD, M.D., TAKEY CRIST, M.D., & TAKEY CRIST, M.D., P.A., d/b/a CRIST CLINIC FOR WOMEN

Helene T. Krasnoff*
Planned Parenthood Fed. of America
1110 Vermont Avenue NW, Suite 300
Washington, DC 20005
(202) 973-4800
helene.krasnoff@ppfa.org

COUNSEL FOR PLANNED PARENTHOOD OF CENTRAL NORTH CAROLINA & PLANNED PARENTHOOD HEALTH SYSTEMS, INC.

*By Special Appearance

# CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of October, 2011, I electronically filed the foregoing PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to counsel for all Defendants:

**Thomas J. Ziko**
tziko@ncdoj.gov
Senior Deputy Attorney General
**I. Faison Hicks**
fhicks@ncdoj.gov
Special Deputy Attorney General
**Stephanie A. Brennan**
sbrennan@ncdoj.gov
Assistant Attorney General

North Carolina Department of Justice
114 Edenton Street
Post Office Box 629
Raleigh, NC 27602
Telephone: (919) 716-6400

/s/ *Katherine Lewis Parker*
Katherine Lewis Parker
NC Bar No. 36263
Legal Director, American Civil Liberties Union
of North Carolina Legal Foundation
Post Office Box 28004
Raleigh, North Carolina 27611
(919) 834-3466
(866) 511-1344 Fax
acluncklp@nc.rr.com