1              IN THE UNITED STATES DISTRICT COURT

2                 MIDDLE DISTRICT OF NORTH CAROLINA

3
GRETCHEN S. STUART, M.D.,et al.,)
4                               )      Case No. 1:11CV804
      Plaintiffs,               )
5  vs.                          )
                                )      Greensboro, NC
6  JANICE E. HUFF, M.D., et al., , )
                                )      October 17, 2011
7      Defendants.              )
   _____)      10:01 a.m.
8

9          TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING

10          BEFORE THE HONORABLE CATHERINE C. EAGLES

11                UNITED STATES DISTRICT JUDGE

12
APPEARANCES:
13
   For Plaintiffs:      KATHERINE LEWIS PARKER
14                       American Civil Liberties Union of
                         North Carolina
15                       PO 28004
                         Raleigh, NC 27611-8004
16
                         BEBE J. ANDERSON
17                       The Center for Reproductive Rights
                         120 WALL ST., 14TH FLOOR
18                       NEW YORK, NY 10005

19                       HELENE T. KRASNOFF
                         Planned Parenthood Federation of America
20                       1110 Vermont Ave., NW, Ste. 300
                         Washington, DC 20005
21
   For Defendants:      ISHAM FAISON HICKS
22                       STEPHANIE A. BRENNAN
                         N.C. Department of Justice
23                       POB 629
                         Raleigh, NC  27602-0629
24
   Court Reporter:      Joseph B. Armstrong, RMR, FCRR
25                       324 W. Market, Room 101
                         Greensboro, NC 27401

1          Greensboro, North Carolina

2          October 17, 2011

3          (At 10:01 a.m., proceedings commenced.)

4          THE COURT:  Good morning.

5          MR. HICKS:  Good morning, Your Honor.

6          THE COURT:  I'll ask everybody to introduce

7    themselves for me and the other courtroom personnel; and

8    while you're doing that, if you would also let me know which

9    one of you will be speaking for your table.  So we'll start

10   with the Plaintiff.

11         MS. PARKER:  Good morning, Your Honor, Katie

12   Parker with the ACLU of North Carolina for Plaintiffs.  I'm

13   here at cocounsel with Helene Kraznoff from Planned

14   Parenthood Federation of America and Bebe Anderson with the

15   Center for Reproductive Rights, and Ms. Anderson will be

16   arguing for the Plaintiffs.

17         THE COURT:  All right.

18         MR. HICKS:  Good morning, Your Honor.  May it

19   please the Court, my name is Faison Hicks.  I'm a special

20   Deputy Attorney General with the North Carolina Department

21   of Justice.  I represent all the defendants here today.  And

22   with me is Stephanie Brennan, an Assistant Attorney General

23   with the DOJ.  She's my colleague, and I'll be making the

24   argument this morning.

25         THE COURT:  All right.  Thank you.

```
 1           All right.  And before we start on the motions
 2  themselves, I just wanted to discuss the logistics of it
 3  with you.  It's not strictly a TRO since the defendant is
 4  here and has had an opportunity to be heard.  On the other
 5  hand, it's all been very fast as well.  So I'm open to
 6  letting this be -- we can talk about this.  You know, we can
 7  have the hearing today, just the argument; I can do whatever
 8  I do.  We can have a couple of days -- I have a few days in
 9  December when you could have an evidentiary hearing if
10  that's needed.  Or if you think there might be a good bit of
11  discovery or whatever that needs to be done, we could put
12  that off until March or May.  Just logistically, what do you
13  all think is going to be needed?
14           MS. ANDERSON:  Your Honor, Bebe Anderson for the
15  Plaintiffs.  We don't think this is probably a case that
16  would require a lot of discovery, but obviously Defendants
17  might feel differently, and I do understand they haven't had
18  the case for long.  So we're sort of open to hear what they
19  feel their needs are.  Certainly, we can put on an
20  evidentiary hearing if that's needed and conduct whatever
21  discovery is needed.
22           THE COURT:  All right.
23           MR. HICKS:  Your Honor, two answers to your
24  question.  In terms of this morning, what we would like to
25  do this morning, if the Court has substantial questions
```

1    about the claims of vagueness of the statute, I'm certainly

2    prepared to discuss the specific claims of vagueness that I

3    have seen the Plaintiffs identify.  If there are more claims

4    of vagueness, I would note that the Texas court actually

5    gave the parties, I think maybe under oral argument, the

6    opportunity -- I think the Plaintiffs had a brief

7    opportunity to submit a supplemental brief very quickly to

8    the Court, I presume within a day or two, identifying all of

9    their vagueness claims, and the Defendants then had a day or

10   two to submit a down and dirty, very quick supplemental

11   brief responding to each of those specific claims.  The

12   speed with which this has come on causes me a little bit of

13   pause, frankly, about the vagueness claims.  I'm not sure I

14   fully comprehend all of them.

15        So I would simply note that for the Court and

16   suggest that at least in the State's view that might not be

17   a bad procedure here.  Now, in the more long-term view of

18   things, I think the State will probably want to take some

19   discovery prior to an evidentiary hearing, but I don't see

20   why that couldn't be done before December so that we could

21   have the evidentiary hearing in December.

22        THE COURT:  Okay.  Anything else --

23        MR. HICKS:  I'll certainly work with Bebe on that.

24        THE COURT:  -- to add for the plaintiff on that?

25        MS. ANDERSON:  Your Honor, certainly we are happy

1  to flesh out with the Defendants all the vagueness in the

2  statute and see if they have explanations that could be then

3  binding in some way and take care of any other vagueness in

4  the statute.

5          However, I would also note that in terms of

6  discovery, whether -- it depends on how much discovery the

7  Defendants need whether we could do it in time to have an

8  evidentiary hearing in December.  I think the concerns about

9  the statute should not require a lot of discovery, so that

10  may indeed be feasible.  On the other hand, it's just too

11  early for the Plaintiffs to know whether that would be --

12  understandably, you know, Defendants don't yet know what

13  evidence they may feel they need put on or what discovery

14  they may need, and so it's hard to respond to that at this

15  time.

16          THE COURT:  Well, if we did do something in

17  December, I was really thinking that it might just be still

18  a preliminary injunction since that's still not very much

19  time; and then if we needed to do something else down the

20  road, we could.  But -- so why don't we plan on being here a

21  couple of days in December.  The time that I have available

22  is the week of the 5th, so I would suggest -- that's a

23  Monday.  I still think in terms of Mondays from my state

24  court days.  So I would suggest maybe the 6th and the

25  7th that we set those aside.  Is that agreeable?

1          MS. ANDERSON:  Yes, Your Honor.  Thank you.

2          MR. HICKS:  Did you say the 6th and the 7th?

3          THE COURT:  Yes, sir.

4          MR. HICKS:  Yes, Your Honor.  That's fine.

5          THE COURT:  All right.  We'll set those aside for

6   an evidentiary hearing if anybody ends up having any

7   additional evidence they want to offer; and if not, we'll

8   check in and see what needs to be done at that time, okay?

9          All right.  I've read everything, so I think I'm

10  ready to hear your legal arguments, and I'll hear from the

11  plaintiff first.  Ms. Anderson?

12         MS. ANDERSON:  Thank you, Your Honor.  Does my

13  voice carry if I'm here without the microphone?

14         THE COURT:  I can hear you.

15         MS. ANDERSON:  Okay.  Thank you.  And also just to

16  clarify, Your Honor, if I could before I get started, in

17  terms of a potential evidentiary hearing in December, I'm

18  assuming that would be if -- you know, obviously if the

19  Court enjoins the statute, it would be an injunction that

20  could carry through to that later date.

21         THE COURT:  Well, since I don't know what I'm

22  going to do, it would be -- if I grant you an injunction

23  today, it would be an opportunity to see whether that

24  extends.  If I don't, it would be your chance to ask me

25  again after putting on some evidence.  So -- and kind of the

1   opposite for the Defendants.  Go ahead.

2           MS. ANDERSON:  Thank you, Your Honor.  And I also

3   wanted to thank Your Honor for scheduling this promptly,

4   because, as you're aware, this act is scheduled to go into

5   effect on October 26.  And even though currently North

6   Carolina, of course, requires that informed consent be

7   obtained before any abortion, just as it's required for any

8   medical procedure --

9           THE COURT:  Actually, you know, I think you may

10  have to use the microphone.  I'm having just a little

11  trouble hearing you.  I don't know if it will pull over

12  there to the lectern or not; and if it won't, I guess you'll

13  have to do it from the table.

14          MS. ANDERSON:  That's fine, Your Honor.  And as I

15  was stating that North Carolina currently requires that

16  there be informed consent before any abortion is performed,

17  just as is true for any medical procedure, and also

18  currently requires that an ultrasound be performed before an

19  abortion for medical purposes of dating.  But the act

20  imposes significant changes --

21          THE COURT:  Was that -- can I ask you about that?

22  Was that in the statute, or was that in just some

23  regulations?

24          MS. ANDERSON:  It's in the administrative

25  regulations that govern facilities licensed as abortion

1  clinics, and it simply requires that it be documented that

2  an ultrasound was performed.  It does not have any of the

3  sorts of requirements, of course, that are present in the

4  act and that are caught -- you know, that are so problematic

5  and constitutionally problematic.

6              THE COURT:  All right.

7              MS. ANDERSON:  So but clearly the act changes

8  things tremendously for abortion providers, and it's also

9  very confusing in parts, and it puts the abortion providers

10  at risk of significant penalties without knowing exactly

11  what they have to do.  So we seek a preliminary injunction

12  and a TRO to maintain the status quo here until there is a

13  final judgment and a final determination of the

14  constitutionality of the act.

15              And we've moved on several of our claims, though

16  not all of them, but we've moved specifically to enjoin

17  Section 90-2182 and the two other sections that are

18  dependent upon it, which are 90-21.87 and 90-21.90, which

19  relate to informed consent on vagueness grounds and then

20  also Section 90-21.85 which sets forth the display and

21  speech requirements in the act which we are seeking to

22  enjoin both not only on vagueness grounds but also as a

23  violation of free speech rights of physicians and also a

24  violation of substantive due process.

25              So Plaintiffs feel they've adequately shown with

1   their arguments and their evidentiary submissions that they

2   meet the requirements for issuance of preliminary injunctive

3   relief; we're likely to succeed on the merits of the claims

4   that we have briefed; and Plaintiffs and their patients are

5   likely to suffer irreparable injury if injunctive relief is

6   not granted; and the balance of equities tips in Plaintiffs'

7   favor; and indeed an injunction to prevent unconstitutional

8   provisions from going into effect will certainly be in the

9   public interest.

10          Here, in terms of the types of irreparable injury

11  and harm that will occur if there is no injunctive relief,

12  those include that it violates the constitutional rights of

13  both patients and abortion providers.  It also puts

14  providers in the untenable situation of having to comply

15  with unclear requirements.  It appears to put them at risk

16  of criminal penalties, and it certainly puts them at risk of

17  quasi-criminal penalties in form of licensure penalties as

18  well as civil suits if they fail to comply with the act's

19  requirements.

20          In addition, physicians, if this law goes into

21  effect, would have to violate their ethical duties, which

22  would harm them, their patients, and the practice of

23  medicine generally, and then there'll be chilling in -- also

24  of the precision of the constitutionally right of

25  reproductive choice if this law is not enjoined.

1          So I'd like to turn first to the free speech claim

2     that Plaintiffs have presented which relates to Section

3     90-21.85.  This display and speech requirement in the act is

4     unlike any requirement in force anywhere in the United

5     States.  There are two other states that have enacted

6     similar laws, and in both of those states those laws have

7     been enjoined.  Most recently, the Texas law was enjoined by

8     a Federal District Court, and a year ago the Oklahoma -- an

9     Oklahoma state court enjoined Oklahoma's similar ultrasound

10    requirements.

11         And the reasons that these requirements have not

12    been upheld and have not been allowed to go into effect

13    anywhere in the United States really goes to the heart of

14    the issue that Defendants rely upon, their argument that

15    this really is all just like what was allowed by the Supreme

16    Court in Casey.  Clearly, this is not at all like what was

17    allowed by the Supreme Court in Casey.  This is

18    qualitatively unlike the provisions that were upheld by the

19    Court, the provisions that were in that Pennsylvania statute

20    that the Casey Court evaluated.

21         The statute -- the informed consent provision of

22    the Pennsylvania statute that was considered by the Supreme

23    Court went to a requirement that all patients receiving

24    abortions be informed of risks and alternatives to the

25    abortion procedure, which is standard informed consent

 1    requirements.

 2            In addition,  the State decided that it had --

 3    sorry -- the Supreme Court decided that its earlier

 4    decisions that precluded any information that related to the

 5    State's interest in potential life from being required to be

 6    presented to the woman had gone to far, and they said it was

 7    allowable -- the Supreme Court said it's allowable -- or may

 8    be allowable for the State to make available to women or to

 9    require that physicians make available to women

10    State-prepared materials that present information such as

11    fetal development information and also information about

12    benefits and services that may be available to women if they

13    choose to continue their pregnancy.  And that's really what

14    the Supreme Court allowed in the Casey decision, and that is

15    totally unlike what is in Section .85.  It's very similar to

16    what is in .82, though there are other problems with how

17    North Carolina tried to put those requirements into place,

18    which I'll get to in a moment.

19            But here, unlike the statute in Pennsylvania that

20    the Supreme Court considered, this statute in North Carolina

21    requires that every woman seeking an abortion come in four

22    hours before her procedure for the specific purpose of

23    having an ultrasound performed by the physician for the

24    purpose of generating images from her body, which then the

25    physician must describe and explain in particular ways

1   mandated by the State, and she has to do that before she can

2   have an abortion.  And those requirements go far beyond

3   simply requiring that a woman know that the State wants to

4   encourage her to continue her pregnancy to term.

5           Rather, as is evident from the defendant's own

6   explanations of these requirements, the requirements are

7   meant to convey the State's opinion on the woman's

8   decision-making and on the woman's relationship with her own

9   particular specific pregnancy.  And irrespective of the

10  woman's circumstances, for every woman, she's -- and

11  irrespective of her decision-making priorities and of her

12  desires as to what information or experiences she wants for

13  her decision-making, the State is requiring that all women

14  seeking an abortion be subjected to this experience of

15  having to come in, have this ultrasound performed for this

16  purpose of generating images from her body and having that

17  speech that the State mandates be provided by the physician;

18  otherwise, the woman cannot obtain a legal abortion in North

19  Carolina if that requirement goes into effect.

20          So there's nothing at all comparable in the

21  Pennsylvania statute.  There's nothing in the Pennsylvania

22  statute that the Casey Court considered that required that a

23  medical procedure be performed on a women before she could

24  give informed consent for the abortion.  There's nothing

25  that requires her body be used to generate information that

```
 1    the State wants her to have.  There's nothing requiring a
 2    physician to subject the woman to unwanted images and
 3    unwanted speech and nothing requiring a woman who doesn't
 4    want those images and/or that -- to hear that speech to
 5    contort herself while she's there in the physician's office,
 6    in the clinic, having an ultrasound performed to contort
 7    herself to avert her eyes and to somehow refuse to hear what
 8    the physician is required to utter as the mouthpiece for the
 9    State.
10          So the Court in Casey did not -- the decision
11    there cannot be -- possibly be read as allowing this
12    requirement to go into effect.  The Court did not address
13    anything like it.  Moreover, the Casey Court cannot be read
14    as providing carte blanche to the State to do anything they
15    want in order to support their interest in potential life.
16          Again, in upholding the Pennsylvania statute, the
17    Court was really reacting to its view that it had gone too
18    far before and had limited too much what the State could do,
19    but it did not say the State may do anything.  Instead, it
20    may be permissible for the State to make some -- to require
21    that some information be available, and it certainly did not
22    rule that the State can go to absolutely any lengths to
23    force upon a woman information about her embryo or her
24    fetus.
25          So here the court has gone -- the State has
```

1    certainly gone too far, and that's where we get into the

2    First Amendment claim here that is so different from the

3    First Amendment compelled speech claim at issue in Casey.

4         As the federal court in Texas decided in

5    construing a very similar set of requirements there, the

6    strict scrutiny should be applied here, and it should be

7    applied here for either of two reasons:  Either because it

8    is ideological speech or because it is -- has to be viewed

9    as intertwining both elements of commercial and

10   noncommercial speech when you're talking about the

11   conversation -- excuse me -- the conversation between a

12   woman and a physician prior to obtaining the medical

13   procedure.

14        But I think here it is very clear, and it's even

15   clearer now after the defendant's opposition brief was

16   filed, that what we're really talking about here is

17   ideological speech.  Here, the Court -- here, the State is

18   requiring this entire package of experience that must be

19   imposed upon any woman before she can get a lawful abortion,

20   and this -- these requirements and this package of coming in

21   early, getting the ultrasound, limiting who can perform it,

22   requiring the speech, inflicting this experience on the

23   woman, the State has explained it is done for -- to give

24   her, quote, an opportunity to educate herself about her

25   unborn child before electing an abortion, end quote.  It's

1   designed to, quote, arm the woman with realtime visual and

2   auditory information about her pregnancy and the particular

3   fetus living within her.  It's supposed to provide the

4   pregnant woman with new and important information via,

5   quote, looking and listening to this information prior to

6   what they call the 4-hour cooling-off period which will

7   influence her understanding of her condition, her options,

8   and the best interest of herself and her unborn child, end

9   quote.

10         And then the State goes on to explain that these

11   requirements are going to make the woman who, quote, resists

12   the powerful urge to see her unborn child in a realtime

13   display, end quote, quote, contemplate the loss of the

14   unique opportunity for at least four hours and then puts the

15   woman in the position of having to, quote, resist the

16   State's efforts to get her to change her mind before -- end

17   quote, before she can obtain an abortion.  Those statements

18   by the State show this is far beyond trying to inform the

19   woman's decision in trying to make sure that information is

20   provided to her.  It inflicts this experience on her for the

21   particular purpose of causing her to view this decision the

22   way the State views the decision, and it's clearly the

23   ideological view of the State in terms of what should be

24   informing the woman's decision-making and in terms of how

25   the woman should prioritize and also what the woman must --

1  how the woman must react to these experiences, how a woman

2  is expected to react to these experiences.

3         So it's clear that the State is insisting that

4  each woman be provided -- be mandated to be provided with an

5  experience that will, quote, cause her to understand her

6  unborn child in a new light and make her see her abortion

7  decision through the State's lens, the State's ideological

8  view of abortion, not her own decision-making process that

9  has led her to seek an abortion, which is why she's there.

10         So Defendants have not met their burden of showing

11  the requirements of 90-21.85 are narrowly tailored to compel

12  any State interest which is the burden they then have.

13  They've asserted two interests to try to support the display

14  and speech requirements.  The first interest they assert is

15  to protect women from psychological harm.  The State claims

16  that its requirement that physicians put the ultrasound

17  screen in the woman's view and provide them mandated

18  description and explanation to every woman is needed to

19  protect every woman seeking an abortion against, quote, the

20  risk that she will subsequently suffer psychological and

21  emotional injury, potentially permanent, from seeing a

22  sonogram or hearing the heartbeat of a human fetus, end

23  quote.

24         For starters, the State presents absolutely no

25  evidence at all to support that there is a risk of such

1   psychological harm that any -- that women are harmed if they
2   have an abortion without having been forced to have this
3   image put in their view and hear this explanation and then
4   later seeing an image of a fetus or hearing a fetal
5   heartbeat.  And it seems their argument seems to be premised
6   on a faulty assumption also that women who have abortions
7   have never seen an image of a fetus or never heard a fetal
8   heartbeat, which is, of course, belied, in part, by the fact
9   that the majority of women in the United States who seek
10  abortions have had at least one child by the time they --
11  when they seek an abortion.
12          And, moreover, Plaintiffs have put evidence in the
13  record that show -- that contradicts the State's claim that
14  actually women's psychological health will be protected by
15  these requirements.  We have evidence from Dr. Stotland who
16  is a well-credentialed mental health professional, and her
17  evidence shows the lack of support between the link for
18  abortion with psychological harm and also the potential for
19  harming women by forcing these experiences on them as the
20  State would do.  Dr. Lyerly, an expert in medical ethics,
21  also provides evidence about the harms that come from
22  inflicting unwanted experiences on a patient when she's
23  seeking medical care, which is one of the reasons why these
24  requirements put physicians in this dilemma of having to
25  violate medical ethics if they comply with the law's

1   requirements.  And then both Dr. Stuart's and -- Dr. Stuart

2   and Dr. Dingfelder relate circumstances from women's actual

3   experiences that show the type of harm that would come from

4   imposing these requirements on women based on actual

5   circumstances of women's lives.

6           Even if the State had met its burden, which it

7   hasn't, of showing that this interest in psychological --

8   avoiding psychological harm and protecting women's

9   psychological health was furthered by the statute, they

10  would fail because they've failed to show that this is

11  narrowly tailored.  Clearly, it would be much much less

12  restrictive if the State had required, as many states do

13  now, that the woman be offered the opportunity to view the

14  image and have, you know, any questions she has answered by

15  the physician.  In fact, there's evidence in the record to

16  show that is indeed what happens now in North Carolina, that

17  women are provided the opportunity to see the ultrasound

18  image, and, of course, allowed as part of the dialogue with

19  the physician to ask questions.  And such a narrow tailoring

20  would be more in conformity with medical ethics and respect

21  for the patient's decision-making and the patient's

22  autonomy.

23          And so, for example, if that were the requirement,

24  that would mean that the woman who was seeking an abortion,

25  for example, because she has a very serious or even fatal

1    fetal anomaly has been diagnosed, or say she's a victim of a

2    rape, she would not have to have the image put in her view

3    and the image described to her.  She would be able to

4    decline that offer and not have to contort herself to avert

5    her eyes or somehow refuse to hear.

6           The second interest that Defendants assert is

7    somehow served by the requirements of the display and speech

8    requirement is, quite frankly, a little baffling to

9    Plaintiffs which is this interest in preventing coercion of

10    women, and they have presented no evidence, for starters, to

11    indicate that women in North Carolina are being coerced and

12    they're having abortions.  But even more importantly, they

13    don't even present a remotely plausible explanation for how

14    forcing these experiences on a woman seeking an abortion

15    could prevent women from being coerced into having an

16    abortion.

17           So as to that interest, not only is it clearly --

18    the statute's clearly not narrowly tailored to further it,

19    it doesn't further it in any way.  So for all of those

20    reasons, Section 90-21.85 should be enjoined in its

21    entirety, Your Honor.

22           Now, there are also vagueness problems with the

23    act --

24           THE COURT:  Well, let me ask you before you move

25    on to that.  So do you see any distinction at all between

```
 1    for purposes of your First Amendment argument for the actual
 2    speech that's required describing what's seen on the
 3    ultrasound screen and offering the patient the opportunity
 4    to listen to the fetal heartbeat and placing the screen so
 5    that the patient can see it?  You know, those are three
 6    discrete acts.  Are they all the same for purposes of your
 7    argument?  How is placing the screen speech?
 8              MS. ANDERSON:  That's symbolic speech, Your Honor,
 9    and the Supreme Court has certainly recognized that speech
10    includes symbolic speech -- wearing arm bands, for example,
11    is the classic example, and that it's certainly -- speech is
12    not limited to articulated words, much less words.  So, for
13    example, a billboard would be speech even if it only has
14    images on it, it doesn't have any words on it.  So both the
15    putting -- forcing the physician to put that image in the
16    woman's view and forcing the physician to speak and provide
17    the selected description that the State requires of the
18    image, those are both compelled speech and have the problems
19    I just mentioned.
20              Requiring an offer, on the other hand, would be
21    simply -- it would be more in line with providing
22    information to the woman.  It would not be compelling the
23    content of the description.  It would not be compelling the
24    physician to -- again, do the symbolic speech of putting
25    that in her view.
```

1     For example, the statute itself does have one

2 offer in there.  It has the offer of trying to make the

3 heart tone audible if it's present, and we are not

4 contesting that that -- if that were all that was in there,

5 if that were the statute, if the statute were simply

6 requiring that the physician tell the woman that if you want

7 me to, I can try to see if the heartbeat is audible, do you

8 want me to?  We would not be challenging that.  It's in

9 there as part of the entirety, though, which again it's this

10 package, Your Honor, which shows so clearly the ideological

11 nature of what the State is requiring because it's requiring

12 all of this without any regard again to the individual

13 patient, to her circumstances, to her desires.  It forces

14 the physician to say particular things and to take

15 particular symbolic steps that amount to symbolic speech and

16 goes, again, far beyond anything that's been upheld by any

17 court in this country.

18          THE COURT:  Okay.  Thank you.

19          MS. ANDERSON:  Certainly, Your Honor.

20          As to vagueness, I want to turn first to Section

21 8290-20.82.  As I mentioned, that is the section of the act

22 that has some relationship to what was looked at by the

23 Supreme Court in the Casey case.  But what they managed to

24 do is they've managed to confuse the requirements in a way

25 that leaves the providers unsure of exactly how they can

1   meet those requirements.

2           The Defendants themselves acknowledge in their

3   opposition brief that the act contains what they refer to

4   as, quote, imperfections, imprecisions, and inconsistencies.

5   It certainly does, and those put the abortion providers in

6   the dilemma of needing to comply with the act to avoid

7   licensure penalties, civil remedies, potential criminal

8   penalties, and knowing how to set up their practice to be

9   performing lawful abortions, but not being sure of exactly

10  how they can do that.

11          And the Plaintiffs have put in evidence to the

12  Court explaining why the meanings of the provisions are

13  unclear, and Defendants have put in no contradictory

14  affidavits or explained how one can possibly understand what

15  these portions mean; and even if they did, of course, we

16  would need a binding court order for the physicians and

17  abortion providers to be protected because they're really in

18  this untenable position of being forced to comply and facing

19  these significant penalties.

20          With reference to to 90-21.82, the key issue is

21  really who can provide the information that is required 24

22  hours before and is required by .82(1) to be provided in

23  person by -- either in phone, over the phone, or in person,

24  but orally to the woman seeking an abortion.  It starts out

25  very clearly.  The beginning portion of that section states

1    that the required information must be provided by the

2    physician or a qualified professional, and then they define

3    the term "qualified professional."

4            But then when you look at the individual

5    components under that, that's where the lack of clarity

6    comes in.  It seems that the State has clearly intended to

7    allow that information to be provided by a physician or

8    registered nurses, nurse practitioners, physician

9    assistants, or qualified technicians, but then they go and

10   say in several places that information is done in a

11   consultation with a physician, gestational age, probable

12   gestational age is determined by the physician, and at one

13   point they refer to the physician or -- a referring

14   physician or a qualified technician, totally -- again,

15   contradicting the opening piece which says that all of the

16   information can be provided either by a physician or by a

17   qualified professional.

18           So the most reasonable reading, Plaintiffs feel,

19   of 90-21.82(1) would be to accept the clear beginning

20   portion which lays out that any of this information can be

21   provided by either a physician or a qualified professional

22   as defined in the act.  But given the internal

23   contradictions within that provision, abortion providers

24   cannot safely assume that's what the State meant, and,

25   therefore, they're left at this risk if they make that

1    assumption given the actual wording that the State used.

2            Also vague, and this relates to both .82 and

3    Section 90-21.90, is this issue about the State materials

4    and the reading of the State materials.  Section 90-21.90,

5    which is termed "assurance of informed consent," it

6    amplifies the requirements of 90-21.82 related to the

7    State-prepared materials that the act mandates.

8            Again, .82 seems clear.  It says that a woman has

9    the right to review those materials, and she's to sign a

10   form saying she had the opportunity to review the

11   State-prepared materials.  Then when you get to .90, it

12   becomes unclear.  And by the way, the part in .82 is

13   comparable to the Pennsylvania statute where -- and the

14   Court uphold the Pennsylvania statute in part because it

15   says the State can require that you make available

16   State-prepared materials about fetal development and that

17   women then have a choice whether to view them or not.

18   That's exactly what was in Pennsylvania, and the Court said

19   that was acceptable.

20           That's what seems to be in .82(2) until you look

21   at .90, which seems to require that if the woman is

22   illiterate, either because she's unable to read English or

23   Spanish, the two languages in which the State materials must

24   be prepared, or she can't read in any language, it appears

25   to require that the physician or qualified professional has

1    to read those materials her.  So -- but it doesn't make

2    sense that a woman who can read either of those languages

3    does not have to read the State materials.  She simply has

4    to know they're available and have the opportunity to review

5    them if she wants to; and, yet, these other women are going

6    to be forced to have to have these materials read to them,

7    and the physician will be forced to have to read them to

8    them.

9           So, again, there's contradictions within the

10   statute that leaves abortion providers unclear on how they

11   can safely comply with the act and protect themselves and

12   ensure that they're performing a lawful abortion.  It seems

13   the most reasonable reading would be the reading that's in

14   .82, which is that all women have to have the -- be informed

15   of the availability of the State materials and be provided

16   the opportunity to review them.

17          So, for example, a woman who can't read in English

18   or Spanish can have her translator inform her what's in

19   those materials just as the statute allows her translator to

20   translate other information that the act mandates; and if

21   the woman is illiterate, perhaps there needs to be a

22   recording of what the materials say that she can listen to.

23   But that isn't how the law is written, so it's unclear how

24   providers can safely comply with this act and what their

25   obligations are if they have a woman who is not able to read

1    the State materials.

2         And then finally in terms of vagueness, in

3    addition to its other problems, which I've discussed, the

4    display and speech requirement has a lot of unclear

5    requirements within it.  For starters, it uses -- it

6    restricts who can do an ultrasound to a physician -- the

7    particular type of ultrasound that the State's now requiring

8    in this act is very different from the current requirement.

9    It says that that can only be provided by limited categories

10   of qualified persons, not by all the people qualified to

11   perform an ultrasound as is currently allowed.  It limits it

12   to the physician who is going to perform the abortion or a

13   qualified technician, as they define the term.

14        Then the State defines the term to include a term

15   that makes no sense in terms of actual medical practice in

16   North Carolina, because one of the categories of a person

17   who supposedly can be a qualified technician and meet the

18   requirements of .85 is an, quote, advanced practice nurse

19   practitioner in obstetrics, end quote.  But that, as we've

20   put in evidence to show, is not a term that has meaning in

21   North Carolina medical practice.

22        One has to assume the Legislature did not intend

23   to put in a totally meaningless term, but then one is left

24   with the quandary of how does one interpret that

25   requirement?  Perhaps it means that either an advanced

1   practice nurse, which is a term that's used, or a nurse
2   practitioner, another valid term, if either of those
3   categories of professionals has experience working with
4   pregnant women, thus, have experience in obstetrics, perhaps
5   those are what is meant by this term, and it just sort of
6   put -- it left out the "and" somewhere in the middle?  But,
7   again, it's not safe for abortion providers to assume what
8   it means.  So that requirement of actually who is allowed to
9   satisfy the requirements of the ultrasound law are not at
10  all clear.
11          Another lack of clarity in that Section .85 is the
12  requirement that the auscultation of the fetal heart tone be
13  done in a, quote, quality consistent with the standard
14  medical practice in the community.  There is no such medical
15  practice in the community because there is no medical
16  practice to make heart tones audible for women seeking
17  abortions.  That is something that's part of obstetrics
18  practice, it is not something that is part of abortion
19  practice.  So, again, abortion providers do not know how
20  they are supposed to comply with that requirement.
21          And then finally, the most confusing part is this
22  72-hour provision which states that if the woman has had an
23  obstetric display of a realtime image of the unborn child
24  within 72 hours before the abortion is to be performed, the
25  certification of the physician or qualified technician who

1   performed the procedure in compliance with this subsection

2   shall be included in the patient records, and then the

3   requirements of this section shall deemed to have been met.

4           It's subject -- this requirement is subject to

5   many contradictory, inconsistent interpretations which we've

6   laid out in our brief, but it appears the Legislature is

7   basically either trying to provide some sort of a limitation

8   such that the ultrasound has to be performed not just at

9   least four hours before, but within a 4- to 72-hour window,

10  or that it's meant to be some sort of exception that perhaps

11  if the woman goes to a different facility and has an

12  ultrasound performed, and then the people at that facility

13  comply with the requirements of .85 and then document that

14  and send her -- and then she decides to have an abortion and

15  goes with that documentation, and it's within that limited

16  time window, maybe that's what it's meant to be.  But it

17  really is impossible to know what it meant.

18          And I think that it's clear, though, that the

19  Legislature intended something by this and may indeed have

20  intended to, as I say, provide an exception and thus sort of

21  broaden the requirements of .85.  So the vagueness of that

22  section can best be cured by actually enjoining the entire

23  Section 90-21.85.

24          Finally, just briefly to mention the substitute

25  due process claim that Plaintiffs have brought.  If Your

1  Honor does not decide that Section 90-21.85, the display and
2  speech requirements, must be enjoined because it violates
3  the free rights of physicians or because of all the
4  vagueness problems I just mentioned, at a minimum it must be
5  enjoined as to those women who choose to avert their eyes
6  and/or refuse to hear the explanation because it is not even
7  rational to think that any State interest is served by
8  forcing those women to come in four hours before their
9  abortion and then waiting four hours to contemplate
10 information or images that they didn't see or hear.
11         And, of course, if that's the case and those women
12 are not subject to that, that would require that clearly
13 when people are scheduling their abortions, the abortion
14 facility would need to inform women, well, there's a
15 requirement right now under the State law -- the new State
16 law that you have to have an ultrasound in a particular
17 manner of a particular type for a particular purpose done
18 four hours ahead of time, and as part of that you'll be --
19 we'll put the screen in your view, and we'll describe, in
20 the way the State's told us we have to, the image that's on
21 the screen.  Now, if you don't want to have that, you don't
22 have to come in four hours ahead of time.
23         Well, obviously if that's done, that creates a
24 disincentive for any women to come in four hours ahead to
25 have that process which clearly the State did not intend to

1  create a disincentive for women to choose to view the screen

2  and hear the explanation.  So that flaw means that really

3  this whole -- it really strikes the whole section because it

4  doesn't make sense to require it for those women, but it

5  doesn't make sense to accept those women in the logical way

6  that I just described.

7          THE COURT:  So there you're not making an undue

8  burden argument, right?  You're not making that undue burden

9  argument that appears in so many of these cases at this

10  time.  I know you have it in your Complaint, but you're not

11  making it at this time, right?

12          MS. ANDERSON:  At this time we are not making an

13  undue burden claim; that's right, Your Honor.  We're saying

14  that this requirement doesn't even satisfy a rational basis.

15  It is just that bad.

16          And so it is simply -- you know, the State has

17  strained to come up with interests that are served by this

18  requirement that all of these women, you know, whether they

19  want -- the women that are going to avert their eyes and

20  refuse to hear it, it says that they have to come in, but it

21  doesn't make any sense to say that it advances any interest

22  in fetal life to do that, and there's certainly no support

23  in either evidence or logic to support the State's assertion

24  that there's some sort of psychological benefit to women to

25  be forced to undergo what they have termed this 4-hour

1  cooling-off period before they are able to obtain the

2  abortion that they've decided to have when they haven't even

3  looked at the image and heard the explanation.

4       And just finally, Your Honor, the balance of

5  equities really weighs in favor of Plaintiffs, and,

6  therefore, it justifies that an injunction be issued.  The

7  Government won't be harmed by being prevented from enforcing

8  these unconstitutional requirements.  There's no

9  administrative burden on the State that's going to be

10 present if this is enjoined.  There's certainly no cost on

11 the State that's going to be present if this is enjoined.

12      And enjoining this would maintain the status quo.

13 Women will continue to have informed consent.  Physicians

14 will continue to be required to obtain informed consent from

15 any women seeking abortion, just as is currently the law in

16 North Carolina, and they will continue to perform a

17 pre-abortion ultrasound, and women will, you know, be able,

18 if they want to, see the image or hear a description, but

19 there wouldn't be these unconstitutional requirements

20 imposed.  And for that reason also, an injunction really

21 does serve the public interest.

22      And it's clear in the cases we've cited in our

23 papers that upholding constitutional rights is in the

24 public's interest and that there's a -- there's also a

25 strong public interest in maintaining the integrity of the

```
 1  medical profession and the physician-patient relationship,
 2  and, as the evidence we've put in shows, this act actually
 3  undermines those.
 4          THE COURT:  So let me ask you one more question
 5  about the First Amendment argument.  So the Government can
 6  compel physicians to tell patients -- to give patients
 7  certain truthful and non-misleading information about
 8  medical procedures.  Do you agree with that generally?
 9          MS. ANDERSON:  As part of informed consent, one of
10  the categories that's allowed that's supposed to be covered
11  is indeed the medical procedure that the person is
12  contemplating having.
13          THE COURT:  And so why doesn't this -- what's
14  required by this statute fall into that category?
15          MS. ANDERSON:  This is entirely different from
16  that, Your Honor.  This is requiring that an experience with
17  a particular purpose and designed to achieve that purpose --
18  the State's purpose is imposed upon a person.  This is not
19  requiring, as in Casey, that the woman have information
20  about her procedure, about her alternatives, about the risks
21  of her procedure and the alternatives.  That's classic
22  informed consent information.  And the State is clearly --
23  as the court in Casey said, the State is clearly allowed to
24  regulate the profession of medicine in ways comparable to
25  other medical practice and that informed consent is
```

1    something that's required for all medical practice.

2         But you don't see another medical practice, and

3    it's not allowed here, and nothing in court decisions say it

4    can be, for the State to come in and say that you have to

5    have -- require women to undergo a particular experience to

6    extract information and images from their body and show

7    those to the women and describe those to the women in order

8    for them to have a medical procedure.  That is totally

9    outside normal informed consent.  And one of the things that

10   show that it's totally outside it is Dr. Lyerly's

11   declaration which explains the informed consent process and

12   the requirements that, as part of that, though there are

13   certainly categories of information that have to be provided

14   to a patient about a procedure, there's also a limit to how

15   much you tell the patient.

16        You don't tell -- you know, the patient has the

17   right of patient autonomy and decision-making as part of --

18   that's what informed consent is supposed to do, allow the

19   patient -- information to allow the patient to make an

20   informed decision as to whether or not to get medical

21   treatment.

22        And so there are -- it's not unlimited what a

23   physician can say.  The physician cannot go into any level

24   of detail simply as part of informed consent.  It is

25   supposed to be guided in part by the level of detail that

1    the woman wants.

2           Here, this requirement makes -- it doesn't allow

3    for the woman to say, well, maybe I want some explanation,

4    no explanation.  They basically have -- it's an all or

5    nothing situation or, you know, except to the extent she can

6    somehow refuse to hear.  So that is totally contrary to the

7    normal informed consent process, which is, of course, part

8    of the regulation of medicine.

9           And also cases make clear that the State doesn't

10   have an unlimited right to regulate the practice of

11   medicine, and physicians do not lose all free speech rights.

12   Certainly, the court in Texas reviewing that statute

13   recognized that.  The court in Florida in the Wolfanger case

14   recognized that.  And the court in Casey also did not say

15   that all information is allowed to be required, that in

16   particular ideological speech cannot be required.

17          And as I've explained here, when you look at the

18   totality of this section, the display and speech

19   requirement, it is clear this really is ideological speech.

20   It is not simply information at all like what is required

21   under informed consent.

22          THE COURT:  All right.  Did I cut you off before

23   you finished?

24          MS. ANDERSON:  No, Your Honor.  Just again, we

25   would seek an injunction to protect abortion providers and

1 their patients from the harm that would otherwise come if

2 this act goes into effect on October 26 or thereafter.

3    THE COURT:  All right.  Thank you.

4    MS. ANDERSON:  Thank you, Your Honor.

5    THE COURT:  All right.  For the defendant?

6    MR. HICKS:  Your Honor, may it please the Court,

7 again, my name is Faison Hicks, and I represent the State.

8    Before I begin my prepared remarks, I would like

9 to address the point that Ms. Anderson made about how this

10 case is completely different from all the other abortion

11 informed consent statutes that have come before the Supreme

12 Court in other courts in that it involves a statute which

13 compels a physician or other health care provider providing

14 abortion services to -- it sounds to me like what they are

15 really saying is to not only make this information available

16 to the patient, to the woman, but to make it available to

17 the woman in a way that she can't avoid actually receiving

18 hearing the information, seeing the information, and

19 otherwise processing the information.

20    THE COURT:  Well, isn't that what it does?

21    MR. HICKS:  No, ma'am, it does not.

22    THE COURT:  How do you refuse to hear?

23    MR. HICKS:  You don't have to -- well, the answer

24 to that question is this.  As I understand the statute, the

25 physician is required to perform an ultrasound, and he will

1    have a screen in front of him, I presume, a monitor in which

2    he'll be seeing the ultrasound image.  The patient, I

3    presume, will be laying on a table or sitting on a chair.

4    The physician could easily position a monitor at a 90-degree

5    angle to the right or left of the patient's head with the

6    patient facing this way so that the patient would have to

7    turn 90 degrees this way or that in order to see the

8    monitor.

9            Furthermore, Your Honor, the arrangement, as I

10   understand it, could be done in such a way that -- I don't

11   know whether anybody else in this courtroom is old enough to

12   remember this, but I'm certainly old enough to remember

13   attending a lot of depositions and going to a lot of trials

14   where the court reporter wore a mask.  It's a dictation

15   mask, and the court reporter speaks into the dictation mask

16   in a normal tone of voice, and yet no one in the courtroom

17   or the deposition can hear what he or she is saying.  The

18   deposition mask is connected electronically to some

19   recording device.

20           I presume that what would happen here, or at least

21   one option that could happen here, is that the dictation

22   mask into which the physician speaks as he or she is looking

23   at the sonogram monitoring screen would be connected to

24   earphones that the woman would wear that would have an

25   on/off switch so that the woman would be in complete control

1   of whether the information came to her or not.

2          So the State rejects the Plaintiffs' underlying

3   argument that this is information that's irresistible, that

4   is going to bombard the woman in a way that she can't avoid

5   it, she can't avoid hearing it, she can't avoid seeing.

6   That's, in our view, simply not so.  The woman does have

7   every opportunity to simply decide do I want to receive this

8   or do I not?

9          Have I answered the Court's question?

10          THE COURT:  So you're saying to comply with this

11   statute, the health care provider would need to buy this

12   special equipment?

13          MR. HICKS:  I'm saying that is one way that a

14   health care provider could clearly comply with this statute

15   by simply acquiring the equipment that court reporters I

16   know used to routinely use and probably still do so that --

17          THE COURT:  Okay.

18          MR. HICKS:  I didn't mean to cut you off.

19          THE COURT:  No, no, I was saying okay, yeah.

20          MR. HICKS:  Your Honor, I'd also like to hand up

21   for the Court a copy of 10A NCAC 14E.0305.  I have

22   additional copies.  I think Ms. Anderson is already aware of

23   it.  But just for the record and as an ease -- to be easy on

24   the Court, this is a copy of the administrative regulation

25   that goes back to 1976, I believe.

1          THE COURT:  Nineteen, what did you say?

2          MR. HICKS:  Seventy-six, February 1, 1976, that

3    says, among other things, in subpart D, that an ultrasound

4    examination shall be performed and the results posted in the

5    patient's medical record for any patient who is scheduled

6    for an abortion procedure.  There's nothing new about the

7    performance of an ultrasound procedure in connection with

8    abortions.  It's routinely done.

9          The ultrasound in this case under the act could be

10   performed.  It could be scheduled certainly within a 72-hour

11   time frame.  It could be scheduled such that the patient

12   would come in and have it performed and have the information

13   made available to her if she chose to perceive it and then

14   have either a 72-hour period or 4-hour period within which

15   to consider the information as it informs her decision.  So

16   I wanted to point those things out to the Court before I

17   began my argument in chief.

18          Your Honor, in the State's view, the key starting

19   point for determining whether the Plaintiffs' motion for a

20   preliminary injunction should be granted is the

21   determination of what is the proper legal standard by which

22   the act should be analyzed.  The Plaintiffs claim that the

23   proper legal standard is strict scrutiny, by which they

24   really mean the act should be held to be unconstitutional on

25   its face without any analysis at all of the interest that

```
 1   the act furthers, because that's what strict scrutiny really
 2   means.
 3          But the Supreme Court's decision in Casey
 4   carefully identified the analytical framework that courts
 5   should employ in evaluating the constitutionality of
 6   statutes imposing informed consent requirements on health
 7   care providers in the abortion context.  The State believes,
 8   Your Honor, that the Casey decision cannot be read
 9   reasonably as being anything other than a directive by the
10   Supreme Court -- well, an analytical framework that is
11   mandated by the Supreme Court for a genre of controversies,
12   namely, abortion informed consent cases.
13          The Casey Court did not limit the applicability of
14   this holding, it merely took the unique requirements of the
15   informed consent statute at issue in that case.  Rather, the
16   Court laid down generalized principles that the lower courts
17   are to apply in analyzing all informed consent to abortion
18   statutes which are challenged either as unconstitutional
19   because they allegedly force speech by physicians or which
20   are challenged as unconstitutionally inhibiting a woman's
21   right to obtain an abortion.
22          Just as in Casey, the Plaintiffs here challenge
23   the statute at issue facially as an unconstitutional
24   requirement that they --
25          THE COURT:  If you can just slow down just a hair.
```

1          MR. HICKS:  Oh, sure.

2          THE COURT:  So I can --

3          MR. HICKS:  I'm sorry, Your Honor.

4          THE COURT:  That's okay.  I hear, you know,

5    southern.

6          MR. HICKS:  Yes, ma'am.

7          Just as in Casey, I would merely point out that

8    the Plaintiffs' challenge here is a facial challenge to the

9    constitutionality of the North Carolina act on the ground

10   that it allegedly forces the physicians and other health

11   care providers to engage in speech with which they do not

12   agree.  In that sense, it's right on point with Casey.

13         Just as in Casey, the Plaintiffs here challenge

14   the statute at issue, again on facial, constitutional

15   grounds, as a restriction on a woman's right to have an

16   abortion.

17         Also just as in Casey, the Plaintiffs here are

18   physicians and abortion health care providers.

19         And just as in Casey, the statute at issue here is

20   a statute which requires health care providers in the

21   abortion context to provide specifically identified

22   information to the woman seeking an abortion in order to

23   fulfill the health care provider's legal duty to obtain the

24   informed consent of the patient.

25         Now, the Court, if I recall correctly, in

1    Ms. Anderson's argument asked Ms. Anderson a question that I
2    took to mean what is the difference in principle between the
3    information that the court in Casey said was
4    constitutionally permissible and the information that's
5    required by the North Carolina act that Ms. Anderson and her
6    colleagues believed is not admissible?  Your Honor, from my
7    perspective, from the State's perspective, although the
8    information is not the same, it's different information, it
9    is all the same in the sense that it is information that is
10   designed to inform a woman's decision about the question of
11   whether to have an abortion or whether to carry a child to
12   term.
13            These statutes are always going to be different.
14   Each one will have its own requirement -- unique
15   requirements as to what sort of information is conveyed, but
16   the key point in Casey was that so long as the information
17   conveyed is information that meets the requirements laid
18   down by the court there, including specifically that it
19   inform the woman's decision and not be designed to restrict,
20   that that sort of statute is constitutional.
21            Now, the legal standard that the Casey Court held
22   appropriate for challenges to the constitutionality to form
23   the consent to abortion statutes is what the Court referred
24   to as the undue burden statute.  Under this legal standard,
25   the undue burden on a woman's right to obtain abortions

1  exists such that the statute is invalid if the statute's

2  purpose or effect is to place substantial obstacles in the

3  path of the woman seeking an abortion prior to the time that

4  the fetus becomes viable.  Put another way, this standard

5  means that the statute at issue may not prohibit abortion

6  prior to fetal viability or impose a substantial obstacle

7  to, and I quote, the woman's effective right to elect the

8  procedure, closed quote.

9         The Court also held that an informed consent to

10  abortion statute imposes a substantial obstacle to a woman's

11  effective right to elect an abortion when the statute, and

12  again I quote, hinders the woman's free choice rather than

13  informing it, giving what I believe is a strong indication

14  of what the Court believes is appropriate in these acts;

15  that is, information, something that will inform the woman's

16  decision about whether to elect an abortion or not,

17  something in the nature of information that will provide the

18  woman with a mature and rational basis for deciding either

19  to carry the baby to term or to submit to an abortion.

20         And the Casey Court went on to say that what was

21  at issue in that case, and I believe in all of these consent

22  to obtain an abortion statutes, is the woman's right to make

23  the ultimate decision whether to have an abortion.  What is

24  not at issue is a right to be insulated from all others in

25  doing so.  Again, I think the Court is telling us something

1    about what the permissible purposes of these statutes are.

2    And one permissible purpose of a statute like the act that's

3    at issue today is for the State to inform the woman of a

4    number of things, the moral consequences of an abortion, the

5    consequences to the fetus, the potential consequences to her

6    future psychological and emotional health as the court

7    supposed them to be and determined as a matter of fact they

8    were.

9           The Casey Court went so far as to say that to

10   promote the State's profound interest in potential life

11   throughout pregnancy, the State may take measures to ensure

12   that the woman's choice is informed, and measures designed

13   to advance this interest will not be invalidated so long as

14   their purpose is to persuade the woman to choose childbirth

15   over abortion, so long as the information that the informed

16   consent statute requires the doctor to convey is truthful

17   and not misleading and so long as those measures do not

18   unduly burden the woman's right to choose.

19          Thus, the Casey Court held that an informed

20   consent to abortion statute will be upheld even if it is

21   designed to persuade the woman to choose childbirth over

22   abortion, so long as the statute does not unduly interfere

23   with a woman's right to make the ultimate decision and is

24   reasonably related to the goal of trying to persuade the

25   woman to choose childbirth over abortion and requires the

physician to impart only truthful and not misleading
information.

Here, the statute could not go any further in
requiring the transmission, the offering up, if you will, of
truthful and not misleading information because the statute
requires that at least in so far as the sonogram and the
fetal heartbeats sound are concerned exact information.  I
mean, it's realtime -- a realtime view of the woman's unborn
child and of the sound of the unborn child's heartbeat if
that's audible.  Nothing could be more true and accurate or
scientific than those facts.  There's nothing misleading
about any of that.

THE COURT:  Now, the State is not requiring the
doctor to make the heart tone available in all cases, right?
They only have to offer that --

MR. HICKS:  That's correct.

THE COURT:  -- if I understand correctly.

MR. HICKS:  And indeed, Your Honor, the -- as I
understand the statute, the State does not require the
physician or other health care provider and to get through
to the patient even with the sonogram.  The sonogram, as I
think the Court observed earlier, has to be displayed on a
monitor in the room.  To me, it would -- I think it would be
more than sufficient if the monitor were at a 90-degree
angle to the woman's head so that she could make the

1   decision whether to avail herself of the opportunity, and

2   the statute clearly says the information is only to be

3   offered to her, not to be forced upon her.

4           In addition, the Casey Court stated that consent

5   to abortion statutes that are designed to foster the health

6   of a woman seeking an abortion are valid if they do not

7   constitute an undue burden on the woman's effective right to

8   choose, and the Court specifically concluded that the

9   psychological health of a woman seeking an abortion is a

10  matter in which the State has a substantial government

11  interest.

12          The Court then said something that to me is

13  compelling for the Plaintiffs' motion, and that is the Court

14  said -- and this was repeated by a different majority in the

15  Gonzales case.  It said as fact that -- if I'm getting

16  this -- if I'm repeating it correctly -- that a woman who

17  goes to get an abortion who is not shown the fetal sonogram,

18  who is not shown an image of her unborn child, and who

19  elects to abort, and who then some time down the road sees

20  the image of an unborn child with its members, with its

21  eyes, with its head, and other human features, may suffer

22  what the Court termed "devastating psychological injury."

23  The court in Gonzales went much further in describing that

24  sort of psychological injury.

25          So, again, it seems to me that the State is

1  supported not just by Casey in requiring that a physician at
2  least offer this information to the patient if she is
3  willing to look at it --
4          THE COURT:  Of course, this -- you know, this
5  statute goes further than offering, don't you think?
6          MR. HICKS:  No, ma'am, I do not.  I believe, as I
7  said earlier, that the statute simply requires the physician
8  to put out a monitor and to say to the woman, you're free to
9  look at this.  This is what -- it's going to depict -- it's
10 going to be the sonogram of your unborn -- of your fetus or
11 embryo.  You may look at this.  You're free not to look at
12 this.  I believe, as I've already said to the Court, that a
13 physician, particularly if the physician feels the way I
14 believe the Plaintiffs do in this case, can and probably
15 would adopt some technological method such as a dictation
16 mask that would make it feasible for the physician to
17 dictate the description that's required by the statute into
18 the mask so that it could only be heard by the woman on her
19 earphones if she elected to turn on the turn-on button and
20 not if she elected to turn the earphones offer.
21          In short, I absolutely reject the argument that
22 this information is information that inevitably will get
23 through to the patient whether the patient wants to hear it
24 and see it or not.  That's just not true.  Existing
25 technology can prevent any such eventuality.

     1          THE COURT:  One way that this case is a little

     2   different from Casey is it requires speech by the doctor.

     3   As I understood Casey, it was materials to be made

     4   available.  Do you think that's a distinction that makes any

     5   difference?

     6          MR. HICKS:  No, ma'am, particularly in light of

     7   the Plaintiffs' attorney's responses to the Court when the

     8   Court asked a similar question to them, and their response,

     9   as I understood it, was this is symbolic speech; and surely

    10   providing literature to a woman, written literature, or

    11   pointing her to a website that contains that literature or

    12   reading or speaking information through the telephone,

    13   surely at a bare minimum those acts would constitute the

    14   same sort of compelled symbolic speech, but I think it would

    15   go farther than that.

    16          So to me, the Casey statute, which dealt with

    17   providing facts, documents, and that sort of thing, is

    18   different from this statute only in a very ironic way, and

    19   in a sense this is, I think, the nub of this case, Your

    20   Honor.  I believe the more I read and hear the Plaintiffs'

    21   argument that their real grievance with the act is that the

    22   General Assembly is requiring that they offer information to

    23   a patient which is, just by its nature, so compelling, so

    24   powerful, that they fear it will be persuasive.

    25          It would be, to my way of thinking, a very strange

1  thing if courts said you can provide cold record documents

2  that are incredibly technical and boring and medical in

3  their nature and scientific in their nature, that's okay.

4  That's all to the good because it allegedly informs a woman

5  and gives her the information to make a mature judgment, as

6  the Casey Court said, about whether to have an abortion or

7  not.  And yet when a State says, well, we would like you to

8  offer up information that really is interesting, compelling,

9  something that really has the power to possibly change a

10  mind or two, then precisely because it is powerful, there's

11  an objection that the information is somehow

12  unconstitutional.

13          Have I answered the Court's question?

14          THE COURT:  Um-hum.

15          MR. HICKS:  The Casey Court specifically held,

16  Your Honor, that an informed consent to abortion statute may

17  lawfully and constitutionally require physicians and other

18  health care providers to inform a woman seeking an abortion

19  of the availability of truthful and non-misleading materials

20  relating to the consequences to the fetus, even when those

21  consequences have no direct relation to her health.

22          Now, again, if Casey would allow a statute to

23  require health care providers to provide materials that are

24  relevant to those subjects, that is to say, the welfare of

25  the fetus itself, even if it's unrelated to the Plaintiffs'

own health, then surely that same rule would apply to a
different form of information that's offered optionally to
the woman.  The sonogram, the image of her child, the sound
of the child's -- unborn child's heartbeat, the description
if she wishes to hear it of the members and features of the
child.  There's no difference in principle.  All of these
things go to inform the woman and to enable her to make a
decision on an informed basis about whether to abort the
pregnancy.

          The Casey Court also specifically upheld the
validity of the 24-hour waiting period imposed by an
informed consent to abortion statute as a reasonable measure
to implement the State's interest in protecting the fetus.

          Finally, the Casey Court dismissed out of hand the
Plaintiffs' argument that an otherwise valid informed
consent to abortion statute is unconstitutional simply
because it interferes with the doctor-patient relationship
and the argument that the abortion provider's First
Amendment speech rights are violated by such a statute.
Casey specifically dealt with those two issues.  If Casey
applies here, and I believe it does -- I believe any
faithful, fair reading of Casey demonstrates that it does
apply here -- if it does, those two arguments are out the
window.

          Thus, in the State's view, the issue presented by

1    the Plaintiffs' facial challenge to the statute is whether

2    the North Carolina informed consent to abortion statute

3    requires them to communicate information that is truthful,

4    not misleading, and that creates an obstacle, a meaningful,

5    significant obstacle to the woman's practical ability to

6    have an abortion.

7            THE COURT:  You know, you said something a minute

8    ago about moral issues here.  So is it your position that --

9    this would go further than what the State actually did.  But

10   under your argument, could the State require the doctor to

11   say to the patient that abortion -- you know, pick your

12   statement, but abortion is morally wrong, or abortion is

13   killing, or something like that.  I mean, a lot of your

14   argument sounds like you think that the State could make the

15   doctor deliver that message to the patient so long as the

16   patient could put her iPhone, you know, turn her iPad on --

17   her iPod, okay, her iThing, her iPad, her i -- you know, her

18   music thing on before the doctor delivered the message.  And

19   I'm joking about it, but obviously it's very serious.  Is

20   that something you think the State could do?

21           MR. HICKS:  I don't know, Your Honor, and I'm not

22   saying that to dodge your question.  I honestly don't know.

23   What I said was simply that comes right out of Casey.  Casey

24   specifically says that a statute -- an informed consent to

25   abortion statute may discuss the moral consequences of

1    abortion, I think the moral and philosophical underpinnings

2    of abortion.  And I would simply --

3              THE COURT:  So direct me to exactly where it says

4    that part.

5              MR. HICKS:  Will you give me a moment, Your Honor?

6              THE COURT:  Uh-huh.

7              MR. HICKS:  If you'll just bear with me, Your

8    Honor.

9              THE COURT:  Yeah, take your time.

10             MR. HICKS:  Thank you.  Your Honor, I'm looking at

11   page 872.

12             THE COURT:  872?

13             MR. HICKS:  Yes, Your Honor.

14             THE COURT:  Okay.  I see it.  Philosophic and

15   social arguments?

16             MR. HICKS:  Yes, Your Honor, and there's also

17   discussion -- at some point they use the word "moral

18   implications."  But this is -- maybe I spotted this

19   immediately, but I'm confident that the word "moral" or

20   "morality" is contained in one of the Court's statements

21   about what the statutes can do, and I would be happy to

22   provide the Court with a supplemental letter brief or

23   something that will identify the exact quote.

24             THE COURT:  All right.  Well, I'll read it again.

25             MR. HICKS:  May I answer your question, though,

1  because I don't think I really did.

2          THE COURT:  Yes, go ahead.

3          MR. HICKS:  If I recall correctly, the Court asked

4  me whether I would go so far as to say that an informed

5  consent to abortion statute may dictate that the physician

6  says something like an abortion would kill an unborn child

7  or it's immoral or something really strong like that, and I

8  think I said to the Court I really don't know the answer to

9  that.

10          That is not the case here, and it's important to

11  say that.  That is not what the General Assembly did here.

12  It may be that if a physician's imposition of authority were

13  required to make judgment calls, value judgments like that,

14  that that would go too far.  I mean, that may very well be,

15  and that is not our case, and that's not what the act

16  requires.

17          I would also --

18          THE COURT:  So you'd basically disagree with the

19  Plaintiffs when they say this is ideological speech?

20          MR. HICKS:  Yes, absolutely, Your Honor.  If it's

21  ideological speech -- see, I'm not even sure I understand

22  what that term really means in the context of informed

23  consent to abortion statutes, because Casey says that

24  statutes that do almost everything -- in fact, I think

25  everything that this statute does are okay.  It specifically

says they are okay.  So if that's ideological speech for the

State to simply say we have a profound preference for

potential life, Casey says the State can say that.  It can

require a physician to transmit the State's message if

that's the message.

          What is perhaps being lost here, though, is this.

Note that the statute ultimately really requires a certain

minimum communication of information.  It does not

require -- it doesn't say to the physician this is all you

shall say, and you're not entitled to say another word; and

it doesn't tell the physician, for the most part, how to say

these things.  For example, there's nothing in the statute

after the physician has imparted the information that the

statute requires -- there's nothing in the statute that

would prevent the physician from saying, look, my own view,

as your physician, is that the information that I've just

given you or just offered to give you, which you have chosen

to ignore or not to ignore, is really not very relevant to

your decision in your circumstances to have an abortion.  I

don't believe as your physician that there will be any

untoward psychological consequences to you in the future if

you have one.  There are any other number of things a

physician could say if he or she were so inclined, and the

statute doesn't forbid that.  It doesn't restrain any of

that.

1          Now, getting back to whether the information

2    required to be communicated but not received in this case

3    is -- would pass muster under the Supreme Court's decision,

4    the Supreme Court in Casey said all information required to

5    be communicated must be truthful and not misleading.  Again,

6    the information here couldn't be more truthful.  It couldn't

7    be less misleading.  It's scientific and medical in nature.

8    It's not only absolutely factual, but it's information

9    that's specifically tailored to the woman who is

10   considered -- the individual woman who is considering having

11   an abortion.

12          In addition, all the information that's required

13   by the statute is designed to assist the woman in making an

14   informed and mature decision about whether to have an

15   abortion or deliver her child.  That's specifically

16   permitted by Casey.  It specifically says a state statute

17   that does that is okay.

18          Furthermore, the information required by the act

19   to be communicated is also designed to promote the State's

20   interest in protecting the woman from the future devastating

21   psychological health consequences, which at least the Casey

22   Court, the highest court in the country, and the Gonzales

23   Court found, would, in fact, ensue if the woman had the

24   abortion without knowing this information and then later for

25   the first time came upon this information.

1    The Gonzales Court went to much greater lengths

2 than the Casey Court in articulating what it, it appears to

3 me, concluded as a fact are the devastating future

4 psychological consequences and injuries to the woman if she

5 is not offered this information prior to having her

6 abortion.  In terms of --

7    THE COURT:  I mean, that's an interesting point.

8 If that's so, then why can't the State force her to look at

9 it and listen to it?

10    MR. HICKS:  I don't know that the State can't.

11 The General Assembly decided, for reasons which I'm not

12 aware, not to go that far.  I can surmise.  I can conjecture

13 and guess that they thought it was prudential not to go that

14 far and that they thought perhaps that Plaintiffs would make

15 an argument in a court asking the Court to enjoin the

16 statute, an argument that the Court -- that might be more

17 moving and compelling to a Court if the Plaintiffs could say

18 this -- the plaintiff -- or the poor woman has to listen to

19 this, she has to be subjected to this, and it's enormously

20 upsetting.  Perhaps that's why the General Assembly chose to

21 make this elective rather than not elective.

22    But the fact is the statute does not require the

23 woman to look, to listen, or to receive this information.

24 She is indeed free to elect -- just as she's free to elect

25 to have her abortion or not, she's free to elect to receive

1   this information or not.  And in that sense, I believe, the

2   statute, just at a common sense level, is reasonable.  It's

3   not oppressive.  It does not punish her.  It does not force

4   her into an emotionally difficult situation.

5           Have I answered the Court's question?

6           THE COURT:  Um-hum.

7           MR. HICKS:  I was going to go on, Your Honor, to

8   address the question of whether the act's informed consent

9   provisions are rationally related to protecting any interest

10  that the State has a legitimate interest in.

11          And, again, under the specific language in Casey,

12  as reinforced by Gonzales, the act's informed consent

13  provisions are rationally related to protecting the woman's

14  future psychological health, something that's specifically

15  recognized by Casey, to the State's interest in promoting

16  the potential life of the unborn child; again, something

17  that's specifically recognized by Casey and Gonzales as

18  legitimate governmental interest and the State's interest in

19  ensuring that the woman not undergo an abortion without at

20  least having an opportunity to fully appreciate the

21  consequences to herself and to her unborn child.

22          In terms of the void for vagueness argument, I

23  will direct the Court's attention to Gonzales.  The Court in

24  that case specifically held that the act at issue there,

25  like the act -- the act at issue there was a criminal

1    statute.  The act at issue here is not.  The Court found

2    that significant.

3            THE COURT:  So what does it mean -- why is it in

4    the statute there at the beginning of 90-21.85(a), the

5    statute we're mostly talking about, it says,

6    "Notwithstanding GS14-451."  Well, I believe the 14s, that's

7    criminal law.

8            MR. HICKS:  It is.

9            THE COURT:  Yeah, so why is that there?  What is

10   the purpose of that phrase?

11           MR. HICKS:  My understanding of that -- my reading

12   of it is simply this, that the General Assembly was saying

13   there are criminal statutes that regulate in a criminal way

14   the performance of abortion.  Despite those, putting those

15   aside as not being applicable here, the civil liabilities

16   for violating this statute are X.

17           Now, it may be that that was not the most artful

18   way to state this, but I think the Court would have to twist

19   itself into the shape of a pretzel to come to the

20   affirmative conclusion that there is criminal liability in

21   the statute, and I would just ask the Court to consider

22   this:  If I were representing a criminal defendant charged

23   with a crime under this particular statute, a physician, for

24   not complying with this statute, I'd ask the Court to

25   consider whether the Court would look favorably upon my

1    argument that, oh, Your Honor, you have to be kidding.

2    Criminal statutes have to be clear.  There can't be any

3    doubt about whether they impose a sanction.  This statute

4    doesn't meet that standard by a long shot.  At most, at

5    most, in the context of a case where Plaintiffs want the

6    statute to be held unconstitutional, they point to that

7    screwy choice of phrase and say the statute is criminal, and

8    it's not.

9              THE COURT:  So you're saying that basically that's

10   in there to make it clear it's not --

11             MR. HICKS:  It's not --

12             THE COURT:  -- criminal?

13             MR. HICKS:  It is not criminal, and that's there

14   to make clear it's not criminal.

15             Your Honor, in Gonzales the Supreme Court also

16   made a considerable deal out of the scienter requirement and

17   said that scienter requirements alleviate vagueness

18   concerns.  There are very considerable scienter requirements

19   in this statute.  They vary from section to section, but

20   they go from things like knowing, willful -- or not

21   willful -- knowing, reckless.  There's also a section of the

22   act that I noticed for the first time this morning -- if I

23   could just have a moment, Your Honor?

24             Your Honor, I would direct your attention to

25   90-21.81(2).  This is the definition of attempt to perform

an abortion.  It reads:  An act or omission of a statutorily

required act that under the circumstances as the actor

believes them to be -- well, right there is a gigantic

window of opportunity for Defendants who are being faced

with charges that they've civilly violated this statute, the

State would have to prove that the actor if -- excuse me --

what the actor actually believed the circumstances to be,

but they go on to read:  An act or omission of a statutorily

required act that under the circumstances as the actor

believes them to be constitutes a substantial step in the

course of conduct -- I would argue the statute means -- that

is planned to culminate in the performance of an abortion in

violation of this article.

          Well, I think there's a pretty substantial

argument there that in order to be held civilly liable, the

physician or other health care provider would have had to

plan the course of conduct with a view to violating the act,

with a specific view to violating the act.

          Now, that's certainly not an intentional expansive

mens rea requirement.  It's perhaps, if anything, not very

artful drafting.  But the argument that this statute is a

trap for the unwary and that there will be horrific

consequences for physicians and health care providers if the

act is not enjoined seems to me to be a stretch, a

considerable stretch.

1        Your Honor, the Gonzales Court in addressing this

2  very argument also noted something that needs to be noted

3  here, a challenge to a statute that's based on arbitrary

4  enforcement is also likely to be speculative when the

5  challenge comes prior to any attempt by anybody to enforce

6  the statute.  We're here at the pre-enforcement, facial

7  unconstitutionality stage.  There's been no attempt by the

8  State to enforce the statute.  And so what we have is sort

9  of a parade of terribles, a parade of possible terribles

10  that, again, to me suggest that the Plaintiffs are trying to

11  read this statute to create problems in order to show the

12  Court that the statute needs to be enjoined.

13        As the Court in Gonzales says, the canon of

14  constitutional avoidance reads every reasonable construction

15  must be resorted to in order to save a statute from being

16  held unconstitutional, and that should be done here.  Now,

17  Your Honor --

18        THE COURT:  So can I ask you about that?

19        MR. HICKS:  Of course.

20        THE COURT:  21.90(b), that's the should the woman

21  be unable to read.

22        MR. HICKS:  I'm sorry, 21 point?

23        THE COURT:  21.90(b), should a woman be unable to

24  read the material, somebody has to read them to her.  So

25  does that mean what it says, or does it mean -- in which

1   case it does raise the question I asked you earlier, or does

2   it mean that if the woman can't read or can't read it in the

3   language that it's provided that somebody has to read it to

4   her if she wants them to?  I mean, do you read into that an

5   option because people who can read English certainly have

6   the option not to read the materials.

7              MR. HICKS:  The Court is asking me whether the

8   verb "presented" means that the woman must, of necessity,

9   actually received the information?

10             THE COURT:  No, uh-uh, I'm sorry.  I'm looking at

11  90-21.90(b).

12             MR. HICKS:  Oh, forgive me, Your Honor.

13             THE COURT:  Yeah, I'm sorry.  I may have misstated

14  it.

15             MR. HICKS:  No, I'm sure you did.

16             THE COURT:  That's the one that --

17             MR. HICKS:  Yes, Your Honor, I'm reading it now.

18  Your Honor, I think the answer to your question is the

19  information -- the subpart B refers back --

20             THE COURT:  Um-hum.

21             MR. HICKS:  -- to 90-21.82 --

22             THE COURT:  Right.

23             MR. HICKS:  -- and I believe that the information

24  required in .82 is, by and large, the information that was

25  okayed by the Casey Court for the Pennsylvania statute.  In

1    other words, this is not -- this is not the fetal -- or the

2    presentation of sonogram.  This is a statement that there

3    will be a fetal presentation or there will be a presentation

4    of a fetal sonogram, there will be a -- if possible, if

5    fetal heartbeat can be perceived, there will be a

6    presentation in some manner of that information.

7            But I believe that found at .82 is essentially the

8    information that was required for the Pennsylvania informed

9    consent statute:  The name of the physician who will perform

10   the abortion, the medical risks associated with a particular

11   abortion procedure, the gestational age of the unborn child,

12   medical risks of carrying a child to full term, the fact of

13   a display of a realtime view of the unborn child will be

14   made, whether the physician has liability insurance or not,

15   whether the physician has admitting privileges at a hospital

16   within a certain number of miles.

17           THE COURT:  I took it to be directed towards the

18   printed materials referenced in -- I'm just going to use the

19   last number, Section 82.2(e), which says the woman has the

20   right to review the printed materials in GS 90-21.83, which

21   is much more than what you were just talking about.

22           MR. HICKS:  The physician has to or qualified

23   professional has to inform the woman either by telephone or

24   in person that, among other things, the woman has the right

25   to review the printed materials described in .83 --

1          THE COURT:  Right.

2          MR. HICKS:  -- that these materials are available

3   on a State-sponsored website.

4          THE COURT:  And if she can't read those materials

5   in English or if she can't read at all or Spanish or

6   whatever language it happens to be available in, then

7   according to Section 90(b), somebody has to read it to her.

8          MR. HICKS:  That's -- I believe that's correct,

9   and I believe that the only difference between that and

10  Casey is that the physician or the qualified health care

11  provider has to go a step beyond handing the document to the

12  woman or citing her to a website.

13         THE COURT:  Right.

14         MR. HICKS:  Has to actually read it.  But this is

15  not the sonogram.

16         THE COURT:  I know, but it is the part where

17  according to 21.83 it has -- apparently then the doctor

18  would have to read the dimensions of the unborn child,

19  information about brain and heart functions, the presence of

20  external members and internal organs, shall provide

21  information about the methods of abortion procedures

22  employed, and then, as you say, the medical risks, the

23  possible adverse psychological effects.  I mean, so the

24  doctor actually has to actually -- I mean, I don't know

25  exactly what the materials say, but that's what .83 requires

1    them to say, so --

2            MR. HICKS:  It's my understanding of the statute,

3    Your Honor, from my prior readings of it that the statute

4    does not require the physician or the health care provider

5    to read over the telephone or in person a description of the

6    fetal anatomy --

7            THE COURT:  Okay.

8            MR. HICKS:  -- a reading of the sonogram.  It

9    does -- I agree with you, it does require that the

10   physician, among other things, if the woman -- if the

11   physician believes that the woman cannot read English or

12   Spanish, would require the physician to read the materials

13   over the telephone or in person, the written materials, to

14   her that are prescribed in .82.  But I do not believe that

15   it requires the physician to go beyond that and say you have

16   to come in here, let me perform a sonogram, and then either

17   read to you what the sonogram says so that you will

18   absolutely hear it or let you hear the fetal heartbeat, and

19   I thought that's what I heard the Court asking.

20           THE COURT:  No, I'm not talking about the sonogram

21   or the ultrasound or the fetal heartbeat at all.  I'm trying

22   to find out what that subsection means.  If she's unable to

23   read the materials provided, then the physician or qualified

24   professional has to read those materials to her.

25           MR. HICKS:  I believe you're right, Your Honor.

```
 1              THE COURT:  So what materials?

 2              MR. HICKS:  I believe these are the materials that

 3    are specified in 90-21.82.

 4              THE COURT:  Uh-huh, and that would be?

 5              MR. HICKS:  Oh, I'm sorry.  That would be --

 6              THE COURT:  I mean, it looks to me like it refers

 7    to --

 8              MR. HICKS:  I think it's the printed materials

 9    that are described -- I'm reading from -- I'm reading from

10    90-21.82(2) --

11              THE COURT:  E.

12              MR. HICKS:  E, yes, Your Honor.  I believe that

13    the health care provider would have to read to such a woman

14    the materials described -- printed materials described in GS

15    90-23.83.

16              THE COURT:  And then when you look and turn at

17    those -- well, I turn.  I don't know how yours is printed

18    out.  But that's where I was reading to you in sub -- in

19    .83(a)(2), the information about dimensions and external

20    members and internal organs and such.

21              MR. HICKS:  Well, these are the materials that

22    current -- well, these are the materials that would have to

23    be provided physically or through a website by mail or in

24    person to a woman, and they do indeed describe among many

25    other things --
```

         1          THE COURT:  But if she can't read them, then the

         2   physician has to read them to her.

         3          MR. HICKS:  Yes, that's my reading of the statute,

         4   Your Honor.

         5          THE COURT:  Okay.  And so she does not have the

         6   option, like people who can read English or, presumably,

         7   Spanish, I don't know what other languages maybe it's being

         8   done in, of not reading it.  She has to --

         9          MR. HICKS:  Well, she has the option of not

        10   reading it.

        11          THE COURT:  Well, she has the option of not

        12   reading it, but of --

        13          MR. HICKS:  Of ignoring it.

        14          THE COURT:  I guess she -- her only choice is if

        15   she doesn't want to hear it, she also has to put her earbuds

        16   in.

        17          MR. HICKS:  Your Honor, I don't know that my

        18   practical life experience is universal for everyone, but I

        19   have been accused many times by my wife of being in a room

        20   with her while she tells me important things, and somehow I

        21   totally miss them.  I don't believe that all human beings

        22   listen to all the information that is spoken to them.  If

        23   so, every student in school would be an A student.  No, I

        24   don't believe that a woman is compelled in any meaningful

        25   sense to actually perceive this information, but I take your

```
 1   point, and I believe that you're correct in your
 2   understanding of the statute.
 3            THE COURT:  Okay.  All right.  Thank you.  And I
 4   think I might need to take a short break.  You may finish
 5   your argument, and I'll hear rebuttal.  So why don't we take
 6   a 10-minute recess.
 7            (At 11:50 a.m., break taken.)
 8            (At 12:00 p.m., break concluded.)
 9            THE COURT:  You know, I was just going to say I
10   think I have interrupted your argument a good bit, so I'll
11   let you get back to where you were when I started asking you
12   questions.
13            MR. HICKS:  I'm happy to answer the Court's
14   questions and appreciate it.
15            Your Honor, getting back to the question that you
16   last asked me, again, I don't have a crystal ball, and I
17   don't have inside information as to what the General
18   Assembly intended by the provision that you questioned me
19   about, but it strikes me just a matter of common sense that
20   perhaps what the General Assembly was seeking to avoid by
21   creating this language about reading to the patient was a
22   situation where there's a patient who -- well, who just
23   can't read, and the General Assembly thought, look, it just
24   wouldn't be fair to treat -- well, I mean, the purpose of
25   the statute is to inform.
```

1          THE COURT:  Right.

2          MR. HICKS:  It just wouldn't be fair -- it would

3    be bizarre for us, the members of the General Assembly, to

4    say on the one hand that the information that the statute

5    hopes -- obviously hopes that the patient will receive,

6    process, take into account, consider, it would be bizarre if

7    we have high hopes that most patients will read that or

8    perceive it, take it into account, and then along comes

9    somebody who literally can't read and the General Assembly

10   insensitively says, oh, well, who cares.

11         My sense is that probably in an imperfect world

12   with imperfect solutions, that was probably something that

13   was -- that they grasped at, perhaps imperfectly, to deal

14   with that problem.

15         However, to me the larger issue, the larger point,

16   is this.  The statute doesn't contain any requirement for

17   the offering up of information concerning a woman's decision

18   whether to have an abortion or not that the Casey Court

19   didn't approve, and the State doesn't shrink from saying

20   that those requirements are constitutional and okay because

21   the Casey Court said that, and that's the law of the land.

22         Now, Your Honor, as to the vagueness arguments

23   that have been made, I'm looking at page 9 of the

24   Plaintiffs' reply brief, there are five bullets that are

25   identified there.

1          THE COURT:  Page?

2          MR. HICKS:  Nine.

3          THE COURT:  Uh-huh.

4          MR. HICKS:  Yes, ma'am, of their reply brief.  Is

5     the Court there?

6          THE COURT:  Yes.

7          MR. HICKS:  The first one is may a registered

8     nurse who is a qualified professional provide all of the

9     information required by .82?  Well, I take -- I take that

10    qualified professional registered nurse language as an

11    alternative provision that the General Assembly has offered

12    up, an option, something that makes the statute more

13    convenient for the Plaintiffs, not less so, and don't think

14    the Court should enjoin the statute because the General

15    Assembly is trying to make it easier for the Plaintiffs to

16    comply.  I mean, the General Assembly could simply say the

17    physician has to do this.

18          We've discussed .2 at length.

19          .3, can a nurse practitioner with a certification

20    in obstetrical ultrasonography and experience in an abortion

21    clinic fulfill the requirements of Section 90-21.85?  Again,

22    I think the statute provides a list of who can do this, and

23    therefore, it seems to me, that enjoining the statute on the

24    ground that one provider or the description of one provider

25    is allegedly vague would be a very strange thing to do.  The

1    General Assembly is trying to help these people by giving

2    more options.

3              How does one make the fetal heart tone in a

4    quality consistent with the standard medical practice when

5    there is no practice of doing that at all?  Well, there's

6    presumably a standard medical practice today that defines

7    how audible and loud and clear the tone of the fetal

8    heartbeat must be for the physician himself to hear when the

9    physician is examining an ultrasound, and my reading of the

10   statute is that it has to meet that standard.  It seems to

11   me that's an effort to try to imagine how this language is

12   constitutional rather than trying to find ways to say it's

13   not.

14             What does the 72-hour provision mean if a woman

15   has an ultrasound that complies --

16             THE COURT:  So can I ask you about that to make

17   sure I understand what you're saying?

18             MR. HICKS:  Yes, ma'am.

19             THE COURT:  You're saying if for some reason the

20   doctor thought it was important for the doctor to hear the

21   heartbeat, then whatever steps the doctor would take so the

22   doctor could hear it, those are the steps the doctor has to

23   take so the patient can hear it if the patient wants to hear

24   it?

25             MR. HICKS:  Yes, ma'am.  That's my reading -- my

1    common sense reading of the statute.   Surely what is good

2    enough for the physician would be good enough for the

3    patient.

4           THE COURT:   Okay.

5           MR. HICKS:   The doctor can't deliver quality

6    medical advice and services without properly perceiving the

7    sound.   I assume that's true.

8           THE COURT:   Okay.   Go ahead.

9           MR. HICKS:   And then finally, what does the

10   72-hour provision mean?   If a woman has an ultrasound that

11   complies with Section .85 four days before the abortion, is

12   that okay?   I take the statute to say, yes, it is okay, if

13   the -- in fact, what I took that to mean is this, Your

14   Honor.   Again, I thought the General Assembly was trying to

15   provide an alternative means so that if the physician -- if

16   the physician who provides the ultrasound is not the same

17   physician who is going to actually perform the abortion some

18   days later, the 72-hour provision was put in place so that

19   the patient could still go to the abortion clinic.   The

20   physician could provide the ultrasound and then another one

21   of his partners could perform the abortion some days later.

22   Again, that strikes me as an effort by the General Assembly

23   to make the statute practicable and workable and not an

24   under due burden for them.   It doesn't strike me as

25   something that the statute or the General Assembly should be

```
 1   penalized for.  Just giving them more options that might be
 2   helpful to them.
 3              Are there any further questions that I can answer
 4   for the Court?
 5              THE COURT:  I did want to ask you about your
 6   brief, because the Plaintiffs did make this argument.  In
 7   your brief when you -- on the First Amendment issue, the two
 8   interests that your brief talked about were the mental
 9   health of the mother and preventing coerced abortions, and
10   you did not rely in your brief on the State's interest in --
11   it's phrased different ways in the cases, but, you know, the
12   State's interest in promoting childbirth as opposed to
13   abortion except in the due process section, so -- but you
14   don't appear to have limited yourself here today.
15              MR. HICKS:  No, Your Honor, and I believe that it
16   is legitimate for the State to rely upon that part of Casey
17   which says that the State may in these statutes express its
18   preference for life.  It may articulate its view, its
19   prejudice, if you will, in favor of life and against
20   abortion.
21              I would also point out, though, that there's
22   nothing fanciful about the notion that a woman's health may
23   be severely injured if she does not at least have the
24   opportunity to receive the information that's at issue here.
25   The Supreme Court itself made this finding.  I mean, it went
```

1  way out of its way.  It called it a "devastating
2  psychological impact."  The Court again years later in
3  Gonzales went to even greater lengths in describing
4  eloquently the sort of damage that it believed would be
5  done.  I just don't think it can be fairly stated today that
6  there's no evidence for this.  I believe there's the sort of
7  evidence that this Court has to take notice of if it comes
8  from the Supreme Court itself in the form of a finding.
9            THE COURT:  Okay.  I do have one other question.
10           MR. HICKS:  Oh, yes, ma'am.
11           THE COURT:  The statute doesn't have any opt out
12  for if the doctor thinks that some part of this would be --
13  would cause psychological or psychiatric harm to the
14  patient.
15           MR. HICKS:  It appears to me that that is correct,
16  Your Honor.
17           THE COURT:  And does that matter in the analysis?
18  Is that a factor that needs to be taken into account, maybe
19  not on the First Amendment issue, but maybe it's just --
20  maybe it's more if the due process argument or the undue
21  burden issue ever gets raised.
22           MR. HICKS:  The State's view of that is no, Your
23  Honor.
24           THE COURT:  All right.  I think that was my last
25  question.  Anything else you want to say to me?

1          MR. HICKS:  For now, I think that's enough, Your

2     Honor.  I may have some comments after the -- after Bebe has

3     made her argument.

4          THE COURT:  Thank you.

5          MR. HICKS:  Thank you, Your Honor.

6          THE COURT:  All right.  Ms. Anderson?

7          MS. ANDERSON:  Thank you, Your Honor.

8          I think it might be helpful to sort of step back

9     and see what .85 -- how it will play out as it's actually

10    written, and that is that a woman who calls to have an

11    abortion, among other things, will be told you have to come

12    in four hours -- at least four hours ahead of time.  We're

13    going to schedule you for this mandatory ultrasound that the

14    State's requiring now.  She comes in.  She's on the

15    operating table and either having a vaginal or abdominal

16    ultrasound performed.  Depending on how far along her

17    pregnancy is determines which type of ultrasound is

18    typically used.  And while that's happening, the physician

19    turns the screen so that it's in her view.  The statute

20    requires that it be -- the images be displayed so that the

21    pregnant woman may view them.  So he turns the screen so

22    that those images are in the view.

23          If the woman says to the physician I don't want to

24    look at those images, I don't need to see that, I don't want

25    that as part of my decision-making, the physician has to

1    say, I'm sorry, the State says I have to put those in your

2    view, whether you want to look at them or not, but the State

3    says you may avert your eyes.  So the woman's lying there,

4    and she can, you know, put her eyes down, close her eyes,

5    avert her eyes in some way and not look.

6              Then the physician has to describe -- provide

7    specific information as part of the description and

8    explanation.  And though it is true that the law does not

9    preclude the physician from saying other things, the State

10   has cherry picked what the physician must say.  It doesn't

11   say the physician has to describe the images.  The physician

12   has to say if certain things are present.  It doesn't have

13   to say if they're absent.  So, again, it is part of -- when

14   looked at in its entirety part of the ideological package

15   that this requirement embodies and this whole experience

16   imparts to the woman.

17             So the physician starts to describe, and the woman

18   says I don't want to hear that, I don't need to hear that,

19   that would be very upsetting to me, or I already had an

20   ultrasound, in fact, as you know, I'm here because the

21   ultrasound showed a fetal anomaly, or, you know, I'm a

22   13-year-old incest victim, and I really don't want to hear

23   that, that's going to be very upsetting to me, the physician

24   has to say I'm sorry, the State requires that I provide this

25   explanation and description to you; otherwise, you cannot

1  have a legal abortion.  Now, it appears that the State feels

2  that this is okay because the physician can try to obtain

3  some sort of equipment, I don't know, noise-blocking

4  earphones, some sort of a deposition mask or court

5  reporter's mask that Defendants suggested.  But in any

6  event, this again -- I mean, this is -- she's here for this

7  medical procedure the State's requiring, and so these sort

8  of extreme measures have to be gone through to try to

9  accommodate the patient's wishes in terms of the level of

10 detail or the information she wants.

11         So that's what -- and also, of course, a physician

12 has to offer to make the heart tone audible in a manner --

13 in medical practice.  But as we've pointed out in evidence,

14 they're -- as Dr. Stuart says, they're -- auscultation of

15 fetal heart tone is not done as part of abortion practice.

16 Dr. Stuart teaches medical students how to perform abortions

17 at UNC.  This is not part of what is taught as part of how

18 to perform abortions.  So there is no medical practice that

19 involves making heart tone audible.

20         So that is what Subsection 85 requires.  There is

21 nothing at all in Casey like that.  There's nothing at all

22 in Gonzales like that.  Gonzales didn't even involve

23 informed consent requirements, much less, you know -- didn't

24 involve any informed consent requirements, also didn't

25 involve any ultrasound requirements.  Casey involved

1    informed consent requirement, but no ultrasound

2    requirements.  So just as a factual matter, those weren't at

3    issue before the court.

4            Now, it is true that in both cases the courts made

5    some broad statements.  They also made some limited

6    statements, and they also ruled on what was in front of

7    them.  And in particular, Casey, in addressing -- it first

8    addressed the undue burden claim; but then when it turned to

9    the First Amendment claim of compelled speech in Casey, it

10   didn't say, well, we've concluded there's no undue burden,

11   so that takes care of the First Amendment issue, period.

12   No, what they did is they said, okay, now we're going to

13   turn to the First Amendment right, and they said what

14   they're ruling on.  All that's left of petitioner's argument

15   is a, quote, asserted First Amendment right of a physician

16   not to provide information about the risk of abortion and

17   childbirth in a manner mandated by the State, end quote.

18   That is not the type of information and experience at issue

19   here set forth in .85.

20           And then the Court went on to say that, you know,

21   the physician's First Amendment rights are clearly

22   implicated, but in this context they're saying it's, quote,

23   only as part of the practice of medicine subject to

24   reasonable licensing and regulation by the State, end quote.

25   Again, relating to, as we talked about earlier, informed

1  consent is something that the State is allowed to require

2  that physicians obtain before performing any medical

3  procedure.

4  THE COURT: Now, the State seems to say that Casey

5  allows the State to require the doctor to make ideological

6  speech to the patients. That's what I heard argued.

7  MS. ANDERSON: That's also what I heard argued,

8  Your Honor.

9  THE COURT: Okay. So what part of that do you

10  disagree with?

11  MS. ANDERSON: I disagree that Casey said that the

12  State may require ideological information be imparted to

13  women. Casey does not stand for that. Casey did not rule

14  that the State may do that. Casey did not address that

15  issue.

16  And, again, you have to look at Casey both in

17  terms of what the Court actually said -- and just to -- and

18  the first amendment part, it said -- again, what the Court

19  actually said, it ended that analysis of the First Amendment

20  claim by saying, quote, we see no constitutional infirmity

21  in the requirement that the physician provide the

22  information mandated by the State here. It didn't say we

23  see no constitutional infirmity when the State requires any

24  information or the State requires ideological information or

25  the State requires anything that is truthful and not

1    misleading.  They didn't say that.  They said the

2    information here is all right under the First Amendment.

3            And, again, even when they are talking in the

4    undue burden setting where they do talk about truthful and

5    misleading and say that if it is, you know, truthful and

6    misleading, it's not going to be an undue burden, they again

7    limit themselves, though, in terms of what they say.  They

8    say that the State may require -- it's stated with reference

9    to information about the risks and nature of the abortion

10   procedure, risk of childbirth, and the probable gestational

11   age of the fetus, that, quote, if the information the State

12   requires to be made available to the woman is truthful and

13   not misleading, the requirement may be permissible, and then

14   it found the specific information before it in that case was

15   permissible.  It did not rule more broadly.  It would not

16   have been appropriate for them to do so, and it didn't.

17   That's what the Court decided.

18           And also they say, again, in Casey, quote, we see

19   no reason why the State may not require doctors to inform a

20   woman seeking an abortion of the availability of materials

21   related to the consequences to the fetus, even when those

22   consequences have no direct relation to her health.  So the

23   Court allowed the requirement that a physician make

24   available State materials that put forth some of the State's

25   view of what's important for the woman's decision-making,

1  which is not the same as requiring that the physician

2  describe to the woman and show the woman her own fetus

3  before she can get a lawful abortion.

4        And so, again, the Defendants argue for a very

5  broad reading of Casey which isn't justified by either the

6  undue burden analysis of Casey, which is not their First

7  Amendment analysis, or their First Amendment analysis.

8        Now, in terms of truthful and misleading, which

9  again comes into their undue burden analysis in Casey, they

10 again -- as I mentioned, they said it may be permissible.

11 They did not say that anything that is truthful and not

12 misleading is not an undue burden and, therefore, not a

13 violation of privacy.

14       So, for example, Your Honor posited the idea that

15 maybe the State -- what if the State said the physician has

16 to say abortion is murder.  Well, again Casey didn't say

17 ideological speech is okay, and that I think would be

18 clearly ideological speech.  But what if the State said that

19 an abortion provider has to say to every patient some people

20 believe that abortion is murder.  That is absolutely a true

21 statement.  It is absolutely true that in the United States

22 today some people believe abortion is murder.  However, that

23 would clearly be ideological, impermissible under the First

24 Amendment to make the physician be the mouthpiece for the

25 State's statement about what abortion is.

1        And since the Gonzales decision, several courts
2   have interpreted Gonzales -- the language in Gonzales and
3   Casey and recognized that they did not -- the broad
4   statements in those decisions did not give states carte
5   blanche to impose any type of requirement under the
6   justification that it's supposedly designed to inform.
7        So, for example, the Planned Parenthood versus
8   Heineman case cited in our papers and in Defendants' papers
9   out of Nebraska, 2010, found that the requirement about risk
10  factors violated, you know, Casey and Gonzales -- or was not
11  allowed under Casey and Gonzales.  Again, limited what the
12  State could do.
13        Similarly, in Planned Parenthood versus Dogard,
14  which was a South Dakota case in 2011, First Amendment
15  violation was found both for a requirement that a woman had
16  to go to a crisis pregnancy center and provide information,
17  but also that the risk factor information that the State was
18  requiring physicians provide, that violated the First
19  Amendment post Gonzales, post Casey
20        THE COURT:  But didn't -- in both of those cases,
21  didn't the Court find that that's because it either was --
22  basically was untruthful, I mean, it was misleading, that it
23  was inaccurate?
24        MS. ANDERSON:  Well, Your Honor, in both of those
25  cases, they did focus a lot on the truthful/misleading

1    standard.  Again, this was -- one of the big differences in

2    those cases to our case is that was information that was

3    sort of added to the list of what is going to be part of the

4    informed consent requirements.  So Casey starts out with

5    their list in Pennsylvania; and since then, states have, you

6    know, tried to add to that list, and sometimes they've gone

7    too far, and sometimes they haven't.  The point I'm making

8    about that is that the State's -- the courts have recognized

9    that Gonzales and Casey did not give carte blanche to

10   anything just because it's designed to inform.

11             And, of course, the most relevant precedent or the

12   most relevant decision is the Texas Medical Providers

13   decision which actually looked at this type of -- the

14   requirements in this type of statute and there found that

15   those ultrasound requirements clearly violated the First

16   Amendment rights, and clearly the Casey analysis, either

17   under the First Amendment or undue burden, did not apply to

18   that First Amendment claim asserted in the Texas case.

19             And along with misstating -- or what Casey stands

20   for, Defendants have also misstated what Gonzales stands

21   for, and I just want to make sure there's no confusion in

22   the record.  Again, Gonzales had nothing to do did with an

23   ultrasound requirement, nothing to do with informed consent

24   requirements like even in .82.  The dicta that the

25   Defendants try to rely upon repeatedly is in -- the Court

1   was talking about information about the specific medical

2   procedure that women would receive, which again is a classic

3   informed consent category of information, wholly unlike

4   anything required by the ultrasound requirements here.

5           In terms of the purpose of this, it is even more

6   confusing, I think, after hearing Defendants' response what

7   purpose is served by these requirements.  Defendant --

8   they've certainly misstated this is an offer.  It is not a

9   mandatory offer, it's a mandatory put it in her view,

10  describe it, explain it.  But they also -- Defendants also

11  said that the act does not require physicians to get through

12  to women and that there can be this mask and the on/off

13  button on headphones so the woman hears nothing and the

14  woman sees nothing.  If that's the case, what possible

15  purpose does it serve to require women to come in at least

16  four hours ahead of time to have an ultrasound for this

17  purpose and then, you know, they don't hear and they don't

18  see, it is simply -- no purpose can be possibly served by

19  that requirement.

20          Also relating --

21          THE COURT:  So are you saying -- I'm trying to

22  figure out the implications of what you just said.  I'm

23  sorry.  I'm having a little trouble articulating it.

24          MS. ANDERSON:  Should I try to re-articulate?

25          THE COURT:  Okay.  Yes, go ahead.

1          MS. ANDERSON:   I think that there are several

2    points to this that I'm trying to make, Your Honor, and will

3    try to make more clearly.

4          No. 1, Defendants are misstating what this is.

5    This is not an offer.   These are mandated experiences and

6    symbolic speech that's required.   And they try to justify

7    those requirements by saying that they're going to prevent

8    psychological harm and coercion and then also promote the

9    potential life.   Well, they have no evidence whatsoever that

10   these requirements are going to in any way protect women

11   from psychological harm, no evidence that women are harmed

12   by not being required to have the image put in their view

13   and the information be imparted through the physician's

14   mouth and later seeing or hearing a fetal heartbeat, which

15   is their premise for their psychological harm related to

16   .85.   They have no evidence and there's no logic to say that

17   those requirements will prevent women from being coerced

18   into having an abortion.

19          So, moreover, they say that the women may turn

20   off -- you know, look away, and they do not have to hear.

21   So they're acknowledging that really this is -- it's one way

22   in which they are acknowledging that this is not narrowly

23   tailored, this is overbroad, and the overbroad aspect to it

24   serves no possible purpose.   It serves no possible purpose

25   to force the women to come in four hours early if they're

1   going to choose not to look and not to hear.

2           And as I mentioned before, if that's the case, and

3   it clearly is, it can't possibly serve a legitimate purpose,

4   then what purpose is served -- then it would not make sense

5   to then say, well, that's all right, that's an acceptable --

6   that's okay.  The State can do that.  The State can require

7   women to come in and go through the charade and to put on

8   these headphones and turn on the off switch and look away,

9   and yet they're still going to have to wait four hours to

10  contemplate something they didn't see or hear, and yet --

11  you know, so that makes no sense.  But then if the State

12  says, all right, we'll allow for it to be enjoined as to

13  those women who don't want to see or hear, then clearly you

14  would have to let women know when they're scheduling you

15  have this opposition, which clearly defeats the State's

16  purpose.

17          So there's -- this whole bundle of what they're

18  requiring doesn't match what they say it is, doesn't match

19  anything in Casey and Gonzales, doesn't match anything

20  upheld by any court in this country, and doesn't hold

21  together and make sense in terms of serving a purpose and

22  serving a purpose in a narrowly tailored -- by a narrowly

23  tailored means

24          THE COURT:  So I think maybe I've figured out how

25  to say my question.  Do you have the statute in front of

1  you?

2         MS. ANDERSON:  Yes, I do, Your Honor.

3         THE COURT:  Okay.  So looking at 21.85, it says in

4  sub A, at least four hours before the procedure, you have to

5  come in.  And then the first thing that happens there in sub

6  sub one is you have to have the ultrasound.  And then you've

7  got these other things that we're talking about.

8         So you are saying that if the require -- what have

9  you been calling them -- the speech and display provisions

10  violate the defendant's First Amendment rights, then that

11  means sub one is unnecessary because it has no purpose, and

12  it's -- but it's not unconstitutional by itself, is it?  Or

13  are you saying that on First Amendment grounds and on the

14  basis of the arguments you're making today?

15         MS. ANDERSON:  Right, Your Honor.  We're certainly

16  not saying that it's unconstitutional to require an

17  ultrasound, and, in fact, the law currently requires an

18  ultrasound.

19         THE COURT:  Okay.

20         MS. ANDERSON:  This law changes those

21  requirements, and part of the changes is you have to come in

22  four hours early, and it's -- only limited people can do the

23  ultrasound, not everyone who is qualified to do an

24  ultrasound.  And why is it changed that way?  Because it's

25  then so that this display can be put in your view and this

```
 1    explanation and description can be provided to you.  That's

 2    the purpose of changing the requirements in terms of the

 3    temporal requirements and who performs the ultrasound.

 4              So if the temporal -- if the requirement that the

 5    display be put in your view and the explanation of the

 6    description be provided does, as we say, as Plaintiffs say,

 7    violate First Amendment rights of the physicians and is

 8    struck, there's no purpose to these changes to the rest of

 9    the law.  And, again, it's looking at the law in context and

10    seeing the totality of the new requirements, what does this

11    law change?  And by the way, that's one way in which this

12    law is different than Texas.  Texas did not have any

13    requirement preexisting for an ultrasound.  Here we have

14    that in North Carolina.

15              And so there already is going to be an ultrasound.

16    A woman is already going to have the opportunity to look at

17    the screen, look at the images, ask for them to be

18    explained.  So this -- peeling off this piece and just

19    leaving one serves no purpose if, as we assert, the rest of

20    the package is found to be a violation of the physician's

21    First Amendment rights.

22              In terms of -- Your Honor was asking Defendants

23    about this provision about reading it.  We certainly --

24    Plaintiffs read 90-21.90(b) where it says "unable to read

25    the materials provided to the woman pursuant to this
```

1  section" to be referring to, I think, what Your Honor was

2  focusing on, which is the part of 90-21.82(2), which is E,

3  which is the -- states the woman has the right to review the

4  printed materials described in Subsection 83 which is the

5  State materials, and then further on in subsection three of

6  90-21.82, it again says the woman has to be informed of her

7  opportunity to review the information. So, again, we would

8  submit that it doesn't make sense and isn't appropriate for

9  the Defendants to require that a woman who is illiterate has

10  to have the materials read to her when other women do not

11  have to read the materials, and they clearly do not have to

12  read the materials under the language of the statute.

13         Just to turn quickly to the scienter issue which

14  Defendants addressed, they leave out the fact that there are

15  administrative penalties, that there's serious licensure

16  penalties if a physician performs an abortion in violation

17  of law. There is no scienter there. In the Gonzales case,

18  there was scienter. It was a criminal law. It has

19  scienter. And there is certainly Supreme Court case law

20  that supports the position that someone is not required to

21  try to comply with a vague statute and then wait and see if

22  they get sanctioned, penalized, criminalized -- penalized in

23  some way, and for -- one case that stands for that principle

24  is Babbit v United Farmworkers National Union at 442 US 289,

25  1979. So certainly Plaintiffs should not be put in the

1   position of having to sort of take a chance that they're

2   interpreting unclear provisions correctly and then see if

3   they are sanctioned or are sued or have some other penalty.

4           In terms of criminal penalties, Plaintiffs are not

5   looking for trouble.  Plaintiffs would be very happy if this

6   law did not have criminal penalties or does not have

7   criminal penalties.  Initially reading it, I never thought

8   it had criminal penalties.  But then when you look at it

9   more carefully and you see that reference to the criminal

10  statute that is in .85 and not in any other section, again,

11  statutory construction principles say you can't just ignore

12  what the Legislature has put in there, you're supposed to

13  try to figure it has some meaning, and so that's why there

14  is this uncertainty for Plaintiffs as to whether there are

15  criminal penalties.

16          But certainly we would be happy if there's an

17  enforceable order that says there are no criminal penalties

18  that would bind the prosecutors and their successors and so

19  that physicians would not have to worry that they actually

20  would be subject to criminal penalties under this law.

21          In terms of the vagueness that the response of

22  Defendants, the reading -- it seems that they're proposing

23  that one can read .82 saying that all of the information can

24  be provided either by a physician or a qualified

25  professional.  They said that the Legislature was trying to

1    make it more convenient.  Again, that is a reading that

2    Plaintiffs would welcome, but not one that Plaintiffs feel

3    they can safely assume given the contradictions in the

4    statute and would certainly need something stronger than

5    Defendants' statement in court that that's the reading.

6    Again, would need protection of a court order binding

7    Defendants and their successors.

8            In terms of the requirement as to who is a

9    qualified technician, if the Legislature was trying to help

10   by giving more options, as Defendants say, it would have

11   helped if they gave an option that made sense in terms of

12   medical practice.

13           In terms of the 72-hour requirement, again,

14   Defendants have said now that it means that if a

15   physician -- any physician, whether -- you know, I

16   understand them to mean any physician doesn't have to be the

17   physician who will perform the procedure.  If any physician

18   performs the ultrasound and does it within the 72- to 4-hour

19   window and does the paperwork required here and complies

20   that that would be acceptable, that is certainly a

21   reading -- you know, if that -- we don't want that statute

22   to -- provision to stand for other reasons.  But if it were

23   to stand, that would be a reading that would -- certainly is

24   one plausible reading and certainly would be one that

25   Plaintiffs could live with.

1          THE COURT:  Well, what else could it mean?

2          MS. ANDERSON:  Well, Your Honor, that's the thing.

3    It's hard to know what it means.  I think that it could mean

4    that.  It could mean that you have to have the ultrasound

5    within a 4- to 72-hour window in any circumstances.  It

6    could mean that -- we're not sure what it means.

7          It just seems odd -- it wasn't written to clearly

8    say that, because, for example, a lot of statutes regulating

9    abortion put some informed consent or other requirements --

10   place it on referring physicians or just physicians

11   generally.  Here, you know, if they said for example

12   "referring physician," that might have been clear.  But if

13   that's what it means, that would be again -- it seems that

14   would be one possible reading of it.  But other readings

15   were that it couldn't be since the statute requires that it

16   be the physician who performed the procedure in the general

17   part.  Does that mean this only applies if it's at some

18   other facility?  Defendants say no.  That's certainly an

19   acceptable reading if that's what it means.  But it doesn't

20   seem to be the only reading.

21          But, again, if the Court can do a limited reading

22   to make some -- give some clarity based on what Defendants

23   say and that would protect Plaintiffs so they could rely on

24   that information, that would be helpful if that provision

25   stands.

```
 1          I think that one thing that's very important to
 2   point out, again, Defendants seem to imply, and I may have
 3   misheard, but seem to imply that Casey and/or Gonzales --
 4   actually, the Supreme Court made findings that the type --
 5   that women would be harmed if they did not look at an
 6   ultrasound image or hear the description.  Clearly, neither
 7   of those cases stood for that.  So, again, maybe I was
 8   mishearing what Defendants said because those cases, again,
 9   did not involve that at all.
10          And just as a point for the record, Defendants
11   have misstated what Casey required.  There were several
12   other things in .82 that were not required in Casey, but
13   that's not the basis upon which we're seeking a preliminary
14   injunction, Your Honor.
15          Do you have any questions?
16          THE COURT:  No.  Thank you.
17          MS. ANDERSON:  Thank you, Your Honor.
18          THE COURT:  I'll give you a limited --
19          MR. HICKS:  I won't take but a minute, Your Honor.
20          THE COURT:  -- opportunity.
21          MR. HICKS:  Just a couple points.  One, I did not
22   mention in my initial presentation something that I'm sure
23   the Court already knows, and that is that there is a
24   substantial, I would say, comprehensive severability clause
25   in the statute that I believe would and should inform any
```

1   court's decision about a facial attack, particularly on the

2   vagueness issues, the alleged vagueness issues.

3          Two, the scienter issue that Ms. Anderson raised,

4   either I don't understand it, or, if I do understand it, I

5   certainly don't agree with it because the provision -- the

6   ethics provision of the North Carolina Medical Licensing

7   Board that they cite in their brief essentially says that

8   the licensing board can revoke, suspend, or do other things

9   to your license that are bad if it determines that you have

10  performed an abortion illegally in North Carolina.  But in

11  order to determine that an abortion has been performed

12  illegally in North Carolina, one has to look at the statute

13  which contains scienter requirements.  So scienter, by

14  definition, is important into what the licensing board would

15  be able to do.

16         Finally, the Casey Court -- it's true.

17  Ms. Anderson is right.  The Casey Court did not say in these

18  words that a State can require a physician to give what

19  Ms. Anderson calls ideological speech.  What I was trying to

20  say to the Court when the Court asked me this question was

21  that, as a practical matter, I don't think that the term

22  "ideological speech" has much meaning anymore after Casey,

23  at least not in the context of consent -- informed consent

24  for abortion statutes because what the Casey Court said is

25  definitely okay are things that clearly are allowed to

1   impart the State's preference.  I think profound preference,
2   it said, for continued life of the child as opposed to
3   abortion and many other things that impart the State's, I
4   don't know what you want to call it, philosophical or
5   ideological view, whatever you want to call it.

6           So to say that the Casey Court didn't okay
7   ideological speech in this context, okay, it's true, the
8   Casey Court didn't use those terms.  But I think if you look
9   beyond quotes and look at what the Casey Court really did
10  put its imprimatur on, if that's not ideological, I'm not
11  sure what is.

12          Your Honor, one final point, and that is this.
13  It's not possible for me to know at this point what the
14  Court's views are about the vagueness issue or, for that
15  matter, any others, and I'm also a little confused by the
16  evidence.  If the Court wishes us to come and present
17  evidence in December, that's what we would like to do.

18          If the Court, however, is going to issue or
19  proposes to at least decide on the question of whether to
20  issue a temporary restraining order based on its view of
21  evidence tendered by the Plaintiffs, I think the Defendants
22  would like to have the opportunity very quickly and
23  expeditiously to present the Court with counterevidence.  If
24  the Court is going to decide this facial challenge on
25  evidence, then I think we'd like to have the opportunity to

1  at least put it in the record.

2          THE COURT:  All right.  Thank you.

3          MR. HICKS:  Thank you, Your Honor.

4          THE COURT:  Anything you want to say?

5          MS. ANDERSON:  Thank you, Your Honor, just I

6  wanted to mention that, of course, we would object to any

7  delay in any decision on injunction so that Defendants could

8  put in evidence.  They have had an opportunity under the

9  Court's scheduling order to do so.  They chose not to do so.

10  And they'll be -- you know, abortion providers and women

11  seeking abortions will be harmed if this law is allowed to

12  go into effect, and, therefore, we would oppose any

13  submissions at this time by defendant or certainly any

14  submissions that would have the potential to delay in any

15  way the Court's decision.  Thank you, Your Honor.

16          THE COURT:  Thank you.  Let me ask the State one

17  more question.

18          MR. HICKS:  Yes, Your Honor.

19          THE COURT:  The argument -- you all have gone back

20  and forth, so I don't know exactly when this was made.  But

21  the Plaintiffs' argument that the 4-hour delay after the

22  ultrasound does not have any purpose if the remaining

23  provisions were to be put on hold for whatever reason, what

24  do you say about that?

25          MR. HICKS:  First, I want to be sure I understand

1    it.  I thought I heard Ms. Anderson's argument to be that if

2    a woman comes in seeking an abortion and says I do not want

3    to receive that information, then what could possibly be the

4    point of making her wait four hours.  Is that a fair

5    characterization of what she was saying?

6         THE COURT:  You heard the same thing I did.  I

7    mean, I guess, what I'm trying to understand is does the

8    State say there is a reason for requiring people to come in

9    four hours before the procedure to have the sonogram if the

10   doctor does not have to provide the visual display and the

11   words that go with it?

12        MR. HICKS:  As our brief stated, Your Honor, and,

13   again, I want to be clear about this, the State does not

14   shrink from this.  I understand the statute, and I believe

15   that my colleagues understand the statute to intend to offer

16   up to the woman seeking an abortion information that the

17   State believes is profoundly necessary in order to

18   adequately inform her decision about whether to have it.

19   And I believe that the statute is designed to present

20   information in a form that is far more powerful than simply

21   a piece of paper.  And, therefore, I take it that the 4-hour

22   period, whether the woman decides to avail herself or not,

23   is intended as a period of sober reflection for the woman on

24   whether she should have looked at the information, whether

25   she should now change her mind and say I would now like to

1  see it --

2         THE COURT:  Okay.  But maybe I'm not -- I must not

3  be asking my question the right way.  Just -- I don't know

4  what I'm going to do yet, so, you know, this is not code.

5         MR. HICKS:  Yes, Your Honor.

6         THE COURT:  But I'm trying to not get you to come

7  back or have lots of fights about what orders say, you know,

8  when I get there, so I'm trying to think of all my

9  questions.

10         MR. HICKS:  Yes, ma'am.

11         THE COURT:  So if the Court were to say that an

12  injunction would be appropriate just -- an injunction would

13  be appropriate on the -- what the Plaintiffs have been

14  calling the speech and display, the part that says you have

15  to show them the ultrasound and you have to describe to them

16  what is visible on the screen, if that violates the

17  physician's First Amendment rights, then is there any

18  remaining purpose to the other provision of subsection 85 or

19  .85 that requires you to come in four hours early for the

20  sonogram?  I mean, does it all stand or fall together in

21  that way?

22         MR. HICKS:  I believe it does.  I think the 4-hour

23  period itself is a signal to the woman that this is a solemn

24  occasion in which the State is giving you a cooling-off

25  period, a 4-hour period to soberly and judicially consider

1    your next step, whether she receives the information or not,

2    whether she avails herself of the information or not.

3            THE COURT:  Okay.  Thank you.  Okay.  So the one

4    thing that I think might be helpful to me, being a fairly

5    concrete person, would be if I got some proposed orders

6    to -- you know, injunctions are very specific things.  So

7    what I would like the plaintiff to prepare and submit would

8    be one proposed order that would just address the First

9    Amendment issue and doesn't address the vagueness or due

10   process argument that you've presented.  Then a separate one

11   that addresses only your void-for-vagueness issues and

12   breaking it down so that I can look at each one in

13   particular.  And then another one that just -- that

14   addresses the void-for-vagueness issue that doesn't impose

15   the injunction but addresses the concerns that you were

16   saying needed to be addressed.

17           Now, of course, I'd would be happy for the

18   defendant to do that, too.  But if I rule your way, the

19   order just needs to say "denied."  So I'm happy for you to

20   submit whatever you want, but it's not helpful in the same

21   kind of way.

22           MR. HICKS:  Is the Court afraid that my feelings

23   will be hurt if you don't solicit an order from me?

24           THE COURT:  I just want to be sure you know I'm

25   happy to hear from you on this; I just don't want to make

1   you do something that doesn't seem to have a lot of purpose

2   to it.  And I'm asking the plaintiff to submit that more to

3   help me think about it than I am for, you know, any

4   argumentative purposes.  So if you all can do that.  Today

5   is Monday.  Can you get it to me -- I'm sensitive to the --

6   I believe it's next week, correct -- some time on Wednesday.

7   Is that feasible?

8              MS. ANDERSON:  Yes.

9              THE COURT:  Okay.  And --

10             MR. HICKS:  Upon our receipt -- excuse me, Your

11  Honor, may I?

12             THE COURT:  Yes, uh-huh.

13             MR. HICKS:  Upon the State's receipt of the

14  proposed orders from counsel for the plaintiff, does the

15  Court contemplate that the State may be heard in response to

16  those report orders, or what is --

17             THE COURT:  Well, that's what I was saying.  I

18  mean, I would be happy to give you the option of presenting

19  alternative proposed orders that reach the same result if

20  there's -- or that, you know, quarrel with the use of the

21  language.

22             MR. HICKS:  Yes, ma'am.

23             THE COURT:  I mean, as I say, if I rule your way,

24  I just throw those out the door and say "denied" because I

25  don't have to really do a lot more than that, I don't think.

1 But if I'm going to enjoin somebody from doing something,

2 then, you know, I need a fairly specific order, and I would

3 welcome your thoughts not that that would be the wrong

4 decision, but that the wording of it, that there's problems

5 with the wording of it.

6     MR. HICKS:  Yes, ma'am.  That's exactly what I was

7 asking.

8     THE COURT:  Yes.  So, you know, if you all get me

9 something by Wednesday, and you get me something --

10     MR. HICKS:  In response maybe by Thursday?

11     THE COURT:  -- by Thursday, that would be all

12 right.  But I don't want either of these to argue really

13 about the merits.  You know, this would just be, as we used

14 to say in state court, the form of the order.  I assume

15 that's a meaningful term here as well.

16     So, yeah, I don't really -- you all have argued

17 the case and briefed it pretty thoroughly, so I don't feel

18 the need for -- but I am sensitive to the way that things

19 are worded.  And so if I do decide to enjoin something, I

20 don't want to do something unintentionally or cause problems

21 that I'm not aware of.  So I would like you all to give me

22 very -- three separate, very specific ones and submit them

23 electronically -- well, talk to Ms. Sanders about the way to

24 submit that because there's some ways that you can do that

25 that are more helpful than others.

1          MR. HICKS:  Is a Word document acceptable to the

2     Court?

3          THE COURT:  Yes, I prefer it, never having

4     mastered Word Perfect.  Yes, I would prefer that.  So if you

5     all would get it to me by Wednesday; you get it to me by

6     Thursday.

7          MR. HICKS:  Yes, Your Honor.

8          MS. ANDERSON:  Your Honor, if I could just get a

9     point of clarification?  Is the third proposed order you

10    suggest one basically that would provide interpretations of

11    the vague sections?

12         THE COURT:  Well, you made an argument towards the

13    end that so long as the State's interpretation was, in fact,

14    what the law meant, then you were okay with that as long as

15    there was an enforceable order saying so, and I took that to

16    mean you were asking me to say so if I agreed with the

17    State's interpretation.  So that's what I was offering you

18    the opportunity to present.

19         MS. ANDERSON:  Thank you, Your Honor.

20         THE COURT:  And, you know, obviously on that one,

21    it would be particularly important for you all to be heard

22    about the form or to offer an alternative way to say it.

23         MR. HICKS:  I understand.

24         THE COURT:  You know, I'm open to -- I really

25    would probably prefer that you just offer me an alternative

1  way to say it rather than quarrel with the way that they

2  have said it.

3         MR. HICKS:  Yes, Your Honor.

4         THE COURT:  Any other questions about the

5  logistics or housekeeping matters?  Yes?

6         MS. ANDERSON:  Well, Your Honor, maybe then we

7  could get our proposed order, that third one in by the end

8  of tomorrow so that Defendants have until the end of

9  Wednesday, and that way you would have everything by the end

10  of Wednesday.

11         THE COURT:  If you all can do it by tomorrow, then

12  that's great.  If you all are comfortable -- okay.  You do

13  it by the end of the day tomorrow, and then the State by the

14  end of the day Wednesday.  You still have 24 --

15         MS. ANDERSON:  For the third one.

16         THE COURT:  Oh, it's the third one only you were

17  proposing to do that?

18         MS. ANDERSON:  Well, I understood that to be the

19  one the Defendants might need to respond to.

20         THE COURT:  Well, that's the one --

21         MR. HICKS:  We would like to look at all of them.

22         THE COURT:  -- they would particularly need to,

23  but I would want to give them the opportunity on all three

24  of them.

25         MS. ANDERSON:  Then could I suggest maybe that

1   within 24 hours of when we submit them, Defendants would

2   submit their response.  If we submit them in early, we will.

3           THE COURT:  Yeah, I mean, the more time I have to

4   think about it, obviously the better it is for me, but I

5   don't want to give you all ulcers to get it done.  So, yeah,

6   if you'll get it to me, and you'll be serving each other by

7   email, I assume, so it will be immediately available.  Yeah,

8   okay.

9           And then if you will hold the 6th and the 7th of

10  December available.

11          MR. HICKS:  Yes, Your Honor.

12          THE COURT:  And then after I decide whatever I

13  decide, you know, if I say no injunction, then we can

14  discuss whether or not we need to have that hearing to give

15  the plaintiff an opportunity to present whatever other -- I

16  don't know if that's even necessary.  It would seem to be

17  more necessary if I do decide to do an injunction to give

18  you all some opportunity to -- since this is all been very

19  quick.  But we can talk about that after I decide.

20          MR. HICKS:  Yes, ma'am.

21          THE COURT:  Anything else?  All right.  We'll be

22  adjourned.

23          (At 12:56 p.m., proceedings adjourned.)

24

25

```
                            *  *  *  *  *

                    C E R T I F I C A T E


        I, JOSEPH B. ARMSTRONG, RMR, FCRR, United States

   District Court Reporter for the Middle District of North

   Carolina, DO HEREBY CERTIFY:

          That the foregoing is a true and correct transcript of

   the proceedings had in the within-entitled action; that I

   reported the same in stenotype to the best of my ability;

   and thereafter reduced same to typewriting through the use

   of Computer-Aided Transcription.
```

```
   Date:   10/31/11      Joseph B. Armstrong, RMR, FCRR
                         United States Court Reporter
                         324 W. Market Street
                         Greensboro, NC  27401
```