# IN THE UNITED STATES DISTRICT COURT

## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| DR. GRETCHEN S. STUART, M.D.; *et al.,* )<br><br>Plaintiffs, )<br><br>v. )<br><br>JANICE E. HUFF, M.D.; *et al.*, )<br>Defendants. ) | Civil Action No. 1:11-cv-804-CCE |

## PROPOSED DEFENDANT-INTERVENORS MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR INTERVENTION

W. Eric Medlin
N.C. State Bar No. 29687
ROBERTSON, MEDLIN & BLOSS, PLCC
127 North Green Street, *Third Floor*
Greensboro, NC 27401
336-378-9881
Fax: 336-378-9886
eric.medlin@robertsonmedlin.com

Steven H. Aden*
D.C. Bar No. 466777
ALLIANCE DEFENSE FUND
801 G. Street, N.W., *Suite 509*
Washington, D.C. 20001
202-393-8690
Fax: 202-347-3622
saden@telladf.org

Samuel B. Casey*
Cal. Bar. No, 76022
JUBILEE CAMPAIGN-
LAW OF LIFE PROJECT
801 G. Street, N.W., *Suite 521*
Washington, D.C. 20001
202-586-5652
Fax: 703-349-7323
sbcasey@lawoflifeproject.org

*Attorneys for Proposed Defendant-Intervenors*

*Notice of Special Appearance
to be filed*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.    PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
II.   QUESTION PRESENTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
III   STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

      A.   THE ACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

      B.   PROCEDURAL SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      C.   THE DEFENDANT-INTERVENORS' INTERESTS . . . . . . . . . . . . . . . . . 3

            1.   THE MEDICAL PROFESSIONALS . . . . . . . . . . . . . . . . . . . . . . . 3

            2.   THE POST-ABORTIVE WOMEN . . . . . . . . . . . . . . . . . . . . . . . .6

            3.   THE PREGNANCY MEDICAL CENTERS . . . . . . . . . . . . . . . . .8

IV.   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12
V.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

ii | M e m o r a n d u m  o f  L a w
in  S u p p o r t  o f  M o t i o n
to  I n t e r v e n e

# <u>TABLE OF AUTHORITIES</u>

*First Penn-Pacific Life Ins. Co. v. William R. Evans, Chartered,*
    200 F.R.D. 532, 537 (D. Md. 2001) . . . . . . . . . . . . . . . . . .  17

*Foard v. Jarman,*
    1990, 387 S.E.2d 162, 326 N.C. 24 . . . . . . . . . . . . . . . . . .  23

*FRCP Rule 24(a)(2)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

*FRCP Rule 24(b)(1)(B)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

*Houston General Insurance Co. v. Moore,*
    193 F.3d 838, 839, (4th Cir. 1999) . . . . . . . . . . . . . . . . . .  12

*N.C. Gen. Stat. § 90-21.13* . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

*N.C. Gen. Stat. § 90-21.85(a) (1), (2) and (5)* . . . . . . . . . . . . . . . .  2

*N.C. Gen. Stat. § 90-21.88 (a)* . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

*N.C. Gen. Stat. § 90-21.88 (b)* . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

*N.C. Gen. Stat. § 90-21.82 (3)* . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

*N.C. Session Law 2011-405, H.B. 854* . . . . . . . . . . . . . . . . . . . . . . .  2

*Osburn v. Danek Medical, Inc.,*
    135 N.C.App. 234, 520 S.E.2d 88 (1999),
    review denied 351 N.C. 359, 542 S.E.2d 215,
    affirmed 352 N.C. 143, 530 S.E.2d 54; . . . . . . . . . . . . . . . .  15

iii | M e m o r a n d u m   o f   L a w
i n   S u p p o r t   o f   M o t i o n
t o   I n t e r v e n e

## **DECLARATIONS**

DR. JOHN THORP, M.D., FACOG

DR. GREGORY BRANNON, M.D., FACOG

DR. MARTIN MCCAFFREY, M.D.

CHIMERE COLLINS

DALLENE HALLENBECK

TRACIE JOHNSON

LANITA WILKS

ASHEVILLE PREGNANCY SUPPORT SERVICES

PREGNANCY RESOURCE CENTER OF CHARLOTTE

iv | Memorandum of Law
in Support of Motion
to Intervene

# I.   PRELIMINARY STATEMENT

Without any interest in unduly delaying or prejudicing the adjudication of the original parties' rights in this action, comes now proposed Defendant-Intervenors (collectively the "Proposed Defendant-Intervenors" or "Movants") and moves this Court to allow them to intervene as Defendants pursuant to Federal Rule of Civil Procedure (FRCP) 24 (a) (2) and alternatively, pursuant to FRCP Rule 24 (b) (1) (B).

The Movants consist of three groups: a) The Medical Professionals; b) The Post-Abortive Women; and, c) The Pregnancy Medical Centers (PMC).  For different reasons, each Movant group possess a direct and substantial interest in the subject matter of the litigation which would be significantly impaired or impeded if they were not allowed to intervene as their interests are not adequately protected by the existing Defendants.

## II.   Question Presented

Whether Movants, as of right under FRCP Rule 24 (a)(2) or permissively within the Court's discretion under FRCP Rule 24(b)(1)(B), ought to be admitted to intervene as party Defendants in this action

## III.   Statement of Facts

Movants seek to intervene in this case to defend their individual, patients' or organizational interests in upholding the constitutionality of the NORTH CAROLINA WOMAN'S RIGHT TO KNOW ACT (N.C. Sess. L. 2011-405, H.B. 854, enacted July 28, 2011, hereafter the "Act").  In addition, Movants seek to preserve the right to pursue the civil remedies, granted by the North Carolina State Legislature, that arise as a result of an abortion provider's failure to adhere to the requirements of the Act.

### A. The Act

As stated in its subtitle, the Act requires "a twenty-four-hour waiting period and the informed consent of a pregnant woman before an abortion may be performed." N.C. Session Law 2011-405. The Act requires certain disclosures to be made, by or on behalf of the physician conducting the abortion, and the performance and explanation of an obstetric ultrasound examination, all prior to the physician performing an abortion.

The Act states that "for the woman to make an informed decision" she must first certify that at least four hours before her abortion that she received an "obstetric real-time view" of her "unborn child" and "a simultaneous explanation of what the display is depicting" and a "medical description of the images, which shall include the dimensions of the embryo or fetus and the presence of external members and internal members, if present and viewable." § 90-21.85(a)(1),(2) and (5). The woman receiving the abortion is permitted to avert "her eyes from the displayed images" or "refuse to hear" the "auscultation of the fetal heart tone" and the accompanying "simultaneous explanation and medical description." § 90-21.85(b).

The Act contains no criminal penalties, but does create "civil remedies:" "Any person upon whom an abortion has been performed and any father of an unborn child that was the subject of an abortion may maintain an action for damages against the person who performed the abortion in knowing or reckless violation of this Article." § 90-21.88 (a). In addition, an injunction may be filed by one of a number of different parties against "any person who has willfully violated" the Act preventing the abortion provider from performing or inducing further abortions in this state in violation of [the Act]." § 90-21.88 (b).

2 | M e m o r a n d u m   o f   L a w
i n   S u p p o r t   o f   M o t i o n
t o   I n t e r v e n e

### B. Procedural Summary

On September 29, 2011, a declaratory and injunctive relief action was filed by Gretchen S. Stuart, M.D., and other abortion providers, on behalf of themselves and their patients, to challenge the constitutionality of the Act. The Plaintiffs also requested injunctive relief and this Court heard the arguments of the Plaintiffs and Defendants, and admitted the Plaintiffs' evidence, at the October 17, 2011 hearing. In its October 25, 2011 Preliminary Injunction, this Court permitted all provisions of the Act to go into effect except § 92-21.85 based on the evidence before it. The Defendants did not present evidence prior to the October 17 hearing. No discovery has been requested by any party nor have any dispositive motions been filed or scheduled. In addition, the Defendants have not filed their answer as of the filing of this motion.

### C. The Defendant-Intervenors' Interests

**1. The Medical Professionals -** The Drs. JOHN THORP, M.D., FACOG, GREGORY BRANNON, M.D., FACOG, and Dr. MARTIN MCCAFFREY, M.D, are richly-experienced and well-qualified licensed members of the North Carolina medical community who are legally and professionally interested, on behalf of themselves and their patients, in assuring that *all* the provisions of the Act being challenged in this case are fully implemented to best protect the medical health of North Carolina women and assure that every North Carolina woman will be given all of the information she needs to give her truly voluntary and fully informed consent before finally deciding to either terminate or carry her pregnancy to term. In addition, the Medical Professional have a direct and substantial interest in the "civil remedies" granted to them in § 90-21.88 (b).

*Dr. John Thorp, M.D., FACOG* is the Hugh McAllister Distinguished Professor of

3 | M e m o r a n d u m  o f  L a w
i n  S u p p o r t  o f  M o t i o n
t o  I n t e r v e n e

Obstetrics and Gynecology at the University of North Carolina (Chapel Hill) School of Medicine. Thorp Decl.¶ 3. He is also a Professor in the Department of Maternal and Child Health, School of Public Health at UNC, as well as an Adjunct Professor in the Department of Epidemiology. *Id.* at ¶ 4. Dr. Thorp is nationally and internationally recognized as one of the leading experts in evidence based women's reproductive health, having published 241 peer reviewed articles, as well as 18 book chapters. Id.at ¶¶7-8 Dr. Thorp has expressed a number of opinions as a Defendant-Intervenor regarding the North Carolina Woman's Right to Know Act. *Id.* at ¶¶ 12-41. It is his belief, based upon evidence-based practice that informed consent is critical in pregnancy outcome decision-making. He affirms that physicians have a duty to provide full and complete information regarding proposed interventions, including termination of pregnancy. He acknowledges that providing ultrasonographic images and accompanying embryonic/fetal developmental information particular for the pregnant patient is the standard of care in obstetrics & gynecology. He further asserts the unique status of the pregnant patient and the duty of care the OBGYN has to both patients, i.e., the embryo or fetus and the mother. Because of the unique nature of terminating a pregnancy, Dr. Thorp believes a woman considering a termination of her pregnancy has a right and a duty to be truly and fully informed beforehand. Dr. Thorp also seeks to protect his own civil remedies as a "health care provider" protected by the Act. *Id*.at ¶ 41.

*Dr. Gregory J. Brannon, M.D. FACOG* is a physician and has been licensed to practice in North Carolina since 1993. He is board-certified by the American Board of Obstetrics and Gynecology and is a fellow in the American College of Obstetrics and Gynecology. Throughout his years of practice, which includes delivering over 8,000 babies, Dr. Brannon has provided the

information necessary for his patients to provide their fully informed consent well over 10,000 times.

In his declaration, Dr. Brannon discusses the information which is necessary for a woman considering abortion to provide her full, voluntarily and informed consent. Dr. Brannon states that "[i]nformed consent of a patient concerning the removal of an organ or tissue cannot be obtained unless the patient understands the function of that tissue and what information is available for diagnosing the condition of that tissue." Brannon Decl. ¶ 9. "Likewise, in discussing a pregnant woman's choice to deliver or terminate her pregnancy, it is impossible to obtain a truly voluntary and fully informed consent to an abortion without discussing with the nature of the tissue is to be removed. In the case of an abortion, the tissue to be removed is a separate, unique living human being who is genetically different from the mother." Brannon Decl. ¶ 10. "The Act does nothing more than to legally require what most obstetricians and gynecologists in North Carolina commonly do and what our medical ethics already counsel and advise."[1] Brannon Decl. ¶ 11.

Finally, Dr. Brannon points out the importance of the Act on the Medical Professionals and PMCs when he says that "[i]t is universally understood and accepted within our specialty that the obstetrician/gynecologist has a duty to two separate patients, i.e., the mother and her child. I have a duty of disclosure to both. Disclosures to the child, and about the risks or harms to the child must be made to the pregnant mother and only she can make the decision for the child." Brannon Decl. ¶ 16.

---

[1] It is important to note that Dr. Brannon's statement does not support this Court's opinion that "The Act goes well beyond requiring disclosure of those items traditionally a part of the informed consent process, which include in this context the nature and risks of the procedure and the gestational age of the fetus." MEMORANDUM OPINION AND ORDER page 9. The Movants heartily acknowledge that this Court did not have the benefit of Dr. Brannon's declaration, or any evidence whatsoever from the Defendants, when the Court drafted its opinion.

*Martin J. McCaffrey, M.D.* is a physician licensed to practice medicine in North Carolina and California and Board Certified in Neonatal-Perinatal Medicine. He is a Professor of Pediatrics in Neonatal-Perinatal Medicine at the University of North Carolina at Chapel Hill, Director of the Perinatal Quality Collaborative of North Carolina and a practicing neonatologist at North Carolina Children's Hospital. McCaffrey routinely counsels women with high risk pregnancies and regularly relies upon ultrasonography in his practice. McCaffrey Decl. ¶1.

Dr. McCaffrey is well aware of studies that show abortions can increase risks associated with premature birth in later pregnancies, leading to a number of possible complications. McCaffrey Decl. ¶6-23. He sees the effects of such risks regularly during the pregnancies of his patients. McCaffrey Decl. ¶14, 16.

As a neonatologist, Dr. McCaffrey and his patients will both be adversely affected if the Act is not enforced. McCaffrey Decl. ¶24-27, 29. Additionally, Plaintiffs' success in this case could negatively affect McCaffrey's ability to tell his patients the truth about the link between abortion and premature birth. McCaffrey Decl. ¶27-29.

**2. The Post-Abortive Women** - CHIMERE COLLINS, DANELLE HALLENBECK, TRACIE JOHNSON, and LANITA WILKS are North Carolina residents and received abortions in North Carolina. Collins Decl.¶ 7-14; Hallenbeck Decl. ¶ 3; Johnson Decl. ¶ 3; Wilks Decl. ¶ 12. The physician performing the abortion for three of the women either did not administer an obstetric ultrasound or did not display and explain the images prior to performing the abortion. Hallenbeck Decl. ¶ 6; Johnson Decl. ¶ 9; Wilks Decl. ¶ 11. Chimere Collins was able to see her ultrasound but it was not "shown" to her. Most importantly, no explanation of the image was given, and Collins was not aware of what exactly she was viewing because she was told it was

just "tissue." Collins Decl. ¶ 11.  Each of these women has suffered mental and emotional injuries as a result of the abortions they received without a fully informed consent. Collins Decl. ¶ 16, 17; Hallenbeck Decl. ¶ 12; Johnson Decl. ¶ 10; Wilks Decl. ¶ 14, 19, 22, 25. Danelle Hallenbeck also suffered from *placenta previa* during a subsequent pregnancy which she believes was caused by her abortion.  She was not informed of this risk.  Hallenbeck Decl. ¶ 11. Each of these woman believe that because they did not receive an ultrasound with a medical explanation of the images displayed prior to receiving an abortion that they did not have full informed consent. Collins Decl. ¶ 17, 24-25; Hallenbeck Decl. ¶ 10; Johnson Decl. ¶ 13; Wilks Decl. ¶ 32-34.  Both Danelle Hallenbeck and Tracie Johnson received an obstetric ultrasound examination while pregnant after their abortions and both carried these pregnancies to term. Hallenbeck Decl. ¶ 10; Johnson Decl. ¶ 13. Each of these four women believe that in order for a woman to make an informed and voluntary decision about whether to continue or discontinue her pregnancy, she should undergo an obstetric ultrasound and have the ultrasound images displayed and explained to her before she provides her informed consent to receive an abortion[2].  Collins Decl. ¶ 26; Hallenbeck Decl. ¶ 26, 27; Johnson Decl. ¶ 19, 20; Wilks Decl. ¶ 34.

Danelle Hallenbeck has also volunteered hundreds of hours talking to many women impacted by an unplanned pregnancy or suffering the consequences of a prior abortion while facilitating retreats and serving as a trained lay counselor at the Life Care Pregnancy Resource Center in Raleigh, North Carolina.  Hallenbeck Decl. ¶ 21.  She has witnessed or talked to

---

[2] Again, these four statements do not support this Court's opinion that "the undisputed evidence offered by the Plaintiffs establishes that these provisions [referring to the speech-and-display requirements] are likely to harm the psychological health of the very group the state purports to protect."  MEMORANDUM OPINION AND ORDER page 10. And again, the Movants point out that the Court did not have the benefit of these declarations.  In fact, the State chose not to introduce *any* evidence prior to the October 17 hearing although the State purports to protect these very women.

women who changed their minds about having an abortion after seeing the ultrasound images of their baby in the 1st or 2nd trimesters. In her experience, once many women see the ultrasound and have it explained to them, they know that they are carrying their baby and they feel empowered to make a decision in light of those true facts. Some decide to carry their baby to term, others decide to terminate their pregnancy, but all are much more fully informed. Id at ¶ 25. Based on both her personal experience and her experience in working with other women, Hallenbeck believes that sharing the information contained in an ultrasound is necessary in order for a woman to make an informed and voluntary decision about whether to continue or terminate her pregnancy. Id at ¶ 26.

**3. The Pregnancy Medical Centers (PMCs) -** ASHEVILLE PREGNANCY SUPPORT SERVICES (APSS) and the PREGNANCY RESOURCE CENTER OF CHARLOTTE (PRCC) are not-for profit organizations duly organized under the laws of the State of North Carolina and are committed to serving every North Carolina woman or man involved in unplanned pregnancy. In particular, the PMCs provide vital information and real-time imaging and fetal heart tone services, as authorized under the Act, so that they can empower a "woman's right to know" and increase the number of women (and men) they annually assist and serve.

Asheville Pregnancy Support Services ("APSS") was founded in 1981 under the name of Birthright of Asheville, and is as a not-for profit organization duly organized under the laws of the State of North Carolina. Id. at ¶1. At all relevant times the mission of APSS is and has been to care for, encourage, and educate women and men at risk for, or impacted by, an unplanned pregnancy. Wood Decl. at ¶3.

APSS' services include free pregnancy testing, peer counseling, guidance and support

such as material support, including maternity clothing, baby items, and emergency supplies of diapers and formula. APSS also provides referrals to other community resources, including medical care, and post abortion support group studies. Id. at ¶4. In December 2006, with the assistance of Focus on the Family's Option Ultrasound Program, APSS expanded its services to include free limited obstetrical ultrasounds complete with audible Doppler to detect and amplify embryonic fetal heart tones. Id. at ¶5. All of these medical services are directly provided by one of APSS' two medical doctors, both of whom are obstetrician/gynecologists and are board-certified by the American Board of Obstetrics and Gynecology; registered nurses trained and tested for competency in limited obstetrical ultrasound; or a registered diagnostic medical sonographer certified in obstetrics and gynecology by the American Registry of Medical Sonography (ARMDS). All medical personnel work under the supervision and standing medical orders of APSS's Medical Director who is also an obstetrician/gynecologist board-certified by the American Board of Obstetrics and Gynecology. Id. at ¶7.

In anticipation of the Act becoming effective on October 26, 2011, APSS has entered into a collaborative agreement with a local abortion provider, Femcare, whereby APPS, as they are qualified do under the Act, may perform informed consent certifications required under the Act for clients referred to APSS by Femcare for such certification. Therefore, they are vitally interested in all of the provisions of the Act going into full force and effect because such effectiveness promises to significantly increase their referrals from Femcare, as well as from other sources. APSS considers the Act as their opportunity to make sure that all women who decide to terminate their pregnancy or carry it to term have done so only after receiving all the information they need to make a fully informed and voluntary decision, including a medically

9 | M e m o r a n d u m   o f   L a w
i n   S u p p o r t   o f   M o t i o n
t o   I n t e r v e n e

accurate description of the ultrasound, real time images and fetal heart tones of each woman's unborn child. Id. at ¶10.

Based upon APSS' and Deborah D. Wood's own personal experience set forth in her declaration, as well as her interviews and discussions with hundreds of post-abortive women in North Carolina, she would conclude that abortion providers in North Carolina, including at least some of the Plaintiffs in this case, do not give women enough information for them to make a truly informed decision about what an abortion is and what risks and adverse complications can arise from abortion.  Id. at ¶13.

Because APSS believes that the number of clients it will be able to serve will significantly increase if all the provisions of the Act are implemented, APSS seeks to intervene as a defendant-intervenor to protect its own legal interests advanced and protected by the Act, as well as to adjudicate the common issues of law and fact raised by the complaint in this matter. Id. at ¶14.

Pregnancy Resource Center of  Charlotte ("PRCC') is one of North Carolina's oldest and largest pregnancy resource centers, and has served more than 50,000 people since opening its doors in 1982.  At all relevant times the mission of PRCC is and has been to care for, encourage, and educate women and men at risk for, or impacted by, an unplanned pregnancy.  Forsythe Decl. ¶3.  PRCC is a not-for profit organization duly organized under the laws of the State of North Carolina.  Id. at ¶1.

PRCC offers free pregnancy testing, including free limited ultrasound, peer counseling, guidance and support including baby items, and emergency supplies of diapers and formula. PRCC also provides referrals to other community resources, including medical care, and post

abortion support group studies.  Id. at ¶5.  In 1996, PRCC expanded its pregnancy testing services to include free limited obstetrical ultrasounds complete with audible Doppler designed to detect fetal heart tones.  Since that time, PRCC has performed thousands of limited ultrasounds. The purposes of the limited ultrasound PRCC offers are to validate the existence of a intrauterine pregnancy; to establish in the most medically accurate way the probable gestational age of the unborn child; and to give a mother a real-time opportunity to view an image of her unborn child and hear the unborn child's fetal heart tone, if she so desires.  Id. at ¶7.  All of PRCC's medical services are directly provided by either its volunteer medical doctors, all of whom are obstetrician/gynecologists who are board-certified by the American Board of Obstetrics and Gynecology, registered nurses trained and tested for competency in limited obstetrical ultrasound, or a registered diagnostic medical sonographer certified in obstetrics and gynecology by the American Registry of Medical Diagnostic Sonography (ARMDS). All medical personnel work under the supervision and standing medical orders of the Medical Director, who is also a board-certified obstetrician/gynecologist. Id. at ¶6.

In anticipation of the Act becoming effective on October 26, 2011, PRCC prepared itself to provide the informed consent certifications required under § 90-21.82 (3) and § 90-21.85 (a)(5) or (c) of the Act for walk-in clients, as well as clients referred to PRCC from any number of entities, including at least one of the Plaintiffs in this action, Planned Parenthood Health Systems, Inc.  Id. at ¶14.

PRCC has served thousands of post-abortive women.  They have seen and heard their post-abortive clients share first-hand the devastatingly adverse emotional, physical, relational, psychological, and spiritual consequences of choosing abortion.  Both from PRCC's counseling

experience and from published studies, PRCC has learned that for some women, abortion is associated with significant emotional and psychological problems. It can affect women in the short-term or for the rest of their lives. PRCC regularly receives calls and communications from women who report how surprised they are by the negative consequences they are experiencing after their abortion. Such women regularly tell PRCC that the risks of the consequences they are now suffering had not been provided or adequately described to them by the abortion provider. Id. at ¶15. PRCC is informed and believes that a woman who makes a truly voluntary and fully informed decision to terminate her pregnancy is less at risk for adverse psychological consequences than a woman who does not feel that she has made a truly voluntary and fully informed decision to terminate her pregnancy.[3] Id. at ¶15.

PRCC seeks to intervene as a defendant-intervenor to protect its own legal interests, including those interests advanced and protected by the Act, as well as to adjudicate the common issues of law and fact raised by the Complaint in this matter. Id. at ¶17.

## IV.  Argument

**MOVANTS SHOULD BE GRANTED INTERVENTION UNDER RULES 24(a)(2) BECAUSE MOVANTS CLAIM INTERESTS THAT RELATE TO THE LEGISLATION THAT IS THE SUBJECT OF THIS ACTION.  THESE INTERESTS WILL BE IMPAIRED IF THE PLAINTIFF'S REQUEST FOR RELIEF IS GRANTED AND THE MOVANTS' INTERESTS ARE NOT BEING ADEQUATELY REPRESENTED BY THE**

---

[3] On page 10 of its MEMORANDUM OPINION AND ORDER, this Court states that "The Defendants first assert that the state has an interest in protecting abortion patients from psychological and emotional distress and that this interest justifies the speech-and-display requirements (Doc. 29 at 12.)  Even if this is a compelling interest, *there is no evidence in the record* supporting the state's claim that the speech-and-display requirements further this interest." (Italics added for emphasis.)  PRCC's declaration, along with other declarations supporting this motion, contains the very evidence that the State failed to put forth.

12 | M e m o r a n d u m   o f   L a w
i n   S u p p o r t   o f   M o t i o n
t o   I n t e r v e n e

**DEFENDANTS.**

FRCP Rule 24(a)(2) provides that "On timely motion, the court must permit anyone to intervene who… claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."

"Applicants to intervene as of right must meet all four of the following requirements: (1) the application to intervene must be timely; (2) the applicant must have an interest in the subject matter of the underlying action; (3) the denial of the motion to intervene would impair or impede the applicant's ability to protect its interest; and (4) the applicant's interest is not adequately represented by the existing parties to the litigation." *Houston General Insurance Co. v. Moore*, 193 F.3d 838, 839 (4th Cir. 1999).

## I – THIS MOTION IS TIMELY AND WILL NOT PREJUDICE THE INTERESTS OF THE OTHER PARTIES.

This motion is timely as it is filed well in advance of any decision on the merits. There has been no discovery and no dispositive motions. The Answer to be filed by the Movants does not raise any new claims or defenses. In fact, intervention by the Movants will likely assist the Defendants as they apparently were unable to come up with the evidence provided by the Movants in this motion.

## II – THE MOVANTS, AND NOT THE DEFENDANTS, ARE THE CLASS OF

13 | M e m o r a n d u m   o f   L a w
i n   S u p p o r t   o f   M o t i o n
t o   I n t e r v e n e

BENEFICIARIES THE NORTH CAROLINA LEGISLATURE INTENDED TO BENEFIT OR PROTECT WITH THE ACT.

The Medical Professionals and the PMCs possess a direct and substantial interest as they are committed to providing safe and responsible care to all their patients or clients, including the provision of the voluntary and informed consent they are authorized to certify under § 90-21.82 and § 90-21.88 of the Act for every woman who is considering whether to terminate or carry her pregnancy to term. *The Post-Abortive Women are the essence of the Act.* While these three groups are the beneficiaries, none are named Defendants and, currently, may not make an appearance in this matter.

It is important to note that while the State may assert that it has an interest in protecting all its citizens, including women considering abortions and health providers, the State failed to produce any evidence from any of its citizens at the October 17 hearing.

III – MOVANTS HAVE A DIRECT AND SUBSTANTIAL INTEREST IN PRESERVING THE CAUSE OF ACTION GRANTED UNDER § 90-21.88 OF THE ACT WHICH WOULD BE IMPAIRED IF THE PLAINTIFFS WERE TO PREVAIL.

Section 90-21.88(a) grants the Post-Abortive Women a cause of action against the Plaintiffs for a knowing or reckless violation of the Act for actual and punitive damages. Because no other North Carolina legislation or court precedent requires an ultrasound be performed on all women prior to performing an abortion, § 90-21.88(a) of the Act provides the

Post-Abortive Women, as well as all women in North Carolina, a statutorily-protected remedy for any injury caused by an abortion provider's failure to provide a pre-abortion obstetric ultrasound and to explain it to her before obtaining the required informed consent from her. The Post-Abortive Women seek to preserve this statutory cause of action that makes it far easier to legally protect their rights against injury than having to solely rely on a common law negligence claim.

Because they have experienced or represent women who have experienced the injury that occurs when a woman receives an abortion without giving a truly informed consent preceded by an obstetric ultrasound examination, the Post-Abortive Women have a strong legal interest in protecting the statutory claim provided in the Act.

Nearly all the Movants have stated that women who undergo an abortion suffer both mental and physical injuries. Collins Decl. ¶ 16, 17; Hallenbeck Decl. ¶ 11, 12; Johnson Decl. ¶ 10; Wilks Decl. ¶ 14, 19, 22, 25. McCaffrey Decl. ¶6-23. They suffer guilt, shame, anger, and even clinically-diagnosed depression that can last for years. Collins Decl. ¶ 16, 17; Hallenbeck Decl. ¶ 12; Johnson Decl. ¶ 10; Wilks Decl. ¶ 14, 19, 22, 25. Abortion also has effects on future pregnancies, as well as heightens the risk of certain female health problems. Hallenbeck Decl. ¶ 11; McCaffrey Decl. ¶6-23. These effects can last many years into the future. Collins Decl. ¶ 16, 17; Hallenbeck Decl. ¶ 11, 12; Johnson Decl. ¶ 10; Wilks Decl. ¶ 14, 19, 22, 25; McCaffrey Decl. ¶6-23.

The Post-Abortive Women, Medical Professionals and PMCs all have a direct and substantial interest in keeping the civil remedies granted by the Act. If the Act is found to be unconstitutional the Movants will have no remedy, or at the very least a less certain remedy, for

15 | M e m o r a n d u m   o f   L a w
i n   S u p p o r t   o f   M o t i o n
t o   I n t e r v e n e

Case 1:11-cv-00804-CCE-LPA   Document 45   Filed 11/08/11   Page 19 of 25

any injuries incurred as a result of a physician's failure to provide adequate information for a woman to make a fully informed decision.

## IV – THE MOVANTS HAVE A DIRECT AND SUBSTANTIAL INTEREST IN INSURING THAT WOMEN CONSIDERING AN ABORTION IN NORTH CAROLINA HAVE THE INFORMATION THEY NEED TO DEVELOP FULLY INFORMED CONSENT.

To meet the statutory informed consent standard (North Carolina G.S. § 90-21.13) a health care provider must provide the patient with sufficient information about the proposed treatment and its attendant risks to conform to the customary practice of members of the same profession with similar training and experience situated in the same or similar communities; in addition, the health care provider must impart enough information to permit a reasonable person to gain a "general understanding" of both the treatment or procedure and the "usual and most frequent risks and hazards" associated with the treatment. *Osburn v. Danek Medical, Inc.*, 135 N.C.App. 234, 520 S.E.2d 88 (1999), *review denied* 351 N.C. 359, 542 S.E.2d 215 (2000), *affirmed* 352 N.C. 143, 530 S.E.2d 54 (2000); *Foard v. Jarman*, 326 N.C. 24, 387 S.E.2d 162 (1990).

In North Carolina, no case has established whether an obstetric ultrasound is or is not required in order for a woman to have informed consent before receiving an elective abortion. The Movants strongly attest and believe that, in order for a woman to truly have informed consent before receiving an abortion, she must first see an ultrasound as required by the challenged Act. The Medical Professionals have a fundamental interest in protecting the health

of women from the negative mental and physical injuries that result when a woman receives an abortion without a fully informed consent from her subjective point of view. To assert their interest, the PMCs have developed the policies and procedures, and acquired the equipment, to provide the Act-required information necessary for a woman to develop truly informed consent. Regretfully, the Post-Abortive Women have experienced, first-hand, the devastating effects of developing an "informed consent" outside the bounds of the Act. If the Act is upheld in this action, the Movant's vital legal interests would be statutorily protected.

## V – THE INTERESTS OF THE MOVANTS ARE NOT ALIGNED WITH THOSE OF THE DEFENDANTS AND THE DEFENDANTS CANNOT AND ARE NOT ADEQUATELY PROTECTING THE MOVANTS' INTERESTS.

At the October 17, 2011 hearing, the State apparently argued that it had three compelling state interests: protecting the psychological health of the patient, preventing coercive abortions, and expressing its preference for the life of the unborn. (Memorandum Opinion and Order, page 4). While the Movants certainly share these interests with the Defendants, the Movants have *additional* direct and substantial interests such as insuring that a pregnant woman understands the potential risks and harms to the child so that she can make the decision for the child (Brannon Decl. ¶ 16) or preserving the "civil remedies" granted in § 90-21.88. Thorp Decl. ¶ 41; Brannon Decl. ¶ 29; McCaffrey Decl. ¶ 39; Collins Decl. ¶ 27; Hallenbeck Decl. ¶ 29; Johnson Decl. ¶ 22; Wilks Decl. ¶ 35; Wood (APSS) Decl. ¶ 14; Forsythe (PRCC) Decl. ¶ 17.

It important for this Court to note that the Defendants are not among the class of beneficiaries protected by the Act while the Movants are. In addition, the Defendants were sued

17 | M e m o r a n d u m   o f   L a w
i n   S u p p o r t   o f   M o t i o n
t o   I n t e r v e n e

in their "official capacity" meaning that there are no women or health care professionals named as defendants.

Finally, as cited in the footnotes in this brief, several elements of this Court's opinion are not supported with the facts contained within the Movants' declarations.  And, as stated within the same footnotes, the Court did not have the benefit of this evidence because the Defendants didn't produce any evidence prior to the October 17 hearing.

While it may be that the Defendants chose not to present any evidence prior to the October 17 hearing because they believed that they could adequately represent the Movants' interests with legal argument alone, the Movants believe that it is impossible for the Defendants to adequate represent the Movants' interest because the Defendants are not Medical Professionals, Post-Abortive Women, or PMCs.


**ALTERNATIVELY, THE MOVANTS SHOULD BE GRANTED INTERVENTION UNDER RULE 24 (b) (1) (B) BECAUSE THEY SHARE A COMMON QUESTION OF LAW OR FACT WITH THE DEFENDANTS.**

Rule 24(b)(1) provides that "On timely motion, the court may permit anyone to intervene who… has a claim or defense that shares with the main action a common question of law or fact."

"Unlike intervention as of right under Rule 24(a)(2), which, as noted, requires a movant to establish four separate elements, permissive intervention under Rule 24(b)(1)(B) gives the Court discretion to grant intervention based upon 'timely application ... when an applicant's claim or defense and the main action have a question of law or fact in common.'" *First Penn-Pacific Life*

18 | M e m o r a n d u m   o f   L a w
i n   S u p p o r t   o f   M o t i o n
t o   I n t e r v e n e

*Ins. Co. v. William R. Evans, Chartered*, 200 F.R.D. 532, 537 (D. Md. 2001)

If this Court does not grant intervention as a right, the Movants request that the Court consider its arguments, as stated above, and permissively grant intervention.  Among others, the Movants share the following questions of law or facts with the Defendants in this matter:

1. The Medical Professionals and PMCs are the entities regulated by the Act.

2. The Movants are the beneficiaries of the Act.

3. The Movants have experienced, some first-hand, the great harm caused by failure to comply with the Act.

4. The Movants have a deep-set interest in seeing the Act upheld.

## V.    CONCLUSION

For the arguments set forth above, and based on the law and compelling facts contained in the Movants' declarations, the Movants respectfully request that this Court to allow them either as of right or permissively to intervene as Defendants in this matter.  Such intervention will not unduly delay or prejudice the adjudication of the original parties rights.

Respectfully submitted, this the 8th day of November, 2011.

/s/ W. Eric Medlin
W. Eric Medlin
(N.C. State Bar No. 29687)
ROBERTSON, MEDLIN & BLOSS, PLCC
127 North Green Street, *3rd Floor*
Greensboro, NC 27401
336-378-9886
Fax: 336-378-9886
eric.medlin@robertsonmedlin.com

Steven H. Aden*
D.C. Bar No. 466777
ALLIANCE DEFENSE FUND
801 G. Street, N.W., *Suite 509*
Washington, D.C. 20001
202-393-8690
Fax: 202-347-3622
saden@telladf.org

Samuel B. Casey*
Cal. Bar. No, 76022
JUBILEE CAMPAIGN-
LAW OF LIFE PROJECT
801 G. Street, N.W., *Suite 521*
Washington, D.C. 20001
202-586-5652
Fax: 703-349-7323
sbcasey@lawoflifeproject.org

*Attorneys for Proposed Defendant-Intervenors*

*Notice of Special Appearance to be filed

20 | M e m o r a n d u m   o f   L a w
i n   S u p p o r t   o f   M o t i o n
t o   I n t e r v e n e

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of November, 2011, I caused a true and correct copy of the foregoing: PROPOSED DEFENDANT-INTERVENORS MEMORANDUM OF LAW IN SUPPPORT OF MOTION FOR INTERVENTION, along with the accompanying Memorandum of Law, Proposed Answer and supporting Declarations of each of the Movants to be electronically served on the following appearing counsel for defendants and plaintiffs by means of the Court's CM/ECF system.

COUNSEL FOR DEFENDANTS:
Thomas J. Ziko (State Bar No. 8577)
*Senior Deputy Attorney General*
I. Faison Hicks (State Bar No. 10672)
Stephanie Brennan (State Bar No. 35955)
*Special Deputies Attorney General*
N.C. Department of Justice
114 W. Edenton Street, Post Office Box 629
Raleigh, North Carolina 27602
Telephone: (919) 716-6900
Fax: (919) 716-6763
Email: tziko@ncdoj.gov
Email: fhicks@ncdoj.gov
Email: sbrennan@ncdoj.gov

COUNSEL FOR PLAINTIFFS:
Katherine Lewis Parker
ACLU OF NORTH CAROLINA
POB 28004
Raleigh, NC 27611-8004
919-834-3466
Fax: 866-511-1344
Email: kparker@acluofnc.org

Bebe J. Anderson
THE CENTER FOR REPRODUCTIVE RIGHTS
120 Wall St., 14th Floor
New York, NY 10005
917-637-3687
Fax: 917-637-3666
Email: banderson@reprorights.org

Andrew D. Beck
AMERICAN CIVIL LIBERTIES UNION
125 Broad St., 18th Floor
New York, NY 10004-2400
212-284-7318
Fax: 212-549-2650
Email: abeck@aclu.org

Helene T. Krasnoff
PLANNED PARENTHOOD FEDERATION OF AMERICA
1110 Vermont Ave., NW, Ste. 300
Washington, Dc 20005
202-973-4800
Fax: 202-296-3480
Email: helene.krasnoff@ppfa.org


Dated:  November 8, 2011


 /s/ W. Eric Medlin_____
W. Eric Medlin (State Bar No. 29687)
ROBERTSON, MEDLIN & BLOSS, PLLC
127 North Green Street, 3rd Floor
Greensboro, NC 27401
336-378-9886
Fax: 336-378-9886
Email: eric.medlin@robertsonmedlin.com

*One of Counsel for*
*Proposed Defendant-Intervenors*