IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| DR. GRETCHEN S. STUART, M.D.; *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br><br> JANICE E. HUFF, M.D.; *et al.*, <br> Defendants. | ) ) ) ) ) ) ) ) ) Civil Action No. 1:11-cv-804-CCE ) ) ) ) ) ) |

**DECLARATION OF CHIMERE COLLINS IN SUPPORT OF
PROPOSED DEFENDANT-INTERVENORS MOTION FOR INTERVENTION**

I, CHIMERE COLLINS, declare as follows:

1. I am not a party or related to a party in this action. I am over the age of eighteen and competent to testify in this matter. I currently reside in Greensboro, North Carolina where I am working full-time while also taking some post-baccalaureate courses concentrating in chemistry at the University of North Carolina at Greensboro. I have read the Complaint filed herein and the recently enacted "WOMAN'S RIGHT TO KNOW ACT" being challenged in that Complaint on the various grounds set forth in this action. (H.B. 854, enacted July 28, 2011, N.C. SESSION LAW 2011-405, the "Act"). I seek to

intervene as a defendant-intervenor in this action. I am knowledgeable of the facts set forth herein and if called to testify would do so, as follows.

2.      I am 26 years old. I was born in Durham and raised in High Point, North Carolina. After serving as Miss Fayetteville State University (FSU) in 2006-2007, I graduated in 2007 from Fayetteville State University with a Bachelor of Science degree in biology. I am currently taking post-baccalaureate courses in Chemistry so I can begin my studies to become a Dental Hygienist in the Fall of 2012. I am currently employed at Solstas Lab Partners as a Requisition Scanner. I am also a member of Insoul Fellowship Church in Fayetteville, NC.

3.      In 2003, at the conclusion of my senior year at High Point Andrews High School when I was 17 years old, I was excited about leaving High Point and attending college on an academic scholarship I had received to attend FSU. However, during our 'Seniors' Beach Week' I made some wrong moral decisions and as a consequence of those decisions learned that I was pregnant in April 2003. The father was a junior in our high school. Neither of us believed we were prepared to marry or parent a child. I was embarrassed to tell my parents, and it was decided we would keep my pregnancy as secret.

4.      I went to my older cousin to ask for advice and guidance. She told me she knew just how to help me and would "handle" the situation. I didn't know it at the time but my

cousin had already had an abortion and had decided for me that abortion was also the best course given my age and other circumstances.

5. The next thing I know is that my cousin called an abortion provider, one of the plaintiffs in this case, Planned Parenthood in Chapel Hill (Planned Parenthood of Central North Carolina). Without my approval or even knowing what she was doing, my cousin told the abortion provider over the telephone that she was "my mother" and was approving an abortion for "her daughter" who with "my mother's approval" was actually being brought to the clinic for my abortion appointment by "my older cousin," who in fact was falsely posing as my mother in the telephone conversation. In fact, the appointment was made for me by my cousin who agreed to take me for my abortion since I was still an unemancipated minor. To my knowledge, my cousin never talked to my parents or got their authority to represent them or their permission to take me to the abortion clinic. Neither of my parents ever provided any written consent indirectly through my cousin or directly to the abortion provider authorizing the abortion provider to perform any abortion upon me.

6. After my older cousin had made an appointment for me at the abortion clinic, I told my parents that I had been invited by my cousin to babysit her two children and would be going to do so in Raleigh over the week-end. My parents gave their permission and never knew that I was secretly going to an abortion clinic with the help of my cousin.

7. When my cousin and I arrived at the abortion clinic in Chapel Hill and signed in, my cousin was asked why we were there, and she told them we were there for "an abortion." My cousin then told them that my "mother" had already consented to my abortion over the telephone and she was just there with my "mother's" approval to complete the paperwork for my "mother."

8. While my cousin was apparently handling the paperwork I was immediately escorted to an examining room by someone who appeared to be a nurse. No one ever asked me my age. No one ever told me what they were doing and what was going to happen next. No one ever told me that there were other options, or asked me if I was sure that I wanted an abortion to take place.

9. The next thing I remember was that the nurse gave me a capsule to insert telling me it would make my cervix expand. It was right about then that I began worrying within myself about whether I should even be there and whether I was doing what I ought to be doing. I felt like I was alone with no one in whom to confide or ask any questions, but I kept these worried thoughts to myself.

10. I believe that the next step was a blood test. I remember being told that I was "Rh negative." The nurse told me words to the effect that "since I was Rh negative I shouldn't continue this pregnancy anyway since it could cause some problems because the baby could eventually fight against my body."

11. The next step I remember was to get an ultrasound. While in the room, the nurse told me, "You can look at the screen if you want but it is not much there just a 'ball of tissue'." I did look at an ultrasound snap shot on the screen that she didn't actually show me, but I did see. Unfortunately, I did not understand that what I was looking at that time was my baby because it really did just look like a "ball of tissue" which is exactly how the nurse had already expressly described the snapshot to me. From the nurse's attitude and demeanor it seemed like it was no big deal to her or for me. By her words and demeanor she made it seem to me that it wasn't a baby yet. In retrospect, I now wish the nurse had not blown my child off to be "just" a ball of tissue, because I actually believed her. She did tell me that I was 7 weeks pregnant but she didn't tell that I was pregnant with an unborn child. To the contrary, she indicated to me I didn't have a baby yet. Whatever anxiety I still felt, I kept to myself because at this point I felt there was nothing I could or should do about it.

12. I don't remember signing any papers and no one ever explained any of the procedures to me. I never received any of the information required to be given to women by the Act being challenged in this action, except the gestational age of that "ball of tissue" in the ultrasound snapshot I did see.

13. The next step and my most lasting memory remains by far the worst memory of my life. The nurse took my cousin and me into the abortion room (because I didn't want to be by myself). The first time that I saw the abortion doctor was when he entered that

room. The abortionist never told me his name. He only said something to the nurse and then rolled out this vacuuming machine. I didn't know what it was for or how it worked. I immediately begin to cry and hyperventilate. I cried so hard I blacked out. My cousin was also crying. She later said, "Girl, I'm so glad you woke up because what if I had to tell your parents when we took you to the hospital."

14. When I woke up it began; the noise from what I now know was the abortion aspirator was terrible, the unexpected pain was even worse. I thought to myself what was I doing? But it was too late; no turning back- my 7-week "ball of tissue" was gone. It was only later that I learned that it was not just a ball of tissue, it was also my baby.

15. And I then I thought I would become just a normal young girl again --mistake erased--because no one told me that there may be adverse psychological effects associated with abortion. In fact, the only things the nurse or the abortion doctor told was it's a "ball of tissue" and "It's going to be alright." And "here's a wet napkin to help you clean up." I thought I would never have to think about my abortion again. But I soon found out that I was mistaken.

16. As soon after as I went to college the depression started, the thoughts of that day at the abortion clinic haunted me to no end and I continued to make bad decisions although I hid it all by masking my inner torment and trying to make the best out of my college career.

17. The depression started for me in the early days of my freshmen year at FSU in my speech class when my friend gave her speech in class on abortion and showed the class a much clearer picture of a seven week old human embryo and I realized that picture – which I had never seen before-- was a picture of who my child actually was at same time I had thought it was just a 'ball of tissue.' My friend described that by 7 weeks the heart is pumping the embryo's own blood to the brain and body, and the beginnings of the arms and legs can be seen, and fingers are beginning to form on the hand. All of this information is now required to be provided to a woman by the Act being challenged in this action. No one at the abortion clinic ever told me or showed me this information before performing my abortion. Had I been provided that information I would have left the abortion clinic before the abortion was performed.

18. When I heard my friend's speech I was devastated inside. But no one knew about my abortion except my cousin and another high school friend who had given me the pregnancy test. I had no one to talk to about what I now realized I had done. As my depression deepened, I tried harder to cover it up by staying very active and telling no one.

19. It was not until 2006 (3 years later) when I heard Ms. Rhoda Barnes, the Founder of the Aftermath Ministry at my church, Insoul Fellowship Church in Fayetteville, talk about the possibility of healing for post-abortive women that I began to deal with my pain and shame that I had secreted from others. Ms. Barnes told us how important it is to

address the various adverse psychological and behavioral symptoms of abortion, many of which I had experienced or was then still suffering (promiscuity, anger, resentment against family, sadness when I saw children that were the same age my aborted child would have been at that time -- causing me to avoid children even though I love them).

20. Ms. Barnes invited us to participate in a 7-week bible study entitled Aftermath - Allowing Father God To Eradicate and Reconcile Memories of Abortion thus Healing)

21. After I had completed that study and began to heal, I decided that I needed to write a letter to my mother finally telling her about my abortion that I had kept secretly from her.

22. After she received my letter, my mother told me she was sad that I had not confided in her and been honest with her when I had first learned I was pregnant and before I had asked my cousin to help me. She told me she would have encouraged me to have my child and raise the child with the same love I had been raised by her. I was greatly relieved and so glad that I had finally told my Mother because it was what I should have done in the first place.

23. Based upon my own experience set forth above, I would conclude that abortionists in North Carolina, including at least some of the plaintiffs in this case, do not give women, particularly unemancipated minors like I was at the time of my abortion, enough information for them to make a truly voluntary and fully informed decision about what an abortion is and what risks and adverse complications can arise from abortion. I

am particularly sure from my own experience that women like me are not told what an ultrasound examination is revealing to the abortionist and why a woman like me might want to not only see her ultrasound but also have what was being seen clearly explained to her, as the Act requires. Lacking this information in my case, I know under all the circumstances described above that I did not give a truly voluntary and fully informed consent to the abortion of my first child.

24. Had the abortionist required written consent from at least one of my parents as was then required by law and otherwise complied with the provisions of the Act being challenged in this case, before he performed the abortion, I am certain I would have had vitally important information which I was not otherwise given. Had I been provided this information, including the display of a real-time image of my child and been provided with a simultaneous medical explanation of what the display was depicting, I would have known for sure that I was terminating the life of my own child, not just some "tissue." Had I known this, I would not have gone through with my abortion at that time and, at the very least, I would have left the abortion clinic that day to think more deeply about it and, perhaps, talk to my mother before I would ever do it.

25. At the time of my abortion I never knew my child's heart was already beating. Had I even known this fact, particularly if I had seen it with a proper explanation, I do not think I would have gone through with my abortion.

9 | P a g e - C o l l i n s   D e c l a r a t i o n

Case 1:11-cv-00804-CCE-LPA   Document 45-4   Filed 11/08/11   Page 9 of 11

26. Based on my personal experience, I believe that sharing the information provided by the ultrasound with the woman is necessary in order to allow her to make a fully informed and voluntary decision about whether to continue or terminate her pregnancy not only for the sake of her health, but for the sake of her child's health.

27. Because the facts as I know them from my own personal experience are directly contradicted by the factual allegations and expert opinions that are being alleged and have already been offered in evidence by the plaintiffs and cited by the Court in this case, I seek to intervene as a defendant-intervenor to protect my own legal interests, including my interests advanced and protected by the Act, as well as to adjudicate the common issues of law and fact raised by the Complaint in this matter. I will do nothing to unduly delay or prejudice the adjudication of the original parties' rights in this case.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct and was executed on November 1, 2011.

*/s/ Chimere Collins*
_____
Chimere Collins

26. Based on my personal experience, I believe that sharing the information provided by the ultrasound with the woman is necessary in order to allow her to make a fully informed and voluntary decision about whether to continue or terminate her pregnancy not only for the sake of her health, but for the sake of her child's health.

27. Because the facts as I know them from my own personal experience are directly contradicted by the factual allegations and expert opinions that are being alleged and have already been offered in evidence by the plaintiffs and cited by the Court in this case, I seek to intervene as a defendant-intervenor to protect my own legal interests, including my interests advanced and protected by the Act, as well as to adjudicate the common issues of law and fact raised by the Complaint in this matter. I will do nothing to unduly delay or prejudice the adjudication of the original parties' rights in this case.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct and was executed on November 1, 2011.

*Chimere C. Collins*

Chimere Collins