IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| DR. GRETCHEN S. STUART, M.D.; *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> JANICE E HUFF, M.D.; *et al.*, <br><br> Defendants. | Civil Action No. 1:11-cv-804-CCE |

### DECLARATION OF DANELLE HALLENBECK IN SUPPORT OF PROPOSED DEFENDANT-INTERVENORS MOTION FOR INTERVENTION

I, DANELLE HALLENBECK, declare as follows:

1. I am not a party or related to a party in this action. I am over the age of eighteen and competent to testify in this matter. I currently reside in Bunnlevel, North Carolina. I have read the Complaint filed herein and the recently enacted "WOMAN'S RIGHT TO KNOW ACT" being challenged in that Complaint on the various grounds set forth in this action. (H.B. 854, enacted July 28, 2011, N.C. SESSION LAW 2011-405, the "Act"). I seek to intervene as a defendant-intervenor in this action. I am knowledgeable of the facts set forth herein and if called to testify would do so, as follows.

2. I graduated in 1998 from Iowa State University with a Bachelor of Science degree in Sociology. In 2012 I expect to receive a Master of Arts Degree in Human Services & Business Administration from Liberty University. I am currently employed as the Human Resource Manager at Passport Door Systems in Angier, North Carolina

3. In June 1993**.**I had an abortion at an abortion clinic in Chapel Hill, North Carolina that I am informed and believe is or was affiliated with Planned Parenthood, one of the plaintiffs in this action. At that time, I was 26 years old**,** a single mom, with a 3-year old son, working part-time as administrative assistance while going to Wake Technical Community College.

4. I sought an abortion because I fearfully felt I couldn't afford another child and imagined that a second pregnancy would preclude finishing my college education.

5. The father of the child agreed that I should get an abortion and drove me to the clinic and paid for the procedure.

6. When I arrived at the abortion clinic I told them that I thought I was 6 to 8 weeks pregnant. I do not recall whether an ultrasound examination of my pregnancy was conducted or not. I am sure I was not shown any sort of ultrasonic real-time image or static picture of my second pregnancy before it was terminated. I also recall quite clearly that when I asked about how far along I was in my pregnancy I was told that "at 8 weeks it was only tissue and the abortion would be over before I knew it." So I assumed that I really was 8 weeks pregnant and was only have some "tissue" removed. I was not

informed of any possible complications, physical or psychological, that may occur if I had an abortion or if I carried to term. I was not provided with any of the information required by the Act being challenged in this case.

7. For example, I was never even informed of the name of the physician who would perform my abortion. I never even spoke to him or had the opportunity to ask him any questions. The abortionist simply slid into the room and performed the abortion and slid out immediately after he was finished.

8. The only words the abortionist said to me while he was performing my abortion, to my shock, were "you are further along than we thought". Those words haunt me to this day because had I thought or known it was not just tissue, but my child, I never would have consented to the abortion. Those words "you were further along than we thought" suggested to me for the first time that my decision to remove what they had told me was only "tissue" actually now meant to me, too late, that I had terminated the life of my child.

9. Guilt immediately descended upon me when realized I traded convenience for torture, love for pain, joy for shame, happiness for sorrow, and I experienced a weight of guilt that I had not expected, nor been warned about prior to my abortion, that slowly corroded away my soul.

10. Motivated by my ongoing guilt and the father's new found regret about the abortion when he saw my depressed and devastated condition, we decided to marry about

one month after the abortion. When I immediately became pregnant again a few months later I was confronted by the image of my third child when I viewed the 1st trimester ultrasound of that pregnancy. It was the first 1st trimester ultrasound I had ever seen. Had I seen a first trimester ultrasound of my second pregnancy and had it been plainly explained to me as the Act requires and my doctor did when he showed me the 1st trimester ultrasound of my third child, I believe that I never would have consented to abort my second child.

11. In my third pregnancy, I developed full *placenta previa*, had to stay in the hospital for approximately 30 days at the government's expense as a Medicaid patient at UNC Chapel Hill Medical Center and couldn't even walk out of my room. My third child, my second son, was delivered approximately six weeks pre-maturely by c-section. I believe the complications that I endured were a direct result of my abortion. Had I been told by the abortionist that there was a risk of *placenta previa* and premature birth, I believe that I never would have consented to the abortion of my second child at that time. Since then I have learned of several studies that actually link previous abortions to pre-mature births.

12. For the next 12 years, from 1993 until 2005, I lived with torment, sorrow and other adverse physical and psychological consequences caused by the fact that I now knew, too late, that I had killed my own child. I kept hearing in my tormented mind "you were further along than we thought." I hated myself and felt undeserving of anything good, even life. I was under intermittent medical care, sought and received psychiatric

counseling on numerous occasions, and was given all kinds of anti-depressants. They helped only for a short time, but the pain kept coming back. I kept stuffing my pain down inside me for the fear of exposing the shame, anguish, guilt and grief that was at the very core of my being. It just kept seeping out no matter what drugs I took. Fueled by my anger at my abortion, my low self-regard, and suicidal thoughts-- my marriage deteriorated and I separated in 1998 and was finally divorced in 2000.

13. In 2005, feeling alone at the end of my rope still seeking some relief, I prayed to God. While watching television one day, I saw a program sponsored by Operation Outcry called "Faces of Abortion." I was shocked as I learned that there were other women like me who had been harmed by their abortions, but who were now on the television coming forward to openly tell their stories of how abortion harmed them. Watching that show, I began to realize that it was permissible to stop hiding my feelings and that I needed to openly tell my story to begin healing.

14. I also learned watching "Faces of Abortion" that day that there were places where I could go to get healing from the torments, depression, suicidal thoughts and other symptoms I was still suffering from my abortion. In particular, I learned there was a healing retreat in South Carolina the following week-end so I signed up and attended the retreat.

15. During that retreat in 2005, sponsored by Rachel's Vineyard, attended by more than 15 women, I listened to women tell their stories of abortion injury and I was able for

the first time to tell my true story of what my abortion had done to me. Up until that moment, I had never told my obstetrician/gynecologists or psychiatrists the truth because I was so ashamed of what I had done to my second child. I learned that there were many other women who always kept the fact and the pain of their abortion secret because they were ashamed to speak of it.

16. Eventually, after I healed, I appeared on "Faces of Abortion" and later became the North Carolina State Team Leader of Operation Outcry. In that capacity, we collected and made public the existence of sworn affidavits from North Carolina women who had been hurt by abortion. As a custodian of these affidavits, at the invitation of the North Carolina Legislature, on May 11, 2011, I testified before the House Judiciary Committee, in support of the Act. In addition to giving a shorter version of my testimony set forth in greater detail in this Declaration, I also showed the Committee over 2000 affidavits signed under penalty of perjury by women from all over the country harmed by their abortions. 211 of those affidavits were signed by women in North Carolina who claimed to have been harmed by their abortions. Only 7 of those 211 North Carolina affiants said their abortionists had fully informed them of the nature of their abortion, what it was and what its risks and adverse consequences could be.

17. One lady from North Carolina in an affidavit I presented to the House Judiciary Committee said:

> *"I was never told of the possibility of future health or pregnancy issues, I was especially never told about the overwhelming guilt and psychological pain that would come from it. In fact, when I expressed my deep sense of guilt before my abortion, the doctor just brushed my concerns away saying it was "just tissue anyway"."*

18. Another lady from North Carolina stated:

> *"It was explained to me that it was a simple procedure and the baby was not a fully formed baby, it was just a 'ball of tissue', it was an early 2nd trimester abortion and when they did the ultrasound, they acted as if it was nothing".*

19. The affidavits I showed in my testimony to the House Judiciary Committee in support of the Act challenged in this case also asked the question "How has abortion affected you? Most of the affidavits talk about the same sort of depression, loss of self-esteem and many of the other symptoms I suffered for 12 years after my abortion.

20. Regarding the adverse psychological consequences associated with her abortion, one lady from North Carolina in her affidavit testified:

> *"Immediately after I was overcome with such a sense of loss and guilt that I cried for days, slipping into a deep depression. I buried my apparent feelings but felt I had " done the worst already" so I became reckless, permissive and very self destructive, to the point that I turned my back on my faith and most things that I knew to be right. My pain would not be denied though, so I slipped deeper and deeper into depression and negative thinking till I finally became suicidal, totally without hope. I destroyed the life within me and destroyed my own life as well".*

21. Since 2005 I have also facilitated two Rachel's Vineyard Retreats with Dr. Martha Shuping and volunteered hundreds of hours talking to many women impacted by an unplanned pregnancy or suffering the consequences of a prior abortion while serving as a trained lay counselor at the Life Care Pregnancy Resource Center in Raleigh, North Carolina.

22. Based upon my own experience set forth above, as well as my interviews and discussion with many post-abortive women in North Carolina, I would conclude that abortionists in North Carolina, including at least some of the plaintiffs in this case, do not give women enough information for them to make a truly voluntary and fully informed decision about what an abortion is and what risks and adverse complications can arise from abortion. I am particularly sure from my own experience that women like me are not told what an ultrasound examination is revealing to the abortionist and why a woman like me might want to see it. Lacking this information in my case, I know under all the circumstances described above that I did not give a truly voluntary and fully informed consent to the abortion of my second child.

23. Had the abortionist complied with the provisions of the Act challenged in this case, before he performed the abortion, I am certain I would have had vitally important information which I was not otherwise given. Had I been provided this information, including the display of a real-time image of my second child and been provided with a simultaneous medical explanation of what the display was depicting, I would have known

8 | P a g e - H a l l e n b e c k  D e c l a r a t i o n

Case 1:11-cv-00804-CCE-LPA   Document 45-5   Filed 11/08/11   Page 8 of 12

for sure that I was terminating the life of my own child, not just some "tissue." Had I known this, I sincerely believe I would not have given my consent to my abortion at that time and, at the very least, I would have left the abortion clinic that day to talk further with the child's father and think more deeply about it before I would ever give such a consent. I doubt I ever would have ever returned to any abortion clinic and I believe I would have given birth to my second child rather than aborting that baby.

24. I testified in favor of the Act because I believe North Carolina women, like myself, have a right and good reason to fully and understandably be told and know all of the information set forth in the Act before they can be expected to voluntarily give their fully informed consent to such an irrevocable surgical procedure terminating the life of a living human being that, as I now know from my own case, has so many short and long-term risks and adverse complications.

25. In my personal experience working with many post-abortive women in North Carolina, I have talked to such women who told me "I never knew its heart was already beating." I have witnessed or talked to women who changed their minds about having an abortion after seeing the ultrasound images of their baby in the 1st or 2nd trimesters. In my experience, once many women see the ultrasound and have it explained to them, they know that they are carrying their baby and they feel empowered to make a decision in light of those true facts. Some decide to carry their baby to term, others decide to terminate their pregnancy, but all are much more fully informed.

9 | P a g e - H a l l e n b e c k   D e c l a r a t i o n

Case 1:11-cv-00804-CCE-LPA   Document 45-5   Filed 11/08/11   Page 9 of 12

26. Based on my personal experiences and upon what women in North Carolina I have talked to have told me, I believe that every woman needs to undergo an ultrasound before obtaining an abortion, and that the ultrasound images should be displayed and explained to her prior to the performance of the abortion as is required by the Act being challenged in this case.

27. Based on my personal experience, and what women in North Carolina have told me, I believe that sharing the information provided by the ultrasound with the woman is necessary in order to allow her to make a fully informed and voluntary decision about whether to continue or terminate her pregnancy not only for the sake of her health, but for the sake of her child's health.

28. Based upon my own personal experience set forth above, as well as my interviews and discussion with many post-abortive women in North Carolina, I would conclude that

///

///

///

///

///

///

abortionists in North Carolina, including at least some of the plaintiffs in this case, do not give women enough information for them to make a truly informed decision about what an abortion is and what risks and adverse complications can arise from abortion.

29. Because the facts as I know them from my own personal experience and from the expert opinions I have read and rely upon in counseling women are directly contradicted by then factual allegations and expert opinions that are being alleged and have already been offered in evidence by the plaintiffs and cited by the Court in this case, I seek to intervene as a defendant-intervenor to protect my own legal interests advanced and protected by the Act, as well as to adjudicate the common issues of law and fact raised by the Complaint in this matter. I will do nothing to unduly delay or prejudice the adjudication of the original parties' rights in this case.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct and was executed on October 28, 2011.

/s/ *Danelle Hallenbeck*
_____
Danelle Hallenbeck

abortionists in North Carolina, including at least some of the plaintiffs in this case, do not give women enough information for them to make a truly informed decision about what an abortion is and what risks and adverse complications can arise from abortion.

29. Because the facts as I know them from my own personal experience and from the expert opinions I have read and rely upon in counseling women are directly contradicted by then factual allegations and expert opinions that are being alleged and have already been offered in evidence by the plaintiffs and cited by the Court in this case, I seek to intervene as a defendant-intervenor to protect my own legal interests advanced and protected by the Act, as well as to adjudicate the common issues of law and fact raised by the Complaint in this matter. I will do nothing to unduly delay or prejudice the adjudication of the original parties' rights in this case.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct and was executed on October 28, 2011.

Danelle Hallenbeck