IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| DR. GRETCHEN S. STUART, M.D.; *et al.*, | )<br>)<br>) |
| Plaintiffs, | )<br>)<br>) |
| v. | )<br>) Civil Action No. 1:11-cv-804-CCE<br>)<br>) |
| JANICE E. HUFF, M.D.; *et al.*, | )<br>) |
| Defendants. | )<br>) |

### DECLARATION OF LANITA WILKS IN SUPPORT OF PROPOSED DEFENDANT-INTERVENORS MOTION FOR INTERVENTION

I, LANITA WILKS, declare as follows:

1. I am not a party or related to a party in this action. I am over the age of eighteen and competent to testify in this matter. I currently reside in Charlotte, North Carolina. I have read the Complaint filed herein and the recently enacted "WOMAN'S RIGHT TO KNOW ACT" being challenged in that Complaint on the various grounds set forth in this action. (H.B. 854, enacted July 28, 2011, N.C. SESSION LAW 2011-405, the "Act"). I seek to intervene as a defendant-intervenor in this action. I am knowledgeable of the facts set forth herein and if called to testify would do so, as follows.

2. I am 28 years old. I was born in 1983 and raised in Ayden, North Carolina. I graduated in 2010 from the University of North Carolina at Charlotte with a Bachelor of Arts degree in English.  I am currently employed as a substitute teacher in the Charlotte Mecklenburg School System (CMS) while pursing my Masters of Arts Degree in Human Service specializing in Business Leadership at Liberty University. I provide regular volunteer services to Big Brothers/Big Sisters of Greater Charlotte, the Pregnancy Resource Center of Charlotte (PRCC) and (CMS) in partnership with Communities In Schools. I am also the founder of Restoring the Heart, Inc. ("RTH").

3. Founded in 2009 and established in 2010, RTH is a Christ centered organization that is dedicated to seeing women and girls of all ages live healthy and positive lifestyles. RTH's focus is on restoration from the inside-out. RTH does this through a number of programs and by hosting seminars, empowerment conferences, retreats, peer counseling, life groups, and more. RTH empowers and educates women to be effective leaders in their homes, in their schools, on their jobs and everywhere they go. RTH empowers and educates women and girls to understand the importance of healthy relationships and healthy families while striving daily to have both.

4. In the Fall of 1998, just after I turned 15 years old, I was living at home with two other sisters, including my twin sister, Shaquita, and my single mother who worked to provide for us as a domestic housekeeper.  It was the beginning of my sophomore year at Ayden-Grifton High School.  I did not know or enjoy the support of my father, who was

a former U.S. Marine and resided in Newport News, Virginia with my stepmother and two younger siblings. Instead I relied upon a boyfriend who was over 18 at that time, but had been my boyfriend since I was 12. He was very generous to me because he had a part-time job. About that time I unwisely began to have premarital sexual relations with him. Almost immediately, I became pregnant but did not realize it or do anything about it until I was in or close to my second trimester.

5. In early December 1998, I learned I was pregnant when my boyfriend became concerned about the fact I had not had a menstrual cycle in more than two months and purchased me a pregnancy test. The test indicated that I was pregnant. Not believing it, I bought myself a second pregnancy test and was shocked when the second test was also positive.

6. I was so afraid and so ashamed that I had allowed myself to become pregnant that I did not want to tell my mother.

7. In response, I looked at an MTV brochure that someone had given me that talked about unplanned pregnancies like mine. I called the 800 number in the brochure and was eventually directed to Planned Parenthood of Raleigh, operated by Planned Parenthood Health Systems, Inc., one of the plaintiffs in this case (hereafter "PPHS").

8. In late December 1998 or early January 1999, in two separate telephone calls, PPHS informed me that they had awarded me a partial stipend for an abortion. Since I was an unemancipated minor at the time, PPHS also instructed me how to get a judicial

by-pass so I would not have to tell my mother or obtain her otherwise legally required written consent for my abortion. Finally, PPHS also referred me to an abortion clinic who told me they had already received my stipend. I am informed and believe that the abortion clinic they referred me to was A Woman's Choice of Raleigh, Inc., another one of the plaintiffs in this case (hereafter the "Abortion Clinic").

9. Before I could go to the Abortion Clinic, I was taken by my boyfriend in his car to the Pitt County Court in Greenville, NC where I had an appointment with a district judge who asked me some questions and completed some paperwork that I had been told I needed to get from the court before I could have an abortion. The appointment took less than 30 minutes. As the judge filled out the paperwork, she asked me some questions, like: "Did I know what I was doing?" "If I thought I was mature enough?" "Was I mentally stable?" "If I had been told or was otherwise aware about any of the adverse psychological consequences that may occur following an abortion?" I told the judge that I had never heard of any complications that might occur, but said I thought I was mentally stable, mature enough, and knew what I was doing. The truth was I had no idea what I was doing, but was largely going along with what my boyfriend thought was best for us. The judge then signed some papers and gave them to me. I took the papers to the Abortion Clinic. The judge never conveyed any of the information to me that is required to be given to a woman under the Act.

10. The abortion took two visits, spaced about a week apart. My boyfriend took me to both visits. At the first visit, I gave the receptionist the paperwork I received from the judge and she verified my information. I was then asked to have a seat, and shortly thereafter called to the back and given a blood test and an ultrasound examination. They were careful to turn the ultrasound screen away from me and never gave me an option to see it. They did tell me that "I was further along" than I had told them over the telephone. They also told me since I was "13 weeks pregnant" I didn't have enough money for a 2nd trimester abortion and I had to come back within no more than a week with some more money or they said, "it would be too late."

11. On Wednesday, January 20, 1999, a date I will never forget and still memorialize each year, within the week they gave me; and after my boyfriend gave me the extra money I needed and took me back to the Abortion Clinic, I had my second ultrasound. Again, the person administering the ultrasound turned the screen away and did not give me the option of seeing it. No one ever explained what the ultrasound was for, what it was showing them or why I might want to know about it. I never gave them any consent to do it. In fact I never received from anyone at the Abortion Clinic any of the information, real-time images or explanations required by the Act, except being told that I was 13 weeks pregnant.

12. After the ultrasound examination, I was taken to another room to take off my clothes and take drugs to dilate my cervix. I did not meet the abortionist until after I took

some pills and was being sedated with a gas mask. I do not recall him ever speaking directly to me or asking me if I had any questions. I never gave my truly voluntary or fully informed consent to anyone to do anything. When I came to my senses, the abortion was over and all I recall is a black woman singing a popular song. I never saw the abortionist again. I was then escorted to a recovery room and given more pills, juice, and animal crackers. After about thirty minutes, I was told I could now go home. I recall being given some post-abortion instructions, such as: that bleeding would be normal and to take the pain pills they provided as needed; to get rest, and how I might be able to get birth control pills without charge. Minutes after leaving the clinic, I advised my boyfriend to pull over because I was feeling light-headed and nauseous and proceeded to vomit. I began to cry and then fell asleep the remainder of the ride home.

13. My boyfriend accompanied me to the Abortion Clinic the day I got my abortion. He paid the balance due and the extra fifty dollars for sedation which they did not tell me about at the first visit. He drove me home. We resumed our sexual relations after my bleeding eventually stopped. I began using birth control I got from the Pitt County Health Department. But I did not feel like myself again for more than 10 years.

14. I almost immediately began having "flashbacks" while awake and asleep, vivid images of me vomiting after the abortion, the black woman singing that song I could never stand to hear again, my boyfriend rejecting me and refusing to comfort me because he said it was hard for him to talk about. By the beginning of my 11th grade year the

relationship with my boyfriend began to deteriorate. He became abusive when I either began withholding sex (because he had given me a sexually transmitted disease) or when I would not follow his orders or instructions. He was verbally abusive and would curse me and call me names. When he became more physically abusive and tried to run me off the road with his car I began to contemplate suicide and I even attempted suicide. I was miserable and the flashbacks of my abortion continued to torment me. I thought how could someone I had been with for so many years and said he loved me, cause me so much pain? I broke up with my boyfriend in 2001 when I was eighteen years old.

15. I didn't learn what an ultrasound was until after I had already had my abortion, in the second semester of my sophomore year when I took a health class in high school. When I learned in that class what an ultrasound was and what could be seen using ultrasound, it only made me more remorseful and angry about my abortion. The same remorseful and angry feelings, accompanied by flashbacks, came up again in that second semester when I learned more about prenatal development, including some of the information required by the Act to be provided to woman before they can give their truly voluntary and informed consent to abortion.

16. I didn't actually see my first real time ultrasound image until I saw the live image of a nine month unborn child just before the birth of my friend's baby when I was a senior in high school. Once again the wonder of seeing that ultrasound only made me regret my own abortion more.

17. About a month after my abortion, my twin sister discovered a letter discussing the abortion that my boyfriend sent to me saying he was now as sad as I was about the abortion. Until I received that letter he had said little or nothing to me about the abortion. Aside from that letter, we rarely brought the subject up again because it was so painful for me. Without my permission, my sister told my mother about my abortion. My mother told me she would have supported my child's birth but that she was not upset. Strangely, learning that I had misjudged what my mother's reaction would be only made me feel worse about not telling my mother and seeking her advice in the first place before I had my abortion.

18. I did not tell my boyfriend's mother until 2011. When she told me that had she known, she would have supported both of us to have the baby. I again had to relive my regrets. Since she has always considered me to be one of her "daughters", it grieved me that I had also not sought her counsel before I had my abortion.

19. Following my abortion, I was so confused and hurt that I shut down inside. For years I cried every single day and begged God who I barely believed in at the time not to be angry with me for making such a horrible mistake. Even after I broke up with my boyfriend after my abortion, my grief and hopelessness remained because I felt as though the one that had caused me the most pain was now gone and so was my child. I became numb to the world.

8 | P a g e - W i l k s   D e c l a r a t i o n

Case 1:11-cv-00804-CCE-LPA   Document 45-7   Filed 11/08/11   Page 8 of 15

20. After I graduated from high school, I attended Pitt Community College to prepare for nursing school. But I wasn't focused and eventually flunked out. As I turned 19 years old I began partying, drinking, smoking, and having sex with complete strangers. I knew that it was a coping mechanism for how I felt inside. I didn't want to deal with the pain, so I did everything I could *not* to think about it. The guilt of my abortion still taunted me and I knew that my self-destructive actions were my way of dealing with my abortion.

21. In May 2004, I moved to Winston-Salem to get away from everything and start over. I moved in with my Aunt (my father's sister) until she kicked me out after letting a friend shower without her permission.

22. In July 2004 I moved to Charlotte to live with my older sister (Nyki) working at Harris Teeter and doing home health care as a CNA I. What I thought I had been able to suppress began to surface. I remember lying in the bed, crying for days. At that time the feelings of loneliness, the depression, and not feeling wanted took over me again. I became more promiscuous than ever and would have sex with guys just to make myself feel like someone "wanted" me. Because of all that I had been through I made it a point to not become attached to anyone that I was sexually involved with especially if I felt like they might have any true feelings for me. I had removed all emotion. I wanted to do men the way I felt they did women. Sex them and leave them became my self-destructive motto. In my mind no one "really" wanted me anyway and I just knew I'd get hurt again if I even allowed myself to get that close to someone. I masked my true feelings by

projecting an outgoing personality. Little did everyone know, I was suffering psychologically and was desperate for help but was too ashamed to tell anyone.

23. In 2007 I decided to cut all sexual ties with the many guys I was involved with as well as quitting drinking, and going to the clubs. I kept hearing a voice in me saying, "My child, this is enough," and at that point I knew something had to change. After attending Central Piedmont Community College off and on from 2004-2007, I finally completed my Associates in Arts degree in the Summer of 2007. In the Fall of 2008 I decided to further my college education at the University of North Carolina at Charlotte (UNCC).

24. During the Summer of 2009 when I was enrolled at UNCC, while attending an Introduction to Afro-American Literature class, my professor asked the class to open our books to a poem entitled, "The Mother" by the African-American poet, Gwendolyn Brooks. As I listened to the poem about abortion and the feelings a post-abortive mother has, tears came to my eyes and I just broke down. At the end when the post-abortive poet addresses her aborted child saying, "You were born, you had a body, you died." It was hard for me not to feel a great sadness or even a feeling of injustice. It was time for me to stop hiding and try to begin healing.

25. After ten years of suffering, I wanted to be free from the adverse psychological and emotional effects my abortion had caused me including the depression, the suicidal

thoughts, the feelings of worthlessness, and all of the sin that I had bathed myself in as a result of my abortion.

26. In the latter part of 2009, I had the privilege of hosting a Girl Talk forum where I had the opportunity to share my story for the first time. It was healing because God showed me that I could now tell others how His words of hope and forgiveness freed me from depression and self-destructive thoughts and actions without being ashamed.

27. After first giving my testimony, in August of 2009, I was led to start RTH, described in paragraph 3 above.

28. I also searched online to volunteer with a Christian organization that advocated for pro-life and so I began to volunteer at the Pregnancy Resource Center of Charlotte (PRCC). Their volunteer coordinator was such a blessing and suggested that I attend a post-abortion women's Bible study and healing course that took me to another level of relief giving me a greater sense of purpose that I was finally walking in the right direction.

29. I am now a volunteer for PRCC and have made it a part of my life's purpose to speak from my own personal experience about about the truths and evils of abortion and how the so-called "pro-choice" message only tells half of the story; as well as how the abortion industry is a billion dollar self-interested industry fueled in part by the fees earned from abortion.

///

30. Through my volunteer work at RTH and PRCC I have had the opportunity to speak with many post-abortive North Carolina women, who like myself (either as minors or as adults) were not given an opportunity to make a truly voluntary fully informed consent to their abortion, largely because they were not offered the information about the risks and complications of abortion or the real-time image and explanation of their unborn child, as is required by the Act challenged in this action.

31. Based upon my own experience set forth above and the experiences that other North Carolina women have shared with me, I would conclude that abortionists in North Carolina, including at least some of the plaintiffs in this case, do not give women, particularly unemancipated minors like I was at the time of my abortion, enough information for them to make a truly voluntary and fully informed decision about what an abortion is and what risks and adverse complications can arise from abortion. I am particularly sure from my own experience that women like me are not told what an ultrasound examination is revealing to the abortionist and why a woman like me might want to not only see her ultrasound but also have what was being seen clearly explained to her, as the Act requires. Lacking this information in my case, I know under all the circumstances described above that I did not give a truly voluntary and fully informed consent to the abortion of my first child.

32. Had I been provided the information required by the Act, including the display of a real-time image of my child and been provided with a simultaneous medical

explanation of what the display was depicting, I would have known for sure that I was terminating the life of my own child, not just some "tissue." Had I known this, I sincerely believe I would not have gone through with my abortion at that time and, at the very least, I would have left the abortion clinic that day to think more deeply about it and, perhaps, talk to my mother or my boyfriend's mother before I would ever consent to it.

33. At the time of my abortion I did not know my child's heart was already beating. Had I even known this fact, particularly if I had seen it with a proper explanation, I would not have gone through with my abortion.

34. Based on my personal experience, I believe that sharing the information provided by the ultrasound with the woman is necessary in order to allow her to make a fully informed and voluntary decision about whether to continue or terminate her pregnancy not only for the sake of her health, but for the sake of her child's health.

35. Because the facts as I know them from my own personal experience which I daily tell women in my work at RTH and PRCC are directly contradicted by the factual allegations and expert opinions that are being alleged and have already been offered in evidence by the plaintiffs and cited by the Court in this case, I seek to intervene as a defendant-intervenor to protect my own legal interests advanced and protected by the

///

///

13 | Page - Wilks Declaration

Case 1:11-cv-00804-CCE-LPA   Document 45-7   Filed 11/08/11   Page 13 of 15

Act, as well as to adjudicate the common issues of law and fact raised by the Complaint in this matter. I will do nothing to unduly delay or prejudice the adjudication of the original parties' rights in this case.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct and was executed on October 30, 2011.

*/s/ Lanita Wilks*
_____
Lanita Wilks

Act, as well as to adjudicate the common issues of law and fact raised by the Complaint in this matter. I will do nothing to unduly delay or prejudice the adjudication of the original parties' rights in this case.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct and was executed on October30, 2011.

*[signature]*

Lanita Wilks