# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

GRETCHEN S. STUART, M.D., et al.,    )
                                    )
               Plaintiffs,        )
                                    )
v.                                  )     CIVIL ACTION
                                    )
                                    )     Case No. 1:11-cv-00804
RALPH C. LOOMIS, M.D., et al.,     )
                                    )
               Defendants.     )
                                    )

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

Page

INTRODUCTION ........................................................................................... 1

STATUTORY FRAMEWORK AND STATEMENT OF FACTS ................... 2

    I.     The Act's Requirements ............................................................. 2

    II.    Plaintiffs' Current Medical Practice .......................................... 6

QUESTIONS PRESENTED ......................................................................... 7

ARGUMENT ................................................................................................ 7

    I.     The "Display of Real-Time View Requirement" Violates the First Amendment Because It Compels Physicians to Deliver Government Speech That They Would Not Otherwise Make .......................................................... 8

           A.    Strict Scrutiny Applies to the "Display of Real-Time View Requirement" Regardless of Whether the Speech Compelled Is Ideological or Factual .................................................. 9

           B.    Strict Scrutiny Applies Because the "Display of Real-Time View Requirement" Imposes Content- and Speaker-Based Restrictions ............................................................. 13

           C.    The Act Fails Both Strict and Intermediate Scrutiny ..................... 14

    II.    *Casey* Does Not Preclude Plaintiffs' Challenge Here ............................... 18

           A.    *Casey*'s First Amendment Analysis Does Not Govern The Speech Compelled By The Act ...................................................... 18

           B.    The Fifth Circuit's Decision in *Lakey* Is Incorrect And This Court Should Not Follow It ............................................................. 21

    III.   The Act's "Display of Real-Time View" Requirement Violates Due Process Because It Is Not Rationally Related to a Legitimate Government Objective .................................................... 22

    IV.   The Act Is Impermissibly Vague ............................................. 25

           A.    Whether the Act Imposes Criminal Penalties ......................... 27

           B.    Who May Provide the Information Required by Section 90-21.82 ............................................................................ 28

           C.    Who May Perform the "Display of Real-Time View" .................. 29

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Axson-Flynn v. Johnson,*
  356 F.3d 1277 (10th Cir. 2004) .................................................................. 10

*Bery v. City of New York,*
  97 F.3d 689 (2d Cir. 1996) ........................................................................ 12

*Brown v. Entm't Merchs. Ass'n,*
  131 S. Ct. 2729 (2011) ................................................................. 14, 15, 16

*County of Sacramento v. Lewis,*
  523 U.S. 833 (1998) .................................................................................. 23

*Colautti v. Franklin,*
  439 U.S. 379 (1979) .................................................................................. 26

*Conant v. Walters,*
  309 F.3d 629 (9th Cir. 2002) ..................................................................... 14

*Couch v. Jabe,*
  679 F.3d 197 (4th Cir. 2012) ....................................................................... 7

*Delaney v. Barlett,*
  370 F. Supp. 2d 373 (M.D.N.C. 2004) ..................................................... 26

*Edenfield v. Fane,*
  507 U.S. 761 (1993) .................................................................................. 17

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trucks Council,*
  485 U.S. 568 (1988) .................................................................................. 26

*First Am. Bank of Va. v. Dole,*
  763 F.2d 644 (4th Cir. 1985) ..................................................................... 26

*Grayned v. City of Rockford,*
  408 U.S. 104 (1972) .................................................................................. 30

*Harris Through Freedman v. Nationwide Mut. Ins. Co.,*
  420 S.E.2d 124 (N.C. 1992) ...................................................................... 26

Case 1:11-cv-00804-CCE-LPA   Document 106   Filed 10/03/12   Page 3 of 40

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Hersh v. United States ex rel. Mukasey,*
553 F.3d 743 (5th Cir. 2008) ........................................................ 10

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,*
515 U.S. 557 (1995) ..................................................................... 10

*In re DNA Ex Post Facto Issues,*
561 F.3d 294 (4th Cir. 2009) ........................................................ 27

*In re R.L.C.,*
643 S.E.2d 920 (N.C. 2007) .......................................................... 25

*Legal Svs. v. Velasquez,*
531 U.S. 533 (2001) ....................................................................... 9

*Multimedia Publ'g Co. of S.C., Inc. v. Greenville-Spartanberg Airport Dist.,*
991 F.2d 154 (4th Cir. 1993) ........................................................ 23

*NAACP-Greensboro Branch v. Guilford Ctny. Bd. of Elections,*
No. 1:12cv111, 2012 WL 873550 (M.D.N.C. Mar. 14, 2012) .................... 25

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.,*
475 U.S. 1 (1986) ........................................................................... 9

*Perry v. Brown,*
671 F.3d 1052 (9th Cir. 2012) ....................................................... 25

*Planned Parenthood of Cent. N.C. v. Cansler,*
No. 1:11cv531, 2012 WL 2513510 (M.D.N.C. June 28, 2012) ............. 23, 25

*Planned Parenthood of Idaho, Inc. v. Wasden,*
376 F.3d 908 (9th Cir. 2004) ........................................................ 29

*Planned Parenthood Minn., N.D., S.D. v. Daugaard,*
799 F. Supp. 2d 1048 (D.S.D. 2011) ............................................... 16

*Planned Parenthood of Southeastern Pennsylvania v. Casey,*
505 U.S. 833 (1992) ................................................................. passim

*Plett v. United States,*
185 F.3d 216 (4th Cir. 1999) .......................................................... 8

Case 1:11-cv-00804-CCE-LPA   Document 106   Filed 10/03/12   Page 4 of 40

# TABLE OF AUTHORITIES
(continued)

Page(s)

*PSINet, Inc. v. Chapman,*
362 F.3d 227 (4th Cir. 2004) ..................................................................... 26

*R.A.V. v. City of St. Paul, Minn.,*
505 U.S. 377 (1992) ............................................................................ 13, 14

*R.J. Reynolds Tobacco Co. v. FDA,*
Nos. 11-5332, 12-5063, 2012 WL 3632003 (D.C. Cir. Aug. 24, 2012) ............... 12, 17

*Richmond Med. Ctr. For Women v. Gilmore,*
55 F. Supp. 2d (E.D. Va. 1999) .................................................................. 29

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc,*
487 U.S. 781 (1988) ......................................................................... passim

*Romer v. Evans,*
517 U.S. 620 (1996) .......................................................................... 23, 25

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
515 U.S. 819 (1995) ................................................................................ 21

*Sorrell v. IMS Health Inc.,*
131 S. Ct. 2653 (2011) .................................................................. 10, 13, 14

*Stuart v. Huff,*
834 F. Supp.2d 424 (M.D.N.C. 2011) ........................................................ passim

*Texas Medical Providers Performing Abortion Services v. Lakey,*
667 F.3d 570 (5th Cir. 2012) ................................................................ 21, 22

*Tri-Cnty. Paving, Inc. v. Ashe Cnty.,*
281 F.3d 430 (4th Cir. 2002) ..................................................................... 26

*United States v. Williams,*
553 U.S. 285 (2008) ................................................................................ 22

*Washington v. Glucksberg,*
521 U.S. 702 (1997) ................................................................................ 25

*Wollschlaeger v. Farmer,*
No. 11-22026, 2012 WL 3064336 (S.D. Fla. Jun. 29, 2012) ............................. 17

-iv-

*Wooley v. Maynard,*
 430 U.S. 705 (1977) ................................................................................................ 11

**STATUTES**

18 Pa. Cons. Stat. § 3205 ........................................................................................ 20

18 Pa. Const. Stat. § 3205(c) ................................................................................... 20

N.C. Gen. Stat. § 90-8.2 .......................................................................................... 30

N.C. Gen. Stat. § 90-14(a)(2) .............................................................................. 2, 26

N.C. Gen. Stat. § 90-21.13(a)(2) ............................................................................... 7

N.C. Gen. Stat. § 90-21.81(9) ................................................................................. 21

N.C. Gen. Stat. § 90-21.82(1) ................................................................................. 28

N.C. Gen. Stat. § 90-21.82(1)(e) ............................................................................ 28

N.C. Gen. Stat. § 90-21.85 .............................................................................. 2 , 5, 27

N.C. Gen. Stat. § 90-21.85(a) ................................................................................ 2, 3

N.C. Gen. Stat. § 90-21.85(a)(1) ............................................................................... 2

N.C. Gen. Stat. § 90-21.85(a)(2) ........................................................................... 2, 3

N.C. Gen. Stat. § 90-21.85(a)(3) ........................................................................... 2, 3

N.C. Gen. Stat. § 90-21.85(a)(4) ........................................................................... 2, 3

N.C. Gen. Stat. § 90-21.85(b) .................................................................................. 3

N.C. Gen. Stat. § 90-21.88 ............................................................................. 2, 26, 27

**OTHER AUTHORITIES**

21 N.C. Admin. Code 32M.0101 *et. seq.* ................................................................. 29

21 N.C. Admin. Code 32M.0800 *et. seq.* ................................................................. 29

Case 1:11-cv-00804-CCE-LPA   Document 106   Filed 10/03/12   Page 6 of 40

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

21 N.C. Admin. Code 36.0801(4) ............................................................... 30

10A N.C. Admin. Code 14E.0305(d) ............................................................. 7

Fed. R. Civ. P. 56(a) ...................................................................................... 7

Stedman's Medical Dictionary (28th ed. 2006) ........................................... 30

-vi-

## INTRODUCTION

Plaintiffs challenge several new provisions of North Carolina law that impose uniquely intrusive and harmful requirements on how physicians must speak to and treat their patients. In particular, the "Display of Real-Time View Requirement" in the Women's Right To Know Act ("the Act") requires physicians, while they are performing a vaginal or abdominal ultrasound on a patient, to display and describe the ultrasound image to her in a manner mandated by the State, even if the patient objects. Physicians must display and describe these images while the patient is lying down on an examination table, partially undressed. Physicians must display and describe these images no matter what the patient's reason for choosing to terminate her pregnancy. Physicians must display and describe these images even if the physician believes it is harmful to the patient or contrary to medical ethics. And, most absurdly, physicians must display and describe these images even if the patient attempts physically to resist, with the Act expressly assuring that it should not be interpreted "to prevent a pregnant woman from averting her eyes from the displayed images or from refusing to hear" the doctor's rendition of the state's script.

In short, the "Display of Real-Time View Requirement" compels Plaintiffs to engage in speech that they would otherwise avoid, and, indeed, to act as unwilling vessels for the State's message. The First Amendment flatly prohibits that result, as this Court already has concluded. The Court should reaffirm that conclusion and find the "Display of Real-Time View Requirement" unconstitutional.

1

## STATUTORY FRAMEWORK AND STATEMENT OF FACTS

### I.    The Act's Requirements

The Act requires physicians, in their own voice, to display and describe ultrasound images of the embryo or fetus to their patients seeking abortions, even if the patient objects, even if the physician believes it will harm the patient and violate medical ethics, and even when doing so is contrary to the physician's medical judgment. *See* Act § 90-21.85; Declaration of Dr. Gretchen S. Stuart ("Stuart Decl.") ¶ 24; Declaration of Dr. Serina E. Floyd ("Floyd Decl.") ¶¶ 15-16; Declaration of Dr. James R. Dingfelder ("Dingfelder Decl.") ¶ 20; Declaration of Dr. Nada L. Stotland ("Stotland Decl.") ¶¶ 15-22. Physicians must comply with the Act or risk civil penalties and loss of their medical licenses. *See* Act § 90-21.88; N.C. Gen. Stat. § 90-14(a)(2).

Specifically, the Act's "Display of Real-Time View Requirement" mandates that either "the physician who is to perform the abortion" or a "qualified technician" working with the physician conduct "an obstetric real-time view of the unborn child on the pregnant woman" at least four hours before an abortion is performed. §§ 90-21.85(a), (a)(1). Under this requirement, the physician or qualified technician must:

- "[d]isplay the images so that the pregnant woman may view them," § 90-21.85(a)(3);

- provide a simultaneous, detailed "explanation of what the display is depicting," including "the presence, location, and dimensions" of the embryo or fetus within the uterus, § 90-21.85(a)(2); and

- provide a "medical description of the images, . . . [including] the dimensions of the embryo or fetus and the presence of external members and internal organs, if present and viewable." § 90-21.85(a)(4).

2

The Act states that "[n]othing in [Section 90-21.85] shall be construed to prevent a pregnant woman from averting her eyes from the displayed images or from refusing to hear the simultaneous explanation and medical description." § 90-21.85(b). The only exception to the requirement is for medical emergencies. §§ 90-21.85(a), 90-21.86.

The Act thus compels doctors, depending on the stage of pregnancy, either to insert an ultrasound probe into the woman's vagina or place it on her abdomen as she lies supine on an examination table. *See* Stuart Decl. ¶ 13; Floyd Decl. ¶ 10; Dingfelder Decl. ¶¶ 10-11; §§ 90-21.85(a)(2) – (4). The patient must be partially undressed, either exposing the lower portion of her abdomen or naked from the waist down with only a drape covering her, *see* Stuart Decl. ¶ 13, "in essence captive, under [the physician's] control, while the patient has the probe in or on her." *Id.* at ¶ 31. The doctor must display and describe the ultrasound images according to state-mandated specifications. It does not matter why the patient has chosen to have an abortion. Nor does it matter if the patient does not want to hear the speech or see the images. Indeed, the state mandates that the doctor continue even if the patient closes her eyes and attempts to drown out the doctor's speech. § 90-21.85(b). As Defendants' own expert explained, "[the Act] says that . . . she can not look at the screen, she can ask that somebody put earmuffs on her or something like that. I mean she's not required to hear the—he is required to provide it [the speech]." Deposition of Dr. Watson A. Bowes ("Bowes Dep.") 87:1-4, Aug. 10, 2012 (attached as Ex. A to Declaration of Andrew Beck).

As the undisputed evidence shows, the Act forces Plaintiffs to act in a way that

3

they believe is harmful to their patients, contrary to their best medical judgment and medical ethics, and that does nothing to improve the quality of informed consent. First, Plaintiffs have uniformly testified that, based on their experience providing abortion services, forcing them to describe and display ultrasound images to patients who do not want to see or hear them will expose those patients to distress and potential psychological harm, contrary to physicians' ethical obligations. *See* Stuart Decl. ¶¶ 28-29; Floyd Decl. ¶ 16-18; Dingfelder Decl. ¶¶ 20-23; *see also* Stotland Decl. ¶¶ 15-22.[1] The Act's requirement may be especially harmful for patients who are seeking abortions because of fetal anomalies, maternal health indications, or in cases of rape or incest. *See* Stuart Decl. ¶¶ 28-29; Floyd Decl. ¶¶ 16-18; Dingfelder Decl. ¶¶ 21-22; Stotland Decl. ¶¶ 18-19. One patient subjected to a similar Texas mandate described it as "nothing short of torture." Declaration of Carolyn Jones ("Jones Decl.") ¶ 5 (testimony of woman who sought an abortion due to a significant fetal anomaly).

That the patient may close her eyes and cover her ears does not mitigate the harm. "[R]equiring women to look away or cover their ears to avoid unwanted information rather than accepting a woman's decision that this information is unwanted *is itself harmful* because some women will undoubtedly feel that they are being negatively judged and that their decision to have an abortion, or their ability to make that decision, is being questioned." Stotland Decl. ¶ 21 (emphasis added).

---

[1] It is undisputed that health care practitioners have an ethical obligation to avoid harming their patients. *See* Declaration of Dr. Anne D. Lyerly ("Lyerly Decl.") ¶ 26; Declaration of Dr. Carol G. Shores ("Shores Decl.") ¶ 18; Declaration of Dr. Amy Weil ("Weil Decl.") ¶ 20.

4

Second, Plaintiffs also believe that the "Display of Real-Time View Requirement" would compel them to violate another ethical obligation: the duty, acknowledged by Defendants' expert, not to act "over the objection of a competent patient." Bowes Dep. at 62:2-23; Stuart Decl. ¶ 42; Floyd Decl. ¶ 22; Lyerly Decl. ¶¶ 12, 22-23; Shores Decl. ¶ 12; Weil Decl. ¶¶ 16, 18.

Third, *all* physicians in North Carolina have an ethical obligation to exercise their medical judgment and discretion, and to practice medicine based on the specific needs of an individual patient. *See* Shores Decl. ¶ 22; Weil Decl. ¶ 14; Bowes Dep. at 73:6-12; Stuart Decl. ¶ 42. As Defendants' expert testified, physicians should "have the discretion to be able to choose in what way they obtain their informed consent from their patients," and physicians should be permitted to "exercise their medical judgment so they can provide individualized medicine based on a patient's particular needs and circumstances[.]" Bowes Dep. at 73:6-12, 161:7-15. Other than in a medical emergency, the Act gives providers no discretion to exempt patients from the Real-Time View Requirement, even in cases where the provider believes that the requirements would harm the patient or would otherwise not be in the patient's best interest. *See* § 90-21.85.

Finally, the undisputed evidence shows that requiring abortion providers to display and describe ultrasound images to patients who are attempting to close their eyes and drown out the providers' speech would serve no medical purpose. *See* Floyd Decl. ¶ 11; Stuart Decl. ¶¶ 22, 31; Bowes Dep. at 132:16-133:1, 140:5-13. When Defendants' expert was asked how it improves the quality of informed consent for the doctor to keep

5

speaking when the patient turns away her head or covers her ears, he conceded "it doesn't." Bowes Dep. at 140:5-13. Similarly, it serves no medical purpose to require such patients to wait four hours between the ultrasound and the abortion procedure. Dingfelder Decl. ¶ 24.

## II.    Plaintiffs' Current Medical Practice

Plaintiffs are North Carolina obstetrician-gynecologists who practice in a variety of settings, including private clinics as well as major hospitals such as the University of North Carolina and Duke University. *See* Stuart Decl. ¶ 5; Floyd Decl. ¶ 2. Plaintiffs offer a range of care to their patients, including pregnancy terminations for patients who make that decision. *See* Stuart Decl. ¶ 4; Floyd Decl. ¶ 2.

Abortion is a very safe medical procedure. *See, e.g.*, Floyd Decl. ¶ 4. The vast majority of abortions in North Carolina occur during the first trimester of pregnancy. *See* Dingfelder Decl. ¶ 6. As is true nation-wide, more than 60% of North Carolina women obtaining abortions already have one child or more.[2] Women seek abortions for a variety of reasons, including family circumstances and the health of the woman or fetus. *See, e.g.*, Floyd Decl. ¶ 5; Stuart Decl. ¶ 6.

Plaintiffs, as a matter of course, ensure a woman's consent to abortion is informed. They and/or their staff inform patients about the nature of the procedure, its risks and benefits, and the alternatives available to the patient and their respective risks and benefits; they likewise counsel the patient to ensure that she is certain about her decision

---

[2] *See* www.schs.state.nc.us/schs/data/pregnancies/2010/abortioncharacteristics.pdf.

to have an abortion. *See* Floyd Decl. ¶¶ 6-7; Stuart Decl. ¶¶ 10, 19; Dingfelder Decl. ¶¶ 7-8. This is precisely the type of information that practitioners in other areas of medical practice provide for informed consent so that a patient is able to make an autonomous decision whether to undergo a medical procedure. *See* Lyerly Decl. ¶¶ 13-14; N.C. Gen. Stat. § 90-21.13(a)(2) (informed consent for medical treatment requires that patient have "a general understanding of the procedures or treatments and of the usual and most frequent risks and hazards inherent in the proposed procedures or treatments").

Abortion providers currently perform an ultrasound before providing an abortion, *see* 10A N.C. Admin. Code 14E.0305(d), but the ultrasound is done for diagnostic purposes: to confirm the pregnancy, to determine the location of the pregnancy, and to establish the gestational age of the embryo or fetus. *See* Floyd Decl. ¶ 8; Stuart Decl. ¶ 13; Dingfelder Decl. ¶ 9. In the absence of the Act, Plaintiffs would not display ultrasound images and describe them in detail to a patient seeking an abortion unless the patient requested it. *See* Floyd Decl. ¶ 8; Stuart Decl. ¶ 14; Dingfelder Decl. ¶ 15.

## QUESTIONS PRESENTED

Does the Act violate Plaintiffs' rights to free speech, as well as the due process rights of Plaintiffs and their patients?

## ARGUMENT

"Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Couch v. Jabe*, 679 F.3d 197, 200 (4th Cir. 2012) (citing Fed. R. Civ. P. 56(a)). "Summary judgment does not

7

become disfavored simply because ... there are *some* disputed facts." *Plett v. United States*, 185 F.3d 216, 223 (4th Cir. 1999) (quotation omitted). "And the question of whether a given set of facts entitles a party to judgment is a question of law." *Id.*

The Court should grant summary judgment to Plaintiffs because there is no dispute over the crucial facts: the Act forces doctors to speak in their own voice and deliver a message to their patients that they oppose and that they believe will even harm them. Such forced speech violates the First Amendment.

## I.   The "Display of Real-Time View Requirement" Violates the First Amendment Because It Compels Physicians to Deliver Government Speech That They Would Not Otherwise Make.

The "Display of Real-Time View Requirement" violates the First Amendment by compelling Plaintiffs to deliver a government message to their patients seeking an abortion. The requirement is extreme – Plaintiffs are compelled to deliver this message at a particularly vulnerable time for their patients, as the patient is lying on an examination table captive during a vaginal or abdominal ultrasound procedure. Further, Plaintiffs must deliver this message even if the patient does not want to hear it, even if the patient tries to block out the message by covering her ears and closing her eyes, and even if the physician believes that delivering the message will serve only to psychologically harm his or her patient and violate medical ethics. Thus, as the Court correctly found in its preliminary injunction order, the speech is required "even when the provider does not want to deliver the message and even when the patients affirmatively do not wish to see it or hear it." *Stuart v. Huff*, 834 F. Supp. 2d 424, 429 (M.D.N.C. 2011). In burdening

8

physician speech in this way, the Act distorts the traditional role of a physician in the physician-patient relationship. *Cf. Legal Svs. v. Velasquez*, 531 U.S. 533, 544 (2001) (stating that "[r]estricting LSC attorneys in advising their clients and in presenting arguments and analyses to the courts distorts the legal system by altering the traditional role of the attorneys . . . .").

There is no dispute that, in the absence of the Act, Plaintiffs would not display ultrasound images and describe them in detail to a patient seeking an abortion unless the patient requested it. *See supra* at 7. "[M]andating speech that a speaker would not otherwise make necessarily alters the content of the speech," and therefore the "Display of Real-Time View Requirement" is a content-based regulation. *Riley v. Nat'l Fed'n of the Blind of N.C., Inc*, 487 U.S. 781, 795 (1988). Under settled First Amendment principles, this requirement must be subjected to strict scrutiny, which it cannot meet.

A. **Strict Scrutiny Applies to the "Display of Real-Time View Requirement" Regardless of Whether the Speech Compelled Is Ideological or Factual.**

To determine the appropriate level of scrutiny for a law that compels speech, the Court should consider the nature of the speech taken as a whole and the effect of the compelled statements thereon. *Riley,* 487 U.S. at 796. Laws that compel speech that is not purely commercial and that have a direct effect on speech are subject to strict scrutiny. *See, e.g., id.*, at 789 n.5, 795-96; *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.,* 475 U.S. 1, 19 (1986) (plurality opinion). The speech compelled by the "Display of Real-Time View Requirement" falls within that category because it directly

9

affects and changes the noncommercial speech that constitutes a physician-patient consultation. *See Stuart*, 834 F. Supp. 2d at 431 (citing Supreme Court cases defining "commercial speech" and finding that speech at issue here is not purely commercial).

That this requirement compels some factual speech does not diminish the applicable standard of review. As the Supreme Court has stated, the general rule "that the speaker has the right to tailor the speech[] applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573-74 (1995). Thus, strict scrutiny is required here even if the compelled speech is truthful, factual, and non-ideological. *See, e.g., id.* at 573; *Riley*, 487 U.S. at 797-98; *Hersh v. United States ex rel. Mukasey*, 553 F.3d 743, 765-66 (5th Cir. 2008); *see also Axson-Flynn v. Johnson*, 356 F.3d 1277, 1284 n.4 (10th Cir. 2004).

Indeed, the Supreme Court has squarely held that compelled statements of fact are "subject to exacting First Amendment scrutiny." *Riley*, 487 U.S. at 797-98.[3] "Facts, after all, are the beginning point for much of the speech that is most essential to advance human knowledge and to conduct human affairs." *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2667 (2011). For this reason, "factual" speech, including "even dry information," is properly subject to close scrutiny because the act of conveying or not conveying particular facts can unquestionably convey viewpoints. *See id.* ("This Court has held

---

[3] Although the Supreme Court called the standard applied in *Riley* "exacting scrutiny," that standard is functionally identical to strict scrutiny – i.e., the state must have a "compelling" interest and may not compel speech where more "narrowly tailored options are available." 487

10

that the creation and dissemination of information are speech within the meaning of the First Amendment."). Thus, this Court need not find that the "Display of Real-Time View Requirement" compels ideological speech for strict scrutiny to apply.

Nevertheless, there is no escaping the conclusion that the requirement compels physicians to use their own voice to communicate the state's ideological message, making it particularly constitutionally suspect. *See, e.g., Wooley v. Maynard*, 430 U.S. 705, 714-15 (1977). This message is ideological *not* because an ultrasound image or description is inherently ideological, but because forcing either on a patient in the context at issue here is ideological. Under the Act, the physician (or a technician acting under the physician's direction) must force images and speech on a patient while she is lying on an examination table, partially undressed, and even if she has expressly said that she does not want to see or hear them. *See supra* at 2. Further, the physician must force these images and sounds on her even when the physician believes that doing so will only distress and harm the patient. *Id.* at 3. Finally, the physician must continue speaking even when the patient is actively trying to avoid the message by averting her eyes and/or closing her ears. In such circumstances, what the Act compels is not informational but performative – the physician must go through the performance of describing and displaying the ultrasound images even if, as Defendants' own expert concedes, this message will not improve the quality of the patient's informed consent. *See supra* at 6.

---

U.S. at 800.

11

To ignore the coercive and non-informational aspects of the "Display of Real-Time View Requirement" would be to ignore all of the speech and expressive conduct that it demands. Just as a photo of dead soldiers conveys more than "purely" factual information when shown at an anti-war protest,[4] so do the ultrasound images that physicians are forced to display and describe under the Act. Requiring a physician to show and describe in detail an embryo or fetus to a woman seeking an abortion and then requiring her to wait at least four hours before obtaining the procedure – regardless of whether she wants to see or hear the images, regardless of the reasons she has chosen an abortion, and regardless even of whether her eyes and ears are open or closed – commandeers the physician to communicate an anti-choice message. *Cf. R.J. Reynolds Tobacco Co. v. FDA*, Nos. 11-5332, 12-5063, 2012 WL 3632003, at *4, 12 (D.C. Cir. Aug. 24, 2012) (striking down under First Amendment compelled speech grounds graphic images required by FDA on cigarette packaging because, rather than being informational, graphic images represented attempt to force companies to disseminate anti-smoking message and to "convey the state's subjective—and perhaps even ideological—view that consumers should reject this otherwise legal, but disfavored product").

---

[4] *See, e.g., Bery v. City of New York*, 97 F.3d 689, 695 (2d Cir. 1996) ("One cannot look at Winslow Homer's paintings on the Civil War without seeing, in his depictions of the boredom and hardship of the individual soldier, expressions of anti-war sentiments . . . .")

12

**B.    Strict Scrutiny Applies Because the "Display of Real-Time View Requirement" Imposes Content- and Speaker-Based Restrictions.**

The "Display of Real-Time View Requirement" also warrants strict scrutiny because it "enacts content- and speaker-based restrictions." *See Sorrell*, 131 S. Ct. at 2663; *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 391 (1992). Although many medical decisions implicate the State's interests in maternal health and potential life – e.g., using assisted reproductive technologies, treating fetal anomalies, and having an amniocentesis, which poses risks of fetal demise – the Act targets abortion providers for unique burdens on their speech because abortion is disfavored by the State.

In *Sorrell*, the Supreme Court rejected the state's argument that a Vermont statute prohibiting the sale of pharmacy records for marketing purposes should be subject to rational basis review because it concluded that "[t]he law on its face burdens disfavored speech by disfavored speakers." 131 S. Ct. at 2663. Specifically, the Supreme Court found that statute had the effect of singling out a disfavored class (pharmaceutical representatives) and preventing only individuals in that class "from communicating with physicians in an effective and informative manner." *Id.*

The same is true of the "Display of Real-Time View Requirement." It has the effect of preventing physicians who provide abortions – and no other physicians – from communicating with their patients in a manner consistent with patient autonomy and the physician's medical judgment about what will help or harm a particular patient simply because the State disfavors abortion. Therefore, the "Display of Real-Time View Requirement" is "content-based and, in practice, viewpoint-discriminatory." *Id.* at 2667.

13

This kind of discrimination imposed on noncommercial speech is constitutionally impermissible unless it satisfies the rigors of strict scrutiny.[5] *See id.* at 2663-64; *R.A.V.*, 505 U.S. at 387 (holding that First Amendment limits government's ability to impose content-based discrimination even on proscribable speech); *Conant v. Walters*, 309 F.3d 629, 637-38 (9th Cir. 2002) (affirming, on First Amendment grounds, grant of permanent injunction against government policy imposing licensing and other penalties against physicians who recommended use of medical marijuana to their patients and stating that policy "condemns expression of a particular viewpoint, i.e. that medical marijuana would likely help a specific patient").

### C. The Act Fails Both Strict and Intermediate Scrutiny.

Under either strict or intermediate scrutiny, it is the government's burden to establish that a content-based law affecting speech is consistent with the First Amendment. *See Sorrell*, 131 S. Ct. at 2667. The "Display of Real-Time View Requirement" fails under either standard.

To satisfy strict scrutiny, Defendants must establish that the "Display of Real-Time View Requirement" serves compelling interests through the least intrusive means. *See Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2738 (2011). In other words, Defendants must identify "an actual problem in need of solving," show that curtailing

---

[5] The Supreme Court in *Sorrell* did not expressly state whether it was applying intermediate or strict scrutiny because it concluded that the law would fail under either standard. 131 S. Ct. at 2667-68. Because the "Display of Real-Time View Requirement" burdens speech that is not purely commercial, *see supra* at Section I.A., strict scrutiny applies. However, this requirement fails under either strict or intermediate scrutiny. *See infra* at Section I.C.

14

free speech is necessary to the solution, and show that no means other than burdening physicians' First Amendment rights will adequately address the identified problem. *Id.*

Defendants cannot satisfy this burden for several reasons. First, although the State's interest in potential life is "important," "legitimate," and "substantial," *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. at 833, 875-76 (1992), it is not compelling prior to viability. Second, the State's interests in ensuring informed consent and in the integrity and ethical standards of the medical profession – whether or not "compelling" – are undermined, not furthered, by the "Display of Real-Time View Requirement." This requirement forces physicians to act against their medical judgment by delivering information and subjecting their patients to experiences even when the physician thinks it would only harm the patient and even when the patient says no, thus turning the common law notion of informed consent on its head. *See supra* at 2-3. Third, any claimed interest in protecting the psychological health of women seeking abortions is similarly undermined by this requirement. The evidence shows that forcing ultrasound images and descriptions on pregnant women over their objection is likely to *harm* their psychological well-being. *See supra* at 3.

In any event, the "Display of Real-Time View Requirement" does not constitute the least restrictive means of furthering any state interest. *See, e.g., Riley*, 487 U.S. at 800-01. The State could have created a law that requires physicians to notify patients that ultrasound viewing and explanations are *available* to them without coercively forcing them on all women. As Justice Scalia wrote in his concurrence in *Riley*, "it is safer to

15

assume that the people are smart enough to get the information they need than to assume that the government is wise or impartial enough to make the judgment for them." *Id.* at 804; *accord Planned Parenthood Minn., N.D., S.D. v. Daugaard*, 799 F. Supp. 2d 1048, 1057 (D.S.D. 2011) (enjoining abortion restriction that compelled speech because less restrictive alternatives were available). Because the "Display of Real-Time View Requirement" is more intrusive than necessary, it fails strict scrutiny.

Further, the Supreme Court has reiterated that the government can satisfy strict scrutiny only if it can establish that it has a compelling interest in the *incremental benefit* of the proposed law. *See Brown*, 131 S. Ct. at 2741. In *Brown*, the Supreme Court rejected the state's assertion that a law governing violent video games satisfied strict scrutiny by furthering a general interest in aiding parental authority, because the proper focus was not the broad goal, but rather the incremental benefit of the law over existing rules. *Id.* Thus, Defendants must show that the *incremental* benefit of the "Display of Real-Time View Requirement," as compared to the informed consent sections of the Act, itself is a compelling state interest that is furthered through the least restrictive means.

Defendants cannot make such a showing here. The informed consent sections of the Act (which Plaintiffs do not challenge) already make available to women detailed information and color pictures depicting embryonic and fetal development, which women may review if they so choose. *See* Beck Decl., Ex. B. To the extent some women may want additional information about such development from their own ultrasounds, physicians already provide it upon a patient's request, and, in any event, the State could

16

require physicians to offer it to them, allowing the abortion to proceed if the patient declines. It is unnecessarily intrusive to mandate – as the Act does – that such speech be delivered to all patients, even when the patient does not want to hear it.

For similar reasons, the "Display of Real-Time View Requirement" cannot survive intermediate scrutiny, which requires the government to show that its asserted interests are substantial and that the regulation at issue advances those interests in a manner that is no more extensive than necessary. *See Reynolds Tobacco*, 2012 WL 3632003, at *9 (stating test). The government's burden under intermediate scrutiny "is not light," and it cannot satisfy its burden "by mere speculation or conjecture." *Id.* (quotation omitted); *see also Edenfield v. Fane*, 507 U.S. 761, 768 (1993) (under intermediate scrutiny, court must reject government's asserted interest "if it appears that the stated interests are not the actual interests served by the restriction"); *Wollschlaeger v. Farmer*, No. 11-22026, 2012 WL 3064336, at * 10 (S.D. Fla. Jun. 29, 2012) (striking down regulation restricting physicians from, *inter alia*, inquiring about a patient's firearm ownership as violating First Amendment, and stating that regulation would fail either strict or intermediate scrutiny because government offered no more than "anecdotal" evidence that law would serve any substantial interests).

Here, Defendants cannot establish that the "Display of Real-Time View Requirement" will actually serve any interests that the State has invoked. Defendants have no evidence that North Carolina women seeking abortion services (the majority of whom are already mothers) are confused about what it means to be pregnant. Further, the

17

requirement *undermines* the State's proffered interests in medical ethics and in patients' psychological health. *See supra at* 3. And the State's interest in "persuad[ing] the woman to choose childbirth over abortion," *Casey*, 505 U.S. at 878, is not served by forcing speech and images on unwilling patients. Bowes Dep. 140:5-13 (agreeing that if a patient averts her eyes and refuses to hear the provider's speech, the forced speech does nothing to improve her decision-making).

In any event, Defendants have failed to prove that requiring physicians to make ultrasound viewing and descriptions available to women would be insufficient to accomplish the State's objectives. Thus, even if the "Display of Real-Time View Requirement" served any substantial interests, which it does not, it fails even intermediate scrutiny because its coercive aspects are more extensive than necessary.

In sum, if the State wants to persuade women to choose childbirth over abortion, it must find other ways to do so. The First Amendment does not allow the State to conscript physicians into providing the State's message in their own voice, and especially not in the coercive manner dictated by the Act.

## II. *Casey* Does Not Preclude Plaintiffs' Challenge Here.

### A. *Casey*'s First Amendment Analysis Does Not Govern The Speech Compelled By The Act.

The Court should reaffirm its previous legal conclusion that *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), does not control the First Amendment analysis here. *See Stuart*, 834 F. Supp. 2d at 430. As the Court succinctly stated, "[t]he Supreme Court's brief discussion of the First Amendment challenges to the

18

Pennsylvania statute [in *Casey*] was undertaken separately and without substantial detail. It seems unlikely that the Supreme Court decided by implication that long-established First Amendment law was irrelevant when speech about abortion is at issue . . . ." *Id.* (citation omitted).

Indeed, Defendants' contention that *Casey* controls here overlooks a crucial part of that decision: the speech that physicians were required to deliver under the Pennsylvania law *already* was part of standard informed consent and medical practice. 505 U.S. at 884 (reviewing under First Amendment requirement that physicians disclose the nature of the procedure, the health risks of abortion and childbirth, and the gestational stage of the pregnancy).[6] Thus, *Casey* says nothing about whether physicians can be compelled, consistent with the First Amendment, to provide verbal speech and expressive conduct that falls *outside* standard medical practice, as they are by the "Display of Real-Time View Requirement." Instead, traditional First Amendment principles govern such speech. As described above, these cases establish that *even truthful compelled factual disclosures* are subject to strict scrutiny when they have a direct effect on speech.

---

[6] The plurality in *Casey* did not state why it did not apply strict scrutiny in its First Amendment analysis. Given that the law at issue required speech "about the risks of abortion and childbirth," 505 U.S. at 884, which already was part of standard informed consent, the plurality may have concluded there was no direct effect on speech. The Supreme Court applies lower scrutiny to laws that do not have a direct or substantial effect on speech. *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 789 n.5.

19

With respect to speech that was *not* part of the standard process of obtaining informed consent (*e.g.* state materials on fetal development), the *Casey* plurality merely held that the state could require a physician to inform the woman of the *availability* of such information in its own state-created pamphlets. *See* 505 U.S. at 882 ("If the information the State requires to be made available to the woman is truthful and not misleading, the requirement may be permissible."). The *Casey* plurality did not hold that the physician could be required, in his or her own voice, to force such information on a woman. And the decision whether to review and consider such information was left entirely up to the woman herself. *Id.* at 881-82 (citing 18 Pa. Cons. Stat. § 3205 (materials to be provided to woman only if she chooses to receive them)).

Further, unlike the Act, the law in *Casey* contained an exception to *all* of the informed consent requirements, including informing women of the availability of developmental information, when, in the judgment of the physician, providing the information would "result[] in a severely adverse effect on the physical or mental health of the patient." 18 Pa. Const. Stat. § 3205(c). The *Casey* plurality considered it important that "the statute does not prevent the physician from exercising his or her medical judgment." 505 U.S. at 884.

Thus, to the extent the *Casey* plurality approved of allowing the State to provide its ideological message to patients, it did so only through an offer of the State's own speech -- with information in the State's publications -- and even then only in circumstances where the physician concluded that the offer would not harm the patient.

20

The plurality did not address, or approve of, commandeering physicians to deliver this message in their own voice, over the patient's objection and contrary to their best medical judgment. "What the state can say itself is very different from what the state can compel individuals to say." *Stuart*, 834 F. Supp. 2d at 430 n.6 (citing *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995)).

## B. The Fifth Circuit's Decision in *Lakey* Is Incorrect And This Court Should Not Follow It.

Defendants will likely rely on *Texas Medical Providers Performing Abortion Services v. Lakey*, 667 F.3d 570 (5th Cir. 2012), but that decision is wrong, and this Court should not follow it.

*Lakey* rests on the proposition that *Casey* did away with First Amendment analysis in the abortion context, instead allowing compelled speech so long as it does not pose an "undue burden" on a woman contemplating an abortion. 667 F.3d at 576; *see also id.* at 577 ("If the disclosures are truthful and non-misleading, and if they would not violate the woman's privacy right under the *Casey* plurality opinion, then Appellees would, by means of their First Amendment claim, essentially trump the balance *Casey* struck between women's rights and the states' prerogatives.") That reading of *Casey* is incorrect for the reasons explained above.

Moreover, the *Lakey* court's conclusion is based on a number of analytical mistakes, including the following. First, the *Lakey* court conflates the analysis of two separate constitutional rights. In doing so, it overlooks the independent vitality of constitutional provisions, each of which provides unique and distinct protections. *Cf.*

21

*United States v. Williams*, 553 U.S. 285 (2008) (analyzing claims under First Amendment and Due Process Clause separately).[7]  Thus, whether a law violates the First Amendment is a distinct inquiry from whether it violates the right to terminate a pregnancy.  Indeed, the plurality in *Casey* itself did not "combine the due process/liberty interest analysis with the First Amendment analysis."  *Stuart*, 834 F. Supp. 2d at 430.

Second, even if *Casey*'s Fourteenth Amendment analysis were relevant to the First Amendment claim, the plurality in *Casey* says only that descriptions of fetal development "*may* be permissible" when the State makes information that is truthful, not misleading, and designed to ensure an informed choice *available* to patients in state-produced pamphlets.  505 U.S. at 882 (emphasis added).  *Casey* does not hold that ordinary First Amendment principles are inapplicable when, as here, the State *requires* physicians to obtain images from women's bodies and deliver a state-mandated speech to them while they are undergoing a medical procedure, even if the woman does not want the information and is trying to avoid it.  There is no abortion exception to the First Amendment, and this Court should not follow the Fifth Circuit's attempt to invent one.

**III.  The Act's "Display of Real-Time View" Requirement Violates Due Process Because It Is Not Rationally Related to a Legitimate Government Objective.**

The Act's "Display of Real-Time View" requirement also violates substantive due process because it is entirely irrational.  "Due process requires that all laws at minimum be 'rationally related to a legitimate governmental objective.'"  *Stuart*, 834 F. Supp. 2d at

---

[7] Moreover, it cannot be the case that by helping women exercise one constitutional right (the right to privacy), a physician loses protections that he or she would otherwise be accorded under

22

436 (quoting *Multimedia Publ'g Co. of S.C., Inc. v. Greenville-Spartanberg Airport Dist.*, 991 F.2d 154, 159 (4th Cir. 1993)). "[T]he touchstone of due process is protection of the individual against arbitrary action of government." *Stuart*, 834 F. Supp. 2d at 436 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998)).

At least as to those patients who want to "avert their eyes" and "refuse to hear," the "Display of Real-Time View" requirement can serve no legitimate goal. Because the Act does not give patients the opportunity to opt out of the requirement altogether, the Act arbitrarily compels physicians to display the ultrasound image in the patient's view, while she "avert[s] her eyes," *and* "[p]rovide a simultaneous explanation of what the display is depicting," while she attempts to "refus[e] to hear" the explanation. In essence, health care providers and patients are compelled to engage in an absurd exercise unheard of in medical practice where no information is actually transmitted to the patient—all in the name of "informing" her decision. And if that were not enough, the Act requires every patient to wait four hours after this farcical routine, even though the Act assumes some patients will have "refused" to see and hear. Thus, the only plausible – and patently illegitimate – purpose for requiring doctors and patients to take part in this charade is to shame and humiliate women who choose to have an abortion. *Cf. Planned Parenthood of Cent. N.C. v. Cansler*, No. 1:11cv531, 2012 WL 2513510, at *13 (M.D.N.C. June 28, 2012) (citing *Romer v. Evans*, 517 U.S. 620, 634 (1996) ("a bare . . . desire to harm a

another right (the right to free speech).

23

politically unpopular group cannot constitute a legitimate governmental interest")
(omission in original)).

Not surprisingly, Defendants have failed to come up with any rational explanation
– nor can they – for why women who want to "avert their eyes" and "refuse to hear" must
be subjected to the "Display of Real-Time View" requirement. According to Defendants,
the requirement "protect[s] the woman's future psychological health," PI Hearing Tr.
56:13-14, Oct. 17, 2011, because she is "less likely to ever regret making [the] choice" to
have an abortion if she "resists the efforts to get her to change her mind and elects to go
through with the abortion," Defs.' Opp'n to Pls.' PI 18-19 [ECF No. 29]. But it strains
the imagination to understand how requiring a patient to turn her head and "put earmuffs
on" during a medical procedure, as Defendants' expert suggested, Bowes Dep. 87:2,
while the physician provides the required information, all while the woman is supine and
undressed on an examining table, promotes psychological health. On the contrary,
Plaintiffs have presented evidence that forcing women to go through this charade will be
harmful to some women.[8]

To be sure, the "Display of Real-Time View" requirement does not promote
potential life either. As Defendants' expert admitted, those women who "avert their
eyes" and "refuse to hear" learn nothing about the "unborn child." *See* Bowes Dep.
132:16-133:1 (admitting that requirement does not help these women understand "the

---

[8] Indeed, subjecting women to this shameful and humiliating farce will make women feel
negatively judged and that their "decision to have an abortion, or their ability to make that
decision, is being questioned." Stotland Decl. ¶ 21.

24

nature of their fetus"). Similarly, Defendants' expert conceded that the requirement does not improve the quality of informed consent for these women. *Id.* at 140: 5-13.

Although rational basis review does not impose rigorous restrictions on legislative enactments, it is not an empty requirement. *See, e.g., Romer*, 517 U.S. at 632-33; *Perry v. Brown*, 671 F.3d 1052, 1089 (9th Cir. 2012); *Cansler*, 2012 WL 2513510, at *13; *NAACP-Greensboro Branch v. Guilford Ctny. Bd. of Elections*, No. 1:12cv111, 2012 WL 873550, at 9 n.12 (M.D.N.C. Mar. 14, 2012). There still must be some legitimate goal that the government seeks to accomplish through reasonable means. *See In re R.L.C.*, 643 S.E.2d 920, 924 (N.C. 2007) ("[T]he government's objective must be legitimate, and the means used by the government must be reasonable to serve that legitimate goal." (citing *Washington v. Glucksberg*, 521 U.S. 702, 728 n.21 (1997)). Here, the humiliating charade that women are subjected to under the "Display of Real-Time View" requirement does not bear a rational relationship to any legitimate state interest, and it therefore violates due process.

## IV. The Act Is Impermissibly Vague.

Plaintiffs are also entitled to judgment as a matter of law on Plaintiffs' claim that the Act is void for vagueness in violation of the Fourteenth Amendment's Due Process Clause. In the alternative, this Court can avoid the constitutional vagueness question by construing the Act in a manner that provides clear notice of the Act's requirements.

A law is unconstitutionally vague if: "it is not sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties,"

25

*Tri-Cnty. Paving, Inc. v. Ashe Cnty.*, 281 F.3d 430, 441 n.9 (4th Cir. 2002) (internal quotation omitted); "men of common intelligence must necessarily guess at its meaning and differ as to its application," *id.*; or "if it encourages arbitrary and erratic enforcement by public officials," *Delaney v. Barlett*, 370 F. Supp. 2d 373, 383 (M.D.N.C. 2004) (internal quotation omitted). Where a law threatens the exercise of constitutional rights, such as the right to abortion, courts have recognized that its review must be more stringent. *See, e.g., Colautti v. Franklin*, 439 U.S. 379, 391 (1979). The same is true where a law imposes criminal or quasi-criminal penalties.[9] *First Am. Bank of Va. v. Dole*, 763 F.2d at 652 n.6.

Plaintiffs acknowledge, however, "every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *PSINet, Inc. v. Chapman*, 362 F.3d 227, 236 (4th Cir. 2004) (quoting *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trucks Council*, 485 U.S. 568, 575 (1988). When interpreting a statute under North Carolina law,[10] "the cardinal principle is to ensure that the purpose of the legislature is accomplished." *Harris Through Freedman v. Nationwide Mut. Ins. Co.*, 420 S.E.2d 124, 128-129 (N.C. 1992). "[A] court must consider the act as a whole, weighing the language of the statute, its spirit, and that which the statute seeks to accomplish.

---

[9] There is no dispute that, at a minimum, the Act subjects Plaintiffs to potential "quasi-criminal" penalties in the form of significant civil liability and harsh administrative penalties, § 90-21.88, including license revocation, N.C. Gen. Stat. § 90-14(a)(2). *See also First Am. Bank of Va. v. Dole*, 763 F.2d 644, 652 n.6 (4th Cir. 1985) ("Civil penalties may be considered 'quasi-criminal' in nature.").

26

Also, it is presumed that the legislature acted in accordance with reason and common sense and that it did not intend an unjust or absurd result . . . ." *Id.* (internal quotations and citations omitted).

### A. Whether the Act Imposes Criminal Penalties

As Plaintiffs stated in their Motion for Preliminary Injunction, it is not sufficiently clear what penalties the Act imposes. Specifically, Section 90-21.85 states that the display of real-time view requirement must be performed "notwithstanding G.S. 14-45.1"—which is the section of the criminal code that defines the circumstances under which abortions are not criminal. But the other provisions of the Act, such as Section 90-21.82, do not contain the same "notwithstanding" language. The reference to G.S. 14-45.1 makes it unclear whether Section 90-21.85 gives rise to criminal liability.

Defendants have stated that "[t]he Act does not impose a criminal penalty," and "provides only for civil penalties," Defs. Opp'n to Pls' PI Mot. at 16, 17 (citing §§ 90-21.85 and 88). This Court agreed. *Stuart*, 834 F. Supp. 2d at 434. Indeed, adopting this reasonable interpretation avoids this aspect of the Act's vagueness. Thus, Plaintiffs urge that this Court, in resolving Plaintiffs' claim that the reference to G.S. 14-45.1 is vague, find as a matter of law that the Act does not contain criminal penalties.

---

[10] In interpreting the Act, this Court should apply the statutory construction rules applied by North Carolina's highest court. *See In re DNA Ex Post Facto Issues*, 561 F.3d 294, 300-301 (4th Cir. 2009).

**B.    Who May Provide the Information Required by Section 90-21.82**

Next, Section 90-21.82 includes several inconsistencies about who may provide the information required by that Section.   For example, it says that "a physician or qualified professional" may orally inform the woman of the required information.  § 90-21.82(1); *see also* Section 90-21.82(1)(e) (stating that "[i]f requested by the woman, the physician or qualified professional shall provide to the woman the list [of places that offer free ultrasounds] as compiled by the Department").   But in the same subdivision it also states that "[t]he information . . . shall be provided during a consultation in which the physician is able to ask questions of the patient and the patient is able to ask questions of the physician."  § 90-21.82(1).

Defendants have argued that "the statute . . . require[s] that a physician or qualified professional provide the listed information and, if a qualified professional provides the information, that a physician be available to ask and answer questions within the statutory timeframe upon request of the patient or the qualified professional."  *Stuart*, 834 F. Supp. 2d at 435.  In addition, the State, has "contend[ed] that this provision does not require that the physician must always personally meet with the patient during this advance consultation, and agree[d] that the physician can be available personally, electronically, or telephonically."  *Id.*  This Court held that Defendants' interpretation of the statutory language is reasonable.  *Id.*  Plaintiffs agree, and urge this Court to find, as a matter of law, that Section 90-21.82 contains the meaning put forth by Defendants.

28

**C. Who May Perform the "Display of Real-Time View"**

Finally, Section 90-21-85(a) states that the "Display of Real-Time View" requirement must be performed by "the physician who is to perform the abortion, or a qualified technician working in conjunction with the physician." A "qualified technician" includes an "*advanced practice nurse practitioner in obstetrics* with certification in obstetrical ultrasonography." § 90-21.81(9) (emphasis added). But it is unclear what an "advanced practice nurse practitioner *in obstetrics*" is because there is no special licensing for a nurse practitioner "*in obstetrics*" in North Carolina.[11]

To date, Defendants have offered no further clarification or evidence of what this term means. *See Stuart*, 834 F. Supp. 2d at 436. Instead, they have suggested that because the Act contains a scienter requirement no further clarification is needed. *See* Defs.' Opp'n to Pls' PI 17 (stating that "the fact that Plaintiffs' civil liability is limited to knowing, reckless or willful violations saves them from exposure to unconstitutional risks"). But, as courts have held, a "requirement of knowledge as applied to an unknowable element cannot save a provision from constitutional invalidity." *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 933 (9th Cir. 2004); *Richmond Med. Ctr. For Women v. Gilmore*, 55 F. Supp. 2d at 441, 499 (E.D. Va. 1999) ("[T]he scienter

---

[11] Plaintiffs have learned that nurse practitioners can be considered "advanced practice nurses" and thus no longer assert that the phrase "advanced practice nurse practitioner" is vague. But it remains the case that there is no certification, license, or recognized subspecialty "in obstetrics" for nurse practitioners in North Carolina (or in other states, to Plaintiffs' knowledge). *See generally* 21 N.C. Admin. Code 32M.0101 *et. seq.* and 36.0800 *et. seq.* (rules of N.C. Medical Board and N.C. Board of Nursing, respectively, relating to approval and practice parameters for nurse practitioners).

29

requirements fail to provide physicians . . . with any more notice of what is forbidden.").

In seeking to adopt a reasonable construction of Section 90-21.85(a) to avoid the constitutional question of its vagueness, it would be "unjust" and "absurd," *supra*, to read the Act as requiring nurse practitioners to have a special type of professional license "in obstetrics" (because no such license exists). Further, the Legislature clearly intended to identify additional professionals that can provide the required ultrasound under the Act.[12] Accordingly, Plaintiffs urge this Court to interpret the term "qualified technician" to include nurse practitioners whose "academic educational preparation and national certification"[13] qualify them to work in obstetrics.[14] Although such a construction does not cure the Act from all of its constitutional defects, *see supra*, at a minimum, it provides Plaintiffs with "a reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

---

[12] *See* PI Hearing Tr. at 69:25-70:1-2 (Defendant stating that "[t]he General Assembly is trying to . . . giv[e] more options" as to who can perform the ultrasound by designating an advance practice nurse practitioner in obstetrics as a "qualified technician").

[13] A nurse practitioner is defined as "a currently licensed registered nurse approved to perform medical acts consistent with the nurse's area of nurse practitioner academic educational preparation and national certification under an agreement with a licensed physician for ongoing supervision, consultation, collaboration and evaluation of the medical acts performed. . . ." 21 N.C. Admin. Code 36.0801(4). That Section 90-21-85(a) (along with the rest of the Act) is in Article 1 of Chapter 90 of the N.C. Gen. Statutes, dealing with the Practice of Medicine, weighs in favor of adopting this definition, which was promulgated by the Medical Board and the Board of Nursing, pursuant to Article 1 of Chapter 90, *see* N.C. Gen. Stat. § 90-8.2.

[14] Unlike the term "advanced practice nurse practitioner," the term "obstetrics" alone has a plain and ordinary meaning, *see, e.g.*, Stedman's Medical Dictionary 1354 (28th ed. 2006) (defining "obstetrics" as "[t]he specialty of medicine concerned with the care of women during pregnancy, parturition, and the puerperium"), which Plaintiffs presume applies here.

30

*/s/ Christopher Brook*
Christopher Brook, NC Bar #33838
American Civil Liberties Union
of North Carolina Legal Foundation
P.O. Box 28004
Raleigh, NC 27611
(919) 834-3466
(866) 511-1344 Fax
cbrook@acluofnc.org

COUNSEL FOR ALL PLAINTIFFS

Helene T. Krasnoff
Planned Parenthood Fed. Of America
1110 Vermont Avenue NW, Suite 300
Washington, DC 20005
(202) 973-4800
helene.krasnoff@ppfa.org

Diana O. Salgado
Planned Parenthood Fed. of America
434 W. 33rd Street
New York, NY 10001
(212) 541-7800
(212) 247-6811 Fax
diana.salgado@ppfa.org

COUNSEL FOR PLANNED
PARENTHOOD OF CENTRAL NORTH
CAROLINA & PLANNED
PARENTHOOD HEALTH SYSTEMS,
INC.

Andrew D. Beck
American Civil Liberties Union
Foundation
125 Broad Street
New York, NY 10004
(212) 284-7318
(212) 549-2651 Fax
abeck@aclu.org

*/s/ Julie Rikelman*
Julie Rikelman
Center for Reproductive Rights
120 Wall Street, 14th Floor
New York, NY 10005
(917) 637-3670
(917) 637-3666 Fax
jrikelman@reprorights.org

Walter Dellinger
Laura Conn
O'Melveny & Myers LLP
1625 Eye Street NW
Washington, DC 20006
(202) 383-5300
(202) 383-5414 Fax
wdellinger@omm.com
lconn@omm.com

Anton Metlitsky
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036
(212) 326-2000
(212) 326-2061 Fax
ametlitsky@omm.com

COUNSEL FOR GRETCHEN S.
STUART, M.D., DAVID A. GRIMES,
M.D., AMY BRYANT, M.D., DECKER
& WATSON d/b/a PIEDMONT
CAROLINA MEDICAL CLINIC, & A
WOMAN'S CHOICE OF RALEIGH,
INC.

31

COUNSEL FOR JAMES R.
DINGFELDER, M.D., SERINA FLOYD,
M.D., TAKEY CRIST, M.D., & TAKEY
CRIST M.D., P.A. d/b/a CRIST CLINIC
FOR WOMEN

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of October, 2012, I electronically filed the foregoing Plaintiffs' Memorandum of Law In Support Of Their Motion for Summary Judgment with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing.

/s/ Christopher Brook
Christopher Brook, NC Bar #33838
American Civil Liberties Union
of North Carolina Legal Foundation
P.O. Box 28004
Raleigh, NC 27611
(919) 834-3466
(866) 511-1344 Fax
cbrook@acluofnc.org

COUNSEL FOR ALL PLAINTIFFS

33