IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| GRETCHEN S. STUART, M.D., et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | CIVIL ACTION |
| ) | |
| RALPH C. LOOMIS, M.D., et al., ) | Case No. 1:11-cv-00804 |
| ) | |
| Defendants. ) | |

## DECLARATION OF GRETCHEN S. STUART, M.D., M.P.H. & T.M., IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

GRETCHEN S. STUART, M.D., M.P.H. & T.M., declares and states the following:

1. I am one of the named plaintiffs in this case, and I submit this declaration in support of Plaintiffs' motion for summary judgment.

2. I am a physician licensed to practice medicine in North Carolina and also in Texas and California. I am board-certified in obstetrics and gynecology.

3. In 1994, I graduated from both the School of Medicine and the School of Public Health and Tropical Medicine at Tulane University, with, respectively, an M.D. and an M.P.H. & T.M. I completed my residency in obstetrics and gynecology in 1998, at Parkland Memorial Hospital at the University of Texas Southwestern Medical Center, Dallas. A copy of my current curriculum vitae is attached as Exhibit A.

4. I have provided reproductive health care, including performing abortions, for over fifteen years. For eight of those years, I practiced obstetrics, including delivering babies, in private practice and at Parkland Memorial Hospital.

1

5. Currently, I am employed by the University of North Carolina ("UNC") School of Medicine, in the Department of Obstetrics and Gynecology, in the Division of Women's Primary Healthcare. I am an Associate Professor at UNC and also am the Director of: the Family Planning Program; the Family Planning Fellowship; and the Special Contraception Clinic. I am appearing as a plaintiff in this action as an individual citizen and am in no way appearing in any official capacity in relation to UNC, nor am I suing on behalf of UNC. The opinions in this declaration are my expert opinions.

## My Provision of Abortion Services

6. Women seek abortions for many different reasons, relating to their individual situations at the time of that pregnancy. In the United States, one out of three women who has reached the age of 45 has had at least one abortion. The reasons women choose to have an abortion include difficulties or concerns related to relationship, family, health (her health or fetal health), financial or other issues in their lives.

7. I provide surgical abortions in a clinical setting and also on both an outpatient and an inpatient basis in a university hospital setting. My practice includes training medical students, residents, and fellows on how to provide abortions in those settings.

8. I perform both first and second trimester abortions; some of the second trimester abortions are two day procedures. Many of my abortion patients have been referred to the clinic by other physicians or medical facilities. Many of these patients have medical conditions (for example, a cervical or uterine anomaly) that make the

2

performance of an abortion more complicated than is typically the case. Many others are seeking an abortion because the pregnancy puts their health at risk or their fetus has been diagnosed with a serious fetal anomaly.

9. Most of my patients live in North Carolina, and they come to me from throughout the state. Some of them travel several hours each way to the clinic.

10. Even before North Carolina's Woman's Right to Know Act" ("the Act") went into partial effect, all of my abortion patients received detailed, one on one options counseling. Currently, I, or one of my colleagues, meet with each patient face to face before beginning any preparation for the abortion procedure.

11. For my patients who have a one day procedure, the typical process consists of the following steps. After determining that the patient has a support system and is comfortable with her decision to have an abortion, the patient receives an ultrasound. I then counsel the patient, obtain her informed consent for the abortion procedure, and perform the abortion. The amount of time that elapses between performing the ultrasound and performing the abortion typically ranges from about half an hour to two hours, depending mainly on how many patients I am seeing that day. My goal is to keep the length of the patient's clinic visit to less than four hours total as often as possible, for the convenience of the patient.

12. If the patient is having a two-day procedure, the typical process is very similar, except that after obtaining the patient's informed consent, I begin the preparation of the patient's cervix. On a subsequent day, after the patient's cervix is sufficiently

3

dilated, I complete the abortion procedure. The amount of time that elapses between performing the ultrasound and inserting the dilators is typically about thirty minutes or less.

13. For abortion patients, I, or another member of my team, will perform an ultrasound to determine the gestational age of the fetus and to confirm the pregnancy and its location, if a recent ultrasound has not been performed and/or the patient has no documentation regarding the first ultrasound. It is my practice to first perform an abdominal ultrasound, which involves putting an ultrasound transducer directly on top of the patient's abdomen, after applying ultrasound gel, while she lies still on the examining table. For an abdominal ultrasound, the patient must expose the lower portion of her abdomen for the procedure. If it is not possible to confirm an intrauterine pregnancy using the abdominal transducer, I, or a member of my team, will perform a vaginal ultrasound, which involves inserting a probe several inches into the woman's vagina while she lies still on the examining table with her feet in stirrups. For a vaginal ultrasound, the patient must undress from the waist down; a drape is then placed over the lower portion of the patient's body. The abdominal transducer or vaginal probe must remain on or inside the patient while the ultrasound is being performed. The ultrasound generally takes between 3 and 5 minutes. Patients differ, but typically when the gestational age is eight weeks lmp or less, a vaginal probe is necessary.

14. It is my practice to offer my patients the opportunity to view the ultrasound. A relatively small number, probably about 20%, choose to look at the image. I have

4

never had a patient who asked me to describe the image, nor have I ever had a patient who decided not to have an abortion after viewing the image. I do not place the ultrasound image in the patient's view if the patient has stated that she does not want to view the ultrasound. Other than confirming for the patient that the pregnancy is inside the uterus and telling her how far along she is, I do not describe the ultrasound images to the patient unless she has a particular question.

15. If a patient expresses uncertainty at any point during the informed consent process, my practice would be to suggest to the patient that she take some additional time to consider her pregnancy options, which almost always includes offering additional counseling services available at the hospital. However, for patients who are certain about their decision, which is the vast majority of my patients, it would be medically inappropriate to force a specific delay between the ultrasound and the abortion procedure.

16. There is no medical reason for requiring all abortion patients to wait a certain number of hours between obtaining the ultrasound and receiving an abortion.

### North Carolina's Woman's Right to Know Act

17. I have reviewed the Act and have many concerns about how Section 90-21.85 will affect women seeking abortions in North Carolina, my provision of abortion services to my patients, and my obligations and professional responsibilities as a physician.

18. Section 90-21.85 imposes what it terms the "display of real-time view requirement," which includes requiring that a physician or "qualified technician" perform

5

an ultrasound at least four hours before the start of the abortion procedure, put the ultrasound image in the patient's view, provide an explanation and a description of the image to the patient, and obtain from the patient a written certification in which she states both that all of the required actions have been done and whether or not she looked at the ultrasound image that the physician or qualified technician had to put in her view.

19. The Act assumes that women who are seeking an abortion have not thought about their decision to seek an abortion and do not realize what an abortion is. Those assumptions do not fit my patients. For example, approximately half of my abortion patients already have at least one child. This is consistent with national statistics on abortion patients. Of course, as for other medical procedures, as part of the standard informed consent process that I am ethically and legally required to do, I make sure that each patient understands the abortion procedure and is comfortable with her decision.

20. As a general matter in ob-gyn practice, physicians do not require patients to view images of their own bodies in order to provide informed consent to a particular procedure. If a patient wishes to view an image of an ultrasound or other radiologic study of her body, she certainly may. However, fully informed consent can be obtained without such viewing and certainly would never be forced on patients. For instance, a patient is not required to view an ultrasound of her uterus before hysterectomy or an ultrasound of a fetus or embryo in the fallopian tube before management of ectopic pregnancy.

21. In the abortion context, displaying the ultrasound image and describing it to the woman is not necessary for diagnostic purposes. Therefore, it is not standard medical practice to take these actions; however, if a patient requests this information, it will be provided to her.

22. Further, unless a patient asks to view the image or asks for a description of the image, it would be medically inappropriate to display it and describe it to the patient because there is no medical purpose in doing so. As a general matter, physicians do not act in ways that serve no medical purpose in caring for their patients.

23. There is no valid medical reason for forcing the image and a description of the image on an abortion patient when she does not want that experience. Instead, forcing this experience on a patient over her objections can actually cause harm to the patient.

24. It is my medical opinion that, should I be required to force this experience on my abortion patients, even when they have not asked for it and even over their objections, my patients will interpret my speech and actions as signaling disapproval of their decision. Thus, the Act will require me to suggest to my patients a sense that I do not respect their opinions and/or decision. Complying with the Act, therefore, will force me to violate the ethical principles of autonomy and beneficence.

**Impact and Harms from Section 90-21.85 on My Patients**

25. The requirements of Section 90-21.85 are harmful for abortion patients because they threaten the patient's right of autonomy. Section 90-21.85 assumes that the

7

woman cannot make her own judgment about what information she needs to make her decision about whether to have an abortion. Respecting patient autonomy is a key principle of medical ethics and, as a medical professional, I have an obligation to respect it and my patients are disserved if I do not.

26. Women can ask to see the ultrasound image if they want that experience and they can ask for information about the image if they want that information. It is my practice to ask each patient if she wants to see the ultrasound and to show the ultrasound to any patient who wants to view it, as well as to answer any questions that the patient may have about the ultrasound. But, in my medical opinion, my standard practice is very different from what the Act requires, which is that I put the screen in the patient's view and describe the images to her, even if the patient says no.

27. Under the Act, the patient is not autonomous in what she sees and what she hears or does not hear. Section 90-21.85 requires me to act over the objection of a patient by requiring me: (i) to place the image in the patient's view, even if the patient says no; (ii) to describe the image, even if the patient says no; and (iii) to force the patient to wait for a medical procedure for at least four hours, even when there is no medical purpose in such a delay. Acting in this way violates my ethical obligations by failing to respect the patient's autonomy. Further, forcing me to make the patient wait for a medical procedure when there is no medical reason for doing so requires me to act against the patient's best interest, which is to spend no more time than necessary in the clinic and away from her personal and professional obligations.

8

28. Additionally, forcing images and descriptions on a patient who does not want those experiences could harm the patient. The specific emotions patients experience will vary; some will feel anger, sadness, violated, upset, and/or disrespected. Some are even likely to be traumatized by the requirements. For example, I have had patients who have become pregnant due to rape or incest and I would not want to put them through the "display of real-time view requirements." One of my patients was a 13 year old rape victim who came to the clinic with her mother. She had already been through a traumatizing situation and had already undergone extensive counseling with psychologists, rape crisis centers, and clergy members. Given her circumstances, I believe it would have been extremely upsetting for that patient and her mother, and would have added to their emotional stress, if I had put an ultrasound screen in the patient's view and described the images to her.

29. Since other portions of the Act have gone into effect, I have continued to treat patients that I believe would be particularly psychologically harmed if I were forced to comply with Section 90-21.85. I took care of a patient with a CMV infection who was carrying a fetus with multiple, and likely lethal, fetal anomalies. The patient had undergone numerous evaluations and ultrasounds with a maternal-fetal medicine specialist and then made the decision to terminate the pregnancy. There was absolutely no medical reason for me to repeat the ultrasound in these circumstances, and I believe that forcing a patient in this situation to view the ultrasound, hear a detailed description of

9

the image, and then wait four hours before the procedure would psychologically harm the patient.

30. Section 90-21.85 says the patient can "avert her eyes" from the ultrasound image and "refuse to hear." In my medical opinion, that option is unworkable in the context of an ultrasound procedure and would be offensive to my patients.

31. While I am performing an ultrasound, my patient should not be forced to direct her gaze either at or away from the ultrasound screen. As mentioned above, the patient needs to lie still on the examining table, whether I am using a vaginal probe or an abdominal transducer. My patient is in essence captive, under my control, while she has the probe in or on her. I suppose the woman must then close her eyes or turn her head to avoid the image I am required to put in the patient's view, if she does not want to view it. To take actions that the patient does not want, that serve no medical purpose and that would require my patient to turn away or close her eyes in this manner creates an adversarial relationship between me and my patient. This kind of adversarial interaction undermines the physician-patient relationship that is particularly crucial prior to a surgery and which is contrary to my ethical obligations as a physician.

32. It is even harder for me to visualize how my patients can "refuse to hear" the explanation and description Section 90-21.85 requires me to give. Further, making my patient cover her ears or put on headphones while I am speaking to her serves no medical purpose and also creates an adversarial relationship between me and the patient. Particularly before undergoing a medical procedure, a patient must put her trust in her

10

physician and this trust is crucial to the physician-patient relationship. To indicate to the patient that she can sometimes refuse to hear what I am saying completely undermines my effort to demonstrate to the patient that she can trust me, which undermines our entire relationship.

33. The "display of real-time view requirements" also will harm my patients by imposing a four hour delay between the ultrasound and the beginning of the abortion procedure. In my clinic, I try to avoid the need for the patient to make more than one trip to the clinic, unless there is a medical need for two visits. I feel this is especially important because many of my patients travel several hours to get to the clinic. The "display of real-time view requirements" will require women to be at the clinic longer than they are now. Most of my patients will have to take extra time off from work or arrange for more hours of childcare as a result.

34. For example, I recently had a 21 year old patient who came from about two hours away after finding out that she was too far along to get an abortion at a nearer facility. It took her about a week after she first made contact with my practice to get the money she needed for the procedure and arrange for someone to drive her to the clinic. The patient came with her mother and we kept the first visit under two hours, so she and her mother could get back home and her mother could get to her job. If Section 90-21.85 had been in effect, the patient would have had to be at the clinic for an extra four hours, which would have caused her mother to lose a full day of wages.

11

35. For some of my patients, the delay caused by the "display of real-time view requirements" is likely to be greater than four hours, causing greater burdens. My patients who travel great distances to get to the clinic are not likely to be able to arrive in time to satisfy the "display of real-time view requirements" and have the abortion on the same day. Those women will have to stay overnight in the Chapel Hill area or make the trip twice. That will mean additional expense, additional time off work and/or extra childcare. These harms will fall disproportionately on low income women. Also, additional expense may cause some women to delay getting an abortion because they need to gather more funds to cover the extra time off work, or childcare, or an overnight stay. Although abortion is a very safe procedure, with increased gestational age the medical risks increase, so these women face possible increased medical risks as a result of Section 90-21.85's requirements.

36. As I understand the Act, I will need to comply with the "display of real-time view requirements" even for patients who come to me with a detailed ultrasound report that they have discussed with another physician. In my practice, I frequently provide abortion services to women who have been referred to me after they already have seen at least one physician and have had an ultrasound performed. Some of my patients have had more than one ultrasound performed before they see me, depending on how far along they are in their pregnancy. Many of these patients have been diagnosed with a serious or even fatal fetal anomaly or with a medical condition that puts the woman's own health at risk if she continues the pregnancy and – after receiving that information

12

about her fetus or about her health – the woman has decided to seek an abortion. In those situations, I receive a full, detailed ultrasound report for the patient. Yet even in those situations, it appears that I will need to comply with the "display of real-time view requirements" before I can initiate the abortion. The patient does not need for me to repeat the information that she has already received about her fetus. Complying with the "display of real-time view requirements" in these situations cannot possibly serve any medical purpose and instead will only expose my patients to harm.

37. For example, one of my patients was a woman from Tennessee who was diagnosed late in pregnancy with a serious fetal anomaly after an ultrasound was performed. She decided to seek an abortion, but could not get it locally and arranged to come to my clinic, which she did about a week after she had that ultrasound. She had already received detailed information about her fetus, from the physician who reviewed that earlier ultrasound with her. With that patient, it would not have served any medical purpose for me to comply with the "display of real-time view requirements." And I think it would have caused great anxiety and even harm to the patient for me to perform an ultrasound in which I put the screen in the patient's view and described the fetus to her. I am concerned about the impact this requirement will have on the emotional health of patients like this.

38. Similarly, many of the patients I see who are seeking an abortion due to maternal indications are referred to me by another physician and I receive a full, detailed ultrasound report. For these patients also, complying with the "display of real-time view

13

requirements" cannot possibly provide the patient with information she does not already have and has considered. Instead, it will be cruel and unethical for me to comply with the "display of real-time view requirements," to ignore my patient's wishes, and to extend the time the patient must spend in the clinic because of the four-hour requirement.

39. For example, one of my patients was under the care of her maternal-fetal medicine doctor when she was diagnosed with stage 3 colon cancer and needed to initiate chemotherapy as rapidly as possible. She could not continue her pregnancy and be on chemotherapy and decided to have an abortion. She had fully discussed and considered her decision with all her doctors, including the cancer doctors, and had full counseling before I saw her. The patient's decision was a very difficult one, and I believe it would have been very painful for the patient if, before she could obtain the abortion, I had performed another ultrasound on the patient, showed and described the fetal images to her, and forced her to wait at least four hours before obtaining the procedure. Additionally, there would have been no medical reason to take these actions.

40. The Act has language about the "display of real-time view requirements" being met if a physician or qualified technician has performed an ultrasound in compliance with those requirements within 72 hours of when an abortion is performed. I am not sure what that language means, but I think that it might apply to situations in which a referring physician – instead of the physician who will perform the abortion – has done an ultrasound. But it appears to require that the other physician put the image in the woman's view, provide the required explanation and description, obtain the required

14

certification from the patient, and take the other steps required by Section 90-21.85(a). To avoid having another ultrasound performed solely to comply with the Act and thus to provide the best patient care, which means avoiding medically unnecessary procedures and delay, obstetricians and fetal medicine specialists will have to coordinate their services to perform the ultrasound in the way required by the Act – even though the woman may not even be contemplating an abortion when that ultrasound is performed – and promptly refer the patient to me. It is my opinion that such coordination is unlikely to occur, especially for patients who reside outside North Carolina.

41. The 72 hour limit appears to be a totally random number that serves no medical purpose and that does not take into account patient circumstances. For example, my patients seeking an abortion due to a fetal anomaly rarely have had their ultrasound within 72 hours of when they see me. Typically I see the patient about 7 to 14 days after they have had the ultrasound, after they have considered the news about their fetus and made the decision whether or not to continue the pregnancy. Also, many of my patients live several hours away from my clinic location and, once they have made their decision, need to make arrangements in order to come to my clinic. So, even if obstetricians and fetal medicine specialists start performing ultrasounds in the way required by Section 90-21.85(a), it appears to me that I would still need to perform the extra ultrasound required by the Act for most of these patients.

**Impact and Harms from Section 90-21.85 on My Practice of Medicine**

42. The "display of real-time view requirements" are not reasonable from a medical standpoint for all of the following reasons: (i) they leave no room for physicians to exercise their medical judgment and provide individualized care; (ii) they require physicians to violate medical ethics in order to comply; (iii) they require physicians to say and do things that the patient does not want, even when doing so serves no medical purpose, and even when doing so could expose the patient to psychological harm; (iv) they require physicians to subject patients to an experience over the patient's objection and even when the physician believes it is medically inappropriate; (v) they require physicians to conduct medical tests to obtain information from the patient's body for non-diagnostic purposes; (vi) they require physicians to speak and act in ways aimed at persuading a patient not to choose a legal medical procedure because of the State's preferences, rather than for medical reasons particular to the patient.

43. The "display of real-time view requirements" will impair my ability to practice medicine, intrude into my relationship with my patients, and force me to engage in medically unethical conduct.

44. By forcing me to practice medicine in a way that imposes harms on my patients, as discussed above, Section 90-21.85 will harm me (including threatening my medical licensure in the state of North Carolina) and harm the medical profession generally.

16

45. Under standard, long-established principles of medical ethics, I inform all my abortion patients of the medical risks of the abortion procedure and the available alternatives and their associated risks. I make sure that each patient has the information that she wants in order to make her decision whether to have an abortion.

46. Section 90-21.85 requires me to assume that every patient, in order to make her decision, needs to have an ultrasound image put in her view, and needs to hear a description and an explanation of the image (including the dimensions of the fetus and the presence of internal organs and external members). However, I am required by my medical license to use my judgment and to provide individualized care based on each patient's needs and circumstances. The Act's "display of real-time view requirements" leaves no room whatsoever for me to exercise my discretion and use my medical judgment. Thus, the Act prevents me from providing individualized care.

47. I am trusted to use my judgment and discretion in obtaining consent from patients for every other type of medical care I provide, including major surgeries and treatment in life-threatening situations. Yet, my license to practice medicine is basically being challenged by my provision of abortion, a very safe medical procedure.

48. As an independently licensed physician, I have legal and professional responsibilities to behave ethically in delivering patient care. I am obligated to provide care in a way that does not harm my patient, respects the patient's decision-making, and respects the patient's autonomy. Complying with the Act puts me in the position of

practicing medicine that is harmful to my patients, which is unethical and contrary to the requirements of the North Carolina Board of Medicine.

49. Forcing me to act over the objections of my patients undermines my practice as a physician; conflicts with my conscience, which obliges me to do the best thing for my patients based on medical considerations and medical ethics; and interferes with the relationship I have with my patients.

50. I believe it is a violation of my obligations as a licensed physician and my free speech rights to force me to say things to a patient, which in my conscience I believe are harmful to my patient.

51. The delays imposed by the Act will also impair my ability as a healthcare provider to provide professional, ethical medical care to my patients. These delays are not medically justified and, as discussed above, will harm many of my patients. Therefore, imposing those delays on my patients is unethical.

52. In addition to these harms to medical practice, there are other aspects of the "display of real-time view requirements" that are contrary to how medicine is practiced.

53. The "display of real-time view requirements" limits who can do the required ultrasound to the physician who will perform the abortion or a "qualified technician." I do not believe there is any valid medical reason to limit the performance of the ultrasound and related required steps to those categories of persons. As an experienced abortion provider, especially one who provides abortions later in pregnancy, I am able to provide medical care that few physicians in North Carolina can provide. As

an issue of allocation of medical resources, it does not make sense to require me to spend extra time to satisfy the "display of real-time view requirements." Other physicians or other personnel are competent to perform a pre-abortion ultrasound and to take the other steps required by Section 90-21.85.

54. Section 90-21.85 also states that the patient must be offered "the opportunity to hear the fetal heart tone" and that the "auscultation of fetal heart tone shall be of a quality consistent with standard medical practice in the community." It is not standard medical practice to make the fetal heart tone audible in the abortion context because it serves no medical purpose. It is not my practice to make the fetal heart tone audible for my patients seeking an abortion. None of my abortion patients has ever asked to hear the fetal heart tone. When I teach medical students, residents, and fellows how to provide abortions, I do not include in my teaching instructions about making the fetal heart tone audible.

19

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 27 day of September, 2012

at Chapel Hill, NC.

*[signature]*
GRETCHEN S. STUART, M.D., M.P.H. & T.M.

20