IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| GRETCHEN S. STUART, M.D., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION |
| | ) | |
| RALPH C. LOOMIS, M.D., et al., | ) | Case No. 1:11-cv-00804 |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF AMY WEIL, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

AMY WEIL, M.D., declares and states the following:

1. I am board-certified in Internal Medicine and am licensed to practice medicine in North Carolina. I have practiced Internal Medicine for nearly twenty years.

2. I graduated from Yale College with a B.A. in History and Psychology in 1986. Between 1986 and 1990, I worked in a psychiatric hospital with adolescents, as an advocate for women, and participated in family genetic research.

3. I graduated from the University of Rochester School of Medicine and Dentistry with a M.D. in 1994. I completed my residency at the Yale Primary Care Internal Medicine Residency program, where I also served as Chief Resident.

4. I have trained and worked in Sri Lanka, first on a self-created rotation in residency and then in 2006 as a Senior U.S. Fulbright Scholar. During my time in Sri Lanka, I taught medical humanities and studied gender-based violence.

1

5. I am a Founding Board Member of Kiran – a community based resource for South Asian Survivors of Domestic Violence. I also have had experience as a counselor for survivors of sexual assault and for patients suffering with psychiatric illnesses.

6. Currently, I am on the faculty of the University of North Carolina School of Medicine (UNC), where I am Associate Professor of Medicine and Social Medicine and Co-Director of the Beacon Child and Family Program. My responsibilities at UNC include caring for patients, teaching and mentoring medical students and residents, directing the Domestic Violence portion of UNC Hospital's Beacon Child and Family Program and serving as Clinical Supervisor of the General Internal Medicine clinic's Depression Screening and Treatment Program. As part of my duties at UNC, I teach a course to medical students titled "Medicine and Society," where we consider issues including the experience of illness, the culture of medicine, medical ethics, health care financing and the role of physicians in society.

7. In my clinical practice, I see and treat adult patients for a variety of general internal medicine health issues such as diabetes, hypertension, hypercholesterolemia, depression, anxiety, PTSD, alcoholism, contraception, menopause, osteoporosis, asthma, COPD, allergies, reflux, hemorrhoids, back pain, joint pain, and pneumonia. Predominantly, my practice is composed of women patients. I also provide a range of medical procedures, such as Pap smears. I and/or my staff obtain informed consent from my patients for all medical treatment.

8. The opinions in this declaration are my expert opinions, based on personal knowledge I have obtained through my education, training, clinical practice, first-hand

2

scientific research, ongoing review of the relevant professional literature, discussions with colleagues, and my attendance at conferences related to the topics discussed below.

9. My experience and credentials are set forth in more detail on my *curriculum vitae*, a true and accurate copy of which is attached hereto as Exhibit A.

## North Carolina's Woman's Right to Know Act

10. I have reviewed North Carolina's Woman's Right to Know Act ("the Act") and discussed it with Plaintiffs' attorneys. It is my understanding that North Carolina law, even before the Act, already required an ultrasound before an abortion procedure. The Act, however, adds a "display of real-time view requirement" (in Section 90-21.85) to the pre-existing legal requirements for every patient seeking an abortion.

11. It is my understanding that Section 90-21.85 imposes the following new requirements on abortion providers: (a) the physician who is to perform an abortion or a "qualified technician" (as defined in the Act) must perform "an obstetric real-time view of the unborn child" (as defined in the Act) on the pregnant woman at least four hours before the abortion; (b) that person must "display the images so that the pregnant woman may view them;" (c) that person must provide to the pregnant woman a "simultaneous explanation of what the display is depicting, which shall include the presence, location, and dimensions of the unborn child within the uterus and the number of unborn children depicted;" (d) that person must provide the pregnant woman with a "medical description of the images, which shall include the dimensions of the embryo or fetus and the presence

3

of external members and internal organs, if present and viewable;" and (e) that person must obtain a written certification from the pregnant woman, in which she "shall indicate whether or not she availed herself of the opportunity to view the image." Section 90-21.85(a). Section 90-21.85 also states that it shall not "be construed to prevent a pregnant woman from averting her eyes from the displayed images or from refusing to hear the simultaneous explanation and medical description." Section 90-21.85(b).

12. It is my understanding that Section 90-21.85 obligates physicians to display visual images of the fetus and describe those images even over a patient's objections, even if the physician believes that such a display and description serves no medical purpose and is not medically appropriate.

13. It is my expert opinion that Section 90-21.85, if it were to take effect, would impose requirements that violate current standards of medical practice in North Carolina, are inconsistent with medical ethics and the principles governing the informed consent process, are contrary to general principles relating to the provision of individualized medicine, and would be harmful to the physician-patient relationship, including by encouraging the use of coercion in medical decision making.

14. Regulation of medicine must leave room for physicians to exercise their medical judgment so that they can provide individualized medicine, based on the patient's particular needs and circumstances. Any regulation that completely eliminates the ability of a physician to exercise discretion, and thereby prevents the physician from providing individualized medicine, as Section 90-21.85 does, would be completely

4

inconsistent with current standards of medical practice in North Carolina. I am not aware of any North Carolina regulation that would prevent me, in my treatment of my patients, from providing individualized medicine based on my medical judgment, and, prior to learning about the Act, I was not aware of any other North Carolina regulation that would so restrict other medical providers.

15. Consistent with these general principles, the informed consent process in internal medicine is designed to be patient-directed. In my practice, my staff and I work with the patient to provide the information that he or she has decided is relevant to make a decision. I would never force the patient to consider information that the patient has decided is not relevant, and I know of no North Carolina regulation that would require me to do so for my patients. It is my opinion that forcing a patient to consider information and have experiences that the patient has stated are not relevant to his or her decision would violate current standards of internal medicine practice in North Carolina.

16. Further, requiring a physician to act over the objections of a competent patient is unheard of in current medical practice in North Carolina. I am not aware of any regulation that would require me to act over the objections of any of my patients who are competent to make decisions for themselves. Any such regulation, if it existed, would violate current standards of internal medicine practice in North Carolina.

17. Force is antithetical to many aspects of a physician-patient relationship. It prevents the physician and patient from creating a relationship based on trust and puts the

5

physician and patient in an adversarial posture, which is counterproductive to providing patients with the best medical care.

18. Indeed, one of the basic ethical principles of the practice of medicine is respect for patient autonomy. Requiring a physician to act over the objections of a competent patient would require the physician to violate patient autonomy. I am not aware of any other North Carolina regulation that would require a physician to violate medical ethics in the treatment of his or her patients. It is my expert opinion that any such regulation is entirely destructive of the practice of medicine.

19. It is inconsistent with current standards of medical practice in North Carolina to require a patient to have a medical experience even over the patient's objections, and even when the physician thinks that it is not medically appropriate. I can think of no circumstance in which I am required to force a medical experience on my patients. Any such requirement, if it existed, would violate current standards of internal medicine practice in North Carolina.

20. It is inconsistent with current standards of medical practice in North Carolina to require a physician to act in a way that, in the physician's medical judgment, would expose his or her patient to potential psychological harm or anxiety when there is no medical purpose for the action. I am not aware of any North Carolina regulation that would require me to expose my patients to psychological harm. Any such regulation, if it existed, would violate current standards of internal medicine practice in North Carolina

6

and would be particularly repugnant to me, as much of my work is with trauma survivors and we do our best not to re-traumatize these patients.

21. It is inconsistent with current standards of medical practice in North Carolina to conduct medical tests to obtain information for non-diagnostic purposes. I am not aware of any North Carolina regulation that would require me to conduct a medical test for non-diagnostic purposes. It is my expert opinion that requiring physicians to take actions that serve no medical purpose would violate current standards of internal medicine practice in North Carolina.

22. Additionally, in my practice, I regularly obtain informed consent from my patients without displaying or describing to them images of their own bodies. For example, if a patient had a herniated spinal disk found on a MRI exam that was still painful after physical therapy and appropriate medication, I would explain the patient's condition and with his or her consent refer them to a surgeon for consideration of repair. In the case of an abnormal mammogram, I have never viewed the images with the patient before referring her on to a surgeon for additional diagnosis and treatment, though I have described the findings and provided a written report of the same at a patient's request. If a patient requested to view a radiologic study of his or her own body, I would certainly obtain the image and discuss it with the patient. But it would violate medical ethics to force such viewing on a patient in order to obtain informed consent.

Case 1:11-cv-00804-CCE-LPA Document 109 Filed 10/03/12 Page 7 of 8

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 24, 2012

at Chapel Hill, NC.

_____
AMY WEIL, M.D.