IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| GRETCHEN S. STUART, M.D., et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | CIVIL ACTION |
| ) | |
| RALPH C. LOOMIS, M.D., et al., ) | Case No. 1:11-cv-00804 |
| ) | |
| Defendants. ) | |

## DECLARATION OF SERINA E. FLOYD, M.D., M.S.P.H.

Serina E. Floyd, M.D., M.S.P.H., declares and states as follows:

1. I submit this declaration in support of Plaintiffs' motion for summary judgment.

2. I am an Assistant Clinical Professor of Obstetrics and Gynecology at Duke University Medical Center, the Associate Residency Program Director of Duke University's Obstetrics and Gynecology Department, and am the Family Planning Program Director at Duke University's Ryan Family Planning Clinic. I have provided reproductive health care services, including performing abortions, for more than a decade. My medical practice includes performing both surgical and medication abortions, and instructing medical students and residents on how to perform abortions. Through my professional and academic experience, I am familiar with the standards applicable to the provision of reproductive health care, including abortions, in North Carolina. A complete copy of my curriculum vitae is attached hereto as Exhibit A.

1

3.  I submit this declaration in my personal capacity, and hold the opinions in this declaration to a reasonable degree of medical certainty. My declaration represents my opinions alone. I do not speak for or serve as an authorized representative of Duke University.

*Abortions in North Carolina and in Dr. Floyd's Practice*

4.  Abortion is a very safe medical procedure, and major complications from abortion are very rare. Induced abortion is significantly safer than childbirth.

5.  Women, including my patients, choose abortion for a wide variety of reasons tied to their individual circumstances at the time of the pregnancy. Many of my patients seek abortions because they have complications or medical conditions—either pregnancy-induced or preexisting—that make continuing the pregnancy a significant threat to their health. Some women seek abortions because of a serious fetal anomaly. Other women seek abortions because of financial difficulties in their lives; because of relationship problems; because having a child would interfere with their responsibilities to other dependents; because they became pregnant as a result of rape or incest; and for numerous other reasons related to the woman's individual circumstances.

6.  Prior to performing any medical procedure, including an abortion, I have an ethical and legal obligation to ensure that a patient's consent to the procedure is informed. In the case of abortion, even before portions of the Woman's Right to Know Act went into effect, each of my patients had extensive counseling to ensure that the patient was making an informed decision about the procedure. This would entail

2

informing the patient about, *inter alia*, the nature of the procedure, its risks and benefits, the alternatives available to the patient and their respective risks and benefits, and the signs and symptoms of complications associated with the procedure; answering any questions that patient has about the procedure or her options; obtaining an understanding of the background underlying the patient's decision; and ensuring that the patient is comfortable with her decision to have an abortion.

7. Counseling a patient to ensure that she is making an informed decision to undergo a medical procedure is the standard of care in North Carolina for abortion and for other medical procedures. In my experience, my patients seeking abortions have given careful, extensive thought to their decision, and, upon being counseled and informed about the procedure and its alternatives, the vast majority are certain about their decision. Very rarely, a patient is ambivalent when she comes into the clinic or becomes ambivalent during the informed consent counseling, and in such instances, I would not perform an abortion and would instead encourage the patient to take time to consider her options.

8. Under existing North Carolina law, all of my patients have an ultrasound performed prior to an abortion in order to determine the gestational age of the embryo or fetus. Many of my patients seeking abortions have been referred by other physicians, and some of these patients have already had at least one ultrasound performed. In those cases, I receive a detailed ultrasound report for the patient that I can use to date the

3

pregnancy, and so there is no medical reason to perform an additional ultrasound as mandated by the Act.

9. For those patients who have not already had an ultrasound performed, we take an ultrasound in order to date the pregnancy. The ultrasound is performed by the attending physician or by a medical resident supervised by the attending physician.

10. For patients at approximately 10 to 12 weeks gestation or later, a transabdominal ultrasound is performed, during which the patient must lie still on the examining table while the ultrasound probe is placed on her abdomen. For patients at an earlier stage of pregnancy, a transvaginal ultrasound is performed, because a transabdominal ultrasound may not be sufficient to locate and date earlier pregnancies. During a transvaginal ultrasound, the patient must lie still on the examining table with her feet in stirrups while the ultrasound probe is inserted into her vagina.

11. I ask my patients if they would like to view the ultrasound image. Some patients choose to look and some do not; it is a matter of individual choice for the patient. I do not place the ultrasound image in the patient's view if the patient does not want to see it. None of my abortion patients has ever asked me to describe the ultrasound image, and I have never provided such a description to a patient who did not want to hear it. Describing an ultrasound image to a patient who did not want to hear the description would serve no medical purpose and could be distressing and potentially traumatic to the patient; I am not aware of any abortion provider in North Carolina who would describe an ultrasound image to a patient who did not ask to have it described.

4

12. In my practice, when the gestational dating ultrasound is needed, it is typically performed approximately one hour before the abortion; the time that elapses between the ultrasound and the abortion ranges from thirty to ninety minutes. There is no medical reason to impose a waiting period on all abortion patients between the time of the ultrasound and the time of the abortion, and I do not force such a delay on my patients.

## *The Woman's Right to Know Act*

13. I have read the Woman's Right to Know Act (the "Act") and am familiar with the "display of real-time view" requirements set forth in Section 90-21.85 of the Act, which I understand have been preliminarily enjoined. I am concerned that if the blocked provisions of the Act were to go into effect, those requirements would compel me to take actions that would be both harmful to my patients and wholly inconsistent with the standard of medical practice in North Carolina.

14. I understand the Act's "display of real-time view" provisions to require abortion providers to place ultrasound images in the patient's view and to describe the details of those images (including external members and internal organs) to the patient, even if the patient does not want to go through that experience and even if the physician believes that subjecting a patient to such an experience would be distressing or traumatic.

15. The "display of real-time view" requirements would be harmful to my patients if that provision of the law were to go into effect. Under my existing practices, each patient already has the opportunity to decide for herself whether she would like to

5

view an ultrasound image and to ask any questions about the image (or about anything else related to the abortion procedure and the options available to her). These current practices are consistent with standard medical practices for abortion in North Carolina, and with my ethical obligations as a physician, which require that I respect the patient's autonomy, allow patients to make their own informed decisions, and avoid taking actions that could be harmful to a patient. The Act's ultrasound requirements would undermine patients' autonomy by forcing images and descriptions on all patients for no medical reason, irrespective of whether the patient does not want to undergo that experience and regardless of whether the experience would be upsetting or even harmful to the patient.

16. Forcing these experiences upon patients who do not want them would cause many patients to experience emotional distress, and for some patients, the experience is likely to be particularly harmful. For instance, many of my patients seek abortions because they have a medical condition—in many instances caused or worsened by pregnancy—which makes continuing the pregnancy a significant threat to their health. For these women, although they have come to a firm decision to have an abortion, it is often an incredibly difficult and anguished decision, because the woman has a desired pregnancy that she cannot keep without risking her life or health. Requiring a doctor to place an ultrasound image in such a patient's view and to describe the embryo or fetus would pointlessly exacerbate a very difficult experience, and would likely be traumatizing and psychologically harmful to some patients.

6

17. For example, one of my recent patients had peripartum cardiomyopathy, a cardiac complication of pregnancy. For this woman, continuing the pregnancy would have carried a twenty-five-to-fifty-percent risk of mortality—in other words, if she did not get an abortion, she faced up to a fifty-percent chance of dying during her pregnancy. Although she wanted to be able to continue the pregnancy, she already had a child at home to care for, and she decided, after careful and difficult consideration, to have an abortion. She was certain in her decision, but she was also emotionally devastated by it. Forcing ultrasound images and a description of the fetus upon a patient in these circumstances would at minimum have caused needless distress, and could very well have caused serious and lasting psychological harm.

18. The Act's requirements would be harmful to women in numerous other circumstances as well. Some of my patients became pregnant as a result of rape, and would be distressed and potentially traumatized if forced to see and hear a description of the rapist's fetus. Many of my patients decide to have an abortion after receiving the tragic news of a serious, sometimes fatal fetal anomaly; forcing ultrasound images and a description of the fetus on women in such a situation would likewise be disturbing and harmful. And for any woman who has made a decision to have an abortion, who after being counseled is certain of her decision, and who has concluded that she does not want to view images of the fetus and hear it described, forcing those experiences upon the patient for no medical reason would in many cases harm the patient, causing the patient to experience unnecessary sadness, anxiety, or anger.

7

19.     It would be a violation of my ethical duties as a physician to speak and act in a manner that is affirmatively harmful to a patient, yet that is what the Act would require. I am not aware of any law or regulation in North Carolina that would similarly compel physicians to act contrary to their patients' interests and wishes for no medical reason.

20.     I am aware that the Act states that a woman may "avert her eyes" from the ultrasound display and attempt to "refuse to hear" the description of the image. These provisions do not alleviate my concerns.

21.     Even if a patient could avert her eyes from the ultrasound display, I understand that the Act would nevertheless mandate that the display be placed in the patient's view while the ultrasound is being performed. The patient would be forced to turn her head and close her eyes in the midst of a medical procedure—sometimes with the ultrasound probe inside her vagina. It is antithetical to all standards of medical practice in North Carolina to take affirmative steps to make a medical procedure more uncomfortable for no medical reason, but that is exactly what the Act would require in compelling an abortion provider to place the display in the patient's view and forcing the patient to avert her eyes.

22.     The Act's statement that a patient may attempt to refuse to hear the simultaneous description of the ultrasound image is even more problematic. It is unheard of in the practice of medicine in North Carolina for a law or regulation to compel a health care provider to make statements to the patient that the patient must affirmatively attempt

8

to drown out by covering her ears or putting in earplugs. It would be distressing to any patient to be subjected to a medical procedure in which the health care provider assumes an adversarial role, forcing speech upon her—with the ultrasound probe on or inside of her—that the patient must attempt not to hear. And it would be unethical for a physician to treat her patient in such a manner. Physicians have an ethical duty to respect their patients' autonomy, and a physician cannot ethically act against the wishes of a competent patient by forcing speech upon the patient that the patient must attempt not to hear.

23. The Act's requirement that I force a description of the embryo or fetus upon an unwilling patient would compel me to communicate an ideological view against abortion to my patients. I believe that if a patient does not want to see the ultrasound image or hear it described, but is forced by her physician to have both experiences, then the physician is being used to convey an antiabortion message to the patient.

24. The "display of real-time view" requirements would force me to act in ways that are harmful to my patients—and inconsistent with my ethical obligations as a physician—in other ways as well. As I noted above, some women have already had one or more ultrasounds performed before coming to me for an abortion, and although I receive a detailed ultrasound report for such patients that is sufficient for medical purposes, the Act would in many cases compel the patient to undergo an additional ultrasound for no medical reason. It would be unethical for a physician to subject patients to redundant medical procedures that have no medical or diagnostic purpose, but

9

that is exactly what the Act would compel physicians to do for patients who have already undergone an ultrasound.

25. The Act contains language that suggests to me that a physician referring a patient to an abortion provider might be able to satisfy the "display of real-time view" requirements so long as that physician performs an ultrasound on the patient no more than 72 hours before the abortion. This provision does not alleviate my concern that the Act would compel abortion providers to perform medically unnecessary ultrasounds on patients who have already undergone one or more ultrasound. This is because many of the patients who are referred to me who have already had an ultrasound performed had the ultrasound more than 72 hours before presenting to me for their procedure. Moreover, it is my understanding that even when a patient has had an ultrasound prior to presenting for her procedure, if the physician or technician performing the ultrasound did not comply with the Act's display-and-describe requirements, I would have to subject the patient to an additional, medically unnecessary ultrasound.

26. Additionally, the Act's mandatory four-hour delay between the ultrasound and the abortion would be contrary to standard medical practices for abortion in North Carolina and would be harmful to my patients. There is no medical reason for imposing a waiting period between the time of an ultrasound and the time of the abortion—once a patient has been counseled about her options and has made an informed decision, it is contrary to standard medical practices to force her to wait for a prescribed amount of time.

10

27. Moreover, for some of my patients, the logistics of complying with the Act's four-hour delay requirement would likely require patients to make two trips to the clinic. Some of my patients travel long distances to reach the clinic and would not be able to arrive early enough to have an ultrasound performed, wait four hours, have the abortion performed, and travel home all in one day. Many of these women already have to make childcare arrangements and take time away from work or school, and would be needlessly burdened by a four-hour waiting period. For some of my patients, having to make two visits to the clinic would cause them to have to delay their procedures, which could increase the risks associated with what is otherwise a very safe medical procedure. And some of my abortion patients are in abusive relationships with partners who monitor their every move, increasing the amount of time that these patients must spend to have the abortion performed would expose them to increased risk of harm for no reason.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 21, 2012

Serina E. Floyd, M.D., M.S.P.H.

11