IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

GRETCHEN S. STUART, M.D., et al., )
)
    Plaintiffs, )
)
v. ) CIVIL ACTION
)
RALPH C. LOOMIS, M.D., et al., ) Case No. 1:11-cv-00804
)
    Defendants. )

## DECLARATION OF JAMES R. DINGFELDER, M.D.

James R. Dingfelder, M.D., declares and states as follows:

1. I submit this declaration in support of Plaintiffs' motion for summary judgment.

2. I am a physician licensed to practice medicine in the State of North Carolina. I have been practicing medicine for more than 46 years and have provided abortion services for approximately four decades. I am the owner of Eastowne OB/GYN and Infertility ("Eastowne"), located in Chapel Hill, where I provide reproductive health care services, including medical and surgical abortions. A complete copy of my curriculum vitae is attached hereto as Exhibit A.

3. I hold the opinions expressed in this declaration to a reasonable degree of medical certainty.

*Abortions in North Carolina and in Dr. Dingfelder's Practice*

1

4. Legal abortion is a very safe medical procedure; it is one of the safest procedures in contemporary medical practice. Major complications from abortion are very rare. Abortion is significantly safer than carrying the pregnancy to term.

5. My experience, and that of my staff, indicates that women seek abortions for all kinds of reasons related to psychological, emotional, medical, familial, economic and personal issues. Every patient has a different story. I have encountered women who seek to terminate because of spousal abuse and fears of further abuse; because of fears of economic destitution; because of the need to take care of an existing child with special needs; because of learning that the fetus has a significant fetal anomaly, which will make it hard to take care of the child along with other children in the family; and many other reasons.

6. The vast majority of abortions in North Carolina, and in the nation, are performed in the first trimester of pregnancy, which consists of the first twelve weeks of pregnancy.

7. As is the case in general medical practice, my practice already provides informed consent for all health care treatments. Obtaining such consent takes place in the context of a confidential medical consultation between my clinical staff, usually a registered nurse, and the patient. During that consultation, my staff explains the abortion procedure, discusses the medical risks, discusses the alternatives available to the woman, and answers any questions the patient may have.

2

8. While the vast majority of my patients are firm in their decision, occasionally my staff and I encounter a patient who is not sure. In those rare circumstances, we will not provide an abortion for the patient. Depending on the patient's circumstances, my staff and I offer to talk through her decision with her more extensively, we offer to refer her to a counselor, and/or we suggest that she take more time to think through her decision and come back if and when she decides that she does, indeed, want to end her pregnancy.

## *The Woman's Right to Know Act*

9. As required by North Carolina law, all of my abortion patients already receive an ultrasound before the procedure. These ultrasounds are used to determine the presence and location of an intrauterine pregnancy, the gestational age of the pregnancy, and whether the patient is carrying multiples. These ultrasounds typically take less than 5 minutes to complete. It does not serve any medical purpose to describe the ultrasound image to the patient, and it is not my practice—nor, to my knowledge, the practice of other North Carolina abortion providers—to describe the ultrasound image unless a patient were to request that it be described.

10. For pregnancies up to approximately 8 weeks lmp, a vaginal ultrasound is sometimes used because it may provide a clearer picture at those very early stages of pregnancy. During a vaginal ultrasound, a patient must put her legs into the stirrups and a vaginal probe is inserted into her vagina.

3

11. From approximately 8 weeks lmp onward, an abdominal probe is typically used because it is sufficient for determining the location and length of the pregnancy.

12. At Eastowne, every abortion patient is asked whether she wants to see an ultrasound image of the pregnancy or have a copy of it. It is up to the patient.

13. These ultrasounds are performed by physicians or registered nurses or medical assistants who have been trained in ultrasound and have, over time, extensive hands-on, supervised experience.

14. It is my understanding that the Court has temporarily blocked the Woman's Right to Know Act's "real-time view" ultrasound requirements from going into effect. I am very concerned that if the Act's ultrasound requirements were to go into effect, the Act would force me to act in a manner that is contrary both to my patients' best interests and to medical ethics. In particular, requiring the physician, while performing an ultrasound on a patient, to describe the images in detail regardless of whether the patient wants this experience and information would be antithetical to good medical practice, would damage my relationship with my patients, and would inflict stress and emotional harm on my patients.

15. As I understand the Act, regardless of whether the patient wants to look at the ultrasound images or hear a description of them, a physician or "qualified technician" must explain and describe the pictures to her, including the external members and internal organs if they are present and visible. Of course I would be glad to provide an explanation of the ultrasound images to any patient who wants it, although I cannot recall

4

any patient who asked to have the image described. But in my opinion, describing the ultrasound image to a patient who asks about it is completely different from forcing a detailed description upon a patient who does not want to hear it. And, contrary to medical ethics and good medical practice, the law does not allow the physician to tailor the information he or she provides to fit the patient's circumstances and needs.

16. While I understand that the Act allows a patient to "refuse to hear" the description of the ultrasound image, this does not alleviate my concerns. Under the Act, I would still have to provide the explanation and description to the patient who was trying to "refuse to hear" the description. The law therefore creates a situation where it appears that the physician is directly at odds with the patient – where the patient literally has to place her fingers in her ears and hum while the physician forces a description of her embryo or fetus upon her.

17. This is not only directly contrary to medical ethics, but it would also undermine a physician's relationship with his or her patients. It would suggest to the patient that I think this information is critical to her decision, that I think she ought to look at the pictures and hear the description, and that I think it ought to influence her decision. It uses the physician to suggest that the patient's decision-making is unsound or that her morals are deficient if she does not look at the pictures and reconsider. In my opinion, requiring a physician to show and describe the ultrasound image over a patient's objections would compel the physician to communicate an ideological or moral message to the patient. Nor do I believe that I could distance myself from this message simply by

5

telling the patient that I do not agree with the Act's requirements. By requiring me to force speech and images upon unwilling patients, the Act would necessarily introduce an inappropriate, adversarial element into the doctor-patient relationship that I could not alleviate simply by informing patients that I disagree with the Act's requirements.

18. Additionally, it would be bad medical practice, and potentially unsafe, for a patient to be forced to cover her ears (and close off communication with a medical provider) in the midst of a vaginal ultrasound. A vaginal ultrasound can be uncomfortable—particularly if the probe is inserted too deeply—and it is important for the provider to be able to speak with the patient during the procedure to ask whether the patient is uncomfortable. That the Act would force some women to cover their ears and close off communications with the person performing the ultrasound in the midst of the procedure in order to avoid medically unnecessary descriptions is just one more example of how the Act would compel abortion providers to act in a manner that is contrary to the patient's best interests and the physician's professional obligations.

19. The relationship between physicians and nurses and their patients is not intended to be adversarial. Subjecting patients to this speech against their will creates a barrier between the physician or nurse and the patient (whom the medical professionals are dedicated to serve). Further, the sacrosanct physician-patient relationship is violated when physicians are forced to introduce information that they believe may induce emotional turmoil. In no other area of my medical practice am I legally compelled to force potentially distressing information that is not medically relevant upon a patient, nor

6

am I aware of any medical procedure or area of medical practice in North Carolina in which a medical provider is required to force information upon an unwilling patient, irrespective of the patient's wishes.

20. Moreover, based on my nearly half century of experience as a doctor treating pregnant women, I believe that requiring patients to be subjected to this treatment would have deleterious effects on some of my patients' emotional well-being.

21. For example, over the course of my practice I have provided care to dozens of women who desperately wanted to be pregnant and have a child, only to discover that there were severe complications with the pregnancy. These women and their husbands or partners are often devastated by the news. In particular, I remember a woman with a wanted pregnancy who was devastated to learn that her fetus had anencephaly, a fatal medical condition in which the fetus lacks the cerebral hemispheres of the brain. This patient specifically asked that my staff take no more time than was necessary for her ultrasound because she did not want to see anything—she already was well aware of the tragic diagnosis and did not want to see anything more. I cannot imagine having to tell this woman that before I can provide her the care she needs, I must perform an ultrasound and describe the details of her fetus to her. I am extremely concerned about the effect this will have on my patients' well-being.

22. I have also treated patients who are seeking abortions because they have been raped. I strongly believe that it would cause some of these patients significant emotional distress for the doctor or technician to describe their rapist's fetus, yet that is

7

exactly what the Act would compel providers to do. For example, I recall one patient in particular who had been raped—she showed up with the police report of the rape in her hand. To force this woman to listen to a detailed description of her rapist's fetus (or to cover her ears while such a description was made) would be cruel and harmful, and contrary to medical ethics.

23. But these tragic circumstances are not the only ones I am concerned about. I am also concerned, for example, about the message that forcing him to show and describe the ultrasound sends to the young woman who is certain that she is not ready to have a baby and wants an abortion, but who has been told by her community that abortion is a sin. Requiring me to describe the pictures to her if she says she does not want it sends the message that her decision is wrong or immoral or selfish and that she should reconsider.

24. Nor can I understand what possible legitimate reason there could be for me to force my patient to come four hours early, subject herself to an ultrasound for the purpose of generating images that she does have to see and a description of those images that she can try to refuse to hear, and then wait four hours before beginning the procedure. There is no medical reason to impose such a four-hour delay requirement on all abortion patients. In those rare cases in which one of my patients has been uncertain about whether to proceed (after learning more about the procedure through the informed consent process), I would not perform an abortion, and would encourage the patient to take the time to think further about her decision. But to force patients who are certain

8

about their decision to wait for four hours is medically unnecessary, inconsistent with standard medical practice in North Carolina, and demeaning to patients. In my opinion, the requirements appear designed to induce shame and guilt in my patients. I find it repugnant to have to play an active role in shaming my patients in this manner.

25. Many of my patients are limited in the day or days and the time of day when they come to the clinic. Due to her location (many patients come long distances), work schedule, child care responsibilities, ability to get away from an abusive partner, and/or other factors, a patient may only be able to come to the clinic one day of the week or only certain hours of the day. For those patients, scheduling the procedure is already difficult. The required four-hour delay between the ultrasound and the abortion procedure would only make things worse, in terms of lost wages, increased childcare difficulties, unaccounted-for time away from an abusive partner. Given that my patients are not even required to look at the images or listen to the description, I cannot understand why I must burden them in this way.

26. I have been a member of the North Carolina Obstetrical and Gynecological Society for thirty-five years. The Society is a membership organization that represents hundreds of obstetricians and gynecologists in the State. In May 2011, prior to the passage of the Act, the Society's President wrote a letter on behalf of the Society to both houses of the North Carolina legislature opposing the Act, a true and exact copy of which is attached hereto as Exhibit B. I agree with the opinions in the letter, and, in particular,

9

with its conclusion that the Act (1) violates ethical principles of patient autonomy, and (2) amounts to a government intrusion into the physician-patient relationship.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 28, 2012

*James R. Dingfelder, MD*
James R. Dingfelder, M.D.

10