IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

GRETCHEN S. STUART, M.D., et al., )
)
    Plaintiffs, )
)
v. ) CIVIL ACTION
)
RALPH C. LOOMIS, M.D., et al., ) Case No. 1:11-cv-00804
)
    Defendants. )

## DECLARATION OF CAROL GETKER SHORES, M.D., PH.D., F.A.C.S.

Carol G. Shores, M.D., Ph.D., F.A.C.S., declares and states as follows:

1. I submit this declaration in support of Plaintiffs' motion for summary judgment.

2. The opinions expressed herein, which I hold to a reasonable degree of medical certainty, come from nearly two decades of treating and consulting with patients in North Carolina as a surgeon and otolaryngologist. My opinions are, in addition, based upon my education and training, my experience teaching medical students and residents, and the information I have obtained from other physicians at conferences and in other professional settings.

3. I am a board-certified otolaryngologist and am a Fellow of the American College of Surgeons.

4. I am on the full-time faculty of the University of North Carolina School of Medicine in Chapel Hill, where I have been an Associate Professor of Surgery in the

1

Department of Otolaryngology/Head and Neck since 2006. Before I became an Associate Professor of Surgery at UNC, I was an Assistant Professor of Surgery in the same department from 2000 to 2006.

5. In my capacity as an Associate Professor of Surgery, I perform surgeries on, and provide other medical care to, approximately 250 new patients each year. My responsibilities as an Associate Professor at UNC likewise include teaching students and residents and conducting research.

6. In addition to my academic and clinical experience at UNC, I previously served as an Associate Professor at WakeMed Faculty Physicians in Raleigh between 2008 and 2010. At WakeMed Faculty Physicians, I treated patients, taught medical students and residents, and conducted research.

7. I received a Ph.D. in Biochemistry from UNC in 1988 and graduated from UNC's School of Medicine with an M.D. in 1995. I completed by residency in surgery at UNC's Department of Otolaryngology/Head and Neck in 2000.

8. Based on my professional and academic experience, I am familiar with the standards and practices generally applicable to the provision of medical care in North Carolina. My experience and credentials are set forth in greater detail in my *curriculum vitae*, a true and accurate copy of which is attached hereto as Exhibit A.

9. I have reviewed North Carolina's Woman's Right to Know Act (HB 854) (the "Act"), and I have discussed its requirements with the attorneys for Plaintiffs in this case.

2

10. I understand that the Act imposes new requirements on physicians providing abortions in North Carolina, and that in particular, Section 90-21.85 of the Act imposes a "display of real-time view requirement" on abortion providers. It is my understanding that under that provision, (1) at least four hours before the abortion procedure, the physician who intends to perform an abortion or a "qualified technician" (as that term is defined in the Act) must perform a real-time view ultrasound on the woman seeking an abortion; (2) the physician or qualified technician must display the images of the embryo or fetus so that the patient may view them; and (3) the physician or qualified technician must provide a "simultaneous explanation" of the images to the woman, including "the presence, location, and dimensions of the unborn child within the uterus and the number of unborn children depicted," and a "medical description of the images," including "the dimensions of the embryo or fetus and the presence of external members and internal organs, if present and viewable." Section 90-21.85(a). I further understand that the Act provides that the woman is not "prevent[ed]" from "averting her eyes from the displayed images or from refusing to hear the simultaneous explanation and medical description," but that the physician or qualified technician must display and describe the ultrasound images even if the patient does not want to see the images or hear them described. Section 90-21.85(b).

11. In my opinion, the Act's "display of real-time view" requirement conflicts with prevailing standards and practices for the provision of medical care in North Carolina. The Act would compel physicians to violate their ethical obligations by forcing

3

medical images, descriptions, and experiences upon unwilling patients; it would mandate that physicians perform medical procedures regardless of whether the physician believes the procedures are medically appropriate; and it would foreclose physicians from practicing individualized medicine based on their medical judgment and a patient's particular circumstances. The "display of real-time view" requirement is entirely at odds with generally applicable standards for the provision of medical care in North Carolina.

12. First, the Act would compel physicians to violate medical ethics by forcing them to act over the objections of a competent patient. A fundamental principle governing the practice of medicine in North Carolina is respect for patient autonomy: All physicians have an ethical obligation to act in accordance with the wishes of a competent patient, and a physician cannot, consistent with his or her ethical obligations, take actions that contravene the wishes of a competent patient. Respect for patient autonomy is a basic, essential principle of medical ethics that governs medical practice every day in every hospital and doctor's office across the State. A physician's ethical obligation to respect a patient's autonomy means that the physician cannot force a medical experience upon an unwilling patient, and must honor the patient's preferences concerning the type of medical information the patient wishes to receive and the manner in which that information is conveyed.

13. This principle of patient autonomy is important in the context of ensuring that a patient has made an informed decision about whether to undergo a medical procedure. Every physician has an ethical obligation to ensure that his or her patient's

4

medical decision-making is informed—that is, to make sure that the patient understands her diagnosis, her treatment options, and the risks and benefits of those options. But patients vary widely when it comes to their preferences for receiving information about a medical condition or procedure. In my practice, for example, some of my patients with cancer wish to see a magnetic resonance imaging ("MRI") image of their own tumor when I am discussing a surgical procedure with them, while for other patients, seeing such an image would be harmful and a source of distress. As a physician, I am ethically bound to honor each of these preferences. I could not, consistent with my responsibility to respect patients' autonomy, withhold information or images related to a patient's condition or procedure from a patient who wished to have the information or view the images, and, by the same token, I could not force images or a description of images upon a patient against his or her preferences. To do either would unquestionably violate the patient's autonomy and would contravene my ethical obligations as a physician. The same is true for physicians practicing in any medical field in North Carolina.

14. It is my understanding that the Act's "display of real-time view" requirement would compel medical providers to act against the wishes of their patients by forcing providers to place ultrasound images in the patient's view and to describe those images, even if the patient did not want to view the images or hear a description. If this is correct, then the Act conflicts with—and is indeed antithetical to—the standards and practices generally governing medical care in North Carolina. I can think of absolutely no other area of medical practice in North Carolina in which a physician is legally

5

required to force medical images and a description of those images upon an unwilling patient, and I am aware of no other regulation of medical care in North Carolina that would similarly mandate that physicians violate their obligation to respect their patients' autonomy.

15. A physician's ethical duty to respect the patient's autonomy likewise means that a physician cannot force a competent patient to undergo a medical procedure or experience to which the patient objects. It is the patient's right to decide what a physician can or cannot do to his or her body, and a physician is ethically bound to honor the patient's wishes regarding whether or not to undergo a medical procedure.

16. It is my understanding that the Act would compel physicians to comply with the "display of real-time view" requirements even in the case of a patient who had already had an ultrasound performed by another provider and who does not want to undergo another ultrasound; that is, even if a patient has already had an ultrasound, the abortion provider has a report from that earlier ultrasound, and the provider believes that there is no medical reason to conduct an additional ultrasound, the physician or qualified technician must nevertheless perform a real-time view ultrasound upon a patient even if the patient objects to the procedure. If this is correct, then the Act's requirements are completely at odds with the standards and practices generally governing medical care in North Carolina. In no other area of medical practice in North Carolina are physicians compelled to breach medical ethics by forcing a competent patient to undergo a medical procedure that the physician believes is not medically appropriate and that the patient

6

does not want to experience. Indeed, if a physician in any other area of medical practice were to force a medical procedure upon an unwilling patient, it would constitute medical malpractice.

17. As a related point, under general standards of North Carolina medical practice, physicians do not conduct medical tests upon patients to obtain information that serves no medical or diagnostic purpose. As taught to me in medical school and a basic tenet of patient care, never order a test or procedure that does not yield usable results. All procedures have potential negative effects, including physical, emotional and financial damage. Yet, as I understand it, the Act would compel abortion providers to perform ultrasounds even in circumstances that are not part of the standard for care for providing abortions, such as when the patient has already had an ultrasound performed. If this is true, then the Act's requirements are not consistent with standards governing the provision of medical care in North Carolina. I know of no other circumstance or regulation in North Carolina in which a physician would be legally compelled to perform a medical procedure or test that he or she did not believe was medically indicated. If done in the normal course of medical practice, procedures that are not indicated would not be covered by any payer and would be considered a form of malpractice.

18. I further understand that the Act would compel abortion providers to place ultrasound images in a patient's view and provide a description of those images even if the physician believes that doing so would expose the patient to psychological harm or anxiety. In this respect as well, the Act unquestionably conflicts with the standards and

7

practices generally governing medical care in North Carolina. The first principle of medical ethics is the precept of non-maleficence, which requires that as physicians we first do no harm. Under this principle, if a physician believes that showing or describing an image to a patient could cause the patient to experience distress or anxiety, the physician should not engage in the distressing conduct.

19. For example, in my practice, I frequently receive positron emission tomography scans (or "PET scans") for my patients who have cancer. PET scans are imaging tests that can be used to help physicians assess how far a patient's cancer has spread. These images can be very disturbing for patients who have widely metastatic disease, as the areas with cancer are seen as bright yellow spots against an image of their body. I hardly ever show them to a patient because doing so would expose the patient to unnecessary distress and anxiety, and I could not, as an ethical matter, show such an image to a patient who did not wish to view it, because doing so could expose the patient to unnecessary harm. There is no reason to display medical images to a patient when doing so could be upsetting or harmful to the patient, and I know of no other regulation in North Carolina that mandates that a medical provider show a patient a particular medical image, particularly where the physician believes that showing the patient the image could harm the patient.

20. Indeed, as a general matter it is not necessary for patients to view images from their own bodies in order to understand their medical condition or to provide informed consent to a medical procedure, including surgery. As I explained above, in my

8

surgical practice, some patients choose to look at MRI images in connection with learning about a procedure, while others—approximately forty percent of my patients—choose not to look at any medical images prior to having the procedure. In my experience, patients who choose to look at the images and those who elect not to look at the images make equally well-informed decisions when consenting to the provision of medical care.

21. I know of no other regulation or area of medical practice in North Carolina in which physicians are legally required to show a patient images from the patient's own body and describe those images to the patient as a condition for obtaining informed consent. To the extent that the Act makes ultrasound images taken from the patient's own body an indispensable precondition for the patient to make an informed decision to undergo a medical procedure, the Act conflicts with the standards and practices generally governing medical care in North Carolina.

22. In addition, it is my understanding that the Act would compel abortion providers to perform an ultrasound and display and describe the images, irrespective of the physician's medical judgment, or the particular circumstances of an individual patient, or whether such an experience is medically appropriate for that patient. In my opinion, this inflexible, one-size-fits-all requirement conflicts with current standards and practices governing the provision of medical care in North Carolina. In providing medical care, physicians—in North Carolina and elsewhere—are obligated to exercise medical judgment so that they can provide individualized medicine based upon the

9

patient's particular needs and circumstances. Physicians must exercise medical judgment in determining whether a particular medical procedure is appropriate for a particular patient and must exercise discretion when deciding how to present information to a patient regarding the patient's condition or a course of treatment. There are many different patient characteristics that govern how facts are presented, such as level of formal and informal education, anxiety level, and presence or absence of family support. Presenting complex medical data and helping patients use this data to make medical decisions is the heart of the *art* of medicine, what we strive so hard to teach but mostly comes from experience.

23. Finally, I understand that the Act mandates that the real-time view ultrasound take place at least four hours before the patient's abortion. This requirement conflicts with prevailing standards and practices for the provision of medical care in North Carolina. I am not familiar with any other area of medical practice in which physicians are legally required to impose a delay between obtaining a patient's informed consent and performing the medical procedure. For example, no legal requirement would prevent me from performing a serious, life-altering surgery like a laryngectomy within an hour (or even fifteen minutes) of the patient's consent to the procedure. The essential consideration—and the standard that governs the provision of medical care in the State—is verifying that the patient understands the procedure, including its risks, benefits, and alternatives. Forcing a patient to wait for an arbitrary period of time does nothing to

Case 1:11-cv-00804-CCE-LPA   Document 112   Filed 10/03/12   Page 10 of 11

further that purpose and is not consistent with general medical practices in North Carolina.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 10, 2012

_____
Carol G. Shores, M.D., Ph.D., F.A.C.S.

11