# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

GRETCHEN S. STUART, M.D.,  )
et al.,                    )
                           )
          Plaintiffs,       )
                           )
v.                         )   Civil Action
                           )   Case No. 1:11-CV-00804
RALPH LOOMIS, M.D., et al.,)
                           )
          Defendants.       )

DEPOSITION OF WATSON ALLEN BOWES, JR., M.D.

FRIDAY, AUGUST 10, 2012

Conference Room

American Civil Liberties Union of North Carolina

727 West Hargett Street, Suite 105

Raleigh, North Carolina

9:30 a.m.

Volume 1 of 1

Pages 1 through 188

Kay McGovern & Associates
Suite 117, 314 West Millbrook Road • Raleigh, NC 27609-4380
(919) 870-1600 • FAX 870-1603 • (800) 255-7886

1    A    Yes.
2    Q    Do you think it's ethical from a medical stand-
3 point for a physician to act over the objection of a
4 competent patient?
5    A    I'm not quite sure what you mean by that.
6    Q    Do you think a physician should do something over
7 the objection--to the patient over the objection of a
8 competent patient?
9         Ms. Brennan:    Objection to form.
10   Q    In your opinion?  Actually, let me withdraw that.
11   A    Yeah.
12   Q    Do you think it's ethical for a patient to do
13 something to a patient over their objection?
14   A    Do you mean a doctor to do something to a patient?
15   Q    Yes.
16        Ms. Brennan:    Objection to form.
17   A    Well, I think it would depend upon the circum-
18 stances and the objection the patient was having.  In general
19 I agree with that, but I think there are exceptions that
20 might be--that would have to be considered.
21   Q    So generally speaking a physician should not act
22 over the objection of a competent patient?
23   A    In general.
24   Q    It would be unethical to do so?
25   A    Again, you'd have to define the specific

KAY McGOVERN & ASSOCIATES           (919) 870-1600
Suite 117, 314 West Millbrook Road  FAX 870-1603
Raleigh, North Carolina 27609-4380  (800) 255-7886

Case 1:11-cv-00804-CCE-LPA   Document 113-1   Filed 10/03/12   Page 3 of 13

1  they were squeamish about seeing whatever was going to be on
2  the video, would you have tried other methods of explaining
3  the procedure and the risks and benefits and alternatives
4  other than showing the video?
5　　　　A　　Yes.
6　　　　Q　　Do you support--would you support a law--or do you
7  believe that--let me withdraw that question. Do you believe
8  that a law--or do you believe that a physician should have
9  the discretion to be able to choose in what way they obtain
10 their informed consent from their patients?
11　　　　A　　In what way they obtain it? Yes, provided they
12 are giving all the information that the patient needs.
13　　　　Q　　When you were practicing, Dr. Bowes, did you
14 perform ultrasounds on your patients?
15　　　　A　　Yes.
16　　　　Q　　Did you perform those ultrasounds yourself?
17　　　　A　　I did in the earlier days. I didn't more
18 recently.
19　　　　Q　　What were the--when was the earlier days?
20　　　　A　　When I was at the University of Colorado.
21　　　　Q　　You did them yourself?
22　　　　A　　Yes.
23　　　　Q　　And then at the University of North Carolina you
24 did not?
25　　　　A　　I did in the early part of it. Then we--we more

KAY McGOVERN & ASSOCIATES　　　　(919) 870-1600
Suite 117, 314 West Millbrook Road　　　　FAX 870-1603
Raleigh, North Carolina 27609-4380　　　　(800) 255-7886

Case 1:11-cv-00804-CCE-LPA   Document 113-1   Filed 10/03/12   Page 4 of 13

1  Q    ---booklets?
2  A    I'm aware of that. I can't really find that where
3  it's in here, but it's in here.
4  Q    On the bottom of page 3.
5  A    The bottom of 3?
6  Q    Yes.
7  A    Okay, 3.
8  Q    Of Exhibit 1.
9  A    "shall publish in English and in each language"---
10      (Witness peruses document.)
11      "Printed information required," yes, okay, that's
12 where it is. Thank you.
13 Q    Are you aware that the physician must display the
14 ultrasound monitor when the physician does offer the--I think
15 it's termed the real-time view of the fetus--that the
16 physician must display the ultrasound monitor in a way so
17 that the woman can view the images on the screen even if the
18 patient says she does not want to see the screen?
19 A    Yes.
20 Q    And are you aware that a--that the physician must
21 give a simultaneous detailed explanation of the image of what
22 the screen is depicting even if the woman says she does not
23 want to hear that explanation?
24 A    Well, she doesn't have to hear it.
25 Q    What do you mean by that?

**KAY McGOVERN & ASSOCIATES**
Suite 117, 314 West Millbrook Road
Raleigh, North Carolina 27609-4380

(919) 870-1600
FAX 870-1603
(800) 255-7886

Case 1:11-cv-00804-CCE-LPA   Document 113-1   Filed 10/03/12   Page 5 of 13

1    A    Well, it says that, you know, she can not look at
2  the screen, she can ask that somebody put earmuffs on her or
3  something like that.  I mean she's not required to hear
4  the--he is required to provide it.  She's not required to
5  hear it or see it.  He or she--I don't know---
6    Q    (interposing)  Can you imagine a patient putting
7  earmuffs on so that she doesn't have to see (sic)?
8    A    I don't know, but she might say "I'm not going to
9  listen to it," put her hands over, you know, like this
10 (indicating), "I don't want to hear that."
11   Q    What was--the reporter didn't get that gesture.
12   A    I said she could put her hands over her ears and
13 say, "I don't want to hear that."
14   Q    And in order to not view the ultrasound monitor,
15 if it's placed in front of her, what do you imagine the
16 patient having to do?
17   A    Close her eyes.
18   Q    And are you aware that the physician must also
19 give the description of the dimensions of the embryo, the
20 fetus, the presence of external members and internal organs
21 if they're present and viewable even if the patient says that
22 she does not want to hear those?
23   A    Yes.
24   Q    Do you also understand that the law only requires
25 that the physician or the qualified technician offer the

KAY McGOVERN & ASSOCIATES
Suite 117, 314 West Millbrook Road
Raleigh, North Carolina 27609-4380
(919) 870-1600
FAX 870-1603
(800) 255-7886

Case 1:11-cv-00804-CCE-LPA   Document 113-1   Filed 10/03/12   Page 6 of 13

```
 1  form.
 2       Q    ---not hear the description?
 3       A    Well, it doesn't specifically make an exception
 4  for women who have had a previous abortion.
 5       Q    Do you mean women who have previously---
 6       A    (interposing)  I mean who've had a---
 7       Q    ---carried to term?
 8       A    I'm sorry; who've previously carried a baby to
 9  term.  I'm sorry.
10       Q    So those--so those women would have to undergo
11  this experience despite knowing the nature of the fetus?
12            Ms. Brennan:       Objection to form.
13       Q    Is that correct?
14       A    They would--they would be included in this because
15  you don't know how much they know.
16       Q    If a woman doesn't want to view the image on the
17  ultrasound screen or hear the description and therefore she
18  either tries to contort herself, her head, so she doesn't see
19  the screen or put earmuffs on, how does that help her under-
20  stand the nature of the fetus that she's carrying if she does
21  those things?
22       A    I think she lacks the full understanding and could
23  very well lack a full understanding.
24       Q    So it doesn't help women, then, understand the
25  nature of their fetus?
```

KAY McGOVERN & ASSOCIATES
Suite 117, 314 West Millbrook Road
Raleigh, North Carolina  27609-4380

(919) 870-1600
FAX 870-1603
(800) 255-7886

1    A    That's right.
2    Q    You also say in paragraph 2 that "the bill ensures
3  that women will have a reasonable time to reflect and
4  consider the information provided to them before they make a
5  final decision about the abortion procedure." Is this still
6  your opinion?
7    A    Yes.
8    Q    Can you tell me which part of the law you believe
9  ensures that women will have a reasonable time to reflect and
10 consider the information provided to them?
11   A    Well, may I have the law back? We'll have to go
12 through it, and I can try to point out those things for you.
13           The Reporter:    Exhibit 1.
14           (Document handed to witness.)
15   A    I believe it says that more than four hours before
16 the--and I'm trying to find the more than four hours.
17           (Witness peruses document.)
18           Okay, under 90-21.82, "At least 24 hours prior to
19 the abortion, a physician or qualified professional has
20 orally informed the woman by telephone...of all of the
21 following things." And then it goes through the things that
22 she must--so there has to be a 24 hour period for that
23 information, I mean before the abortion. And I believe as
24 far as the ultrasound, it's four hours. And let me just see
25 where that is so I can state it accurately.

KAY McGOVERN & ASSOCIATES                    (919) 870-1600
Suite 117, 314 West Millbrook Road           FAX 870-1603
Raleigh, North Carolina 27609-4380           (800) 255-7886

1  then an additional four hours that that gives them a
2  reasonable time to reflect and consider the information?  I
3  realize that the act requires that, but what are you relying
4  on when you say---
5       A    (interposing)  Do you want me to define what's a
6  reasonable time?
7       Q    What are you relying on when you say that that's
8  reasonable?
9       A    Common sense.
10      Q    Can you expound on that a little bit?
11      A    What, common sense?
12      Q    Why you think it's common sense that a 24--that
13 the 24 hour period is necessary and then an additional four
14 hour period.
15           Ms. Brennan:       I'm going to object to the "and
16 an additional four hour period" because I think that mis-
17 characterizes the statute.
18      A    I just think that it's a pretty--it's a pretty
19 clear explanation or a pretty clear definition of what a
20 reasonable time is.
21      Q    Are you relying on anything other than common
22 sense?
23      A    I think that's sufficient.  No, I am not.
24      Q    If the patient chooses to turn her head away and
25 not view the ultrasound--the images on the ultrasound screen

KAY McGOVERN & ASSOCIATES            (919) 870-1600
Suite 117, 314 West Millbrook Road   FAX 870-1603
Raleigh, North Carolina  27609-4380  (800) 255-7886

Case 1:11-cv-00804-CCE-LPA  Document 113-1  Filed 10/03/12  Page 9 of 13

1  or hear the simultaneous explanation, do you think the
2  patient still needs to wait an additional four hours after
3  the ultrasound before the physician can perform the
4  procedure?
5          Ms. Brennan:        Objection to form.
6       A   I can't answer that.  I don't know that that would
7  be necessary.  Just--if the image has been displayed and she
8  has not seen it or heard the information, whether it's four
9  hours from--I just don't have an opinion about that.
10      Q   I want to go back to something and ask you this.
11 I want to go back to your other statement in paragraph 2 that
12 we discussed that the law allows a woman to understand the
13 nature of the fetus she's carrying.  Are you relying on any
14 literature or data to support the argument that a woman must
15 see her fetus to understand the nature of the fetus?
16      A   No.
17      Q   What is the basis of--are you relying on anything
18 else when you say--when you make that statement?
19      A   Yes.
20      Q   What else, sir?
21      A   More common sense; if you see more information,
22 you're very likely to have a better, a clearer idea of what's
23 involved.
24      Q   But I'm asking if there's anything that you're
25 relying on that says that the specific information, as you

KAY McGOVERN & ASSOCIATES
Suite 117, 314 West Millbrook Road
Raleigh, North Carolina 27609-4380

(919) 870-1600
FAX 870-1603
(800) 255-7886

Case 1:11-cv-00804-CCE-LPA   Document 113-1   Filed 10/03/12   Page 10 of 13

1  saying here, would that still accurately---
2       A    (interposing)  Yes.
3       Q    Okay.
4       A    I would agree with that, I believe.
5       Q    If the patient doesn't want to see the ultrasound,
6  turns her head, closes her eyes, how does that improve the
7  quality of informed consent?
8       A    It doesn't.
9       Q    And if a patient doesn't want to hear the descrip-
10 tion of the images on the ultrasound and therefore has to put
11 her fingers in her ears, how does improve the quality of
12 informed consent?
13      A    It doesn't.
14      Q    And yet under the act a woman can still consent to
15 having an abortion procedure; is that correct?
16      A    I understand that that could--that that's correct.
17      Q    Is it within the standard of care for abortion
18 practice for a patient--for physicians to place ultrasound
19 screens in a patient's view even if she doesn't want to see
20 it?
21      A    Is that standard of care in abortion practice?
22 No.
23      Q    And is it within--is it a standard of care for
24 physicians to provide a simultaneous description of the
25 ultrasound even if the patient doesn't want to see it?

KAY McGOVERN & ASSOCIATES                        (919) 870-1600
Suite 117, 314 West Millbrook Road               FAX 870-1603
Raleigh, North Carolina 27609-4380               (800) 255-7886

Case 1:11-cv-00804-CCE-LPA   Document 113-1   Filed 10/03/12   Page 11 of 13

1  included in that informed consent.
2  Q    Is that for every patient dealing--every patient
3  deciding whether to proceed with a specific procedure?
4  A    What they're--yes, I think that you--there may be
5  a basic amount of information that should be provided to
6  every patient in the situation of that particular procedure.
7  Q    Do you think that physicians should be able to
8  exercise their medical judgment so they can provide
9  individualized medicine based on a patient's particular needs
10 and circumstances?
11 A    In all of medicine?
12 Q    Sure, in all---
13 A    (interposing)  Yes.
14 Q    ---of medicine.
15 A    Yes.
16 Q    Moving to paragraph 5 of your expert report---
17 A    (interposing)  Okay.
18 Q    ---you state, "I am not aware of any evidence that
19 patients will be harmed by the provision of information."
20 Just so I'm clear, what information are you referring to in
21 this sentence?  Are you referring to the specific---
22 A    (interposing)  Well, the information in this--the
23 information in this law.
24 Q    The information that's required to be provided by
25 the law?

KAY McGOVERN & ASSOCIATES
Suite 117, 314 West Millbrook Road
Raleigh, North Carolina 27609-4380
(919) 870-1600
FAX 870-1603
(800) 255-7886

Case 1:11-cv-00804-CCE-LPA   Document 113-1   Filed 10/03/12   Page 12 of 13

STATE OF NORTH CAROLINA

COUNTY OF WAKE

### C E R T I F I C A T E

I, Kay K. Rohde, Notary Public-Reporter, do hereby certify that **Watson Allen Bowes, Jr., M.D.** was duly sworn or affirmed by me prior to the taking of the foregoing deposition, that said deposition was taken by me and transcribed under my direction, that the foregoing pages 7 through 186 constitute a true and correct transcript of the testimony of the witness, and that the witness reserved the right to review his testimony.

I do further certify that I am not counsel for or in the employment of either of the parties to this action, nor am I interested in the results of this action.

I do further certify that the stipulations contained herein were entered into by counsel in my presence.

In witness whereof, I have hereunto set my hand, this 6th day of September, 2012.

/s/ Kay K. Rohde

Kay K. Rohde, CVR-CM
Notary No. 19971050205

**KAY McGOVERN & ASSOCIATES**
Suite 117, 314 West Millbrook Road
Raleigh, North Carolina 27609-4380

(919) 870-1600
FAX 870-1603
(800) 255-7886