IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| GRETCHEN S. STUART, M.D., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION |
| | ) | |
| RALPH C. LOOMIS, M.D., et al., | ) | Case No. 1:11-cv-00804 |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF NADA LOGAN STOTLAND, M.D., MPH, IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

NADA LOGAN STOTLAND, M.D., MPH, declares and states the following:

1. I am a board-certified psychiatrist licensed to practice medicine in Illinois. In addition to my medical degree, I have a master's degree in public health. I am a professor in the psychiatry department at Rush Medical College of Rush University in Chicago, and I am the former chair of the psychiatry department at the Illinois Masonic Medical Center in Chicago. Throughout my career, I have treated patients with psychiatric issues related to pregnancy and have consulted with patients seeking abortions.

2. I have been a member of the American Psychiatric Association since 1976, and I served as President of the organization from 2008 to 2009. I have also held appointed or elected leadership positions in the North American Society for Psychosocial Obstetrics and Gynecology, the American College of Obstetricians and Gynecologists, the Society for Women's Health Research, the U.S. Health Resources and Services Administration, and the World Psychiatric Association.

1

3. I have authored or edited seven books and published over fifty articles and chapters in peer reviewed journals, primarily on the topics of psychiatry and obstetrics and gynecology. I have written or edited two peer-reviewed books specifically on the topic of abortion: Psychiatric Aspects of Abortion, published in 1991, as well as Abortion: Facts and Feelings in 1998, both of which were published by American Psychiatric Publishing, Inc. I recently co-authored a paper entitled "Is there an 'Abortion Trauma Syndrome'?: Critiquing the Evidence," published by the Harvard Review of Psychiatry in 2009. Other particularly relevant articles I authored include "Psychosocial Aspects of Induced Abortion" in the Journal of Clinical Obstetrics and Gynecology in 1997 and "The Myth of the Abortion Trauma Syndrome" in the Journal of the American Medical Association in 1992. My experience and credentials are set forth in more detail on my *curriculum vitae*, a true and accurate copy of which is attached hereto as Exhibit A.

4. The opinions expressed in this declaration are my expert medical opinions based on my thirty years of experience as a psychiatrist specializing in reproductive health. Additionally, my opinions are based on knowledge I have obtained through my education, training, ongoing review of the relevant professional literature, which includes ongoing review of studies and commentary on abortion and mental health, discussions with colleagues, and my attendance at conferences related to the topics discussed below.

5. The literature which informs the opinions set forth below includes, but is by no means limited to, the following:

- American Psychological Association, Task Force on Mental Health and Abortion, "Report of the Task Force on Mental Health and Abortion" (2008), available at http://www.apa.org/pi/women/programs/abortion/mental-health.pdf (Report of the APA Task Force) (copy appended as Exhibit B);

- Gail Erlick Robinson, Nada L. Stotland, Nancy Felipe Russo, Joan A. Lang & Mallay Occhiogrosso, "Is There an 'Abortion Trauma Syndrome'?: Critiquing the Evidence," Harvard Review of Psychiatry, 17:4, 268-290 (2009) (copy appended as Exhibit C);

- Brenda Major, Mark Appelbaum, Linda Beckman, Mary Ann Dutton, Nancy Felipe Russo, Carolyn West, "Abortion and Mental Health: Evaluating the Evidence," American Psychologist, 64:9, 863-890 (2009) (copy appended as Exhibit D);

- Trine Munk-Olsen, Thomas Munk Laursen, Carsten B. Pedersen, Øjvind Lidegaard & Preben Bo Mortensen, "Induced First-Trimester Abortion and Risk of Mental Disorder," New England Journal of Medicine, 364:4, 332-339 (2011) (copy appended as Exhibit E); and

- Report from National Collaborating Centre for Mental Health at the Royal College of Psychiatrists, entitled "Induced Abortion and Mental Health: A systematic review of the mental health outcomes of induced abortion," available at http://www.nccmh.org.uk/publications_SR_abortion_in_MH.html.

6. I have reviewed North Carolina's Woman's Right to Know Act ("the Act"). I understand that under Section 90-21.85 of the Act, the woman must be informed that "the opportunity to hear the fetal heart tone" is available to her. Additionally, the physician who is to perform an abortion or a "qualified technician" must perform an ultrasound on the pregnant woman and the images must be displayed so that the woman can view them. The person performing the ultrasound must also give a "simultaneous explanation of what the display is depicting," and provide a "medical description of the images," including "the dimensions of the embryo or fetus and the presence of external members and internal organs, if present and viewable." The law states that it shall not "be construed to prevent a pregnant woman from averting her eyes from the displayed images or from refusing to hear the simultaneous explanation and medical description." The woman must certify in writing whether or not "she availed herself of the opportunity to view the image" and that she has been offered an opportunity to hear the fetal heart tone. Other than medical emergencies, there are no exceptions to these requirements.

## Emotional and Psychological Responses to Abortion

7. Women of all ages who have unwanted pregnancies experience complex emotional responses, regardless of whether they choose to terminate the pregnancy or carry to term.

8. Abortion carries less risk of psychological consequences than does carrying a pregnancy to term.

4

9. The predominant emotional responses following abortion are positive feelings of relief, and many women feel an increased sense of control over their lives after an abortion. Additionally, women may experience a whole range of emotions following an abortion. Possible negative responses, however, do not constitute a psychiatric illness.

10. As with any major life event, a woman's feelings about her abortion may change over time. Such changes can result in a woman experiencing either positive or negative emotions, or both. It does not necessarily mean that a woman regrets her abortion decision and does not mean that she is suffering from a psychiatric disorder.

11. Severe emotional distress by women following an abortion is transient and rare. Moreover, neither pregnancy nor abortion is the type of catastrophic event that triggers the psychiatric disorder known as posttraumatic stress disorder (PTSD).

12. The most powerful predictor of the psychiatric state a woman will be in following an abortion is the psychiatric state she was in before she had the abortion. Other factors include: her freedom to make an autonomous decision; whether she has been neglected or a victim of abuse or other violence; her past psychiatric history; her level of social support; her economic situation; and whether her loved ones provide her support regardless of whether or not she decides to continue the pregnancy.

13. An American Psychological Association Task Force on Mental Health and Abortion issued a report in 2008 based on its review and evaluation of "all empirical studies published in English in peer-reviewed journals post-1989 that compared the

5

mental health of women who had an induced abortion to the mental health of comparison groups of women or that examined factors that predict mental health among women who had an elective abortion in the United States." (Report of the APA Task Force at p. 3.) The conclusions in the final report included the following:

- "The best scientific evidence published indicates that among adult women who have an unplanned pregnancy the relative risk of mental health problems is no greater if they have a single elective first-trimester abortion than if they deliver that pregnancy." (*Id.* at p. 4 (emphasis omitted))

- "In general, . . ., the prevalence of mental health problems among women in the United States who had a single, legal, first-trimester abortion for non-therapeutic reasons was consistent with normative rates of comparable mental health problems in the general population of women in the United States." (*Id.* at p. 4)

- There was a lack of evidence "sufficient to support the claim that an observed association between abortion history and mental health was caused by the abortion per se, as opposed to other factors." (*Id.* at p. 4).

14. The Royal College of Psychiatrists, which is the professional and educational body for psychiatrists in the United Kingdom, recently published a report on "Induced Abortion and Mental Health: A systematic review of the mental health outcomes of induced abortion." The report indicates that the authors engaged in very detailed, rigorous review of methodologically sound studies on the topic and reached

6

essentially the same conclusions as did the American Psychological Association's Task Force.

**The Psychological Impact of Section 90-21.85's Provisions**

15. Compelling a patient to look at the outcome of a medical test or image or to listen to any detailed explanation of such medical test or image will cause some patients psychological pain and/or anxiety.

16. For some abortion patients who do not want to view an ultrasound image, hear an explanation of the image, and/or hear a description of the image, providing those experiences, explanations, or descriptions will cause anxiety and psychological pain.

17. It is my opinion that requiring a physician to do any of these things, when unwanted by the patient, would serve no purpose other than to intentionally upset the patient and deter her from carrying out a decision she has made.

18. For some groups of women, requiring a physician to place an ultrasound image in the patient's view and provide an explanation and description, when unwanted by the patient, will impose additional harms. For example, in some cases in which a woman has experienced infertility, she may begin her pregnancy carrying several embryos. In order to improve the chances of delivery of one or more healthy infants, the woman may decide to reduce the number of embryos or fetuses she is carrying. In these cases, to put ultrasound images in view and provide an explanation and description is likely to cause the patient to experience grief, or more acute grief, over the difficult decision she has made to protect the life or health of the embryo(s) she will continue to

7

carry. The same will be true for some women who are terminating the pregnancy because the fetus suffers from a severe anomaly.

19. Another group of women for whom the requirements of the law will be particularly harmful are those pregnant as a result of rape or incest. The psychological trauma suffered by these women is based in part on their loss of control and dignity. The provisions of Section 90-21.85 will exacerbate these feelings by denying these women control over what information they receive.

20. I am not aware of other situations in medicine, including the care of a pregnant woman who wishes to carry the pregnancy to term, in which a physician is required to put unwanted images in a patient's view or to provide explanations of images or test results in more detail than a patient chooses to receive. This is a direct, unprecedented, medically unnecessary and deleterious interference in the doctor-patient relationship---a relationship important to the outcome of medical care.

21. The fact that a woman can avert her eyes or refuse to hear the description does not eliminate these potential harms. In fact, requiring women to look away or cover their ears to avoid unwanted information rather than accepting a woman's decision that this information is unwanted is itself harmful because some women will undoubtedly feel that they are being negatively judged and that their decision to have an abortion, or their ability to make that decision, is being questioned. The provision that each woman must certify to this process carries precisely that meaning. Whether women impute this to the state of North Carolina or to their health care provider, it will have a negative impact on

the post-abortion mental health of some women. As noted, autonomous decision-making and perceived support can influence a woman's post-abortion mental health.

22. This potential for harm will be inflicted on virtually all women seeking abortions in North Carolina.

## Assertions that Section 90-21.85 Will Prevent Future Psychological Harm to Women

23. I understand that the State of North Carolina has argued that Section 90-21.85 will: "protect[] a large segment of the State's citizens from very real and serious future psychological and emotional injuries. If a pregnant woman undergoes an abortion, and, prior to performing the abortion no one offers her the opportunity to see or hear the heart beat of the fetus growing within her body, and subsequent to the abortion, the woman sees an image and/or hears the heart beat of a human fetus, the effect on her psychological and emotional health could be significant." As I understand it, the State asserts that failure to have an ultrasound image placed in her view (that she does not need to look at) or be offered to hear fetal heart tones (that she does not have to hear) prior to an abortion, and then later seeing an ultrasound image or hearing a fetal heart tone, could result in "devastating psychological injury."

24. This argument is highly speculative and unsupported by any scientific study that I am aware of.

25. In the first instance, I am aware of no scientific study or other credible support for the idea that women do not understand that being pregnant means that an embryo or fetus is developing within their bodies. Thus, any assertion that seeing an

9

ultrasound or hearing a fetal heart tone after the abortion will lead to a heretofore unrecognized understanding of the abortion is highly unlikely.

26. In the field of psychiatry, it is not possible to predict which subsequent events from the whole range of possible human experiences might trigger a strong emotional reaction to a previous event in a particular woman. For example, a subsequent pregnancy or change of religious views may cause a woman to have a strong emotional reaction to a previous abortion – either positive or negative. But there is no basis on which to single out the opportunity to view an ultrasound and/or hear a fetal heart tone from the numerous events that might precipitate a strong reaction.

27. Nor does a subsequent negative emotional reaction mean that a woman's choice was uninformed or that she has a psychiatric disorder.

28. Even if it were possible to identify a "triggering event," there is absolutely no basis to believe that exposure to that event would protect against the person experiencing a negative emotional reaction after later exposure to that same "triggering event." Regardless, it makes no sense, and runs counter to basic medical and psychiatric principles, to expose a large number of women to a potentially painful and deleterious experience in order to hypothetically protect some subset of women, if any, who might have a negative reaction to subsequent exposure to that experience. Therefore, it makes no sense, and runs counter to basic medical and psychiatric principles, to force all women seeking an abortion to experience viewing an ultrasound image and hearing its description.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 21, 2012

at Chicago, IL.

_____
NADA STOTLAND, M.D., MPH

11