# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

GRETCHEN S. STUART, M.D., et al.,     )
     )
     Plaintiffs,     )
     )
v.     )     CIVIL ACTION
     )
RALPH C. LOOMIS, M.D., et al.,     )     Case No. 1:11-cv-00804
     )
     Defendants.     )

## PLAINTIFFS' OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

ARGUMENT..................................................................................................... 1

I.  THE "DISPLAY OF REAL-TIME VIEW REQUIREMENT" VIOLATES
    PHYSICIANS' FIRST AMENDMENT RIGHTS................................................ 1

    A.  The "Display of Real-Time View Requirement" Commandeers
        Physicians to Communicate the State's Message and Is Therefore
        Subject to Strict Scrutiny.............................................................. 1

    B.  The "Display of Real-Time View Requirement" Fails Strict
        Scrutiny. ....................................................................................... 8

        1.  Defendants have failed to assert a compelling interest that
            would justify the "Display of Real-Time View Requirement.".......... 9

        2.  In any event, even if any of the asserted interests is
            compelling, the "Display of Real-Time View Requirement" is
            not narrowly tailored to serve those interests through the least
            restrictive means............................................................ 11

    C.  *Lakey* Was Wrongly Decided, and The Court Should Not Follow It. ....... 13

II.  THE "DISPLAY OF REAL-TIME VIEW REQUIREMENT" VIOLATES
     SUBSTANTIVE DUE PROCESS BECAUSE IT IS IRRATIONAL. ................. 16

    A.  The Act's "Display of Real-Time View Requirement" Is Irrational. ........ 16

    B.  North Carolina Physicians Have Standing to Assert the Rights of
        Their Abortion Patients. .............................................................. 17

III.  PLAINTIFFS AGREE WITH DEFENDANTS THAT THIS COURT
      SHOULD ADOPT A REASONABLE SAVING CONSTRUCTION OF
      THE ACT. ....................................................................................... 21

IV.  THIS COURT CORRECTLY ENJOINED SECTION 90-21.85 IN ITS
     ENTIRETY........................................................................................ 23

CONCLUSION ................................................................................................ 29

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Akron v. Akron Ctr. for Reproductive Health, Inc.*,
  462 U.S. 416 (1983) ............................................................................ 18

*Alaska Airlines, Inc. v. Brock*,
  480 U.S. 678 (1987) ....................................................................... 27, 28

*Am. Coll. of Obstetricians & Gynecologists v. Thornburgh*,
  737 F.2d 283 (3d Cir. 1984) ........................................................... 19, 21

*Artistic Entm't, Inc. v. City of Warner Robins*,
  331 F.3d 1196 (11th Cir. 2003) ............................................................ 24

*Ashcroft v. ACLU*,
  542 U.S. 656 (2004) ................................................................... 1, 9, 12

*Ayotte v. Planned Parenthood of N. New England*,
  546 U.S. 320 (2006) ....................................................... 21, 24, 25, 29

*Bellotti v. Baird*,
  428 U.S. 132 (1976) ............................................................................ 22

*Brown v. Entm't Merchs Ass'n*,
  131 S. Ct. 2729 (2011) ........................................................................ 10

*Buschi v. Kirven*,
  775 F.2d 1240 (4th Cir. 1985) ............................................................. 18

*Freilich v. Upper Chesapeake Health, Inc.*,
  313 F.3d 205 (4th Cir. 2002) ............................................................... 20

*Garcetti v. Ceballos*,
  547 U.S. 410 (2006) .............................................................................. 4

*Gonzales v. Carhart*,
  550 U.S. 124 (2007) ......................................................................... 2, 3

*Greenville Women's Clinic v. Bryant*,
  222 F.3d 157 (4th Cir. 2000) ............................................................... 18

Case 1:11-cv-00804-CCE-LPA   Document 127   Filed 12/03/12   Page 3 of 38

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*Karlin v. Foust,*
  188 F.3d 446 (7th Cir. 1999) ................................................................. 19

*Kowalski v. Tesmer,*
  543 U.S. 125 (2004) ..................................................................... 18, 19

*Lee v. York Cnty. Sch. Div.,*
  484 F.3d 687 (4th Cir. 2007) ................................................................. 4

*Legal Svs. Corp. v. Velasquez,*
  531 U.S. 533 (2001) ....................................................................... 3

*Legend Night Club v. Miller,*
  637 F.3d 291 (4th Cir. 2011) ........................................................... 25, 29

*Miller v. Montgomery Cnty.,*
  458 Fed. Appx. 304 (4th Cir. 2011) ......................................................... 21

*Newton v. Astrue,*
  559 F. Supp. 2d 662 (E.D.N.C. 2008) ....................................................... 23

*Ohralik v. Ohio State Bar Ass'n,*
  436 U.S. 447 (1978) ......................................................................... 2

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1,*
  551 U.S. 701 (2007) ....................................................................... 10

*Planned Parenthood of N. New England v. Heed,*
  390 F.3d 53 (1st Cir. 2004) ............................................................... 21

*Planned Parenthood of Se. Penn. v. Casey,*
  505 U.S 833 (1992) .................................................................. passim

*PSINet, Inc. v. Chapman,*
  362 F.3d 227 (4th Cir. 2004) ........................................................... 24, 28

*Qwest Corp. v. City of Santa Fe, N.M.,*
  380 F.3d 1258 (10th Cir. 2004) ......................................................... 24, 28

iii

Page(s)

*R.I. Med. Soc'y v. Whitehouse*,
239 F.3d 104 (1st Cir. 2001) ................................................................... 19

*Randall v. Sorrell*,
548 U.S. 230 (2006) ............................................................ 24, 26, 27, 28

*Reno v. ACLU*,
521 U.S. 844 (1997) ......................................................................... 24, 25

*Reynolds Tobacco Co. v. FDA*,
696 F.3d 1205 (D.C. Cir. 2012) ................................................................. 2

*Riley v. Nat. Fed. of the Blind of N.C.*,
487 U.S. 784 (1988) ................................................................. 3, 4, 13, 15

*Rumsfeld v. Forum for Academic and Inst'l Rights, Inc.*,
547 U.S. 47 (2006) ................................................................................... 4

*Singleton v. Wulff*,
428 U.S. 106 (1976) ............................................................. 17, 18, 19, 20

*Sorrell v. IMS Health, Inc.*,
131 S. Ct. 2653 (2011) ......................................................................... 2, 3

*Springfield Armory, Inc. v. City of Columbus*,
29 F.3d 250 (6th Cir. 1994) ............................................................. 24, 27

*Stenberg v. Carhart*,
530 U.S. 914 (2000) ............................................................................... 18

*Stuart v. Huff*,
834 F. Supp. 2d 424 (M.D.N.C. 2011) ............................................ passim

*Tex. Med. Providers Performing Abortion Servs. v. Lakey*,
667 F.3d 570 (5th Cir. 2012) .............................................. 13, 14, 15, 16

*Thornburgh v. Am. Coll. of Obstetricians & Gynecologists*,
476 U.S. 747 (1986) ......................................................... 18, 20, 21

iv

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*U.S. v. Playboy Entm't Group, Inc.*,
529 U.S. 803 (2000) .......................................................................... 1, 11, 13

*United States v. Andreas*,
150 F.3d 766 (7th Cir. 1998) ............................................................. 23

*Villas at Parkside Partners v. City of Farmers Branch*,
577 F. Supp. 2d 858 (N.D. Tex. 2008) .............................................. 28

*Warth v. Seldin*,
422 U.S. 490 (1975) ........................................................................... 20

STATUTES

Miss. Code Ann. § 41-41-34 ............................................................. 12

N.C. Gen. Stat. § 90-21.82 ........................................................... 8, 11

N.C. Gen. Stat. § 90-21.85 ....................................................... passim

N.D. Cent. Code § 14-02.1-04 .......................................................... 12

18 Pa. Const. Stat. § 3205 ................................................................. 16

Va. Code Ann. § 18.2-76 ................................................................... 12

OTHER AUTHORITIES

10A N.C. Admin. Code § 14E.0305 .................................................. 27

**ARGUMENT**

I.   **THE "DISPLAY OF REAL-TIME VIEW REQUIREMENT" VIOLATES PHYSICIANS' FIRST AMENDMENT RIGHTS.**

Defendants argue that a government can make doctors say (or presumably not say) essentially anything that the government wants in the guise of regulating the medical profession.   This argument is incorrect—if accepted, it would create a massive "physician" exception to the First Amendment unsupported by any Supreme Court decision or by any constitutional principle.   The Court should reject Defendants' arguments and strike the "Display of Real-Time View Requirement."

   A.   **The "Display of Real-Time View Requirement" Commandeers Physicians to Communicate the State's Message and Is Therefore Subject to Strict Scrutiny.**

The "Display of Real-Time View Requirement" is a content-based regulation of speech and is thus subject to strict scrutiny.   *See* Pls.' Br. at 13-14;[1] *see also Ashcroft v. ACLU*, 542 U.S. 656, 660 (2004) (content-based restriction of speech is presumptively invalid); *U.S. v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 813 (2000) (strict scrutiny applies to content-based regulation).   None of Defendants' arguments for avoiding strict scrutiny is persuasive.

First, Defendants concede that when the government compels ideological speech, its regulations must satisfy strict scrutiny.   Defs.' Br. at 16.   For all the reasons discussed

---

[1] Plaintiffs refer to their Memorandum of Law in Support of Their Motion for Summary Judgment as "Pls.' Br." and to Defendants' Memorandum in Support of their Motion for Summary Judgment as "Defs.' Br."

1

in Plaintiffs' moving brief, the "Display of Real-Time View Requirement" does just that: it commandeers unwilling physicians to use their own voice and expressive conduct to communicate the State's message against abortion. And it commandeers physicians to convey the State's antiabortion message in a uniquely intrusive way—during a medical procedure while the patient is vulnerable and disrobed. Further, it compels physicians to force the State's message on a patient even as she struggles to close her eyes, cover her ears, and avoid the speech. To ignore the ideological nature of this speech is to ignore the reality of what the Act would compel physicians to say and do.

The fact that some of the speech and expressive conduct required is also factual should not reduce the level of scrutiny the Court applies. Facts are the building blocks of all communication, *see Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653, 2667 (2011), and can be ideological in context, as they are here. *See, e.g.*, *Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1216-17 (D.C. Cir. 2012) (finding graphic images required by FDA on cigarette packaging were not "purely factual," as compared to textual warnings, but instead were "unabashed attempts" to "browbeat consumers into quitting"); *cf. Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 457-58, 464-65 (1978) (oral, in-person communication is qualitatively different from—and more intrusive than—written communication).

Defendants' only response is to assert that *Planned Parenthood of Se. Penn. v. Casey*, 505 U.S 833 (1992), and *Gonzales v. Carhart*, 550 U.S. 124 (2007), foreclose the

2

conclusion that the speech here is ideological. But *Gonzales* contains no First Amendment discussion, and (as explained further below) *Casey*'s short First Amendment discussion did not address anything like the visual and auditory assault on an unwilling patient at issue here.

Second, Defendants contend that the Court should apply rational basis review to the "Display of Real-Time View Requirement" because governments can "compel speech as part of their authority to regulate professions." Defs.' Br. at 11. That argument proves far too much and is meritless. The Supreme Court has rejected arguments that rational basis review applies whenever a government compels speech by a professional in his or her professional capacity; instead, it has repeatedly applied heightened scrutiny to regulations of speech by professionals. *See, e.g.*, *Sorrell*, 131 S.Ct. at 2667 (stating that regulation of speech by pharmaceutical representatives would fail both strict and intermediate scrutiny); *Legal Svs. Corp. v. Velasquez*, 531 U.S. 533, 548 (2001) (treating restriction of speech by attorneys during litigation as viewpoint discrimination); *Riley v. Nat. Fed. of the Blind of N.C.*, 487 U.S. 784, 795-96 (1988) (applying "exacting First Amendment scrutiny" to regulation of speech by professional fundraisers, and rejecting the proposition that "a professional's speech is necessarily commercial").

Defendants point to several situations in which they assert that the State compels speech, Defs.' Br. at 11, but they are irrelevant. They involve either regulations of conduct with only an incidental effect on speech (e.g., physicians reporting gunshot

3

wounds) or speech by public employees (e.g., an oath of office). *Id.* Laws that have only an incidental effect on speech are subject to a different level of scrutiny than laws that directly regulate speech. *See, e.g.*, *Rumsfeld v. Forum for Academic and Inst'l Rights, Inc.*, 547 U.S. 47, 61-62 (2006) (rejecting First Amendment challenge to statute requiring law schools to provide military recruiters with equal access to students on campus as provided to other employers because statute regulated conduct and because compelled factual statements necessary to comply with statute, such as emails notifying students of time and place of interviews, were "plainly incidental" to regulation of conduct). Similarly, the State has much more leeway to regulate speech by government employees acting in their governmental capacity. *See Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006) ("[W]hen public employees make statements pursuant to their official duties, [they] are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.").[2] Unlike Defendants' examples, the "Display of Real-Time View Requirement" applies to private, not governmental, speakers and "regulat[es] how a speaker may speak," thereby "directly affect[ing] that speech." *Riley*, 487 U.S. at 789 n.5.

---

[2] The government's authority to regulate the speech of its employees may be even greater in the context of compulsory public school education. *See Lee v. York Cnty. Sch. Div.*, 484 F.3d 687, 695 (4th Cir. 2007) ("Courts have generally recognized that public schools possess the right to regulate speech that occurs within a compulsory classroom setting, and that a school board's ability in this regard exceeds the permissible regulation of speech in other governmental workplaces or forums."). Defendants' reference to regulations of teachers' speech, *see* Defs.' Br. at 11, is therefore inapposite.

4

Third, Defendants insist on a dangerously broad and unsupported reading of the First Amendment discussion in *Casey*. In particular, Defendants claim that "*Casey* establishes a wider principle that applies rational-basis review to *all* compelled speech provisions that regulate 'the practice of medicine.'" Defs.' Br. at 16 (emphasis added). Thus, Defendants argue that the State can put any words it wants into the mouths of physicians, so long as those words are "factual," thereby essentially creating a physician exception to the First Amendment.

The Court should continue to reject that proposition because *Casey* holds no such thing. Instead, in its First Amendment analysis, the *Casey* plurality stated only that there was "no constitutional infirmity in the requirement that the physician provide the information mandated by the State *here*." 505 U.S. at 884 (emphasis added). Thus, the plurality's discussion was tied to the particular requirements in that case, and it did not create a new rule for every compelled speech requirement that the State could set out to impose on physicians.

Contrary to Defendants' suggestion, Plaintiffs do not argue that the mere "fact that the Act mandates disclosures that extend beyond the Pennsylvania law" is what requires a different standard of review for the "Display of Real-Time View Requirement." Defs.' Br. at 14. Rather, Plaintiffs argue that the plurality in *Casey* found that the factual speech compelled from physicians by the law at issue—"information about the risks of abortion, and childbirth," *Casey*, 505 U.S. at 884—was consistent with medical practice because it

5

was the type of information *already* provided by physicians for informed consent purposes. By contrast, the "Display of Real-Time View Requirement" is inconsistent with medical practice because it requires physicians to speak and act over a patient's objection, and even when doing so could harm the patient, which is antithetical to the basic principles of medicine. *See* Pls.' Br. at 4.

Indeed, in selectively quoting from *Casey* to contend that *any* forced speech concerning the "'practice of medicine'" is subject only to rational basis review, Defs.' Br. at 16, Defendants mischaracterize that decision's First Amendment discussion. *Casey* addressed only "*reasonable* licensing and regulation by the State." 505 U.S. at 884 (emphasis added). The "Display of Real-Time View Requirement" is not a reasonable regulation of medicine because, *inter alia*, it forces a physician to speak and act out the State's ideological message while the patient is trapped on an examination table and particularly vulnerable; it forces the physician to make use of this vulnerability by displaying and describing the ultrasound images even if the patient says no; it requires the physician to continue describing and displaying the images even if the patient is actively trying to avoid them; and, consequently, it requires a physician to say and do things to her patient even if the physician believes that the patient will be harmed in the process. *See* Pls.' Br. at 3-7.

Further, to the extent that Pennsylvania required physicians to disseminate its own ideological message to patients, it did so in a way that had a limited effect on physician

6

speech: a physician merely had to *offer* the State's *own publications* to a patient, who was free to decline them, and even then only when the physician concluded that the offer itself would not harm the patient. *Casey*, 505 U.S. at 881. Thus, the speech issues posed in *Casey* were entirely different from the speech issues posed by this case, where the Act forces a physician (or those acting under her supervision) personally to speak and act out the State's ideological message herself, even when the patient has no interest in hearing that message, and even when the physician believes it would harm the patient.

Finally, even if the Supreme Court were to subject informed consent requirements to some lower standard of review under the First Amendment than strict scrutiny, *see Stuart v. Huff*, 834 F. Supp. 2d 424, 431-32 (M.D.N.C. 2011), forcing images and descriptions on a patient that the patient must strain to avoid is not an informed consent requirement and should not be evaluated as such. To the contrary, this requirement is entirely inconsistent with the informed consent process. Informed consent involves a discussion to provide the patient with the information necessary to help her make the right decision *for her*. Bowes Decl. in Supp. of Defs.' Mot. for Summ. J. ¶ 5 ("The procedures surrounding informed consent are designed to facilitate the capacity of rational beings to make judgments of what they consider best, rather than what the physician or any other person might consider best for them.") (internal citation omitted). Information that the patient actively avoids cannot possibly help to inform her. Bowes Dep. at 140:5-13. But the "Display of Real-Time View Requirement" commands that the

7

physician continue speaking and displaying images to the patient *even if* the patient is actively trying not to listen or see. *Id.* at 87:1-4. This is one of the many aspects of the requirement that makes it not only ideological but also wholly inconsistent with any plausible conception of traditional informed consent. Indeed, Defendants repeatedly acknowledge in their briefing that the statute would not "prevent the woman from wearing earphones (or the physician from providing them) to avoid listening during the sonogram procedure." *See, e.g.*, Defs.' Br. at 2 n.1. Thus, whatever the "Display of Real-Time View" requires, it is *not* an interaction for informed consent purposes.[3]

For all of the above reasons and under settled First Amendment principles, the "Display of Real-Time View Requirement" should be subject to strict scrutiny.

### B. The "Display of Real-Time View Requirement" Fails Strict Scrutiny.

Defendants argue that the "Display of Real-Time View Requirement" satisfies strict scrutiny because it is the most efficient means for achieving the State's goals. That contention is incorrect both because Defendants have failed to establish a compelling state interest, and because even if any interest Defendants assert is compelling, they have failed to demonstrate that the Requirement is the least restrictive means of furthering that interest. Indeed, Defendants' analysis completely misunderstands the least restrictive

---

[3] Notably, the "Display of Real-Time View Requirement" is not in the section of the Act entitled "informed consent," and is instead in its own separate section. *Compare* N.C. Gen. Stat. § 90-21.82 ("Informed consent to abortion") *with* N.C. Gen. Stat. § 90-21.85 ("Display of real-time view requirement"). This isolation of the requirement accurately reflects the fact that it is not part of the informed consent process.

8

means inquiry—they appear to argue that as soon as the State asserts a compelling interest, it is entitled to a sledgehammer to achieve its goals, including forcing physicians to display and describe ultrasound images to patients who do not want to see or hear while the patients are lying supine on an examination table.

Defendants' argument could not be more wrong. Strict scrutiny analysis is designed to place limits on government action to ensure that, even when the State has a compelling interest, it furthers that interest in a manner that is *least* intrusive on constitutionally-protected rights. As the Supreme Court explained in *Ashcroft v. ACLU*:

> The purpose of the [least restrictive means] test is to ensure that speech is restricted no further than necessary to achieve the goal . . . . For that reason, the test does not begin with the status quo of existing regulations, then ask whether the challenged restriction has some additional ability to achieve [the State's] legitimate interest. . . . Instead, the court should ask whether the challenged regulation is the least restrictive means among available, effective alternatives.

542 U.S. at 656-66 (holding that plaintiffs were likely to succeed on First Amendment challenge to law restricting speech on Internet for purpose of protecting minors because government had failed to show that filtering technology that could be used directly on computers accessed by minors would be ineffective).

### 1. Defendants have failed to assert a compelling interest that would justify the "Display of Real-Time View Requirement."

Defendants contend that the Requirement is intended to further three compelling interests: (i) ensuring that a woman seeking abortion services is fully informed about the development of the embryo or fetus that she is carrying; (ii) persuading the woman not to

9

terminate her pregnancy; and, (iii) ensuring that a woman is not coerced into choosing an abortion. *See* Defs.' Br. at 19.

None of these interests is compelling here. The second asserted interest is an interest in potential life. Although this interest is important, the Supreme Court has made clear that it is not *compelling* until viability; otherwise states could simply ban abortion altogether. *Casey*, 505 U.S. at 860. Thus, this interest cannot justify the Act, which applies at all stages of pregnancy. To the extent Defendants contend that the State has an interest in "persuading" the woman to carry to term that can be separated from its interest in potential life, that argument is irrelevant here. Even if the State has a compelling interest in persuading women to make the decisions *it* wants, which it does not, it does not have a compelling interest in forcing physicians to do the persuading for it. If such a compelling interest were recognized, then the State could use physicians as its puppets in communicating any number of government messages. Such a compelling interest would lead to the evisceration of First Amendment protection for physicians.

Further, interests one and three are already served by the informed consent portions of the Act, and the State "does not have a compelling interest in each marginal percentage point by which its goals are advanced." *Brown v. Entm't Merchs Ass'n*, 131 S. Ct. 2729, 2741 n.9 (2011); *cf. Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 704 (2007) (holding that student assignment plan which took into account students' race did not survive strict scrutiny, in part, because the "minimal

10

impact" of the suspect practice "cast doubt" on its "necessity"). Under the informed consent sections, which Plaintiffs do not challenge, women in North Carolina seeking abortion services already are told about state-produced pamphlets that describe fetal development in two-week increments, include images of that development, and provide specified information about alternatives to abortion. N.C. Gen. Stat. § 90-21.82. Defendants complain that these other legal requirements are not as "powerful" as the ultrasound image of the woman's own pregnancy. *See* Defs.' Br. at 21. The question before the Court, however, is not whether the woman's own ultrasound image is more "powerful," but whether, even if it is, the State has a compelling interest in forcing a physician to describe and display the ultrasound image to all women, even those who object, and even when the State has made other images available. Supreme Court precedent teaches that it does not.[4]

> **2. In any event, even if any of the asserted interests is compelling, the "Display of Real-Time View Requirement" is not narrowly tailored to serve those interests through the least restrictive means.**

As the Court already has recognized, a less restrictive alternative to the "Display of Real-Time View Requirement" is readily available here—requiring physicians to *offer*

---

[4] No less fundamentally, to establish that an interest is compelling, the state must prove that there is an "actual problem" in need of solving, which means that "the Government must present more than anecdote and supposition." *Playboy*, 529 U.S. at 822. Here, there is no evidence beyond anecdote and supposition to indicate that *any* of the interests invoked by Defendants is an actual problem warranting the extreme speech burdens the State has chosen to employ through the Act. To the contrary, the record evidence demonstrates that the majority of women who choose to terminate a pregnancy are already mothers and are thus fully aware of the consequences of abortion. *See* Pls.' Br. at 6.

11

to display and describe the ultrasound to every patient but not forcing the physician to speak and display even when the patient says no. *See Stuart*, 834 F. Supp. 2d at 432-33. Defendants have the burden to prove that this less restrictive alternative would be ineffective. *See Ashcroft v. ACLU*, 542 U.S. at 665 ("When Plaintiffs challenge a content-based speech restriction, the burden is on the Government to prove that the proposed alternatives will not be as effective as the challenged statute."). Further, the fact that the State would *prefer* the Act is not enough. "The 'starch' in our constitutional standards cannot be sacrificed to accommodate the enforcement choices of the Government." *Id.* at 669 (internal citation omitted).

Defendants utterly have failed to meet their burden. Their only basis for concluding that an *offer* to view an ultrasound and hear an explanation of the image would be ineffective is nonsensical: they speculate that "[o]ffering the information but not providing it if the woman declines means that the information would not get conveyed to those women who would choose to actually look and hear as the ultrasound occurs." Defs.' Br. at 21. But an *offer* to view and hear exactly what the "Display of Real-Time View Requirement" *mandates* would do exactly that: it would allow women to "choose to actually look and hear as the ultrasound occurs," which is all that the vast majority of states that have legislated in this area have required. *See, e.g.,* Miss. Code Ann. § 41-41-34(1)(b); N.D. Cent. Code § 14-02.1-04(4); Va. Code Ann. § 18.2-76(C). "A court should not assume a plausible, less restrictive alternative would be ineffective."

12

*Playboy*, 529 U.S. at 824.  Tellingly, Defendants have offered no "survey-type evidence" that such offer laws are ineffective.  *Id.* at 820 (internal citation omitted).

Defendants' argument appears to be simply that the current law is a more efficient method of pressing the State's message than the alternative: the Act requires unwilling doctors to speak the government's message to all women and puts the burden on women to try and avoid the message if they want to do so.  That may be true, but that is precisely the problem—the Supreme Court has "affirm[ed] simply and emphatically that the First Amendment does not permit the State to sacrifice speech for efficiency."  *Riley*, 487 U.S. at 795.  For all these reasons, this coercive law violates the First Amendment.

## C.  *Lakey* Was Wrongly Decided, and The Court Should Not Follow It.

Defendants rely heavily on the non-binding Fifth Circuit decision in *Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 576 (5th Cir. 2012), but *Lakey*'s interpretation of *Casey* and First Amendment jurisprudence is incorrect for all the reasons discussed in Plaintiffs' moving brief.  Defendants rely on the following passage from *Lakey*:

> First, informed consent laws that do not impose an undue burden on the woman's right to have an abortion are permissible if they require truthful, nonmisleading, and relevant disclosures.  Second, such laws are part of the state's reasonable regulation of medical practice and do not fall under the rubric of compelling "ideological" speech that triggers First Amendment strict scrutiny.  Third, "relevant" informed consent may entail not only the physical and psychological risks to the expectant mother . . . but also the state's legitimate interests in "protecting the potential life within her."

*Id.* at 576 (footnote ommited) (quoting *Casey*).  Each of these conclusions is wrong.

13

First, the plurality in *Casey* did not hold that a statute that could survive the undue burden inquiry—a legal test analyzed from the *patient's* point of view—is therefore immune to all other constitutional challenges by any party, including a First Amendment challenge by a physician affected by the law. To the extent *Lakey* suggests that informed consent laws pass *First Amendment* scrutiny if they "require truthful, nonmisleading, and relevant disclosures," *id.*, the decision totally misreads *Casey*: the truthful/nonmisleading discussion in *Casey* is part of the undue burden analysis, not the First Amendment analysis.[5] In any event, even in its undue burden analysis, the plurality in *Casey* says only that detailed information about fetal development "*may* be permissible" when all the State does is make information that is truthful and not misleading *available* to patients in state-produced pamphlets. 505 U.S. at 882 (emphasis added). By relying on this discussion in *Casey* to uphold the coercive Texas ultrasound law, the *Lakey* court profoundly changed that standard, equating making state-produced information *available* to women to review if they so choose, with *requiring* physicians to speak and display the State's own message, even when the woman has no interest in hearing it. That distinction makes all the difference under the First Amendment. Indeed, the Court in *Casey* did not come close to addressing the constitutionality of a law that would compel physicians to force unwanted and potentially harmful speech upon unwilling patients in the midst of a

---

[5] Indeed, given that there is no undue burden claim in this case, *Lakey*'s discussion of whether a disclosure requirement is truthful and non-misleading, and therefore permissible under the *undue burden* test, is simply not relevant here.

14

medical procedure. *Lakey* fails to grapple with—or even mention—this fundamental distinction between the law at issue in *Casey* and the speech mandated by the Texas and North Carolina laws.

The second conclusion in *Lakey* is also incorrect to the extent it suggests that only compelled ideological speech should trigger strict scrutiny.[6] The Supreme Court has expressly rejected that contention in numerous cases, including *Riley*. In that case, it applied strict scrutiny to compelled factual disclosures. *Riley,* 487 U.S. at 797-98.

The *Lakey* court also erred in its third conclusion. *Casey* did not hold that the "state's legitimate interests in 'protecting . . . potential life,'" *Lakey* 667 F.3d at 576, allowed the State to use physicians to *impose* detailed information about fetal development on every woman. To the contrary, as stated above, the law at issue in *Casey* merely made written information about embryonic and fetal development *available* to women; consistent with principles of informed consent, the decision of whether the information was relevant, and whether to review it, was left up to the woman herself. *See* 505 U.S. at 881-82 (citing 18 Pa. Cons. Stat. § 3205).

Further, the law in *Casey* contained an exception to all of the informed consent requirements, including informing women of the availability of embryonic and fetal developmental information, when, in the judgment of the physician, providing the information would "result[] in a severely adverse effect on the physical or mental health

---

[6] In any event, as Plaintiffs have made clear, the speech compelled by the "Display of Real-Time View Requirement" is unquestionably ideological.

15

of the patient." 18 Pa. Const. Stat. § 3205(c). The *Casey* plurality considered it important that "the statute does not prevent the physician from exercising his or her medical judgment," which is why the Pennsylvania requirement could reasonably be considered ordinary regulation of medical practice. 505 U.S. at 883-84. Here, in contrast, the Act *precludes* physicians from exercising their medical judgment, instead conscripting them as mouthpieces for the State.

In sum, *Lakey* was wrongly decided because it equates the Texas law, which prohibits physicians from exercising their medical judgment, forces physicians to harm their patients, and forces women to submit to medical tests and experiences even if they say no, with the law at issue in *Casey*, which did none of those things. *See* 505 U.S. at 881-84. To follow *Lakey* would be to accept a physician exception to the First Amendment. Neither the Constitution nor any Supreme Court precedent permits that result.

## II. THE "DISPLAY OF REAL-TIME VIEW REQUIREMENT" VIOLATES SUBSTANTIVE DUE PROCESS BECAUSE IT IS IRRATIONAL.

### A. The Act's "Display of Real-Time View Requirement" Is Irrational.

Defendants provide no credible response to Plaintiffs' claim that the "Display of Real-Time View Requirement" violates substantive due process, at least as to those women who want to "avert their eyes" and "refuse to hear." According to Defendants, "even if the woman profess[es] not to want the information," some women may "change their minds while the sonogram is being conducted," and thus the Act's mandate that

16

physicians act over their patients' objections is rational. Defs.' Br. at 25. But this argument fails to recognize that women who have managed not to see or hear the information (as the Act presumes) cannot, as a practical matter, be "persuaded" to change their mind. Moreover, this type of justification cannot stand. It is based on an impermissible gender stereotype that "when a woman says no, she really means yes."

For all the reasons discussed in Plaintiffs' brief supporting their motion for summary judgment, Plaintiffs have met their burden to prove that there is no rational justification for the "Display of Real-Time View Requirement" as to those women who want to "avert their eyes" and "refuse to hear."

### B. North Carolina Physicians Have Standing to Assert the Rights of Their Abortion Patients.

Perhaps recognizing that they can offer no rational justification for the "Display of Real-Time View Requirement," Defendants contend that Plaintiffs, as physicians, lack standing to assert claims on behalf of their patients. This argument is untenable: the right of physicians to challenge the constitutionality of abortion restrictions on behalf of their patients is well established. Defendants' latest efforts to brush aside Plaintiffs' patients' claims by raising wholly unsupported technical arguments are simply a red herring and should be rejected for the reasons below.

First, more than thirty years ago the Supreme Court decided *Singleton v. Wulff*, 428 U.S. 106 (1976), allowing plaintiff physicians to bring claims on behalf of their abortion patients. *See also id.* at 118 (plurality opinion stating that it is "appropriate to

17

allow a physician to assert the rights of women patients as against governmental interference with the abortion decision").[7]  Since *Singleton*, the Supreme Court and federal appellate courts have uniformly afforded physicians standing to challenge abortion restrictions on behalf of their patients, including in the context of "informed consent" laws.  *See, e.g.*, *Casey*, 505 U.S. at 881-87 (challenge by abortion providers to state informed consent law); *Thornburgh v. Am. Coll. of Obstetricians & Gynecologists*, 476 U.S. 747, 759-65 (1986) (same), *overruled on other grounds by Casey*; *Akron v. Akron Ctr. for Reproductive Health, Inc.*, 462 U.S. 416, 439-49 (1983) (same), *overruled on other grounds by Casey*.  *See also Stenberg v. Carhart*, 530 U.S. 914 (2000) (allowing physician to raise patients' rights in challenge against abortion regulation); *Greenville Women's Clinic v. Bryant*, 222 F.3d 157 (4th Cir. 2000) (same).

Second, the Supreme Court's decision in *Kowalski v. Tesmer*, 543 U.S. 125 (2004), cited by Defendants, Defs.' Br. at 22-23, is not to the contrary.[8]  In *Kowalski*, the

---

[7] The only case law Defendants cite to support their argument is found in a footnote, where Defendants state that *Singleton* "is not law" and cite to Justice Stevens's concurrence.  Defs.' Br. at 23 n.10.  But in his concurrence, Justice Stevens clearly stated that the plaintiff physicians had standing, including to raise claims on behalf of their patients, given that the physicians were also seeking to assert claims regarding their own rights and had an economic stake in the case.  *See Singleton*, 428 U.S. at 121-22 (Stevens, J., concurring).  *See also Buschi v. Kirven*, 775 F.2d 1240, 1260 (4th Cir. 1985) (noting that Justice Stevens's vote "was essential to the *favorable* resolution of the standing issue" in *Singleton* (emphasis added)).  So too, here, Plaintiff physicians are seeking to assert claims regarding their own rights and have an economic stake in the case where there is a risk of licensure and damages actions for noncompliance with the Act.

[8] The issue in *Kowalski* was whether plaintiff attorneys had third-party standing to assert the rights of future *pro se* clients, where the attorneys faced no criminal or civil penalties under the law.  543 U.S. at 131, 134.

18

U.S. Supreme Court recognized that it has been "quite forgiving in certain circumstances" in allowing third-party standing, including "when enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights." *Id.* at 130 (citing *Warth v. Seldin*, 422 U.S. 490, 510 (1975) (citing several cases, including *Doe v. Bolton*, 410 U.S. 179 (1973), the companion case to *Roe v. Wade*)). Here, Plaintiff physicians have third-party standing because the Act places them at risk of penalties in a way that would violate their patients' rights.

Moreover, as in *Singleton*, the Supreme Court in *Kowalski* explained that courts must ask "whether the party asserting the right has a 'close' relationship with the person who possesses the right [and] whether there is a 'hindrance' to the possessor's ability to protect his own interests." *Id.* at 130. Plaintiff physicians readily meet this test. "The closeness of the relationship" between Plaintiff physicians and their patients "is patent": "the constitutionally protected abortion decision is one in which the physician is intimately involved."[9] *Singleton*, 428 U.S. at 117. *See also* Stuart Decl. in Supp. of Pls.' Mot. for Prelim. Inj. ¶¶ 7-11; Dingfelder Decl. in Supp. of Pls.' Mot. for Prelim. Inj. ¶¶ 4, 6, 8, 22-24. Thus, "[a]side from the woman herself . . . the physician is uniquely

---

[9] Defendants' suggestion that there is a conflict of interest between Plaintiff physicians and their patients because the Act affords civil remedies for aggrieved patients, Defs.' Br. at 23, is incorrect as a matter of law. *See, e.g.*, *R.I. Med. Soc'y v. Whitehouse*, 239 F.3d 104, 105 & n.1 (1st Cir. 2001) (plaintiffs, physician and owners of a medical clinic, had standing to raise claims on behalf of patients in challenge to abortion statute, which created a private right of action for patients against plaintiffs); *Karlin v. Foust*, 188 F.3d 446, 456 & n.5 (7th Cir. 1999) (same as to abortion providers); *Am. Coll. of Obstetricians & Gynecologists v. Thornburgh*, 737 F.2d 283, 289, 290 n.6 (3d Cir. 1984) (same as to plaintiff physicians and medical providers).

19

qualified to litigate the constitutionality of the State's interference with . . . that decision."

*Singleton*, 428 U.S. at 117.[10]

Defendants also argue that "any pregnant woman who wants an abortion in North Carolina can sue the officials charged with enforcing this law." Defs.' Br. at 22-23. This argument was rejected by the Supreme Court in *Singleton* and should be rejected by this Court. A woman seeking to terminate her pregnancy faces "several obstacles" in bringing a claim on her own—namely that a woman's "desire to protect the very privacy of her decision" could discourage her from bringing suit, even pseudonymously.[11] *Singleton*, 428 U.S. at 117.

Finally, this Court also must reject Defendants' cursory argument that Plaintiffs cannot proceed with a third-party claim under Section 1983 or the Declaratory Judgment

---

[10] When considering whether to dismiss for lack of standing, the Court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth*, 422 U.S. at 501. But if the Court were to determine that Plaintiffs did not clearly demonstrate in their pleadings the criteria for third-party standing, Plaintiffs request that the Court allow Plaintiffs the opportunity to replead or submit additional affidavits to address any perceived deficiencies. *See id.* ("[I]t is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing.")

[11] For this reason, Defendants' reliance on *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205 (4th Cir. 2002), Defs.' Br. at 23 n.10, is misplaced. In that case, the Fourth Circuit rejected a physician's efforts to raise claims on behalf of her dialysis patients because the court reasoned that disabled and chronically ill patients are typical and frequent plaintiffs. *Id.* at 215. The same cannot be said for abortion patients. Indeed, courts have repeatedly recognized the extremely sensitive nature of a woman's decision to terminate her pregnancy. *See, e.g.*, *Casey*, 505 U.S. at 900 (noting the importance of keeping "the identity of each woman who has had an abortion . . . confidential" (citing *Bellotti v. Baird*, 443 U.S. 622, 655 (1979) (Stevens, J., concurring) ("It is inherent in the right to make the abortion decision that the right may be exercised without public scrutiny . . . .")); *Thornburgh*, 476 U.S. at 766-67 ("The decision to terminate a pregnancy is an intensely private one . . . .").

Act. Defendants' argument is simply wrong. *See, e.g.*, *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 324-25 (2006) (noting that respondents/plaintiffs brought suit under 42 U.S.C. § 1983 and that the district court granted injunctive relief under 28 U.S.C. § 2201(a), where plaintiffs raised claims on behalf of patients, *see Planned Parenthood of N. New England v. Heed*, 390 F.3d 53, 56 n.2 (1st Cir. 2004) (citing *Singleton*)); *Thornburgh*, 476 U.S. at 751 ("the plaintiffs, pursuant to 42 U.S.C. § 1983, sought declaratory and injunctive relief," where plaintiffs raised claims on behalf of patients, *see* 737 F.2d 283, 290 n.6 (3d Cir. 1984)); *Miller v. Montgomery Cnty.*, 458 Fed. Appx. 304, 307 n.6 (4th Cir. 2011) (analyzing plaintiff's Section 1983 claim and conducting third-party standing analysis).

For all these reasons, the Court should reject Defendants' standing argument.

## III.   PLAINTIFFS AGREE WITH DEFENDANTS THAT THIS COURT SHOULD ADOPT A REASONABLE SAVING CONSTRUCTION OF THE ACT.

In response to Plaintiffs' vagueness claim, Defendants argue *inter alia* that "statutes should be construed whenever possible so as to uphold their constitutionality." Defs.' Br. at 9. *See also id.* ("The duty of federal courts to impose saving constructions on state statutes is universal, and it applies with full force in void-for-vagueness challenges, and abortion litigation" (internal citations omitted)).[12] Plaintiffs agree. *See* Pls.' Br. at 26.

---

[12] Defendants also state that this Court should abstain to allow a state agency or court to impose a constitutional interpretation of the Act. Defs.' Br. at 5. But abstention is clearly not required

Specifically, Defendants state that this Court should read the term "Advanced Practice Nurse Practitioner in Obstetrics," which is included in the definition of "qualified technician," to mean that "a nurse practitioner who is certified in obstetrical ultrasonography may perform ultrasounds under the Act." Defs.' Br. at 5. Reading this critical term in this manner is both reasonable and in line with Plaintiffs' proposed interpretation. If the term were so construed by the Court, it would resolve Plaintiffs' vagueness claim as to this provision of the Act.

Defendants also propose to resolve Plaintiffs' vagueness concerns regarding the 72-hour exception in Section 90-21.85(a), which appears to grant an exception for some women who obtain a prior ultrasound from a different physician. Plaintiffs have argued that this provision does not give sufficient notice as to whether: this requires the physician providing the abortion to complete a certification; the ultrasound has to be performed within a certain time; this is an exception for women who obtain an ultrasound elsewhere. *See* Pls.' Br. in Supp. of Prelim. Inj. at 16.

According to Defendants, this provision allows "a physician (or qualified technician) other than the one who will perform the abortion [to] perform[] an ultrasound

---

because this Court can impose the reasonable saving constructions discussed below. Indeed, although Defendants base their abstention argument on *Bellotti v. Baird*, 428 U.S. 132 (1976), Defs.' Br. at 5, that case is wholly distinguishable because there the parties "[took] . . . entirely different view[s] of the statute" in question, *Bellotti*, 428 U.S. at 145, and thus there was no obvious reasonable construction for the court to adopt. *See also id.* at 148 n.16 ("The heated debate among the parties over the meaning of the statute is a strong indication of the ambiguities it contains.").

on the woman within 72 hours before the abortion," and so long as "that person provides the required certification, then the requirements of Section 90-21.85(a) have been met." Defs.' Br. at 6. Defendants add that "[n]othing in the 72-hour provision sets a time frame for when the physician performing the abortion may perform the ultrasound or exempts any abortions from the certification requirement." *Id.* This reading of Section 90-21.85(a) is reasonable, and, if endorsed by this Court, would resolve Plaintiffs' vagueness claim as to this provision of the Act.

Thus, Plaintiffs request that this Court find as a matter of the law that Section 90-21.85(a), including the term "qualified technician," be read in the manner Defendants have proposed, as outlined above.

## IV. THIS COURT CORRECTLY ENJOINED SECTION 90-21.85 IN ITS ENTIRETY.

As this Court recognized in its decision preliminarily enjoining Section 90-21.85, "[t]he parties agreed at oral argument that the requirements of [Section 90-21.85] rise and fall together." *Stuart*, 834 F. Supp. 2d at 437. Without explanation, Defendants now abandon their original reading of the Act and contend in a three-sentence argument[13] that portions of Section 90-21.85 are salvageable from the Act's unconstitutional speech/display requirement. The Court should reject Defendants' unsupported reversal

---

[13] Defendants' argument on this point is cursory and bereft of any citations. Under these circumstances, the Court could deem the argument waived. *See United States v. Andreas*, 150 F.3d 766, 769 (7th Cir. 1998) ("[P]erfunctory and undeveloped arguments . . . are waived[.]"); *accord Newton v. Astrue*, 559 F. Supp. 2d 662, 670-71 (E.D.N.C. 2008) (same).

23

of position and enjoin Section 90-21.85 in its entirety.

The principles governing this Court's decision whether to enjoin Section 90-21.85 as a whole are well-established. On the one hand, when faced with an unconstitutional statute, courts "[g]enerally . . . try to limit the solution to the problem" by "sever[ing] [the law's] problematic portions while leaving the remainder intact." *Ayotte*, 546 U.S. at 328-29 (citations omitted). But it is equally well-established that it is not always possible to sever unconstitutional phrases and subsections from a statutory provision. *See, e.g.*, *Randall v. Sorrell*, 548 U.S. 230, 262 (2006); *Reno v. ACLU*, 521 U.S. 844, 882-83 (1997). In particular, the court may not sever unconstitutional provisions when the valid and invalid provisions are intertwined, where the modified statute would be irrational or inoperative, or where the resultant severed statute would itself raise constitutional difficulties. *See Randall*, 548 U.S. at 262 (severance warranted only where remaining provisions are "fully operative as a law") (citation omitted);[14] *PSINet, Inc. v. Chapman*, 362 F.3d 227, 236-37 (4th Cir. 2004) (rejecting severance where modified statutory provision could "create[] First Amendment problems of its own"); *Springfield Armory, Inc. v. City of Columbus*, 29 F.3d 250, 254 (6th Cir. 1994) (declining to sever where "[s]uch a redaction would make the ordinance even more irrational than it is now"). And courts "must be careful not to encroach upon the domain of a state legislature by

---

[14] *See also Qwest Corp. v. City of Santa Fe, N.M.*, 380 F.3d 1258, 1274 (10th Cir. 2004); *Artistic Entm't, Inc. v. City of Warner Robins*, 331 F.3d 1196, 1204 (11th Cir. 2003).

24

rewriting a law to conform it to constitutional requirements."[15] *Legend Night Club v. Miller*, 637 F.3d 291, 301 (4th Cir. 2011) (quotation marks and citations omitted).

Under these principles, the Court was unquestionably correct to enjoin Section 90-21.85 as a whole. As an initial matter, this Court *did* "limit the solution to the problem," *Ayotte*, 546 U.S. at 328, when it crafted its narrow preliminary injunctive order, which "enjoin[ed] *only* the enforcement of section 90–21.85" but did "not enjoin the enforcement of the entire Act." *Stuart*, 834 F. Supp. 2d at 437 (emphasis added).

Defendants' new argument that the Court should attempt to sever portions within Section 90-21.85 itself turns entirely on their erroneous contention that "Plaintiffs' First Amendment challenge . . . only implicates two provisions" of Section 90-21.85. Defs.' Br. at 25 (citing "the first sentence of subsection (a)(2)" and subsection (a)(4)). But this argument fundamentally misreads Plaintiffs' claims, this Court's own First Amendment analysis, and Section 90-21.85. The unconstitutional expression mandated by Section 90-21.85 is not, as Defendants now contend, confined to the explanation/description requirements contained in subsections (a)(2) and (a)(4). Rather, as Plaintiffs have argued throughout this litigation, the First Amendment activity implicated by Section 90-21.85 "consists of both actual speech (verbal explanations and descriptions) and symbolic speech/expressive conduct (displaying ultrasound images, requiring the woman to wait

---

[15] These principles apply, of course, even when the statute contains a severability clause. A severability clause "is an aid merely; not an inexorable command." *Reno*, 521 U.S. at 884 n.49 (quotation marks and citation omitted).

four hours, requiring the woman's certification)."[16]  Third Am. Compl. ¶ 66.   Thus, for example, subsection (a)(3)'s image-display requirements are no less a part of the compelled expression than is the forced description of those images.  *See id.*[17]  Indeed, this Court recognized that the First Amendment impact of Section 90-21.85 is not confined to the provisions identified by Defendants in their motion when it held that Section 90-21.85 "compels content-based speech by providers; it requires providers to orally *and visually convey* specified material about the fetus to their patients."   *Stuart*, 834 F. Supp. 2d at 429 (footnote omitted, emphasis added).

Moreover, it is clear that the only purpose for subsection (a)(1)'s requirement that providers "[p]erform an obstetric real-time view of the unborn child on the pregnant woman" is to generate the images that the law unconstitutionally forces providers to convey and describe.  N.C. Gen. Stat. § 90-21.85(a)(1).  The Act makes it abundantly clear that this ultrasound procedure is to be performed "in order for" the images to be forced on the patient as part of the unconstitutional speech/display requirement and not for any medical or diagnostic purpose.  *Id.* at § 90-21.85(a).  Indeed, because abortion

---

[16]   *See also* Pls.' Br. at 12 ("Requiring a physician to show and describe in detail an embryo or fetus to a woman seeking an abortion and then requiring her to wait at least four hours before obtaining the procedure – regardless of whether she wants to see or hear the images, regardless of the reason she has chosen an abortion, and regardless even of whether her eyes and ears are open or closed – commandeers the physician to communicate an anti-choice message").

[17]   Once subsection (a)(3) is invalidated, subsection (a)(5)—which demands that the patient certify whether she looked at the unconstitutional forced display—would make no sense (and therefore certainly would not be "fully operative as a law," *Randall*, 548 U.S. at 262 (citation omitted)).  It must likewise be enjoined.

26

providers are *already* required by law to perform an ultrasound for diagnostic purposes, *see* 10A N.C. Admin. Code § 14E.0305(d), and because statutes must be read to have meaning, that is the only plausible reading of this subsection.  Thus, Subsection (a)(1) is part and parcel of the unconstitutional forced speech/display mandate and must likewise be enjoined.[18]

Similarly, Section 90-21.85(a)'s provision mandating a four-hour waiting period between an ultrasound display and the abortion would not be "fully operative as a law" once the ultrasound display itself is enjoined as unconstitutional.  *Randall*, 548 U.S. at 262 (citation omitted).  The purpose of the four-hour waiting period is unquestionably "intertwined" with the unconstitutional speech/display requirement, *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987) (quotation marks and citation omitted), as Defendants have themselves acknowledged, *see*, *e.g.*, Defs.' Br. in Opp. to Prelim. Inj. at 15 ("[L]ooking at and listening to this information prior to the four hour 'cooling of[f]' period, provides the pregnant woman with new and important information which will influence her understanding of her condition, her options and the best interest of herself and her unborn child.").  Indeed, enjoining the unconstitutional forced speech/display requirement but preserving the four-hour waiting period would be "even more irrational" than the present statutory scheme, *Springfield Armory*, 29 F.3d at 254, and would

---

[18]  Section 90-21.85(a)'s language concerning ultrasounds performed "within 72 hours before the abortion" similarly is not "fully operative as a law" in the absence of the speech/display requirement.  *Randall*, 548 U.S. at 262 (citation omitted).

27

"create[] [constitutional] problems of its own," *PSINet*, 362 F.3d at 236, because it would impose a delay on women seeking abortions with no corresponding informational benefit.[19] *See Casey*, 505 U.S. at 885 (linking the justification for a waiting period to the fact that "the statute directs that important information become part of the background of the decision"). As such, the Act's speech/display requirement and the waiting period requirement unquestionably rise and fall together.

For all of these reasons, Defendants are simply wrong to suggest that the First Amendment challenge here implicates just two subsections within Section 90-21.85. To the contrary, the First Amendment violations imposed by the forced speech/display requirement touch nearly *every* sentence within Section 90-21.85. Courts have not hesitated to hold under comparable circumstances that it would be inappropriate—and tantamount to drafting a new statute—to attempt to preserve individual lines or phrases within partially invalid statutory subsections when "the [invalid] provisions are intertwined with other regulations" such that "little remains" once the invalid provisions are stricken. *Qwest Corp.*, 380 F.3d at 1274; *see, e.g.*, *Randall*, 548 U.S. at 262; *Alaska Airlines*, 480 U.S. at 684; *Villas at Parkside Partners v. City of Farmers Branch*, 577 F. Supp. 2d 858, 875 (N.D. Tex. 2008) (declining to "strip[] phrases that are inextricably

---

[19] It would be no answer to this irrationality for Defendants to pin a newfound rationale for the waiting period on the fact that the Act requires abortion providers to "*offer* the pregnant woman the opportunity to hear the fetal heart tone." Act, § 90-21.85(a)(2) (emphasis added). As Plaintiffs have argued, *see supra* at Part II.A., imposing a mandatory waiting period on a woman seeking an abortion in order for her to ponder information *she has declined to receive* is simply irrational.

28

intertwined" because that would be equivalent to "writ[ing] new legislation"); *cf. Legend Night Club*, 637 F.3d at 301 ("[W]here a statute requires an amendment to pass constitutional muster, we cannot usurp the legislature's role and rewrite it.").

The unconstitutional speech/display requirement is the centerpiece of Section 90-21.85, and the unconstitutional provisions are interwoven throughout that Section. Under these circumstances, the appropriate course is for the Court to enjoin Section 90-21.85 in its entirety "while leaving the remainder [of the Woman's Right to Know Act] intact." *Ayotte*, 546 U.S. at 328-29.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion for summary judgment.

29

Dated: December 3, 2012

Respectfully submitted,

_/s/ Christopher Brook_                          _/s/ Julie Rikelman_
Christopher Brook, NC Bar #33838        Julie Rikelman
American Civil Liberties Union            Center for Reproductive Rights
of North Carolina Legal Foundation     120 Wall Street, 14th Floor
P.O. Box 28004                       New York, NY 10005
Raleigh, NC 27611                 (917) 637-3670
(919) 834-3466                   (917) 637-3666 Fax
(866) 511-1344 Fax              jrikelman@reprorights.org
cbrook@acluofnc.org

COUNSEL FOR ALL PLAINTIFFS

Helene T. Krasnoff               Walter Dellinger
Planned Parenthood Fed. Of America   O'Melveny & Myers LLP
1110 Vermont Avenue NW, Suite 300   1625 Eye Street NW
Washington, DC 20005            Washington, DC 20006
(202) 973-4800                   (202) 383-5300
helene.krasnoff@ppfa.org         (202) 383-5414 Fax
                                   wdellinger@omm.com

Diana O. Salgado
Planned Parenthood Fed. of America   Anton Metlitsky
434 W. 33rd Street               O'Melveny & Myers LLP
New York, NY 10001            Times Square Tower
(212) 541-7800                   7 Times Square
(212) 247-6811 Fax            New York, NY 10036
diana.salgado@ppfa.org          (212) 326-2000
                                   (212) 326-2061 Fax

COUNSEL FOR PLANNED         ametlitsky@omm.com
PARENTHOOD OF CENTRAL NORTH
CAROLINA & PLANNED
PARENTHOOD HEALTH SYSTEMS,  COUNSEL FOR GRETCHEN S.
INC.                            STUART, M.D., DAVID A. GRIMES,
                                   M.D., AMY BRYANT, M.D., DECKER
Andrew D. Beck                 & WATSON d/b/a PIEDMONT
American Civil Liberties Union        CAROLINA MEDICAL CLINIC, & A
Foundation                     WOMAN'S CHOICE OF RALEIGH,
                                     INC.

125 Broad Street
New York, NY 10004
(212) 284-7318
(212) 549-2651 Fax
abeck@aclu.org

COUNSEL FOR JAMES R.
DINGFELDER, M.D., SERINA FLOYD,
M.D., TAKEY CRIST, M.D., & TAKEY
CRIST M.D., P.A. d/b/a CRIST CLINIC
FOR WOMEN

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of December, 2012, I electronically filed the foregoing **PLAINTIFFS' OPPOSITON TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing.

*/s/ Christopher Brook*
Christopher Brook, NC Bar #33838
American Civil Liberties Union
of North Carolina Legal Foundation
P.O. Box 28004
Raleigh, NC 27611
(919) 834-3466
(866) 511-1344 Fax
cbrook@acluofnc.org

COUNSEL FOR ALL PLAINTIFFS