# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### GREENSBORO DIVISION

GRETCHEN S. STUART, M.D., et al.,   )
                                         )
                Plaintiffs,     )
                                         )
     – against –           )   Case No. 1:11-CV-00804
                                         )
RALPH LOOMIS, M.D., et al.,      )
                                         )
                Defendants.    )

## THE DEFENDANTS' MEMORANDUM OF LAW IN RESPONSE AND IN OPPOSITION TO THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# INDEX

**Page Number**

TABLE OF AUTHORITIES ……………………………………………..……………….....ii

PRELIMINARY STATEMENT …………………………………………..…………….1

NATURE OF THE CASE ……………………………………………….…………...1

STATEMENT OF THE FACTS ……………………………………………………...2

QUESTIONS PRESENTED ……………………………………………………5

ARGUMENT …………………………………………………………….………...5

     A.  The Act Does Not Violate the
        Plaintiffs' First Amendment
        Rights ……………………………………………………………...6

     B.  The Factual and Logical Premises
        Underlying the Plaintiffs' Position
        in this Case Demonstrate That Their
        First Amendment Argument is
        Neither Sound Nor Well Grounded ……………………………………14

CONCLUSION ………………………………………………………………16

CERTIFICATE OF FILING AND SERVICE ……………………………………18

# TABLE OF AUTHORITIES

**Page**

**Statutes and Rules**

United States Constitution, First Amendment ……………………………………………5

N.C. Gen. Stat. §§90-21.80, *et seq.* (the "Woman's
Right to Know Act") ………………………………………………….…………1

N.C. Gen. Stat. §90-21.85 …………………………………………………….………2

10A N.C.A.C. 14E.0305(d) …………………………………………….………….………2

**Cases**

*Axson-Flynn v. Johnson*, 356 F.3d 1277 (10th Cir. 2004) …………………………………..8

*Bery v. City of New York*, 97 F.3d 689 (2nd Cir. 1996),
*cert. denied*, 520 U.S. 1251 (1997) …………………………………………………8

*Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729
(2011) …………………………………………………………………………8

*Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002), *cert.
denied*, 540 U.S. 946 (2003) …………………………………………………8

*Gonzales v. Carhart*, 550 U.S. 124 (2007) …………………………………..………………9

*Greater Baltimore Center for Pregnancy Concerns v.
Mayor and City Council of Baltimore*, 683 F.3d 539
(4th Cir. decided June 27, 2012; rev. op. issued July 6,
2012), *pet. for rehearing en banc granted sub nom.
Greater Baltimore Center for Pregnancy Concerns, Inc.
v. Mayor and City Council of Baltimore and St. Brigid's
Roman Catholic Congregation Inc. v. Mayor and City
Council of Baltimore*, __ F.3d __, Nos. 11-1111 (L),
11-1185 (4th Cir. Aug. 15, 2012) ………………………………………………..13

*Hersh v. United States, ex rel. Mukasey*, 553 F.3d 743
(5th Cir. 2008), *cert. denied,* 130 S. Ct. 1878 (2010) …………………………………8

*Hurley v. Irish-American Gay, Lesbian & Bisexual
Group of Boston*, 515 U.S. 557 (1995) …………………………………………..8

*Legal Services v. Velasquez*, 531 U.S. 533 (2001) ...................................................8

*Pacific Gas & Electric Co. v. Public Utilities Comm'n
of California*, 475 U.S. 1 (1986) .................................................................8

*Planned Parenthood Minnesota, North Dakota, South
Dakota v. Daugaard*, 799 F. Supp.2d 1048 (D.S.D.
2011) .....................................................................................................7

*Planned Parenthood Minnesota, North Dakota, South
Dakota v. Rounds*, 530 F.3d 724 (8th Cir. 2008), *rev'd
in part on other grounds*, 686 F.3d 889 (8th Cir. 2012)
*(reh'ing en banc)* .................................................................................12

*Planned Parenthood of Southeastern Pennsylvania
v. Casey*, 505 U.S. 833 (1992) ....................................................................5

*R.A.F. v. City of St. Paul, Minnesota*, 505 U.S. 377
(1992) .....................................................................................................8

*Riley v. National Federation of the Blind of North
Carolina, Inc.,* 487 U.S. 781 (1988) .............................................................8

*R.J. Reynolds Tobacco Co. v. FDA*, Nos. 11-5332, 12-5063,
2012 WL 3632003 (D.C. Cir. Aug. 24, 2012) ...................................................8

*Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653 (2011) .........................................8

*Texas Medical Providers Performing Abortion Services
v. Lakey*, 667 F.3d 570 (5th Cir. 2012) .......................................................11

*Wollschlaeger v. Farmer*, No. 11-22026, 2012 WL
3064336 (S.D. Fla. June 29, 2012) ...............................................................8

*Wooley v. Maynard*, 430 U.S. 705 (1977) .....................................................8

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

GRETCHEN S. STUART, M.D., et al.,     )
                                         )
               Plaintiffs,        )
                                         )
    – against –             )     Case No. 1:11-CV-00804
                                         )
RALPH LOOMIS, M.D., et al.,       )
                                         )
              Defendants.     )

## THE DEFENDANTS' MEMORANDUM OF LAW IN RESPONSE AND IN OPPOSITION TO THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

### PRELIMINARY STATEMENT

The Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment (the "Defendants' Initial Brief") contains a full and complete statement of the reasons why their Motion for Summary Judgment should be granted. In response to the Plaintiffs' Memorandum of Law in Support of Their Motion for Summary Judgment (the "Plaintiffs' Initial Brief"), the Defendants refer the Court to their Initial Brief, which the Defendants incorporate by reference herein. In this Memorandum of Law, the Defendants limit their remarks to a response to certain statements and arguments made in the Plaintiffs' Initial Brief which are inaccurate, incomplete and/or misleading and a response to the underlying premise of the Plaintiffs' position in this case.

### NATURE OF THE CASE

This case involves a challenge to the Women's Right to Know Act, N.C. Gen. Stat. §§90-21.80, *et seq.* (the "Act"). The Plaintiffs – physicians who perform abortions in their practices and clinics that employ physicians who perform abortions – complain that certain provisions of

the Act violate their constitutional rights and the constitutional rights of women seeking abortions. The Defendants maintain that the Plaintiffs lack standing to advance their patients' rights in this litigation and seek summary judgment on each of the Plaintiffs' claims.

## STATEMENT OF THE FACTS

For their Statement of the Facts relevant to the Plaintiffs' Motion for Summary Judgment and their response to that Motion, the Defendants refer the Court to the Statement of Facts contained in their Initial Brief.

In addition, however, the Defendants will here briefly address a few of the more significant factual misstatements that are contained in the Plaintiffs' Initial Brief.

The Plaintiffs assert as fact that the Act's "Display of Real-Time View Requirement," N.C. Gen. Stat. §90-21.85(a), imposes a "uniquely intrusive and harmful requirement on how physicians must speak to and treat their patients" – namely, the requirement that they perform a vaginal or abdominal ultrasound on a patient, "even if the patient objects," "even if the patient attempts physically to resist" and "no matter what the patient's reasons are for choosing an abortion." (Plaintiffs' Initial Brief at page 1)

This is untrue.

The law in North Carolina as it existed *prior* to the enactment of N.C. Gen. Stat. §90-21.85 mandated that all women undergo an ultrasound procedure prior to having an abortion. 10A N.C.A.C. 14E.0305(d). The Act merely requires that, unless the woman elects to undergo two separate ultrasound procedures, which the Act does *not* mandate, the ultrasound procedure required by preexisting North Carolina law must be performed on the woman no more than 72 hours and no less than 4 hours before the abortion. N.C. Gen. Stat. §90-21.85 (a). Furthermore,

Case 1:11-cv-00804-CCE-LPA   Document 131   Filed 12/03/12   Page 6 of 22

the Act does not create, expand upon or even address any requirement that the ultrasound procedure be performed vaginally or abdominally.

The Plaintiffs also assert that:

> [t]he Act ... compels doctors, ..., either to insert an ultrasound probe into the woman's vagina or place it on her abdomen as she lies supine on an examination table. The patient must be partially undressed, either exposing the lower portion of her abdomen or naked from the waist down with only a drape covering her, in essence captive, under the physician's control, while the patient has the probe in or on her.

(Plaintiffs' Initial Brief at page 3)

These statements are likewise untrue. Not only does the Act not create the requirement that a woman undergo an ultrasound procedure prior to having an abortion, but it manifestly does not mandate the position or posture that the woman is to occupy in the physician's examination room during the ultrasound procedure or the manner, nature or extent of her clothing during the examination. In addition, the fact that, as a matter of accepted medical practice among physicians, the ultrasound procedure necessarily requires that the physician either insert an ultrasound probe into the woman or place it on her abdomen is neither new nor attributable to the Act. It is inherent to the ultrasound procedure as it exists and has existed since before the Act became law. Indeed, this is not something that the Act even purports to speak to. The same is true of the Plaintiffs' complaint that, during the ultrasound procedure, the woman is "under the physician's control, while [she] has the probe in or on her." This is not the result of anything contained in the Act and is simply a function of the nature of the ultrasound procedure and accepted medical practice among physicians.

The Plaintiffs' assertion that the Act requires them to display and describe the ultrasound image to their patients, even if they object – in fact, "even if the patient[s] attempt[] physically to

–3–

resist" (Plaintiffs' Initial Brief at page 1) – is so materially misleading as to be untrue in its essence. The reality is that the Act requires the physician to make the ultrasound image available for the woman to see *if she wishes to avail herself of the opportunity to see it*; to describe the ultrasound image to the woman *if she wishes to avail herself of the opportunity to hear what the physician is saying*; and to allow the woman to listen to the fetus' heart beat, if it can be heard *and if she wishes to avail herself of the opportunity to listen.*

Put another way, the Act requires the physician to "broadcast" or "transmit" this informed consent information to the patient, but it does not require the patient to "receive" these "broadcasts" or "transmissions." The Act requires the physician to provide the patient with the *opportunity* to see and hear, but it does not require the patient to watch or listen to the results of the ultrasound. Consequently, the Act does not prohibit the woman from averting her eyes or refusing to listen to the physician's description of the ultrasound image or the fetal heart beat.

Indeed, nothing contained in the Act prohibits a physician from:

• equipping his or her examination rooms with earphones and blinders that can be used by patients who elect not to hear the fetal heart beat and the physician's description of the ultrasound image and/or who elect not to see the ultrasound image; or

• informing his or her patients that what the physician is about to depict and say to the patient in compliance with N.C. Gen. Stat. §90-21.85(a) may be disturbing to the patient, that the patient is free to elect not to watch or listen to these depictions, descriptions and sounds and that, if the patient so elects, she may use the earphones and blinders that the physician has made available for those purposes.

Thus, in reality, the Act requires abortion-providing physicians to *offer* the informed consent information that is identified in the Act to their patients. It does not require patients to

–4–

listen to, watch or otherwise avail themselves of the offered information, and it is entirely feasible for patients to totally ignore and avoid all of this offered information.

## STATEMENT OF THE QUESTIONS PRESENTED

As the Defendants stated in their Initial Brief, the questions presented by the parties' motions for summary judgment are:

I.  Whether the "Woman's Right to Know Act," N.C. Gen. Stat. §§90-21.80, *et seq.*, is Unconstitutionally Vague on its Face, Despite the Fact That Each Provision of the Act Has a Reasonable and Valid Construction and Nothing in the Act is So Vague as to Require Invalidation of the Act in its Entirety?

II. Whether the "Woman's Right to Know Act," N.C. Gen. Stat. §§90-21.80, *et seq.*, Which Requires the Physician-Plaintiffs Who Perform Abortions to Provide Truthful, Non-Misleading Information Relevant to a Patient's Decision to Abort Her Unborn Child in Order to Secure Informed Consent for the Abortion, Violates the Physician-Plaintiffs' Constitutional Rights Under the Standards of Review Described in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992)?

## ARGUMENT

For their response to the arguments made by the Plaintiffs' in their Initial Brief and, in particular, for their arguments regarding the first question above, the Defendants refer the Court to the Argument section of their Initial Brief.

The Defendants limit their responsive Argument in this brief to two subjects.  First, the Defendants respond to the Plaintiffs' argument that the Act is invalid under the First Amendment to the United States Constitution, despite the United States Supreme Court's decision in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992).  (Plaintiffs' Initial Brief at pages 8-22)  Second, the Defendants respond to the Plaintiffs' underlying factual and logical premises in this case.  Specifically, the Defendants respond to the notion underlying the

Case 1:11-cv-00804-CCE-LPA   Document 131   Filed 12/03/12   Page 9 of 22

Plaintiffs' position in this case that the only type of informed consent information that the State may constitutionally require to be offered by abortion-providing physicians to their patients is highly remote, sterile, scientifically and medically technical, ponderous and essentially academic information about some other woman's pregnancy and abortion (or pregnancy and abortion in general) and some other woman's fetus. The Defendants also respond to the notion underlying the Plaintiffs' position in this case that the Constitution requires that pregnant women considering an abortion should be given less rather than more information, information that is less relevant to them as individuals rather than information about their own unique pregnancies and their own fetuses and information in which the pregnant woman is less likely to take an interest or to which she is less likely to pay any attention.

## A.

### The Act Does Not Violate the Plaintiffs' First Amendment Rights.

The primary thrust of the Plaintiffs' Initial Brief is that the Act's "Display of Real-Time View Requirement" violates their First Amendment rights by forcing them to say the things and convey the visual and aural information mandated by N.C. Gen. Stat. §90-21.85(a). They assert that the strict scrutiny test applies to – and invalidates – this requirement of the Act, because it compels speech, and that, consequently, the strict scrutiny test applies whether the speech mandated by the Act is deemed to be ideological or factual. (Plaintiffs' Brief at page 9) The Plaintiffs also argue that the strict scrutiny test applies to – and invalidates – the Act because it imposes content and speaker-based restrictions on their speech. (Plaintiffs' Brief at page 13)

These arguments are in direct conflict with and will not withstand scrutiny under the Supreme Court's decision in *Casey*.

–6–

As an initial matter, the Defendants note that, in making these arguments concerning compelled speech, content- and speaker-based restrictions on speech and the alleged applicability of the strict scrutiny test to the Act, the Plaintiffs cite as supporting authorities *Casey*, for the proposition that "the State's interest in potential life is 'important,' 'legitimate' and 'substantial'" (a proposition with which the Defendants agree), and this Court's written decision and interlocutory Order on the Plaintiffs' Motion for a Preliminary Injunction, a decision that this Court made at the very outset of this case on a virtually non-existent factual record.

The Plaintiffs also cite as a supporting authority an interlocutory, non-final order and written decision entering a preliminary injunction by a United States District Court in South Dakota in *Planned Parenthood Minnesota, North Dakota, South Dakota v. Daugaard*, 799 F. Supp.2d 1048, 1054 (D.S.D. 2011), in which the court expressly held that it was *not* ruling on the physician-plaintiff's claim that the statute in question violated the *physician's* right to free speech, *id*. at 1054 n. 4, and in which the court held instead that the statute at issue there violated the abortion *patient's* free speech rights by forcing her to report to a "pregnancy help center" the fact that she was contemplating having an abortion. *Id.* at 1056-57. It was only that aspect of the statute in *Daugaard* that the court held was subject to strict scrutiny. *Id.*

This renders *Daugaard* wholly distinguishable from the case now before this Court, given that, *inter alia*, the issue here is whether the physician-plaintiffs' speech rights should be evaluated, as mandated by *Casey*, within the context of the state's right to regulate the practice of medicine and as part of the state's authority to enact medical informed consent regulations.

Beyond these three case citations, the Plaintiffs cite 15 cases in support of their argument that the strict scrutiny test applies to the Court's analysis in this informed consent to abortion case. All of these 15 cases are significantly distinguishable factually from this case in that, *inter*

*alia*, they did not even arise in the context of a state law regulating abortion or the manner in which physicians are to perform abortions.[1]

The case supplying the legal principles controlling the decision in this case is *Casey*. There, the Supreme Court clearly stated that states may constitutionally require physicians to say specific things to a patient and provide a patient with specific information in order to ensure that

---

[1] These cases are, in the order in which the Plaintiffs cite them, *Legal Services v. Velasquez*, 531 U.S. 533 (2001) (suit by a nonprofit legal services organization challenging a funding law that restricted the types of arguments that a legal services lawyer may make in seeking relief on behalf of indigent clients); *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781 (1988) (suit by charities challenging a state solicitation law on the ground that it violated the charities' free speech rights); *Pacific Gas & Electric Co. v. Public Utilities Comm'n of California*, 475 U.S. 1 (1986) (suit by a public utility company challenging a ruling by a state utilities commission that the utility had to include political editorials in the billing materials it sent to its customers, despite the fact that the utility disagreed with the editorials); *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557 (1995) (suit by private parade organizer challenging a law that purported to require it to include in its parade a group with whose views it disagreed); *Hersh v. United States, ex rel. Mukasey*, 553 F.3d 743 (5th Cir. 2008), *cert. denied*, 130 S. Ct. 1878 (2010) (suit over the interpretation of Bankruptcy Code provisions and whether attorneys are "debt relief agencies" under the Bankruptcy Code); *Axson-Flynn v. Johnson*, 356 F.3d 1277 (10th Cir. 2004) (suit by a Mormon college student against her college claiming that it was forcing her to use what she considered to be offensive words that violated her religious beliefs by requiring her to read a script in class); *Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653 (2011) (challenge to a state statute preventing pharmaceutical "detailers" from obtaining prescriber-identification information which the law made readily available to others); *Wooley v. Maynard*, 430 U.S. 705 (1977) (suit challenging the plaintiffs' criminal prosecution for covering up the state's motto, "Live Free or Die," on their automobile license plates); *R.J. Reynolds Tobacco Co. v. FDA*, Nos. 11-5332, 12-5063, 2012 WL 3632003 (D.C. Cir. Aug. 24, 2012) (suit by a cigarette manufacturer challenging the FDA's rule requiring it to place graphic warnings on its product packaging); *Bery v. City of New York*, 97 F.3d 689 (2nd Cir. 1996), *cert. denied*, 520 U.S. 1251 (1997) (suit challenging an ordinance severely restricting the right of persons to engage in retail sale of works of art); *R.A.F. v. City of St. Paul, Minnesota*, 505 U.S. 377 (1992) (challenge to a criminal prosecution of the defendant for allegedly burning a cross in the yard of an African-American family); *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002), *cert. denied*, 540 U.S. 946 (2003) (suit over a law that prohibited physicians from recommending the use of Marijuana for medical purposes); *Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729 (2011) (suit challenging the sale of "violent" video games); *Edenfield v. Fane*, 507 U.S. 761 (challenge to professional group's [C.P.A.s'] anti-solicitation rules); and *Wollschlaeger v. Farmer*, No. 11-22026, 2012 WL 3064336 (S.D. Fla. June 29, 2012) (challenge to a law forbidding physicians from recording in patients' records or from disclosing the fact that a patient owned a firearm unless it was relevant to the patient's health or safety).

Case 1:11-cv-00804-CCE-LPA   Document 131   Filed 12/03/12   Page 12 of 22

the patient's consent to a medical procedure is fully informed. 505 U.S. at 881. The *Casey* Court stated that a state may constitutionally enact such an informed consent law as part of its power to regulate medical practice and practitioners. *Id.* at 884.

The Plaintiffs incorrectly argue that the *Casey* Court did not deal with or consider the state statute at issue in that case in terms of whether it violated the physician-plaintiffs' First Amendment rights. In fact, however, the *Casey* Court expressly recognized that the First Amendment rights of the physician-plaintiffs in that case *were* implicated, but "only as part of the practice of medicine, subject to reasonable licensing and regulation by the state." *Id.* The Court also stated that "a requirement that a doctor give a woman certain information as part of obtaining her consent to an abortion is, for constitutional purposes, no different from a requirement that a doctor give certain specific information about any medical procedure." *Id.*

Thus, the *Casey* Court concluded that, notwithstanding a physician's First Amendment rights, a state may constitutionally require the physician to provide a woman seeking an abortion with truthful, non-misleading information about, *inter alia*, the health risks of abortion to the pregnant woman. *Id.* at 883. In that context, the Court specifically recognized – and thereby established as a matter of binding precedent – that one of the health risks that is associated with any woman's decision to go through with an abortion is the "devastating psychological consequence[]" that can ensue when she discovers only after her abortion that "her decision was not fully informed." *Id. See also Gonzales v. Carhart*, 550 U.S. 124, 159 (2007) ("Whether to have an abortion requires a difficult and painful moral decision. While we find no reliable data to measure the phenomenon, it seems unexceptional to conclude [that] some women come to regret their choice …").

–9–

This principle from *Casey* applies fully to the informed consent to abortion provisions of N.C. Gen. Stat. §90-21.85(a). The Act represents an attempt by the General Assembly to provide women seeking abortions with what all parties to this case concede is truthful, non-misleading information which, if the pregnant woman avails herself of it, considers it and voluntarily acts on it, could save her from suffering the potentially devastating psychological injuries that are described by the *Casey* Court.

The *Casey* Court also made clear that states may constitutionally enact laws that require physicians to inform their abortion patients of truthful, non-misleading information going not only to the health risks to the woman should she decide to go through with the abortion, but also truthful, non-misleading information going to an abortion's "impact on the fetus." *Id.* Indeed, the *Casey* Court said "It cannot be doubted that most women considering an abortion would deem the impact on the fetus relevant, if not dispositive, to the decision." *Id.*

The *Casey* Court's findings and its description of the physicians' limited speech rights apply directly to the informed consent to abortion provisions of N.C. Gen. Stat. §90-21.85(a). The visual and aural information from the sonogram that the Act requires physicians to offer to their patients seeking abortions is a sight and sound depiction of the fetus itself. And the fetus depicted and described in this informed consent information is not some *other* woman's fetus, but rather the patient's own unborn child. It is depicted exactly as it exists and in real-time. As the Supreme Court stated in *Casey*, "It cannot be doubted that most women considering an abortion would deem the impact on the fetus relevant, if not dispositive, to the decision." The information that the Act makes available to a woman who is seeking an abortion is the most obvious, direct, immediate and relevant type of information imaginable concerning an abortion's

impact on her fetus. Therefore, the obligation to make that information available to the woman cannot be a violation of the physician-plaintiffs' free speech rights.

The *Casey* Court expressly eschewed the strict scrutiny test for state informed consent laws. *E.g.,* 505 U.S. at 871-74. Instead, it made clear that the constitutional test of informed consent laws is whether they constitute an undue burden on a woman's right to have an abortion. *Id.* at 872-74, 877. *See also Texas Medical Providers Performing Abortion Services v. Lakey*, 667 F.3d 570, 576 (5th Cir. 2012) (*Casey* and *Gonzales* make clear that "laws [like the one at issue here] … do not fall under the rubric of compelling 'ideological' speech that triggers First Amendment strict scrutiny."). In doing so, the *Casey* Court stated that:

> What is at stake is the woman's right to make the ultimate decision, not a right to be insulated from all others in doing so. Regulations which do no more than create a structural mechanism by which the state, or the parent or guardian of a minor, may express profound respect for the life of the unborn are permitted, if they are not a substantial obstacle to the woman's exercise of the right to choose. [Citation omitted] Unless it has that effect on her right of choice, a state measure designed to persuade her to choose childbirth over abortion will be upheld if it is reasonably related to that goal. Regulations designed to foster the health of a woman seeking an abortion are [likewise] valid if they do not constitute an undue burden.

*Id.* at 877-78.

The *Casey* Court also made clear that a state informed consent to abortion law that does not create a substantial obstacle to the woman's exercise of the right to choose is constitutionally valid even if the materials or information that the law requires to be offered to the woman clearly express a preference for childbirth over abortion. *Id.* at 883.

Although the state law under challenge in *Casey* did not mandate that the abortion-providing physicians in that case offer to their patients the same *type* of information that is at

Case 1:11-cv-00804-CCE-LPA   Document 131   Filed 12/03/12   Page 15 of 22

issue in this case, both *Casey* and this case involve state laws that require only that the physician *offer* certain informed consent to abortion information to the patient. Neither the laws at issue in *Casey* nor the Act now before this Court requires the physician to *force* the patient to look at, listen to or otherwise receive the information that those laws require be made available to the patient. In other words, in both *Casey* and this case, the woman may decline to accept the offered information – by declining to review and read the materials required in *Casey* or by not looking at the sonogram and not listening to the physician's description or the fetal heart beat (as described above in the Statement of the Facts).

In short, the Act's informed consent provisions do not create a substantial obstacle to a woman's exercise of the right to choose. Thus, the Act's provisions do not constitute an undue burden on a woman's right to have an abortion.

For all of these reasons, the *Casey* decision requires that N.C. Gen. Stat. §90-21.85(a) be held to be constitutionally valid.

The United States Courts of Appeals for the Fifth and Eighth Circuits have reached similar conclusions regarding the holdings and effect of *Casey*. *Texas Medical Providers Performing Abortion Services v. Lakey*, 667 F.3d 570 (5th Cir. 2012); *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*, 530 F.3d 724 (8th Cir. 2008), *rev'd in part on other grounds*, 686 F.3d 889 (8th Cir. 2012) (*reh'ing en banc*).

Following a detailed analysis of *Casey*, the *Lakey* court held that a Texas informed consent to abortion statute that is remarkably similar to the Act was constitutional under, *inter alia*, *Casey*. The *Lakey* court concluded that: (i) state informed consent laws that do not impose an undue burden on a woman's right to have an abortion are permissible if they require the provision of truthful, non-misleading and relevant disclosures; (ii) such laws are part of the

–12–

state's reasonable regulation of medical practice and do not fall under the rubric of compelling "ideological" speech that triggers First Amendment strict scrutiny; and (iii) "relevant" informed consent may address itself not only to the physical and psychological risks to the expectant mother who is facing this "difficult moral decision," but also to the state's legitimate interests in "protecting the potential life within her." *Lakey*, 667 F.3d at 576.

The *Rounds* court also upheld an informed consent provision pursuant to *Casey*, holding that:

> [W]hile the State cannot compel an individual simply to speak the State's ideological message, it can use its regulatory authority to require a physician to provide truthful, non-misleading information relevant to a patient's decision to have an abortion, even if that information might also encourage the patient to choose childbirth over abortion.

530 F.3d at 734-35.

Furthermore, a panel of the United States Court of Appeals for the Fourth Circuit has recognized that *Casey* concluded that a state law mandating disclosures that are focused on the speech of licensed medical professionals is constitutionally valid even when that law implicates a physician's right not to speak, where the law does so only as part of the practice of medicine, which is subject to reasonable licensing and regulation by the State. *Greater Baltimore Center for Pregnancy Concerns v. Mayor and City Council of Baltimore*, 683 F.3d 539 (4th Cir. decided June 27, 2012; rev. op. issued July 6, 2012), *pet. for rehearing en banc granted sub nom. Greater Baltimore Center for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore and St. Brigid's Roman Catholic Congregation Inc. v. Mayor and City Council of Baltimore*, __ F.3d __, Nos. 11-1111 (L), 11-1185 (4th Cir. Aug. 15, 2012).[2]

---

[2] Oral argument is scheduled to be heard in the Fourth Circuit's *en banc* rehearing of this decision on December 6, 2012.

In *Greater Baltimore*, the panel originally deciding the case considered an ordinance requiring limited-service pregnancy centers to post signs making clear that they did not provide or make referrals for birth control or abortion services and determined that the ordinance was subject to strict scrutiny. In doing so, however, the court specifically distinguished the speech in that case from the type of speech that was at issue in *Casey* (and in this case):

> In *Casey*, the mandatory disclosures focused on the speech of licensed medical professionals, and the regulations were upheld because, even though they implicated a physician's right not to speak, they did so 'only as part of the practice of medicine, subject to reasonable licensing and regulation by the State.' *Casey*, 505 U.S. at 884. More particularly, the regulations there were permissible because they facilitated the process of obtaining a patient's informed consent prior to performing a medical procedure. Thus the regulation of such professional speech was imposed incidental to the broader governmental regulation of a profession and was justified by this larger context.

*Greater Baltimore*, 683 F.3d at 554. The Fourth Circuit panel deciding *Greater Baltimore* thus recognized that *Casey* mandates the application of a different standard for professional speech, particularly in the informed consent context.

## B.

### The Factual and Logical Premises Underlying the Plaintiffs' Position in This Case Demonstrate That Their First Amendment Argument is Neither Sound Nor Well Grounded.

The Plaintiffs' position in this case is marked by a starkly obvious anomaly. They state in their Initial Brief and in their various declarations that they are committed to providing their patients with all the information necessary to enable them to make a fully informed decision as to whether to undergo an abortion procedure. (Plaintiffs' Initial Brief at page 6) They also state that they are committed to providing their patients with informed consent information that is individually-tailored to each patient's unique circumstances. (Plaintiffs' Initial Brief at page 5)

–14–

Indeed, they criticize the Act because they claim that it mandates a one-size-fits-all approach to informed consent. (*Id.*)

But the only information that the Plaintiffs indicate they are willing to offer to their patients is literature (including still photographs) on the general subjects of pregnancy, fetuses, abortions, the health benefits and risks of childbirth and abortion and so forth. In other words, in a twenty-first century world in which most people get their information aurally or visually, the Plaintiffs are willing to offer their patients information that, both in its substance and in its medium of delivery, is dry, remote, academic, technical, ponderous to read, difficult to understand, not personally relevant to the individual recipient and, most importantly, not about *the individual recipient's* pregnancy, *the individual recipient's* fetus or *the individual recipient's* abortion. Put another way, the Plaintiffs are claiming a constitutional right to withhold from their patients the best and most accessible information about their pregnancies.

The Plaintiffs are strongly opposed to offering a patient information that is about her in particular, her pregnancy in particular and her fetus in particular, despite the fact that most people view information about themselves as more relevant to them and more compelling than information about others. The Plaintiffs are equally strongly opposed to the *medium* by which the information identified by the Act is to be offered to the patient, even though common human experience strongly suggests that that medium – what amounts to a motion picture with sound and in real-time of the individual patient's fetus – is likely to attract the interest of the patient, such that the patient will be far more likely to actually want to avail herself of (that is, watch and listen to) this uniquely relevant and individually-tailored information.

The logic of the Plaintiffs' position in this case is that the Constitution prefers, indeed, mandates, that they provide their patients with less relevant information, less direct information,

–15–

less compelling information, less impactful information and, thus, less effective information than that which modern technology makes possible. The Plaintiffs' position is contrary not only to the concept of medical informed consent – the very subject of the legislation that is under attack in this case – but also to the traditional constitutional principle that, in our constitutional scheme, more and better information, not less, is always preferable and always superior.

All parties to this case agree that the information that the Act requires physicians to offer to their patients is truthful and non-misleading. The record shows that the information at issue in this case is individually-tailored and uniquely relevant to each patient. Moreover, the medium by which this information is offered is more immediate and compelling than mere text. Thus, it is much more likely to attract the interest, attention and thoughtful consideration of the patient. Given that the information that the Act requires physicians to offer to their abortion patients is directly related to securing the patient's informed consent, these are sufficient reasons to uphold the Act.

## CONCLUSION

For each of the foregoing reasons, as well as the reasons more particularly set forth in the Defendants' Initial Brief, the State of North Carolina, acting by and on behalf of all of the Defendants in this case, respectfully prays that the Court deny the Plaintiffs' Motion for Summary Judgment, grant the Defendants' Motion for Summary Judgment and dismiss the Plaintiffs' Complaint, including each and every claim for relief asserted therein, with prejudice.

Respectfully submitted this 3rd day of December 2012.

                                    /S/ Thomas J. Ziko
                                Thomas J. Ziko
                                North Carolina State Bar Number 8577
                                *Attorney for the State of North Carolina*

                                Senior Deputy Attorney General
                                North Carolina Department of Justice
                                114 West Edenton Street
                                Raleigh, North Carolina 27603
                                Post Office Box 629
                                Raleigh, North Carolina 27602-0629
                                Telephone number: 919/716-6900
                                Facsimile number: 919/716-6763
                                Email address: tziko@ncdoj.gov


                                    /S/ I. Faison Hicks
                                I. Faison Hicks
                                North Carolina State Bar Number 10672
                                *Attorney for the State of North Carolina*

                                Special Deputy Attorney General
                                North Carolina Department of Justice
                                114 West Edenton Street
                                Raleigh, North Carolina 27603
                                Post Office Box 629
                                Raleigh, North Carolina 27602-0629
                                Telephone number: 919/716-6629
                                Facsimile number: 919/716-6763
                                Email address: fhicks@ncdoj.gov

## CERTIFICATE OF SERVICE

This is to certify that, on the 3rd day of December 2012, I caused a copy of the foregoing to be electronically filed with the Office of the Clerk of Court of the United States District Court for the Middle District of North Carolina using the CM/ECF system, which will automatically send notification of such filing to all registered CM/ECF participants, including counsel for each of the parties in this action.

_____/S/ I. Faison Hicks_____
I. Faison Hicks