IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| GRETCHEN S. STUART, M.D., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION |
| | ) | |
| RALPH C. LOOMIS, M.D., et al., | ) | Case No. 1:11-cv-00804 |
| | ) | |
| Defendants. | ) | |

# PLAINTIFFS' SUPPLEMENTAL BRIEF
# IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

In response to the Court's July 9, 2013 Order, Plaintiffs submit this brief to address relevant decisions issued since the parties completed summary judgment briefing. These decisions cement three key legal principles relevant to this case: (i) the First Amendment protects against speech compelled by the government; (ii) when the government compels speech that is not purely commercial, its actions are subject to strict scrutiny, regardless of whether the compelled speech is factual or ideological; and, (iii) context is crucial when determining the standard of review applicable to a First Amendment compelled speech claim.

## I. Recent Decisions Confirm That Compelled Speech That Is Not Purely Commercial Is Subject To Strict Scrutiny.

### A. The Fourth Circuit Has Applied Strict Scrutiny To Decide Challenges To Compelled Speech That Is Not Purely Commercial.

The Court has asked the parties to address three specific Fourth Circuit decisions. Two of these decisions, *Greater Baltimore Center for Pregnancy Concerns, Inc. v. Baltimore* ("*Baltimore CPC*"), Nos. 11-1111, 11-1185, 2013 WL 3336884 (4th Cir. July 3, 2013) (en banc) and *Centro Tepeyac v. Montgomery County*, Nos. 11-1314, 11-1336, 2013 WL 3336825 (4th Cir. July 3, 2013) (en banc), involve First Amendment compelled speech claims and thus are relevant to the issues posed in this case. The third case, *Moore-King v. Chesterfield*, 708 F.3d 560 (4th Cir. 2013), concerns a First Amendment challenge to a licensing and zoning ordinance with an incidental impact on speech and is therefore inapposite.

1

1. *Baltimore CPC* and *Centro Tepeyac*

In *Baltimore CPC* and *Centro Tepeyac*, the Fourth Circuit considered the constitutionality of local laws requiring crisis pregnancy centers ("CPCs") to disclose to women the limited nature of the services they provide. *Baltimore CPC*, 2013 WL 3336884, at *1; *Centro Tepeyac*, 2013 WL 3336825, at *1. Because of the procedural posture of these cases, neither opinion reached the ultimate question on the merits. *Baltimore CPC*, 2013 WL 3336884, at *18 (vacating district court's judgment against the City and remanding for further proceedings); *Centro Tepeyac*, 2013 WL 3336825, at *7 (affirming preliminary injunction). As relevant to this case, however, the Fourth Circuit held that such laws are subject to strict scrutiny to the extent that they regulate speech that is not purely commercial. The Court also adopted a contextual approach to deciding whether speech is commercial and noted that when commercial speech is "inextricably intertwined with otherwise fully protected speech," it triggers strict scrutiny. *Baltimore CPC*, 2013 WL 3336884, at *15 (internal quotation marks omitted). *See also Centro Tepeyac*, 2013 WL 3336825, at *4.

Specifically, in *Baltimore CPC*, the Fourth Circuit held that the district court prematurely granted the plaintiffs' motion for summary judgment on their challenge to a Baltimore Ordinance (the "Ordinance") requiring CPCs to post a sign in their waiting rooms.[1] The decision emphasized the "fact-driven" analysis required to decide whether a

---

[1] The Ordinance provides, in pertinent part, that "a limited-service pregnancy center must provide its clients and potential clients with a disclaimer substantially to the effect that the center

statute targets commercial speech, *Baltimore CPC*, 2013 WL 3336884, at *13, and held that the City had wrongly been denied discovery to prove, *inter alia*: (1) that the "Ordinance targets misleading commercial speech and thus is subject to rational basis (rather than strict) scrutiny";[2] and (2) if the speech is not commercial, that the restrictions are narrowly tailored to achieve the government's stated objectives. *Id.* at **12, 16.

*Centro Tepeyac* involved a challenge to a Montgomery County Board of Health Resolution (the "Resolution") requiring CPCs to "post at least one sign" in a "conspicuous[]" location stating that (i) "the Center does not have a licensed medical professional on staff" and (ii) "the Montgomery County Health Officer encourages women who are or may be pregnant to consult with a licensed health care provider." 2013 WL 3336825 at *1.[3] The district court had granted a partial preliminary injunction, and the Fourth Circuit affirmed, commending the district court "for its careful and restrained analysis." *Id.* at *6. That analysis explained that because the Resolution requires Centro Tepeyac to say something it might not otherwise say, it is a content-based regulation of speech and thus subject to strict scrutiny, unless it regulates purely commercial speech. *Id.* at * 3. Because the alleged facts suggested that the speech is not

---

does not provide or make referral for abortion or birth-control services." 2013 WL 3336884, at *1. The disclaimer can be provided through one or more signs. *Id.*

[2] To the extent that the Ordinance is aimed at "nonmisleading commercial speech regarding lawful activity," the Fourth Circuit held that it "must withstand intermediate scrutiny – that is, [it] must directly advance a substantial governmental interest and be no more extensive than is necessary to serve that interest." 2013 WL 3336884, at *12 n.8

[3] The Resolution further specified that the sign must be "written in English and Spanish," "easily readable," and "posted in the Center's waiting room or other area where individuals await service." *Id.*

purely commercial, the district court applied strict scrutiny. *Id.* at *4. Although the district court recognized that the government might have a "compelling interest in ensuring that its citizenry are able to obtain needed medical care," it held that only the first of the two compelled statements (that "the Center does not have a licensed medical professional on staff") was narrowly tailored to achieve this goal. *Id.* It found that "the record [was] at least colorable at this stage to suggest that [the first disclaimer] is narrowly tailored to meet [the County's stated] interest" because it "merely notifies patients 'that a licensed medical professional is not on staff,' 'does not require any other specific message,' and 'in neutral language states the truth.'" *Id*. at *5. By contrast, the

> court was . . . concerned that, in light of the first compelled statement . . . , the second statement [*i.e.*, that the County encourages women to seek medical advice] may constitute 'unneeded speech,' because the County's interest in ensuring that women will not forgo medical treatment 'might be satisfied once women were aware that [a CPC does] not staff a medical professional.'

*Id*. at * 4. The Fourth Circuit held that the court's ruling was not an abuse of discretion.

### 2. *Moore-King*

In *Moore-King*, the Fourth Circuit considered a First Amendment challenge to a set of county ordinances requiring, *inter alia*, that a "person seeking a business license to practice as a fortune teller . . . apply for and obtain a permit from the chief of police" and pay "a license tax of $300.00." 708 F.3d at 563. None of the ordinances at issue in *Moore-King* directly regulated the plaintiff's speech in any way. *Id.* Instead, plaintiff claimed that the county's licensing requirement impeded her ability to operate her business which, in turn, centers on speaking with clients. *Id*. at 566. The Fourth Circuit

4

affirmed the district court's dismissal of Moore-King's speech claim. The court found that the First Amendment "affords some degree of protection" to her speech, *id.* at 567, but it nevertheless rejected her claim because the licensing and zoning ordinances at issue regulated conduct and had, at most, an incidental effect on that speech. *Id.* at 569; *see also Rumsfeld v. Forum for Academic and Inst. Rights, Inc.*, 547 U.S. 47, 62 (2006) (holding that plaintiffs failed to state First Amendment compelled speech claim where any compelled speech was "plainly incidental" to statute's regulation of conduct). The court's discussion of the contours of the professional speech doctrine is dicta given that the ordinances regulated conduct.[4] In any event, as applied to physicians, the professional speech doctrine means only that the state has authority to reasonably regulate the ordinary practice of medicine, a proposition that no one disputes. *See Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 884 (1992) (upholding basic informed consent provisions about nature of procedure, alternatives, and risks).

> **B. Other Decisions From The United States Supreme Court And Other Courts Of Appeals Confirm That The First Amendment Protects Against Compelled Speech, Including Non-Ideological Speech.**

The Court asked the parties to address not only the three specific cases described above, but also "any other cases decided since briefing closed which might be relevant."

---

[4] The court's discussion of professional speech also does not address whether and under what circumstances the government may *compel* speech in a professional context. *See id.* at 566-69. Furthermore, the court observed that even the government's general licensing and regulatory authority may be constrained depending on the extent to which a profession self-regulates. *See id.* at 570 ("With respect to an occupation like fortune telling where no accrediting institution like a board of law examiners or medical practitioners exists, a legislature may reasonably determine that additional regulatory requirements are necessary.").

5

Order at 1. As explained below, several recent Supreme Court and appellate decisions confirm that the First Amendment protects against compelled speech, including non-ideological speech.

In *Agency for International Development v. Alliance for Open Society International, Inc.* ("*AID Case*"), 133 S. Ct. 2321 (2013), the Supreme Court confirmed that it is a "basic First Amendment principle that freedom of speech prohibits the government from telling people what they must say." *Id.* at 2327 (quotation omitted). Based in large part on this principle, the Court struck down a statutory provision conditioning receipt of certain federal funds on a nongovernmental organization's willingness to pledge in writing that it is opposed to prostitution. *Id.* at 2326. Crucially, the Court observed that if the challenged provision had been "enacted as a direct regulation of speech, . . . [it] would *plainly* violate the First Amendment." *Id.* at 2327 (emphasis added).[5] *See also id.* ("The government may not . . . compel the endorsement of ideas that it approves.") (internal citations omitted). That is so because "[a]t the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Id.* (internal citations omitted).

Further, several recent court of appeals cases confirm that the compelled speech doctrine is not limited to compelled ideological speech. In *Cressman v. Thompson*, No.

---

[5] The Court found that the speech compelled by the government violated the First Amendment even as a condition for the receipt of funding because it sought to "leverage funding to regulate speech outside the contours of the program itself." *Id.* at 2328.

12-6151, 2013 WL 2501938 (10th Cir. Jun. 12, 2013), the Tenth Circuit reversed the dismissal of a compelled-speech challenge to an Oklahoma statute requiring motorists to display an image on license plates of a Native American shooting an arrow toward the sky. *Id.* at *16. *Cressman* not only demonstrates the continued vitality of the First Amendment bar against compelled speech, *id.* at **10-11, but also repeatedly stresses that the First Amendment protection against compelled speech "is not limited to ideological speech." *Id.* at *14. *See also id.* at *10 ("The 'general rule, that the speaker has the right to tailor his speech, applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid.'" (quoting *Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995)).

The D.C. Circuit came to a similar conclusion in *National Ass'n of Manufacturers v. NLRB*, Nos. 12-5068, 12-5138, 2013 WL 1876234 (D.C. Cir. May 7, 2013), where it struck down a rule compelling employers to post a sign notifying employees of their rights under the National Labor Relations Act. *Id.* at *9.[6] In reaching its decision, the D.C. Circuit noted that "leading" Supreme Court "First Amendment precedents have established the principle that freedom of speech prohibits the government from telling people what they must say," and that, even if the information on the sign was purely

---

[6] The D.C. Circuit held that the Board's final regulation violated § 8(c), 29 U.S.C. § 158(c), of the National Labor Relations Act, which affirmatively authorizes employers to engage in speech so long as it "contains no threat of reprisal or force or promise of benefit." 2013 WL 1876234, at *5. For the purposes of its decision, however, the court assumed that the scope of the right protected by § 8(c) is coextensive with the right to freedom of speech as guaranteed by the First Amendment. *Id*. at *6 & n.8.

7

factual, "[t]he right against compelled speech is not, and cannot be, restricted to ideological messages." *Id.* at \*\*7-8. *See also id. at* \*7 ("The right to disseminate another's speech necessarily includes the right not to disseminate it. First Amendment law acknowledges this apparent truth: '*all* speech inherently involves choices of what to say and what to leave unsaid.'")

## II. The Recent Decisions Confirm That The Display of Real-Time View Requirement Violates Physicians' First Amendment Rights.

The opinions described above support Plaintiffs' First Amendment challenge to the Display of Real-Time View Requirement for at least three reasons. First, the courts in *AID*, *Centro Tepeyac*, *Cressman* and *National Ass'n of Manufacturers* held that the speech compelled by the government violated the First Amendment, and they did so on facts that are arguably less intrusive on individual rights than the facts posed by this case. Unlike this case, *none* of those decisions involved the government forcing individuals to act out the government's message by physically speaking words and displaying images against their will in a context where the compelled speech could psychologically harm a captive and vulnerable listener. Instead, the provisions challenged in those cases required organizations to sign documents adopting certain policy positions or to post signs. *See, e.g., Baltimore CPC,* 2013 WL 3336884, at \*1; *Centro Tepeyac*, 2013 WL 3336825, at \*1; *Nat'l Ass'n of Mfrs.*, 2013 WL 1876234, at \*\*1-2.

Second, the Fourth Circuit's *en banc* decisions make clear that context is crucial to determining the appropriate level of scrutiny for compelled speech. Here, the speech compelled by the Display of Real-Time View Requirement is ideological, not because an

8

ultrasound image or description is inherently ideological, but because of the *context* in which this compelled speech occurs. *See*, *e.g.*, Pls.' Br. Summ. J. 9-14.

Third, the recent opinions confirm that compelled speech that is not purely commercial is subject to strict scrutiny, even if it is non-ideological. The Court already has preliminarily concluded that the speech compelled by the Display of Real-Time View Requirement is not purely commercial, *Stuart v. Huff*, 834 F. Supp. 2d 424, 431 (M.D.N.C. 2011), and the State has not introduced any new facts to alter that conclusion. Indeed, holding that a physician's communication with his or her patient during the informed consent process is purely commercial would eviscerate the First Amendment rights of physicians when interacting with their patients and allow the state to use doctors to convey any message it chooses.

Additionally, the Display of Real-Time View Requirement cannot be considered a reasonable regulation of professional speech because it falls outside the ordinary regulation of medical practice both as a factual and legal matter. For instance, unlike the informed consent provision at issue in *Casey*, the Display of Real-Time View Requirement does not permit a patient to waive her physician providing the government message, nor does it allow a physician to exercise any therapeutic privilege if he or she believes that forcing these sounds and images on the patient would not be in her best interest. *Compare Casey*, 505 U.S. at 884-85, 902-03 *with* N.C. Women's Right to Know Act, §§ 90-21.85(a), 90-21.86. Not only are therapeutic privilege and waiver established aspects of informed consent in the actual practice of medicine, Pls.' Br. Summ. J. 3-7, but

9

they are integral to the historical understanding of how medical practice could be regulated through informed consent law, *see* Ruth R. Faden & Tom L. Beauchamp, A History and Theory of Informed Consent 37-38 (1986).

Finally, for the reasons set forth in Plaintiffs' summary judgment briefing, the Display of Real-Time View Requirement cannot satisfy strict scrutiny. Like the portion of the Ordinance enjoined in *Centro Tepeyac*, there are obviously less intrusive ways in which North Carolina can advance its alleged interest in ensuring informed consent, including requiring physicians to *offer* the ultrasound images and descriptions to patients. As for the compelled statement that survived strict scrutiny in *Centro Tepeyac*, it did so on grounds that are not present in this case: the government had acted to correct misleading advertising by CPCs that led women to believe that they offered professional medical services even when they did not, such that women were literally confused about the *type* of facility they were in when they walked through a center's doors. *See Tepeyac v. Montgomery County,* 779 F.Supp. 2d 456, 468 (D. Md. 2011). The State has never made a similar claim in this case, nor could it, because women who have made an appointment with a physician who provides abortion services understand what medical services are provided when they enter that physician's office.

## CONCLUSION

The Court should grant Plaintiffs' motion for summary judgment.

10

Dated: July 22, 2013

Respectfully submitted,

*/s/ Christopher Brook*
Christopher Brook, NC Bar #33838
American Civil Liberties Union
of North Carolina Legal Foundation
P.O. Box 28004
Raleigh, NC 27611
(919) 834-3466
(866) 511-1344 Fax
cbrook@acluofnc.org

COUNSEL FOR ALL PLAINTIFFS

Helene T. Krasnoff
Planned Parenthood Fed. Of America
1110 Vermont Avenue NW, Suite 300
Washington, DC 20005
(202) 973-4800
helene.krasnoff@ppfa.org

Diana O. Salgado
Planned Parenthood Fed. of America
434 W. 33rd Street
New York, NY 10001
(212) 541-7800
(212) 247-6811 Fax
diana.salgado@ppfa.org

COUNSEL FOR PLANNED
PARENTHOOD OF CENTRAL NORTH
CAROLINA & PLANNED
PARENTHOOD HEALTH SYSTEMS,
INC.

Andrew D. Beck
American Civil Liberties Union
Foundation
125 Broad Street
New York, NY 10004

*/s/ Julie Rikelman*
Julie Rikelman
Center for Reproductive Rights
120 Wall Street, 14th Floor
New York, NY 10005
(917) 637-3670
(202) 568-6510 Fax
jrikelman@reprorights.org

Walter Dellinger
O'Melveny & Myers LLP
1625 Eye Street NW
Washington, DC 20006
(202) 383-5300
(202) 383-5414 Fax
wdellinger@omm.com

Anton Metlitsky
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036
(212) 326-2000
(212) 326-2061 Fax
ametlitsky@omm.com

COUNSEL FOR GRETCHEN S.
STUART, M.D., DAVID A. GRIMES,
M.D., AMY BRYANT, M.D., DECKER
& WATSON d/b/a PIEDMONT
CAROLINA MEDICAL CLINIC, & A
WOMAN'S CHOICE OF RALEIGH,
INC.

(212) 284-7318
(212) 549-2651 Fax
abeck@aclu.org

COUNSEL FOR JAMES R.
DINGFELDER, M.D., SERINA FLOYD,
M.D., TAKEY CRIST, M.D., & TAKEY
CRIST M.D., P.A. d/b/a CRIST CLINIC
FOR WOMEN

12

**CERTIFICATE OF SERVICE**

I hereby certify that on the 22nd day of July, 2013, I electronically filed the foregoing **PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing.

>  */s/ Christopher Brook*
>  Christopher Brook, NC Bar #33838
>  American Civil Liberties Union
>  of North Carolina Legal Foundation
>  P.O. Box 28004
>  Raleigh, NC 27611
>  (919) 834-3466
>  (866) 511-1344 Fax
>  cbrook@acluofnc.org
>
>  COUNSEL FOR ALL PLAINTIFFS