IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| GRETCHEN S. STUART, M.D., et al., | ) |
| Plaintiffs, | ) |
| v. | ) CIVIL ACTION |
| RALPH LOOMIS, M.D., et al., | ) Case No. 1:11-cv-00804 |
| Defendants. | ) |

**PLAINTIFFS' SUPPLEMENTAL REPLY BRIEF
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

## ARGUMENT

The State contends that this case is governed by *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), and that the Fourth Circuit decisions this Court asked the parties to consider in their supplemental briefing—*Centro Tepeyac v. Montgomery County*, __ F.3d __, 2013 WL 3336825 (4th Cir. 2013) (en banc), *Greater Baltimore Center for Pregnancy Concerns, Inc. v. Mayor of Baltimore*, __ F.3d __, 2013 WL 3336884 (4th Cir. 2013) (en banc), and *Moore-King v. County of Chesterfield*, 708 F.3d 560 (4th Cir. 2013)—"are all consistent" with *Casey*. State Supp. Br. 2. The State is correct that these cases are consistent with *Casey*, but that does not help the State. As this Court has already held, *Casey*'s First Amendment discussion does not control the outcome here—and traditional strict scrutiny applies—because unlike the Pennsylvania law upheld in *Casey*, the Display of Real-Time View Requirement (the "Requirement") is not a reasonable regulation of medical practice. *Centro Tepeyac* and *Baltimore CPC* confirm that regulations that compel non-commercial speech, like the Requirement, are subject to strict scrutiny, a standard the Requirement cannot satisfy. *Moore-King* is distinguishable from this case for many reasons, but to the extent its discussion of the professional-speech doctrine is relevant here, it simply reaffirms that general licensing regulations can avoid strict First Amendment scrutiny, a point no one disputes.

## I. THE FOURTH CIRCUIT'S RECENT EN BANC DECISIONS CONFIRM THAT STRICT SCRUTINY APPLIES TO COMPELLED SPEECH THAT IS NOT PURELY COMMERCIAL, AS IS THE CASE HERE.

Although the State barely mentions it, the central legal principle animating both

*Centro Tepeyac* and *Baltimore CPC* is that "the strict scrutiny standard generally applies to content-based regulations, including compelled speech." *Baltimore CPC*, 2013 WL 3336884, at *12; *see also Centro Tepeyac*, 2013 WL 3336825, at *3-4 (upholding lower court's strict-scrutiny review of content-based regulation of speech). As Plaintiffs have repeatedly explained, the Requirement is a content-based regulation that compels physicians to parrot the State's message against their will. Moreover, these decisions reinforce the proposition that in determining the type of speech at issue, context matters, and the context here makes clear that the Requirement is not only content-based, but compels ideological speech. Pls.' Supp. Br. 8-9. In all events, the Requirement can survive only if it satisfies strict scrutiny.

The State's effort to draw support from these decisions is meritless. The State's analysis of *Baltimore CPC* includes a lengthy discussion of the different standards of review that apply to *commercial* speech. State Supp. Br. 10. But this Court has already held that the speech compelled by the Requirement is *not* purely commercial speech. *See Stuart v. Huff*, 834 F. Supp. 2d 424, 431-32 (M.D.N.C. 2011); *see also* Pls.' SJ Br. pp. 8-14. Nothing in *Baltimore CPC* warrants disturbing that conclusion. There, the City of Baltimore sought to regulate a crisis pregnancy center's ("CPC") "offer to provide services to consumers by making clear that the offer does not include abortion and comprehensive birth control services," 2013 WL 3336884, at *13—in other words, a CPC's description of the services it provides. Even then, the Court did not hold that the ordinance at issue regulates purely commercial speech—only that the district court should have allowed more discovery before deciding whether it does. *Id.* at *13-15.

2

Here, the speech the State seeks to regulate is not the description of what services physicians provide, but intimate physician-patient discussions—in particular, compelling a physician to convey the State's message while the patient is lying exposed on an examination table. The difference between the two regulations is self-evident, and the State offers nothing from *Baltimore CPC* or anywhere else to support the proposition that intimate physician-patient speech of the sort at issue here is purely commercial.

The State also relies on *Centro Tepeyac*, contending that the case recognizes "that the state may have a compelling interest, sufficient to overcome the strict scrutiny test, in protecting a pregnant woman's health by requiring persons who offer her . . . pregnancy-related services to provide her with truthful, non-misleading information." State Supp. Br. 7-8. Certainly, some regulations are constitutional even if subject to strict scrutiny. But the Requirement is not one of them for the reasons Plaintiffs have previously explained, including that even if the Requirement furthers a compelling state interest, it is far more speech-restrictive than necessary to achieve any such interest. Pls.' SJ Br. pp. 14-17. That was not true of the relevant regulation in *Centro Tepeyac*. *Compare* 2013 WL 3336825 at *1, 4-6 (finding required disclaimer that the CPC "does not have a licensed medical professional on staff" likely to survive strict scrutiny); *with id.* (sign "encourag[ing] women ... to consult with a licensed heath care provider" unlikely to survive strict scrutiny because it is not narrowly tailored to state interest in public health).

## II. THE PROFESSIONAL-SPEECH DOCTRINE AFFORDS THE STATE NO SUPPORT.

The State also relies on *Moore-King* for the proposition that "[t]he Act is a

3

regulation of professional speech covered by the professional speech doctrine." State Supp. Br. 4. *Moore-King* does not support the State's position.

The professional-speech doctrine described in *Moore-King*, 708 F.3d at 568-70, allows states in some circumstances to "enact[] generally applicable licensing provisions," without "enact[ing] a limitation on freedom of speech . . . subject to First Amendment scrutiny." *Lowe v. SEC*, 472 U.S. 181, 232 (1985) (citations omitted) (White, J., concurring). But the doctrine applies only when the "inhibition of [free speech] is merely the *incidental effect* of observing an otherwise legitimate regulation." *Accountant's Society of Virginia v. Bowman*, 860 F.2d 602, 604 (4th Cir. 1988) (emphasis added) (internal citations omitted); *see also Moore-King*, 708 F.3d at 569. That was true in *Moore-King*, which was a challenge to a "generally applicable licensing and regulatory scheme for fortune tellers" that affected Moore-King's speech only insofar as her alleged inability to comply with the licensing and regulatory scheme rendered her unable to practice a profession that incidentally involved speech. *See Moore-King*, 708 F.3d at 564-65, 569. But it is not true here. The Act is not a generally applicable law that incidentally affects physicians' speech—it is a law that applies only to physicians who perform abortions, and affirmatively *compels* physicians to speak a state-sanctioned message with which they do not agree. *See* Pls.' Supp. Br. 8-9. Moreover, *Moore-King* itself explained that government regulation of fortune tellers was warranted in large part because they are not themselves subject to a professional code of conduct. *See* 708 F.3d at 570. The state's interest in regulating the medical profession, which *is* regulated by such a code, is significantly diminished. *Cf. Garcetti v. Ceballos*, 547 U.S. 410, 446 (2006)

4

(Breyer, J., dissenting); *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 544 (2001); *Polk Cnty. v. Dodson*, 454 U.S. 312, 321 (1981).

In any event, even if *Moore-King* is read as the State would read it, its import as applied to physicians is simply that the state can reasonably regulate the practice of medicine, which *Casey* held and no one here challenges. But as Plaintiffs have explained and as this Court has already held, *see Huff*, 834 F. Supp. 2d at 431-32, the Act's compelled-speech requirement is not remotely like the regulation upheld in *Casey*. There (i) the physician could waive completely the informed-consent requirements if she concluded that the information may "result[] in a severely adverse effect on the physical or mental health of the patient," and (ii) the patient was free to decline the state's published materials on fetal development. *See Casey*, 505 U.S. at 881-84, 902-04. The regulations in *Casey* were thus fully consistent with traditional informed-consent principles. *See* Pls.' Supp. Br. 9-10; Pls.' SJ Br. 3-7; Ruth R. Faden & Tom L. Beauchamp, *A History and Theory of Informed Consent* 37-38 (1986). The Act, in contrast, requires physicians to present the state's message regardless whether the patient wants to hear it or the physician concludes that it is not in her best interest. That is not a reasonable regulation of medical practice—it is a compulsion of speech, and it is subject to strict scrutiny.

## CONCLUSION

Plaintiffs' motion for summary judgment should be granted.

Dated: August 5, 2013

Case 1:11-cv-00804-CCE-LPA Document 148 Filed 08/05/13 Page 6 of 9

Respectfully submitted,

/s/ Christopher Brook
Christopher Brook, NC Bar #33838
American Civil Liberties Union
of North Carolina Legal Foundation
P.O. Box 28004
Raleigh, NC 27611
(919) 834-3466
(866) 511-1344 Fax
cbrook@acluofnc.org

**COUNSEL FOR ALL PLAINTIFFS**
Helene T. Krasnoff
Planned Parenthood Fed. Of America
1110 Vermont Avenue NW, Suite 300
Washington, DC 20005
(202) 973-4800
helene.krasnoff@ppfa.org

Diana O. Salgado
Planned Parenthood Fed. of America
434 W. 33rd Street
New York, NY 10001
(212) 541-7800
(212) 247-6811 Fax
dianasalgado@ppfa.org

COUNSEL FOR PLANNED
PARENTHOOD OF CENTRAL NORTH
CAROLINA & PLANNED
PARENTHOOD HEALTH SYSTEMS,
INC.

/s/ Julie Rikelman
Julie Rikelman
Center for Reproductive Rights
120 Wall Street, 14th Floor
New York, NY 10005
(917) 637-3670
(917) 637-3666 Fax
jrikelman@reprorights.org

Walter Dellinger
O'Melveny & Myers LLP
1625 Eye Street NW
Washington, DC 20006
(202) 383-5300
(202) 383-5414 Fax
wdellinger@omm.com

Anton Metlitsky
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036
(212) 326-2000
(212) 326-2061 Fax
ametlitsky@omm.com

COUNSEL FOR GRETCHEN S.
STUART, M.D., DAVID A. GRIMES,
M.D., AMY BRYANT, M.D., DECKER &
WATSON d/b/a PIEDMONT CAROLINA
MEDICAL CLINIC, & A WOMAN'S
CHOICE OF RALEIGH, INC.

Andrew D. Beck
American Civil Liberties Union Foundation
125 Broad Street
New York, NY 10004
(212) 284-7318
(212) 549-2651 Fax
abeck@aclu.org

COUNSEL FOR JAMES R.
DINGFELDER, M.D., SERINA FLOYD,
M.D., TAKEY CRIST, M.D., & TAKEY
CRIST M.D., P.A. d/b/a CRIST CLINIC
FOR WOMEN

# CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of August, 2013, I electronically filed the foregoing PLAINTIFF'S SUPPLEMENTAL REPLY BRIEF with the Clerk of the court by using the CM/ECF system, which will send a notice of electronic filing.

/s/ Christopher A. Brook
Christopher A. Brook
NC Bar 33838
Legal Director, American Civil Liberties Union
of North Carolina Legal Foundation
P.O. Box 28004
Raleigh, NC 27611
(919) 834-3466
(866) 511-1344 Fax
CBrook@acluofnc.org