# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

GRETCHEN S. STUART, M.D., et al., )
)
      Plaintiffs, )
)
v. ) CIVIL ACTION
)
RALPH LOOMIS, M.D., et al., ) Case No. 1:11-cv-00804
)
      Defendants. )
)
)

## PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS

**The Plaintiffs**

1. Plaintiffs include North Carolina obstetrician-gynecologists who practice in private clinics as well as major hospitals, including the University of North Carolina. *See, e.g.,* Declaration of Gretchen S. Stuart, M.D., M.P.H. & T.M., In Support of Plaintiffs' Motion for Summary Judgment at ¶ 5 (Sept. 27, 2012) (Dkt. No. 107) (the "Stuart Decl."); Declaration of James R. Dingfelder, M.D. at ¶ 2 (Sept. 28, 2012) (Dkt. No. 111) (the "Dingfelder Decl.").

2. Plaintiffs offer a range of care to their patients, including abortions for patients who make that decision. *See, e.g.,* Stuart Decl. at ¶ 4; Dingfelder Decl. at ¶ 2.

**Abortions in North Carolina**

3. Abortion is a very safe medical procedure. *See* Dingfelder Decl. at ¶ 4.

4. The vast majority of abortions in North Carolina occur during the first trimester of pregnancy. *Id.* at ¶ 6 ("The vast majority of abortions in North Carolina . . . are performed in the first trimester of pregnancy, which consists of the first twelve weeks of pregnancy.").

5. As is true nation-wide, more than 60% of North Carolina women obtaining abortions already have at least one child. *See* www.schs.state.nc.us/schs/data/pregnancies/2010/abortion characteristics.pdf.

6. Women seek abortions for a variety of reasons, including family circumstances and the health of the woman or fetus. *See, e.g.,* Stuart Decl. at ¶ 8 ("Many [of my patients] are seeking an abortion because the pregnancy puts their health at risk or their fetus has been diagnosed with a serious fetal anomaly."); Dingfelder Decl. at ¶ 5 ("My

experience, and that of my staff, indicates that women seek abortions for all kinds of reasons related to psychological, emotional, medical, familial, economic, and personal issues.").

**Plaintiffs' Current Medical Practices**

7. Plaintiffs currently obtain a patient's informed consent to an abortion by discussing, among other things, (i) the nature of the procedure, (ii) the procedure's risks and benefits, and (iii) alternatives available to the patient, along with their respective risks and benefits. *See, e.g.,* Stuart Decl. at ¶ 10 ("Even before North Carolina's Woman's Right to Know Act . . . went into partial effect, all of my abortion patients received detailed, one on one options counseling."); *id.* at ¶ 19 ("[A]s part of the standard informed consent process that I am ethically and legally required to do, I make sure that each patient understands the abortion procedure and is comfortable with her decision."); Dingfelder Decl. at ¶ 7 ("[M]y practice already provides informed consent for all health care treatments . . . . During that consultation, my staff explains the abortion procedure, discusses the medical risks, discusses the alternatives available to the women, and answers any questions the patient may have.").

8. Plaintiffs also currently counsel each patient to ensure that she is certain about her decision to have an abortion. *See, e.g.,* Dingfelder Decl. at ¶ 8 ("[M]y staff and I offer to talk through her decision with her more extensively, we offer to refer her to a counselor, and/or we suggest that she take more time to think through her decision . . . ."); Stuart Decl. at ¶ 11 ("After determining that the patient has a support system and is comfortable

2

with her decision to have an abortion, . . . I then counsel the patient, [and] obtain her informed consent . . . .").

9. The information currently provided by Plaintiffs and their staff to abortion patients is the same type of information that practitioners in other areas of medical practice in North Carolina provide to ensure that a patient is able to make an autonomous, informed decision regarding whether to undergo a medical procedure. *See* N.C. Gen. Stat. § 90-21.13(a)(2) (informed consent for medical treatment requires that patient have "a general understanding of the procedures or treatments and of the usual and most frequent risks and hazards inherent in the proposed procedures or treatments"); *see also* Declaration of Anne Drapkin Lyerly, M.D., M.A., In Support of Plaintiffs' Motion for Summary Judgment at ¶¶ 13-14 (Sept. 30, 2012) (Dkt. No. 108) (the "Lyerly Decl.") ("The purpose of the informed consent process is to ensure that the patient's consent consists of an informed and autonomous decision and to make it possible to respect the individual patient's views about what she wants to do."); Dingfelder at ¶ 7 ("As is the case in general medical practice, my practice already provides informed consent for all health care treatments.").

10. Under current North Carolina law, all abortion providers must already perform an ultrasound before providing an abortion. *See* 10A N.C. Admin. Code 14E.0305(d).

11. Plaintiffs perform such an ultrasound for diagnostic purposes to (i) confirm the pregnancy, (ii) determine the location of the embryo or fetus, and (iii) establish the gestational age of the embryo or fetus. *See, e.g.,* Stuart Decl. at ¶ 13 ("For abortion patients, I, or another member of my team, will perform an ultrasound to determine the

3

gestational age of the fetus and to confirm the pregnancy and its location . . . ."); Dingfelder Decl. at ¶ 9 ("As required by North Carolina law, all of my abortion patients already receive an ultrasound before the procedure. These ultrasounds are used to determine the presence and location of an intrauterine pregnancy, the gestational age of the pregnancy, and whether the patient is carrying multiples.").

12. Even before the Woman's Right to Know Act, (the "Act"), it was and continues to be Plaintiffs' practice to (i) offer patients an opportunity to view the ultrasound, and (ii) answer any questions that their patients may have about the ultrasound images. *See, e.g.,* Stuart Decl. at ¶ 14 ("It is my practice to offer my patients the opportunity to view the ultrasound . . . . I have never had a patient who asked me to describe the image, nor have I ever had a patient who decided not to have an abortion after viewing the image."); Dingfelder Decl. at ¶ 12; *see also id.* at ¶ 15 ("Of course I would be glad to provide an explanation of the ultrasound images to any patient who wants it . . . .").

13. In the absence of the Act, Plaintiffs would not display and describe ultrasound images to a patient seeking an abortion unless the patient requested it. *See* Stuart Decl. at ¶¶ 14, 22 ("I do not place the ultrasound image in the patient's view if the patient has stated that she does not want to view the ultrasound . . . . I do not describe the ultrasound images to the patient unless she has a particular question . . . . [U]nless a patient asks to view the image or asks for a description of the image, it would be medically inappropriate to display it and describe it to the patient because there is no medical purpose in doing so."); Dingfelder Decl. at ¶ 9; *see also id.* at ¶ 15 ("[D]escribing the ultrasound image to a

4

patient who asks about it is completely different from forcing a detailed description upon a patient who does not want to hear it.").

**The Statutory Framework**

14. To comply with the Display of Real-Time View Requirement, the physician or qualified technician must perform an ultrasound on the woman, which requires that she lie on an examination table while, depending on the stage of pregnancy, the physician or qualified technician (i) inserts an ultrasound probe into her vagina, or (ii) places an ultrasound probe on her abdomen. *See, e.g.,* Stuart Decl. ¶ 13 ("For an abdominal ultrasound, the patient must expose the lower portion of her abdomen for the procedure . . . . [A] vaginal ultrasound . . . involves inserting a probe several inches into the woman's vagina while she lies still on the examining table with her feet in stirrups . . . . The abdominal transducer or vaginal probe must remain on or inside the patient while the ultrasound is being performed."); Dingfelder Decl. at ¶¶ 10-11 ("For pregnancies up to approximately 8 weeks lmp, a vaginal ultrasound is sometimes used because it may provide a clearer picture at those very early stages of pregnancy . . . . For approximately 8 weeks lmp onward, an abdominal probe is typically used . . . .").

15. During the ultrasound procedure, the woman must be partially undressed, either (i) exposing the lower portion of her abdomen, or (ii) naked from the waist down, covered only by a drape. *See* Stuart Decl. at ¶ 13 ("For an abdominal ultrasound, the patient must expose the lower portion of her abdomen for the procedure . . . . For a vaginal ultrasound, the patient must undress from the waist down; a drape is then placed over the lower portion of the patient's body.").

5

16. The Display of Real-Time View Requirement mandates that, while the woman is partially undressed with the ultrasound probe in or on her, the physician or qualified technician must (i) "[d]isplay the images so that the pregnant woman may view them" (*see* N.C. Gen. Stat. § 90-21.85(a)(3)); (ii) "[p]rovide a simultaneous explanation of what the display is depicting," including "the presence, location, and dimensions" of the embryo or fetus (*see id.* at § 90-21.85(a)(2)); and (iii) "[p]rovide a medical description of the images, . . . [including] the presence of external members and internal organs, if present and viewable" (*see id.* at § 90-21.85(a)(4)).

17. Plaintiffs must comply with the Display of Real-Time View Requirement by displaying and describing the images in their own voices, even if the patient (i) objects, (ii) closes her eyes or turns away, or (iii) attempts to drown out the speech. *See id.* at § 90-21.85(b); *see also* Deposition of Watson Allen Bowes at 87:1-3 (Aug. 10, 2012) (Dkt. No. 113-1) (the "Bowes Dep.") (testifying that under the Act, "[the patient] can not look at the screen, she can ask that somebody put earmuffs on her or something like that. I mean she's not required to hear [the speech]—he is required to provide [the speech].").

18. Plaintiffs must also comply with the Display of Real-Time View Requirement even if they believe that (i) acting over the patient's objection will harm the patient or violate medical ethics, or (ii) doing so is contrary to the physician's medical judgment. *See* N.C. Gen. Stat. § 90-21.85; *see also* Dingfelder Decl. at ¶ 14 ("I am very concerned that if the Act's ultrasound requirements were to go into effect, the Act would force me to act in a manner that is contrary both to my patients' best interests and to medical

ethics."); Stuart Decl. at ¶ 24 ("Complying with the Act . . . will force me to violate the ethical principles of autonomy and beneficence.").

**Potential Effect of the Act on Plaintiffs' Medical Practices**

19. All physicians in North Carolina have an ethical obligation to (i) exercise their medical judgment and discretion, and (ii) practice medicine based on the specific needs of an individual patient. *See, e.g.,* Declaration of Carol Getker Shores, M.D., PH.D., F.A.C.S. at ¶ 22 (Sept. 10, 2012) (Dkt. No. 112) (the "Shores Decl.") ("In providing medical care, physicians—in North Carolina and elsewhere—are obligated to exercise medical judgment so that they can provide individualized medicine based upon the patient's particular needs and circumstances."); Declaration of Amy Weil, M.D., In Support of Plaintiffs' Motion for Summary Judgment at ¶ 14 (Sept. 24, 2012) (Dkt. No. 109) (the "Weil Decl.") ("I am not aware of any North Carolina regulation that would prevent me, in my treatment of my patients, from providing individualized medicine based on my medical judgment, and, prior to learning about the Act, I was not aware of any other North Carolina regulation that would so restrict other medical providers."); Stuart Decl. at ¶ 48 ("As an independently licensed physician, I have legal and professional responsibilities to behave ethically in delivering patient care. I am obligated to provide care in a way that does not harm my patient, respects the patient's decision-making, and respects the patient's autonomy.").

20. Specifically, a physician should have the discretion to be able to choose in what way he or she obtains informed consent from a patient. *See* Bowes Dep. at 73:8-12 (Dkt. No. 113-1) ("Q: [D]o you believe that a physician should have the discretion to be able

7

to choose in what way they obtain their informed consent from their patients? A: Yes, provided they are giving all the information that the patient needs.").

21. Also, a physician should be able to exercise his or her medical judgment so that he or she "can provide individualized medicine based on a patient's particular needs and circumstances." *See id.* at 161:7-15.

22. In general, a physician should not act over the objection of a competent patient. *See id.* at 62:21-23.

23. Healthcare practitioners also have an ethical obligation to avoid harming their patients. *See* Lyerly Decl. at ¶ 26 (referring to "the principle of non-maleficence, the duty not to inflict harm on a patient"); Shores Decl. at ¶ 18 ("The first principle of medical ethics is the precept of non-maleficence, which requires that as physicians we first do no harm"); Weil Decl. at ¶ 20 ("It is inconsistent with current standards of medical practice in North Carolina to require a physician to act in a way that, in the physician's medical judgment, would expose his or her patient to potential psychological harm or anxiety when there is no medical purpose for the action.").

24. There is "a meaningful difference" between, on the one hand, a physician "offering a woman the ability to view [an] ultrasound and hear [a] simultaneous explanation" and, on the other hand, a physician "placing [a] screen in her view even over her objection and describing the ultrasound even over her objection" because, as Dr. Bowes testified, "one says the physician . . . must do this. The other says they would just offer it." Bowes Dep. at 91:19-92:3 (Dkt. No. 133-1).

25. It is the medical judgment of Plaintiff physicians, based on their decades of medical experience, that forcing them to display and describe ultrasound images to their patients seeking abortions, even if the patient does not want to see the images or hear the description will —contrary to the physicians' "do-no-harm" ethical obligations —expose those patients to distress and potential psychological harm. *See, e.g.,* Stuart Decl. at ¶ 28 ("[F]orcing images and descriptions on a patient who does not want those experiences could harm the patient."); Dingfelder Decl. at ¶ 20 ("[B]ased on my nearly half century of experience as a doctor treating pregnant women, I believe that requiring patients to be subjected to this treatment would have deleterious effects on some of my patients' emotional well-being."); *see also* Declaration of Nada Logan Stotland, M.D., MPH, In Support of Plaintiffs' Motion for Summary Judgment at ¶¶ 16-20 (Sept. 21, 2012) (Dkt. No. 115) (the "Stotland Decl.") ("For some abortion patients who do not want to view an ultrasound image, hear an explanation of the image, and/or hear a description of the image, providing those experiences, explanations, or descriptions will cause anxiety and psychological pain.").

26. The Display of Real-Time View Requirement will be especially harmful for patients who are seeking abortions because of fetal anomalies, maternal health indications, or in cases of rape or incest. *See, e.g.,* Dingfelder Decl. at ¶ 22 ("I have also treated patients who are seeking abortions because they have been raped. I strongly believe that it would cause some of these patients significant emotional distress for the doctor or technician to describe their rapist's fetus . . . ."); Stuart Decl. at ¶ 28 ("I have had patients who have become pregnant due to rape or incest and I would not want to put

9

them through the 'display of real-time view requirements.'"); *id.* at ¶ 29 (testifying that she "continue[s] to treat patients that [she] believe[s] would be particularly psychologically harmed if [she] were forced to comply with [the Act]," including a patient who had "undergone numerous evaluations and ultrasounds with a maternal-fetal medicine specialist and then made the decision to terminate the pregnancy."); Declaration of Carolyn Jones, In Support of Plaintiffs' Motion for Summary Judgment at ¶ 5 (Oct. 1, 2012) (Dkt. No. 114) (explaining, after having been subjected to a similar mandate in Texas, that the "experience was nothing short of torture"); Stotland Decl. ¶ 18 (explaining that for women who choose to reduce the number of embryos they are carrying, "to put ultrasound images in view and provide an explanation and description is likely to cause the patient to experience grief, or more acute grief, over the difficult decision she has made to protect the life or health of the embryo(s) she will continue to carry.").

27. Complying with the Act would require Plaintiffs to violate their ethical duties. *See, e.g.*, Stuart Decl. at ¶ 42 (testifying that the Act would require physicians to "subject patients to an experience over the patient's objection and even where the physician believes it is medically inappropriate"); Lyerly Decl. at ¶ 14 ("The practitioner's role in the informed consent process is to provide the patient with information that will allow the patient to make an autonomous choice."); Shores Decl. at ¶ 12 ("[T]he Act would compel physicians to violate medical ethics by forcing them to act over the objections of a competent patient."); Weil Decl. at ¶ 16 ("[R]equiring a physician to act over the objections of a competent patient is unheard of in current medical practice in North

10

Carolina."); *see also* Bowes Exp. Report at 1 (Dkt. No. 117-1) ("one of the foundation ethical principles in the practice of medicine . . . is respect for a patient's autonomy"); Bowes Dep. at 174:10-16 (answering "[n]o, I've not done that," when asked if he has ever placed images of a patient's own body in her view over her objection).

28. Requiring physicians to comply with the Display of Real-Time View Requirement and display and describe ultrasound images to patients who do not want to see the images or hear the description serves no medical purpose. *See, e.g.,* Bowes Dep. at 140:5-13 (Dkt. No. 113-1) ("Q: If the patient doesn't want to see the ultrasound, turns her head, closes her eyes, how does that improve the quality of informed consent? A: It doesn't. Q: And if the patient doesn't want to hear the description of the images on the ultrasound, and therefore has put her fingers in her ears, how does that improve the quality of informed consent? A: It doesn't."); Stuart Decl. at ¶ 23 ("There is no valid medical reason for forcing the image and a description of the image on an abortion patient when she does not want that experience. Instead, forcing this experience on a patient over her objections can actually cause harm to the patient.").

29. Requiring patients to wait four hours between the display and description mandated by the Display of Real-Time View Requirement and the abortion procedure serves no medical purpose. *See* Dingfelder Decl. at ¶ 24 ("There is no medical reason to impose such a four-hour delay requirement on all abortion patients. In those rare cases in which one of my patients has been uncertain about whether to proceed (after learning more about the procedure from the informed consent process), I would not perform an abortion, and would encourage the patient to take the time to think further about her

11

decision. But to force patients who are certain about their decision to wait for four hours is medically unnecessary, inconsistent with standard medical practice in North Carolina, and demeaning to patients.").

Dated: August 16, 2013

Respectfully submitted,

/s/ Christopher Brook
Christopher Brook, NC Bar #33838
American Civil Liberties Union
of North Carolina Legal Foundation
P.O. Box 28004
Raleigh, NC 27611
(919) 834-3466
(866) 511-1344 Fax
cbrook@acluofnc.org

COUNSEL FOR ALL PLAINTIFFS

Helene T. Krasnoff
Planned Parenthood Fed. Of America
1110 Vermont Avenue NW, Suite 300
Washington, DC 20005
(202) 973-4800
helene.krasnoff@ppfa.org

Diana O. Salgado
Planned Parenthood Fed. of America
434 W. 33rd Street
New York, NY 10001
(212) 541-7800
(212) 247-6811 Fax
Diana.salgado@ppfa.org

COUNSEL FOR PLANNED
PARENTHOOD OF CENTRAL NORTH
CAROLINA & PLANNED
PARENTHOOD HEALTH SYSTEMS,
INC.

/s/ Julie Rikelman
Julie Rikelman
Center for Reproductive Rights
120 Wall Street, 14th Floor
New York, NY 10005
(917) 637-3670
(917) 637-3666 Fax
jrikelman@reprorights.org

Walter Dellinger
O'Melveny & Myers LLP
1625 Eye Street NW
Washington, DC 20006
(202) 383-5300
(202) 383-5414 Fax
wdellinger@omm.com

Anton Metlitsky
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036
(212) 326-2000
(212) 326-2061 Fax
ametlitsky@omm.com

COUNSEL FOR GRETCHEN S.
STUART, M.D., DAVID A. GRIMES,
M.D., AMY BRYANT, M.D., DECKER &
WATSON d/b/a PIEDMONT CAROLINA
MEDICAL CLINIC, & A WOMAN'S
CHOICE OF RALEIGH, INC.

Andrew D. Beck
American Civil Liberties Union Foundation
125 Broad Street
New York, NY 10004
(212) 284-7318
(212) 549-2651 Fax
abeck@aclu.org

COUNSEL FOR JAMES R.
DINGFELDER, M.D., SERINA FLOYD,
M.D., TAKEY CRIST, M.D., & TAKEY
CRIST M.D., P.A. d/b/a CRIST CLINIC
FOR WOMEN