IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

GRETCHEN S. STUART, M.D., et al., )
)
       Plaintiffs, )
)
v. ) CIVIL ACTION
)
RALPH LOOMIS, M.D., et al., ) Case No. 1:11-cv-00804
)
       Defendants. )
)
)

**PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS**

**The Plaintiffs**

1. Plaintiffs include North Carolina obstetrician-gynecologists who practice in private clinics as well as major hospitals, including the University of North Carolina. *See, e.g.,* Declaration of Gretchen S. Stuart, M.D., M.P.H. & T.M., In Support of Plaintiffs' Motion for Summary Judgment at ¶ 5 (Sept. 27, 2012) (the "Stuart Decl."), Dkt. No. 107; Declaration of James R. Dingfelder, M.D. at ¶ 2 (Sept. 28, 2012) (the "Dingfelder Decl."), Dkt. No. 111.

2. Plaintiffs offer a range of medical services to their patients, including abortions for patients who make that decision. *See, e.g.*, Stuart Decl. at ¶ 4, Dkt. No. 107; Dingfelder Decl. at ¶ 2, Dkt. No. 111.

**Abortions in North Carolina**

3. Abortion is a very safe medical procedure. *See* Dingfelder Decl. at ¶ 4, Dkt. No. 111.

4. The vast majority of abortions in North Carolina occur during the first trimester of pregnancy. *Id.* at ¶ 6, Dkt. No. 111.

5. As is true nation-wide, more than 60% of North Carolina women obtaining abortions already have at least one child. *See* www.schs.state.nc.us/schs/data/pregnancies/2010/abortion characteristics.pdf. *See also* Stuart Decl. at ¶ 19, Dkt. No. 107.

6. Women seek abortions for a variety of reasons, including family circumstances and the health of the woman or fetus. *See, e.g.*, Stuart Decl. at ¶ 8, Dkt. No. 107; Dingfelder Decl. at ¶ 5, Dkt. No. 111.

**Plaintiffs' Current Medical Practices**

7. Plaintiffs currently obtain a patient's informed consent to an abortion by discussing, among other things, (i) the nature of the procedure, (ii) the procedure's risks and benefits, and (iii) alternatives available to the patient, along with their respective risks and benefits. *See, e.g.*, Stuart Decl. at ¶¶ 10, 19, Dkt. No. 107; Dingfelder Decl. at ¶ 7, Dkt. No. 111.

8. Plaintiffs also currently counsel each patient to ensure that she is certain about her decision to have an abortion. *See, e.g.*, Dingfelder Decl. at ¶ 8, Dkt. No. 111; Stuart Decl. at ¶ 11, Dkt. No. 107.

9. Under current North Carolina law, all abortion providers must already perform an ultrasound before providing an abortion. *See* 10A N.C. Admin. Code 14E.0305(d).

10. Plaintiffs perform such an ultrasound for diagnostic purposes to (i) confirm the pregnancy, (ii) determine the location of the embryo or fetus, and (iii) establish the gestational age of the embryo or fetus. *See, e.g.*, Stuart Decl. at ¶ 13, Dkt. No. 107; Dingfelder Decl. at ¶ 9, Dkt. No. 111.

11. Even before the Woman's Right to Know Act, (the "Act"), it was and continues to be Plaintiffs' practice to (i) offer patients an opportunity to view the ultrasound, and (ii) answer any questions that their patients may have about the ultrasound images. *See, e.g.*, Stuart Decl. at ¶ 14, Dkt. No. 107; Dingfelder Decl. at ¶¶ 12, 15, Dkt. No. 111.

12. In the absence of the Act, Plaintiffs would not display and describe ultrasound images to a patient seeking an abortion unless the patient requested it. *See* Stuart Decl. at ¶¶ 14, 22, Dkt. No. 107; Dingfelder Decl. at ¶¶ 9, 15, Dkt. No. 111.

**The Statutory Framework**

13. To comply with the Display of Real-Time View Requirement, the physician or qualified technician must perform an ultrasound on the woman, which requires that she lie on an examination table while, depending on the stage of pregnancy, the physician or qualified technician (i) inserts an ultrasound probe into her vagina, or (ii) places an ultrasound probe on her abdomen. *See, e.g.*, Stuart Decl. ¶ 13, Dkt. No. 107; Dingfelder Decl. at ¶¶ 10-11, Dkt. No. 111.

14. During the ultrasound procedure, the woman must either (i) expose the lower portion of her abdomen, or (ii) be naked from the waist down, covered only by a drape. *See* Stuart Decl. at ¶ 13, Dkt. No. 107.

15. If the patient does not want to see the images or hear the simultaneous explanation, "[the patient] can not look at the screen, she can ask that somebody put earmuffs on her or something like that. I mean she's not required to hear [the speech]—[the physician] is required to provide [the speech]." Deposition of Watson Allen Bowes at 87:1-3 (Aug. 10, 2012) (the "Bowes Dep."), Dkt. No. 113-1.

**Potential Effect of the Act on Plaintiffs' Medical Practices**

16. All physicians in North Carolina have an ethical obligation to (i) exercise their medical judgment and discretion, and (ii) practice medicine based on the specific needs of an individual patient. *See, e.g.*, Declaration of Carol Getker Shores, M.D., PH.D., F.A.C.S. at ¶ 22 (Sept. 10, 2012) (the "Shores Decl."), Dkt. No. 112; Declaration of Amy Weil, M.D., In Support of Plaintiffs' Motion for Summary Judgment at ¶ 14 (Sept. 24, 2012) (the "Weil Decl."), Dkt. No. 109; Stuart Decl. at ¶ 48, Dkt. No. 107.

17. A physician should have the discretion to be able to choose in what way he or she obtains informed consent from a patient. *See* Bowes Dep. at 73:8-12, Dkt. No. 133-1.

18. Also, a physician should be able to exercise his or her medical judgment so that he or she "can provide individualized medicine based on a patient's particular needs and circumstances." *See* Bowes Dep. at 161:7-15, Dkt. No. 113-1.

19. In general, a physician should not act over the objection of a competent patient. *See* Bowes Dep. at 62:21-23, Dkt. No. 113-1; Bowes Exp. Report at 1, Dkt. No. 117-1.

20. Healthcare practitioners also have an ethical obligation to avoid harming their patients. *See* Declaration of Anne Drapkin Lyerly, M.D., M.A., In Support of Plaintiffs' Motion for Summary Judgment at ¶ 26 (Sept. 30, 2012) (the "Lyerly Decl."), Dkt. No. 108; Shores Decl. at ¶ 18, Dkt. No. 112; Weil Decl. at ¶ 20, Dkt. No. 109.

21. Plaintiffs must comply with the Display of Real-Time View Requirement even if they believe that (i) acting over the patient's objection will harm the patient or violate medical ethics, or (ii) doing so is contrary to the physician's medical judgment. Dingfelder Decl. at ¶ 14, Dkt. No. 111; Stuart Decl. at ¶¶ 24, 42, Dkt. No. 107; Shores Decl. at ¶ 12, Dkt. No. 112; Weil Decl. at ¶ 16, Dkt. No. 109.

22. There is "a meaningful difference" between, on the one hand, a physician "offering a woman the ability to view [an] ultrasound and hear [a] simultaneous explanation" and, on the other hand, a physician "placing [a] screen in her view even over her objection and describing the ultrasound even over her objection" because "one says the physician . . . must do this. The other says they would just offer it." Bowes Dep. at 91:19-92:3, Dkt. No. 133-1.

4

23. It is the medical judgment of Plaintiff physicians that forcing them to display and describe ultrasound images to their patients seeking abortions, even if the patient does not want to see the images or hear the description, will expose those patients to distress and potential psychological harm. *See, e.g.*, Stuart Decl. at ¶ 28, Dkt. No. 107; Dingfelder Decl. at ¶ 20, Dkt. No. 111; *see also* Declaration of Nada Logan Stotland, M.D., MPH, In Support of Plaintiffs' Motion for Summary Judgment at ¶¶ 16-20 (Sept. 21, 2012) (the "Stotland Decl."), Dkt. No. 115.

24. It is the medical judgment of Plaintiff physicians that the Display of Real-Time View Requirement will be especially harmful for patients who are seeking abortions because of fetal anomalies, maternal health indications, or in cases of rape or incest. *See, e.g.*, Dingfelder Decl. at ¶ 22, Dkt. No. 111; Stuart Decl. at ¶¶ 28, 29, Dkt. No. 107. *See also* Declaration of Carolyn Jones, In Support of Plaintiffs' Motion for Summary Judgment at ¶ 5 (Oct. 1, 2012), Dkt. No. 114; Stotland Decl. at ¶ 18, Dkt. No. 115.

25. It does not improve the quality of informed consent to require physicians to comply with the Display of Real-Time View Requirement and display and describe ultrasound images to patients who do not want to see the images or hear the description. *See, e.g.*, Bowes Dep. at 140:5-13, Dkt. No. 113-1; Stuart Decl. at ¶ 23, Dkt. No. 107.

Dated: August 19, 2013

Respectfully submitted,

| | |
|---|---|
| */s/ Christopher Brook* | */s/ Julie Rikelman* |
| Christopher Brook, NC Bar #33838 | Julie Rikelman |
| American Civil Liberties Union | Center for Reproductive Rights |
| of North Carolina Legal Foundation | 120 Wall Street, 14th Floor |
| P.O. Box 28004 | New York, NY 10005 |
| Raleigh, NC 27611 | (917) 637-3670 |
| (919) 834-3466 | (917) 637-3666 Fax |
| (866) 511-1344 Fax | jrikelman@reprorights.org |
| cbrook@acluofnc.org | |

COUNSEL FOR ALL PLAINTIFFS

Helene T. Krasnoff
Planned Parenthood Fed. Of America
1110 Vermont Avenue NW, Suite 300
Washington, DC 20005
(202) 973-4800
helene.krasnoff@ppfa.org

Diana O. Salgado
Planned Parenthood Fed. of America
434 W. 33rd Street
New York, NY 10001
(212) 541-7800
(212) 247-6811 Fax
Diana.salgado@ppfa.org

COUNSEL FOR PLANNED
PARENTHOOD OF CENTRAL NORTH
CAROLINA & PLANNED
PARENTHOOD HEALTH SYSTEMS,
INC.

Walter Dellinger
O'Melveny & Myers LLP
1625 Eye Street NW
Washington, DC 20006
(202) 383-5300
(202) 383-5414 Fax
wdellinger@omm.com

Anton Metlitsky
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036
(212) 326-2000
(212) 326-2061 Fax
ametlitsky@omm.com

COUNSEL FOR GRETCHEN S.
STUART, M.D., DAVID A. GRIMES,
M.D., AMY BRYANT, M.D., DECKER &
WATSON d/b/a PIEDMONT CAROLINA
MEDICAL CLINIC, & A WOMAN'S
CHOICE OF RALEIGH, INC.

Andrew D. Beck
American Civil Liberties Union Foundation
125 Broad Street
New York, NY 10004
(212) 284-7318
(212) 549-2651 Fax
abeck@aclu.org

COUNSEL FOR JAMES R.
DINGFELDER, M.D., SERINA FLOYD,
M.D., TAKEY CRIST, M.D., & TAKEY
CRIST M.D., P.A. d/b/a CRIST CLINIC
FOR WOMEN