IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


GRETCHEN S. STUART, M.D.,    *
et al.,                      *
                             *
            Plaintiffs,      *   Case No. 1:11CV804
                             *
vs.                          *
                             *   Greensboro, North Carolina
JANICE E. HUFF, M.D.,        *   August 23, 2013
et al.,                      *   9:30 a.m.
            Defendants.      *
*****************************

         TRANSCRIPT OF SUMMARY JUDGMENT MOTION HEARING
           BEFORE THE HONORABLE CATHERINE C. EAGLES
               UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:        JULIE RIKELMAN, ESQUIRE
                           Center for Reproductive Rights
                           120 Wall Street, 14th Floor
                           New York, New York 10005

                           CHRISTOPHER A. BROOK, ESQUIRE
                           American Civil Liberties Union of
                              North Carolina
                           Post Office Box 28004
                           Raleigh, North Carolina 27611

                           ANDREW D. BECK, ESQUIRE
                           American Civil Liberties Union
                           125 Broad Street, 18th Floor
                           New York, New York 10004

For the Defendants:        I. FAISON HICKS, ESQUIRE
                           N.C. Department of Justice
                           Post Office Box 629
                           Raleigh, North Carolina 27602

Court Reporter:            Lori Russell, RMR, CRR
                           P.O. Box 20593
                           Winston-Salem, North Carolina 27120

          Proceedings recorded by stenotype reporter.
        Transcript produced by Computer-Aided Transcription.

P R O C E E D I N G S

THE COURT:  Good morning.  I'm sorry I had to move it up to 9:30, but I take it you all got the word.  We're having a naturalization ceremony in here this afternoon and we have to be out of the way and all the other courtrooms were actually full.

All right.  I'm ready to hear your arguments on the cross motions for summary judgment.  I've reviewed, of course, all the briefs which were filed some time ago and then the supplemental briefs, and then I looked at your submissions on the facts, which I appreciate and found that helpful.

Everybody filed motions, so I don't know -- I'll just let the Plaintiff go first and let you all go back and forth until you start repeating yourselves.  Okay.

Go ahead.

MS. RIKELMAN:  Thank you, Your Honor.  May it please the Court, my name is Julie Rikelman and I'll be arguing on behalf of the Plaintiffs this morning.

I wanted to begin today by discussing the claims that are left before the Court.  The Plaintiffs have moved for summary judgment on all three claims in our latest amended complaint:  The Plaintiff's First Amendment claim; the patient substantive due process claim, and; then the physician's vagueness challenges.

1    The parties' summary judgment briefing, however,

2   has greatly narrowed the issues on the vagueness claim.  The

3   State has proposed savings construction of all of the

4   statutory language that is at issue.

5        THE COURT:  They proposed what kind of --

6        MS. RIKELMAN:  Savings.

7        THE COURT:  Savings, okay.

8        MS. RIKELMAN:  Yes.  And we agree that their

9   constructions are reasonable, Your Honor, so if they were

10  adopted by the Court, they would resolve our vagueness

11  challenges.

12       For that reason, I wanted to focus today on the

13  remaining claims, and in particular the physicians' First

14  Amendment claim.  The physicians have challenged the

15  "Display of Real-Time View Requirement" in the statute.  As

16  Your Honor is aware, this requirement mandates that, on

17  penalty of losing their medical licenses, physicians must do

18  the following:

19       They must display and describe in detail the

20  ultrasound image to every patient seeking an abortion even

21  if she says no, and even if the physician thinks that doing

22  so will harm that particular patient;

23       The physicians must display and describe the

24  images while the patient is captive on an examination table

25  during the ultrasound procedure and partially undressed,

1    and;

2         Then they must force the patient to wait at least

3    four hours before proceeding with the abortion.

4         This is the requirement that we contend violates

5    the First Amendment, because it requires physicians

6    personally and in their own voice to communicate the State's

7    anti-abortion message.

8         I wanted to focus my comments today about the

9    First Amendment on the questions that the Court raised to

10   the parties during the August 1 telephonic conference and I

11   heard the Court ask at least three questions:

12        First, how a ruling in this case fits into the

13   context of healthcare regulation overall;

14        Second, Your Honor asked the parties to address

15   the *Lakey* and *Rounds* decisions, and;

16        Third, Your Honor asked the parties to talk about

17   the recent decisions from the Fourth Circuit.

18        So I'm going to go ahead and do that by starting

19   with your question about how this case fits into the context

20   of healthcare regulation overall and in particular, how

21   compelled speech fits into that context.

22        Your Honor, a ruling for Plaintiff on our First

23   Amendment claim is crucial to protecting the practice of

24   medicine and making sure that states are not allowed to use

25   physicians as puppets to communicate their ideological

1    messages.  Fortunately, this law is highly unusual, so a
2    ruling in our favor also will not jeopardize healthcare
3    regulation in general, nor will it jeopardize informed
4    consent law in particular.
5            As the Court recognized in the preliminary
6    injunction ruling, this law goes well beyond the traditional
7    requirements of informed consent laws, and Plaintiffs submit
8    that it's not an informed consent law at all for at least
9    two reasons.
10           First, the requirement is performative rather than
11   informative.  According to the State, a physician can comply
12   with the requirement even if no information is communicated
13   whatsoever.  The structure of the statute itself establishes
14   this.  The requirement says that a woman can close her eyes
15   and cover her ears to drown out the speech and yet still
16   give legally valid informed consent to the procedure, but
17   the physician has to go on speaking and displaying in order
18   not to lose his or her medical license.
19           Indeed, this is how the State self-described the
20   requirement in paragraph 15 of its submission of the
21   undisputed material facts, and I'm quoting here.  "If the
22   patient states that she does not want to see the ultrasound
23   images, hear the fetal heartbeat or hear the description and
24   explanation concerning the ultrasound images, she may avert
25   her eyes from the ultrasound screen.  Furthermore, the

1    abortion provider may provide the patient with eye blinders

2    and earphones so that as a practical matter she may avoid

3    seeing and hearing the ultrasound images, the fetal

4    heartbeat and/or the description and explanation concerning

5    the ultrasound images."

6          So under this requirement, Your Honor, a patient

7    would be lying on an examination table with blinders around

8    her head, earphones on her ears, and a physician would be

9    standing on the other side of the blinders displaying and

10   describing the ultrasound images to no one at all.

11         We submit that this is not an interaction for

12   informed consent purposes; instead, it's a perversion of the

13   informed consent process.

14         Second, this requirement is inconsistent with how

15   informed consent has traditionally been regulated.  There is

16   no exception in this law whatsoever for physician judgment,

17   so the physician has to proceed even if he or she, in her

18   best medical judgment, thinks that doing so will harm the

19   patient.  Indeed, striking this requirement as

20   unconstitutional under the First Amendment would be

21   consistent with other federal court rulings on physician

22   speech, such as the Ninth Circuit's decision in the *Conant*

23   case and the recent *Wollschlaeger* decision.

24         To remind the Court, in *Conant* the Ninth Circuit

25   struck down a law that prohibited physicians from

1    recommending the use of medical marijuana to certain
2    seriously ill patients, such as cancer patients.  The Ninth
3    Circuit in that decision recognized that physician speech
4    can be entitled to the strongest protection under the First
5    Amendment that the Constitution allows; that the law at
6    issue altered the traditional role of physicians in the
7    medical system by prohibiting speech that was necessary to
8    the proper functioning of that system, and it distinguished
9    *Casey* on the ground that the law had no therapeutic
10   privilege exception and therefore physicians were precluded
11   from using their medical judgment, just as is the case here.
12        In *Wollschlaeger*, a Federal District Court in
13   Florida struck down a law that prevented physicians from
14   asking their patients about guns in the home and from
15   recording that information in their medical record unless it
16   was directly relevant to their medical care.
17        The *Wollschlaeger* Court explicitly rejected the
18   State's invitation to apply only limited review to the law
19   at issue, saying that it was a content-based restriction on
20   speech and it would have to be subject to heightened review.
21        The Court recognized that the law would chill
22   practitioner's speech in a way that impairs the provision of
23   medical care overall and could harm patients.  The Court
24   also found that the law would fail either strict or
25   intermediate scrutiny because there were less restrictive

1    alternatives that were available.

2          These decisions support our claim in this case,

3    Your Honor, because they treat physician speech as subject

4    to heightened scrutiny under the First Amendment, just as

5    Your Honor did in the preliminary injunction ruling.

6          I wanted to turn now to the *Lakey* and *Rounds*

7    decisions, the second question that Your Honor posed.

8    Plaintiffs respectfully submit that those cases were wrongly

9    decided.  However, only the *Lakey* decision is squarely on

10   point here because the law at issue in *Rounds* was materially

11   different in several key respects.  Our briefing did address

12   these cases in detail, Your Honor, so I just wanted to

13   emphasize a few points this morning.

14         First, even the Eighth Circuit in the *Rounds*

15   decision recognized that the State cannot use physicians

16   simply to communicate ideological messages.  It recognized

17   that ideological speech is different, but in our view, it

18   erred in concluding that the speech required in that case

19   was not ideological.

20         Second, both *Lakey* and *Rounds* made the crucial

21   error of conflating the undue burden standard discussed in

22   *Casey* with the First Amendment standard.  This Court has

23   already recognized that as a mistake in its preliminary

24   injunction ruling because the Supreme Court itself in *Casey*

25   treated and analyzed those claims separately.

1           Our physicians' First Amendment claim here should
2    be evaluated under First Amendment standards.  There is no
3    undo burden claim in this case.
4           Third, both of these decisions essentially treat
5    *Casey* as having created an abortion exception to the First
6    Amendment, and the State in this case goes even further and
7    suggests that *Casey* actually created a physician exception
8    to the First Amendment.
9           Both of these readings are inconsistent with *Casey*
10   itself and would set extremely dangerous precedents for the
11   State's ability to use physicians as its puppets.
12          The law at issue in *Casey* was qualitatively
13   different from the "Display of Real-Time View Requirement,"
14   and what the Supreme Court said about the Pennsylvania law
15   was actually quite limited.  The informed consent law at
16   issue in *Casey* did only two things.
17          One, it required by statute that physicians inform
18   patients about the risks of the abortion procedure, the
19   risks of any alternatives, and the gestational age of the
20   pregnancy.  What's crucial is understanding that the lower
21   Court decision in that case made clear that the plaintiffs
22   -- the plaintiff physicians were already providing that
23   information to their patients.  The physicians had no
24   objection to providing the information and thus they were
25   not even unwilling speakers.

1           Their only challenge to that part of the law was

2    that it required them personally to deliver the information

3    rather than using their trained counselors, which had been

4    their practice up to that point.

5           Second, the law in *Casey* required physicians to

6    offer to their patients written materials prepared by the

7    State about embryonic and fetal development, but it was up

8    to the woman to decide whether to accept this offer and the

9    physicians only had to actually provide the materials if the

10   woman said yes.  And, of course, importantly, all of the

11   informed consent requirements at issue in *Casey* were subject

12   to the physician judgment exception.  The doctors didn't

13   even need to offer the State's written materials if they

14   believed that doing so would harm a particular patient.

15          The privilege -- the exception that they had in

16   that case said that if, in the physician's good-faith

17   medical judgment, the physician concluded that making the

18   offering, the information would result in severely adverse

19   affects on the physical or mental health of the patient, the

20   physician did not have to do it.

21          And the Supreme Court noted this exception and

22   found it important, saying that the statute therefore did

23   not prevent a physician from exercising his or her medical

24   judgment, which is, of course, exactly what the "Display of

25   Real-Time View Requirement" does here.

1           For all of these reasons, the informed consent law
2    at issue in *Casey* could reasonably be considered to have
3    only an incidental effect on physician speech and therefore
4    be subject to very limited review under the First Amendment.
5    That simply can't be said of the "Display of Real-Time View
6    Requirement."
7           *Casey* does not answer the question posed in this
8    case, which is whether a law that forces physicians
9    personally and in their own voice to deliver a government
10   message in the middle of a medical procedure is consistent
11   with the First Amendment.  The Court should look to
12   traditional First Amendment case law to answer that
13   question, just as it did in its preliminary injunction
14   ruling, and that case law makes clear the requirement is
15   unconstitutional.
16          Finally, Your Honor, I wanted to respond to your
17   question about the Fourth Circuit's recent decisions.  As we
18   explained in our supplemental briefing, we believe that the
19   recent decisions support our First Amendment claim here for
20   a few reasons:
21          First, the Fourth Circuit emphasized the context
22   is crucial to determining the appropriate level of scrutiny
23   for compelled speech.  Here, for all the reasons we argued
24   in our briefing, the context makes clear that the compelled
25   speech is ideological;

Second, in both *Baltimore CPC* and *Centro Tepeyac*, the Fourth Circuit confirmed that strict scrutiny is generally appropriate for content-based regulations of speech, including compelled speech, and;

Third, the Court confirmed that even commercial speech, if it's inextricably intertwined with otherwise fully protected speech, should also be subject to strict scrutiny.

Finally, in *Centro Tepeyac*, the Fourth Circuit upheld a preliminary injunction ruling that a compelled speech requirement likely violated strict scrutiny on facts that are much less intrusive on individual rights than the facts at issue here.

In *Centro Tepeyac*, the ordinance at issue only required Crisis Pregnancy Center employees to post signs on their premises. No one was required to personally, in their own voice, speak the government's message.

We also think that other recent appellate court decisions support our First Amendment claim in this case.

The Tenth Circuit's recent decision in *Cressman* and the D.C. Circuit's decision in the *NLRB* case squarely hold that the First Amendment's protection against compelled speech applies to compelled facts, as well as to ideological speech.

And for all of these reasons, Your Honor, we

1  believe the "Display of Real-Time View Requirement" violates

2  well-established First Amendment law; that the Court was

3  correct in its preliminary injunction ruling, and; that the

4  Court should block the requirement permanently.

5          I'm happy to answer any other questions the Court

6  may have or to reserve time --

7          THE COURT:  You mentioned your due process -- you

8  know, that you had three arguments:  the First Amendment

9  argument, the patient's due process argument.  So can you

10  just go over with me the patient's due process argument that

11  you're making?

12          MS. RIKELMAN:  Yes, Your Honor.  The argument on

13  behalf of our patients is that the requirement is

14  irrational, especially as applied to patients who refuse to

15  see or hear.

16          As we explained in our briefing, if there's no

17  information being communicated to the patient whatsoever, if

18  there are earphones on her ears and blinders around her

19  head, then the quality of the informed consent is not being

20  improved and, in fact, the State's only witness in this case

21  conceded that.  So particularly as applied to that group of

22  patients, Your Honor, the requirement can't even pass

23  rational basis, and that's the heart of our claim.

24          THE COURT:  All right.  Thank you.

25          MS. RIKELMAN:  Thank you very much.

1    THE COURT:  For the State?

2    MR. HICKS:  Yes, Your Honor.  My name is Faison

3 Hicks.  I'm a Special Deputy Attorney General with the

4 North Carolina Department of Justice and I represent the

5 State.

6    Your Honor, I'd like to begin by responding to

7 some of the points made by opposing counsel, beginning with

8 the very last point.

9    I thought I heard opposing counsel say, with

10 respect to the Plaintiffs' patients due process claim, that

11 the essence of their argument is that -- they were critical

12 of the argument that the woman can cover her eyes and ears

13 because, in their view, if the woman covers her eyes and

14 ears the fact is not an informed-consent law, what's the

15 rational basis for it.

16    And it seems to me, Your Honor, that the whole

17 point of giving the woman the opportunity to close her eyes

18 and ears, in other words, to -- to specifically permit a

19 physician's office to equip itself with equipment that will

20 enable the woman to not see and not hear the message that's

21 going to be offered to her, is in anticipation of the very

22 complaints that we've heard in this case; that women will

23 be -- will be, if not tortured, will be -- will be made

24 extraordinarily uncomfortable by hearing this message.

25    And it seems to me, seems to the State, that the

1   Plaintiffs can't have it both ways here.  The State is
2   simply -- and I think the General Assembly was simply trying
3   to make it possible for -- for the act to follow a middle
4   course to say:  For those patients who are willing to look,
5   the message should be offered.
6           I mean, I had a physician's appointment on Monday
7   of this week and I -- I knew what my physician was going to
8   say.  I did not want to hear it.  I was even tempted to
9   simply skip the session, but I decided to be a man about it
10  and just go and hear it.  Sometimes we just have to hear
11  what is not pleasant to hear, and some people can do that
12  and some people cannot.
13          And I think the State's view, the General
14  Assembly's view, was to give the patient a choice.  Now,
15  surely being reasonable like that should not make the
16  statute constitutionally infirm.
17          The Plaintiffs also take the position, if I heard
18  correctly, that the Act compels the physicians to make
19  speech that is an anti-abortion speech and that is
20  ideological in nature.
21          Your Honor, I don't -- the State doesn't want to
22  concede this point.  This is an informed consent to the
23  abortion statute.
24          Now, if -- if someone in this room wants to start
25  guessing about what -- about the subjective,

1    inside-the-heart-and-mind motivations of one or more members

2    of the General Assembly in enacting this law or some other

3    law, have at it.  It seems to me that's a feckless exercise.

4    Who knows what the motivations of some or all of these

5    people were.

6         The Act purports, by its own language, to be an

7    informed consent statute.  It is not fanciful to imagine

8    that this type of informed consent is necessary and serves a

9    valuable purpose, no less an authority, than the highest

10   court of our country.

11        The United States Supreme Court in the *Casey* case

12   has said, and has now put it beyond dispute by anybody, that

13   if a woman has an abortion and only later, after the

14   abortion, learns for the first time the true implications of

15   what she did, she may suffer severe psychological

16   consequences.  In other words, she may be injured in a

17   medical sense.  So there is a risk, a health risk, at issue

18   here.

19        The General Assembly was not fanciful in imaging

20   informed -- the subject of informed consent needed to be

21   dealt with in this context, therefore, the State does not

22   for a second concede that the message conveyed -- required

23   to be conveyed by the Act is ideological or that it's

24   antiabortion.

25        We obviously don't believe that *Lakey* was wrongly

1    decided, Your Honor.  We think that -- I mean, look, we

2    believe that *Lakey* reads *Casey* exactly the way we read

3    *Casey,* and we think it's an entirely fair reading and we

4    agree with the Plaintiff that it's on point.  The statute

5    there is very close to our statute.  The *Rounds* case we

6    believe is also very close to our case.

7            What we see, Your Honor, in a few words, is this;

8    that the Supreme Court in *Casey*, as we argued some time ago

9    when we appeared in the first place -- the Supreme Court in

10   *Casey* said essentially this:

11           That informed consent to abortion laws may

12   constitutionally compel physicians and other abortion

13   healthcare providers to make disclosures of information, in

14   other words, may compel speech, provided that the speech is

15   truthful and not misleading, provided that the speech is

16   really relevant to the woman's decision about whether to

17   have an abortion --

18           THE COURT:  So right there.

19           MR. HICKS:  Yes, ma'am.

20           THE COURT:  "Really relevant to the woman's

21   decision."  If she can cover her eyes and cover her ears,

22   stop up her ears, how can it be relevant if she doesn't have

23   to listen to it?

24           MR. HICKS:  I would -- my answer to that would be

25   that if she -- if she is the sort of person who has --

1 | obviously, if she closes her eyes and ears, she's the sort
2 | of person who has said to herself, Damn the torpedoes.  Full
3 | speed ahead.  I don't want to hear this.  I have some vision
4 | in my mind of what this is going to be.  Either I don't want
5 | to hear it or I can't take it, or I want the outcome that I
6 | seek so badly that I don't want to know what I may be doing
7 | because it may prevent me from doing it.
8 |        That does not make it irrelevant.  It means that
9 | she has her own reasons that she believes are compelling for
10 | not hearing it.
11 |        The State has said, perhaps reluctantly, I don't
12 | know, we will respect that.  We are not going to force her
13 | against her will to hear this.  We are going to set -- we're
14 | going to take what we think is a reasonable course.  We're
15 | going to offer up the information if she wants to receive
16 | it, but we're not going to cram it down her throat.
17 |        And, Judge, I mean, it seems to me it would be --
18 | it would be bizarre for the State to have said otherwise.
19 | This is the only reasonable thing to do and it doesn't
20 | strike me that it's something that the Plaintiffs ought to
21 | be heard to complain about simply because it is reasonable.
22 |        I don't know if I've answered your question, but
23 | I've answered it to the best of my ability, Your Honor.
24 |        THE COURT:  Well --
25 |        MR. HICKS:  Your Honor, the third thing the

1   Supreme Court said in *Casey* in terms of laying out those

2   situations where States may constitutionally compel speech

3   that relates to informed consent about abortion was this:

4   The ultimate brake, as in an automobile brake, on what

5   States may and may not do is this.  They may not, in the

6   guise of erecting a law having to do with informed consent

7   to abortion, create as a practical matter an obstacle -- a

8   substantial obstacle to a women's ability to obtain an

9   abortion.

10          I don't think that there's a serious argument that

11  this statute creates a substantial obstacle to a woman's

12  ability to obtain an abortion.  What it seems to me and what

13  I think it seems to the State that it does is to require

14  that those women who elect to hear and see the information

15  offered, it will require that they make the decision in

16  perhaps an even more sober, judicious, and reflective

17  context.  That's what I -- at least I think the Act can be

18  read reasonably to -- to be intending that.

19          THE COURT:  Can you address their argument that

20  *Casey* is distinguishable because the statute in Pennsylvania

21  had a therapeutic exception and this one doesn't?

22          MR. HICKS:  I'm not sure I understand your

23  question, Your Honor.  The exception that you're talking

24  about was what?

25          THE COURT:  Well, their argument -- I don't know

1  that I can --

2         MR. HICKS:  I'm sorry.  I couldn't hear a good

3  deal of their argument.

4         THE COURT:  Oh, okay.

5         MR. HICKS:  I'm at the age where I'm not hearing

6  as well.

7         THE COURT:  I understood them to say that *Casey*

8  was distinguishable because the Pennsylvania statute at

9  issue had an exception even to requiring physicians to give

10 the patient the written materials prepared by the State if

11 the physician in his or her medical judgment thought that

12 that would be harmful to the patient.

13        Maybe I've summarized it -- did I summarize that

14 reasonably accurately?

15        MS. RIKELMAN:  Yes, Your Honor.

16        THE COURT:  Okay.  And that that makes *Casey* at

17 least distinguishable from this case, which forces the

18 patient to lie there while this information is spoken and

19 shown even if the patient doesn't want to see or hear it and

20 takes steps not to see or hear it.

21        MR. HICKS:  I guess my response is multi-fold.

22        One, I don't recall the *Casey* Court's -- the

23 plurality decision being based upon that.  I don't recall --

24 and I'm pretty confident about this, Judge, that the Court

25 didn't base its decision on that.

1       Two, I thought -- and, again, I had a hard time

2   hearing just because I'm an old man now.  It's painful to

3   admit that I don't hear the way I used to.  I had a hard

4   time hearing, but I thought I heard opposing counsel say

5   that, at least in the Plaintiffs' view, the *Casey* court

6   really didn't deal with compelled speech at all because the

7   plaintiff physicians in *Casey* were perfectly happy to give

8   the -- the information that the Pennsylvania statute

9   mandated and, in fact, said to the Court, We're giving this

10  already and there's really no dispute here.

11       I don't know that I read *Casey* that way, but

12  that's what I thought I heard.

13       THE COURT:  I believe what I heard them say is

14  that that is -- you can find that information in the

15  opinions of the -- either the Circuit Court or the District

16  Court.

17       MR. HICKS:  Okay.  All right.  Then I was going to

18  say, if that's the case, then maybe -- you know, maybe their

19  view of the case is that wasn't a compelled speech case at

20  all.  It seems to me that it is.  I think I read *Casey*

21  different from them and I think the answer to your question

22  is just that I don't believe for a second that the plurality

23  decision in *Casey* turned in any way, shape, or form on the

24  presence of a therapeutic exception to the Pennsylvania

25  statute.  I think you had exactly the same decision from the

1   plurality with a concurrence by the other members if this

2   statute had been before the Court, or certainly if this

3   statute were before the Court now.

4           THE COURT:  Okay.

5           MR. HICKS:  May I go on, Your Honor?

6           THE COURT:  Yes, proceed.

7           MR. HICKS:  Just briefly with respect to the three

8   Fourth Circuit cases.  Of course, both sides have briefed

9   these and you've read what the State thinks about these, but

10  to summarize, I want -- I want to be up front and candid

11  with the Court.

12          My initial reaction about all three cases was,

13  Gee, these cases are so different from the facts here that

14  they have what I think is snippets that are really enticing

15  that I just wanted to jump all over and say, Oh, yeah, we

16  win.  And I'm sure the Plaintiffs had the same view, because

17  there are snippets to go around for everybody.

18          But to be honest with you, I didn't think that

19  those cases really -- I think they stirred the hash rather

20  than adding meat, I guess, is what I think.

21          THE COURT:  I think you might actually agree with

22  Plaintiffs' counsel on that point.  I think you all think

23  those cases are not particularly helpful.

24          MR. HICKS:  Well, you know, I do think this, Your

25  Honor.  Having made that disclosure to you so you know I'm

1  trying to be as candid as I can be, I don't think it is

2  insignificant that the Fourth Circuit has now said in two

3  cases, both the first case, the case decided in February,

4  and in one of the two July cases, I think *Centro Tepeyac* in

5  a footnote, that it has said that, look, there is this

6  professional speech doctrine out there, and where -- where a

7  professional or even a nonprofessional, but certainly a

8  physician or a lawyer, receives payment and is engaged in a

9  private advice setting with a patient or a client, then the

10  State may reasonably regulate the -- what the physician or

11  the attorney or pharmacist or whoever it is, what he or she

12  says.

13          And indeed there are lots and lots of cases out

14  there that uphold the constitutionality of compelled speech

15  in that context.  I do think that's significant.

16          I was disappointed, of course, that the February

17  decision decided by the Supreme Court, the *Moore-King* case,

18  was -- dealt with fortunetellers rather than physicians.

19  That's regrettable, although I must also say that the Court,

20  I believe, if I remember correctly, it analogized the

21  telling of the future to a physician's diagnoses and an

22  attorney's advice to clients about what the law may be.  The

23  Court actually said that.

24          I do not believe -- to be candid again, I don't

25  believe the Court had abortion in mind when it was talking

1   about this.  I don't know for a fact that the Court would

2   actually have said what it -- would have -- it might have

3   spoken more cautiously if it had had that in mind.

4          So I -- to answer the question that you asked us

5   about in your July 9 Order, I don't know that I attach an

6   enormous amount of significance to any of the three cases.

7   They have some fascinating snippets.

8          I still believe that *Casey* is the -- is the

9   primary precedent, primary paradigm for the decision in this

10  case.  The fact that it has now -- the fact that the State's

11  view of *Casey* has now been upheld or affirmed, if you will,

12  by two other courts of appeal, one sitting *en banc*, says to

13  me that the State has a pretty reasonable view of *Casey* and

14  I -- in any case, beyond that, you asked counsel to comment

15  upon how we thought -- if I understood you correctly, your

16  decision in this case might affect the regulation of

17  medicine and the practice of medicine, healthcare.

18          THE COURT:  Well, just generally how -- how

19  this -- you know, the legislature's role in regulating the

20  practice of medicine and, you know, some of your -- one of

21  your statements in the recent submissions -- I think you

22  said informed consent practices are not matters to be

23  determined by private practitioners, doctors as a whole, but

24  are matters that can only be defined if described by the

25  legislative branch of the State government, which I

1    actually --

2            MR. HICKS:  And I added to that, I think, Your

3    Honor, by saying, in effect, as checked up on by federal

4    district courts.

5            THE COURT:  Right, subject to constitutional

6    requirements.  And that's -- I guess kind of my question is,

7    you know, just not everything is about abortion and --

8            MR. HICKS:  Right.  Yes, ma'am.

9            THE COURT:  -- and so obviously the State can

10   regulate the practice of medicine to some degree, but, you

11   know, there's all kinds of disputes out there in the world

12   about whatever the fillings are that some dentists think are

13   good ideas and other dentists think are very harmful and,

14   you know, what -- I just am trying to understand what has to

15   exist before the State can regulate the details of the --

16   this, you know, providing care to a patient because the

17   legislature is not doctors, usually.  I mean, maybe there

18   may be some.

19           MR. HICKS:  Yes, ma'am.

20           THE COURT:  It's not researchers with doctorates

21   in molecular biology who know about what causes cancer.  I

22   mean, they -- you know, but they certainly have their role.

23   So just how far if they were to -- how far -- when and --

24   can they do this and -- you know, because the way it's

25   certainly been done for a while is in fact by standard of

1   care, which is, in fact, practitioners establishing the --

2   what is required for informed consent.

3           MR. HICKS:  And courts do.

4           THE COURT:  And courts too.

5           MR. HICKS:  It's really court dominated, I would

6   argue.

7           THE COURT:  That's true.  But courts imposing some

8   informed consent, but then what is required for informed

9   consent is usually established by standard of care; at least

10  that's true in North Carolina.

11          I know there's some -- you know, a fair amount of

12  variety around the states.  I'm just trying to put this into

13  context here.  If, you know, a state legislature decided --

14  I'll just have to make something up that would be maybe

15  ridiculous.  But they decide having your gallbladder removed

16  increased your risk of Alzheimer's, and there was one study

17  that supported that and a million that said that's

18  ridiculous, but the legislature decided, well, doctors have

19  to tell their patients this.  You know --

20          MR. HICKS:  Yes, ma'am.

21          THE COURT:  -- I'm not trying to make up a

22  ridiculous situation.

23          MR. HICKS:  I understand.

24          THE COURT:  I'm just trying to understand what are

25  the outside limits of this because it goes without saying

1  that legislatures and state government or federal
2  governments can regulate this to some extent, but what about
3  the other end?  Where does -- where can they not do it?  And
4  I guess that's what I'm trying to figure out and understand.
5          MR. HICKS:  Well, I guess I would say, Your Honor,
6  that -- that's a big question, but I guess I would say that
7  I remember when President Clinton's healthcare initiative
8  was placed before Congress.  I remember hearing on NPR that
9  at that point -- that was a long time ago -- that the -- the
10  healthcare delivery system in the United States in terms of
11  annual dollars spent represented fully one-sixth of our
12  entire economy.  I'm sure it's more than that now.  It's one
13  of the most heavily regulated fields of commerce in the
14  United States.
15          Anybody who has ever -- any lawyer who has ever
16  worked on it, it's just breathtaking the amount of
17  regulation, not just from the United States Government but
18  from every state, and some cities have -- I mean, New York
19  City where I used to live and practice law has boatloads of
20  regulations over the delivery of healthcare.  And -- since
21  President Roosevelt, it's just been like that, and; if
22  anything, the role of government - federal, state and
23  local - has grown every year, not decreased to the point
24  where I think that this has now just become a tradition.
25          And I think the other thing that's going to cause

1   this to become even more of an issue is that -- that various

2   governments are now paying so much to physicians and other

3   healthcare providers to provide healthcare that there's

4   always a quid pro quo and -- and -- so I -- my guess is if

5   you ask the government at any level how far can this go, the

6   government would say, well, pretty far, and it's going to go

7   pretty far, I think they would say, as long as we're tolling

8   out taxpayer dollars.

9           But I think, Judge, the other thing is that the

10  Judicial branch of both the United States government and the

11  state governments, for an even longer period of time, have

12  played a very active role, perhaps without intending to, in

13  regulating the -- the dispensing of healthcare in this

14  country through tort lawsuits, not just about the standard

15  of care but about -- well, yes, about the standard -- about

16  whether this or that act or omission was reasonable under

17  particular factual circumstances.

18          And, again, that's -- it's inevitable that's going

19  to evolve as our civilization does and as we have -- as our

20  ideas about what is reasonable change; as we become more

21  affluent, the idea of what is reasonable is going to expand.

22          Now, what is the point at which the General

23  Assembly, for example, just clearly can't get involved in

24  this?  I mean, could the General Assembly enact a law

25  tomorrow that would say a gallbladder is a spleen?  Gee, I

1  don't know.  I mean, I -- I guess my -- and I have not

2  thought this through, Your Honor, so don't hold this too

3  much against me.  But I guess my initial take on that is

4  there is a political mechanism in place, a very reliable

5  political mechanism in place, that can deal with these sorts

6  of problems that you're talking about that exist at the

7  margins, and it's elections.  If -- and this happens

8  sometimes.

9        There's a mayor in San Diego who is all over the

10 news because he won't quit after he did something dreadful

11 and has admitted that he did it and simply won't be a man

12 about it and be contrite and say, You're right, I quit.  And

13 if he doesn't quit, you know, he's going to quit when the

14 voters send him home.

15       And so -- and, you know, I -- I think there is a

16 natural disincentive therefore for political parties,

17 whichever ones they are, and for individuals who are members

18 of legislative bodies or who are -- who are running agencies

19 of government, at the state and federal level, to enact or

20 promulgate kooky laws or kooky legislation that will end up

21 incurring the ire and the wrath of a lot of people, and it

22 seems to me in that sense that that's a problem that

23 probably largely takes care of itself.

24       As I drove here this morning, I was really

25 struggling to think how could the adjudication of the issues

1    before the Court today end up creating a -- or throwing a

2    real monkey wrench into the government's regulation of the

3    healthcare industry, either in North Carolina or in the

4    United States, and I don't think that the Court's decision

5    in this case stands any greater chance of doing that than

6    the Court's decision in a lot of other cases that deal with

7    the healthcare industry in one aspect or another.

8            As this Court knows better than most people,

9    abortion is simply a hot-button topic and there's -- there's

10   nary an abortion regulation or statute that doesn't get

11   challenged by somebody.  People feel strongly about it.

12   It's just one of those subjects and people on both sides

13   feel strongly, but I don't know that that means that it's

14   going to have a really great significance for the delivery

15   of healthcare.

16           I don't think my -- I'm not sure my answer has

17   been of much use to you, but that's the best I can do,

18   Judge.

19           THE COURT:  Okay.

20           MR. HICKS:  As to the *Pruitt* case, Your Honor, I

21   have a very elemental understanding of the decision.  It

22   appears to me that the Supreme Court has actually sent back

23   to Oklahoma, back to the Court there, that decision for

24   further proceedings.  I gather that --

25           THE COURT:  You're talking -- that's the Oklahoma

1  case?

2       MR. HICKS:  Yes, ma'am.

3       THE COURT:  Maybe I'm wrong.  I thought there were

4  two Oklahoma cases, and one of them they sent back and the

5  other one they still have pending.  They're nodding yes.  I

6  can't remember.

7       MR. HICKS:  I'll be able to talk to you about the

8  one they've sent back.  I'm not sure that I can

9  intelligently talk to you about the other.  I would be

10  thrilled to have the opportunity to submit a 10-page brief

11  on it or 5-page brief, if that would be helpful to the

12  Court.

13       THE COURT:  Well, the one -- the opinion that I

14  read in the one they didn't send back, the one that is still

15  pending, it doesn't really say anything.  It rules.  It

16  says -- basically, I think it said it was unconstitutional,

17  whatever the statute was in Oklahoma, but it didn't really

18  explain.

19       MR. HICKS:  Would the Court like to receive some

20  sort of small, short but thoughtful brief from the parties

21  on this?

22       THE COURT:  Well, I'll think about that.  I don't

23  know.  *Pruitt* and -- is *Pruitt* the one that was remanded to

24  the Oklahoma Supreme Court?

25       MR. HICKS:  I think so, Your Honor.

1          THE COURT:  Okay.  Then the other one must have

2    been called something else.  I can't remember the name of

3    it.  Maybe the Plaintiffs will remember.

4          MR. HICKS:  I hope it was called something else.

5    I'll feel some better because I couldn't find it.

6          THE COURT:  All right.  Well, let me think about

7    that before I ask you to do it, because --

8          MR. HICKS:  And, Your Honor, I feel badly I

9    haven't taken fully an hour.

10         THE COURT:  That's okay.

11         MR. HICKS:  I think that's really all I had to say

12   to the Court today.

13         THE COURT:  I'm usually not unhappy when people

14   take less time.

15         MR. HICKS:  Thank you, Your Honor.

16         THE COURT:  All right.  Thank you.

17         Rebuttal for the Plaintiff?

18         MS. RIKELMAN:  Thank you, Your Honor.  Let me just

19   start actually at the very end, just very quickly.

20         The case that was sent back to the Oklahoma

21   Supreme Court was not the ultrasound case.  It was the other

22   case.  It's a case called *Cline*.  And Your Honor is correct

23   that there was a ruling by the Oklahoma Supreme Court

24   striking down a similar Oklahoma law as unconstitutional.

25   The State of Oklahoma sought cert.  The Supreme Court has

1    not ruled on the cert petition.

2         THE COURT:  That one is *Pruitt* that was not

3    remanded.

4         MS. RIKELMAN:  Correct.

5         THE COURT:  And -- but do I remember correctly?  I

6    remember looking at the decision in *Pruitt* and thinking -- I

7    mean, it just doesn't really say anything, right?

8         MS. RIKELMAN:  It is brief, Your Honor, yes.

9         THE COURT:  And there was no opinion from a Court

10   of Appeals in Oklahoma?

11        MS. RIKELMAN:  There was not an opinion from the

12   Court of Appeals.  There's an equally brief opinion from the

13   Oklahoma trial court in the case.

14        THE COURT:  Okay.  All right.

15        MS. RIKELMAN:  So, Your Honor, I just wanted to

16   address a few points that the State made.

17        First, the State argued, as it did in its brief,

18   that this law is an offer law.  Your Honor, we strenuously

19   disagree with that.  This is not an offer law.

20        The doctor is required to speak unless he or she

21   wants to risk his or her medical license regardless of what

22   the patient does.  There's no choice for the patient other

23   than to actively try and avoid the speech.  And in fact,

24   Your Honor, the State's own expert conceded that there is a

25   significant difference between this law and an offer law.

1        Again, I just want to read from the joint
2   submission of undisputed facts.  This is Paragraph 14
3   quoting from the State's own expert.  He said:  There's a
4   meaningful difference between, on the one hand, a physician
5   offering a woman the ability to view an ultrasound and hear
6   a simultaneous explanation, and; on the other hand, a
7   physician placing a screen in her view, even over her
8   objection, and describing the ultrasound, even over her
9   objection, because one says the physician must do this.  The
10  other says they would just offer it.
11       This is not an offer law, Your Honor.  We gave
12  Your Honor several examples of offer laws in the briefing,
13  such as from Mississippi and Virginia, and this law simply
14  is not that.  Unless the physician describes and displays
15  their medical license is at issue.
16       The second point I wanted to respond to was the
17  State's claim this is not ideological speech.
18       First of all, Your Honor, that claim does not have
19  to do with the motivations of the legislature.  It has to do
20  with the text of the statute itself.
21       And I'd like to point out that, contrary to what
22  the State says, the State itself does not purport that this
23  is an informed consent law.  In fact, the "Display of
24  Real-Time View Requirement" is not in the portion of the
25  statute that's entitled "Informed Consent."  It's in a

1    freestanding portion of the statute.

2           And as I mentioned earlier, Your Honor, the woman
3    does not have to receive any of the information about the
4    ultrasound in order to give legally valid informed consent.
5    So this is not an informed consent requirement.

6           In any event, the State labels about what the law
7    is or does are not dispositive in the Court's First
8    Amendment analysis.  The Supreme Court has said that
9    repeatedly and, of course, very clearly in the *Riley* case.
10   And, Your Honor, the speech here we believe is clearly
11   ideological for a number of reasons.

12          First, the doctor has to speak regardless of what
13   the patient wants.

14          Second, the physician must provide the speech and
15   display the images in the middle of a medical procedure when
16   the woman is partially undressed on an examination table.

17          Third, the physician has to then force the woman
18   to wait at least four hours before proceeding, and then
19   again there's no exception.  So the physician has to do it
20   even if he or she thinks the patient will be harmed.

21          Something that the physician has to say and
22   display regardless of what the patient wants and even if
23   it's against the physician's medical judgment must be
24   ideological, Your Honor.

25          The third point I wanted to address was the

1    State's argument that the plurality in the *Casey* decision

2    didn't really care about the presence of a therapeutic

3    privilege exception; that that wasn't important to the

4    decision.

5              We disagree, Your Honor, and in fact if you look

6    back at the *Casey* decision, in the section of the decision

7    talking about the informed consent requirements, the

8    plurality wrote very clearly:

9              "It is worth noting that the statute now before us

10   does not require a physician to comply with the informed

11   consent provisions if he or she can demonstrate by a

12   preponderance of the evidence that he or she reasonably

13   believed that furnishing the information would have resulted

14   in a severely adverse effect on the physical or mental

15   health of the patient.  In this respect, the statute does

16   not prevent the physician from exercising his or her medical

17   judgment."

18             And that's exactly what the statute does and that

19   discussion is part of the informed consent discussion in

20   *Casey* and precedes almost immediately the First Amendment

21   discussion.

22             Next, Your Honor, the State raised the

23   professional speech doctrine.  As we discussed in our brief,

24   Your Honor, the Supreme Court has actually applied

25   heightened scrutiny to many cases involving speech by

1    professionals.  Professional speech has many components

2    which the Supreme Court has recognized and it applied

3    heightened scrutiny in cases like *Riley*, *Velasquez*, *Sorrell*.

4    All of those cases involve speech by professionals; and in

5    fact in *Riley*, the professional speech was even a disclosure

6    requirement and the Court still concluded that the

7    requirement had to be subject to exacting scrutiny.

8        In general, the way the Courts have viewed the

9    professional speech doctrine is in the case like the

10   fortuneteller case, where there's a general licensing scheme

11   that has only an incidental effect on speech.  The Courts

12   rightly recognize that that kind of licensing scheme does

13   not need to be subject to heightened review under the First

14   Amendment.

15       Next, Your Honor, the State tried to answer the

16   question about what is the difference between the reasonable

17   regulation of medicine and what we believe this law does.

18   And I would submit, Your Honor, there's at least three lines

19   that the Court can draw to distinguish this law.

20       First, again, the physician has to speak

21   regardless of what the patient wants.  The physician has to

22   speak even against her medical judgment and the physician

23   has to speak even if no information is communicated

24   whatsoever.  That is not the practice of medicine, Your

25   Honor.  If the physician can't exercise his or her medical

1    judgment and no information is being communicated, that is

2    not an informed consent process.

3         THE COURT:  So what if it were a statute where the

4    legislature said before you can have chemo or radiation

5    treatment, the doctor has to tell the patient certain things

6    about the risks of that, which are substantial, and it had a

7    similar kind of thing, you know, it required the doctor to

8    speak it and it gave the patient this option of not

9    listening to it?  Would that be okay?

10        MS. RIKELMAN:  Well, Your Honor, as you recognized

11   in your preliminary injunction ruling, it's hard to know

12   what level of scrutiny the Court would apply to a

13   traditional informed consent requirement.  I would argue the

14   example you just gave is also not a traditional informed

15   consent requirement because if the doctor is required to

16   speak, even if the patient isn't listening, it's not

17   informative.  It's performative.

18        What is the point of making the physician engage

19   in that performance unless what you're trying to do is

20   punish the physician and the patient in some way?  The point

21   of informed consent is for the patient to receive

22   information that actually improves the quality of the

23   medical condition, but the State's own expert conceded that

24   what's required here won't do that because somebody who has

25   blinders around her head or earphones on her ears isn't

1  going to get any information and her decision making won't

2  be improved at all.

3       If in your example the doctor had to provide

4  information, there's -- and it was subject to scrutiny,

5  perhaps it would survive depending on the means that the

6  State was using to further its interests.  Because, again,

7  one of the key problems with the "Display of Real-Time View

8  Requirement" is that there is a clear, less restrictive

9  alternative, the offer law.

10      The State could require physicians to offer the

11  display and the description to the patient, but then respect

12  the patient's decision to say no and not require a physician

13  to engage in the farce of speaking and displaying to no one

14  at all.

15      And so it could be, Your Honor, that if an

16  informed consent law required a physician to discuss with a

17  patient, not in the middle of the chemotherapy procedure but

18  in an office setting, certain risks, it could be that a law

19  like that would survive intermediate scrutiny.  This is not

20  this law.  This law is highly unusual and it's not an

21  informed consent law at all, Your Honor.

22      I just wanted to end, unless the Court has any

23  other questions, by reminding the Court that the only issue

24  outstanding other than the summary judgment motions are

25  Plaintiffs' motions to strike.  If the Court has any

1    questions about that, my colleague, Andrew Beck, would be

2    happy to answer them.

3            THE COURT:  As I -- okay.  Well, I will ask one

4    question about that.  As I understood your argument, it was

5    based on failure to disclose, but then it appeared that they

6    had in fact disclosed, so --

7            MR. BECK:  Your Honor, in the e-mail disclosure,

8    they did not mention their intent to rely upon these other

9    documents.  In the hard copy disclosure, they did, and

10   Plaintiffs did not recognize the discrepancy between these

11   two documents.  But, Your Honor, they were required to

12   produce expert reports for these doctors regardless.

13           It's not -- it's not up to Defendants to invent

14   their own discovery protocols, and so if they wanted to rely

15   these witnesses' testimony, they had to produce the reports

16   that are required under Rule 26(a) -- (a)(2)(B).  And so, in

17   fact, it doesn't matter that they referenced them in that

18   letter; you're not allowed to incorporate that by reference.

19   The rules are clear, and under Rule 37(c)(1) the result that

20   attaches when the parties fail to make those disclosures is

21   also clear.

22           THE COURT:  Did the affidavits themselves not

23   really function like reports?

24           MR. BECK:  They are missing, Your Honor, several

25   key pieces of information that Rule 26(a)(2)(B) requires.

1       They don't list the cases in which these witnesses

2  testified as experts in the previous four years.  They

3  contain no statement of compensation.  They don't list any

4  exhibits that will be used to support their opinions and at

5  least one of the declarations doesn't list any of the facts

6  or data that the witness relied upon to form his opinion.

7       And I would direct or ask Your Honor if you would

8  look at the decision in *Carr versus Deeds* by the Fourth

9  Circuit.

10       THE COURT:  *Carr versus* --

11       MR. BECK:  Sorry.  *Carr*, C-a-r-r, *versus Deeds*.

12  The citation -- it's cited in our brief, Your Honor.

13       THE COURT:  Okay.  It's been a while since I've

14  actually looked at the motion to strike.  I've been reading

15  the rest of the stuff, so --

16       MR. BECK:  I understand, Your Honor.

17       In *Carr versus Deeds*, the plaintiff attached to

18  her complaint a document that contained some but not all of

19  the information that's required under the Federal Rules and

20  did not make a proper Rule 26(a)(2)(B) disclosure, and the

21  Fourth Circuit held that it was properly excluded in that

22  case; that the plaintiff couldn't rely on that evidence

23  because, in the language of the Fourth Circuit, "every

24  litigant in federal court is plainly entitled under Rule

25  26(a)(2)(B) to be given the information spelled out therein

1   and none should shoulder the burden to independently

2   investigate and ferret out that information as best they can

3   and at the expense of their client."

4           In that case as well, there was some information

5   relevant to Rule 26(a)(2)(B) contained in the report but it

6   was not complete, and the Fourth Circuit said, essentially,

7   if you disobey the requirements of Rule 26(a)(2)(B) you do

8   so at your peril.  That was the language of the Court.

9           And so here -- we think the case is directly

10  analogous here.  Defendants aren't allowed to say, And by

11  the way, we rely on these materials which themselves don't

12  purport to be Rule 26(a)(2)(B) reports, which are missing

13  critical pieces of information that 26(a)(2)(B) requires.

14          And so while Plaintiffs didn't recognize the

15  discrepancy, it shouldn't be incumbent on Plaintiffs here to

16  monitor Defendants' noncompliance with the Rule.

17          THE COURT:  All right.  Thank you.

18          All right.  Mr. Hicks, do you want to address both

19  parts of -- if there's anything else you want to say on the

20  underlying, the merits, or the motion to strike?

21          MR. HICKS:  If you don't mind, I'll take it from

22  the last comments they made and go backward.  I'll remember

23  it better that way.

24          THE COURT:  Okay.

25          MR. HICKS:  Your Honor, it was my understanding

1   under the Court's July 9 order that we would be here to

2   argue the cross motions for summary judgment and to inform

3   the Court about our thoughts concerning the Fourth Circuit's

4   three 2013 cases, as well as the other matters that -- that

5   you talked to us about on the telephone. I, to be honest

6   with you, was caught totally unaware there would be a

7   discussion about a motion to strike.

8           The discovery in this matter was handled by one of

9   my colleagues, Stephanie Brennan, who has been off of this

10  case and, in fact, she works for a totally different client.

11  She's not able to work on this case. She's been off it for

12  quite a while. I just can't argue the matter, Your Honor.

13  I don't know the first thing about it.

14          THE COURT: That's fine. You briefed it. It's

15  been fully briefed, so I'm -- and really the question I had

16  about it was for the Plaintiff.

17          MR. HICKS: Okay.

18          THE COURT: I understood you-all's argument.

19          MR. HICKS: Very well. Your Honor, I would say

20  this. I represent a client -- well, for 25 years I was in

21  private practice and I represented private parties. Now I

22  represent the People and I would ask Your Honor that the

23  People not be prejudiced if I have done something or failed

24  to do something that I should have done, and I would ask the

25  Court to allow the People's evidence and the People's

1  witnesses to be heard, unless there's been some significant
2  prejudice to the other side.
3      Your Honor, as to the -- the other matters that
4  were stated by opposing counsel, it just seems to me to be
5  silly to say that what the Act requires the physicians in
6  this case to convey renders them non-physicians or it makes
7  what they're doing not the practice of medicine.  That's
8  silly.
9      There are lots and lots and lots of laws -
10  court-made laws and statutory laws, federal and state - that
11  require healthcare providers, including physicians and
12  surgeons, to say very specific things to patients and
13  others.  In fact, to parents, to the police, to DHSS, lots
14  of folks.  And to say, Oh, well that's not the practice of
15  medicine, or that's not the practice of law and so we can
16  completely get around this statute, to me, that's just
17  sophistry.  I don't think that's a correct way to go at
18  this.
19      It seems to me this clearly is and involves the
20  practice of medicine, the practice of medicine for a fee,
21  incidentally, as I'm sure you saw in the proposed undisputed
22  and disputed findings.  And -- and the fact that Dr. Bowes
23  thinks that there's not a meaningful difference -- I can't
24  quote or even paraphrase what he said now, but it was quoted
25  or paraphrased by opposing counsel, to me is really neither

1    here nor there.

2            What matters is what the duly constituting,

3    lawmaking body that is charged with the responsibility for

4    deciding what legal informed consent believes is meaningful

5    and relevant and what patients need to hear.  And then once

6    they have passed those laws, it's necessary for their laws

7    to come before courts like this for a very sober and

8    judicious determination of whether those laws comply with

9    all of our constitutional requirements and that's happening

10   here in the way it's supposed to happen, and I just don't

11   think that's up to Dr. Bowes or the Plaintiffs to decide

12   that.

13           In fact, the logic of their opposition, and you

14   can see this clearly in reading the joint submission, is

15   that physicians ought to really be able to say to the

16   Courts, This is the way it's going to be.  Now, lawyers

17   can't do that and we shouldn't -- we shouldn't attempt to do

18   that.  The State Bar which regulates us is an agency of the

19   government.

20           Now, to be sure, lawyers have a tremendous

21   involvement with it.  The State Bar Council is almost all

22   lawyers.  The medical society, too, is an agency of the

23   state government.  The government in the end has to make

24   these decisions about what is and isn't informed consent,

25   what's necessary and what's not necessary.  Of course --

1          THE COURT:  Well, that goes back to my question to
2    you about the science underlying it all.
3          MR. HICKS:  About the what?
4          THE COURT:  The science underlying it all, you
5    know, and when medical judgment is appropriate and --
6          MR. HICKS:  Well, see, I guess my answer to that
7    is this -- a couple of things.
8          One -- forgive the advocate in me, but, you know,
9    the *Casey* Court has said something that we're now all stuck
10   with, and that is that if a woman undergoes an abortion and
11   only later realizes the implications of what she did, only
12   later realizes what she actually did, she may be severely
13   psychologically injured.  That's now a fact as far as
14   everyone in this courtroom is concerned.
15         So there is a legitimate interest that -- that a
16   legislature has in protecting its citizens from that type of
17   harm; and there's a nexus, a pretty clear one, between laws
18   like this and a State's desire to simply protect the health
19   of its people.
20         But, two, in answer to your question, what are the
21   limits on what the General Assembly can do, and I guess, you
22   know, what do -- what role do physicians play in that.  I am
23   just a citizen.  I'm not an expert at this, but I'm
24   absolutely sure this is true at the level of the United
25   States government and I'm confident it's true at the level

1   of our state government and other state governments.  People
2   from industry - and in this case people from the profession
3   of physicians and surgeons and other healthcare providers -
4   regularly and routinely appear before the General Assembly
5   and offer their opinions, sometimes their testimony.  They
6   offer testimony all the time to the Congress under oath.
7           With the General Assembly, it's been my experience
8   it's not been so often under oath, but they frequently
9   appear and tell the members of the General Assembly, who are
10  members of this and that committee that are considering this
11  and that piece of legislation, what their perspective is,
12  and they also make written submissions to members of the
13  General Assembly that say, Look, this is kooky.  The
14  gallbladder is the gallbladder.  It ain't the spleen.  Now,
15  don't pass a bill that says the gallbladder is the spleen.
16  You'd be killing people.
17          That is a process that has always gone on.  It
18  goes on now.  I'm sure it will always go on, and it's an
19  important process.
20          Look, let's not act like -- let's not stick our
21  head in the sand.  Physicians and surgeons are represented
22  by a very powerful, very well-funded, highly organized lobby
23  in the United States Congress, in the General Assembly in
24  Raleigh, and I suspect in every legislature in every other
25  state in this country.  I mean, they're very -- their flag

1   might as well be the "Don't Tread On Me" flag.

2           This is not a group that can't get its voices

3   heard; and if they believe that the General Assembly is

4   about to do something or has done something that is just

5   cockamamie, that is scientifically cockamamie or that is

6   contrary to the interest of patients, I think the Court has

7   every reason to believe that they --

8           THE COURT:  So what I hear you saying - you made

9   that argument before and you're making it now - is that

10  there are no First Amendment restrictions on State

11  regulation of doctors in their treatment of patients.

12  That's what --

13          MR. HICKS:  I'm sorry.  There's no -- I just want

14  to be sure I --

15          THE COURT:  There's no First Amendment -- the

16  First Amendment basically just doesn't apply to protect

17  any -- to protect physicians in their communications with

18  their patients; that physicians have no First Amendment

19  rights.  That's what it sounds like you're saying.

20          MR. HICKS:  Well, it may sound that way, Your

21  Honor, but given --

22          THE COURT:  That's not what you're saying?

23          MR. HICKS:  -- that it's not necessary to answer

24  that question in this case.  To me, it would be reckless for

25  me to venture an answer to that.  I really don't know.

```
1           What I am absolutely confident of is that in a
2    case where a legislature has simply looked at a situation
3    where there's a logical connection between the reality that
4    the Supreme Court has observed, that there's this health
5    risk out there and a law that says, you know, what I think
6    is a pretty reasonable way physicians ought to offer to
7    provide this informed consent information; if the woman for
8    whatever reason doesn't want to receive it, we're going to
9    respect her right not to receive it.
10           THE COURT:  Well, I understand that argument, but
11   what I heard you saying when you got -- started talking
12   about the legislature and elections and lobbying, it sounded
13   like you were saying there's a political process for this
14   and --
15           MR. HICKS:  There is.
16           THE COURT:  -- physicians have no First Amendment
17   rights.
18           MR. HICKS:  I didn't say physicians have no First
19   Amendment rights.
20           THE COURT:  Okay.  Because that's kind of what --
21   I mean, I was asking what the outside range is and your
22   answer appeared to be --
23           MR. HICKS:  I don't know.
24           THE COURT:  -- there is no outside range, they
25   don't have any First Amendment rights.
```

1          MR. HICKS:  Let me be clear.  I don't know the
2     outside range.
3          I mean, look, I've been a lawyer long enough to
4     know that there will always be another fact pattern that's
5     going to come out and surprise us all, one that I just
6     couldn't foresee.  And, Your Honor, to be candid with you,
7     I'm so focused on this case, this fact pattern that, as my
8     maid used to say, I ain't much studying on what might be
9     coming up tomorrow.  So I don't know that I really know the
10    answer to your question and I would not want to stake myself
11    out that physicians don't have rights of any kind, but I am
12    saying this.  This is not a group of people who are
13    powerless in the society.
14         It's a group of people who are highly organized,
15    well funded, a good group of people.  I'm glad they are all
16    those things, but they are -- their voices are regularly and
17    routinely heard, and they're highly expert.
18         And my guess is that the General Assembly and the
19    Congress routinely and regularly seek the advice and counsel
20    of these experts when it decides to venture into the realm
21    of enacting legislation that will affect the healthcare
22    system, because they're just as concerned as you are about
23    how all -- whatever it is I'm about to do will affect the
24    delivery of healthcare services in this country because
25    everybody knows that's important to everybody.

1          Have I answered the Court's question?

2          THE COURT:  I -- you know, I understand your

3   answer.

4          MR. HICKS:  That's the best I can answer.

5          THE COURT:  I understand your answer.

6          MR. HICKS:  Thank you.  I think that's maybe the

7   best I can answer.

8          Your Honor, I would want to offer up one other

9   thought.  As you know from hearing my argument this morning

10  and all those many months ago, the State is persuaded more

11  now, I'd say, than even before that the *Casey* court, the

12  *Lakey* court -- *Lakey* decision and the decision in *Rounds*

13  mandate that -- mandate the outcome here and mandate that

14  the Act here be held to be constitutional.  We think that

15  the preliminary injunction ought to be lifted and that the

16  Act ought to be declared constitutional.

17         However, if the Court were to disagree with the

18  State on this, bearing in mind that there is a severability

19  clause in the statute, the State believes that it would be

20  unwise, improper, and -- and gratuitous if the Court did not

21  fashion an Order that said that even though I'm enjoining --

22  permanently enjoining the enforcement of the statute, I'm --

23  in effect, physicians still have to at least offer to give

24  this information to the patient.

25         If the patient says, I don't want it, then they --

Case 1:11-cv-00804-CCE-LPA   Document 159   Filed 09/09/13   Page 51 of 55

1  they don't have to do the description, they don't have to do

2  the sonogram, they don't have to do all the rest.

3          THE COURT:  All right.

4          MR. HICKS:  And that is definitely not what I'm

5  asking the Court to do.  That's what I'm saying I would

6  consider to be a loss, but -- but -- at a bear minimum we

7  would ask that, Your Honor.

8          THE COURT:  All right.  Thank you.

9          MR. HICKS:  Thank you, Your Honor.

10          THE COURT:  Anything else you haven't already

11  said?

12          MS. RIKELMAN:  May I very briefly, Your Honor?

13          THE COURT:  Uh-huh.

14          MS. RIKELMAN:  Your Honor, physicians do not lose

15  their First Amendment rights when they begin practicing

16  medicine and in fact the Ninth Circuit recognized in

17  *Velasquez* that it's very important for physicians to

18  maintain those rights in order for the practice of medicine

19  to function appropriately.  It has never been part of the

20  regulation of medicine in the United States to require

21  physicians personally to communicate the State's ideological

22  messages.  That's not part of the history in this country.

23          The State certainly does have an interest in

24  potential life, which *Casey* recognized, but the State cannot

25  compel doctors to communicate that personally and in their

1  own voice against their will, and there's nothing in *Casey*

2  that says that the State can do that.

3       And, Your Honor, the interest in potential life

4  can absolutely be met with a clearly less restrictive

5  alternative, which is an offer law, which a number of other

6  jurisdictions have passed and that is available and, since

7  the State chose the most restrictive means here rather than

8  the least, the law should be struck down.

9       And with respect to the State's last point, we do

10  not believe that there's any way to turn this law, which

11  requires the doctor to speak no matter what if he or she

12  doesn't want to lose her medical license, into an offer law.

13  That would require rewriting the statute, which the Court is

14  not in a position to do under the case law.

15       Thank you very much, Your Honor.  I have nothing

16  further.

17       THE COURT:  All right.  Thank you all very much.

18       You know, I had held off on this pending those two

19  July Fourth Circuit opinions because I thought they might be

20  more helpful than they ended up being, but I'm -- it may --

21  it's not going to be tomorrow.  I do not have the case ready

22  to come out.  I'm going to consider your arguments and think

23  about it a little further.  I hope not to be too terribly

24  much longer, but I'm sure it will take me several weeks, at

25  a minimum, to finish it.

Case 1:11-cv-00804-CCE-LPA   Document 159   Filed 09/09/13   Page 53 of 55

1          So if anything -- I would just invite you -- if

2     something does happen with some other case out there that

3     gets decided, you're certainly free to submit just a

4     citation to the case, a supplemental -- suggestion of

5     supplemental authority and I would welcome that,

6     particularly if it's out of circuit.

7          I keep up with the Fourth Circuit pretty well and

8     I don't guess we'll hear anything from the Supreme Court

9     until October.  Anything out of any other circuit, certainly

10    I would welcome that.  I believe all the cases you all cited

11    to me today are in your materials so -- and I can find all

12    of them.

13         I appreciate you being here today and we're out

14    well in time to let the naturalization ceremony go forward.

15    So thank you for that.

16             Court is adjourned.

17         MR. HICKS:  Thank you, Your Honor.  We appreciate

18    it.

19         MS. RIKELMAN:  Thank you, Your Honor.

20        (Proceedings concluded at 10:45 a.m.)

21

22

23

24

25

55

1                    C E R T I F I C A T E

2        I, LORI RUSSELL, RMR, CRR, United States District Court
   Reporter for the Middle District of North Carolina, DO
3    HEREBY CERTIFY:

4        That the foregoing is a true and correct transcript of
   the proceedings had in the within-entitled action; that I
5    reported the same in stenotype to the best of my ability and
   thereafter reduced same to typewriting through the use of
6    Computer-Aided Transcription.

7

8    *Lori Russell*

9    Lori Russell, RMR, CRR                Date:  9-9-13
   Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25