IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

GRETCHEN S. STUART, M.D., et al.,       )
                                        )
            Plaintiffs,                 )
                                        )
        v.                              )           1:11-CV-804
                                        )
RALPH C. LOOMIS, M.D., et al.,          )
                                        )
            Defendants.                 )


## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, District Judge.

In 2011, North Carolina imposed new requirements on health care providers who treat patients seeking abortions.  The Woman's Right to Know Act ("the Act"), codified at N.C. Gen. Stat. §§ 90-21.80 through 90-21.92, sets forth the information physicians and other health care providers[1] (hereinafter "providers") are required to make available to a woman seeking an abortion before she can give informed consent.  Another section, the "speech-and-display provision," requires that the provider perform an ultrasound at least four hours in advance of an abortion, during which he or she must display ultrasound images so that the patient may view them and must describe the images to the patient.  The description must include the dimensions of the embryo or fetus and the presence of external members and internal organs, if present and viewable.  The woman need not watch or listen to the display and explanation.

Plaintiffs—several North Carolina physicians and health care providers—brought this action on behalf of themselves and their patients challenging the constitutionality of parts of the

---

[1] *See* N.C. Gen. Stat. § 90-21.81(8), (9) (defining "qualified professional" and "qualified technician").

Act.  Defendants are various North Carolina government agents sued in their official capacities, which the Court will refer to as either "Defendants" or "the state."  Plaintiffs primarily object to being required to deliver the speech-and-display information to women who do not wish to receive it and to women at risk of serious psychological harm from the information.

The Supreme Court has never held that a state has the power to compel a health care provider to speak, in his or her own voice, the state's ideological message in favor of carrying a pregnancy to term, and this Court declines to do so today.  To the extent the Act is an effort by the state to require health care providers to deliver information in support of the state's philosophic and social position discouraging abortion and encouraging childbirth, it is content-based, and it is not sufficiently narrowly tailored to survive strict scrutiny.  Otherwise, the state has not established that the speech-and-display provision directly advances a substantial state interest in regulating health care, especially when the state does not require the patient to receive the message and the patient takes steps to avoid receipt of the message.  Thus, it does not survive heightened scrutiny.

Because the speech-and-display provision violates Plaintiffs' First Amendment rights, enforcement of this provision must be enjoined.  Plaintiffs' due process claim is thus moot.  Finally, the Court agrees with the parties' proposed constructions of certain disputed provisions, so that the Act is not void as vague.

**BACKGROUND**

In their initial complaint, Plaintiffs contended that the Act violated their constitutional rights in a number of ways.  They immediately moved for a preliminary injunction based on First Amendment and vagueness arguments.  The Court found that Plaintiffs were likely to succeed on the merits of their First Amendment compelled speech claims related to the speech-and-display

provision, granted Plaintiffs' motion in part, and enjoined Defendants from enforcing the speech-and-display provision. *See Stuart v. Huff*, 834 F. Supp. 2d 424 (M.D.N.C. 2011); (CM-ECF Docs. 40, 66.) The Court denied the motion as to Plaintiffs' vagueness arguments, and the remainder of the Act became effective on October 28, 2011.

After the Court enjoined part of the Act, several individuals sought to intervene as defendants in the action. The Court denied their motion. *Stuart v. Huff*, No. 1:11-cv-804, 2011 WL 6740400 (M.D.N.C. Dec. 22, 2011). The Fourth Circuit affirmed. *Stuart v. Huff*, 706 F.3d 345 (4th Cir. 2013).

After a period of discovery, Plaintiffs filed a Second Amended Complaint which narrowed their claims. (Doc. 75.) Their First Amendment, due process, and vagueness claims remain. The parties have each moved for summary judgment.

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When both parties move for summary judgment, "the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks omitted). In reviewing each motion, the court should "resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." *Id.* (internal quotation marks omitted).

## FIRST AMENDMENT CLAIM

Plaintiffs contend that the speech-and-display provision violates their First Amendment rights because it compels them to deliver the state's content-based message to their patients, a message they do not want to deliver in the absence of a request from or consent of their patients.

Plaintiffs contend that the Court should apply strict scrutiny to this compelled, content-based speech, and that the provision does not survive this review.

Defendants disagree both as to this standard of review and as to the outcome. While they admit the provision compels speech, they contend that it compels health care providers to give abortion patients truthful, non-misleading, and relevant information sufficient to satisfy the deferential standard they contend the Supreme Court established in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992). In the alternative, Defendants argue that the speech is commercial, triggering intermediate scrutiny, or, again in the alternative, that the Act passes constitutional muster even applying strict scrutiny.

## I.      Factual and Legal Background

In support of their motion, Plaintiffs rely on the declarations of seven physicians, (Docs. 107-112, 115), testimony from the state's expert, (Docs. 113-1, 133-1), and the declaration of one woman who underwent an abortion. (Doc. 114.) In support of their motion, Defendants rely on the report of the state's expert, (Doc. 117-1), and on affidavits from three women who had abortions, originally submitted by non-parties in support of their motion to intervene.[2] (Docs. 45-4 to 45-6.)

The Court concludes that the material facts are undisputed and that summary judgment is appropriate.[3]

---

[2] The Court has granted Plaintiffs' motion to strike declarations of experts not properly identified during discovery on which Defendants seek to rely. (*See* Doc. 162.) Though Defendants listed the affidavits in their summary judgment motion, they barely cited them in their briefs. The Court has relied only on the evidence before it by affidavits, depositions, and learned treatises cited in the affidavits of experts. No party has made more than passing reference to legislative history.

[3] The parties initially agreed that the facts are undisputed. (*See* Doc. 142 at 1.) Later, some disputes arose as to whether certain facts are material. (*See generally* Doc. 158.)

## A. Speech-and-Display Provision

The Act requires an ultrasound at least four and no more than seventy-two hours before an abortion. N.C. Gen. Stat. § 90-21.85(a). During this ultrasound procedure, the patient must lie on an examination table where she either (i) exposes the lower portion of her abdomen, or (ii) is naked from the waist down, covered only by a drape. (Doc. 107 at ¶ 13; *see also* Doc. 110 at ¶ 10; Doc. 111 at ¶ 10.) Depending on the stage of pregnancy, the provider (i) inserts an ultrasound probe into the patient's vagina, or (ii) places an ultrasound probe on her abdomen.[4] (Doc. 107 at ¶ 13; Doc. 110 at ¶ 10; Doc. 111 at ¶¶ 10-11.) The provider must display the images produced from the ultrasound "so that the pregnant woman may view them." N.C. Gen. Stat. § 90-21.85(a)(3). Providers must then give "a simultaneous explanation of what the display is depicting, which shall include the presence, location, and dimensions of the unborn child within the uterus," *id.* § 90-21.85(a)(2), and "a medical description of the images, which shall include the dimensions of the embryo or fetus and the presence of external members and internal organs, if present and viewable." *Id.* § 90-21.85(a)(4).

The Act provides that "[n]othing in this section shall be construed to prevent a pregnant woman from averting her eyes from the displayed images or from refusing to hear the simultaneous explanation and medical description." *Id.* § 90-21.85(b). If the patient does not want to see the ultrasound images or hear the description and explanation concerning the ultrasound images, the provider may give the patient eye blinders and headphones so that, as a practical matter, she may avoid seeing the ultrasound images and/or hearing the fetal heartbeat and the description of the ultrasound images. (*See* Doc. 113-1 at 6; Doc. 133-2 at 3-4; *see also*

---

[4] Defendants contend the necessity of a vaginal ultrasound is disputed, (Doc. 158 at 8), but they have offered no evidence to the contrary.

Doc. 107 at ¶¶ 31-32; Doc. 110 at ¶¶ 21-22; Doc. 111 at ¶ 18.) However, providers must comply with the speech-and-display requirements regardless, even if (i) the patient wears blinders and earphones and cannot see or hear the message; (ii) they believe that acting over the patient's objection will harm the patient or violate medical ethics; or (iii) doing so is contrary to their medical judgment. (*See* Doc. 107 at ¶¶ 22-24, 42, 46; Doc. 108 at ¶ 11; Doc. 109 at ¶ 16; Doc. 110 at ¶ 14; Doc. 111 at ¶ 14; Doc. 112 at ¶ 12); *see also* N.C. Gen. Stat. § 90-21.85(a).

A woman who does not watch or listen to the real-time display and description can still give informed consent to an abortion. *See* N.C. Gen. Stat. §§ 90-21.82, 90-21.85(b). When a provider displays and describes ultrasound images to patients who take steps to avoid seeing the images or hearing the description, the quality of informed consent is not improved and no medical purpose is served. (*See* Doc. 107 at ¶¶ 23, 30-32, 42; Doc. 110 at ¶¶ 20-22; Doc. 111 at ¶¶ 16-19; Doc. 113-1 at 7-8, 11; Doc. 115 at ¶¶ 20-21.)

### B. Abortion in North Carolina

Abortion is a very safe medical procedure. (Doc. 107 at ¶ 47; Doc. 110 at ¶¶ 4, 27; Doc. 111 at ¶ 4.) In North Carolina, only a licensed physician may perform a surgical abortion, and a licensed physician must be present when a patient undergoes a chemically induced abortion. *See* N.C. Gen. Stat. § 90-21.82(1)(a). Women seek abortions for a variety of reasons, including but not limited to the health of the woman or fetus. (Doc. 107 at ¶¶ 6, 8; Doc. 110 at ¶ 5; Doc. 111 at ¶ 5.) The vast majority of abortions in North Carolina occur during the first trimester of pregnancy. (Doc. 111 at ¶ 6.) As is true nation-wide, approximately half of North Carolina women obtaining abortions already have at least one child. (Doc. 107 at ¶ 19.)

Since 1994, the North Carolina Department of Health and Human Services has required by regulation an ultrasound for any patient who is scheduled for an abortion procedure. *See* 10A

N.C. Admin. Code 14E.0305(d). These same regulations require a written consent form to be voluntarily signed by the patient, which signature must be witnessed and also signed by the physician performing the procedure. *Id.* at 14E.0305(a).

All physicians in North Carolina have ethical duties to their patients,[5] the violation of which subjects them to discipline by the North Carolina Medical Board. *See* N.C. Gen. Stat. §§ 90-2(a), 90-14(a)(6); *N.C. Dep't of Corr. v. N.C. Med. Bd.*, 363 N.C. 189, 199, 675 S.E.2d 641, 648 (2009). Physicians are charged with the duties to respect patient autonomy;[6] to act upon patients only with the patient's consent and, generally, to not act over a competent patient's objection;[7] to act in the patient's individual interests as defined by the patient;[8] not to inflict harm on patients;[9] and to exercise their medical judgment and discretion.[10] Indeed, doctors in North

---

[5] *See generally* Tom L. Beauchamp & James F. Childress, *Principles of Biomedical Ethics* 99-239 (6th ed. 2009) (cited by state's expert, (Doc. 117-1 at pp. 4-5 ¶ 1), and Plaintiffs' expert, (Doc. 108 at ¶¶ 12, 15-16, 18)); Comm. on Ethics, Am. Coll. of Obstetricians & Gynecologists, *Comm. Op. # 390: Ethical Decision Making in Obstetrics and Gynecology* (2007) (cited by Plaintiffs' expert, (Doc. 108 at ¶ 12); state's expert was a committee member, (*see* Doc. 117-1 at p. 9)).

[6] *See* Doc. 107 at ¶ 25; Doc. 108 at ¶¶ 12, 14-15; Doc. 109 at ¶ 18; Doc. 110 at ¶¶ 15, 22; Doc. 111-2 at 2; Doc. 112 at ¶ 12; Doc. 117-1 at p. 4 ¶ 1. *See generally* Beauchamp & Childress, *supra*, at 99-140.

[7] *See* Doc. 108 at ¶¶ 15, 19; Doc. 109 at ¶ 16; Doc. 110 at ¶ 22; Doc. 112 at ¶ 15; Doc. 113-1 at 3; Doc. 117-1 at p. 4 ¶ 1. *See generally* Beauchamp & Childress, *supra*, at 99-105.

[8] *See* Doc. 107 at ¶ 46; Doc. 108 at ¶¶ 12-13, 25; Doc. 109 at ¶¶ 13-14; Doc. 110 at ¶ 19; Doc. 112 at ¶ 22; *see also* Doc. 107 at ¶ 48; Doc. 113-1 at 12; *see also Jacobs v. Physicians Weight Loss Ctr. of Am., Inc.*, 173 N.C. App. 663, 668, 620 S.E.2d 232, 236 (2005) (requiring the physician to "act in good faith and with due regard to the interests" of the patient) (quoting *Tin Originals, Inc. v. Colonial Tin Works, Inc.*, 98 N.C. App. 663, 666, 391 S.E.2d 831, 833 (1990)). *See generally* Beauchamp & Childress, *supra*, at 197-239.

[9] *See* Doc. 107 at ¶ 48; Doc. 108 at ¶¶ 12, 26; Doc. 109 at ¶ 20; Doc. 110 at ¶ 19; Doc. 112 at ¶ 18; *see also Comm. Op. # 390*, *supra*, at 3. *See generally* Beauchamp & Childress, *supra*, at 149-96.

7

Carolina have a fiduciary relationship to their patients.  *See, e.g.*, *Black*, 312 N.C. at 646, 325 S.E.2d at 482; *King*, ___ N.C. App. at ___, 737 S.E.2d at 809.

All physicians in North Carolina, including those who provide abortions, must also comply with statutory requirements for informed consent or face civil liability to their patients. Health care providers must comply with "the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities" when they obtain informed consent.  N.C. Gen. Stat. § 90-21.13(a)(1).  Providers must also give patients information sufficient to give a reasonable person "a general understanding of the procedures or treatments and of the usual and most frequent risks and hazards inherent in the proposed procedures or treatments which are recognized and followed by other health care providers engaged in the same field of practice in the same or similar communities."  *Id.* § 90-21.13(a)(2).

If, however, a patient chooses not to consider some information, that is a choice the physician should ordinarily respect; the American College Of Obstetricians and Gynecologists, for example, has advised physicians that a patient's refusal of information is "itself an exercise of choice, and its acceptance can be part of respect for the patient's autonomy" and "[i]mplicit in the ethical concept of informed consent is the goal of maximizing a patient's freedoms."  Comm. on Ethics, Am. Coll. of Obstetricians & Gynecologists, *Comm. Op. # 439: Informed Consent* 7 (2009, reaffirmed 2012) (cited by Plaintiffs' expert, (Doc. 108 at ¶ 13); state's expert was a committee member, (*see* Doc. 117-1 at p. 9)) (distinguishing a patient's refusal of information

---

[10] *See* Doc. 107 at ¶¶ 46-47; Doc. 109 at ¶¶ 14, 20; Doc. 112 at ¶ 22; Doc. 113-1 at 4, 12; *see, e.g.*, *Black v. Littlejohn*, 312 N.C. 626, 646, 325 S.E.2d 469, 482 (1985); *King v. Bryant*, ___ N.C. App. ___, ___, 737 S.E.2d 802, 809 (2013).

from other exceptions to disclosure requirements).[11]  If unusual and rare circumstances exist such that information ordinarily required for informed consent would cause serious harm to the patient, physicians can and should decline to disclose the information to the patient.[12]

Regardless of the Act, standard medical practice for abortion in North Carolina requires a provider to discuss with the patient, among other things, the nature of the procedure, the procedure's risks and benefits, and alternatives available to the patient, along with their respective risks and benefits.  (*See* Doc. 107 at ¶¶ 10, 19, 45; Doc. 108 at ¶ 14; Doc. 110 at ¶ 6; Doc. 111 at ¶ 7.)  It also involves asking patients if they want to view the ultrasound images, showing the images if the patient wants to see them, and answering questions about the ultrasound.  (*See* Doc. 107 at ¶¶ 14, 21-22, 26; Doc. 108 at ¶ 21; Doc. 110 at ¶¶ 11, 15; Doc. 111 at ¶¶ 12, 15.)  In the absence of the Act, Plaintiffs would not offer to display and describe ultrasound images to some patients who are at risk of significant psychological harm, (*see* Doc.

_____

[11] *See also* Elysa Gordon, *Multiculturalism in Medical Decisionmaking: The Notion of Informed Waiver*, 23 Fordham Urb. L. J. 1321, 1340 (1996) (collecting authorities on waiver of informed consent rights).

[12] While providers should withhold information only in rare circumstances and with great caution, *Comm. Op. # 439*, *supra*, at 7, medical ethics and the principles of informed consent "require the exercise of judgment.  Disclosure may be excused, for example, if in the doctor's judgment the patient's emotional ability to handle the information is compromised."  Barbara L. Atwell, *The Modern Age of Informed Consent*, 40 U. Rich. L. Rev. 591, 595 (2006).  *Salgo v. Leland Stanford Jr. University Board of Trustees,* one of the watershed informed consent cases, expressly noted this therapeutic exception and its limits, 317 P.2d 170, 181 (Cal. Dist. Ct. App. 1957), as did *Canterbury v. Spence*, 464 F.2d 772, 789 (D.C. Cir. 1972).  *See* Gordon, *supra*, at 1338-39; Richard E. Shugrue & Kathryn Linstromberg, *The Practitioner's Guide to Informed Consent*, 24 Creighton L. Rev. 881, 905-08 (1991); *see also Butler v. Berkeley*, 25 N.C. App. 325, 341-42, 213 S.E.2d 571, 581-82 (1975) (discussing value of physician judgment in disclosing risks and benefits and noting the "primary importance" of "the best interest of [the] patient.").  In other contexts, North Carolina law recognizes the necessity of withholding certain kinds of information from a patient.  *See, e.g.*, N.C. Gen. Stat. § 160A-168(c)(1) (establishing that an employee is entitled to see his or her personnel file, except for "information concerning a medical disability, mental or physical, that a prudent physician would not divulge to his patient").

107 at ¶¶ 28-29, 36-39; Doc. 110 at ¶¶ 16-19; Doc. 111 at ¶¶ 14-15, 20-23; Doc. 112 at ¶ 18;

Doc. 115 at ¶¶ 15-19), and Plaintiffs would not display and describe the images to any patient

seeking an abortion unless the patient requested it.  (*See* Doc. 107 at ¶¶ 14, 20-22, 26; Doc. 108

at ¶ 21; Doc. 110 at ¶¶ 11, 15; Doc. 111 at ¶¶ 9, 15; Doc. 112 at ¶¶ 13-14, 19; Doc. 115 at ¶ 20.)

Thus, the parties agree that even in the absence of the Act, it is appropriate for providers

to offer the information required by the speech-and-display provision to almost all patients and to

provide the information to all patients who want to hear and see it.  The dispute in this case

therefore centers on whether the state can compel providers to deliver the state's message to

women who do not want to hear it or who are at risk of significant psychological harm from

receiving it.

### C.  First Amendment Principles

The First Amendment generally prohibits the government from requiring people to speak

its messages.  *See Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, ___ U.S. ___, ___,

133 S. Ct. 2321, 2327 (2013); *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515

U.S. 557, 573 (1995); *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796-97

(1988).  Because "[m]andating speech that a speaker would not otherwise make necessarily alters

the content of the speech," speech compelled by the government is typically considered content-

based regulation.  *Riley*, 487 U.S. at 795.  Content-based speech compelled by the government is

generally subject to strict scrutiny, even where the compelled speech is limited to factually

accurate or non-ideological statements.  *Id.* at 797-98; *see also Greater Balt. Ctr. for Pregnancy

Concerns, Inc. v. Mayor of Balt.*, 721 F.3d 264, 283 (4th Cir. 2013).  Strict scrutiny requires that

the speech restriction be narrowly tailored to promote a compelling government interest.  *See

United States v. Playboy Entm't Grp.*, 529 U.S. 803, 813 (2000).

Despite the apparent absolute nature of these rules, courts have recognized certain areas of compelled speech to which strict scrutiny does not apply. One common area exempt from strict scrutiny is compelled commercial speech, which is "expression related solely to the economic interests of the speaker and its audience."[13] *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980). Such speech is still entitled to First Amendment protection, though the government has more leeway to impose restrictions. *Id.* at 563. Typically, laws restricting or prohibiting non-misleading commercial speech are subject to intermediate scrutiny, under which the government must prove that the restriction directly advances and is narrowly tailored to serve a substantial government interest. *Id.* at 566. If, however, the government compels people to disclose "purely factual and uncontroversial information about the terms under which [their] services will be available" in order to avoid misleading advertisements, the regulation is scrutinized less heavily, and the government need only show a reasonable connection between its interest in preventing deception and the regulation. *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985); *see Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457, 490 (1997) (Souter, J., dissenting) (identifying *Zauderer* as the Supreme Court's earliest examination of a commercial-speech mandate). The Court has upheld disclosure rules in the bankruptcy context under this same standard when the compelled disclosures at issue were needed to prevent deception in advertising. *See Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 249-50 (2010).

The Supreme Court does not necessarily apply rational basis review every time the government compels speech in the context of professional advertising. "Unjustified or unduly

---

[13] Speech that triggers lesser scrutiny pursuant to the commercial speech doctrine must be purely commercial; when speech "is inextricably intertwined with otherwise fully protected speech," strict scrutiny applies. *Riley*, 487 U.S. at 796.

burdensome disclosure requirements," for example, "offend the First Amendment." *Id.* at 250.

The Court has evaluated some restrictions and prohibitions on professional advertising under intermediate scrutiny, *see In re R.M.J.*, 455 U.S. 191, 203-07 (1982), and others under strict scrutiny. *See NAACP v. Button*, 371 U.S. 415, 438-40 (1963).

Moreover, the commercial speech doctrine is less likely to apply when the speech regulation at issue is content-based. For example, in *Riley*, the Supreme Court considered a First Amendment challenge to a statute requiring professional fundraisers to disclose to potential donors the percentage of charitable contributions collected during the previous twelve months that were actually turned over to charity. 487 U.S. at 795. In deciding to apply strict scrutiny, the Court noted only that the Act was a content-based regulation of speech because it was compelled speech and that the speech could not be labeled commercial when examined as a whole. *Id.* at 795-96.

Similarly, in *Sorrell v. IMS Health Inc.*, the Supreme Court held that a state statute that prohibited pharmaceutical manufacturers from using prescriber-identifying information for marketing was First Amendment-protected expression that must be subject to "heightened judicial scrutiny." ___ U.S. ___, ___, 131 S. Ct. 2653, 2659 (2011). Even though the statute regulated commercial speech, the Court applied heightened scrutiny in striking it down because it was content-based; its express purpose was "to diminish the effectiveness of marketing by manufacturers of brand-name drugs." *Id.* at ___, 131 S. Ct. at 2663-64.[14] Heightened scrutiny

---

[14] *See also Entm't Software Ass'n v. Blagojevich*, 469 F.3d 641, 652 (7th Cir. 2006) (applying strict scrutiny to regulation requiring the application of a sticker marked "18" on "sexually explicit" games because the sticker communicated a non-factual, "subjective[,] and highly controversial message"); *cf. Brown v. Entm't Merchs. Ass'n*, ___ U.S. ___, ___, 131 S. Ct. 2729, 2738 (2011) (applying strict scrutiny to strike down regulation prohibiting sale or rental of violent video games to minors and requiring "18" packaging label).

requires at a minimum that the provision at issue must directly advance a substantial state interest and be drawn to achieve that interest. *See id.* at ___, 131 S. Ct. at 2667-68 (defining heightened scrutiny in the commercial speech context.) It also requires that the harms the provision prevents must be "real, not merely conjectural," and that the provision at issue "in fact alleviate[s] these harms in a direct and material way." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 662, 664 (1994).

Outside of the advertising context, it has long been recognized that the state can require licenses and impose reasonable regulations on professions which require "a certain degree of skill and learning upon which the community may confidently rely." *Dent v. West Virginia*, 129 U.S. 114, 122 (1889). In *Dent*, the Supreme Court upheld a state law prohibiting the practice of medicine without a license, holding that a state may require a license so long as it is "appropriate to the calling or profession, and attainable by reasonable study or application." *Id.* at 121-22; *see also Watson v. Maryland*, 218 U.S. 173, 176 (1910). Similarly, in *Keller v. State Bar of California*, the Supreme Court held that the state may require lawyers to belong to an organized bar that expended dues to fund activities germane to the profession because of its interests in regulating the profession and improving the quality of legal services.[15] 496 U.S. 1, 13-14 (1990).

In a variety of contexts, the Supreme Court has acknowledged the government's "interest in protecting the integrity and ethics of the medical profession" specifically. *Washington v.*

---

[15] Courts have similarly held that states may regulate the licensing of other professions without running afoul of the Constitution. *See, e.g.*, *Nat'l Ass'n for Advancement of Psychoanalysis v. Cal. Bd. of Psychology* (*NAAP*), 228 F.3d 1043, 1051 (9th Cir. 2000) (mental health professionals); *Mitchell v. Clayton*, 995 F.2d 772, 774 (7th Cir. 1993) (acupuncturists); *Accountant's Soc'y of Va. v. Bowman*, 860 F.2d 602, 605 (4th Cir. 1988) (accountants); *Underhill Assocs., Inc. v. Bradshaw*, 674 F.2d 293, 296 (4th Cir. 1982) (securities broker-dealers); *Locke v. Shore*, 682 F. Supp. 2d 1283, 1292 (N.D. Fla. 2010) (interior designers).

*Glucksberg*, 521 U.S. 702, 731 (1997).[16] States have routinely required that health care

providers conform to professional standards within the field and provide competent medical

advice. *See Pickup v. Brown*, 728 F.3d 1042, 1054-55 (9th Cir. 2013) (collecting cases, noting

that a doctor "may not counsel a patient to rely on quack medicine" (quotation marks omitted)).[17]

States have also long required health care providers to give patients information they

need to make informed decisions about medical treatment. *See, e.g.*, *Canterbury*, 464 F.2d at

781 ("The cases demonstrate that the physician is under an obligation to communicate specific

information to the patient when the exigencies of reasonable care call for it.").[18] Thus, courts

have routinely imposed civil liability on physicians who have failed to provide enough

information to patients in advance of treatment. *Id.*; *see, e.g.*, *Nelson v. Patrick*, 73 N.C. App. 1,

---

[16] *See also Gonzales v. Carhart*, 550 U.S. 124, 157 (2007) ("Under our precedents it is clear the State has a significant role to play in regulating the medical profession."); *Roe v. Wade*, 410 U.S. 113, 154 (1973) (recognizing the state's ability to impose reasonable regulations to protect its interest in safeguarding health and to maintain medical standards); *Barsky v. Bd. of Regents*, 347 U.S. 442, 451 (1954) (indicating the state has "legitimate concern for maintaining high standards of professional conduct" in the practice of medicine).

[17] *See also* Robert Post, *Informed Consent to Abortion: A First Amendment Analysis of Compelled Physician Speech*, 2007 U. Ill. L. Rev. 939, 949 (2007) [hereinafter Post Article].

[18] *See generally Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 67 n.8 (1976) (interpreting the term "informed consent" to mean "the giving of information to the patient as to just what would be done and as to its consequences"); James A. Bulen, Jr., *Complementary and Alternative Medicine: Ethical and Legal Aspects of Informed Consent to Treatment*, 24 J. Legal Med. 331, 333-35 (2003); Sonia M. Suter, *The Politics of Information: Informed Consent in Abortion & End-of-Life Decision Making*, 39 Am. J. L. & Med. 7, 11-17 (2013); Erin Talati, *When A Spoonful of Sugar Doesn't Help the Medicine Go Down: Informed Consent, Mental Illness, and Moral Agency*, 6 Ind. Health L. Rev. 171, 176-77 & n.17 (2009). This rule is an extension of the application of the common law of assault and battery to medical care, when courts historically held that a physician could not perform an operation without his patient's consent. *See., e.g.*, *Schloendorff v. Soc'y of N.Y. Hosp.*, 105 N.E. 92, 93-94 (N.Y. 1914) ("Every human being of adult years and sound mind has a right to determine what shall be done with his own body."), *abrogated on other grounds by Bing v. Thunig*, 143 N.E.2d 3 (N.Y. 1957).

10-12, 326 S.E.2d 45, 51-52 (1985) (citing N.C. Gen. Stat. § 90-21.13).  In doing so, courts have linked informed consent and competent advice requirements to standards of the profession and to well-established negligence standards.[19]  *See Pickup*, 728 F.3d at 1054-55.

Beyond generally applicable licensing systems and enforcement of professional norms, just what "professional speech"[20] means and whether it receives a different degree of protection under the First Amendment is not particularly clear.  *See Stuart*, 834 F. Supp. 2d at 431 (noting that "the phrase has been used by Supreme Court justices only in passing" and collecting cases).  Nonetheless, it is clear that individuals do not surrender their First Amendment rights entirely when they speak as professionals.  In *Casey*, the Court explicitly recognized a physician's First Amendment rights and cited *Wooley v. Maynard*, 430 U.S. 705 (1977), which held that the state cannot compel a person to speak the state's ideological message.  *Casey*, 505 U.S. at 884; *see also Keller*, 496 U.S. at 13-14 (holding that the state could not compel members of the state bar to fund "activities of an ideological nature").  The Supreme Court also has noted in dicta that

---

[19] Perhaps because of this traditional approach, this kind of regulation historically raised barely a whisper of First Amendment concern.  *See Pickup*, 728 F.3d at 1054 (noting that "doctors are routinely held liable for giving negligent medical advice to their patients, without serious suggestion that the First Amendment protects their right to give advice that is not consistent with the accepted standard of care"); *see also* Post Article, *supra*, at 950; Frederick Schauer, *The Boundaries of the First Amendment*: *A Preliminary Exploration of Constitutional Salience*, 117 Harv. L. Rev. 1765, 1767 (2004) ("[T]he question whether the First Amendment shows up at all [in cases implicating speech] is rarely addressed, and the answer is too often simply assumed.").  *See generally* Amanda McMurray Roe, *Not-So-Informed Consent: Using the Doctor-Patient Relationship to Promote State-Supported Outcomes*, 60 Case W. Res. L. Rev. 205, 205-13 (2009) (describing informed consent doctrine historically and the "relatively recent development of informed consent statutes for specific procedures").

[20] The modern "professional speech doctrine" traces its roots to concurrences by Justice White in *Lowe v. SEC*, 472 U.S. 181 (1985) (striking down permanent injunction against publishing non-personalized investment advice), and Justice Jackson in *Thomas v. Collins*, 323 U.S. 516 (1945) (holding unconstitutional a Texas law that criminalized labor union membership solicitation without first obtaining an organizer's card).

"[s]peech by professionals obviously has many dimensions. There are circumstances in which we will accord speech by [professionals] . . . the strongest protection our Constitution has to offer." *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 634 (1995).

In fact, the Fourth Circuit recently intimated that where professionals are accredited and licensed, the state has a lower interest in compelling their speech. *See Moore-King v. Cnty. of Chesterfield*, 708 F.3d 560, 570 (4th Cir. 2013). In *Moore-King*, the Fourth Circuit upheld a regulation requiring professional fortune tellers to obtain and pay for licenses, finding no First Amendment violation. *Id.* at 569-70. The court noted that "[w]ith respect to an occupation such as fortune telling where no accrediting institution like a board of law examiners or medical practitioners exists, a legislature may reasonably determine that additional regulatory requirements are necessary." *Id.* at 570.

In the health care context specifically, the Ninth Circuit recently reiterated that "doctor-patient communications about medical treatment receive substantial First Amendment protection." *Pickup*, 728 F.3d at 1053 (emphasis omitted).[21] In *Pickup,* the court characterized a statute that prohibited a certain kind of psychotherapy for use with minors as a regulation of conduct with only an incidental effect on speech. *Id.* at 1055-56. The court found rational basis review was appropriate because the statute "regulates only treatment, while leaving mental health providers free to discuss and recommend, or recommend against." *Id.* at 1056. Because the "overwhelming consensus" of opinion within the profession was that the recommended

---

[21] *See also Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 186 (4th Cir. 2013) (affirming district court's application of strict scrutiny on undeveloped record to uphold preliminary injunction against county resolution requiring pregnancy resource centers to post disclosure signs); *cf. Cooksey v. Futrell*, 721 F.3d 226, 234-39 (4th Cir. 2013) (applying First Amendment standing principles to appellant's claim that prohibition on practicing dietetics/nutrition without a license and state's regulation of his diet website violated his First Amendment rights).

therapy was harmful and ineffective, the Court found the legislature acted rationally in relying on that consensus. *Id.* at 1057.

The Ninth Circuit in *Pickup* was guided by two of its earlier speech cases. *Id.* at 1051-52. In *NAAP*, the Court held that California's psychology licensing scheme did not violate the First Amendment, as it was content- and viewpoint-neutral and did not "dictate what can be said between psychologists and patients during treatment." 228 F.3d at 1054-56. The *Pickup* court contrasted *NAAP* with *Conant v. Walters*, in which the Ninth Circuit applied strict scrutiny to a federal policy declaration that a doctor's recommendation or prescription of medical marijuana would lead to revocation of the doctor's registration to prescribe controlled substances. 309 F.3d 629, 639 (9th Cir. 2002). The court recognized that "[b]eing a member of a regulated profession does not, as the government suggests, result in a surrender of First Amendment rights," and concluded that the content- and viewpoint-based policy was not sufficiently narrowly tailored. *Id.* at 637, 639; *see Pickup*, 728 F.3d at 1056.[22] The court in *Pickup* characterized *Conant* as holding that "content- or viewpoint-based regulation of communication *about* treatment must be closely scrutinized." *Pickup*, 728 F.3d at 1056.

It is also clear that a state's regulation of professional speech must be consistent with the goals and duties of the profession. In *Legal Services Corp. v. Velazquez*, for example, the Supreme Court expressed concern about a statute that interfered with traditional professional relationships by restricting the kind of professional advice a lawyer could give. 531 U.S. 533 (2001). The Court found that regulations which prohibited federally-funded legal aid attorneys

---

[22] *See also Wollschlaeger v. Farmer*, 880 F. Supp. 2d 1251, 1255, 1261-62 (S.D. Fla. 2012) (applying strict scrutiny to invalidate a state statute prohibiting doctors from asking patients whether they own firearms because it was content-based and went beyond "permissible regulation of professional speech or occupational conduct that imposed a mere incidental burden on speech").

from advising clients about potential constitutional claims violated the First Amendment, noting that "[r]estricting . . . attorneys in advising their clients and in presenting arguments and analyses to the courts distorts the legal system by altering the traditional role of the attorneys." *Id.* at 544. Likewise, in *Milavetz*, the Court narrowly construed the statute at issue so as to avoid any concerns that the statute would inhibit "frank discussion" between attorney and client. 559 U.S. at 246. Courts have been careful to insure that the regulation at issue was in fact directed at the state's purported interest in the profession. *See Keller*, 496 U.S. at 14; *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 768 (1976) (discounting state's interest in improving standards of pharmacists where disclosure had more to do with retail sales than with professional standards).

As a review of these authorities makes clear, whether, when, and to what extent the government can compel speech by a professional cannot be established with hard and fast rules. *See Healy v. James*, 408 U.S. 169, 180 (1972) ("First Amendment rights must always be applied 'in light of the special characteristics of the . . . environment' in the particular case." (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969))); *Moore-King*, 708 F.3d at 570 (recognizing "variability inherent in occupational regulations," and noting that "[j]ust as the internal requirements of a profession may differ, so may the government's regulatory response based on the nature of the activity and the need to protect the public" (citing Robert C. Post, *Democracy, Expertise, and Academic Freedom* 134 n.83 (2012) [hereinafter Post Book])).[23] The use of labels and categories is of limited utility. *See Button*, 371 U.S. at 429.

---

[23] *See also* Rodney A. Smolla, *Smolla & Nimmer on Freedom of Speech* § 2:12 at 2-14 (3d ed. 2013) ("The [Supreme] Court consistently refuses to adopt an absolutist position in most areas, yet it also tends to devise doctrines tailored to specific topic areas that are highly

Rather, compelled professional speech is more appropriately viewed on a continuum, taking into account the regulatory context, the nature of the professional relationship, the degree of intrusion into the relationship, the reasons and evidentiary support for the intrusion, and the connection between the compelled speech and the government's interests. *See Riley*, 487 U.S. at 796 ("[The] lodestars in deciding what level of scrutiny to apply to a compelled statement must be the nature of the speech taken as a whole and the effect of the compelled statement thereon."); *Pickup*, 728 F.3d at 1053-55 (explaining continuum of First Amendment rights of professionals in determining whether regulation is of speech or of conduct); *Centro Tepeyac*, 722 F.3d at 193 (Wilkinson, J., concurring) ("Compelled speech is not an all-or-nothing matter .").

## II.  Analysis

### A.  Standard

The speech-and-display provision compels speech by providers because it requires them, over their objection, to show the real-time display and to describe what can be seen to every single patient, regardless of the patient's wishes and individual medical needs. The state not only compels the delivery of the message in all situations, but it also compels the content of the message (the display and the verbal description of the physical features of the fetus, if any), the format of the message (in the physician's own voice and on a screen the provider sets to face the patient), exactly where the information must be delivered (in the examining room), and when it must be delivered (in the middle of a medical procedure while the patient is disrobed and, for women in very early stages of pregnancy, while she has a probe in her vagina, at least four hours but no more than seventy-two hours before the abortion). *See* N.C. Gen. Stat. § 90-21.85(a). By

---

protective of freedom of speech, requiring much more than a mere 'reasonable basis' for any governmental action abridging speech.").

delivering the information in this way, providers appear to have adopted the state's message, and patients are likely to assume that the provider's speech delivered during a medical procedure conveys ideas and messages the provider endorses and has deemed "worthy of presentation." *Hurley*, 515 U.S. at 575. (*See* Doc. 107 at ¶ 24; Doc. 111 at ¶ 17; Doc. 115 at ¶ 21); *see also* Jennifer M. Keighley, *Physician Speech & Mandatory Ultrasound Laws: The First Amendment's Limit on Compelled Ideological Speech*, 34 Cardozo L. Rev. 2347, 2374 (2013) ("Because of the fiduciary relationship between physicians and their patients, patients are likely to place significant value on the physicians' speech about a medical procedure.").

To the extent the speech-and-display provision requires providers to deliver a message designed to persuade women not to terminate a pregnancy, which the state forthrightly acknowledges is one of its purposes, (*see* Doc. 118 at 25), it "imposes burdens that are based on the content of speech and that are aimed at a particular viewpoint." *See Sorrell*, ___ U.S. at ___, 131 S. Ct. at 2663-64. Requiring a physician or other health care provider to deliver the state's content-based, non-medical message in his or her own voice as if the message was his or her own constitutes compelled ideological speech and warrants the highest degree of First Amendment protection. *See Hurley*, 515 U.S. at 579 ("[T]he law . . . is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government"); *Casey* 505 U.S. at 884 (citing *Wooley*, 430 U.S. 705); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 386 (1992); *Wooley*, 430 U.S. at 716. This is so even if the disclosure is limited to factual information. *See Riley*, 487 U.S. at 797-98.

The state contends that the speech-and-display provision is related to medical care so that, consistent with the state's traditional authority to regulate medical care, a lower standard of scrutiny should apply. Plaintiffs appear to dismiss this argument completely, contending that

strict scrutiny always applies when the state compels content-based speech. Yet Plaintiffs' approach overlooks the state's historic interest in the health and safety of its citizens, which the state may protect through reasonable regulation of the medical profession, including compelled speech consistent with professional norms. *See* discussion *supra* Part I.C.

Nonetheless, the talismanic recitation that the state has the authority to license and regulate health care providers does not mean much merely by being invoked. *See Button*, 371 U.S. at 429 ("[A] State cannot foreclose the exercise of constitutional rights by mere labels."); *see also Edenfield v. Fane*, 507 U.S. 761, 770 (1993) (holding that the fact that a state accounting board's interests in maintaining ethical standards "are substantial in the abstract does not mean, however, that [the prohibition at issue] serves them"). The Court cannot disregard the state's express ideological interest in determining what level of scrutiny to apply, even if it is only one of several interests at play.[24] *See Sorrell*, ___ U.S. at ___, 131 S. Ct. at 2664. Therefore, it is appropriate to evaluate the speech-and-display provision with heightened scrutiny. *See id.* It is also appropriate to apply heightened scrutiny because the state is seeking to compel "doctor-patient communications *about* medical treatment," *see Pickup*, 728 F.3d at 1053, and to create a new professional norm in a highly regulated field where providers are educated specialists with

---

[24] Abortion is not just a personal and medical decision; it is, in our culture, a part of the political landscape. *See generally Casey*, 505 U.S. 833. The Supreme Court has "long recognized that it is difficult to distinguish politics from entertainment, and dangerous to try." *Brown*, ___ U.S. at ___, 131 S. Ct. at 2733. To some extent the same can be said about the intersection of politics and abortion. Even outside the abortion context, it does not take much imagination to identify serious problems with allowing the government to justify compelled speech on one basis when its primary purpose is otherwise. Under the guise of promoting informed consent, for example, the state might require physicians to show gruesome videos of surgery to patients, when the real purpose was to reduce medical costs by discouraging patients from choosing expensive surgery.

significant training and expertise and who are already licensed by the state.[25]  *See Moore-King*, 708 F.3d at 570; *see also Dent*, 129 U.S. at 122 (holding medical licensing requirements must be "appropriate to the calling or profession").[26]  There may be minimal First Amendment concerns when the state compels compliance with "standards of acceptable and prevailing medical practice," *see In re Guess*, 327 N.C. 46, 52-53, 393 S.E.2d 833, 837 (1990) (internal quotation marks omitted), but when the state seeks to compel speech outside those prevailing practices, the issue is quite different.  *See* Post Book, *supra*, at 53-54.[27]

Even though the speech at issue is obviously not commercial,[28] the heightened scrutiny applicable to commercial speech restrictions provides a good model for evaluating restrictions on

---

[25] *See, e.g.*, N.C. Gen. Stat. § 90-9.1, -9.3, -9.4, -171.30.  Just as physicians cannot advise patients based on "quack medicine," *Pickup*, 728 F.3d at 1054, states cannot compel professional speech based on outlier research or opinions, on uninformed intuition, or for political or other non-medical purposes.  *See* Post Book, *supra*, at 53.

[26] *Cf. Keller*, 496 U.S. at 13-14 (holding that while the state may require lawyers to belong to an organized bar because of its interests in regulating the profession and improving the quality of legal services, the state cannot compel members of the state bar to fund "activities of an ideological nature" which fall outside the state's interest in regulating the profession and improving services); *Va. State Bd. of Pharmacy*, 425 U.S. at 768 (holding that state's proffered interest in maintaining professional standards was "greatly undermined by the fact that high professional standards, to a substantial extent, are guaranteed by the close regulation to which pharmacists in Virginia are subject"); *Pickup*, 728 F.3d at 1057 (detailing numerous studies justifying state's prohibition of certain psychological treatments for minors).

[27] *Cf.* Joan H. Krause, *Reconceptualizing Informed Consent in an Era of Health Care Cost Containment*, 85 Iowa L. Rev. 261, 380, 382 (1999) (discussing specific breast cancer informed consent statutes that "provide for the creation of standardized informational summaries by an *independent medical body*" and determine information to be disclosed based on "exclusively medical criteria" (emphasis added)).

[28] Defendants make a passing reference to the commercial speech doctrine, but the speech-and-display provision does not regulate "expression related solely to the economic interests of the speaker and its audience," such that it would be subject to intermediate scrutiny pursuant to the commercial speech doctrine.  *See Cent. Hudson*, 447 U.S. at 561; *see also Riley*, 487 U.S. at 795-96; *Moore-King*, 708 F.3d at 568.  No one contends that the rational basis test from the *Zauderer* line of commercial-speech cases applies, as indeed it could not: the speech-and-display

professional speech.[29]  This is particularly so here, where "the outcome is the same whether a special commercial speech inquiry or a stricter form of judicial scrutiny is applied."  *See Sorrell*, ___ U.S. at ___, 131 S. Ct. at 2667.  As stated earlier, heightened scrutiny requires at a minimum that the provision directly advances a substantial state interest and is drawn to achieve that interest.  *See id.* at ___, 131 S. Ct. at 2667-68.  It also requires that the harms the provision prevents are "real, not merely conjectural," and that the provision at issue "in fact alleviate[s] these harms in a direct and material way."  *Turner Broad.*, 512 U.S. at 664.  This evaluation must take into account the regulatory context, the nature of the professional relationship, the degree of intrusion into it, the reasons for the intrusion and evidentiary support for the intrusion, and the connection between the compelled speech and the government's interests.  *See Riley*, 487 U.S. at 796; *Pickup*, 728 F.3d at 1053-55.

### B.  Application

The state contends the speech-and-display provision aids its interest in persuading women to opt for childbirth over abortion,[30] (Doc. 118 at 25), by providing information which makes it less likely the woman will terminate the pregnancy.  The state further contends that the provision aids its interest in voluntary and informed consent by reducing the risk of psychological harm should the woman come to know of the fetus's physical characteristics for the first time after the abortion and thus to regret her decision and by decreasing the likelihood of

---

[29] *See* Post Book, *supra*, at 43 ("If the circulation of commercial information serves the value of democratic competence, so also does the circulation of expert knowledge.  Constitutional protections for the dissemination of expert knowledge should therefore be roughly analogous to those applicable to the circulation of commercial information.").

[30] The state also refers to this interest as "protecting fetal life," (Doc. 118 at 27), and "promoting life."  (*Id.* at 24.)

provision compels speech as part and parcel of the delivery of professional advice and services, not in the context of advertising.

a coerced abortion. These goals are accomplished, the state contends, by showing the woman the physical characteristics of her fetus to make her "aware of what the implications of [abortion] are in terms of fetal life." (Doc. 133-1 at 6.)

The state's interests in protecting fetal health and insuring voluntary and informed consent are valid state interests. The state has made cogent arguments that information about the physical characteristics of the fetus conveyed as a result of the speech-and-display provision could be helpful and relevant to some patients considering abortion. (*See* Doc. 118 at 20.) And the state has offered some evidence to support this view. In a 2002 study cited by the state's expert, (Doc. 117-1 at p. 6 ¶ 5), researchers determined that most women who were offered and accepted the opportunity to look at the ultrasound before an abortion viewed it "in a positive light, that it would help them to make a better choice." A.A. Bamigboye et al., *Issues in Medicine: Should Women View the Ultrasound Image Before First-Trimester Termination of Pregnancy*, 92-6 S. Afr. Med. J. 430, 432 (2002). Other studies outside the abortion context indicate that visual aids can be helpful in making medical decisions. (*See* Doc. 117-1 at p. 5 ¶ 3 (collecting articles).)

This evidence, however, is not directed to the speech actually compelled by the Act. The speech-and-display provision does not merely require providers to *offer* the real-time display and description to every patient, as the cited research indicates would be helpful.[31] *See* Bamigboye, *supra*, at 432 (recommending that women receiving ultrasounds "should be specifically asked whether they prefer to see or not to see the image on the scan"). Rather, the Act requires

_____

[31] Plaintiffs agree that it is appropriate to offer the visual information to most patients as a general matter and that it is standard practice to answer questions about what can be seen on the visual depiction. *See* discussion *supra* Part I.B; (*see also* Doc. 107 at ¶ 26; Doc. 108 at ¶ 21; Doc. 110 at ¶ 15.)

providers to actually *deliver* the information to every single patient who seeks an abortion, even those who object to receiving it or who would be harmed by it. Providers must display and describe to every single patient, even those who go so far as to cover their eyes and block their ears to prevent receipt of the information. *See* N.C. Gen. Stat. § 90-21.85(b); (*see also* Doc. 113-1 at 6.) They must do the same to patients whose physical or mental health would be placed at serious risk by the information and the method and mode of delivery,[32] (*see* Doc. 107 at ¶¶ 36-39, 42; Doc. 108 at ¶ 26; Doc. 110 at ¶¶ 14-16; Doc. 111 at ¶ 14; Doc. 112 at ¶ 18; Doc. 115 at ¶¶ 18-19), even if the patient asks the provider not to show or describe the images. (*See* Doc. 107 at ¶ 42; Doc. 108 at ¶ 11; Doc. 109 at ¶ 12; Doc. 110 at ¶ 14; Doc. 111 at ¶ 14.) And they must speak this message even though the Act itself provides that women can give informed consent without actually seeing the images or hearing the description. *See* N.C. Gen. Stat. §§ 90-21.82, 90-21.85(b).

It is this compelled speech to which Plaintiffs object.[33] The state has been silent as to any reason for requiring a provider to show and describe the fetal images to a woman who has covered her eyes and blocked her ears.[34] The state also offers no reason for compelling

---

[32] It is undisputed that some women in particular mental health or physical circumstances are at risk of suffering serious and lasting psychological or emotional harm if they watch the display and hear the description in the inflexible mode and manner required by the speech-and-display provision, especially if the message is delivered without their consent or over their objection. (*See* Doc. 107 at ¶¶ 38-39; Doc. 108 at ¶ 26; Doc. 110 at ¶¶ 16-18; Doc. 111 at ¶¶ 20-22; Doc. 114 at ¶¶ 5-6; Doc. 115 at ¶¶ 18-19.)

[33] Plaintiffs also object to delivering this information to women who do not affirmatively consent to receiving it. In view of the Court's resolution of the issue otherwise, it is unnecessary to reach this contention. No one contends the state can force women to receive the state's message. *See generally* Caroline Mala Corbin, *The First Amendment Right Against Compelled Listening*, 89 B.U. L. Rev. 939 (2009).

[34] When pressed on this point at oral argument, the state continued its efforts to convert the Act into a statute that merely required providers to offer the information to patients. (Doc. 159 at

providers to show and describe the images to women the providers know will be harmed, responding only that women who will be significantly harmed by the message can avoid it because the Act allows them to "avert their eyes" and "refuse to hear" the message. The state's own expert witness agrees that the delivery of the state's message in these circumstances does not provide any information to the patient and does not aid voluntary and informed consent.[35] (*See* Doc. 113-1 at 7-8, 11.) To the extent the Act requires providers to speak the state's message to women who cover their ears and eyes to avoid the state's message, it is performative rather than informative, and it does not serve any legitimate purpose.

This is in stark contrast to the *Casey* statute, which required providers only to make a patient aware of the availability of a state-sponsored pamphlet concerning fetal characteristics.

---

17-18.) As noted elsewhere, providers must do more than offer the information; they must deliver the information. Indeed, while on the one hand the state's argument emphasized that a pregnant woman seeking an abortion can choose not to hear and see the information, elsewhere the state seemed to suggest that the woman should "be a man about it" and "hear what is not pleasant to hear." (*See id.* at 15.)

[35] Moreover, the uncontroverted evidence shows that forcing at-risk patients to cover their eyes and ears to avoid receiving the message does not remove the potential for serious psychological harm. In fact, the uncontroverted evidence is that performing the procedure while the patient resists is itself harmful. (*See* Doc. 107 at ¶¶ 31-32; Doc. 108 at ¶ 24; Doc. 110 at ¶ 22; Doc. 115 at ¶¶ 20-21.) It seems unexceptionable to conclude, for example, that serious psychological harm could result from requiring a woman who became pregnant as a result of rape to lie half-undressed with a vaginal probe inside her while she listens to an unwanted message from a medical professional who has refused to listen to her wishes, especially if she were blindfolded to avoid the message. (*See* Doc. 107 at ¶ 31.) Defendants' expert concedes that requiring the unwilling patient to close her eyes and cover her ears is not a very good solution, because in the same paragraph in which he says it is sufficient to avoid harm, he also says if the woman does not want to hear the description, she "at all times has the option to choose not to proceed" with the abortion. (Doc. 117-1 at p. 6 ¶ 6.) This is inconsistent with the Act, which is clear that the woman does not have to hear the description and also constitutes the very definition of an undue burden, as it forces a woman to choose between her legal right to choose abortion and exposing herself to a significant risk of psychological damage. *See* discussion *infra* Part II.C.

*See Casey*, 505 U.S. at 882 (holding there is "no reason why the State may not require doctors to inform a woman seeking an abortion of *the availability of materials relating to* the consequences to the fetus, even when those consequences have no direct relation to her health" (emphasis added)). The statute did not specify where or how the information had to be provided, and it did not require the provider to personally show information about fetal development to patients. *Id.* at 902-03 (reprinting 18 Pa. Cons. Stat. § 3205 in full). The Act requires the provider to deliver in his or her own voice information the state deems relevant during the middle of a medical procedure in the exact manner dictated by the state, a much more significant intrusion than the *Casey* statute's relatively passive requirements.[36] *Cf. Hurley*, 515 U.S. at 575 (holding that council was not required to admit gay, lesbian, and bisexual group to parade because group's participation "would likely be perceived as having resulted from the Council's customary determination about a unit admitted to the parade, that its message was worthy of presentation and quite possibly of support as well"); *Wooley*, 430 U.S. at 715 ("Compelling the affirmative act of a flag salute involved a more serious infringement upon personal liberties than the passive act of carrying the state motto on a license plate.").

The statute at issue in *Casey* also explicitly contained a therapeutic exception which did not "require a physician to comply with the informed consent provisions 'if he or she can demonstrate by a preponderance of the evidence, that he or she reasonably believed that

---

[36] In provisions not challenged here on First Amendment grounds, the Act also goes beyond *Casey* to require the provider to tell the patient twenty-four hours before the abortion that the speech-and-display procedure is available. *See* N.C. Gen. Stat. § 90-21.82(1)(e). Regardless of the Act, the standard practice in North Carolina is for providers to offer to show the real-time display during the ultrasound. (*See* Doc. 107 at ¶¶ 14, 21-22, 26; Doc. 108 at ¶ 21; Doc. 110 at ¶¶ 11, 15; Doc. 111 at ¶¶ 12, 15.) Women must also be informed of the availability of similar information on a state-provided website and in state-provided printed materials. *See* N.C. Gen. Stat. § 90-21.82(2)(e).

furnishing the information would have resulted in a severely adverse effect on the physical or mental health of the patient.'" 505 U.S. at 883-84. Thus, it did not "prevent the physician from exercising his or her medical judgment." *Id.* at 884.[37] Despite its broader reach and the uncontradicted evidence that a small subset of women will be harmed by the speech-and-display provision, the Act does not contain even a narrow medical or therapeutic exception. Not only does the Act compel Plaintiffs to deliver the message to women who would be harmed by it, but its rigid requirements preclude the physician from delivering the same or similar information in a different way that might pose a lower risk of harm to the patient. This is radically different from the speech in *Casey*, and it calls into question the state's allegedly health-based motivation. *See Dent*, 129 U.S. at 122.

The state has offered no real defense of this one-size-fits-all requirement, and the only evidence the state presents about psychological harm does not contradict Plaintiffs' evidence. The state's expert points out the unremarkable fact that physicians do not hold back significant

---

[37] *See also Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 578 (5th Cir. 2012) (noting that similar Texas law requires patient to hear medical explanation of sonogram unless she falls under three exceptions). In *Gonzales*, the Supreme Court held that a statute prohibiting a particular method of ending fetal life in the later stages of pregnancy was not facially unconstitutional despite not providing for a health exception. 550 U.S. at 163. *Gonzales* is distinguishable for several reasons. First, the statute at issue in *Gonzales* regulated conduct, and it was challenged as an undue burden under the Fourteenth Amendment, not as a First Amendment violation. Moreover, the absence of an exception in *Gonzales* furthered one of Congress's legitimate interests—"drawing boundaries to prevent certain practices that extinguish life and are close to actions that are condemned." *Id.* at 158. Here, the state has not even argued that compelling the speech when it will physically or mentally harm the patient furthers any of its interests. Finally, and perhaps most significantly, the government in *Gonzales* had medical support for its position that the statute did not create significant health risks and that the barred procedure was never medically necessary. *Id.* at 161. In such a case, the Court concluded, Congress could weigh in. *Id.* at 163-64 ("Medical uncertainty does not foreclose the exercise of legislative power in the abortion context any more than it does in other contexts."). Here, on the other hand, there is no uncertainty; the state has not provided any evidence to dispute Plaintiffs' evidence that the compelled speech can be medically harmful in a variety of situations.

information "simply because it might cause temporary stress or anxiety," and further testified that he is "not aware of any evidence that patients will be harmed by the provision of information." (Doc. 117-1 at p. 6 ¶ 5.)  He does not address or even mention those patients who have individual risk factors for more profound psychological problems.[38]

Plaintiffs have presented undisputed evidence that compelled delivery of the state's message in these situations would raise serious ethical issues and be inconsistent with the purposes of the informed consent rule.  (*See* Doc. 107 at ¶¶ 24, 27, 31, 38, 42-43, 46-50; Doc. 108 at ¶¶ 11-12, 17, 22-23, 30; Doc. 109 at ¶¶ 13, 15-22; Doc. 110 at ¶¶ 15, 19, 22; Doc. 111 at ¶¶ 14-17, 22.)  It is a basic precept of medical ethics that physicians are charged with the duties to not inflict harm on patients and to exercise their medical judgment and discretion.  *See* discussion *supra* Part I.B.

Consistent with rules of medical ethics summarized above, even the state's expert emphasizes that "there can obviously be no rigid prescription" as to what a patient medically and ethically should be told, (Doc. 117-1 at p. 6 ¶ 4 (quotation marks omitted)), and that an individual approach to patients is generally required.  (*See* Doc. 113-1 at 12; *see also id.* at 4 (agreeing physicians should have discretion to choose how they obtain informed consent).) Further, he agrees that informed consent procedures "must be free of coercion," should be

_____

[38] Neither study cited by the expert as some proof of absence of harm addressed the potential benefits or risks when providers were forced to show and speak the information to their patients, much less to patients who were at high risk of psychological harm; rather, both studies involved offering women *the choice* of seeing the visual information at issue.  (*See* Doc. 117-1 at p. 6 ¶ 5, (citing Ellen R. Wiebe & Lisa C. Adams, *Women's Experience of Viewing the Products of Conception after an Abortion*, 80 Contraception 575, 575-77 (2009); Bamigboye, *supra*, at 430-32).)  One of these studies, which specifically examined the effects of offering to show the ultrasound to women seeking abortion, explicitly noted that "[s]eeing the image of a fetus which is subsequently aborted may have profound emotional consequences for the woman.  Any recommendations regarding visualisation or non-visualisation of ultrasound images should be based on sound evidence."  Bamigboye, *supra*, at 430.

"designed to facilitate the capacity of rational beings to make judgments of what they consider best, rather than what the physician or any other person might consider best for them," and should be free of paternalism. (Doc. 117-1 at p. 6 ¶ 4 (quotation marks omitted).) These ethical rules honoring medical judgment and discretion and patient autonomy support accepting the patient's decision not to receive the information and do not support forcing providers to give this information to women who do not want it, who are not required to receive it, and who take steps to avoid receiving it.

The state attempts to justify the compelled speech with the contention that showing a woman her own fetus and describing it to her is the best way for the state to express its interest in promoting life, as it has the effect of encouraging the woman "to engage in a moment of reflection about her decision whether to terminate her pregnancy—and the gravity of that decision." (Doc. 118 at 26.) But the speech-and-display provision is *not* the state's expression of its own message promoting childbirth and discouraging abortion. Rather, it compels a health care provider to act as the state's courier and to disseminate the state's message discouraging abortion, in the provider's own voice, in the middle of a medical procedure, and under circumstances where it would seem the message is the provider's and not the state's. This is not allowed under the First Amendment. *See Wooley*, 430 U.S. at 716 ("[W]here the State's interest is to disseminate an ideology, no matter how acceptable to some, such interest cannot outweigh an individual's First Amendment right to avoid becoming the courier for such message."). While "[t]he government may use *its* voice and its regulatory authority to show its profound respect for the life within the woman," *Gonzales*, 550 U.S. at 128 (emphasis added), the Supreme Court has never held that the government may use a professional's voice to do the same. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828, 833 (1995) (stating that when the

30

government speaks for itself, it "may make content-based choices," but that "[i]n the realm of private speech or expression, government regulation may not favor one speaker over another"); *Riley*, 487 U.S. at 804 (Scalia, J., concurring) ("[I]t is safer to assume that the people are smart enough to get the information they need than to assume that the government is wise or impartial enough to make the judgment for them."). The state "does not have a compelling interest in each marginal percentage point by which its goals are advanced." *Brown*, ___ U.S. at ___, 131 S. Ct. at 2741 n.9.

Defendants also contend that the speech-and-display requirement furthers the state's interest in promoting voluntary and informed consent by making women aware of the extent of fetal development, by protecting women's psychological health by ensuring that women are fully informed before making an irreversible decision that they may come to regret,[39] and by reducing coerced abortions. Here, the state relies on its traditional power to regulate the practice of medicine so as to promote and protect patient health.

This argument is undermined by the very structure of the Act, which does not require women to receive the information about fetal development. Because the Act explicitly allows a woman to "refuse to hear" the information, she can give voluntary and informed consent even if she refuses to receive the state's message. Indeed, the speech-and-display provision is in an entirely different section of the Act, N.C. Gen. Stat. § 90-21.85, from the section dealing with informed consent. *Id.* § 90-21.82. It is also undermined by the state's expert, who agrees that

---

[39] Defendants do not contend that there is any other medical or health-related reason that a woman needs to see the real-time display or hear the description of the fetus's physical characteristics. There is no evidence that in the ordinary case the description serves any diagnostic purpose, affects the kind of procedure undertaken, or has any other medical purpose. Indeed, all the evidence is to the contrary. (*See* Doc. 107 at ¶¶ 21-22, 42; Doc. 109 at ¶¶ 12, 21; Doc. 110 at ¶¶ 8, 24; Doc. 111 at ¶ 24; Doc. 112 at ¶ 17.)

requiring the provider to deliver information to women who refuse to listen does nothing to advance the state's goals, (*see* Doc. 113-1 at 7-8, 11), and by the state's willingness to require providers to inflict psychological harm on some of their patients in order to insure delivery of its message.[40]

Further, the state has not shown that the speech-and-display provision is necessary to alleviate a real harm. The state offers no evidence that psychological harm caused by learning of the fetus's physical characteristics after an abortion is substantial either in numbers or degree, nor is there evidence that the compelled disclosures ameliorate any such harm, especially when they are not received.[41] (*See* Doc. 115 at ¶¶ 23-26.) In the face of Plaintiffs' evidence that the provision will cause serious psychological harm to some women, the state has not shown that its interest "would be achieved less effectively absent the regulation." *See Turner Broad.*, 512 U.S. at 662 (quotation marks omitted).

The state's contention that the provision prevents coercive abortions is completely unclear. To the extent Defendants contend that providers are coercing abortions, the argument rests, at least in part, on an assumption that health care providers do not fulfill their legal and ethical duties to obtain informed consent or, worse, actively coerce patients to undergo abortions.

---

[40] The underinclusiveness of the Act also raises suspicions about the primacy of the state's interest in informed consent. *See Brown*, ___ U.S. at ___, 131 S. Ct. at 2740. The Act exempts an entirely different population of pregnant women who are also faced with choices that put their fetuses at risk. (*See, e.g.*, Doc. 108 at ¶¶ 28-29 (discussing increased risk of miscarriage caused by chorionic villus sampling and amniocentesis).)

[41] There is no evidence that the risk of emotional harm from learning after the fact that the fetus might have had physical features qualifies as one of the "usual and most frequent risks and hazards inherent in the . . . procedure[]" so that disclosure would be otherwise required by North Carolina law. N.C. Gen. Stat. § 90-21.13(a)(2).

There is no evidence before the Court that either of these things is true, even in small measure.[42] *Cf. Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 374 (2002) (noting, in dicta, that the "assumption that doctors would prescribe unnecessary medications" is questionable). All of Plaintiffs' evidence is to the contrary. (*See* Doc. 107 at ¶¶ 10, 19, 45; Doc. 108 at ¶ 14; Doc. 110 at ¶ 6; Doc. 111 at ¶ 7.)

Even assuming provider-coerced abortion is a real and not theoretical harm, the state has not shown that the speech-and-display provision is directed at alleviating this harm. If a provider is already in the habit of unethically and illegally coercing abortions, in violation of unquestionably valid informed consent law and ethical rules, the addition of the speech-and-display provision will not deter him or her from continuing to ignore the law. Rather than more regulations that compel speech from ethical providers, better enforcement of the existing rules is an obvious, more direct solution. *See Sorrell*, ___ U.S. at ___, 131 S. Ct. at 2669-70 (holding that speech restriction was not drawn to achieve state's interest where state had not shown that existing, not content-based remedies were inadequate).

To the extent Defendants contend that third-parties, such as boyfriends, husbands, or parents, are coercing abortions, Defendants have not provided any evidence that the speech-and-display provision is directed at preventing such coercion. Even under intermediate scrutiny, the government's burden is heavy, *see Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487 (1995), and the state cannot carry it here with mere conjecture or speculation. *Id.*; *cf. W.Va. Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 305-06 (2009) (noting in the

---

[42] In fact, none of the purported lay intervenors suggest that they were coerced by a provider into choosing to have an abortion. One suggests that she was sedated against her will when she arrived at the abortion clinic, (Doc. 45-6 at ¶¶ 6-7), but this is a separate problem entirely and one that the speech-and-display provision does not even come close to remedying.

commercial speech context that "restrictions must not be more extensive than necessary" and that where a state has a comprehensive scheme to serve its interest, limitations on commercial speech should "complement non-speech alternatives," not serve as substitutes for them).

Even assuming the speech-and-display provision actually reduces the risk of psychological harm or of coercive abortion, it burdens substantially more speech than necessary. *See Turner Broad.*, 512 U.S. at 662. There are many other ways to provide the necessary information to patients without hijacking the provider's voice in the middle of a medical procedure. The Act, generally applicable informed consent law, and established medical practices in North Carolina ensure that women are informed several times in several ways of the availability of information about fetal development and that it is easily available to those women who believe it will be helpful to their decision-making. *See* discussion *supra*, n.36. The Act requires that its informed consent disclosures be provided to the woman "individually," and in a manner that ensures that "the woman is not the victim of a coerced abortion." N.C. Gen. Stat. § 90-21.90(a). It further requires the provider to inform the patient that she has other alternatives to abortion and that she is "free to withhold or withdraw her consent to the abortion at any time." N.C. Gen. Stat. § 90-21.82(2)(d), (2)(f). The uncontradicted evidence is that providers in the state consider it to be part of the standard of care to offer women the opportunity to view the ultrasound and to ensure that women are not being coerced before they perform an abortion. (*See* Doc. 107 at ¶¶ 14, 21-22, 26; Doc. 108 at ¶¶ 16, 21; Doc. 110 at ¶¶ 11, 15; Doc. 111 at ¶¶ 12, 15.)

In short, the state's arguments do nothing to avoid the First Amendment issues raised by compelling providers to speak the state's message to women who refuse to hear it or who would be harmed by it. Indeed, those arguments increase the First Amendment concerns, given the lack

of empirical evidence for the supposed health interests put forth, the conflicts with established rules of medical ethics, and the admitted non-medical and value-based motives behind the Act. With no provision for a therapeutic exception or for a different method of delivery to women at serious risk of harm and with no evidence of any benefit from delivering the message to women who refuse to listen to it, the Act does not directly or indirectly advance any of the proffered state interests and is not drawn to achieve a substantial state interest. It undermines well-established professional norms in the medical field, without empirical justification. It does not survive heightened scrutiny.

### C. *Casey* is Consistent with this Result

*Casey* does not compel a different analysis. The state contends that *Casey* stands for the proposition that if a statute compels physicians to convey truthful, non-misleading, and relevant information to patients, then it does not constitute an undue burden on the woman's right to choose and, *ipso facto*, it passes First Amendment muster. The state also points to two federal courts of appeals cases which employed the undue burden test to uphold compelled disclosure laws in the abortion context against First Amendment challenges. *See Lakey*, 667 F.3d 570; *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 686 F.3d 889 (8th Cir. 2012) ("*Rounds II*"); 653 F.3d 662 (8th Cir. 2011) ("*Rounds I*").

In the due process context, *Casey* provides an exhaustive and detailed analysis of the reasons the state may regulate abortion providers and the ways in which such regulation is permissible under the Fourteenth Amendment. *Casey* does not provide a similarly detailed analysis on the way to evaluate such laws under the First Amendment. Rather, *Casey* refers to the state's ability to license and regulate the practice of medicine, contrasts it to the state's inability to compel ideological speech, and concludes there is no "constitutional infirmity in the

requirement that the physician provide the information mandated by the State *here*." *Casey*, 505 U.S. at 884 (emphasis added).

Despite its brevity, the First Amendment analysis is clearly a traditional one, couched by its reference to *Wooley* in terms of compelled speech and by its reference to the state's ability to regulate the practice of medicine in terms of professional speech. *Casey* did not purport to carve out a new First Amendment exception or create a new standard of review for all abortion-related speech cases. *See Brown*, ___ U.S. at ___, 131 S. Ct. at 2734-38 (declining to carve out novel First Amendment exception for violent video games); *United States v. Stevens*, 559 U.S. 460, 468-72 (2010) (same for depictions of animal cruelty); *see also Pruitt v. Nova Health Sys.*, No. 12-1170, 134 S. Ct. 617 (Nov. 12, 2013) (denying certiorari from Oklahoma Supreme Court case holding similar statute unconstitutional under *Casey*).

Nowhere else in First Amendment law is the state's effort to compel speech evaluated by determining whether the compelled speech violates a different constitutional right, much less a different constitutional right belonging to a different person. Such an interpretation of *Casey* would be inconsistent with decades of First Amendment case law and would ignore the values memorialized in the First Amendment.

With due respect, *Lakey* and *Rounds* are wrongly decided. They are not grounded in traditional First Amendment principles, from which *Casey* did not diverge. They read *Casey* as creating, in two sentences, an entirely new category of abortion-related compelled speech to which a unique standard of review applies. The application of a due process standard to a First

Amendment issue improperly conflates two separate constitutional doctrines in a way that gives short shrift to the First Amendment.[43]

Even if the Court credited this standard of review, the speech-and-display provision would not pass First Amendment muster. It goes significantly further than the statute at issue in *Casey*, and it would not survive even under Defendants' proposed test.

Under Defendants' test, the state can compel providers to speak so long as the information is truthful, not misleading, and relevant. As discussed above, the Act by its terms says that the information is not necessary or relevant to every woman's decision, and other provisions make sure that women are aware of the availability of the information if she wants to receive it. It is standard medical practice in North Carolina to provide the information upon request. Yet if a woman permissibly decides the information is not relevant to her, or indeed would be harmful to her, she must still be physically present, undressed or half-undressed on an examining table, while the provider is compelled to deliver the state's message, a message which, by the Act's own terms, is not necessary for informed consent. Indeed, the state would have a physician attempt to persuade a woman not to have an abortion by showing and describing any physical characteristics against the woman's will, even if she will die if she continues her pregnancy and even if she has a mental health history that makes forced and

---

[43] As is clear from the Court's analysis above, *Casey* obviously is relevant to the First Amendment analysis in several ways, even though it did not create a new First Amendment exception or a new standard of review for all abortion-related speech cases. First, by its citation to *Wooley*, the *Casey* court acknowledged that a physician cannot be compelled to disseminate, in his or her own voice, the state's ideological message. 505 U.S. at 884. Second, *Casey* explicitly links the state's ability to require physicians to provide information to the state's historical authority to regulate the practice of medicine. Third, *Casey* provides a basis for an enlightening comparison of the terms of the Pennsylvania statute it upheld and the Act at issue here. Finally, *Casey*'s discussion of the state's interests in regulating abortion in the Fourteenth Amendment context readily transfers to a First Amendment analysis, even if its application of the undue burden test does not.

graphic delivery of this information in the middle of a medical procedure a risky proposition for her.

Instead of a "reasonable framework" within which a woman makes the decision about terminating a pregnancy, *see Casey*, 505 U.S. at 873, the speech-and-display provision is more like an unyielding straightjacket. It goes well beyond "encourag[ing the pregnant woman] to know that there are philosophic and social arguments of great weight that can be brought to bear in favor of continuing the pregnancy to full term" and "taking steps to ensure that [her] choice is thoughtful and informed." *Id.* at 872. By requiring providers to deliver this information to a woman who takes steps not to hear it or would be harmed by hearing it, the state has erected an obstacle and has moved from "encouraging" to lecturing, using health care providers as its mouthpiece. *See Riley*, 487 U.S. at 804 (Scalia, J., concurring). As discussed above, there is no health reason for requiring the disclosure to women who take steps not to hear it or would be harmed by hearing it, making this an "unnecessary health regulation[]" which is not allowed under *Casey*. *See* 505 U.S. at 878.

### D. Conclusion

For the foregoing reasons, the one-size-fits-all speech-and-display provision violates Plaintiffs' First Amendment rights. The Act requires providers to deliver the state's message to women who take steps not to hear it and to women who will be harmed by receiving it with no legitimate purpose. Thus, it is overbroad, and it does not directly advance the state's interests in reducing psychological harm to women or in increasing informed and voluntary consent. To the extent the Act requires providers to deliver the state's message designed to discourage abortion, it is an impermissible attempt to compel these providers to deliver the state's message in favor of childbirth and against abortion. Plaintiffs are entitled to summary judgment.

### III.    Modification of Preliminary Injunction

At the preliminary injunction stage, Defendants agreed that the requirements of the speech-and-display provision rise and fall together.  Now, in two sentences and without explanation, Defendants request that the Court enjoin the enforcement of only the first sentence of § 90-21.85(a)(2) and § 90-21.85(a)(4) in the alternative to enjoining the speech-and-display provision in its entirety.  (Doc. 118 at 31-32.)  It is not clear how the remaining provisions of § 90-21.85 would function in the absence of subsections (a)(2) and (a)(4), and the Defendants essentially ask the Court to rewrite the statute so that it is constitutional.  (Doc. 159 at 51-52.)  The Court declines the invitation.

## DUE PROCESS CLAIM

Plaintiffs also contend that N.C. Gen. Stat. § 90-21.85 violates substantive due process.  As an initial matter, Defendants argue that Plaintiffs lack standing to challenge the Act on due process grounds to the extent they seek to do so on behalf of their patients.  Generally, "even when the plaintiff has alleged injury sufficient to meet the 'case or controversy' [standing] requirement, . . . the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."  *Warth v. Seldin*, 422 U.S. 490, 499 (1975).

Under the doctrine of third-party standing, however, a plaintiff may assert the rights of another with whom the plaintiff has a "close" relationship if there is a "'hindrance' to the possessor's ability to protect his own interests."  *Kowalski v. Tesmer*, 543 U.S. 125, 129-30 (2004).  The Supreme Court has "been quite forgiving with these criteria in certain circumstances," including those in which the "enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights."  *Id.* at 130 (quotation

marks omitted). A plurality of the Supreme Court and several courts of appeal have allowed physicians and providers to assert their patients' constitutional right to an abortion. *See, e.g.*, *Singleton v. Wulff*, 428 U.S. 106, 118 (1976); *Aid for Women v. Foulston*, 441 F.3d 1101, 1112 (10th Cir. 2006); *Planned Parenthood of N. New England v. Heed*, 390 F.3d 53, 56 n.2 (1st Cir. 2004), *vacated on other grounds*, 546 U.S. 320 (2006); *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 916-18 (9th Cir. 2004); *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1346-48 (2d Cir. 1989).

Plaintiffs here satisfy both prongs of the test for third-party standing. Plaintiff physicians and providers and their patients have a sufficiently close relationship in the abortion context that Plaintiffs "can reasonably be expected properly to frame the issues and present them with the necessary adversarial zeal." *Sec'y of State v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984). Further, women seeking abortions face genuine obstacles to litigation. A woman's interest in the privacy of her decision may keep her from coming forward to present her own case. Furthermore, a woman seeking to assert her due process right to an abortion faces "imminent mootness" presented by pregnancy's inherent time limitations. *See Singleton*, 428 U.S. at 117. Plaintiffs' relationships to their patients and their patients' obstacles to litigation are indistinguishable from those in the cases cited above. Accordingly, Plaintiffs have standing to assert the rights of their patients "as against governmental interference with the abortion decision." *Id.* at 118.

Plaintiffs contend that the Act's speech-and-display provision violates substantive due process because it is irrational. Due process requires that all laws at a minimum be "rationally related to a legitimate governmental objective." *Multimedia Publ'g Co. of S.C. v. Greenville-Spartanburg Airport Dist.*, 991 F.2d 154, 159 (4th Cir. 1993). Having already struck down the

Act's speech-and-display provision, the Court declines to reach this issue beyond its holdings on the First Amendment issue, denying both parties' motions on this ground as moot.

## VAGUENESS CLAIM

Finally, Plaintiffs contend that the Act is void as vague. In response, Defendants urge the Court to adopt savings constructions to eliminate any alleged vagueness. Plaintiffs agree with Defendants' proposed constructions. Specifically, the parties agree that (1) the term "advanced practice nurse practitioner in obstetrics" included in the definition of qualified technician, N.C. Gen. Stat. § 90-21.81(9), should be defined as "a nurse practitioner who is certified in obstetrical ultrasonography," (Doc. 118 at 11; Doc. 127 at 28); (2) the seventy-two-hour exception, N.C. Gen. Stat. § 90-21.85(a), should be construed as permitting an alternative means of compliance by which a physician other than the provider may perform an ultrasound and complete the required certification within seventy-two hours before the abortion, (Doc. 118 at 11-12; Doc. 127 at 28-29.); (3) a physician or qualified professional may provide the information in section 90-21.82(1), but a physician must "be available to ask and answer questions within the statutory timeframe upon request of the patient or the qualified professional," (Doc. 106 at 35 (citing *Stuart*, 834 F. Supp. 2d at 435)); and (4) the Act imposes no criminal penalties. (Doc. 106 at 34; Doc. 118 at 13.)

A law is void for vagueness where people of "common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926). However, "[w]here fairly possible, courts should construe a statute to avoid a danger of unconstitutionality." *Planned Parenthood Ass'n of Kansas City v. Ashcroft*, 462 U.S. 476, 493 (1983). The Court's reading of the challenged provisions is the same as the parties', such that the Act is not void as vague. *See, e.g.*, *W. Va. Mfrs. Ass'n v. West Virginia*, 714 F.2d

308, 314 (4th Cir. 1983) (finding statute not void for vagueness where "[t]he meaning of its language is discoverable from the context").  Further, as the Court concludes that the speech-and-display provision is unconstitutional, any challenge to the seventy-two-hour exception is moot.

## CONCLUSION

For the foregoing reasons, both parties' motions for summary judgment, (Docs. 105, 117), will be granted in part and denied in part.  A permanent injunction and final judgment will follow.

This the 17th day of January, 2014.

UNITED STATES DISTRICT JUDGE