**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

━━━━━━━━━━━━

**No. 14-1150**

━━━━━━━━━━━━

GRETCHEN S. STUART, MD, on behalf of herself and her patients seeking abortions; JAMES R. DINGFELDER, MD, on behalf of himself and his patients seeking abortions; DAVID A. GRIMES, MD, on behalf of himself and his patients seeking abortions; AMY BRYANT, MD, on behalf of herself and her patients seeking abortions; SERINA FLOYD, MD, on behalf of herself and her patients seeking abortions; DECKER & WATSON, INC., d/b/a Piedmont Carolina Medical Clinic; PLANNED PARENTHOOD OF CENTRAL NORTH CAROLINA; A WOMAN'S CHOICE OF RALEIGH, INC.; PLANNED PARENTHOOD HEALTH SYSTEMS, INC.; TAKEY CRIST, on behalf of himself and his patients seeking abortions; TAKEY CRIST, M.D., P.A., d/b/a Crist Clinic for Women,

Plaintiffs - Appellees,

v.

PAUL S. CAMNITZ, MD, in his official capacity as President of the North Carolina Medical Board and his employees, agents and successors; ROY COOPER, in his official capacity as Attorney General of North Carolina and his employees, agents and successors; ALDONA ZOFIA WOS, in her official capacity as Secretary of the North Carolina Department of Health and Human Services and her employees, agents and successors; JIM WOODALL, in his official capacity as District Attorney ("DA") for Prosecutorial District ("PD") 15B and his employees, agents and successors; LEON STANBACK, in his official capacity as DA for PD 14 and his employees, agents and successors; DISTRICT ATTORNEY DOUGLAS HENDERSON, in his official capacity as DA for PD 18 and his employees, agents and successors; BILLY WEST, in his official capacity as DA for PD 12 and his employees, agents and successors; C. COLON WILLOUGHBY, JR., in his official capacity as DA for PD 10 and his employees, agents and successors; BENJAMIN R. DAVID, in his official capacity as DA for PD 5 and his employees, agents and successors; ERNIE LEE, in his official capacity as DA for PD 4 and his employees, agents and

successors; JIM O'NEILL, in his official capacity as DA for
PD 21 and his employees, agents and successors,

                    Defendants - Appellants,

JOHN THORP,

                    Intervenor/Defendant,

FRANCIS J. BECKWITH, MJS, PhD; GERARD V. BRADLEY; TERESA S.
COLLETT; DAVID K. DEWOLF; RICK DUNCAN; EDWARD M. GAFFNEY;
STEPHEN GILLES; MICHAEL STOKES PAULSEN; RONALD J. RYCHLAK;
RICHARD STITH; RUTH SAMUELSON; PAT MCELRAFT; PAT HURLEY;
MARILYN AVILA; SUSAN MARTIN; CAROLYN M JUSTICE; RENA W.
TURNER; MICHELE D. PRESNELL; SARAH STEVENS; JACQUELINE
MICHELLE SCHAFFER; DEBRA CONRAD; MARK BRODY; CHRIS WHITMIRE;
ALLEN MCNEILL; DONNY LAMBETH; GEORGE CLEVELAND; LINDA
JOHNSON; DAVID CURTIS; JOYCE KRAWIEC; SHIRLEY RANDLEMEN; DAN
SOUCEK; NORMAN SANDERSON; WARREN DANIEL; BUCK NEWTON; KATHY
L. HARRINGTON; ANDREW BROCK,

                    Amici Supporting Appellant,


AMERICAN   COLLEGE   OF   OBSTETRICIANS   AND   GYNECOLOGISTS;
AMERICAN  MEDICAL  ASSOCIATION;  AMERICAN  PUBLIC  HEALTH
ASSOCIATION,

                    Amici Supporting Appellee.

                    _____

Appeal from the United States District Court for the Middle
District of North Carolina, at Greensboro. Catherine C. Eagles,
District Judge. (1:11-cv-00804-CCE-LPA)

                    _____

Argued: October 29, 2014          Decided: December 22, 2014

                    _____

Before TRAXLER, Chief Judge, and WILKINSON and DUNCAN, Circuit
Judges.

                    _____

2

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Chief Judge Traxler and Judge Duncan joined.

———————————

**ARGUED:** John Foster Maddrey, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellants. Julie Rikelman, CENTER FOR REPRODUCTIVE RIGHTS, New York, New York, for Appellees. **ON BRIEF:** Roy Cooper, Attorney General, Gary R. Govert, Assistant Solicitor General, I. Faison Hicks, Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellants. Christopher Brook, AMERICAN CIVIL LIBERTIES UNION OF NORTH CAROLINA LEGAL FOUNDATION, Raleigh, North Carolina; Andrew D. Beck, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York; Jennifer Sokoler, CENTER FOR REPRODUCTIVE RIGHTS, New York, New York; Walter Dellinger, Anton Metlitsky, Leah Godesky, O'MELVENY & MYERS LLP, Washington, D.C.; Diana O. Salgado, New York, New York, Helene T. Krasnoff, PLANNED PARENTHOOD FED. OF AMERICA, Washington, D.C., for Appellees. Anna R. Franzonello, Mailee R. Smith, William L. Saunders, Denise M. Burke, AMERICANS UNITED FOR LIFE, Washington, D.C., for Amici Francis J. Beckwith, MJS, PhD, Gerard V. Bradley, Teresa S. Collett, David K. Dewolf, Rick Duncan, Edward M. Gaffney, Stephen Gilles, Michael Stokes Paulsen, Ronald J. Rychlak, and Richard Stith. Scott W. Gaylord, Jennings Professor, Thomas J. Molony, Associate Professor of Law, ELON UNIVERSITY SCHOOL OF LAW, Greensboro, North Carolina, for Amici Ruth Samuelson, Pat McElraft, Pat Hurley, Marilyn Avila, Susan Martin, Carolyn M. Justice, Rena W. Turner, Michele D. Presnell, Sarah Stevens, Jacqueline Michelle Schaffer, Debra Conrad, Mark Brody, Chris Whitmire, Allen McNeill, Donny Lambeth, George Cleveland, Linda Johnson, David Curtis, Joyce Krawiec, Shirley Randlemen, Dan Soucek, Norman Sanderson, Warren Daniel, Buck Newton, Kathy L. Harrington, and Andrew Brock. Kimberly A. Parker, Alathea E. Porter, Thaila K. Sundaresan, Tiffany E. Payne, WILMER CUTLER PICKERING HALE AND DORR LLP, Washington, D.C., for Amici American College of Obstetricians and Gynecologists and American Medical Association. Shannon Rose Selden, Courtney M. Dankworth, DEBEVOISE & PLIMPTON LLP, New York, New York, for Amicus American Public Health Association.

———————————

WILKINSON, Circuit Judge:

At issue here is a North Carolina statute that requires physicians to perform an ultrasound, display the sonogram, and describe the fetus to women seeking abortions. A physician must display and describe the image during the ultrasound, even if the woman actively "avert[s] her eyes" and "refus[es] to hear." N.C. Gen. Stat. § 90-21.85(b). This compelled speech, even though it is a regulation of the medical profession, is ideological in intent and in kind. The means used by North Carolina extend well beyond those states have customarily employed to effectuate their undeniable interests in ensuring informed consent and in protecting the sanctity of life in all its phases. We thus affirm the district court's holding that this compelled speech provision violates the First Amendment.

I.

In July 2011, the North Carolina General Assembly passed the Woman's Right to Know Act over a gubernatorial veto. The Act amended Chapter 90 of the North Carolina General Statutes, which governs medical and related professions, adding a new article regulating the steps that must precede an abortion.

Physicians and abortion providers filed suit after the Act's passage but before its effective date, asking the court to enjoin enforcement of the Act and declare it unconstitutional. In October 2011, the district court issued a preliminary

4

injunction barring enforcement of one provision of the Act, the Display of Real-Time View Requirement ("the Requirement"), codified at N.C. Gen. Stat. § 90-21.85. J.A. 143-44. The court subsequently allowed the plaintiffs to amend their complaint. The Third Amended Complaint asserted that the Display of Real-Time View Requirement violated the physicians' First Amendment free speech rights and the physicians' and the patients' Fourteenth Amendment due process rights. J.A. 282.[1]

The Display of Real-Time View Requirement obligates doctors (or technicians) to perform an ultrasound on any woman seeking an abortion at least four but not more than seventy-two hours before the abortion is to take place. N.C. Gen. Stat. § 90-21.85(a)(1). The physician must display the sonogram so that the woman can see it, id. § 90-21.85(a)(3), and describe the fetus in detail, "includ[ing] the presence, location, and dimensions of the unborn child within the uterus and the number of unborn children depicted," id. § 90-21.85(a)(2), as well as "the presence of external members and internal organs, if present and viewable," id. § 90-21.85(a)(4). The physician also must offer

---

[1] The Third Amended Complaint also challenged both the Display of Real-Time View Requirement and the Informed Consent to Abortion provision, N.C. Gen. Stat. § 90-21.82, as unconstitutionally vague. J.A. 281. The parties and the district court agreed on savings constructions so that the Act was not void for vagueness, and the plaintiffs did not appeal that ruling. Stuart v. Loomis, 992 F. Supp. 2d 585, 611 (M.D.N.C. 2014) (district court opinion).

5

to allow the woman to hear the fetal heart tone. Id. § 90-21.85(a)(2). The woman, however, may "avert[] her eyes from the displayed images" and "refus[e] to hear the simultaneous explanation and medical description" by presumably covering her eyes and ears. Id. § 90-21.85(b).

The Act provides an exception to these requirements only in cases of medical emergency. Id. § 90-21.86. Physicians who violate the Act are liable for damages and may be enjoined from providing further abortions that violate the Act in North Carolina. Id. § 90-21.88. Violation of the Act also may result in the loss of the doctor's medical license. See id. § 90-14(a)(2) (The North Carolina Medical Board may impose disciplinary measures, including license revocation, upon a doctor who "[p]roduc[es] or attempt[s] to produce an abortion contrary to law.").

Not at issue in this appeal are several other informed consent provisions to which physicians, independently of the Display of Real-Time View Requirement, are subject. The first is the informed consent provision of the Act itself. Id. § 90-21.82. It requires that, at least twenty-four hours before an abortion is to be performed, a doctor or qualified professional explain to the woman seeking the abortion the risks of the procedure, the risks of carrying the child to term, "and any adverse psychological effects associated with the abortion." Id.

6

§ 90-21.82(1)(b), (d). The physician must also convey the "probable gestational age of the unborn child," id. § 90-21.82(1)(c), that financial assistance for the pregnancy may be available, that the father of the child is obligated to pay child support, and that there are alternatives to abortion, id. § 90-21.82(2)(a)-(d). Furthermore, the doctor must inform the woman that she can view on a state-sponsored website materials published by the state which describe the fetus. The doctor must also give or mail the woman physical copies of the materials if she wishes, and must "list agencies that offer alternatives to abortion." Id. § 90-21.82(2)(e).

Before this Act, physicians were still subject to North Carolina's general informed consent requirements when conducting abortions. See id. § 90-21.13(a); 10A N.C. Admin. Code 14E.0305(a); Appellees' Br. 6. Prior to its enactment, the physicians challenging the Act claim they were "inform[ing] each patient about the nature of the abortion procedure, its risks and benefits, and the alternatives available to the patient and their respective risks and benefits" and "counsel[ing] the patient to ensure that she was certain about her decision to have an abortion." Appellees' Br. 6.

Both parties moved for summary judgment. Applying heightened, intermediate scrutiny, Stuart v. Loomis, 992 F. Supp. 2d 585, 600-01 (M.D.N.C. 2014), the district court held

7

that the Display of Real-Time View Requirement violated the physicians' First Amendment rights to free speech. Id. at 607-09. It thus granted the plaintiffs' motion for summary judgment and entered a permanent injunction. Id. at 610-11. The court declined to reach the merits of the due process claim, finding it moot in light of the court's ruling on the First Amendment claim. Id. at 611.[2]

We review a grant of summary judgment de novo. S. Appalachian Mountain Stewards v. A & G Coal Corp., 758 F.3d 560, 562 (4th Cir. 2014). In so doing, we view the facts in the light most favorable to the state. Moore-King v. Cnty. of Chesterfield, Va., 708 F.3d 560, 566 (4th Cir. 2013).

II.

A.

"Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. This concept sounds simple, but proves more complicated on closer inspection. Laws that impinge upon speech receive different levels of judicial scrutiny depending on the type of regulation and the justifications and purposes underlying it. On the one hand, regulations that

---

[2] After the district court's order granting the preliminary injunction, several individuals and pregnancy counseling centers moved to intervene as defendants. The district court denied the motion, Stuart v. Huff, 2011 WL 6740400 (M.D.N.C. Dec. 22, 2011), and this court affirmed, Stuart v. Huff, 706 F.3d 345 (4th Cir. 2013).

8

discriminate against speech based on its content "are presumptively invalid," R.A.V. v. City of St. Paul, Minn., 505 U.S. 377, 382 (1992), and courts usually "apply the most exacting scrutiny," Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 642 (1994); see also United States v. Playboy Entm't Grp., Inc., 529 U.S. 803, 814 (2000). On the other hand, "area[s] traditionally subject to government regulation," such as commercial speech and professional conduct, typically receive a lower level of review. Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y., 447 U.S. 557, 562-63 (1980) (regulation of commercial speech); see also Keller v. State Bar of Cal., 496 U.S. 1, 13-16 (1990) (regulation of legal profession).

We thus must first examine the type of regulation at issue to determine the requisite level of scrutiny to apply. Turner, 512 U.S. at 637 (explaining that "because not every interference with speech triggers the same degree of scrutiny under the First Amendment, we must decide at the outset the level of scrutiny applicable"). As we do, we are mindful of "the First Amendment's command that government regulation of speech must be measured in minimums, not maximums." Riley v. Nat'l Fed'n of the Blind of N.C., Inc., 487 U.S. 781, 790 (1988).

The physicians urge us to find that the regulation must receive strict scrutiny because it is content-based and ideological. See Appellees' Br. 36-40. The state counters that

9

the Requirement must be treated as a regulation of the medical profession in the context of abortion and thus subject only to rational basis review. See Appellants' Br. 7-15, 20-28. The district court chose a different path. Recognizing that the Requirement both compelled speech and regulated the medical profession, the court applied neither strict scrutiny nor rational basis review, but rather the intermediate scrutiny standard normally used for certain commercial speech regulations. See Stuart v. Loomis, 992 F. Supp. 2d 585, 598-601 (M.D.N.C. 2014). For the reasons outlined below, we agree with the district court that the Requirement is a content-based regulation of a medical professional's speech which must satisfy at least intermediate scrutiny to survive.

B.

The Display of Real-Time View Requirement regulates both speech and conduct. The physician must convey the descriptions mandated by the statute in his or her own voice. The sonogram display is also intimately connected with the describing requirement. The two are thus best viewed as a single whole. In deciding whether an activity "possesses sufficient communicative elements to bring the First Amendment into play, we have asked whether '[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it.'" Texas v. Johnson,

10

491 U.S. 397, 404 (1989) (quoting <u>Spence v. Washington</u>, 418 U.S. 405, 410-11 (1974)). The state's avowed intent and the anticipated effect of all aspects of the Requirement are to discourage abortion or at the very least cause the woman to reconsider her decision. <u>See</u> Appellants' Br. 29-32. The clear import of displaying the sonogram in this context -- while the woman who has requested an abortion is partially disrobed on an examination table -- is to use the visual imagery of the fetus to dissuade the patient from continuing with the planned procedure. If the state's intent is to convey a distinct message, the message does not lose its expressive character because it happens to be delivered by a private party. Whether one agrees or disagrees with the state's approach here cannot be the question. In this context, the display of the sonogram is plainly an expressive act entitled to First Amendment protection. <u>See, e.g.</u>, <u>John Doe No. 1 v. Reed</u>, 561 U.S. 186, 194-95 (2010) (recognizing First Amendment protections for signing a referendum petition); <u>Joseph Burstyn, Inc. v. Wilson</u>, 343 U.S. 495, 501-02 (1952) (commercial film).

The First Amendment not only protects against prohibitions of speech, but also against regulations that compel speech. "Since all speech inherently involves choices of what to say and what to leave unsaid, one important manifestation of the principle of free speech is that one who chooses to speak may

11

also decide what not to say." Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos., 515 U.S. 557, 573 (1995) (citations omitted) (internal quotation marks omitted); see also Wooley v. Maynard, 430 U.S. 705, 714 (1977) ("[T]he First Amendment . . . includes both the right to speak freely and the right to refrain from speaking at all."). A regulation compelling speech is by its very nature content-based, because it requires the speaker to change the content of his speech or even to say something where he would otherwise be silent. Riley, 487 U.S. at 795 ("Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech."); Centro Tepeyac v. Montgomery Cnty., 722 F.3d 184, 189 (4th Cir. 2013) (en banc) (same). Compelled speech is particularly suspect because it can directly affect listeners as well as speakers. Listeners may have difficulty discerning that the message is the state's, not the speaker's, especially where the "speaker [is] intimately connected with the communication advanced." Hurley, 515 U.S. at 576.

The Requirement is quintessential compelled speech. It forces physicians to say things they otherwise would not say. Moreover, the statement compelled here is ideological; it conveys a particular opinion. The state freely admits that the purpose and anticipated effect of the Display of Real-Time View Requirement is to convince women seeking abortions to change

12

their minds or reassess their decisions. See Appellants' Br. 29-32.

It may be true, as the Fifth Circuit has noted, that "the required disclosures . . . are the epitome of truthful, non-misleading information." Tex. Med. Providers Performing Abortion Servs. v. Lakey, 667 F.3d 570, 577-78 (5th Cir. 2012). But an individual's "right to tailor [his] speech" or to not speak at all "applies . . . equally to statements of fact the speaker would rather avoid." Hurley, 515 U.S. at 573; see also Sorrel v. IMS Health Inc., 131 S. Ct. 2653, 2667 (2011); Turner, 512 U.S. at 645; Riley, 487 U.S. at 797-98. While it is true that the words the state puts into the doctor's mouth are factual, that does not divorce the speech from its moral or ideological implications. "[C]ontext matters." Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt., 721 F.3d 264, 286 (4th Cir. 2013) (en banc). Of course we need not go so far as to say that every required description of a typical fetus is in every context ideological. But this Display of Real-Time View Requirement explicitly promotes a pro-life message by demanding the provision of facts that all fall on one side of the abortion debate -- and does so shortly before the time of decision when the intended recipient is most vulnerable.

The state protests that the Requirement does not dictate a specific script and that the doctor is free to supplement the

information with his own opinion about abortion. Reply Br. 14-16. That is true; the state does not demand that the doctor use particular words. But that does not mean that the Requirement is "not designed to favor or disadvantage speech of any particular content." Turner, 512 U.S. at 652. In fact, the clear and conceded purpose of the Requirement is to support the state's pro-life position. That the doctor may supplement the compelled speech with his own perspective does not cure the coercion -- the government's message still must be delivered (though not necessarily received).

Content-based regulations of speech typically receive strict scrutiny. Id. at 642. The state, however, maintains that the Requirement is merely a regulation of the practice of medicine that need only satisfy rational basis review. We turn now to that contention.[3]

C.

The state's power to prescribe rules and regulations for professions, including medicine, has an extensive history. See

---

[3] Plaintiffs seem to suggest that the Display of Real-Time View Requirement constitutes viewpoint discrimination and that we should strike the provision down on that basis. See Appellees' Br. 2, 54. Because we find that the Requirement fails even intermediate scrutiny, infra Part III, it is unnecessary for us to definitively determine whether the compelled speech here requires strict scrutiny. See Greater Balt., 721 F.3d at 288 (cautioning against "precipitately concluding that the [provision] is an exercise of viewpoint discrimination").

14

_Dent v. West Virginia_, 129 U.S. 114, 122 (1889) ("[I]t has been the practice of different states, from time immemorial, to exact in many pursuits a certain degree of skill and learning upon which the community may confidently rely."). Licensing and regulation by the state "provide clients with the confidence they require to put their health or their livelihood in the hands of those who utilize knowledge and methods with which the clients ordinarily have little or no familiarity." _King v. Gov. of N.J._, 767 F.3d 216, 232 (3d Cir. 2014). The state may establish licensing qualifications, _Dent_, 129 U.S. at 122, oblige the payment of dues to a professional organization for purposes such as "disciplining members" and "proposing ethical codes," _Keller_, 496 U.S. at 16, and even set standards for the conduct of professional activities, _Barsky v. Bd. of Regents of Univ. of State of N.Y._, 347 U.S. 442, 449-50 (1954). In the medical context, the state may require the provision of information sufficient for patients to give their informed consent to medical procedures, _see Canterbury v. Spence_, 464 F.2d 772, 781 (D.C. Cir. 1972), and patients may seek damages when doctors fail to follow statutory and professionally recognized norms, _see, e.g_, N.C. Gen. Stat. § 90-21.88. Simply put, "[t]he power of government to regulate the professions is not lost whenever the practice of a profession entails speech."

15

Lowe v. SEC, 472 U.S. 181, 228 (1985) (White, J., concurring in the judgment).

But that does not mean that individuals simply abandon their First Amendment rights when they commence practicing a profession. See Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 884 (1992) (plurality opinion) ("[T]he physician's First Amendment rights not to speak are implicated." (emphasis added)); Lowe, 472 U.S. at 229-30 (White, J., concurring in the judgment) ("But the principle that the government may restrict entry into professions and vocations through licensing schemes has never been extended to encompass the licensing of speech per se or of the press."). To the contrary, "speech is speech, and it must be analyzed as such for purposes of the First Amendment." King, 767 F.3d at 229. There are "many dimensions" to professionals' speech. Fla. Bar v. Went For It, Inc., 515 U.S. 618, 634 (1995). And "[t]here are circumstances in which we will accord speech by attorneys on public issues and matters of legal representation the strongest protection our Constitution has to offer." Id. With all forms of compelled speech, we must look to the context of the regulation to determine when the state's regulatory authority has extended too far. Riley, 487 U.S. at 796.

When the First Amendment rights of a professional are at stake, the stringency of review thus slides "along a continuum"

16

from "public dialogue" on one end to "regulation of professional conduct" on the other. Pickup v. Brown, 740 F.3d 1208, 1227, 1229 (9th Cir. 2013) (emphasis in original). Other circuits have recently relied on the distinction between professional speech and professional conduct when deciding on the appropriate level of scrutiny to apply to regulations of the medical profession. See King, 767 F.3d at 224-29, 233-37; Wollschlaeger v. Gov. of Fla., 760 F.3d 1195, 1217-25 (11th Cir. 2014).

The Display of Real-Time View Requirement resides somewhere in the middle on that sliding scale. It is a regulation of medical treatment insofar as it directs doctors to do certain things in the context of treating a patient. In that sense, the government can lay claim to its stronger interest in the regulation of professional conduct. But that is hardly the end of the matter. The government's regulatory interest is less potent in the context of a self-regulating profession like medicine. Moore-King v. Cnty. of Chesterfield, Va., 708 F.3d 560, 570 (4th Cir. 2013). Moreover, the Requirement is a clearly content-based regulation of speech; it requires doctors to "say" as well as "do." As the district court found, the confluence of these factors points toward borrowing a heightened intermediate scrutiny standard used in certain commercial speech cases. Stuart, 992 F. Supp. 2d at 600. Thus, we need not conclusively determine whether strict scrutiny ever applies in similar

17

situations, because in this case "the outcome is the same whether a special commercial speech inquiry or a stricter form of judicial scrutiny is applied." <u>Sorrel</u>, 131 S. Ct. at 2667.

D.

Insofar as our decision on the applicable standard of review differs from the positions taken by the Fifth and Eighth Circuits in cases examining the constitutionality of abortion regulations under the First Amendment, we respectfully disagree. Both courts relied heavily on a single paragraph in <u>Casey</u>:

> All that is left of petitioners' argument is an asserted First Amendment right of a physician not to provide information about the risks of abortion, and childbirth, in a manner mandated by the State. To be sure, the physician's First Amendment rights not to speak are implicated, see <u>Wooley v. Maynard</u>, 430 U.S. 705 (1977), but only as part of the practice of medicine, subject to reasonable licensing and regulation by the State, cf. <u>Whalen v. Roe</u>, 429 U.S. 589, 603 (1977). We see no constitutional infirmity in the requirement that the physician provide the information mandated by the State here.

505 U.S. at 884; <u>see also</u> <u>Lakey</u>, 667 F.3d at 574-76; <u>Planned Parenthood Minn., N.D., S.D. v. Rounds</u>, 686 F.3d 889, 893 (8th Cir. 2012) (en banc) ("<u>Rounds II</u>"); <u>Planned Parenthood Minn., N.D., S.D. v. Rounds</u>, 530 F.3d 724, 733-35 (8th Cir. 2008) (en banc) ("<u>Rounds I</u>"). That is the sum of the First Amendment analysis in <u>Casey</u>.

In considering an ultrasound display-and-describe requirement similar to the one at issue here, the Fifth Circuit

18

interpreted _Casey_ as employing "the antithesis of strict
scrutiny." _Lakey_, 667 F.3d at 575. It further noted that in
_Gonzales v. Carhart_, the Supreme Court "upheld a state's
'significant role . . . in regulating the medical profession.'"
_Lakey_, 667 F.3d at 575-76 (quoting _Gonzales v. Carhart_, 550 U.S.
124, 157 (2007)). Therefore, the _Lakey_ court reasoned,
provisions such as the one at issue here -- that is, laws that
"require truthful, nonmisleading, and relevant disclosures," _id._
at 576 -- "do not fall under the rubric of compelling
'ideological' speech that triggers First Amendment strict
scrutiny," _id._ The Eighth Circuit similarly drew from _Casey_ and
_Gonzales_ the rule that the First Amendment permits the state to
"use its regulatory authority to require a physician to provide
truthful, non-misleading information relevant to a patient's
decision to have an abortion." _Rounds I_, 530 F.3d at 734-35; _see
also_ _Rounds II_, 686 F.3d at 893.

  With respect, our sister circuits read too much into _Casey_
and _Gonzales_. The single paragraph in _Casey_ does not assert that
physicians forfeit their First Amendment rights in the
procedures surrounding abortions, nor does it announce the
proper level of scrutiny to be applied to abortion regulations
that compel speech to the extraordinary extent present here. The
plurality opinion stated that the medical profession is "subject
to reasonable licensing and regulation by the State" and that

19

physicians' speech is "part of the practice of medicine." <u>Casey</u>, 505 U.S. at 884. But the plurality did not hold sweepingly that all regulation of speech in the medical context merely receives rational basis review. Rather, having noted the physicians' First Amendment rights and the state's countervailing interest in regulating the medical profession, the plurality simply stated that it saw "no constitutional infirmity in the requirement that the physician provide the information mandated by the State <u>here</u>." <u>Id.</u> (emphasis added). That particularized finding hardly announces a guiding standard of scrutiny for use in every subsequent compelled speech case involving abortion.

Furthermore, the Fifth and Eighth Circuits' reliance on <u>Gonzales</u> seems inapposite. <u>Gonzales</u> was not a First Amendment case; the plaintiffs there did not bring free speech claims. <u>See</u> <u>Carhart v. Ashcroft</u>, 331 F. Supp. 2d 805, 814 (D. Neb. 2004); <u>Planned Parenthood Fed'n of Am. v. Ashcroft</u>, 320 F. Supp. 2d 957, 967 (N.D. Cal. 2004). Thus <u>Gonzales</u> does not elucidate the First Amendment standard applied in <u>Casey</u>. <u>Gonzales</u> provides valuable insight into the relationship between the state and the medical profession and the role the state may play in ensuring that women are properly informed before making what is indisputably a profound choice with permanent and potentially harmful impacts. <u>See</u> <u>infra</u> Part III. But it says nothing about the level of scrutiny courts should apply when reviewing a claim

20

that a regulation compelling speech in the abortion context violates physicians' First Amendment free speech rights. The fact that a regulation does not impose an undue burden on a woman under the due process clause does not answer the question of whether it imposes an impermissible burden on the physician under the First Amendment. A heightened intermediate level of scrutiny is thus consistent with Supreme Court precedent and appropriately recognizes the intersection here of regulation of speech and regulation of the medical profession in the context of an abortion procedure.[4]

### III.

Under an intermediate standard of scrutiny, the state bears the burden of demonstrating "at least that the statute directly advances a substantial governmental interest and that the measure is drawn to achieve that interest." Sorrel v. IMS Health Inc., 131 S. Ct. 2653, 2667-68 (2011). This formulation seeks to "ensure not only that the State's interests are proportional to the resulting burdens placed on speech but also that the law

---

[4] The state's amici insist that the decision we reach today will permit future litigants to use the First Amendment "as a 'trump card' in a multitude of challenges to abortion regulations, allowing abortion proponents to provoke a 'back-door,' strict scrutiny approach" that will override Casey's undue burden standard. Law Professors' Br. 27. We think this concern is overdrawn. The great majority of abortion regulations do not compel anyone's speech, and the great majority of litigants do not raise First Amendment concerns.

21

does not seek to suppress a disfavored message." Id. at 2668. The court can and should take into account the effect of the regulation on the intended recipient of the compelled speech, especially where she is a captive listener. See Hill v. Colorado, 530 U.S. 703, 716-18 (2000); Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 756-57 (1976); Greater Balt. Ctr. For Pregnancy Concerns, Inc. v. Mayor of Balt., 721 F.3d 264, 286 (4th Cir. 2013) (en banc); cf. Lee v. Weisman, 505 U.S. 577, 598 (1992).

The protection of fetal life, along with the companion interests of protecting the pregnant woman's psychological health and ensuring that "so grave a choice is well informed," Gonzales, 550 U.S. at 159, is undeniably an important state interest. The Supreme Court has repeatedly affirmed the state's "important and legitimate interest" in preserving, promoting, and protecting fetal life. Roe v. Wade, 410 U.S. 113, 162 (1973) (quoted in Casey, 505 U.S. at 871); see also Gonzales, 550 U.S. at 145. We shall presume for the purpose of this appeal that this statute protects fetal life by increasing the likelihood that a woman will not follow through on the decision to have an abortion. Nonetheless, the means used to promote a substantial state interest must be drawn so as to directly advance the interest without impeding too greatly on individual liberty interests or competing state concerns. Sorrel, 131 S. Ct. at

22

2667-68. The means employed here are far-reaching -- almost unprecedentedly so -- in a number of respects and far outstrip the provision at issue in Casey. See Casey, 505 U.S. at 881. This statutory provision interferes with the physician's right to free speech beyond the extent permitted for reasonable regulation of the medical profession, while simultaneously threatening harm to the patient's psychological health, interfering with the physician's professional judgment, and compromising the doctor-patient relationship. We must therefore find the Display of Real-Time View Requirement unconstitutional.

A.

Before addressing the provision's constitutional infirmities, it is well worth identifying briefly the various state interests at stake in this case. As we noted above, the Supreme Court has forcefully reiterated that the state's interest in protecting fetal life is important and profound. This interest derives from the state's general interest in protecting and promoting respect for life, and has been recognized in abortion decisions without number. See, e.g., Gonzales, 550 U.S. at 158; Casey, 505 U.S. at 871; Greenville Women's Clinic v. Bryant, 222 F.3d 157, 165-66 (4th Cir. 2000). We do not question the substantial state interest at work here.

As part of its general interest in promoting the health of its citizens, the state also has an interest in promoting the

23

psychological health of women seeking abortions. Appellants' Br. 17. The state may seek to protect women both from the psychological harm of "com[ing] to regret their choice," Gonzales, 550 U.S. at 159, as well as the psychological harm from the process of obtaining an abortion itself. The Supreme Court has also recognized a state interest in maintaining "the integrity and ethics of the medical profession," which includes promoting a healthy doctor-patient relationship, Washington v. Glucksberg, 521 U.S. 702, 731 (1997); see also Gonzales, 550 U.S. at 157, and respecting physicians' professional judgment, see Casey, 505 U.S. at 884.

However, that important state interests are implicated in the abortion context is only the starting point for our analysis. Though physicians and other professionals may be subject to regulations by the state that restrict their First Amendment freedoms when acting in the course of their professions, professionals do not leave their speech rights at the office door. See Lowe v. SEC, 472 U.S. 181, 229-30 (1985) (White, J., concurring in the judgment). Any state regulation that limits the free speech rights of professionals must pass the requisite constitutional test. The Display of Real-Time View Requirement must directly advance an important state interest in a manner that is drawn to that interest and proportional to the burden placed on the speech. See Sorrel, 131 S. Ct. at 2667-68.

24

B.

North Carolina contends that the Display of Real-Time View Requirement is merely "reasonable . . . regulation by the State" of the medical profession that does not violate the physicians' First Amendment rights any more than informed consent requirements do. Appellants' Br. 22-25 (quoting <u>Tex. Med. Providers Performing Abortion Servs. v. Lakey</u>, 667 F.3d 570, 575 (5th Cir. 2012) (quoting <u>Casey</u>, 505 U.S. at 882)). The requirements the provision imposes on physicians, however, resemble neither traditional informed consent nor the variation found in the Pennsylvania statute at issue in <u>Casey</u>. The North Carolina statute goes much further, imposing additional burdens on the physicians' free speech and risking the compromise of other important state interests.

Traditional informed consent requirements derive from the principle of patient autonomy in medical treatment. Grounded in self-determination, obtaining informed consent prior to medical treatment is meant to ensure that each patient has "the information she needs to meaningfully consent to medical procedures." Am. Coll. of Obstetricians & Gynecologists & the Am. Med. Ass'n ("ACOG & AMA") Br. 5; <u>see also</u> AMA, Op. 8.08 – Informed Consent (2006). As the term suggests, informed consent consists of two essential elements: comprehension and free consent. ACOG & AMA Br. 7; ACOG, Comm. Op. No. 439 – Informed

25

Consent, at 2 (2012). Comprehension requires that the physician
convey adequate information about the diagnosis, the prognosis,
alternative treatment options (including no treatment), and the
risks and likely results of each option. ACOG & AMA Br. 7; ACOG,
Comm. Op. No. 439, at 3, 5; see also J.A. 359 (declaration of
Dr. Anne Drapkin Lyerly); Canterbury v. Spence, 464 F.2d 772,
780-81 (D.C. Cir. 1972). Physicians determine the "adequate"
information for each patient based on what a reasonable
physician would convey, what a reasonable patient would want to
know, and what the individual patient would subjectively wish to
know given the patient's individualized needs and treatment
circumstances. ACOG, Comm. Op. No. 439, at 5. Free consent, as
it suggests, requires that the patient be able to exercise her
autonomy free from coercion. Id. at 3, 5. It may even include at
times the choice not to receive certain pertinent information
and to rely instead on the judgment of the doctor. Id. at 7;
ACOG & AMA Br. 8. The physician's role in this process is to
inform and assist the patient without imposing his or her own
personal will and values on the patient. J.A. 359-60
(declaration of Dr. Anne Drapkin Lyerly); ACOG, Comm. Op. No.
439, at 3. The informed consent process typically involves a
conversation between the patient, fully clothed, and the
physician in an office or similar room before the procedure
begins. ACOG & AMA Br. 8, 23; ACOG, Comm. Op. No. 439, at 4.

26

Once the patient has received the information she needs, she signs a consent form, and treatment may proceed. See, e.g., N.C. Gen. Stat. § 90-21.13(b).

The Pennsylvania statute challenged in Casey prescribes a modified form of informed consent for abortions. To provide informed consent, the statute first requires the physician to orally inform the woman of the nature of the abortion procedure, the "risks and alternatives to the procedure . . . that a reasonable patient would consider material to the decision" whether to have an abortion, the risks of carrying the child to term, and the "probable gestational age of the unborn child" when the abortion is to be performed. 18 Pa. Cons. Stat. § 3205(a)(1). The physician must give this information at least twenty-four hours prior to the abortion. Id. Aside from the gestational age of the fetus, this information is the same type that would be required under traditional informed consent for any medical procedure.

The statute continues on, however, to require that the physician must inform the woman, at least twenty-four hours in advance, that the state prints materials that describe the unborn child, and a copy must be provided to her if she wants it. 18 Pa. Cons. Stat. § 3205(a)(2)-(3). Finally, the statute requires the physician to provide some additional information about financial and other assistance that may be available from

27

the state and the father. 18 Pa. Cons. Stat. § 3205(a)(2). These provisions deviate only modestly from traditional informed consent. They also closely resemble the informed consent provisions of North Carolina's Woman's Right to Know Act that are not under challenge in this appeal. N.C. Gen. Stat. § 90-21.82(1)-(2). The challenged Display of Real-Time View Requirement, N.C. Gen. Stat. § 90-21.85, however, reaches beyond the modified form of informed consent that the Court approved in Casey. In so doing, it imposes a virtually unprecedented burden on the right of professional speech that operates to the detriment of both speaker and listener.

C.

The burdens trace in part from deviations from the traditions of informed consent. The most serious deviation from standard practice is requiring the physician to display an image and provide an explanation and medical description to a woman who has through ear and eye covering rendered herself temporarily deaf and blind. This is starkly compelled speech that impedes on the physician's First Amendment rights with no counterbalancing promotion of state interests. The woman does not receive the information, so it cannot inform her decision. In fact, "[t]he state's own expert witness agrees that the delivery of the state's message in these circumstances does not provide any information to the patient and does not aid

28

voluntary and informed consent." <u>Stuart v. Loomis</u>, 992 F. Supp. 2d 585, 602 (M.D.N.C. 2014). And while having to choose between blindfolding and earmuffing herself or watching and listening to unwanted information may in some remote way influence a woman in favor of carrying the child to term, forced speech to unwilling or incapacitated listeners does not bear the constitutionally necessary connection to the protection of fetal life. Moreover, far from promoting the psychological health of women, this requirement risks the infliction of psychological harm on the woman who chooses not to receive this information. She must endure the embarrassing spectacle of averting her eyes and covering her ears while her physician -- a person to whom she should be encouraged to listen -- recites information to her. We can perceive no benefit to state interests from walling off patients and physicians in a manner antithetical to the very communication that lies at the heart of the informed consent process.

The constitutional burden on the physicians' expressive rights is not lifted by having a willing listener. The information the physician had to convey orally in <u>Casey</u> was no more than a slight modification of traditional informed consent disclosures. The information conveyed here in the examining room more closely resembles the materials that in <u>Casey</u> were provided by the state in a pamphlet. <u>Casey</u>, 505 U.S. at 881. A physician

29

in Pennsylvania need only inform the patient that such information is available and, if requested, provide her with a copy of the state-issued pamphlet. 18 Pa. Cons. Stat. § 3205(a)(2)(i) & (a)(3). Informing a patient that there are state-issued materials available is not ideological, because the viewpoint conveyed by the pamphlet is clearly the state's -- not the physician's. It is no wonder then that the <u>Casey</u> court found no First Amendment infirmities in that requirement. By contrast, the North Carolina statute compels the physician to speak and display the very information on a volatile subject that the state would like to convey. <u>See</u> N.C. Gen. Stat. § 90-21.85(a)(2)-(4). The coercive effects of the speech are magnified when the physician is compelled to deliver the state's preferred message in his or her own voice. This Requirement treads far more heavily on the physicians' free speech rights than the state pamphlet provisions at issue in <u>Casey</u>.

Though the information conveyed may be strictly factual, the context surrounding the delivery of it promotes the viewpoint the state wishes to encourage. As a matter of policy, the state may certainly express a preference for childbirth over abortion, <u>Webster v. Reprod. Health Servs.</u>, 492 U.S. 490, 511 (1989), and use its agents and written materials to convey that message. However the state cannot commandeer the doctor-patient relationship to compel a physician to express its preference to

30

the patient. As the district court noted, "[b]y requiring providers to deliver this information to a woman who takes steps not to hear it or would be harmed by hearing it, the state has . . . moved from 'encouraging' to lecturing, using health care providers as its mouthpiece." Stuart, 992 F. Supp. 2d at 609. Transforming the physician into the mouthpiece of the state undermines the trust that is necessary for facilitating healthy doctor-patient relationships and, through them, successful treatment outcomes. See Am. Pub. Health Ass'n ("APHA") Br. 9-10. The patient seeks in a physician a medical professional with the capacity for independent medical judgment that professional status implies. The rupture of trust comes with replacing what the doctor's medical judgment would counsel in a communication with what the state wishes told. It subverts the patient's expectations when the physician is compelled to deliver a state message bearing little connection to the search for professional services that led the patient to the doctor's door.

Furthermore, by failing to include a therapeutic privilege exception, the Display of Real-Time View Requirement interferes with the physician's professional judgment and ethical obligations. The absence of a therapeutic exception means that the state has sought not only to control the content of the physician's speech, but to dictate its timing. Under the Requirement, the physician must display and describe the fetus

31

simultaneously with the ultrasound procedure, and he must do this at least four and not more than seventy-two hours prior to the abortion procedure. See N.C. Gen. Stat. § 90-21.85(a). Therapeutic privilege, however, permits physicians to decline or at least wait to convey relevant information as part of informed consent because in their professional judgment delivering the information to the patient at a particular time would result in serious psychological or physical harm. ACOG, Comm. Op. 439, at 7. It is an important privilege, albeit a limited one to be used sparingly. See id. It protects the health of particularly vulnerable or fragile patients, and permits the physician to uphold his ethical obligations of benevolence.

The Casey court found it relevant that the Pennsylvania statute contained a therapeutic exception so that it "does not prevent the physician from exercising his or her medical judgment." 505 U.S. at 883-84. North Carolina by contrast requires the physician to "[d]isplay the images" and "[p]rovide a simultaneous explanation of what the display is depicting" along with "a medical description of the images," with no exception. N.C. Gen. Stat. § 90-21.85(a)(2)-(4). The lack of a provision similar to Pennsylvania's in North Carolina's statute runs contrary to the state's interest in "protecting the integrity and ethics of the medical profession," Gonzales, 550 U.S. at 157, and more generally to its interest in the

32

psychological and physical well-being of the affected women. Particularly for women who have been victims of sexual assaults or whose fetuses are nonviable or have severe, life-threatening developmental abnormalities, having to watch a sonogram and listen to a description of the fetus could prove psychologically devastating. See J.A. 332-33 (declaration of Dr. Gretchen S. Stuart); Appellees' Br. 12-13; APHA Br. 8-9. Requiring the physician to provide the information regardless of the psychological or emotional well-being of the patient, see N.C. Gen. Stat. §§ 90-21.85 & 90-21.86, can hardly be considered closely drawn to those state interests the provision is supposed to promote.

In sum, though the State would have us view this provision as simply a reasonable regulation of the medical profession, these requirements look nothing like traditional informed consent, or even the versions provided for in Casey and in N.C. Gen. Stat. § 90-21.82. As such, they impose an extraordinary burden on expressive rights. The three elements discussed so far -- requiring the physician to speak to a patient who is not listening, rendering the physician the mouthpiece of the state's message, and omitting a therapeutic privilege to protect the health of the patient -- markedly depart from standard medical practice.

D.

33

Other aspects of the Requirement are equally unusual. As described above, informed consent frequently consists of a fully-clothed conversation between the patient and physician, often in the physician's office. It is driven by the "patient's particular needs and circumstances," J.A. 388 (declaration of Dr. Amy Weil), so that the patient receives the information he or she wants in a setting that promotes an informed and thoughtful choice.

This provision, however, finds the patient half-naked or disrobed on her back on an examination table, with an ultrasound probe either on her belly or inserted into her vagina. Appellees' Br. 13; APHA Br. 8. Informed consent has not generally been thought to require a patient to view images from his or her own body, ACOG & AMA Br. 7, much less in a setting in which personal judgment may be altered or impaired. Yet this provision requires that she do so or "avert[] her eyes." N.C. Gen. Stat. § 90-21.85(a)(3), (b). Rather than engaging in a conversation calculated to inform, the physician must continue talking regardless of whether the patient is listening. See Stuart, 992 F. Supp. 2d at 590 & 602 n.34. The information is provided irrespective of the needs or wants of the patient, in direct contravention of medical ethics and the principle of patient autonomy. "[F]orcing this experience on a patient over her objections" in this manner interferes with the decision of a

34

patient not to receive information that could make an indescribably difficult decision even more traumatic and could "actually cause harm to the patient." J.A. 330 (declaration of Dr. Gretchen S. Stuart). And it is intended to convey not the risks and benefits of the medical procedure to the patient's own health, but rather the full weight of the state's moral condemnation. Though the state is plainly free to express such a preference for childbirth to women, it is not the function of informed consent to require a physician to deliver the state's preference in a setting this fraught with stress and anxiety.

There are few absolutes in the difficult area of professional regulation and professional expression. But there do exist constraints on the permissible interference with the doctor-patient relationship; there are limits on state attempts to compel physicians to deliver its message, especially when that message runs counter to the physician's professional judgment and the patient's autonomous decision about what information she wants. Though states may surely enact legislation to ensure that a woman's choice is informed and thoughtful when she elects to have an abortion, states cannot so compromise physicians' free speech rights, professional judgment, patient autonomy, and other important state interests in the process. The means here exceed what is proper to promote the undeniably profound and important purpose of protecting

35

fetal life. See, e.g., Sorrel, 131 S. Ct. at 2667–68, 2670 (holding that Vermont statute unconstitutionally burdened speech because "[w]hile Vermont's stated policy goals may be proper, § 4631(d) does not advance them in a permissible way" under intermediate scrutiny).

## IV.

"The right to speak and the right to refrain from speaking are complementary components of the broader concept of 'individual freedom of mind.'" Wooley v. Maynard, 430 U.S. 705, 714 (1977) (quoting W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 637 (1943)). Regulations which compel ideological speech "pose the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion." Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 641 (1994). Abortion may well be a special case because of the undeniable gravity of all that is involved, but it cannot be so special a case that all other professional rights and medical norms go out the window. While the state itself may promote through various means childbirth over abortion, it may not coerce doctors into voicing that message on behalf of the state in the particular manner and setting attempted here. The district court did not err in concluding that § 90-21.85 of the North Carolina General Statutes violates

36

the First Amendment and in enjoining the enforcement of that provision. Its judgment is in all respects affirmed.

AFFIRMED

37