IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| GRETCHEN S. STUART, M.D., *et al.*, | ) | CIVIL ACTION NO. |
| | ) | 1:11-CV-804 |
| Plaintiffs, | ) | |
| | ) | |
| – against – | ) | RESPONSE OF THE DEFENDANTS |
| | ) | IN OPPOSITION TO THE |
| CHERYL WALKER-McGILL, M.D., *et al.*, | ) | PLAINTIFFS' FEE PETITION |
| | ) | |
| Defendants. | ) | |

The defendants (the "State") hereby respectfully submit this Response in Opposition to the plaintiffs' September 14, 2015 fee petition (Docket 177).

Introduction and Applicable Legal Standard

The plaintiffs are only entitled to a reasonable award of their attorneys' fees and costs. They are not entitled to a windfall. *See, e.g., Blum v. Stenson*, 465 U.S. 886 (1984); *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1360 (4th Cir. 1995). An award of attorneys' fees is usually determined by multiplying the number of hours reasonably expended by a reasonable hourly rate. *See Hensley v. Eckerhart,* 461 U.S. 424, 433; *Rum Creek Coal Sales v. Capterton,* 31 F.3d 169, 174-75 (4th Cir. 1994). Courts must exclude from a fee calculation hours that were not reasonably expended. *Daly v. Hill,* 790 F.2d 1071, 1079 (4th Cir. 1986). The consistent requirement for every aspect of a litigant's fee petition is thus reasonableness. The burden is on the party seeking an award of attorneys' fees to justify the amount claimed. *See id.* at 1079.

Analysis of the Papers Filed by the Plaintiffs' in Support of Their Fee Petition

A review of the declarations filed by the plaintiffs in support of their fee petition demonstrates that their fee petition is not reasonable in a number of significant respects.

The Declaration of Anton Metlitsky

Mr. Metlitsky avers that he has personal knowledge of the matters stated in his Declaration derived, in part, from his review of the files in his law firm's possession. (¶ 2) He adds that his personal knowledge is derived from information provided to him by other persons. (¶ 2) But none of Mr. Metlitsky's colleagues signed the Metlitsky Declaration or filed his or her own affidavit. There is no statement in Mr. Metlitsky's Declaration that the documents he describes as O'Melveny time, cost and billing records are or can qualify as business records under the Federal Rules of Evidence or that they fit within some other exception to the rule against hearsay evidence. There is no way to determine from Mr. Metlitsky's Declaration which parts of the Declaration are based on his own personal knowledge and which parts are based on statements made to him by others.

Mr. Metlitsky also asserts that it was apparent from the outset of this case that the Woman's Right to Know Act "would raise complex and novel constitutional-law issues concerning … the First Amendment and the level of scrutiny that should be applied by courts evaluating the Act." (¶ 4) But these issues were not novel or even all that complex. As Mr. Metlitsky obliquely acknowledges, the *Lakey* case in Texas had already proceeded substantially when this case was filed. (¶ 4) As Mr. Metlitsky also acknowledges, the *Lakey* case involved a "similar" statute. (¶ 4) Indeed, that statute was strikingly similar (almost identical) to North Carolina's statute and the very same issues, cases and other legal principles were argued and briefed in Texas. One of the plaintiff's own lawyers in this case, Ms. Bebe Anderson, was involved as counsel in the *Lakey* case and, from the beginning of this lawsuit, was obviously already knowledgeable about the constitutional law and the constitutional law cases applicable, as well as the briefs filed and the arguments made by both sides in the *Lakey* case. In addition,

one of the physician affiants in this case was a physician affiant in *Lakey*. Because the *Lakey* case preceded this case, because one of the plaintiffs' lawyers in this case was also a lawyer in *Lakey* and because virtually exactly the same constitutional issues were involved in both cases, the plaintiffs in this case should have been able to take their legal research, briefs, expert affidavits and knowledge from the *Lakey* case and use them in this case without starting from scratch or reinventing the wheel in this case. This should have been true of the plaintiffs' efforts in this case at that pleading stage, the preliminary injunction stage, the summary judgment stage and the appellate stage.

The State asks the Court to carefully scrutinize the plaintiffs' fee petition and its supporting Declarations with an eye to identifying those areas of the plaintiffs' lawyers' efforts in this case in which they did not fully and efficiently use the knowledge, briefs, affidavits and other things that became available to them from the *Lakey* case in their preparation of their complaint, briefs, expert affidavits and their subsequent filings (at the trial and appellate stages) in this case. To the degree that the Court concludes that the plaintiffs reinvented the wheel in their work on this case and did not take full advantage of the work already done and the knowledge already gained in *Lakey*, the State asks the Court to deny the plaintiffs' fee petition.

Mr. Metlitsky also asserts that he and his colleagues at O'Melveny were engaged by the plaintiffs because it would be essential to engage counsel with experience handling "complex summary judgment records at the district-court level, and merits and certiorari-stage briefs in the United States Courts of Appeals and the United States Supreme Court, including in cases involving novel constitutional questions." (¶ 4) But all of the attorneys who represented the plaintiffs in this case purport to have substantial experience and expertise as trial attorneys, which would include expertise in summary judgment practice. And almost all of them purport to

be highly experienced and expert in working on what they characterize as complex constitutional law cases, including First Amendment and reproductive rights cases. And most of them claim an expertise at appellate practice. It may have been reasonable for the plaintiffs to retain one or two O'Melveny lawyers to offer their special expertise at Supreme Court practice, but the plaintiffs ask this Court to award fees at extraordinarily high rates for *four* O'Melveny lawyers, *all* of whom worked on this case nearly from its beginning through the end of the District Court phase and through the appeals stage, including the Supreme Court stage. And the plaintiffs also ask this Court to award them fees for *six* other attorneys from multiple organizations who duplicated much of what the four O'Melveny lawyers did throughout the course of this case. The State asks the Court not to award fees for such duplication of effort to multiple lawyers, when a much smaller team of attorneys could have litigated this case, particularly given that the *Lakey* case was already in existence.

The Metlitsky Declaration also points out that the O'Melveny firm assigned two very senior-level attorneys to this case, Walter Dellinger and Mr. Metlitsky. (¶¶ 7-9) The State believes that this constituted overstaffing and mis-staffing of the case, particularly given the number of other attorneys who worked on this case and the extraordinarily high hourly rates charged by the O'Melveny firm for its senior lawyers' time.

The Metlitsky Declaration and its Exhibits also make clear that, although Mr. Metlitsky and his O'Melveny colleagues ask the Court to apply extraordinarily high hourly rates to their work based on their special knowledge, expertise and experience in the substantive and procedural law applicable to this case, Mr. Metlitsky and two of his colleagues performed a very substantial amount of basic legal research on the very issues as to which they claim to already possess so much knowledge and expertise. *See, e.g.,* Metlitsky Declaration, ¶¶ 25, 26; Exhibit to

–4–

Metlitsky Declaration (Metlitsky time entries for July 5, 2012, August 20, 2012, September 19, 2012, September 20, 2012, April 7, 2014, April 8, 2014, May 1, 2014, May 5, 2014, May 14, 2014, May 19, 2014, May 22, 2014, May 23, 2014, May 26, 2014, May 27, 2014, May 28, 2014, May 29, 2014, May 30, 2014, May 31, 2014, March 30, 2015, March 31, 2015, April 2, 2015, April 6, 2015, April 9, 2015, April 10, 2015, April 14, 2015, April 16, 2015, April 17, 2015, April 19, 2015, April 20, 2015, April 21, 2015, April 22, 2015, April 23, 2015, April 24, 2015; Laura Conn time entries for September 10, 2012, September 11, 2012, September 13, 2012; Leah Godesky time entries for March 24, 2014, March 28, 2014, April 10, 2014, April 11, 2014, April 13, 2014, April 17, 2014, May 4, 2014, May 5, 2014, May 14, 2014, May 16, 2014). If the O'Melveny firm was engaged because, as Mr. Metlitsky avers, it already knew so much of the substantive and procedural law relating to complex district court, appellate court and Supreme Court litigation, and if this high level of knowledge and expertise allegedly justify the O'Melveny team's extraordinarily high hourly rates, then the Court should not award the plaintiffs any fees for basic legal research done by these lawyers – especially where, as here, the *Lakey* litigants had already plowed this ground fully and no new significant cases were uncovered by the plaintiffs' counsel in this case. This is even more true where, as is the case here, many of the non-O'Melveny attorneys who represented the plaintiffs in this case also spent a considerable amount of time conducting basic legal research on the very issues as to which they claim an extraordinary level of knowledge and expertise. They, too, base their claims for extraordinarily high hourly rates on this claimed knowledge and expertise.

Examples of this basis legal research work done by non-O'Melveny attorneys who represented the plaintiffs in this case can be found in the following time entries of the following lawyers: Andrew Beck, April 4, 2012, June 20, 2012; Julie Rikelman, October 10, 2012,

–5–

October 15, 2012, October 16, 2012, July 9, 2013, August 15, 2013, August 16, 2013, August 21, 2013, April 3, 2014, May 20, 2014, June 20, 2014, October 16, 2014, October 17, 2014, October 18, 2014, October 21, 2014, October 23, 2014, October 24, 2014, October 27, 2014, April 8, 2015; Bebe Anderson, August 5, 2011, August 6, 2011, August 7, 2011, August 8, 2011, August 13, 2011, August 14, 2011, August 15, 2011, August 19, 2011, August 20, 2011, August 21, 2011, August 23, 2011, September 7, 2011, September 11, 2011, October 12, 2011, November 4, 2011, November 5, 2011; Jennifer Sokoler, July 9, 2013, July 16, 2013, July 17, 2013, August 14, 2013, August 15, 2013, August 16, 2013, March 31, 2014, April 3, 2014; Hillary Schneller, October 22, 2014, October 22, 2014, October 23, 2014, March 31, 2015; Katherine Parker and Christopher Brook, June 25, 2015, June 24, 2015, June 22, 2015, June 17, 2015, July 18, 2013, March 29, 2012, January 10, 2012, October 31, 2011, October 12, 2011, October 3, 2011, September 20, 2011, September 12, 2011, August 25, 2011, August 24, 2011, August 22, 2011, August 19, 2011, August 18, 2011, August 17, 2011, August 16, 2011, August 15, 2011, August 12, 2011, August 11, 2011, August 8, 2011, August 5, 2011, August 4, 2011, August 3, 2011, August 2, 2011, July 27, 2011, July 11, 2011; Diana Salgado, September 17, 2012, September 18, 2012, September 20, 2012, October 23, 2012 (reported as "October 23, 2015"), October 26, 2012, April 2, 2013, April 6, 2013, February 25, 2014, March 24, 2015, March 25, 2015, April 15, 2015; Helene Krasnoff, September 13, 2011, September 14, 2011, October 13, 2011. If the Court were to award the plaintiffs' attorneys a fee based on the extraordinarily high hourly rates they claim (or some lower, but still higher-than-usual hourly rate), the State believes that all or virtually all of this legal research work done by the plaintiffs' lawyers should be excluded from any fee award, since these lawyers' claim to a higher-than-

usual hourly rate is based on their claim that they are extraordinarily knowledgeable and expert in the field.

There are yet other problems with the Metlitsky Declaration and the time sheets attached to it as Exhibits which the State believes mandate that the Court deny the plaintiffs' fee petition, at least in part. One such problem arises from the fact that many of the time entries reported on the Exhibits to the Metlitsky Declaration are plainly insufficient on their face to support a fee award. Examples include fragmentary, incomplete and thus ambiguous time entries, such as "Review materials," "Discussions and analysis," "Conversation with L. Conn," "Correspondence with J. Rikelman," "Correspond with B. Anderson," "Review case law," "Call with J. Rikelman," and the like. Time entries like these (and many, many more) which fail to identify the person(s) to whom the timekeeper was speaking or corresponding and the reason for the communication make it impossible for the reader to evaluate the reasonableness of the time entry or the necessity for the work. These types of time entries also make it impossible for the reader to evaluate or know what documents or cases the timekeeper was reviewing or what the relevance or necessity of the work was. No real-world client would consider such a bill reasonable and no such client would pay such a bill. The State should not be required to pay a fee award based on such incomplete time entries.

Examples of such time entries from the Exhibits to Mr. Metlitsky's Declaration include: Walter Dellinger, October 11, 2011, October 12, 2011, November 5, 2011, November 7, 2011, October 8, 2013, October 9, 2013, October 10, 2013; Anton Metlitsky, October 18, 2011, August 2, 2012, August 28, 2012, December 10, 2012, December 13, 2012, July 15, 2013, November 3, 2014, August 2, 2014, May 5, 2014; Laura Conn, October 18, 2011, October 25, 2011, November 9, 2011, December 16, 2011, January 10, 2012, June 12, 2012, September 13, 2012.

–7–

And these fragmentary time entries are not limited to the O'Melveny lawyers. They can also be found in the following other time entries of the following other lawyers who represented the plaintiffs in this case: Andrew Beck, August 22, 2011, September 8, 2011, September 19, 2011, September 23, 2011, September 26, 2011, October 4, 2011, October 11, 2011, October 18, 2011, November 10, 2011, November 23, 2011, November 28, 2011, December 12, 2011, December 19, 2011 (two entries), December 22, 2011, January 13, 2012, January 20, 2012, April 10, 2012, July 25, 2012, September 21, 2012, September 28, 2012, October 1, 2012, October 5, 2012, November 27, 2012, December 10, 2012, March 29, 2013, May 29, 2013, July 24, 2013, August 19, 2013 (two entries), August 20, 2013, August 21, 2013, February 3, 2014, February 4, 2014, February 26, 2014, March 14, 2014, April 3, 2014, May 5, 2014, June 6, 2014, June 17, 2014, January 13, 2014, April 29, 2014; Julie Rikelman, March 22, 2012, September 11, 2012, September 21, 2012, September 25, 2012, November 26, 2012; Bebe Anderson, August 1, 2011, August 2, 2011, August 3, 2011, August 4, 2011, August 5, 2011, August 8, 2011, August 9, 2011, August 10, 2011, August 11, 2011, August 12, 2011, August 15, 2011, August 16, 2011, August 17, 2011, August 18, 2011, August 19, 2011, August 22, 2011, August 23, 2011, August 24, 2011, August 25, 2011, August 26, 2011, September 6, 2011, September 9, 2011, September 12, 2011, September 14, 2011, September 15, 2011, September 16, 2011, September 17, 2011, September 19, 2011, September 20, 2011, September 21, 2011, September 23, 2011, September 24, 2011, October 5, 2011, October 12, 2011, October 14, 2011, October 24, 2011, November 5, 2011, November 9, 2011, November 11, 2011, November 15, 2011, November 16, 2011, November 18, 2011, November 30, 2011, February 23, 2012, March 25, 2012, March 26, 2012, March 29, 2012; Jennifer Sokoler, February 4, 2014, February 26, 2014, April 3, 2014; Helene Krasnoff, October 5, 2011; Diana Salgado, September 28, 2012 ("bundled" time entry containing

–8–

the entry "call to HK and potential declarant"), September 28, 2012 (second entry on that date), November 30, 2012 ("emailing w/ JR"), December 21, 2012 ("bundled" time entry reading "emailing w/ co-counsel"), July 24, 2013, February 20, 2014.

In addition to this problem, many of these fragmentary or otherwise unreasonable time entries are "bundled" together with other time entries. By way of example only, on June 12, 2012, Ms. Laura Conn of the O'Melveny firm reported that she worked four (4) hours on this case. Her time entry for that day actually reports three separate items of attorney work. One was "Correspond with Joint Defense team." It is impossible to determine from this entry what this correspondence was about; therefore, it is impossible to evaluate the degree to which this work was necessary and reasonable. But Ms. Conn combined three other items of work into this one "bundled" time entry for the same day. Thus, it is also impossible to delete the fragmentary and unreasonable time entry from the total four hours of work Ms. Conn reported for that day. The State asks the Court to strike all such bundled time entries from the time sheet exhibits supporting the plaintiffs' fee application where one or more of the bundled items of work is unreasonable and insufficient for one reason or another to justify a fee award – such as when a bundled time entry contains within it an unreasonable fragmentary and incomplete time entry. Examples of these bundling problems can be found in the following time entries: Julie Rikelman, March 22, 2012, September 11, 2011, September 21, 2011, September 25, 2011, November 26, 2012, August 15, 2013, August 16, 2013, August 21, 2013, April 3, 2014, August 21, 2014, April 3, 2014, May 20, 2014, June 20, 2014, June 22, 2014, October 23, 2014, October 27, 2014; Katherine Parker and Christopher Brook, July 18, 2013, March 29, 2012, January 10, 2013, October 13, 2011, October 12, 2011, October 3, 2011, September 20, 2011, September 12, 2011, August 25, 2011, August 24, 2011, August 22, 2011, August 19, 2011, August 18, 2011,

–9–

August 17, 2011, August 16, 2011, August 15, 2011, August 12, 2011, August 11, 2011, August 8, 2011, August 5, 2011, August 4, 2011, August 3, 2011, August 2, 2011, July 27, 2011, July 11, 2011

## The Declaration of Diana Salgado

Ms. Salgado's Declaration acknowledges that it is based, at least in part, on hearsay information and that it is not based on her own personal knowledge. (¶ 1 – "I make this declaration upon my personal knowledge *or information provided to me by co-counsel in connection with* ...."). (Emphasis supplied) Ms. Salgado does not identify the third-person source(s) of this information, she does not disclose what this third-person information is and she does not provide the reader with information sufficient to identify and segregate out those parts of her Declaration that are based on hearsay or a lack of personal knowledge. Accordingly, it is impossible to assess, among many other things, the degree to which the Salgado Declaration is based on hearsay or non-personal knowledge evidence or whether any of this hearsay or non-personal knowledge evidence meets the requirements of one or more of the exceptions to the hearsay rule. In addition to this unidentified hearsay and non-personal knowledge problem with the Salgado Declaration, the affiant, Ms. Salgado, purports to act as the affiant not only for herself, but also for another person, Ms. Helene Krasnoff. Ms. Krasnoff did not sign the Salgado Declaration and she did not tender an affidavit of her own to the Court. Thus, everything that Ms. Salgado says in her Declaration about what Ms. Krasnoff said or did is either hearsay (or double hearsay) or is not based on the personal knowledge of the affiant. Under these circumstances, the Salgado Declaration, including its Exhibits, should not be treated as competent evidence in support of the plaintiffs' fee petition. Alternatively, the Court should not award any attorneys' fees on account of work done by Ms. Salgado or Ms. Krasnoff except to the

degree that it can clearly ascertain from the face of the Salgado Declaration that those fees are fully evidenced and legally justified by the competent portions of the Salgado Declaration.

Quite apart from these basic evidentiary problems with the Salgado Declaration, that Declaration reveals additional deficiencies. For example, on July 26, 2012, Ms. Salgado reported her work on this case for that day as "making travel arrangements for Bowes dep." This is not the type of work normally performed by lawyers, especially lawyers charging their clients very high hourly rates for their legal work. For obvious reasons of cost efficiency, this is the type of non-legal work that is normally performed by a lawyer's administrative assistant. The State does not believe that this entry justifies any attorneys' fee award. In addition, on January 5 and 15, 2015, Ms. Salgado reported her time as "emails to CB re PP merger" and "same as above." The State does not believe that this internal Planned Parenthood merger transaction or Ms. Salgado's work relating to it had anything to do with the prosecution of this case and that no attorneys' fee award should be made based on this time entry.

<u>Other Deficiencies in the Documents Filed by the Plaintiffs in Support of Their Fee Petition</u>

Beyond these problems and deficiencies in the plaintiffs' fee petition and their supporting papers, the State would note the following matters. The daily time entries reported by Ms. Bebe Anderson include reports of "misc case preparation work" and "misc case prep." *See* time entries for Bebe Anderson for August 11, 2011, August 12, 2011, August 15, 2011, August 16, 2011, August 17, 2011, August 18, 2011, August 19, 2011, August 21, 2011, August 22, 2011, August 23, 2011, August 25, 2011, September 6, 2011, September 8, 2011, September 12, 2011, September 14, 2011, September 16, 2011, September 17, 2011, September 18, 2011, September 19, 2011, September 20, 2011, September 24, 2011, October 3, 2011, November 3, 2011, November 5, 2011, November 10, 2011, November 11, 2011, November 23, 2011, November

28, 2011, January 7, 2012 and April 1, 2012. These entries do not reasonably describe the work performed. It is impossible to assess them as written in terms of whether the work was reasonably connected to the prosecution of this case, necessary or otherwise appropriate – or even what the work was. No real-world client would pay a bill containing time entries like these. The State should not be required to pay for this work either.

In addition, it appears to the State that at least some of the plaintiffs in this case are attempting to recover attorneys' fees for their lawyers' work in defending against the motion of certain persons to intervene in this case. *See, e.g.*, time entries of Katherine L. Parker and Christopher Brook for April 24, 2012, April 23, 2012, February 29, 2012, January 25, 2012, November 29, 2011, November 9, 2011. As this Court knows, the State vigorously opposed the intervention motion from the outset and succeeded in preventing the putative intervenors from intervening in this case. The State should not have to pay the plaintiffs' attorneys' fees for this part of the case.

Moreover, many of the attorney affiants who have filed declarations supporting the plaintiffs' fee petition argue that other attorneys in North Carolina would not have been willing to take this case on without the assurance of being paid (unless they won the case). But the plaintiffs have not offered any affidavit testimony stating that they even tried to engage North Carolina attorneys in private practice – much less that any such attorneys turned them down. And the Metlitsky and Salgado Declarations assert that the plaintiffs engaged their attorneys because they had special confidence and trust in their expertise, experience, knowledge in cases such as this, strong commitment to abortion rights and other qualities.[1] Thus, in the State's view,

---

[1] *See, e.g.,* Salgado Declaration, ¶ 13 ("We believe our affiliates request that we represent them in cases like these because of our expertise in the area of reproductive rights and other constitutional rights, such as First Amendment rights, …" and "[B]ecause the provision of

–12–

the plaintiffs did not engage their legal counsel because no one else would take their case, but because the plaintiffs wanted these particular attorneys to represent them.

Many of the plaintiffs' attorney affiants claim that the plaintiffs' attorneys lost other work because they spent their time working on this case. But this argument seems particularly inapplicable to most of the plaintiffs' attorneys in this case. Most of the plaintiffs' attorneys work as employee-lawyers for non-profit, public interest organizations that do not practice law as a business or for profit. To the extent that their employer organizations are logically "out" any monies by reason of their attorney-employees' efforts on this case, it would logically only be for the attorney-employees' "cost," including administrative overhead, to their employer organizations. But the plaintiffs have offered no evidence as to what these costs are. Instead, they seek to recover "lost fees," as if they were engaged in private law practice for profit. The State does not believe that it should have to pay a free market, private practice hourly rate to attorneys who are not engaged in the private practice of law for profit.

Next, the plaintiffs' fee petition seeks an award of fees for ten (10) attorneys (plus one paralegal). The State believes that this sort of practice is an invitation to duplicative effort and cost inefficiency. At no time during the conduct of this case were the State defendants represented by more than two attorneys at one time (and for much of the case, the State defendants were represented by one attorney). And the plaintiffs have offered no affidavit evidence demonstrating why this case required so many lawyers. The State believes that this is fundamentally unreasonable and asks the Court to reduce any attorneys' fee award that it may grant to the plaintiffs so as to reflect a more reasonable number of attorney participants.

---

abortion services is highly politicized in this country, …, our clients choose to place their trust in PPL&L due to our strong commitment to ensuring abortion access."); Metlitsky Declaration, ¶ 4.

–13–

As to the paralegal for whose time the plaintiffs seek a fee award, the State would refer the Court to the following of her time entries:

| | |
|---|---|
| September 29, 2011-<br>December 21, 2012 | Maintain and update pleadings, telephone conferences with case manager and court personnel |

This bundled time entry purports to report this timekeeper's combined work over an almost two (2) month period in one time entry. This practice of bundling time entries over an extended period of time invites inaccurate reporting of time, since the timekeeper's memory may fail as the time nears to enter his or her time at the end of the reporting period (in this case, nearly two months). In addition, this time entry includes a report of telephone conferences, but does not identify the purpose(s) of these communications or state why they were necessary.

| | |
|---|---|
| October 17, 2011 | Attend hearing on Motion for [Preliminary Injunction] |

There is no explanation of why it was necessary or reasonable for this paralegal, who does not even work for the attorney who actually argued the plaintiffs' Motion for a Preliminary Injunction, to travel to Greensboro to attend this hearing.

| | |
|---|---|
| July 22, 2013-<br>August 8, 2013 | The timekeeper reports that she electronically filed eight (8) documents with this Court. She reports that this took four (4) hours to accomplish. |

The State does not believe that it should take four hours to electronically file eight documents using the PACER filing system.

| | |
|---|---|
| July 22, 2013 –<br>August 22, 2013 | Telephone conferences with Case Manager and other court personnel. |

This bundled time entry reports all of this timekeeper's work on this case for a full month. As a bundled time report, it is inherently unreliable (for the reasons set forth above). In addition, it does not state the purpose of these telephone conferences or why they were necessary.

| | |
|---|---|
| August 23, 2013 | Attend oral argument on [Motion for Summary Judgment] |

–14–

Again, there is no explanation of why it was necessary or reasonable for this paralegal to attend this hearing.

The State does not believe that these time entries are reasonable and believes that the Court should not enter a fee award in any amount based on these time entries.

In addition, the Declaration of Andrew Beck, in which he states that his time should be reimbursed at the rate of $400.00 per hour, reveals that, when this case was filed, he had been licensed to practice law for only two years and that he had spent that two year period as a law clerk for two judges. Hence, it appears that he had no actual experience at all practicing law when this case was filed. The State does not believe that an attorney with no practice experience merits a $400.00 per hour fee rate.

The State would further request that the Court scrutinize Mr. Beck's time entries. Many of them are fragmentary and incomplete (*e.g.*, August 22, 2011 – "Call with co-counsel"). They also seek reimbursement for his work in opposition to the Motion to Intervene (*see, e.g.*, Mr. Beck's time entry for November 19, 2011), which, for the reasons set forth above in this Response, the State believes is inappropriate and unreasonable.

The State further asks that the Court disregard those portions of the Declarations of Mark Sigmon, Kimberly Parker and Jonathan Sasser which show on their faces that they are not based on the affiant's personal knowledge, or that they are based on hearsay or that parts of them are simply verbatim copies of part(s) of one or another of the other declarations submitted by the plaintiffs in support of their fee petition.

As regards the fee requests for those of the plaintiffs' attorneys who practice law outside of this State, the State notes that the Supreme Court has held that attorneys' fees are to be calculated according to the prevailing rates in the relevant community. *Blum v. Stenson,* 465

–15–

Case 1:11-cv-00804-CCE-LPA   Document 179   Filed 10/05/15   Page 15 of 18

U.S. 886, 888 (1984). Even where attorneys have special expertise, they are limited to the fee customarily charged by local attorneys – not that commanded by their special expertise. *See Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843 (2001).

Conclusion

The plaintiffs' fee request is so large in amount that it implies that: (i) this case was a massive litigation that required a large attorney team to handle it and an enormous amount of attorney time; and (ii) this case was novel and extremely complex. In fact, this case was relatively simple and straightforward, especially for attorneys who work regularly (in the case of most, full time) on First Amendment and reproductive rights cases. In addition, as noted above, the issues, motions, briefs, affidavits, arguments and so forth that were applicable to this case had been developed in the *Lakey* case and the case law that decided this case was the case law that existed prior to *Lakey*. The plaintiffs' attorneys already knew this law – indeed, one of them was an attorney in *Lakey*. Furthermore, this case involved very little discovery, no mediation, no trial and was decided by this Court on a motion for summary judgment. The plaintiffs caused their fees to be high by engaging so many lawyers and then allowing virtually all of them to work in a duplicative and inefficient manner on this case. The State acknowledges that the plaintiffs are entitled to a reasonable fee award, but the State respectfully contends that the fee amount sought by the plaintiffs here is highly excessive and unreasonable. For the reasons set forth above in this brief, the State respectfully prays that the Court award the plaintiffs only a reasonable fee amount.

–16–

Respectfully submitted this 5th day of October 2015.

           /S/ I. Faison Hicks
I. Faison Hicks
North Carolina State Bar No. 10672
*Attorney for the State of North Carolina*

Special Deputy Attorney General
North Carolina Department of Justice
114 West Edenton Street
Office number 349
Raleigh, North Carolina 27603
Post Office Box 629
Raleigh, North Carolina 27602-0629
Telephone number: 919/716-6629
Facsimile number: 919/716-6763
Email address: fhicks@ncdoj.gov

**CERTIFICATE OF SERVICE**

This is to certify that, on the 5th day of October 2015, I caused a copy of the foregoing to be electronically filed with the Office of the Clerk of the United States District Court for the Middle District of North Carolina using the CM/ECF filing system, which will automatically provide notice and service of the foregoing to all counsel of record herein.

_____/S/ I. Faison Hicks_____
I. Faison Hicks