IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| GRETCHEN S. STUART, M.D., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:11-CV-804 |
| | ) | |
| CHERYL WALKER-MCGILL, M.D., et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, District Judge.

In 2011, North Carolina imposed new requirements on health care providers who treat patients seeking abortions. The plaintiffs brought this lawsuit challenging the constitutionality of a number of provisions of the Act, and they prevailed. The plaintiffs now seek their attorneys' fees and expenses pursuant to 42 U.S.C. § 1988(b), which authorizes district courts to award reasonable attorneys' fees to prevailing parties in certain civil rights litigation. While there is no dispute over the reasonableness of the expenses, the defendants do dispute the amount of attorneys' fees, contending that the evidence is insufficient to support the fee request, the hourly rates sought are not reasonable, and the time spent was excessive.

The plaintiffs submitted extensive documentation supporting their fee requests, as well as affidavits by several attorneys involved in the litigation and three experienced attorneys who were not involved. The defendants submitted no evidence to the contrary. Plaintiffs' counsel provided excellent legal services in a complicated case that required

work before every level of the federal courts. The Court finds that, with a few small exceptions, the plaintiffs have met their burden to show that the number of hours expended and the hourly rates requested are reasonable in light of the complexity of the case and the prevailing market rates and in its discretion will award almost all the requested fees.

## I.    ATTORNEYS' FEES GENERALLY

Plaintiffs who prevail in suits to vindicate civil rights are entitled to recover reasonable attorneys' fees unless special circumstances make a fee award unjust. *Lefemine v. Wideman*, 758 F.3d 551, 553 (4th Cir. 2014); *see also Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983).[1] A "reasonable attorney's fee is one that is adequate to attract competent counsel, but . . . [that does] not produce windfalls to attorneys." *Blum v. Stenson,* 465 U.S. 886, 897 (1984) (citations and internal quotations omitted); *see also Daly v. Hill*, 790 F.2d 1071, 1077 (4th Cir. 1986). There are a number of factors relevant in determining an appropriate attorney's fee, *see E. Assoc. Coal Corp. v. Dir., Office of Workers' Comp. Programs*, 724 F.3d 561, 570 n.5 (4th Cir. 2013), but the "critical inquiry" in determining reasonableness of a fee award is "the appropriate hourly rate." *Blum*, 465 U.S. at 895 n.11. If the hourly rate is properly calculated, "the 'product of reasonable hours times [the] reasonable rate' normally provides a 'reasonable' attorney's

---

[1] "Courts have universally recognized that [the] special circumstances exception is very narrowly limited." *Doe v. Bd. of Educ. of Baltimore Cty.*, 165 F.3d 260, 264 (4th Cir. 1998) (quotation marks and citation omitted). Indeed, "[o]nly on rare occasions does a case present such circumstances." *Id.*; *accord*, *Lefemine*, 758 F.3d at 555. The defendants do not contend there are any special circumstances here.

2

fee within the meaning of [§ 1988]." *Id.* at 897 (quoting *Hensley*, 461 U.S. at 434). "This figure, commonly referred to as the 'lodestar,' is presumed to be the reasonable fee contemplated by § 1988." *City of Riverside v. Rivera*, 477 U.S. 561, 568 (1986) (plurality opinion). "A fee based upon reasonable rates and hours is presumed to be fully compensatory without producing a windfall." *Daly*, 790 F.2d at 1078.

"[R]easonable fees under § 1988 are to be calculated according to the prevailing market rates in the relevant community, regardless of whether [the] plaintiff is represented by private or nonprofit counsel." *Blum*, 465 U.S. at 895 (quotations omitted); *see also McGee v. Cole*, No. 3:13–24068, 2015 WL 4366161, at *3 (S.D. W.Va. July 16, 2015) (same). The fact that "a nonprofit legal services organization may contractually have agreed not to charge *any* fee of a civil rights plaintiff does not preclude the award of a reasonable fee to a prevailing party . . . calculated in the usual way." *Blanchard v. Bergeron*, 489 U.S. 87, 95 (1989) (emphasis in original).

Counsel for a prevailing party has a duty to exercise "billing judgment" to "exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. . . . Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority." *Hensley*, 461 U.S. at 434 (quotation marks omitted).

## II.   EXPENSES

"A prevailing plaintiff in a civil rights action is entitled, under § 1988, to recover those reasonable out-of-pocket expenses incurred by the attorney which are normally

3

charged to a fee-paying client, in the course of providing legal services." *Spell v. McDaniel*, 852 F.2d 762, 771 (4th Cir. 1988) (quotations and citation omitted). The plaintiffs here seek total expenses of $16,226.47. (Doc. 178 at 16).[2] Supporting this request, the plaintiffs have submitted records indicating the dates, amounts, and purposes of each expense. (*See* exhibits to Doc. 178). The Court has reviewed the requested expenses, which cover such things as travel costs associated with court hearings and depositions, copies, and printing, and finds that they were reasonably incurred in preparing the case. The defendants do not object to reimbursement of the plaintiffs' litigation expenses. The Court finds that the plaintiffs are entitled to reimbursement for the full amount of their submitted expenses.

## III. THE FEE REQUESTS AND DEFENDANTS' OBJECTIONS

### A. SUMMARY OF PLAINTIFFS' FEE REQUESTS

The plaintiffs seek to recover hourly rates ranging from $250 for an associate with two years' experience to $550 for work done by a former United States Solicitor General. The plaintiffs seek total fees of $1,029,587.50, which covers the work of thirteen attorneys and one paralegal at five firms and organizations over the four-year course of this litigation. (*See* exhibits to Doc. 178).

In support of their fee application, the plaintiffs submitted affidavits, along with supporting documentation, from six attorneys who worked on this case: Julie Rikelman,

---

[2] On p. 6 of their brief, the plaintiffs refer to $16,266.27 in expenses. (Doc. 178). The Court assumes this is a typo, as p. 16 and the supporting documentation indicate $16,226.47 is the correct total.

an attorney with the Center for Reproductive Rights ("CRR"); Christopher Brook and Katherine Parker, the current and former legal directors of ACLU of North Carolina ("ACLU-NC"); Andrew Beck, an attorney with the Reproductive Freedom Project of the American Civil Liberties Union ("ACLU"); Diana Salgado, an attorney with Planned Parenthood Federation of America; and Anton Metlitsky, an attorney at O'Melveny & Myers LLP ("O'Melveny"). (*See* Docs. 178-17; 178-9; 178-16; 178-1; 178-8; 178-15). The plaintiffs also submitted affidavits from three attorneys unaffiliated with the lawsuit; each is experienced in constitutional litigation, and each opined that the hourly rates and fee requests were reasonable. (*See* Docs. 178-10; 178-18; 178-19).[3]

The plaintiffs seek the following in attorneys' fees:

CRR: $503,940.
- Bebe Anderson (lead counsel): 431.6 hours at $550 hourly (2011-12).[4]
- Julie Rikelman (lead counsel): 447.2 hours at $550 hourly (2012-15).[5]
- Jennifer Sokoler: 91.35 hours at $250 hourly (2012-14).[6]
- Hillary Schneller: 26.75 hours at $250 hourly (2014-15).[7]

ACLU-NC: $71,362.50.

---

[3] All references are to the CM-ECF docket numbers. When the filed document has paragraph numbers, the Court has referenced those for specificity. Where there are no paragraph numbers, the Court has referenced the page number appended by the CM-ECF system.

[4] (Doc. 178-17 at ¶¶ 15-16, 21). Ms. Anderson also requests attorneys' fees for a small number of hours spent on case-related travel at the reduced rate of $275 hourly. (*Id.* at ¶ 25).

[5] (*Id.* at ¶¶ 3, 12, 21). Ms. Rikelman also requests attorneys' fees for a small number of hours spent on case-related travel at the reduced rate of $275 hourly. (*Id.* at ¶ 25).

[6] (*Id.* at ¶ 21; Doc. 178-23 at 3). In her affidavit, Ms. Rikelman requests 91.4 hours for Ms. Sokoler's work. (Doc. 178-17 at ¶ 17). However, Ms. Sokoler's time sheet indicates a total of 91.35 hours. (Doc. 178-23 at 3). The Court will use the smaller figure.

[7] (Doc. 178-17 at ¶¶ 18, 21).

5

- Katherine Parker: 174.6 hours at $250 hourly (2011-12).[8]
- Christopher Brook: 98.1 hours at $250 hourly (2012-15).[9]
- Emily-Mary Brown (paralegal): 25.5 hours at $125 hourly (2011-14).[10]

ACLU Reproductive Freedom Project: $109,600.
- Andrew Beck: 274 hours at $400 hourly (2011-15).[11]

Planned Parenthood: $135,355.
- Helene Krasnoff: 89.1 hours at $550 hourly plus 18 travel hours at $275 hourly (2011-12).[12]
- Diane Salgado: 199.5 hours at $400 hourly plus 8 travel hours at $200 hourly (2012-15).[13]

O'Melveny: $212,110.
- Walter Dellinger: 61.2 hours at $550 hourly (2011-15).[14]
- Aaron Metlitsky: 262.5 hours at $400 hourly (2011-15).[15]
- Laura Conn: 152.5 hours at $250 hourly (2011-12).[16]
- Leah Godesky: 141.3 hours at $250 hourly (2012-15).[17]

## B. DEFENDANTS' OBJECTIONS TO THE FEE REQUESTS

The defendants contend that the hours spent are unreasonable in light of an alleged lack of complexity of the case, the work performed, and the number of timekeepers.

---

[8] (Doc. 178-16 at ¶¶ 7, 16).

[9] (Doc. 178-9 at ¶¶ 7, 17).

[10] (Doc. 178-6 at 2).

[11] (Doc. 178-1 at ¶ 12).

[12] (Doc. 178-8 at ¶ 17).

[13] (*Id.* at ¶ 16).

[14] (Doc. 178-15 at ¶¶ 16, 27).

[15] (*Id.* at ¶¶ 17, 27).

[16] (*Id.* at ¶¶ 18, 27).

[17] (*Id.* at ¶¶ 19, 27).

6

Additionally, the defendants contend that the hourly rates are unreasonable. They also challenge the documentation the plaintiffs provided in support of their fee request and make a number of objections to specific time entries. (*See* Doc. 179).

## IV. ANALYSIS

There is no dispute that the plaintiffs were the "prevailing party." *See* § 1988(b); *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792-93 (1989); *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 604 (2001) ("[E]nforceable judgments on the merits . . . create the material alteration of the legal relationship of the parties necessary to permit an award of attorneys' fees.") (internal quotations omitted); *see also Stuart v. Huff*, 834 F. Supp. 2d 424 (M.D.N.C. 2011) (granting preliminary injunction) (Doc. 39); *Stuart v. Loomis*, 992 F. Supp. 2d 585 (M.D.N.C. 2014) (granting summary judgment for the plaintiffs and permanent injunctive relief) (Docs. 163, 164); *Stuart v. Camnitz*, 774 F.3d 238 (4th Cir. 2014) (affirming judgment) (Doc. 170); *Walker-McGill v. Stuart*, 135 S. Ct. 2838 (2015) (mem.) (denying certiorari).

Accordingly, the Court begins by calculating the "lodestar" figure: "In calculating a reasonable fee under § 1988, a court starts by multiplying the number of hours reasonably spent on the litigation times a reasonable hourly rate." *Plyler v. Evatt*, 902 F.2d 273, 277 (4th Cir. 1990) (citing *Hensley*, 461 U.S. at 433); *see* discussion *supra*.

7

## A. NUMBER OF HOURS

### 1. Reasonableness of Hours Generally

The fee applicant bears the burden of documenting the appropriate hours expended. *Hensley*, 461 U.S. at 437. Here, the plaintiffs submitted six declarations along with nearly one-hundred pages of billing records. (*See* exhibits to Doc. 178). All records but those of NC-ACLU's paralegal were contemporaneously recorded. (*Id.*)[18] The submissions credibly indicate that the attorneys excluded a number of time entries and timekeepers from their request to avoid unnecessary and duplicative entries, as well as some work for which they might have been entitled to recover fees. (*See, e.g.*, Doc. 178-17 at ¶ 20 (affirming that the CRR request excludes time entries for senior attorneys who advised on the case, junior attorneys who completed discrete projects, work on the fee application and opposition to the motion for intervention, and all work by paralegals); 178-8 at ¶ 11 (affirming the exclusion of Planned Parenthood time entries for one attorney-consultant, work on the fee application and opposition to the motion for intervention, and all work by paralegals); 178-15 at ¶ 28 (affirming that the O'Melveny request excludes hundreds of hours of attorney, summer associate, and paralegal time)).[19]

_____

[18] The time record for Emily-Mary Brown, the NC-ACLU paralegal, is in a different format from the records submitted by the NC-ACLU attorneys and does not always break down tasks by date. (Doc. 178-6).

[19] Mr. Brook and Ms. Godesky are the only attorneys to include time spent on the fee application. (*See* Docs. 178-5 at 1-2; 178-12 at 4-5). The plaintiffs would have been justified in including all their time spent on this fee application in the request. *See Daly,* 790 F.2d at 1080 ("Time spent defending entitlement to attorney's fees is properly compensable in a § 1988 fee award.").

In total, the plaintiffs seek compensation for 2475.7 attorney hours and 25.5 paralegal hours for the four-year litigation. (*See* exhibits to Doc. 178).

Speaking generally, this is a reasonable amount of time to spend on a case involving significant and novel constitutional issues and requiring work on a preliminary injunction and a modification thereto, discovery, cross-summary judgment motions, four hearings before a United States District Judge, an appeal to the United States Court of Appeals for the Fourth Circuit that included oral argument, a petition for certiorari to the United States Supreme Court, and a fee application. Before litigation over attorneys' fees began, the docket of this court alone reflected 172 entries, which does not cover the events in the appellate courts. In this court, the plaintiffs filed nine substantive motions,[20] most of which required preparation of a brief in support, review of a brief in opposition, and preparation of a reply brief. The State filed two substantive motions,[21] each of which required review and a responsive brief. The plaintiffs also filed two supplemental briefs in response to orders from the court, as well as a detailed statement of undisputed facts. They presented evidence from twelve experts, each of whom had to be consulted regarding Rule 26 disclosures and preparation of reports. The defendants presented evidence from one expert, whom the plaintiffs deposed.

---

[20] Docs. 8, 42, 51, 76, 102, 105, 128, 150, 177. In counting the substantive motions, the Court did not include housekeeping matters, such as motions to extend time. Nor did the Court include the motion to intervene, since, for the reasons discussed, *infra*, the plaintiffs may not recover attorneys' fees from the defendants for time spent on intervention.

[21] Docs. 50, 117.

The legal issues were complex and required substantial research even for constitutional lawyers with extensive experience in reproductive rights and First Amendment law.  The few decisions on the First Amendment rights of healthcare providers tend to be fact-specific and to arise in different contexts and within different statutory schemes, not all of which involve compelled speech.[22]  Compelled speech cases, particularly those involving other professionals and regulated entities, had to be studied, *see Stuart*, 992 F. Supp. 2d at 593-96 (summarizing compelled speech standards of review, commercial speech cases, and regulatory cases), and several important decisions in the area were decided while this case was pending.[23]  The case raised issues of North Carolina informed consent law, health care regulation, the professional speech doctrine, and standing, each of which has an extensive body of potentially applicable law. Moreover, after the preliminary injunction was issued, the plaintiffs were faced with the task of convincing the Court not to follow an unfavorable decision from the Fifth Circuit about a similar statute.  *See Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 580 (5th Cir. 2012).  The likelihood of appellate proceedings was high from the beginning of the case.  (*See* Doc. 178-15 at ¶ 4).

---

[22] Ms. Salgado was involved in some of these cases.  (*See* Doc. 178-8 at ¶ 5).

[23] *E.g.*, *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321 (2013); *Greater Balt. Ctr. for Pregnancy Concerns v. Mayor & City Council of Balt.*, 721 F.3d 264 (4th Cir. 2013); *Moore-King v. Cty of Chesterfield*, 708 F.3d 560 (4th Cir. 2013); *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184 (4th Cir. 2013); *Pickup v. Brown*, 728 F.3d 1042, 1054-55 (9th Cir. 2013), *superseded on denial of reh'g en banc*, 740 F.3d 1208 (Jan. 29, 2014).

10

Development of a factual record was also very important, both to distinguish the case from *Lakey* and to prove the plaintiffs' case. While the State chose not to undertake substantial discovery, that did not relieve the plaintiffs of the obligation to present evidence supporting each element of their claim and to rebut each defense the State raised. The reasonableness of devoting resources to the development of a factual record was borne out by this Court's decision, which referred to the factual record over 150 times, (*see* Doc. 163), and by the Fourth Circuit's reliance on affidavits and medical group advisory opinions in the record. *See, e.g.*, *Stuart*, 774 F.3d at 251-52.

Three lawyers unaffiliated with any plaintiff independently reviewed the time records and offered opinions that the number of hours was reasonable. (*See* Docs. 178-10; 178-18; 178-19). These lawyers are each experienced with constitutional and civil rights litigation against governmental entities.[24] This credible testimony from experienced, independent lawyers provides additional evidence that the number of hours spent on the case as a whole was reasonable.

In addition to this general overview of the time spent on the case as a whole, the Court has evaluated the amount of time spent on each phase of the case. The litigation can be divided roughly into phases: preliminary injunction, discovery, summary judgment, Fourth Circuit appeal, petition for certiorari, and fee application. The hours

---

[24] One is a partner in a large law firm in Washington, D.C., with significant experience in reproductive rights litigation and familiarity with the hourly rates of D.C. and New York City lawyers. (Doc. 178-10). One is a partner in a reputable North Carolina firm who is familiar with the work of Ms. Parker and Mr. Brook and with the North Carolina legal market. (Doc. 178-18). The third is admitted to practice in all three federal district courts in North Carolina and has also worked on a constitutional case with Ms. Parker and Mr. Brook. (Doc. 178-19).

11

spent on each phase were very reasonable, even modest in some phases, for the amount of work done.

To illustrate just one of those phases by way of example, plaintiffs' counsel is seeking to recover for approximately 350 hours spent on the case while it was on appeal.[25] An appendix had to be prepared and housekeeping matters such as court admissions handled. Familiarity with the district court opinion was a necessity; that opinion was over forty-one pages long and contained citations to approximately forty United States Supreme Court cases, twenty-two circuit court decisions, a number of North Carolina appellate decisions, and fourteen treatises and law review articles, not to mention statutes, regulations, other court decisions, and factual references to the record. (Doc. 163). The research the plaintiffs' attorneys completed at the district court stage had to be updated, and arguments made by the defendants in their brief had to be assessed and addressed.[26] The defendants' brief was over thirty pages long and cited to twenty-two cases and twenty other authorities, not all of which were included in the district court opinion. (Docket 14-1150, Doc. 36). The plaintiffs' appellate brief was over fifty pages

---

[25] The defendants filed notice of appeal on February 17, 2104, (Doc. 165), and the Fourth Circuit affirmed on December 22, 2014. (Doc. 171). The Court reviewed the time entries for all attorneys between these two dates in arriving at this approximation.

[26] The record reflects that Ms. Sokolor at CRR and Ms. Godesky at O'Melveny did a good bit of the research and preparation of first drafts, each spending approximately forty-five hours on their specific tasks. (Docs. 178-23 at 3; 178-11 at 20-22). Mr. Metlitsky spent approximately ninety hours researching, writing, and editing the brief, (Docs. 178-11 at 6-8; 178-12 at 1), and Ms. Rikelman spent about eighty hours. (Doc. 178-21 at 6-7). Mr. Metlitsky affirms that Mr. Dellinger worked on the appeal, (Doc. 178-15 at ¶ 23), but the time records he submitted show he is not seeking to be paid for this time. (Doc. 178-11 at 1-2).

long.  (Docket 14-1150, Doc. 51).  Once the case was set for oral argument, counsel had to be prepared to address questions about the facts, the record, North Carolina informed consent law, standing, compelled speech, professional speech, regulation of health care providers, due process rights, reproductive rights cases, compelled listening, and more.[27]

Three hundred and fifty hours is a modest amount of time for such a major undertaking.  *See E.E.O.C. v. Freeman*, __ F.Supp.3d __, __, 2015 WL 5178420 at *15 (D. Md. September 3, 2015) (summarizing cases holding that 320 hours and 420 hours are reasonable amounts to spend on an appeal and approving a fee application where 450 hours were spent on an appeal.)  The Court's review of the time spent on other phases of the case confirms that the plaintiffs have been similarly restrained in the number of hours included in their request for fees.

The defendants produced no affidavits or other information in support of their contention that the number of hours spent was unreasonable.  Rather, they maintain that the issues in the litigation "were not novel or even all that complex."  (Doc. 179 at 2). The defendants assert the statute challenged in this litigation was so "strikingly similar" to the Texas statute at issue in the *Lakey* case that, "the plaintiffs in this case should have been able to take their legal research, briefs, expert affidavits and knowledge from the

---

[27] Mr. Metlitsky spent approximately eight hours assisting Ms. Rikelman with her preparation for oral argument, (Doc. 178-12 at 1), on which she spent approximately sixty hours. (Doc. 178-21 at 7).  Mr. Beck, Mr. Brook, and Ms. Salgado each spent between sixteen and twenty-nine hours assisting with various housekeeping tasks and providing other support, such as conferring and strategizing about the brief and oral argument, editing the brief, and honing arguments.  (Docs. 178-2 at 4; 178-5 at 3-4; 178-8 at 30-31).

13

*Lakey* case and use them in this case without starting from scratch or reinventing the wheel." (*Id.* at 2-3).

No doubt the involvement of the CRR attorneys in the *Lakey* case saved the plaintiffs time at the beginning of this litigation,[28] but a cookie-cutter complaint and preliminary injunction briefing would have been inappropriate. The statutes were not identical, and the drafting of the complaint had to account for these distinctions. The two cases arose in different jurisdictions, so the *Lakey* briefing had to address Fifth Circuit precedent and a Texas regulatory scheme, while the briefing in this case concerned Fourth Circuit and North Carolina law.

Moreover, the two cases completely diverged shortly after the preliminary injunction stage. The *Lakey* complaint was filed on July 21, 2011, and a preliminary injunction was entered on August 30, 2011.[29] This case was filed a month later, and a preliminary injunction was issued on October 25, 2011. (Docs. 1, 40). On January 10, 2012, the Fifth Circuit reversed the *Lakey* district court,[30] and less than a month later the district court entered summary judgment for the defendants.[31] The *Lakey* case was over before the pretrial discovery conference was held in this case. (*See* Doc. 68).

---

[28] The Court's review of the time spent during the preliminary injunction phase indicates that the total amount was moderate, given the short time frame within which counsel had to work and the complicated nature of the case. *See also* discussion *infra* at pp. 28-29.

[29] 806 F. Supp. 2d 942, 947 (W.D. Tex. 2011), *vacated in part*, 667 F.3d 570 (5th Cir. 2012).

[30] 667 F.3d 570 (5th Cir. 2012).

[31] No. A–11–CA–486–SS, 2012 WL 373132 (W.D. Tex. Feb. 6, 2012).

14

After the preliminary injunction stage, *Lakey* made the plaintiffs' job here more difficult, not less; they now had to deal with a published circuit court opinion holding that a similar statute did not raise substantial First Amendment concerns.[32] This warranted more attention to the development of a thorough factual record with appropriate expert testimony and to identifying legal authority that supported their position. As noted *supra*, the case involved the intersection of a number of areas of law, with a good deal of uncertainty as to the appropriate degree of scrutiny to be applied to the compelled speech at issue. In fact, the Fourth Circuit opened its analysis by noting that the law surrounding government regulation of speech, and judicial scrutiny thereof, is complicated. *Stuart*, 774 F.3d at 244-45. The defendants' argument that *Lakey* made this case simple is not supported in fact.

At each stage of the litigation, the State vigorously opposed the plaintiffs. A defendant "cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response." *City of Riverside*, 477 U.S. at 580 n.11 (quotations and citations omitted). While a close and careful review of the reasonableness of time spent on a case is appropriate, it is improper to "engage in an ex post facto determination of whether attorney hours were necessary to the relief obtained." *Grant v. Martinez*, 973 F.2d 96, 99 (2nd Cir. 1992).[33]

---

[32] *See* 667 F.3d at 580.

[33] *Accord Woolridge v. Marlene Indus. Corp.*, 898 F.2d 1169, 1177 (6th Cir. 1990), *abrogated on other grounds*, *Buckhannon*, 532 U.S. 598; *Dennis v. Chang*, 611 F.2d 1302, 1308 (9th Cir. 1980).

The Court is not persuaded by the State's unsupported contentions that plaintiffs' counsel spent too much time on the case.

## 2. Reasonableness of Efforts to Avoid Undue Duplication

Beyond this general overview of time spent in toto and on specific phases of the litigation, the Court has also reviewed the individual time entries from each lawyer to ensure that the amount of time was reasonable and that there was not undue duplication. *See Daly*, 790 F.2d at 1079.

"There is nothing inherently unreasonable about a client having multiple attorneys, and they may all be compensated if they are not unreasonably doing the same work and are being compensated for the distinct contribution of each lawyer." *Norman v. Hous. Auth. of Montgomery*, 836 F.2d 1292, 1302 (11th Cir. 1988); *accord, Anchondo v. Anderson, Crenshaw & Associates*, 616 F.3d 1098, 1105 (10th Cir. 2010); *ACLU of Georgia v. Barnes,* 168 F.3d 423, 431 (11th Cir. 1999); *Elderberry of Weber City, LLC v. Living Centers- Southeast*, 2014 WL 3900389 at *5 (W.D. Va. Aug. 11, 2014) ("Reduction of hours is not warranted simply because a client has multiple attorneys"). While there were a number of attorneys working on this case over time, the various attorneys divided up responsibilities for the work required during the various phases of the case in a reasonable way. For example:

-   Ms. Anderson and then Ms. Rikelman took on lead counsel duties. Ms. Anderson prepared the case for filing, argued the plaintiffs' initial motions before this Court, researched and developed the arguments supporting those motions, and identified and worked with expert witnesses. (Doc. 178-17 at ¶ 16). Ms. Rikelman argued the motion for summary judgment before this Court and at the Fourth Circuit. (*Id.* at ¶ 3). She also took the lead in developing the arguments supporting the plaintiffs' First Amendment claim. (*Id.*)

16

-   Mr. Beck was responsible for first drafts of a number of motions, briefs, and discovery documents. (Docs. 178-1 at ¶ 2; 178-2 at 2-4). He thereafter consulted with other attorneys as the case continued, as was reasonable given his familiarity with the facts and record, and appeared at the summary judgment hearing in connection with the motion to exclude. (Docs. 178-2 at 4; 159 at 40-42).

-   Ms. Krasnoff took the lead drafting the preliminary injunction briefing on vagueness and reviewed and edited certain of Mr. Beck's work. (Doc. 178-8 at 10-13).

-   Ms. Salgado was responsible for the deposition of the defendants' expert witness. (*Id.* at 27). Thereafter she took over responsibility for vagueness legal arguments from Ms. Krasnoff and coordinated edits to the briefing opposing the State's summary judgment motion. (*Id.* at 28-29). Once the appellate process began, she coordinated with potential amicus and assisted with legal research. (*Id.* at 30-32).

-   Ms. Parker did much of the factual and legal research as well as background and coordination work leading up to the filing of the lawsuit. (Doc. 178-5 at 14-17). She had significant client contact related to the motion to modify the preliminary injunction and was the point person for initial discussions with potential witnesses. (*Id.* at 10-17).

-   Mr. Brook communicated and coordinated with opposing counsel about development of a court-requested joint statement of undisputed facts and other matters. (Doc. 178-5 at 4-6). During the summary judgment and appellate stages, he spent small but regular amounts of time discussing the case with co-counsel, (*id.* at 3-5), as was appropriate since he was the only North Carolina lawyer involved in the case. His time on the cert petition was minimal, (*id.* at 3), and he took the lead on the fee request legal research. (*Id.* at 1-2).

-   Mr. Metlitsky took a lead role in drafting the plaintiffs' supplemental brief in support of their summary judgment motion, the brief opposing the defendants' appeal, and the brief opposing certiorari. (Doc. 178-15 at ¶ 24). Given his experience with appellate practice, including working on dozens of briefs filed with the U.S. Supreme Court, (*id.* at ¶ 8), these tasks were appropriate.

-   Mr. Dellinger consulted with the other plaintiffs' attorneys on strategic litigation decisions and oversaw O'Melveny work opposing the State's efforts to overturn the district court decision in the Fourth Circuit and by way of petition for certiorari. (*Id.* at ¶ 23).

Time spent coordinating, editing, and conferring was reasonable, given the different aspects of the case the attorneys worked on and their different areas of value-added expertise.[34] *Hudson v. Pittsylvania Cty., Va.*, No. 4:11CV00043, 2013 WL 4520023, at *7 (W.D. Va. Aug. 26, 2013) (holding that "[re]lying on co-counsel to review and edit pleadings is the type of division of responsibility that reflects each counsel's distinct contribution to the case, and is not impermissible 'duplication' that must be avoided"), *aff'd,* 774 F.3d 231 (4th Cir. 2014). With very few exceptions, discussed *infra*, the individual entries reflect a reasonable amount of time spent on reasonable tasks.

The defendants assert that a "much smaller team of attorneys could have litigated this case," and that the State should not have to pay attorneys' fees for work that "constituted overstaffing and mis-staffing." (Doc. 179 at 4; *see also id.* at 13). As noted, there is nothing inherently objectionable about dividing up work between and among a team of attorneys as opposed to having one or two lawyers do all the work. *Norman*, 836 F.2d at 1302. The defendants cite no case for the proposition that a prevailing party can only recover for the time of a small number of attorneys.

Indeed, spreading out the work makes sense. The evidence establishes that the plaintiffs' attorneys all had other responsibilities beyond this case,[35] and having several lawyers familiar with the case means there is always someone available to take the

---

[34] The attorneys' qualifications are further discussed *infra* at pp. 33-34, 38-40.

[35] The declarations of the various attorneys for the plaintiffs make clear, directly or indirectly, that they all had responsibilities other than this litigation during the relevant time frame. (*See, e.g.*, Docs. 178-8 at ¶ 4; 178-9 at ¶ 15; 178-15 at ¶¶ 8, 10, 11; 178-17 at ¶¶ 4, 8).

laboring oar when the need arises.[36]  It also allows for tasks to be divided up so that work is done in a timely fashion.  Moreover, while ACLU-NC represented all plaintiffs, (*see* Doc. 1 at 29), other lawyers represented smaller subsets of plaintiffs, thus bringing with them knowledge and perspective from their individual clients.  (*Id.* at 29-30).  As discussed *supra*, the defendants' assertions that this litigation was not complex are belied by the record, and a complex case requires more hands than a simple case.  Finally, as discussed *supra*, review of the record shows that the lawyers divided up the tasks in a reasonable way and that redundant time was excluded from the time records.[37]  When the record reflects efficient cooperation between counsel, reimbursement of attorneys' fees is appropriate.  *See Anchondo*, 616 F.3d at 1105 n.6.

   The quality of the legal work also bears consideration and supports the division of labor by plaintiffs' counsel.  The lawyers prosecuting this case did excellent work, and excellent work takes time.  There is no way one or two lawyers could have done the amount of work required to prosecute the case and defend the judgment.  Lawyers who take the time necessary to develop an adequate factual record and provide quality briefs to the court should not be penalized when it comes time to award attorneys' fees.

_____

[36] While the discovery and summary judgment briefing schedule in this case went fairly smoothly and allowed the lawyers to plan their schedules, the Court imposed additional requirements on short notice, (*see, e.g.*, Doc. 142), that required immediate and significant attention.  The plaintiffs had no control over when this Court or the appellate court would issue decisions or whether the decisions would be appealed, providing further uncertainty over scheduling and staffing.

[37] This is most clearly shown by the request for only 25.5 hours of paralegal time for the entire case, (Docs. 178-6 at 2; 178 at 18), an amount obviously significantly less than the case required.

### 3. Hours That Will Be Excluded

The Court finds that the plaintiffs are not entitled to fees for a small number of the hours for which they seek recovery.

### a. Intervention Motion

In this Circuit "intervention-related fees and expenses . . . are not recoverable under 42 U.S.C. § 1988 by a prevailing plaintiff against a losing defendant." *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 178 (4th Cir. 1994). While most of the plaintiffs' attorneys omitted from their time sheets any hours spent opposing intervention in the lawsuit, (*see, e.g.*, Docs. 178-17 at ¶ 20; 178-8 at ¶ 11), Ms. Parker included a few such entries on her joint time sheet with Mr. Brook, (Doc. 178-5 at 7-11), as did Mr. Beck, (Doc. 178-2 at 2), and Mr. Dellinger. (Doc. 178-11 at 1).[38] The plaintiffs may not recover fees for the hours spent on the motion to intervene.

Ms. Parker[39] recorded three entries in 2012 reflecting time spent exclusively on the motion to intervene: 0.70 hours on January 25, 0.20 hours on February 29, and 0.20 hours on March 29. (Doc. 178-5 at 8-10). That time, 1.1 hours, will be excluded. Her time sheet reflects additional time that was partially spent on the motion to intervene and on other tasks. On November 9, 2011, Ms. Parker spent 0.40 hours on the motion to

---

[38] Defendants object to paying attorneys' fees for this work. (Doc. 179 at 12).

[39] The time entries for Ms. Parker and Mr. Brook are contained in one document, which does not specify which attorney did what work. (Doc. 178-5). As it appears that Mr. Brook came on board when Ms. Parker left the NC-ACLU in May 2012, (*see* Docs. 178-9 at ¶ 4; 178-20), the Court infers that all time before May 2012 was spent by Ms. Parker and all time after May 2012 was spent by Mr. Brook.

intervene and other tasks, (*id.* at 11); on November 29, 2011, she spent 0.40 hours on the motion to intervene and unrelated tasks, (*id.* at 11); she spent 0.60 hours on April 23, 2012, on correspondence related to the joint appendix for the appeal by the intervenors and unrelated correspondence, (*id.* at 7); and the next day, she spent 0.20 hours on the joint appendix and another task. (*Id.*) While some of this work was not related to the motion to intervene, the Court cannot tell how long these unrelated tasks took. As the burden is on the plaintiff to establish that the hours were reasonable, the Court will exclude all of the time, 1.6 hours, for these dates. *See Morris v. Wachovia Sec. Inc.*, 448 F.3d 268, 283 (4th Cir. 2006) (affirming denial of fees where bills were inadequate to allow court to "allocate the time spent on each claim"). The total excluded from Ms. Parker's requested hours is 2.7 hours.

Mr. Beck similarly included time related to the motion to intervene: 3.3 hours on November 9, 2011, 1 hour on November 21, 2011, and 0.6 hours on December 18, 2011. (Doc. 178-2 at 2). This time, totaling 4.9 hours, will be excluded from his requested hours. It also appears that Mr. Dellinger spent an hour reading an appellate brief in connection with the motion to intervene. (Doc. 178-11 at 1 (reflecting one hour spent on "review of CA4 brief" on April 2, 2012, a time when nothing on the merits was before the Fourth Circuit and the appeal by the movants desiring to intervene was before the Fourth Circuit)). This hour will be excluded.

Finally, the Court will exclude 2.9 hours spent by Ms. Conn on November 9, 2011, to "participate in call with B. Anderson; review filing documents; discuss case with J. Baker". (*Id.* at 9). The motion to intervene and related documents were filed the day

before, (*see* Docs. 45-48), and the Court cannot tell whether Ms. Conn was reviewing those documents or the State's motion to dismiss filed on November 9. (*See* Doc. 50). This time will be excluded.

### b. Other Miscellaneous Exclusions

The Court will also exclude four of Ms. Salgado's time entries: "making travel arrangements for Bowes dep," (Doc. 178-8 at 27 (entry dated July 26, 2012)), and three entries related to a Planned Parenthood merger and name change. (*Id.* at 31, 32 (entries dated January 5 and 15, 2015, and May 8, 2015)).[40] The travel entry concerns non-legal work, and clerical or secretarial tasks should not be billed at an attorney rate, even if an attorney performs them. *See Missouri v. Jenkins,* 491 U.S. 275, 288 n.10 (1989); *Lipsett v. Blanco*, 975 F.2d 934, 940 (1st Cir. 1992). The other entries involved an internal Planned Parenthood merger that had nothing to do with this case. The Court will reduce Ms. Salgado's hours by 1.7 hours reflecting these four entries.

The Court will also exclude 1.2 hours Ms. Conn spent in April 2012 for what is described as "correspond regarding experts" and "correspond regarding expert witness." (Doc. 178-11 at 10).[41] There is no explanation of with whom she was corresponding—the expert? opposing counsel? co-counsel?—or to what end, nor do time entries of other

---

[40] The defendants objected to the travel arrangements entry and two of the merger entries, (Doc. 179 at 11), but not the third similar entry on May 8, 2015. (*See* Doc. 178-8 at 32).

[41] The defendants do not object to these entries, but they are similar to others the defendants assert are vague or fragmentary. (*See* Doc. 179 at 7-8).

lawyers from that time frame provide context to allow the court to figure out the nature of the work. The Court is unable to determine that this effort was not duplicative.

Finally, the Court will exclude the paralegal time for attending the August 23, 2013, summary judgment hearing. (*See* Doc. 178-6 at 1). While it is ordinarily appropriate in a document-heavy case for a legal assistant to attend a summary judgment hearing to facilitate quick access to documents about which the Court may have questions, in this case the parties stipulated to the relevant facts and three lawyers were already in attendance. (*See* Minute Entry for August 23, 2013). The Court will exclude three hours of paralegal time.

### 4. Hours Allowed Over Defendants' Objections

The defendants object to the documentation the plaintiffs provided in support of their fee request, as well as object to a number of specific time entries. The Court has reviewed these objections along with the corresponding plaintiff time sheets, and, as noted *supra* at pp. 20-23, some of these objections have merit. Some half-dozen objections appear to be clerical mistakes by the defendants, as the plaintiffs do not seek to recover for time spent on the dates set forth by the defendants as objectionable. (*Compare, e.g.*, Doc. 179 at 9 (objecting to entry for Katherine Parker and Christopher Brook dated January 10, 2013); *and* Doc. 178-5 at 6). Otherwise, and for the reasons stated, *infra*, the Court overrules the objections.[42]

---

[42]The analysis of specific time entries that follows is illustrative of the review the Court has undertaken of all challenged time entries.

### a. "Hearsay" Hours

The defendants contend that the Court should not award fees for any time spent by any lawyer at O'Melveny other than Mr. Metlitsky or for Ms. Krasnoff's time because the affidavits from Mr. Metlitsky and Ms. Salgado are hearsay as to what other attorneys in their offices did.  (Doc. 179 at 2, 10).  As with their other objections, the defendants cite no legal authority supporting their assertion that time records are inadmissible unless authenticated by each individual attorney whose time is reflected,[43]  (*see* Doc. 179), and the Court is aware of none.  *See Rypinski v. Chevrolet Motor Div. of Gen. Motors Corp.*, Civ. A. No. 95–2256, 1996 WL 432475 at *2 (E.D. Pa. July 22, 1996) (recommending award of attorneys' fees supported by affidavit based on counsel's "knowledge, information and belief"); *cf. Morris*, 448 F.3d at 283 (affirming denial of fee award where the fee affidavit failed to adequately describe the work done).

In any event, Mr. Metlitsky and Ms. Salgado attest to personal knowledge of the business practices concerning timekeeping where they work, and such testimony is not hearsay.  (Docs. 178-15 at ¶¶ 2, 20-22; 178-8 at ¶¶ 1-2).  Each offered testimony sufficient to authenticate the timesheets as business records.  Mr. Metlitsky's affidavit makes it clear that the O'Melveny time records were contemporaneously kept in the same manner the firm keeps time records for paying clients, and it is also obvious that he knew

---

[43] *Hughes v. B/E Aerospace, Inc*., No. 1:12CV717, 2014 WL 906220, at *1 n.1 (M.D.N.C. Mar. 7, 2014) ("A party should not expect a court to do the work that it elected not to do."); *see generally*, *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 397 (7th Cir. 2000) ("[I]t is not this court's responsibility to research and construct the parties' arguments.") (internal quotation marks omitted).

about the work done by other O'Melveny attorneys since he was the responsible lawyer. (Doc. 178-15 at ¶¶ 8, 20). Ms. Salgado's declaration similarly states that Planned Parenthood attorneys kept time records contemporaneously. (Doc. 178-8 at ¶ 2). The defendants have proffered no reason why the Court should not find credible the sworn testimony of Mr. Metlitsky and Ms. Salgado that these records were kept contemporaneously and in the ordinary course of business.[44]

The Supreme Court has cautioned that "[a] request for attorneys' fees should not result in a second major litigation." *Hensley*, 461 U.S. at 437. What is required is that billing records are sufficiently detailed that the Court may determine whether the hours requested were reasonably expended. *Id.* The plaintiffs' evidence meets this purpose, and the defendants' evidentiary objections to these two affidavits are overruled.

### b. Bundled Time Entries

The defendants object to time entries where multiple tasks are "bundled" together. (Doc. 179 at 9-10). They ask the Court "to strike all such bundled time entries . . . where one or more of the bundled items of work is unreasonable and insufficient for one reason or another to justify a fee award." (*Id.* at 9).

Though counsel for the prevailing party need not "record in great detail how each minute of his time was expended," *Hensley*, 461 U.S. at 437 n.12, "bundling" different tasks into one time entry can cause problems, *inter alia*, where a party does not prevail on

---

[44] Additionally, the "general thoroughness" of the plaintiffs' billing records is worth emphasizing. *See Spell v. McDaniel*, 616 F. Supp. 1069, 1087 n.25 (E.D.N.C. 1985), *aff'd in part and vacated in part on other grounds*, 824 F.2d 1380 (4th Cir. 1987).

all claims, if the nature of the description makes it difficult for a reviewing court to identify excessive hours, or if the time entries group tasks that are appropriately paid by the losing party with tasks that are not. *See, e.g.*, *Morris*, 448 F.3d at 283; *Erickson v. City of Topeka*, 239 F. Supp. 2d 1202, 1206-07 (D. Kan. 2002).

With the exception of some bundling that occurred in connection with time spent on the motion to intervene, *see* discussion *supra* at 20, no such difficulties arise with the challenged entries here. The entries the defendants challenge as "bundled," (*see* Doc. 79 at 9-10), viewed individually and in the context of entries by the same attorney and by other attorneys within the same time frame, do not reflect the expenditure of unreasonable amounts of time, considering the specific tasks detailed. *See Aventis CropScience, N.V. v. Pioneer Hi-Bred Int'l, Inc.*, No. 1:00CV463, 2010 WL 2306677 at *7 (M.D.N.C. June 8, 2010) (finding, "considering the time and labor required and the complexity of the legal questions presented, that the amounts of time expended in the allegedly vague ['block'] entries . . . were reasonable").

For example, the defendants object to paying for 1.25 hours of Ms. Rikelman's time on March 22, 2012, described as "correspond with Dr. Lyerly re expert report; t/c w/ Dr. Stuart & B. Anderson," (Doc. 178-21 at 3), and for three hours of her time on November 26, 2012, for "[e]diting due process, vagueness, and severability sections of SJ opp brief; correspond with co-counsel; editing motion to strike." (*Id.* at 4; *see also* Doc. 179 at 9). All of these tasks were reasonably undertaken and an hour and a quarter is a very modest time for these tasks taken as a whole.

The defendants also object to the "bundled" time entries of the ACLU-NC paralegal, Ms. Brown. (Doc. 179 at 14). Ms. Brown's time sheet indicates that she spent five hours over a fifteen-month period on the following: "Maintain and update pleadings, telephone conferences with Case Manager and court personnel," and one hour over a one-month date range on: "Telephone conferences with Case Manager and Other Court Personnel." (Doc. 178-6 at 1). While a better practice would have been to note more specifically the dates, times, and tasks performed, *see Rum Creek*, 31 F.3d at 180, the amount of time Ms. Brown recorded for these tasks is quite small and is not unreasonable.[45]

### c. Vague or Fragmentary Time Entries

The defendants also object to a number of specific time entries as "fragmentary, incomplete, and thus ambiguous." (Doc. 179 at 7-9, 11-12). They assert that terse time entries such as "[d]iscussions and analysis" and "[r]eview case law" make it "impossible for the reader to evaluate or know what documents or cases the timekeeper was reviewing or what the relevance or necessity of the work was." (*Id.* at 7).

As the Fourth Circuit has noted, time entries like these are not ideal. "We have frequently exhorted counsel to describe specifically the tasks performed." *Rum Creek*, 31 F.3d at 180. Nonetheless, a prevailing party can recover fees for such time if the hours

---

[45] In their brief, the defendants also object to the time Ms. Brown spent to file documents with the court, and assert that it does not take half an hour to file court documents electronically. (Doc. 179 at 14). However, they provide no evidence to support that claim, and speculative statements in a brief are insufficient to overcome evidence from several lawyers that the time Ms. Brown spent on the specified tasks was reasonable. (*See* Doc. 178-9 at ¶ 9; Doc. 178-18 at ¶ 12; Doc. 178-19 at ¶ 13).

were necessary to prosecute the case and a court can be confident there was not unacceptable duplication. *Id.* Here, in context and to a reader familiar with the timeline of the litigation, the entries to which the defendants object are not so incomplete or vague as to preclude recovery.

For example, the defendants object to 31.6 hours of Ms. Anderson's time in August, September, and October 2011 spent on miscellaneous case preparation. (Docs. 179 at 8, 11; 178-22 at 3-7). As the plaintiffs' time sheets and affidavits reflect, Ms. Anderson had primary responsibility for preparing the case for filing, arguing the motion for a temporary restraining order and preliminary injunction, developing the plaintiffs' arguments early in the case, and identifying and working with expert witnesses. (*See* Docs. 178-17 at ¶ 16; 178-22 at 3-7). The entries from other plaintiffs' attorneys shows that Ms. Parker was the only other attorney devoting significant time to the case in these months, and that she focused primarily on client contact.[46] Ms. Anderson was lead counsel on a nascent constitutional lawsuit working to coordinate factual and legal research, draft and revise a complaint and a motion for a preliminary injunction supported

---

[46] Ms. Parker logged about 135 hours, or an average of about 11 hours per week, from August 1, 2011, until the time the preliminary injunction issued, mostly working with potential plaintiffs and undertaking legal and factual research supporting the complaint and motion for a preliminary injunction. (Doc. 178-5 at 12-16). Ms. Krasnoff began working at the end of August 2011 and focused on drafting the vagueness section of the preliminary injunction brief and reviewing and revising the complaint and declarations for a total of about fifty hours. (Doc. 178-8 at 10). Mr. Beck worked less than twenty-five hours before the preliminary injunction on coordination with co-counsel, getting up to speed on the complaint and declarations, and drafting the due process portion of a brief. (Doc. 178-2 at 2). The O'Melveny timekeepers came on board in mid-October and logged only a handful of hours. (*See* Docs. 178-15 at ¶ 2; 178-11 at 1, 3, 9).

by four expert declarations, and ramp up a team of attorneys to assist under significant time pressure because of the upcoming effective date of the statute. From the time she became involved in the case on August 1 until the entry of the preliminary injunction on October 25, Ms. Anderson essentially worked full-time on the case, spending approximately 350 hours. This is a reasonable amount of time for the filing of the case and the preliminary injunction motion, and the lack of detail in the description of 31.6 of these hours does not make them unreasonable.

Similarly, the defendants object to some of Ms. Conn's time. (*See* Doc. 179 at 7). For example, the defendants object to 1.8 hours Ms. Conn spent on October 18, 2011, to "participate in call with A. Metlitsky; review reply brief; correspond with B. Anderson at CRR." (Doc. 178-11 at 9). Mr. Metlitsky's time record for that same day reflects that the discussion with Ms. Conn took half an hour, (*id.* at 3), not an unreasonable length of time to discuss the preliminary injunction hearing that occurred the day before. (*See* Minute Entry for October 17, 2011); *see Chapman v. Ourisman Chevrolet Co.*, 2011 WL 2651867 at *16 (D. Md. July 1, 2011) (noting that it may be appropriate to award fees for "periodic conferences of defined duration held for the purpose of work organization, strategy and delegation of tasks"). Even if Ms. Conn took all of the remaining 1.3 hours reviewing the ten-page reply brief, (Doc. 36), that is a necessary task and a reasonable amount of time for the task. The defendants also object to 1.2 hours Ms. Conn spent on October 25, 2011, to "correspond with B. Anderson; review court decision." (Doc. 178-11 at 9). It is difficult to understand why it would not be reasonable for Ms. Conn to spend 1.2 hours reviewing the Court's nineteen-page decision on the preliminary

29

injunction issued that day, (Doc. 39), as a thorough understanding of it would be necessary to future work. While these and some other entries on her time report are less detailed than might be desirable in a perfect world, they are well within the range of specificity required, *see Hensley*, 461 U.S. at 437 n.12, and the Court has been able to determine the nature of the work from Ms. Conn's other time entries, time entries of other attorneys from the same time frame, and from a review of what was happening in the case. With limited exceptions detailed elsewhere in this Order,[47] Ms. Conn's work was adequately described.

### d. Basic Legal Research Objections

The defendants object to the nature and amount of legal research the plaintiffs' attorneys conducted. They assert that the Court should not award any attorneys' fees for what they characterize as "basic legal research" on issues on which the plaintiffs' attorneys "claim to already possess so much knowledge and expertise." (Doc. 179 at 4). The defendants have identified several dozen time entries they assert represent such basic legal research. (*Id.* at 5-6).

A review of these entries demonstrates that the plaintiffs' time spent on research was not unduly basic and was reasonable. For instance, Ms. Rikelman's time entries from October 2012, some of which the defendants challenge, (*id.*), reflect that she took the lead on drafting the First Amendment section of the summary judgment opposition

---

[47] *See* discussion *supra* at p. 21 (excluding 2.9 hours of Ms. Conn's time for lack of clarity as to whether work was done on motion to intervene or motion to dismiss) and p. 22 (excluding 1.2 hours of Ms. Conn's time for lack of detail).

brief. (*See* Doc. 178-21 at 4). The entries the defendants challenge indicate Ms. Rikelman spent seven hours on October 15-16 drafting the First Amendment section of the opposition brief and reviewing materials cited by the State in its summary judgment brief. (*Id.*) This task was not so "basic" that Ms. Rikelman should be expected to produce it off the top of her head with no work; even an attorney well versed in a particular area of law should spend some time reviewing the case law cited by her opponent for the purpose of tailoring her arguments and addressing specific concerns. Ms. Rikelman appears to have spent relatively little time on that exercise, especially considering that the State's brief supporting its summary judgment motion was nearly thirty pages long and cited some forty authorities. (*See* Doc. 118).[48]

The defendants also object to virtually all of the time Mr. Metlitsky spent researching and drafting the appellate brief and the brief opposing the petition for certiorari as work too basic for an experienced attorney. (*See* Docs. 179 at 5; 178-11 at 7-8; 178-12 at 1-2). The defendants do not object specifically to the time Mr. Metlitsky spent revising either brief. Before briefs can be revised they must be drafted, and "counsel are not forbidden from receiving fees for background research if the research is

---

[48] Furthermore, time entries by other attorneys, including more junior attorneys, show that they were occupied with other matters during October 2012, demonstrating that the plaintiffs met their obligation to exclude redundant hours, *see Hensley*, 461 U.S. at 434, and that Ms. Rikelman was not duplicating basic work conducted by others. *See, e.g.*, Doc. 178-2 at 3 (Mr. Beck's time entries reflect work on the severability issue for the summary judgment opposition brief.); Doc. 178-8 at 28-29 (Ms. Salgado worked on vagueness and standing issues for the opposition brief.); Doc. 178-5 at 6-7 (reflecting that Mr. Brook did virtually no work on the brief); Doc. 178-11 at 5, 16-17 (reflecting that the O'Melveny attorneys worked on the plaintiffs' summary judgment brief, rather than the opposition brief)).

(1) relevant and (2) reasonable in terms of time for the scope and complexity of the litigation." *Spell v. McDaniel*, 616 F. Supp. 1069, 1098 (E.D.N.C. 1985), *aff'd in part and vacated in part on other grounds*, 824 F.2d 1380 (4th Cir. 1987). The time Mr. Metlitsky spent researching and drafting both briefs was reasonable.[49]

## 5. Conclusion as to Hours Worked

The Court finds that the following hours were reasonably spent on this litigation:

---

[49] *See* pp. 12-13, *supra*, for further discussion of the time spent during the appellate stage of litigation. Mr. Metlitsky spent less than sixty hours researching and drafting the opposition to certiorari. (*See* Doc. 178-12 at 1-2). The time entries from the other plaintiffs' attorneys reflect that Mr. Metlitsky did the lion's share of the work on this task. (*See, e.g.*, Docs. 178-2 at 4; 178-8 at 32; 178-5 at 3; 178-21 at 7-8; 178-24 at 3).

| | | | |
|---|---|---|---|
| Ms. Anderson: | 431.6 | Mr. Beck: | 269.1 |
| Ms. Rikelman: | 447.2 | Ms. Krasnoff: | 107.1 |
| Ms. Sokoler: | 91.35 | Ms. Salgado: | 205.8 |
| Ms. Schneller: | 26.75 | Mr. Dellinger: | 60.2 |
| Ms. Parker: | 171.9 | Mr. Metlitsky: | 262.5 |
| Mr. Brook: | 98.1 | Ms. Conn: | 148.4 |
| Ms. Brown: | 22.5 | Ms. Godesky: | 141.3 |
| | | **Total:** | **2483.8** |

## B. HOURLY RATES

The second step of calculating the lodestar figure involves determining the hourly rate to be applied. *See, e.g.*, *Plyler*, 902 F.2d at 277 (4th Cir. 1990). "[T]he burden rests with the fee applicant to establish the reasonableness of a requested rate." *Id.* (citing *Blum*, 465 U.S. at 895 n.11).

The default rule is that the appropriate hourly rate is the market rate in the district where the case was tried. *Rum Creek*, 31 F.3d at 175.[50] A prevailing plaintiff may justify an award of extra-community hourly market rates if "the complexity and specialized nature of a case . . . mean that no attorney, with the required skills, is available locally,

---

[50] The defendants contend that as most of the plaintiffs' attorneys work for nonprofits, the State should not "have to pay a free market, private practice hourly rate" for their work. (Doc. 179 at 13). It is well settled that "reasonable fees" are "calculated according to the prevailing market rates in the relevant community, regardless of whether plaintiff is represented by private or nonprofit counsel." *Blum*, 465 U.S. at 894-895; *Blanchard*, 489 U.S. at 94-95. The defendants cite no authority for their contention that market rates are an incorrect basis for the fee awards.

and the party choosing the attorney from elsewhere acted reasonably in making the choice." *Id.* at 179 (quoting *Nat'l Wildlife Fed. v. Hanson*, 859 F.2d 313, 317 (4th Cir. 1988) (internal quotations omitted).

### 1. Middle District of North Carolina Market Rates

For the two North Carolina lawyers who worked on this case, Ms. Parker and Mr. Brook, the plaintiffs seek an hourly rate of $250. (Doc. 178-9 at ¶¶ 17-18). Both attorneys have extensive experience in North Carolina courts and in constitutional law generally. Ms. Parker had eleven years of legal experience when the lawsuit commenced, primarily in civil rights litigation and media and commercial litigation. (Docs. 178-16 at ¶¶ 2, 4; 178-20 at 1). Mr. Brook, who began working on the lawsuit when he became legal director of the ACLU-NC in May 2012, had over six years of experience practicing law at that time and now has over ten. (Doc. 178-9 at ¶¶ 2-4). Both lawyers opined that the $250 hourly rate they request is equal to or less than the prevailing market rate in this district for an attorney of their skill, experience, and reputation. (Docs. 178-9 at ¶¶ 17-18; 178-16 at ¶¶ 17-18). Additionally, Ms. Parker, who worked in private practice both before and after her role in the litigation, declared that $250 is the hourly rate she would charge to a paying client for the type of work she performed in this case. (Doc. 178-16 at ¶ 16). The determination of whether a requested rate is representative of the prevailing market rate "is best guided by what attorneys earn from paying clients for similar services in similar circumstances." *Rum Creek*, 31 F.3d at 175.

Courts typically require the reasonableness of the hourly rate to be justified by more than the attorney's own affidavit. "To inform and assist the court in the exercise of

34

its discretion, the burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum*, 465 U.S. at 895 n.11.

Here, the plaintiffs have presented such evidence in the form of declarations from Jonathan Sasser, a partner at Ellis & Winters, LLP, (Doc. 178-18), and Mark Sigmon, another attorney admitted to federal practice in North Carolina. (Doc. 178-19). Both are unaffiliated with this case and have been involved in other litigation with Ms. Parker and Mr. Brook. *See* n. 24 *supra*. They have opined that the ACLU-NC attorneys are skilled, experienced, and well qualified to perform the work in this case. (Docs. 178-18 at ¶¶ 4-5; 178-19 at ¶¶ 4-5). Likewise, both have opined that the prevailing market rate for these attorneys in the Middle District of North Carolina is equal to or more than the $250 hourly requested. (Docs. 178-18 at ¶¶ 15-16; 178-19 at ¶¶ 15-16). The defendants have submitted no contrary evidence. The plaintiffs have met their burden to establish that the $250 hourly rate is more than reasonable for Ms. Parker and Mr. Brook.

The plaintiffs also submitted evidence that the $125 hourly rate requested for the ACLU-NC paralegal, Ms. Brown, was reasonable and in line with the prevailing market rate in this district for a paralegal. (*See* Docs. 178-9 at ¶ 19; 178-16 at ¶ 19; 178-18 at ¶ 17; 178-19 at ¶ 17). Mr. Brook and Ms. Parker testified by affidavit that they delegated tasks to Ms. Brown, which lowered the cost of the litigation because those tasks would otherwise have fallen to attorneys. (Docs. 178-9 at ¶ 9; 178-16 at ¶ 9). Time spent by paralegals and legal assistants can be included in attorney fee awards and should be billed

35

according to market practices. *See Jenkins*, 491 U.S. at 287-88 ("By encouraging the use of lower cost paralegals rather than attorneys wherever possible, permitting market-rate billing of paralegal hours encourages cost-effective delivery of legal services and, by reducing the spiraling cost of civil rights litigation, furthers the policies underlying civil rights statutes.") (quotations and citation omitted). The Court will award attorneys' fees for Ms. Brown's work at a rate of $125 an hour.

## 2. Extra-Community Attorney Rates

### a. Reasonableness of Choosing Extra-Community Counsel

Ms. Parker's and Mr. Brook's affidavits establish that ACLU-NC would have been unable to prosecute this case without additional resources and more experienced attorneys. (*See* Docs. 178-9 at ¶ 15; 178-16 at ¶ 14 ("The ACLU-NC never had more than two attorneys licensed and practicing in North Carolina during the course of this litigation. This individual or these two attorneys were responsible for all civil liberty-related legal matters implicating the mission of the ACLU-NC in our office. None of these attorneys had particular expertise in abortion-related provisions impacting physicians' First Amendment Rights.")). They also explained the several reasons it would have been difficult to obtain attorneys in North Carolina willing to undertake the representation. (Docs. 178-9 at ¶¶ 11-14; 178-16 at ¶¶ 10-13).

This evidence was echoed by the unaffiliated North Carolina attorneys. Mr. Sasser declared he is "familiar with the work of the ACLU-NC and can state these are sizable responsibilities, especially in recent years. Given ACLU-NC's limited resources and experience as well as the complexity and duration of this litigation, it is my opinion

that the ACLU-NC could not have handled this litigation without further expert litigation assistance." (Doc. 178-18 at ¶ 18; *accord* Doc. 178-19 at ¶ 18). He agreed with ACLU-NC counsel that most attorneys in North Carolina would not have accepted the representation in the subject case. (Doc. 178-18 at ¶ 10). Mr. Sigmon concurred and also affirmed that there is a "paucity of pro bono counsel" willing to take labor-intensive civil rights cases in North Carolina. (Doc. 178-19 at ¶¶ 8, 9).

The plaintiffs' uncontroverted evidence from their counsel and from attorneys independent of this litigation is that it would have been difficult to find a North Carolina lawyer who would have accepted pro bono representation in this case and that there was no available counsel in North Carolina with the skills, experience, and resources necessary to take on a case of this complexity and specialized nature on a pro bono basis. (*See* Docs. 178-9 at ¶ 16 (expressing unawareness of attorneys in the North Carolina market with a similar level of expertise in reproductive rights constitutional challenges as the attorneys retained at CRR, Planned Parenthood, and the ACLU's Reproductive Freedom Project); 178-18 at ¶ 10; 178-19 at ¶ 11; 178-10 at ¶ 6). This uncontroverted, credible evidence supports the conclusion that the complexity and specialized nature of the case meant local counsel was not available and that the plaintiffs acted reasonably in choosing attorneys in D.C. and New York. *Rum Creek*, 31 F.3d at 179. The Court so finds.

The defendants assert that the plaintiffs have offered insufficient evidence that other North Carolina attorneys would not have been willing to undertake the case pro bono. (Doc. 179 at 12). The defendants appear to contend that the proffered affidavits

are insufficient because they do not include testimony stating that the plaintiffs tried to engage specific North Carolina attorneys who turned down the work. (Doc. 179 at 12). However, the defendants do not cite any legal authority suggesting that such testimony is required.

Certainly there are many experienced civil rights attorneys in North Carolina, and no doubt some of them could have competently handled the case, given enough time. However, there is no evidence that there were any experienced constitutional lawyers in the state who were as familiar with the confluence of reproductive rights and First Amendment law as the out-of-state attorneys hired by the plaintiffs, much less that there were two or three such lawyers, which is the minimum it would have taken to staff this case at the partner level. Nor is there any evidence that these hypothetical lawyers would have taken on such a labor-intensive pro bono representation. The State's speculation to the contrary is not persuasive. Moreover, at least one experienced constitutional lawyer in North Carolina charges paying clients an hourly rate of $625, (Doc. 178-18 at ¶ 14), so it is not clear it would have saved money to hire such lawyers, had they been available; the highest hourly rate the plaintiffs seek for partner-level work is $550.

The plaintiffs were likewise reasonable in choosing the individual extra-community attorneys who participated in the litigation. *Rum Creek*, 31 F.3d at 179. All the out-of-state attorneys who worked on this case at a partner level have extensive experience in constitutional litigation and were well qualified to make a contribution to the prosecution of the case in district court and to the defense of the judgment in the appellate courts.

38

Ms. Anderson had thirty years of legal experience as of 2011 and has litigated numerous reproductive rights cases, often as lead counsel. (Doc. 178-17 at ¶ 15). Ms. Rikelman had about fifteen years of legal experience focused on complex litigation, reproductive rights law, and First Amendment law at the time she began work on the lawsuit. (*Id.* at ¶¶ 5-7, 9). She also had experience challenging mandatory ultrasound laws in other cases; at the time this litigation began, CRR was the only organization that had previously litigated similar challenges. (*Id.* at ¶ 10). In 2011, Ms. Krasnoff had fourteen years' legal experience, primarily in litigating reproductive rights challenges, as well as experience in the Middle District of North Carolina. (Doc. 178-8 at ¶¶ 9-10, 13). When O'Melveny became involved in the litigation in October 2011, Mr. Metlitsky had six years of legal experience, including a clerkship with Supreme Court Chief Justice John Roberts, and he spent significant time on constitutional law appellate litigation. (Doc. 178-15 at ¶¶ 2, 8). Mr. Dellinger has previously served as head of the Office of Legal Counsel and as U.S. Solicitor General, has argued numerous cases before the U.S. Supreme Court, and has written scores of Supreme Court briefs in more than forty years of practice. (Doc. 178-15 at ¶ 7).[51]

---

[51] The defendants object to the use of the O'Melveny attorneys, asserting that engaging them was unnecessary because all the plaintiffs' attorneys had substantial experience with complex constitutional cases. (Doc. 179 at 3-4). The defendants further object to the fact that the firm assigned two senior attorneys to the case, Mr. Dellinger and Mr. Metlitsky. (*Id.* at 4). None of the other attorneys who worked on the case had clerked for a Supreme Court justice or served as Solicitor General of the United States, and thus Mr. Dellinger and Mr. Metlitsky each brought valuable experience to the table. Moreover, a careful review of the submitted time sheets shows that the plaintiffs met their duty to exercise "billing judgment" by excluding "hours that are excessive, redundant, or otherwise unnecessary." *Hensley*, 461 U.S. at 434; *see also Norman*, 836 F.2d at 1302. The O'Melveny attorneys took a lead role in researching and drafting certain

The less experienced lawyers also brought valuable and varied backgrounds to the table. At the time she began work on the lawsuit in 2012, Ms. Salgado had six years of experience practicing law, all as counsel for Planned Parenthood, and had worked on numerous cases challenging statutes impacting reproductive health care. (Doc. 178-8 at ¶¶ 4-6). Mr. Beck clerked for two different federal judges, and since the inception of the lawsuit in 2011 his work for the ACLU has focused exclusively on reproductive rights litigation. (Doc. 178-1 at ¶¶ 4-6). Ms. Sokoler and Ms. Schneller, who worked at CRR at different times, each had two years of legal experience when they began work on the case, and Ms. Sokoler had completed two federal clerkships. (Docs. 178-17 at ¶¶ 17-18). Mr. Metlitsky was assisted by associate Ms. Conn from 2011-12 and counsel Ms. Godesky from 2012 to the present. (Doc. 178-15 at ¶¶ 10-11). Each had three years of experience practicing law at the time she began work on the litigation. (*Id.*) Ms. Godesky has served as the lead O'Melveny associate on several complex federal litigation cases. (*Id.* at ¶ 11). As noted *supra*, these attorneys participated in the litigation in ways consistent with and appropriate for their level of experience; it is reasonable to assign relatively new lawyers to work on legal research, prepare first drafts, deal with logistical matters and coordination, and provide final cite-checks of briefs.

---

briefs appropriate to their experience and expertise, (*see* Doc. 178-15 at ¶ 24), and the evidence does not reveal duplication by the other attorneys. Furthermore, Mr. Dellinger donated the majority of his time spent on the case. (*Id.* at ¶ 23). Retaining the O'Melveny attorneys before the appellate or Supreme Court stage was reasonable, as the way a case is litigated in the first instance can affect its viability on appeal.

The plaintiffs have demonstrated that it was reasonable to hire attorneys from CRR, Planned Parenthood, the ACLU's Reproductive Freedom Project, and O'Melveny.

### b. Reasonableness of Extra-Community Rates

The plaintiffs have submitted uncontradicted evidence to show that the hourly rate requested for each attorney is reasonable—indeed, modest—for the applicable extra-community legal markets and, as to the O'Melveny attorneys, less than the firm charges paying clients. Actual rates charged in those markets are higher, and some considerably higher, than the plaintiffs seek for their work on this litigation.

According to uncontradicted testimony from Kimberly Parker, a partner at Wilmer Cutler Pickering Hale and Dorr LLP based in Washington, D.C., paying clients in the D.C. and New York markets pay $385-690 per hour for attorneys with less than five years of experience, $650-855 for attorneys with five to eight years of experience, and $655-1255 for attorneys with nine or more years of experience. (Doc. 178-10 at ¶¶ 4, 8-11). Actual rates charged by O'Melveny are very similar. (Doc. 178-15 at ¶¶ 12-15). Furthermore, the hourly rates the plaintiffs seek here are lower than market rates in the D.C. area per the *Laffey* matrix. (*See* Doc. 178-7).[52]

To summarize the evidence:

---

[52] The *Laffey* matrix was established by the D.C. courts to assess presumptively reasonable local market rates for D.C.-based attorneys and is updated periodically. *Robinson v. Equifax Information Services, LLC*, 560 F.3d 235, 244 (4th Cir. 2009); *see Covington v. District of Columbia*, 57 F.3d 1101, 1109 (D.C. Cir. 1995); *see generally Salazar v. District of Columbia*, __ F.3d __, __ , 2015 WL 9258954 at *4-6 (D.C. Cir. Dec. 18, 2015) (discussing *Laffey* matrix updates). In another context, the Fourth Circuit has noted that the *Laffey* matrix "is a useful starting point to determine fees, [but] not a required referent." *Newport News Shipbldg. & Dry Dock Co. v. Holiday*, 591 F.3d 219, 229 (4th Cir. 2009).

| Attorney | Experience (years) | D.C., New York Market Rates[53] | *Laffey* Matrix Rates[54] | Rate Requested |
|---|---|---|---|---|
| Mr. Dellinger | 45 + | $655-1255 | $796 | $550 |
| Ms. Anderson | 30 + | $655-1255 | $796 | $550 |
| Ms. Rikelman | 15-18 | $655-1255 | $661 | $550 |
| Ms. Krasnoff | 14 + | $655-1255 | $661 | $550 |
| Mr. Metlitsky | 6-10 | $650-1255 | $406-586 | $400 |
| Ms. Salgado | 6-9 | $650-855 | $406-586 | $400 |
| Mr. Beck | 4-8 | $385-855 | $406-586 | $400 |
| Ms. Godesky | 3-6 | $385-855 | $331-406 | $250 |
| Ms. Conn | 3 | $385-690 | $331 | $250 |
| Ms. Sokoler | 2 | $385-690 | $331 | $250 |
| Ms. Schneller | 2 | $385-690 | $331 | $250 |

---

[53] These numbers are from Kimberly Parker's testimony. (Doc. 178-10 at ¶¶ 4, 8-11). The O'Melveny attorneys offered additional evidence of the actual rates they charge to paying clients, which are somewhat lower than the top of Ms. Parker's range but still well higher than the rates requested here. (Doc. 178-15 at ¶¶ 16-19). For example, Mr. Dellinger charges paying clients between $990 and $1225, (*id.* at ¶ 16), significantly more than $550. The Court has considered this evidence as well, even though it is not included in the chart for logistical reasons.

[54] The rates indicated are those for the year beginning June 1, 2015. (*E.g.*, Doc. 178-7). The *Laffey* matrix rates are adjusted annually and typically rise, so the 2015 rates for each level of experience are slightly higher than the corresponding 2011 rates. The Fourth Circuit has noted that "[u]sing current market rates [rather than rates in effect at the time the services were performed] to calculate the lodestar may counterbalance the delay in payment as well as simplify the task of the district court." *Daly*, 790 F.2d at 1081 (quotations omitted). "Delay necessarily erodes the value of a fee that would have been reasonable if paid at the time the services were rendered." *Id.*

This evidence establishes without contradiction that the hourly rates the plaintiffs seek are reasonable, and the Court so finds.

The defendants assert that Mr. Beck of the ACLU's Reproductive Rights Project was too inexperienced to be reimbursed at a rate of $400 per hour. First, the defendants inaccurately assert that Mr. Beck had not practiced law before he began working on this case. (*See* Doc. 179 at 15). Mr. Beck's affidavit makes it clear that he had worked for a year practicing law with the ACLU after three years spent clerking for two federal judges. (Doc. 178-1 ¶¶ 4-6). Thus, at the inception of this case in 2011, Mr. Beck had four years of legal experience.[55] His work at the ACLU to date has focused exclusively on reproductive rights litigation. (Doc. 178-1 at ¶¶ 4-6). Mr. Beck graduated with honors from a top law school and is admitted to the bar of five circuit courts. (*Id.* at ¶ 4). He has experience with challenging laws restricting access to reproductive healthcare involving the First Amendment—the very issues involved in this litigation. (*Id.* at ¶ 6). At the beginning of the case, he had double the years of legal experience of the CRR attorneys for whom the plaintiffs request $250/hour.[56] His time sheets indicate he was

---

[55] Clerkships are relevant in evaluating an attorney's legal experience, *see, e.g.*, *Blum*, 465 U.S. at 899 n.15; *Serricchio v. Wachovia Securities, LLC*, 706 F.Supp.2d 237, 256 (D. Conn. 2010); *Wise v. Kelly*, 620 F. Supp. 2d 435, 449 (S.D.N.Y. 2008), and the *Laffey* matrix calculates the "years out of law school" beginning from June 1 of each year, reflecting the date by which law students graduate. (*E.g.*, Doc. 178-7 at 2).

[56] Mr. Beck had only one more year of experience than the two O'Melveny attorneys for whom the plaintiffs seek $250/hour. However, O'Melveny's paying clients paid between $495 and $750 per hour for those attorneys' time during the relevant periods. (Doc. 178-15 at ¶¶ 18-19). The fact that all of O'Melveny's attorneys have requested lower rates than would have been justified by the evidence does not affect the reasonableness of Mr. Beck's requested rate.

43

performing work appropriate for his experience level.[57]   An hourly rate of $400 per hour

for Mr. Beck is well within the $385-690 range for lawyers with less than five years'

experience and is reasonable.[58]

### 3.  Defendants' Additional Evidentiary Objection

The defendants make a cursory argument asking the Court to disregard

unspecified parts of the affidavits of the three lawyers unaffiliated with this litigation.

Their argument in full follows:

> The State further asks that the Court disregard those portions of [the three
> affidavits] which show on their faces that they are not based on the affiant's
> personal knowledge, or that they are based on hearsay or that parts of them
> are simply verbatim copies of part(s) of one or another of the other
> declarations submitted by the plaintiffs in support of their fee petition.

(Doc. 179 at 15).  The defendants do not identify which parts of the multi-page

declarations, even by paragraph, they think the Court should disregard, nor do they cite

any legal authority or provide any analysis in support of their argument.

The Court appreciates that the plaintiffs bear the burden of proof, but such broad

and non-specific objections are not helpful to the Court.  Nor is the Court required to do

the legal work needed to support a cursory argument when counsel declined the

opportunity.  *See* note 43, *supra*.  In any event, the affidavits establish that the declarants

are knowledgeable about hourly rates in the relevant market and have the professional

---

[57] The first drafts Mr. Beck worked on included a motion to modify the preliminary
injunction, the initial discovery disclosures, the statement of facts for the summary judgment
brief, and a motion to exclude certain affidavits.  (Doc. 178-2 at 2-4).

[58] *See* chart, *supra* pp. 41-42.

experience needed to offer expert opinions about the reasonableness of the hours and fees. It would be impossible for a lawyer who did not participate in the case to have "personal knowledge" of the time spent on the case, yet, as noted *supra*, the case law strongly encourages such opinion testimony. The fact that the affidavits track the language of the cases concerning attorney fees simply shows that the lawyers were aware of the appropriate standard the Court would apply.[59]

#### 4. Conclusion as to Hourly Rates

The Court finds that the proposed hourly rates for work done by plaintiffs' counsel are reasonable under the circumstances and are well within or lower than market rates in North Carolina, as to Ms. Parker, Mr. Brook, and their legal assistant, and in Washington, D.C., and New York City, as to the remaining attorneys.

### V. CONCLUSION

In evaluating the reasonableness of the time spent and hourly rates requested, the Court has considered the time and labor expended; the novelty and difficulty of the questions presented; the skill required to properly perform the legal services rendered; the attorneys' opportunity costs in prosecuting this litigation; the time limitations imposed by the circumstances; the weight of the matter in controversy and the results obtained; the experience, reputations, and abilities of the attorneys; the undesirability of the case within the legal community; the nature and length of the professional relationships; and the

---

[59] The Court assumes the defendants are not contending that these three officers of the court are being untruthful. To the extent the defendants so insinuate, the Court rejects the inference as unsupported by any evidence and unwarranted.

hourly rates generally charged in the prevailing markets.[60]  Taking those things into account, and upon careful review of the evidence in light of the Court's experience with the case, the Court in its discretion finds that the defendants should pay the plaintiffs' reasonable attorneys' fees in the total amount of $1,027,090, as follows:

ACLU-NC is entitled to $70,312.50 in fees, reflecting 171.9 hours worked by Ms. Parker at a rate of $250 hourly, 98.1 hours worked by Mr. Brook at a rate of $250 hourly, and 22.5 hours worked by Ms. Brown at a rate of $125 hourly.

CRR is entitled to $503,927.50 in fees, reflecting 431.6 hours worked by Ms. Anderson at a rate of $550 hourly or $275 hourly for non-working travel time, 447.2 hours worked by Ms. Rikelman at a rate of $550 hourly or $275 hourly for non-working travel time, 91.35 hours worked by Ms. Sokoler at a rate of $250 hourly, and 26.75 hours worked by Ms. Schneller at a rate of $250 hourly.[61]

ACLU's Reproductive Freedom Project is entitled to $107,640 in fees, reflecting 269.1 hours worked by Mr. Beck at a rate of $400 hourly.

Planned Parenthood is entitled to $134,675 in fees, reflecting 89.1 hours worked by Ms. Krasnoff at a rate of $550 hourly, 18 travel hours by Ms. Krasnoff at a rate of $275 hourly, 197.8 hours worked by Ms. Salgado at a rate of $400 hourly, and 8 travel hours by Ms. Salgado at a rate of $200 hourly.

---

[60] Neither party submitted any evidence of attorneys' fees awarded in similar cases.

[61] The defendants have not objected to the reduced travel rate or the way CRR calculated the travel hours.  While the breakdown for travel time is not explicit in Ms. Rikelman's affidavit or time sheets, the Court has reviewed the time sheets and done the algebra to confirm the travel time was reasonable.

O'Melveny is entitled to $210,535 in fees, reflecting 60.2 hours of work by Mr. Dellinger at a rate of $550 hourly, 262.5 hours of work by Mr. Metlitsky at a rate of $400 hourly, 148.4 hours of work by Ms. Conn at a rate of $250 hourly, and 141.3 hours of work for Ms. Godesky at a rate of $250 hourly.

The Court also awards $16,226.47 in expenses. The expenses break down as follows: $5,144.80 to CRR; $1,916.98 to ACLU; $2,245.09 to Planned Parenthood; and $6,919.60 to O'Melveny.

It is **ORDERED** that the motion for attorneys' fees and expenses is **GRANTED** and the defendants shall pay the following amounts to the following plaintiffs within ninety days:

1. To ACLU-NC: $70,312.50

2. To CRR: $509,072.30

3. To ACLU: $109,556.98

4. To Planned Parenthood: $136,920.09

5. To O'Melveny & Myers: $217,454.60

This the 25th day of January, 2016.

UNITED STATES DISTRICT JUDGE